UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ABU DHABI COMMERCIAL BANK, Individually and On Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 08-CIV-7508 |
| | : | <u>CLASS ACTION</u> |
| Plaintiff, | : : | <u>COMPLAINT FOR BREACH OF</u> |
| | : | FIDUCIARY DUTY, BREACH OF |
| vs. | : | CONTRACT, COMMON LAW FRAUD, |
| | : | NEGLIGENT MISREPRESENTATION, |
| MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY & CO. INTERNATIONAL LIMITED, THE BANK OF NEW YORK MELLON (f/k/a THE BANK OF NEW YORK), QSR MANAGEMENT LIMITED, MOODY'S INVESTORS SERVICE, INC., MOODY'S INVESTORS SERVICE LTD., STANDARD & POOR'S RATINGS SERVICES and THE McGRAW HILL COMPANIES, INC., | : : : : : : : : : : : | UNJUST ENRICHMENT AND AIDING AND ABETTING |
| Defendants. | : : | |
| | x | <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.    OVERVIEW ..................................................................................................1

II.   JURISDICTION AND VENUE ..................................................................6

III.  PARTIES .....................................................................................................7

IV.  BACKGROUND .........................................................................................8

     A.    The Largest Financial Product of Its Kind..................................8

     B.    Structured Investment Vehicle......................................................8

     C.    The Rating Agencies' Historical Roles.........................................11

V.    THE RATING AGENCIES' ROLES IN THE CHEYNE SIV .....................12

     A.    The Rating Agencies Helped Create and Operate the Cheyne SIV......................12

     B.    The Rating Agencies Were Highly Compensated for Their Services ..................15

VI.  FACTUAL ALLEGATIONS WITH PARTICULARITY .............................16

VII. THE REASONS WHY DEFENDANTS KNEW THE STATEMENTS AND OMISSIONS WERE MATERIALLY MISLEADING....................................19

     A.    Defendants Knew the Cheyne SIV Bond Ratings Differed from Ratings of Corporate Bonds ........................................................20

     B.    Defendants Knew the Cheyne SIV Acquired Extremely Risky (Not "High Grade" or "A") Assets ..................................................21

          1.    Representative Loans Included in the Cheyne SIV ...................21

          2.    New Century: Representative Loans and Practices of U.S. Mortgage Originators.................................................24

     C.    The Ratings Were Based on Demonstrably Inaccurate Statistical Information, as Defendants Knew .........................................32

     D.    The Process Used to Derive Ratings Was Deeply Flawed, as Defendants Knew ..........................................................34

     E.    Defendants Were Highly Motivated to Conceal Problems with the Cheyne SIV ........................................................40

Page

VIII.   DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS
        UNDERLYING THE NOTES ............................................................................42

IX.     CLASS ACTION ALLEGATIONS ..................................................................44

X.      COUNTS ........................................................................................................45

        COUNT 1-A ....................................................................................................45

                Claim for Breaches of Fiduciary Duties Against Morgan Stanley .......................45

        COUNT 1-B ....................................................................................................47

                Claim for Breaches of Contract Against Morgan Stanley .....................................47

        COUNT 1-C ....................................................................................................51

                Claim for Contract Failure of Condition Against Morgan Stanley........................51

        COUNT 1-D ....................................................................................................52

                Claim for Breaches of Covenant of Good Faith and Fair Dealing Against
                Morgan Stanley ......................................................................................................52

        COUNT 1-E ....................................................................................................53

                Claim for Unjust Enrichment Against Morgan Stanley.........................................53

        COUNT 1-F ....................................................................................................54

                Claim for Tortious Interference with Contract Against Morgan Stanley ..............54

        COUNT 1-G....................................................................................................55

                Claim for Breach of Contract (Third Party Beneficiary) Against Morgan
                Stanley ...................................................................................................................55

        COUNT 1-H....................................................................................................56

                Claim for Tortious Interference with Contract (Third Party Beneficiary)
                Against Morgan Stanley .......................................................................................56

        COUNT 1-I ....................................................................................................57

                Claim for Common Law Fraud Against Morgan Stanley......................................57

- ii -

**Page**

COUNT 1-J .................................................................................................59

    Claim for Negligent Misrepresentation Against Morgan Stanley .........................59

COUNT 1-K ...............................................................................................60

    Claim for Aiding and Abetting Against Morgan Stanley .....................................60

COUNT 2-A ...............................................................................................61

    Claim for Breaches of Fiduciary Duties Against the Rating Agencies ................61

COUNT 2-B ...............................................................................................64

    Claim for Breaches of Contract Against the Rating Agencies .............................64

COUNT 2-C ...............................................................................................67

    Claim for Contract Failure of Condition Against the Rating Agencies................67

COUNT 2-D ...............................................................................................69

    Claim for Breach of Contract (Third Party Beneficiary) Against the Rating
        Agencies ...............................................................................................69

COUNT 2-E ...............................................................................................70

    Claim for Breaches of Covenant of Good Faith and Fair Dealing Against
        the Rating Agencies ..............................................................................70

COUNT 2-F ...............................................................................................72

    Claim for Unjust Enrichment Against the Rating Agencies.................................72

COUNT 2-G ...............................................................................................74

    Claim for Tortious Interference with Contract Against the Rating
        Agencies...............................................................................................74

COUNT 2-H...............................................................................................76

    Claim for Tortious Interference with Contract (Third Party Beneficiary)
        Against the Rating Agencies..................................................................76

COUNT 2-I .................................................................................................77

**Page**

    Claim for Common Law Fraud Against the Rating Agencies ...............................77

COUNT 2-J ...................................................................................................................80

    Claim for Negligent Misrepresentation Against the Rating Agencies..................80

COUNT 2-K ..................................................................................................................84

    Claim for Aiding and Abetting Against the Rating Agencies ..............................84

COUNT 3-A ..................................................................................................................84

    Claim for Breaches of Fiduciary Duties Against BoNY .......................................84

COUNT 3-B ..................................................................................................................85

    Claim for Breaches of Contract Against BoNY ...................................................85

COUNT 3-C ..................................................................................................................86

    Claim for Contract Failure of Condition Against BoNY ......................................86

COUNT 3-D ..................................................................................................................88

    Claim for Breaches of Contract (Third Party Beneficiary) Against BoNY...........88

COUNT 3-E ..................................................................................................................88

    Claim for Breaches of Covenant of Good Faith and Fair Dealing Against
        BoNY ...........................................................................................................88

COUNT 3-F ..................................................................................................................89

    Claim for Unjust Enrichment Against BoNY......................................................89

COUNT 3-G..................................................................................................................91

    Claim for Tortious Interference with Contract Against BoNY ............................91

COUNT 3-H..................................................................................................................92

    Claim for Tortious Interference with Contract (Third Party Beneficiary)
        Against BoNY...............................................................................................92

COUNT 3-I ...................................................................................................................93

**Page**

Claim for Common Law Fraud Against BoNY ..........................................................93

COUNT 3-J ..........................................................................................................95

Claim for Negligent Misrepresentation Against BoNY.........................................95

COUNT 3-K ..........................................................................................................97

Claim for Aiding and Abetting Against BoNY ....................................................97

XI.     PRAYER FOR RELIEF ...............................................................................98

XII.    JURY DEMAND ..........................................................................................99

## I.      OVERVIEW

1.      This case involves the collapse of a complex deal known as a Structured Investment Vehicle ("SIV").  SIVs have been at the heart of the recent U.S. credit crisis.  At their core, SIVs are a mechanism for banks to offload exposure to U.S. asset-backed securities, including residential mortgages.  The linchpin of an SIV is the high credit rating that applies to the financial instruments it issues.

2.      In this case, defendants designed an SIV, known as the "Cheyne SIV," that would generate millions of dollars in fees for themselves by issuing tranches of "investment grade" financial instruments, and then purchasing securities backed by "investment grade" U.S. mortgages and other asset-backed securities.  Defendants represented that the arrangers and placement agent would work closely with two credit rating agencies to ensure that the SIV's financial instruments warranted a high investment grade rating, initially and over time.  Defendants represented that they would oversee the SIV's investments and facilitate the purchase of safe and highly rated assets consistent with the high rating of the SIV's financial instruments.  Although the SIV was complex, defendants marketed it as a safe, highly rated, and secure financial instrument.

3.      Although defendants marketed the SIV's financial instruments as highly rated and backed by reliable collateral and reasonable assumptions, in reality these instruments contained hidden embedded risks, which caused them to plummet in value as the mortgage market collapsed.  To persuade investors to buy the SIV's instruments, defendants agreed that the SIV's underlying investment portfolio would be acquired and managed in a way that legitimately justified the high investment grade credit ratings of the instruments issued by the SIV.  Instead, defendants knowingly breached those obligations by including risky investments that did not legitimately support such high ratings.

4.     Defendants recklessly failed to oversee and supervise the SIV's acquisition of assets, both initially and over time.  Instead of protecting the SIV and its investors, as they promised they would, defendants exposed the SIV to significant undisclosed risks.  Defendants knew the assets purchased and held by the SIV were risky and of poor quality.  They further knew the models used to generate the high ratings were flawed.  Specifically, defendants knew that the undisclosed assumptions regarding the expected default and recovery rates of the SIV's portfolio assets, and the correlations among those assets, were unreasonable and false.

5.     Defendants attempted to prevent the SIV's investors from bringing legal claims based on the defendants' knowing breaches and violations of law by creating a Byzantine structure and then sending each purchaser hundreds of pages of boilerplate risk factor descriptions and other disclaimers and non-reliance provisions.  Yet in all of these pages, including complex disclosures even defendants did not understand, ***defendants never disclosed any of the known key risks and facts that caused losses on the SIV's securities***.

6.     Plaintiff purchased interests in the Cheyne SIV and was promised that the defendants would satisfy their obligations and duties.  Instead, as a result of defendants' breaches, the plaintiff's investments are now worthless.  There is no question of the damage plaintiff has suffered: the ***financial instruments plaintiff purchased, which defendants represented had high investment grade credit ratings, are now worth zero***.

7.     This action is brought by Abu Dhabi Commercial Bank ("ADCB"), a bank headquartered in Abu Dhabi, United Arab Emirates.

8.     ADCB brings this case as a class action on behalf of all persons who acquired "investment grade" Mezzanine Capital Notes (the "Capital Notes") issued by Cheyne Finance PLC (now known as SIV Portfolio PLC) ("Cheyne PLC") and its wholly-owned subsidiary Cheyne

Finance Capital Notes LLC ("Cheyne LLC") (together, the "Cheyne SIV") during the period from October 2004 to October 2007 (the "Class Period") pursuant to substantially identical written representations contained in documents distributed to the plaintiff Class during the Class Period. Various entities provided management services to the Cheyne SIV, including the defendants named herein as well as non-party Cheyne Capital Management (UK) LLP and its successors and affiliates ("Cheyne Capital").

9.    ADCB acquired Capital Notes and has been damaged thereby.

10.    This action charges defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited and their affiliates (together, "Morgan Stanley"), as arrangers and placement agents of the Capital Notes, with violations of New York law.

11.    This action also charges credit rating agencies Moody's Investors Service, Inc. and its affiliates, including wholly-owned and controlled subsidiary Moody's Investors Service Ltd. (collectively, "Moody's"), and The McGraw-Hill Companies, Inc. and its affiliates, including its wholly-owned and controlled business division Standard & Poor's Ratings Services (collectively, "S&P," and together with Moody's, the "Rating Agencies"), with violations of New York law.

12.    Through consulting on the structure of the Cheyne SIV, placing their "investment grade" ratings on the Cheyne SIV, and providing operating instructions for this SIV, the Rating Agencies intentionally, recklessly or negligently misled investors in the Cheyne SIV.  But for the Rating Agencies' violations of law, the Capital Notes never would have been issued.

13.    Defendant Morgan Stanley had in its possession, at the time it sold assets to the Cheyne SIV investors, quantitative and qualitative information that any reasonable investor would want to know.  Morgan Stanley elected not to disclose this information, which demonstrated the fact that the assets backing the Cheyne SIV were far riskier than represented and were, indeed, impaired

- 3 -

*at the time the Cheyne SIV was created and grew even riskier over time*.  Defendant The Bank of New York Mellon (f/k/a The Bank of New York) and its wholly-owned subsidiary QSR Management Limited (together, "BoNY"), were aware of these facts as they "daily" marked to market the value of all of the Cheyne SIV's collateral assets, and then reported that information to the Rating Agencies, but not to the Capital Notes investors.  Over time, as residential mortgage backed securities ("RMBS") and related securities became even riskier, defendants, rather than reduce the Cheyne SIV's exposure during this period and disclose the increasing risks to investors, continued buying into the storm.

14.     Beginning in 2004 and into 2007, Morgan Stanley distributed the "key terms" of the Capital Notes in sales materials about the Cheyne SIV.  The sales materials emphasized that the Capital Notes would be rated A/A3 "investment grade" by S&P and Moody's, respectively, and that the entire structure was "AAA," or risk-free.  These materials highlighted the purportedly extensive due diligence and fundamental credit analyses that went into the collateral asset acquisition process.

15.     The sale of each Capital Note enabled defendants to issue even more senior debt.  As a consequence, throughout a period of increasing quantitative and qualitative risks associated with U.S. nonprime loans, defendants added more and more assets and more and more leveraged exposure to those assets.

16.     The impact of defendants' failure to price, rate and explain the known risks and practices of U.S. nonprime mortgage lenders during the relevant time period cannot be overstated.  First, the Cheyne SIV was only as strong as the quality of its assets.  Second, because Class members invested in Capital Notes that were junior to senior debt, they experienced losses flowing from low-quality assets first, before the senior debt.

17.    Defendants caused a preliminary and, in August of 2005, a final Information Memorandum to be issued to investors in connection with and for the purpose of issuing up to $3 billion in "investment grade" Capital Notes, which included provisions for the issuance of Junior Capital Notes, a form of "credit enhancement" or equity cushion for the Capital Notes.

18.    Moody's and S&P provided structuring and monitoring services, as well as their coveted "investment grade" ratings, to the investment and were intimately involved in the creation and maintenance of the Cheyne SIV.

19.    In fact, it was a condition precedent to the issuance of the Capital Notes that they receive such high ratings from the Rating Agencies.  The Rating Agencies were willing to oblige Morgan Stanley because they were compensated approximately three times their usual fee for rating corporate bonds.  Without these ratings, the Rating Agencies would not have received these fees.

20.    Defendants acted to ensure the placement of superior credit ratings on the Capital Notes, when in fact the Capital Notes were not equivalent to other more traditional investments with the same credit ratings.  The Rating Agencies based their ratings on undisclosed and serious flaws in their models, including false and outdated information.  Because of these failures, the Capital Notes sold to plaintiff were secured by assets that had a much higher risk profile than was represented in the Information Memorandum.  The Rating Agencies provided unreasonably high ratings in part because they faced serious conflicts of interest.   When the U.S. Securities and Exchange Commissions ("SEC") learned about the severity of the Rating Agencies' conflicts, it deemed it necessary to flatly prohibit the practices creating such conflicts.

21.    By late 2007, the truth about the quality of mortgages that secured the Capital Notes began to be revealed to the public.  Because of the low quality of these assets, senior debt investors in the Cheyne SIV refused to provide liquidity and the Cheyne SIV collapsed.  Cheyne PLC was

then restructured and an auction process was instituted, which essentially wiped out any of the minimal remaining value of the Capital Notes. The Capital Notes are now worthless. The relatively low interest rates on the Capital Notes never reflected or compensated investors for the risks to which they were exposed. The ratings, structuring and monitoring services the Rating Agencies provided were flawed from the start.

## II.    JURISDICTION AND VENUE

22.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), in that plaintiff and defendants are citizens of different states and a foreign state and the matter in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of Abu Dhabi and certain of the defendants are citizens of the State of New York.

23.    Venue is proper in this District because the violations of law complained of herein occurred in part in this District, including the dissemination of the materially false and misleading statements complained of herein. Defendants conduct business in this District. The Placement Agent for the Capital Notes program is Morgan Stanley & Co. Incorporated. Defendant Morgan Stanley is headquartered in this District. The U.S. Agent, Principal Paying Agent, Calculation Agent, Depositary, Registrar, and U.S. Security Agent for the Capital Notes program is BoNY, which also owns the Administrator of Cheyne PLC.

24.    Up to 100% of the investments in the underlying portfolio could be made in the United States and much of the portfolio of RMBS is based on mortgages backing U.S. real estate and other instruments backed by U.S. RMBS. Approximately 80% of the assets were concentrated in the United States as of August 2007. At that time, approximately 100% of the more than $8 billion in senior financing (commercial paper and medium term notes) used to acquire the assets was issued by the Delaware subsidiary of the Cheyne SIV. The register of the certificateless depositary interests was to be maintained in New York. A minimum of 75% of the portfolio was required to be

denominated in U.S. dollars. The Capital Notes, the Capital Notes Purchase Agreement, the U.S. Capital Notes Security Documents and the U.S. Capital Notes Agency Agreement are governed by, and construed in accordance with, the laws of the State of New York.

## III.    PARTIES

25.    Plaintiff ADCB is a bank headquartered in Abu Dhabi, United Arab Emirates. ADCB acquired Capital Notes and has been damaged thereby.

26.    Defendant Morgan Stanley is an investment banking and global financial services corporation headquartered in New York City. Morgan Stanley serves diversified groups of corporations, governments, financial institutions, and individuals, and acted as Placement Agent for the Capital Notes.

27.    Defendant The Bank of New York, now known as The Bank of New York Mellon (collectively, the "Bank"), is the U.S. Agent, Principal Paying Agent, Calculation Agent, Depositary, Registrar, and U.S. Security Agent for the Capital Notes program.

28.    Defendant QSR is a wholly-owned subsidiary of the Bank. QSR provides administrative services to the SIV and asset-backed securities markets. QSR acted as the Administrator in the sale of the Capital Notes, helping to draft and disseminate the Management Agreements. QSR has responsibilities to determine and report the market values of the Cheyne SIV's collateral assets. The Bank wholly owns QSR, and they are collectively referred to as "BoNY."

29.    Defendant Moody's is a credit rating agency based in the United States.

30.    Defendant S&P is a credit rating agency based in the United States.

31.    Among other things, Moody's and S&P were involved in the structuring, rating and monitoring of the Cheyne SIV and the issuance of Capital Notes. The Rating Agencies received a substantial success fee for helping Morgan Stanley launch the SIV, as well as fees that increased in

tandem with its growth.  The Rating Agencies' substantial remuneration was drawn from the proceeds of the Capital Notes issuance, and their ongoing fees were paid out of income owed to Capital Notes investors.  It was a condition to the offering of Capital Notes that they receive a rating of A3 from Moody's and a rating of A from S&P.

## IV.    BACKGROUND

### A.    The Largest Financial Product of Its Kind

32.    Defendants created and helped operate the SIV financial product at issue in this case. It was promoted as a means to generate stable financial returns, with exposure to only safe, high-grade assets.  High-grade assets had to be acquired because the financial structure of the Cheyne SIV depended on a great deal of "leverage," or debt financing.  Because of this leveraged structure, the acquisition of low-quality assets would have a disproportionately negative effect on the investment capital raised by Morgan Stanley comprising the Capital Notes.  In fact, the acquisition of low-quality assets would render the Rating Agencies' "investment grade" ratings completely false.

33.    As detailed herein, however, defendants knew that this financial product – the largest ever of its kind – had serious design flaws and had a set of operating instructions that allowed investors' capital to be squandered on low-quality, high-risk U.S. mortgage products.

### B.    Structured Investment Vehicle

34.    A structured investment vehicle is a special purpose entity that borrows money by issuing short- and medium-term debt and then uses that money to buy longer-term securities, including mortgage bonds and other asset-backed securities.  An SIV is sometimes called a "conduit," because it raises short-term funds and channels those funds into longer-term assets.  An SIV's business model resembles that of a bank: it seeks to earn a spread between the interest rate at which it borrows and the interest rate at which it lends.  And like a bank, an SIV has both assets and liabilities.

35.     An SIV typically has three categories of liabilities: commercial paper ("CP"), medium-term notes ("MTNs"), and other medium-term debt, often called "capital notes." The CP and MTNs are senior in priority to the capital notes, which bear the first loss if an SIV's assets decline in value. Moreover, the equity of an SIV typically is of nominal value. Accordingly, the credit quality of an SIV's assets are particularly important to the holders of capital notes.

36.     An SIV's assets typically include investment grade rated asset-backed securities ("ABS"), RMBS, and collateralized debt obligations ("CDOs"). ABS investments typically entitle investors to principal and interest drawn from pools of student loans, credit cards, or auto loans. The term is sometimes used more broadly to include RMBS. RMBS are backed by a variety of residential mortgages. CDOs invest in ABS and RMBS. SIVs typically are designed to invest in high grade and highly rated assets in these investment categories.

37.     The "liabilities" or bond (note) investors in SIVs typically receive "investment grade" ratings from credit rating agencies. These ratings are derived in large measure from the quality of the assets backing the structure, as well as structural features such as "credit enhancement." Credit enhancement can take a number of forms, but is often accomplished through structural subordination. For example, in the Cheyne SIV, the Capital Notes investors were protected by a subordinated series or "tranche" of Junior Capital Notes.

38.     During the relevant times, the Rating Agencies did not distinguish between "structured finance" bonds (such as the Capital Notes and most of the Cheyne SIV's constituent securities) and corporate bond ratings. In other words, according to the Rating Agencies, a structured finance investment with a particular rating had the same default probability and loss severity (should default occur) as a corporate bond with that same rating.

39.     The Capital Notes were rated A3/A by defendants Moody's and S&P, respectively. These were the highest credit ratings ever given to capital notes in any SIV. Defendant Morgan Stanley describes these ratings in the following way:

| | |
|---|---|
| Moody's | These bonds possess many favorable investment attributes. Factors giving security to principal and interest are considered adequate. |
| S&P | Although these bonds are somewhat more susceptible to the adverse effects of changing economic conditions, the issuer's capacity to meet its financial obligations is strong. |

40.     The senior bonds to the Capital Notes also received very high "Triple A" credit ratings. These ratings are the same as those typically assigned by the Rating Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills. Indeed, the Information Memorandum defined "Triple A"-rated investments as "risk-free."

41.     The ratings assigned to any structured credit communicate specific information to investors about the assets backing their bonds. This information is important because an SIV's success depends directly on the credit quality of the assets acquired by the SIV. If stable, investment grade instruments comprise the SIV, then SIV investors are much less likely to suffer a loss. Because losses on assets acquired by the SIV are applied in reverse order of tranche seniority in an SIV's capital structure, the lower tranches, such as the Capital Notes in this case, are even more sensitive to the quality of those assets. In other words, a Capital Notes holder's investment is only as good as the weakest instruments acquired by the SIV. SIV investors are willing to invest in large part because of the relatively high investment grade credit ratings assigned to the Capital Notes, which are in part a reflection of the high ratings assigned to the assets acquired by the SIV.

42.     Of course, with safety comes a "cost." "Investment grade" products are commonly understood in the marketplace to be stable, secure and safe. Accordingly, arrangers of those

investments, such as Morgan Stanley, are able to pay investors a relatively low interest rate. Capital Notes investors were supposed to earn a small 1.5% increment or "spread" to a benchmark interest rate. The benchmark rate chosen by the arrangers in this case was the three-month LIBOR, or a measure of the interest rate at which banks lend to each other for a three-month term.

43.     Before the risks and realities of the Capital Notes began to be revealed in August 2007, the conservative economics of the Capital Notes (*i.e.*, low risk and low reward) appeared consistent with the offering documentation distributed to investors. These written materials distributed by Morgan Stanley repeated the same messages: The Capital Notes are safe, secure and stable.

### C.     The Rating Agencies' Historical Roles

44.     Historically, the Rating Agencies were conservative institutions more like governmental entities or publishers than market actors. The Rating Agencies often liken themselves to reporters. That is because in the past they provided unsolicited "opinions" on the creditworthiness of corporations and had a subscription-based business model. Their evaluations were often derived from publicly available information such as filings with the SEC.

45.     Over time, the Rating Agencies earned the trust of the marketplace for their integrity and unbiased approach to evaluating bonds. Similarly, in 1975 the SEC provided the Rating Agencies a special status of "nationally recognized statistical rating organization" or NRSRO to help insure the integrity of the ratings process. According to the SEC, the "single most important criterion" to granting NRSRO status is that "the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings" and that part of awarding the NRSRO label to a company hinges on "the rating organization's independence from the companies it rates."

## V.     THE RATING AGENCIES' ROLES IN THE CHEYNE SIV

### A.     The Rating Agencies Helped Create and Operate the Cheyne SIV

46.     The Rating Agencies did not perform their historical functions in respect of the Cheyne SIV.  Instead, the Rating Agencies were actively involved in its creation and ongoing operation.

47.     For example, the Rating Agencies helped determine how much "equity" was required beneath the Capital Notes in order to support the Capital Notes' "investment grade" ratings. Specifically, the Rating Agencies and Morgan Stanley determined that support from approximately 0.75% (of the entire capital structure) from the Junior Capital Notes was sufficient to support the Capital Notes at a "higher rating than traditional SIV single tranche Capital Notes."  The activity of determining the quantum of equity and cash necessary to support the assigned "investment grade" ratings was done at the inception of the Cheyne SIV and on an ongoing basis by the Rating Agencies' instruction.

48.     On an ongoing basis, selling documents explained that the Cheyne SIV would set a Capital Notes capital buffer based on a "simulation model [that] has been agreed [on] with S&P and Moody's."  That model, in turn, was based upon "rating transition matrices agreed on with the rating agencies to simulate asset performance."  A "rating transition" occurs when a rating agency changes the grade assigned to a particular asset.  In other words, the Rating Agencies were key not only in determining the relative proportions of the various tranches of debt and equity issued by the Cheyne SIV, but also in continuing to make that determination on an ongoing basis.

49.     The Rating Agencies also provided "capital matrices" to determine the base minimum amount of capital allowed before the Cheyne SIV would operate in a more conservative way.  These operating instructions are themselves based on the ratings of the assets that the Cheyne SIV would acquire.  Each time the Cheyne SIV selected a potential investment to be acquired, it would

determine the weighted average life of the asset, its credit rating and the industry – such as subprime mortgage-backed securities – from which the investment is drawn.

50.    Based on these parameters, on an asset-by-asset basis, the Cheyne SIV would set aside a predetermined amount of capital for the protection of the Capital Notes, and to preserve their investment grade ratings.  The percentage of capital required was agreed upon with the Rating Agencies.

51.    The volume of the Cheyne SIV's equity or equity-like capital, junior and senior debt can be understood to represent the "liability" side of the Cheyne SIV.  These liabilities represent the Cheyne SIV's financial obligations to its investors.

52.    The Rating Agencies also provided instructions on which types of assets the Cheyne SIV could acquire.  As noted above, some of the capital reserve instructions were derived from the asset class acquired by the Cheyne SIV.  The quality of the assets determines how much capital should be set aside to protect the "investment grade" ratings of the bonds, which depend directly upon those assets for the service of interest and return of principal.

53.    After examining both the assets and the liabilities of the Cheyne SIV, Moody's and S&P provided "Triple A" ratings to the entire structure.  Without such high ratings, the Cheyne SIV could not have issued its primary source of funding as cheaply, or entered into a variety of counterparty transactions at favorable rates.

54.    Importantly, because the primary source of funding was commercial paper and medium term notes, which are short-term liabilities, the Rating Agencies had to monitor the Cheyne SIV's capital frequently.  Thus, as represented in selling documents, the "Rating agencies monitor Cheyne Finance's counterparty and Capital Note ratings on an ongoing basis."

55.     Indeed, the SIV transaction documents provided that every week the Rating Agencies were supposed to receive reports from defendant BoNY (through its subsidiary QSR).  BoNY was required to "mark to market" all of Cheyne SIV's assets on a "daily" basis and "deliver reports to rating agencies weekly."  It was required to conduct more frequent valuations "if directed by the rating agencies."  The Rating Agencies thus observed the performance of the collateral assets every week throughout the Class Period.

56.     Further, as described in the selling documents (including preliminary and final versions of the Information Memorandum), the Rating Agencies had an ongoing involvement in the transaction and were an integral part of the monitoring of Cheyne SIV's covenants and covenant breaches.  The Rating Agencies' approval was required for a determination of "legal maturity date."  They would be involved in determining any cure period.  They were involved in approving substitutions and changes to the portfolio.  They were involved in many meetings held by investors and retained approval rights of modifications made by investors.  They received monthly asset reports, placed restrictions on the portfolio and monitored the portfolio over time.

57.     In sum, without "investment grade" ratings, the Cheyne SIV would not have existed and could not have operated.  Indeed, once the Rating Agencies' conflicts of interest and models based on flawed data and unreasonable model assumptions started to become apparent in late 2007, the Rating Agencies were forced to drop their ratings and the SIV's structure began to unravel.  The ratings declines cut off the Cheyne SIV's commercial paper funding, and thus marked the end of the SIV as anything but a shell containing impaired assets ready for a distressed auction at deep discounts.

58.     Whatever their historical roles, the Rating Agencies were deeply entrenched in the creation and operation of the Cheyne SIV.  They did not merely provide an "opinion."  A Group

Managing Director of Moody's recently confirmed that Moody's did in fact provide structuring services for structured finance entities, such as the Cheyne SIV. *The Wall Street Journal* reported the following acknowledgement in an article dated June 7, 2008:

> [A Group Managing Director] acknowledges that accepting the subprime mortgage ratings at face value didn't work out as planned. "***We have to create additional robustness in the structures to account for the volatility***" in the underlying mortgage securities, she says. "***We didn't necessarily do enough of that***."

## B.    The Rating Agencies Were Highly Compensated for Their Services

59.    The selling documents include vague information on how the Rating Agencies were compensated. The Cheyne SIV was a so-called "private placement" and of little interest to the public at large. The Rating Agencies thus eschewed their subscription-based business model in favor of the type of "success fee" compensation that investment bankers enjoy upon the closing of a transaction. The Rating Agencies' fees were not explicitly disclosed.

60.    The Information Memorandum stated there were U.S. $15 million in "upfront costs" (paid out of the proceeds of the Capital Notes' investment) to be shared among a number of parties. On information and belief, the Rating Agencies were paid fees in the range of 10 or more basis points (or one tenth of 1 percent) at the "launch" of the SIV. Assuming an approximate $3 billion launch value, the Rating Agencies would have been paid $6 million.

61.    The Rating Agencies were paid ongoing fees following the launch. They shared annual remuneration with several other parties of approximately $1,200,000 and 0.055% of the market value of the collateral assets.

62.    As discussed below, investors were unaware that the Rating Agencies were paid ***only if*** they provided the desired "investment grade" ratings and ***only in the event*** that the transaction closed with those ratings and how such conflicts affected the ratings process.

- 15 -

## VI.     FACTUAL ALLEGATIONS WITH PARTICULARITY

63.     Defendants repeatedly made false and misleading statements and omissions concerning the credit quality of the Capital Notes, the credit quality of the collateral assets supporting those notes, and the due diligence processes required to select the SIV's assets.  Although the selling documents contained dozens of pages of general disclaimers and risk factor disclosures, they never specifically disclaimed or warned investors about any of the key risks and factual realities associated with the Capital Notes.

64.     Morgan Stanley and the Rating Agencies communicated or authorized the communication of the following information, in substantially identical terms, to Capital Notes investors in written materials.  Specifically, that the Capital Notes:

(a)     merited "A" and "A3" ratings, which would be confirmed at least "monthly";

(b)     were exposed to only "highly rated" and "higher quality" assets;

(c)     were supported by at least 60% "AAA" collateral assets;

(d)     provided capital to acquire investments of at least "A-" investment grade quality;

(e)     provided capital during a "ramp-up" (or acquisition) phase, that would occur in a "benign" credit environment;

(f)     were levered with "Triple A" (or equivalent) senior debt;

(g)     were issued by the Cheyne SIV, a "Triple A" counterparty credit;

(h)     had Rating Agency-approved capital reserve matrices in place that would require the Cheyne SIV to set aside sufficient reserve capital to protect all of the credit ratings;

(i)     were protected by the fact that all "[i]nvestment decisions follow a detailed review and recommendation process," including:

(A)    "***Fundamental issuer/servicer soundness is analysed*** via lead indicators including credit/ financial strength/servicer ratings, issuer/ servicer solvency, systems and procedures, strategy and core competencies, SWOT [Strengths, Weaknesses, Opportunities, Threats] analysis, back-up servicer";

(B)    "Adequacy of structural security analysed through lead indicators such as security over ***core assets***, bankruptcy remoteness, auxiliary facilities, subordination levels, ***creditor environment***, legal jurisdiction and enforcement/recovery procedures";

(C)    "***Ensure that the collateral is understood*** through lead indicators such as stratifications, concentrations, product understanding, pricing";

(D)    that a "formal credit analysis process" is used to "concentrate on assets which will provide stable and predictable cashflows" with a "preference for assets with actuarial, predictable performance characteristics" as well as a "***strong focus on credit analysis and surveillance in order to avoid the 'downside'***";

(E)    that "specific credit metrics would be used to measure performance," including,

- "Delinquency buckets: 0-30, 30-60, 60-90, 90+ days"

- "Cumulative losses, foreclosures"

- "CPR's" (or Constant Payment Rates)

- "Excess spread"

- "Subordination"

(F)    that a formal "monitoring process" included "***[r]egular contact with the arranger, servicer, manager, originator, trustee, rating agencies and other investors.***"

(j)    were protected by a strict investment framework that would require the Cheyne SIV, at "launch" and throughout the Class Period, to acquire assets consistent with the foregoing representations and set aside sufficient capital;

(k)    were protected by the fact that the Cheyne SIV would be well diversified, with a maximum 4% exposure to a single AAA obligor; a maximum of 2% exposure to a single AA obligor; and no more than 0.5% exposure to any single A obligor;

(l)    had an appropriate market "spread," given their risk/return profile, which was a relatively low 1.5% higher than the three-month LIBOR benchmark interest rate;

(m)    had a sound mechanism in place to calculate and accurately record the market value of the collateral assets backing their investment capital, which would be used "daily" throughout the Class Period; and

(n)    were safe and secure even as of July 2007 because SIVs were "an oasis of calm in the subprime maelstrom."

65.    Dates currently known to plaintiff on which some or all of the foregoing information was provided to the plaintiff Class include:

(a)    an October 2004 presentation to investors, which included the "Key Terms" of the Capital Notes and the Cheyne SIV (provided by Morgan Stanley and, on information and belief, with Rating Agency approval as to ratings information);

(b)    an April 2005 presentation to investors, which included the "Key Terms" of the Capital Notes and the Cheyne SIV (provided by Morgan Stanley and, on information and belief, with Rating Agency approval as to ratings information);

(c)    a May 2005 "pre-sale" report issued by S&P (report provided by Morgan Stanley to investors and, on information and belief, with S&P's approval);

(d)    in a preliminary and on August 18, 2005, a final Information Memorandum to Capital Notes investors (provided by Morgan Stanley and, on information and belief, with Rating Agency knowledge and approval as to ratings information);

(e)      a September 2005 presentation to investors, which included the "Key Terms" of the Capital Notes and the Cheyne SIV (provided by Morgan Stanley and, on information and belief, with Rating Agency knowledge and approval as to ratings information);

(f)      as to the "Triple-A" ratings for senior debt, repeatedly throughout the Class Period by Morgan Stanley and the Rating Agencies in connection with continuous "rolling" of senior debt;

(g)      as to the A/A3 ratings on the Capital Notes, monthly throughout the Class Period per Rating Agency-approved models and "ongoing" monitoring; and

(h)      as to the report that SIVs were "an oasis of calm in the subprime maelstrom," in a July 20, 2007 report by Moody's.

66.      Upon information and belief, defendants made substantially similar written representations to other members of the plaintiff Class throughout the Class Period.  This belief is supported by the fact that plaintiff ADCB held onto its Capital Notes throughout the Class Period and never received any notice of a ratings change, warning, or notice of any capital covenant breaches or other operational failures until the end of the Class Period.  The Capital Notes were not publicly offered, and it was defendant Morgan Stanley's practice to provide substantially similar sales materials each time they endeavored to sell additional Capital Notes, repeating substantially identical information provided by the Rating Agencies.

67.      The documents described above are referred to as the "Selling Documents."

## VII.    THE REASONS WHY DEFENDANTS KNEW THE STATEMENTS AND OMISSIONS WERE MATERIALLY MISLEADING

68.      The statements set forth above were false and misleading and failed to include material information when made and throughout the Class Period, as described below.

69.     The terms quoted as well as the context in which they were used communicated to all members of the plaintiff Class that the Capital Notes represented a stable, low-risk, safe and secure investment.  At a base minimum, the representations did not reflect the objective reality of the risks associated with the Capital Notes.

A.     **Defendants Knew the Cheyne SIV Bond Ratings Differed from Ratings of Corporate Bonds**

70.     With respect to credit ratings, the Selling Documents failed to state that the SIV ratings were materially different from other ratings, including corporate bond ratings.  The SIV ratings differ from corporate credit ratings in several important ways, and defendants were aware of these crucial differences, none of which was disclosed in the Selling Documents.

71.     For example, because SIVs involve numerous assets, the Rating Agencies do not use only estimates of expected loss and/or probability of default in determining SIV credit ratings. Instead, the agencies also employ one or more sophisticated mathematical credit risk models based on random event simulations to assess the estimated loss distributions associated with those numerous assets.  These models require the rating agencies to make estimates and assumptions regarding each of the various assets, including the degree to which losses on these assets would be correlated with each other.  Upon information and belief, the defendants other than the Rating Agencies also were aware of these models, had access to these models or similar models, and also used different models to generate their own proprietary estimates of credit risk.  None of these models would have been necessary for evaluating corporate bond ratings.

72.     Nor were the "investment grade" ratings reflective of the actual risk associated with the securities included in the portfolio.  Much of the portfolio was made up of RMBS, most of which were "non-prime" or subprime mortgages.  The Selling Documents concealed the lending practices that had been used to generate the underlying mortgages, including stated income loans where the

stated income was unreasonably high as compared to the stated job title. These were referred to in the industry as "liar loans." The non-prime RMBS also included mortgages based on artificially inflated appraisals and loans to subprime borrowers with "silent seconds," where the down payment was in reality another loan. These lending improprieties dramatically increased the probability of delinquencies, defaults, foreclosures and, ultimately, losses. The credit ratings on the RMBS were consequently not indicative of the riskiness of these securities and the ratings on the Capital Notes were similarly misleading. When the real risks were exposed, the Cheyne SIV lost its funding ability and collapsed.

**B.     Defendants Knew the Cheyne SIV Acquired Extremely Risky (Not "High Grade" or "A") Assets**

73.     The Cheyne SIV's investment portfolio eventually included many securities derived from mortgages issued under extremely dubious circumstances. Whether the mortgage loans were categorized as to "prime" or "non-prime" borrowers, many of the mortgages were granted in amounts not justified by the borrowers' income. Many borrowers were qualified under stated income applications (usually reserved for self-employed individuals which could not provide Form W-2s) even though such borrowers were wage earners. Many borrowers qualified under pay-option adjustable rate mortgages ("ARMs") which would, after the initial teaser period, adjust to such high payment amounts that it would be impossible for the borrowers to make the payments.

**1.     Representative Loans Included in the Cheyne SIV**

74.     For example, the following are characteristics of certain securities that were eventually placed in the investment portfolio:

- A $9.2 million investment ARS1 2006-M1 originally rated AA+ and Aa1 by S&P and Moody's, respectively, the securities have since been downgraded to BB and Ba3. The loan portfolio underlying ARS1 2006-M1 has an astounding 40.78% of its mortgages in the 60+ day category (which includes loans 60 days delinquent) those in foreclosure or those in Real Estate Owned. ("REO"). Even though the ARS1 2006-M1 is a 2006 deal, some 17.16% of

- 21 -

the loans are already in real estate owned, with an additional 16.73% in foreclosure. This is not entirely unpredictable given that 81% of the loans in the portfolio were originated by Argent Mortgage Company, LLC ("Argent"), a lender with a poor reputation in the industry. Argent, referred to by *The New York Times* as a "troubled subprime mortgage" entity, had been granting stated income loans at relatively high loan-to-value ratios. Argent had been accused by state regulators of failing to monitor new brokers and correspondents and failing to perform due diligence of brokers and correspondents, including reconciling adverse information found in database searches during the broker approval process. Argent had agreed to a cease-and-desist order in Georgia which required it to implement "Common Sense Underwriting" procedures to ensure that terms and conditions of loan programs match the status of the borrowers (*e.g.*, a salaried, large firm employee should apply for a full document program rather than a stated income loan).

- An $11.1 million investment in ARS1 2006-W2, of which 100% of the underlying mortgage loans were originated by Argent. Given the poor underwriting, it is not surprising that 45.76% of the loans fall into the 60+ day category with 21.02% in foreclosure.

- A $7.3 million investment in CMLTI 2007-AHL3 which were 100% originated by American Home Mortgage Corp. ("AHM"). Even though this security was created as recently as 2007, already 10.96% of its loans are in foreclosure and 3.36% are in REO. In order to post desired loan production, AHM was as a matter of course granting exceptions even where compensating factors did not exist. AHM's business was dependent on continually increasing volume. Thus, it became even more aggressive in early 2007 when AHM made $16.7 billion in mortgage loans. A third of its mortgages were pay-option ARMs, which allowed borrowers to make payments which were less ***than the interest amount accruing on the loan***, resulting in the difference being added to the principal balance each month. AHM granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own balance sheet. In fact, AHM went bankrupt in August 2007, after loan volumes dropped.

- A $6.5 million investment in CARR 2005-NC3, which has 31.13% of its portfolio in the 60+ day category. These loans were 100% originated by New Century Mortgage Corporation ("New Century"), which has since failed due to its aggressive lending practices.

- A $7.4 million investment in FFMER 2007-3, another 2007 deal which already has 12.44% of its loans in foreclosure. These loans were all originated by First Franklin, a subprime lender acquired in 2006 by Merrill Lynch.

- An \$11.5 million investment in FHLT 2006-C, which has 17.19% of its mortgage loans in foreclosure. This poor performance was not unexpected given the loans were all originated by Fremont Investment & Loan ("Fremont"). Fremont, which acquired as much as 90% of its mortgages through brokers, did not perform the quality control procedures as represented. In fact, its brokers had the reputation among other mortgage brokers of doing any deal. In October 2007, Fremont was sued by Morgan Stanley due to misrepresentations about borrowers' assets, income, employment and occupancy. Fremont was accused of not meeting its own underwriting guidelines, including rent verification, credit history information and credit scores. The loans in question in the *Morgan Stanley* suit were purchased from August 30, 2005 to December 28, 2006 – the same time period as Merrill Lynch's purchases. In March 2007, Fremont ceased offering subprime loans and was forced to clean up its underwriting by a cease-and-desist order by federal regulators. Staff inside Fremont had a nickname for no-down-payment loans for subprime borrowers: "pulse products," meaning that if a borrower had a pulse he or she could qualify for one of Fremont's products.

- A \$9.8 million investment in LBMLT 2006-2, which was originally rated Aa2 by Moody's but has subsequently been downgraded to B3-. Indicative of the poor quality of the mortgages, some 49.95% of the loans are now in the 60+ day category with 17.05% in REO. A \$9.5 million investment in LBMLT 2006-4 has had similar performance.

- A \$24.2 million investment in AHM 2006-a, comprised of purportedly "prime" borrowers, has 15.73% in the 60+ day category due to AHM's aggressive lending practices.

- A \$46.3 million investment in BCAP 2007-AA1, which was serviced by Countrywide Mortgage and IndyMac Bank, two lenders known for their aggressive practices. Unsurprisingly, some 14.32% of these loans are in the 60+ day category even though the loans were purportedly made to prime borrowers and are of recent vintage.

75. The foregoing loans are representative of subprime mortgage loans originated during the Class Period and acquired by the Cheyne SIV. By mid-2005, when the Cheyne SIV was launched, just five U.S. originators controlled approximately 40% of the U.S. subprime market, including New Century. As discussed below, the Cheyne SIV acquired New Century loans. This industry concentration undermined the diversification requirement of the Cheyne SIV.

- 23 -

76.     The low quality of the assets selected for inclusion further demonstrates the inaccuracy of the representations that all assets would be subject to strict due diligence and monitoring processes.  Without such representations, the Capital Notes would never have been issued.  One reason why proper asset selection (which can be derived only from a proper investigation into the qualities of those assets) was a prerequisite to the creation of the SIV is because the success of the Cheyne SIV depended on that process.  For reasons set forth above and below, defendants knew that the representations made to investors were false and remained false throughout the Class Period.

### 2.    New Century: Representative Loans and Practices of U.S. Mortgage Originators

77.     Throughout 2005 and 2006, New Century was forced to buy back an increasing volume of its loans because those loans were in breach of the representations and warranties New Century made to buyers in securitization transactions.  The quality of New Century's loans started to deteriorate substantially – relative to its *own* historical "subprime" lending patterns and origination standards – in 2005, and throughout 2006 and into 2007.  New Century loans acquired by the Cheyne SIV were originated during this time period.  It was not a "benign" credit period. And none of the subprime RMBS acquired by the Cheyne SIV were "high grade" or "investment grade" or any grade other than "extremely low grade."

78.     New Century declared bankruptcy on April 2, 2007.  Morgan Stanley knew that New Century was about to go bankrupt because it participated in a March 6, 2007 conference call with New Century senior management shortly before the company collapsed.  This information was reported by *The Wall Street Journal* on March 29, 2007:

- "In February, New Century mortgages that had been worth $8 billion fell by more than $300 million within days, someone familiar with the matter says."

- "New Century was running out of options. It was unable to get new financing and in violation of its existing lending agreements, in part because it was low on cash. So the company convened the ***March 6 conference call with its 11 lenders***."

- "The bankers listened without indicating whether they'd help. In private meetings after hanging up, some expressed shock at New Century's precarious state, given its depleted cash supply. 'That told us the situation was more dire than we thought,' says a banker on the call."

- "***That night, Citigroup moved forward with a decision to declare New Century in default. Others followed. The next day, Mr. Einhorn resigned from New Century's board. Though Morgan Stanley agreed to a $265 million loan, it demanded as collateral a loan portfolio worth even more, and reversed course a few days later and cut off additional financing***."

Morgan Stanley was New Century's fourth largest creditor. It seized nearly $2.5 billion in loans and conducted a fire sale of those loans on or about March 26, 2007.

79.     Still, Capital Notes investors had no reason to be concerned about whether New Century or other low-quality loans were included in the Cheyne SIV portfolio because (i) the market value was being monitored "daily"; (ii) there were strict operational requirements that required Cheyne Capital to take action and inform the Capital Notes investors of any problems; (iii) the (at least) "monthly" confirmations of the "investment grade" ratings continued to roll uninterrupted; and (iv) the Rating Agencies continued to stamp "AAA" on the senior debt (again, reflecting the asset quality in the Cheyne SIV) as well as continuing to represent the Capital Notes were rated A/A3, consistent with their "ongoing" monitoring responsibilities. Moreover, defendants did not provide reports to the Capital Notes investors setting out the collateral assets and accurate market values.

80.     The extent of Morgan Stanley's knowledge of the real risks associated with the RMBS subprime mortgage market are further evidenced by the information that surfaced following New Century's bankruptcy. The U.S. Bankruptcy Court of the District of Delaware presiding over the New Century case appointed an examiner (the "Examiner") to work with governmental agencies to investigate New Century's accounting practices, among other things. The Examiner engaged a

law firm, forensic accountants and financial advisors to assist in his investigation and reporting. The Examiner provided a final report to the Bankruptcy Court dated February 29, 2008 (the "New Century Bankruptcy Report").

81.    The New Century Bankruptcy Report concludes that the "increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007." The Examiner made numerous findings that are directly applicable to the New Century loans included by defendants in the Cheyne SIV.

82.    These facts were known to defendants because both Morgan Stanley and the Rating Agencies were active participants in the mortgage credit market. Morgan Stanley clearly communicated with New Century management and promoted the fact that Cheyne Capital had "[r]egular contact with the arranger [*e.g.*, Morgan Stanley], servicer, manager, originator [*e.g.* New New Century] and other investors" in order to "identify potential deterioration in asset credit quality or any negative trends across the portfolio." Indicators of deterioration include loan delinquencies, loan kickouts in new transactions and early payment defaults in existing RMBS transactions.

83.    "Kickouts" and "early payment defaults" ("EPDs") are important loan quality metrics. Kickouts occur in the context of bulk or "whole loan" sales by New Century to bulk buyers of its loans such as Morgan Stanley who, in turn, sell those loans to investors via securitization transactions. New Century sold the vast majority of the loans it originated. It sold nearly all of those loans (except for four direct securitizations in 2005) in whole loan transactions. Before acquiring loans in such bulk sales transactions, buyers are afforded the opportunity to conduct due diligence on the subject loan pool. At that time, buyers can refuse to acquire certain loans from that particular pool. Those rejected loans are so-called "kickouts." Bulk buyers explain to originators the reasons

why such loans are being rejected, such as deviation from the originator's stated underwriting standards, defective home appraisals, or missing documentation.

84.    The Examiner made the following finding with respect to the reasons why New Century's loans were often rejected in kickouts:

> As noted, investors primarily kicked out loans due to defects in the loan origination processes, such as defective appraisals, unacceptable exceptions made to underwriting guidelines and missing documentation, each of which was an indication of the quality of the loans that were originated, since most loans rejected by purchasers reflected deviations by New Century from its loan origination processes.

85.    New Century experienced serious deterioration in loan quality from 2005 through early 2007.  Defendants were aware of these facts.  They did not disclose such facts to the Cheyne SIV investors.

86.    For example, with respect to New Century loans originated in 2005, the Examiner found that EPDs increased steadily from 6.58% in April 2005 to 9.24% in December of 2005.  Similarly, "kickouts" from whole loan sales steadily increased from 5.64% in January of 2005 to 8.77% in December of 2005, which amounted to nearly $2.3 *billion* in loans.  Importantly, among the top reasons given for kicking out loans were: property value, documentation, compliance and excessive debt-to-income issues.  Approximately $280 million of loans were kicked out "due to loan files that were missing required documentation – loans that never should have been funded until the files were complete."  As discussed below, Morgan Stanley was a New Century whole-loan buyer and therefore had first-hand knowledge of its deteriorating loan quality.

87.    From an already deteriorated loan quality condition in 2005, the Examiner made the following findings concerning New Century's loans in 2006 and 2007:

> ***New Century's loan quality trends worsened dramatically in 2006 and early 2007***. The most important metrics by which New Century tracked loan quality, EPD and kickouts, showed large increases throughout the year.  Further, in March and September 2006, it became clear that loans originated by New Century in 2005 and

early-2006 had *significantly greater delinquency rates* than similar loans originated by New Century in 2003 and 2004.

88.     The Examiner found that the same problems causing loan quality to deteriorate in 2005, such as defective property appraisals and missing documentation, continued throughout 2006. EPDs continued to increase, rising from 8.37% in January of 2006 to 16.82% in December of 2006. Kickout percentages increased from 6.92% in January of 2006 to 14.95% in December of 2006: "The same sorts of problems were identified as the chief causes of the kickouts, again indicating that loan quality was inadequate and that the recurring problems in the loan origination processes had not yet been fixed." In 2006, there were a total of over $5.2 *billion* in kickouts (almost double 2005's already alarming $2.3 billion amount) and $693 million were due to the risk of missing documentation (more than double 2005's $280 million worth of missing documents).

89.     Consistent with the Examiner's findings, New Century loans included in the Cheyne SIV had atrocious – and undisclosed – performance characteristics *at the time they were included in the Cheyne SIV*. The Cheyne SIV included loans pools with alarming delinquency statistics by any measure. As a point of comparison, for all of New Century's 2005 loans, it reported that 2.42% of those loans fell within its "60+" (or nearly three months late in payment) loan delinquency category as of the end of 2005. New Century loans included in the Cheyne SIV had delinquency statistics that were more than double that amount by the beginning of 2006, and nearly ten times that figure by early 2007.

90.     Morgan Stanley represented to Cheyne SIV investors that Cheyne Capital had access to originators and had access to extensive statistical information on the loan pools supporting the assets it acquired. The Rating Agencies received the exact same information as a matter of contractual right with respect to the billions of dollars in RMBS they rate and as a consequence of

the weekly reports on the Cheyne SIV portfolio they received from BoNY.  BoNY was obligated to review this information.

91.    Morgan Stanley also had direct, inside knowledge of the kickout, EPD and credit quality deterioration characterizing New Century's loans during the relevant time.  Morgan Stanley had a longstanding relationship with New Century and regularly purchased large pools of mortgages from New Century in whole loan transactions and provided large loans or "warehouse" financing to New Century.  In 2005 alone, Morgan Stanley bought $5.8 billion in loans originated by New Century.  In 2004, Morgan Stanley bought $14.1 billion of New Century's loans.  In addition to Morgan Stanley's whole loan acquisitions, it underwrote over $10 billion in New Century securities from 1998 through 2006.  Further, Morgan Stanley provided billions of dollars in "warehouse" financing to New Century.  Those loans were backed by New Century's mortgages.  Prior to the end of the Class Period, Morgan Stanley conducted a fire sale of $2.5 billion of such mortgages.

92.    On information and belief, Morgan Stanley also received due diligence reports from an external firm, Clayton Holdings Inc. ("Clayton"), when it acquired loans from New Century and other lenders whose mortgages were backing the Cheyne SIV.  This belief is based on the fact that Morgan Stanley was one of Clayton's largest clients in 2005 and 2006.

93.    Defendants failed to explain to investors that this company was generating due diligence reports for Morgan Stanley detailing the number of "exceptions" to the already materially misleading underwriting standards disclosed in the Information Memorandum.  A recent investigation by *The New York Times* has revealed the following information, reported on January 27, 2008:

> • "Clayton Holdings, a company based in Connecticut that vetted home loans for many investment banks, has agreed to provide important documents and the testimony of its officials to the New York attorney general, Andrew M.

Cuomo, *in exchange for immunity from civil and criminal prosecution in the state*."

- Clayton conducted due diligence investigations on certain mortgage loan portfolios, creating statistical information that "*Clayton promised . . . it would provide as evidence*."

- A principal for Clayton stated: "'This information that we provided to the attorney general is *the same information that we provided to our clients*.'"

- "As part of the [immunity] deal, *Clayton has told the prosecutors that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions*.  In an another sign that the industry was becoming less careful, *some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio*, a person familiar with the investigation said."

94.    *The New York Times* further reported: "It is unclear how many lending exceptions are contained in the $1 trillion subprime mortgage market, *but industry participants cite figures ranging from about 50 percent to 80 percent for some loan portfolios they examined*."

95.    A January 27, 2008 *Reuters* report corroborates the fact that Clayton's due diligence findings were not disclosed and were ignored by investment banks such as Morgan Stanley.  The report quotes the president of Clayton as saying: "'In some cases we felt that we were potted plants.'"  The Selling Documents failed to disclose such material lapses in quality control over the mortgage loan pools and failed to disclose the processes defendants actually followed to originate, acquire and package the mortgage loans for sale to the investors.

96.    Defendants failed to disclose (i) the percentage, if any, of the loans backing the Cheyne SIV that were actually reviewed for compliance with laws and the representations and warranties for the applicable loan pools; (ii) the percentage of "exception loans" discovered throughout any due diligence process conducted by any entity (whether independent or conflicted); and (iii) how the percentage of "exception loans" varied over time with respect to particular originators and with respect to the mortgage pools created and sold by Morgan Stanley.

97.     BoNY failed to disclose material facts in the Selling Documents regarding their conflicts of interest and relationships with the various defendants. For example, QSR and the Rating Agencies had an ongoing relationship that included structuring and establishing new finance vehicles. QSR offered assistance to a range of clients in "structuring and rating agency negotiation." QSR had extensive experience in structured vehicles and the complex process of structuring and establishing new vehicles, including coordination with the Rating Agencies.

98.     Given the due diligence processes reported by the Examiner in the New Century Bankruptcy, Morgan Stanley's acquisition of billions of dollars of mortgages from New Century, and the due diligence services provided to Morgan Stanley by Clayton, Morgan Stanley clearly reviewed non-public information concerning the deteriorating credit quality of loans originated by New Century and other lenders underlying the Cheyne SIV. Morgan Stanley failed to provide such material information to the Cheyne SIV investors.

99.     Moreover, the Rating Agencies had access to non-public information about the collateral underlying the SIV from their involvement in rating the originators of the mortgages purchased by the SIV. Because the Rating Agencies are exempt from SEC Regulation FD (Fair Disclosure), they have access to such non-public information.

100.     If any defendant had disclosed all of the material non-public information in their possession regarding the originators, the transaction could never have closed. Without the "investment grade" ratings of S&P and Moody's, the Capital Notes would not have been issued. Indeed, without "investment grade" ratings, the securities supporting the Cheyne SIV would not have even been *eligible* for issuance on a "shelf takedown" basis under the SEC rules. The reason the SEC permits securities such as the RMBS backing the Cheyne SIV to be issued on Form S-3 – which involves far less oversight by the SEC than in a typical registration – is because of the very

- 31 -

low risk such securities represent to the investment community as a result of the high-quality, low-risk nature of securities that receive "investment grade" ratings.

101.    Throughout the Class Period, the holders of the Capital Notes could have exercised contractual rights to force the Cheyne SIV to buy only the "investment grade" assets they promised to acquire.  In the event the Cheyne SIV refused to do so, they could have sold their Capital Notes or insured them to preserve at least *some* value.

### C.    The Ratings Were Based on Demonstrably Inaccurate Statistical Information, as Defendants Knew

102.    Capital Notes investors were repeatedly told that their investment was "investment grade," the assets supporting their investment were "investment grade," the entire the Cheyne SIV was "investment grade" and was, as a result, an investment that only warranted a small "spread" to the interest rates banks charge each other for loans.  Despite their repeated "investment grade" assertions, defendants never disclosed that the ratings were based on models with inaccurate inputs, which caused the models to generate inaccurate credit ratings.

103.    For example, the Rating Agencies' models depended upon irrelevant historical information preceding 2000.  From the period 2001-2005, however, (i) the percentage of "subprime" mortgage loans tripled; (ii) the combined LTV (or loan-to-value) ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" adjustable rate mortgages quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "'second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Capital Notes – experienced over a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.

104.    The exotic mortgage products characterizing the U.S. marketplace in 2005 performed poorly, and defendants knew it.  Each month the Rating Agencies received performance data on billions of dollars in U.S. loans.  Under the contractual terms of the many RMBS they rate, the Rating Agencies are provided such monthly performance data, including delinquency information. Thus, by the time the Rating Agencies provided "investment grade" certifications to the Capital Notes in August 2005, they knew that their historical data no longer reflected market realities and that mortgage credit quality was rapidly deteriorating.  This deterioration continued throughout the Class Period, as the Rating Agencies knew.

105.    None of this information was disclosed to Capital Notes investors.  At the time of the issuance of the Capital Notes, and throughout the Class Period, the Rating Agencies and the other defendants knew that the Cheyne SIV was buying into one of the riskiest mortgage markets in U.S. history.

106.    The acquisition period of an SIV (also known as the "Ramp Up" phase) is crucial to its success.  Yet defendants said nothing about the dramatic changes in the U.S. mortgage market. To the contrary, defendants stated in the Selling Documents that "*[t]iming of market entry benefits from the relatively benign recent credit environment*." Nothing could have been further from the truth.

107.    The documents also concealed the level of coordination between the Rating Agencies and the other defendants in developing the structure of the Cheyne SIV's note classes so as to achieve the desired rating.  The documents failed to explain correlation risk associated with the Capital Notes.  As described in the Information Memorandum, the Capital Notes received high investment grade ratings from both S&P and Moody's.  Moody's and S&P consulted with the Cheyne SIV and Morgan Stanley on the structure of the Capital Notes program, and thereby

obtained information not available to investors regarding the collateral underlying the Capital Notes. The Rating Agencies assisted Morgan Stanley in coordinating the structure and collateral underlying the Capital Notes so that the Rating Agencies could then give investment grade ratings. Then, in willful or reckless disregard for the true risks associated with the Capital Notes, the Rating Agencies issued investment grade ratings, which made it possible to sell the Capital Notes. Thus, the Rating Agencies aided the other defendants in violating New York law.

108. The Information Memorandum stated that the S&P rating addressed "the ability of [the Cheyne SIV] to make ultimate payment of principal and interest." The Moody's rating addressed "the credit risk factors associated with" the Capital Notes. The Information Memorandum disclosed generic risks associated with most investments and concluded that "the risks are subject to monitoring and control pursuant to the funding and investment criteria agreed [to] with the Rating Agencies." The Information Memorandum also disclosed that "there may be other criteria agreed [to] with the Rating Agencies that are not disclosed."

> **D.    The Process Used to Derive Ratings Was Deeply Flawed, as Defendants Knew**

109. As noted, it was a condition to the issuance of the Capital Notes that they receive "investment grade" ratings. The key marketing feature of the Capital Notes was the fact that they were the "first" ever to receive an "A" rating.

110. Defendants failed to explain that the Rating Agencies would be compensated only if they provided such ratings. Investors placed their trust in the credit ratings largely ***because*** they were supposed to be independent and unbiased agencies. None of the Cheyne SIV investors knew the integrity of the ratings had been compromised. If they had, they would not have bought the securities.

111.    Serious conflicts of interest at the Rating Agencies have been revealed recently.  Such conflicts undermined the credibility of the ratings at the time they were issued.  One former Moody's employee testified on April 24, 2008, to the Senate Banking, Housing and Urban Affairs Committee, that "[t]here is a far more serious conflict of interest than is commonly believed at the root of the current rating agency business model" and went on to say that "one could make the case that whenever a rating analyst is supervised by a manager whose compensation is determined by market share or revenue growth (rather than ratings accuracy) the objectivity of ratings is compromised."

112.    As reported on April 11, 2008, in *The Wall Street Journal,* a former Moody's analyst further stated that while there was no explicit directive to subordinate ratings objectivity to earn business from investment banks, such as defendant Morgan Stanley, there was "'a palpable erosion of institutional support for rating analysis that threatened market share.'"

113.    It was reported in the same article that "Moody's agreed to switch analysts on deals after bankers complained."  The Chief Executive Officer of Moody's recently confirmed that they were in fact pressured to provide strong ratings: "Everybody always seeks to pressure us.  Anyone with a position in the credit markets will hope that the credit-rating agencies agree with its opinion. It's a conflict of interest question."

114.    United States Congressional Representative Gary Ackerman made the following additional statements on September 5, 2007, to the Committee on House Financial Services regarding the rating agency conflicts:

> Originators then took these [mortgage] loans – many of which should have been assessed as much riskier than they were – and packaged them into securities to sell to investors.  ***If there had been full disclosure, smart and careful investors would have judged that these mortgage backed bonds carried a disproportionately high level of risk***.

*     *     *

*The credit-rating firms were double-dipping; profiting first from helping to put these shady securities together, and then collecting fees for deliberately rating these risky products at a higher value than they were worth*.  It's like hiring a judge to advise you as to how to commit an act and then paying him to decide whether you have committed a crime.

115.    The former Chairman of the SEC, Arthur Levitt, Jr., made the remarks quoted below on November 27, 2007, in Ontario, at a forum for securities regulators and market participants to discuss important capital markets issues.  Mr. Levitt's remarks were entitled "Strengthening the Gatekeepers: The importance of independence and accountability to capital markets."

In terms of market meltdowns and the degree of pain inflicted on the financial system, the subprime mortgage crisis has the potential to rival just about anything in recent financial history including the post-Enron turndown of a few years ago.

The scope of this crisis is not the only similarity to the Enron-era scandals. They also share root causes that include conflicts of interest, a lack of accountability, and limited transparency leavened with a healthy dose of naive greed.

*Indeed, the subprime meltdown – which is still roiling the markets and the economic health of the world – is yet another example of what happens when independence and accountability is compromised among key market actors . . . of what happens when trust breaks down*.

*Just like we did in the months after the implosion of Enron and Worldcom, we are now learning that a number of critical gatekeepers and market actors did not perform as we had hoped*.

First, consider the credit rating agencies.

Until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions.

But then the business model changed, and the issuers of securities themselves became the ones who paid to be rated . . . and as structured finance increased in popularity, it deepened this relationship between issuer and rater.

Now, *investors are relying on credit ratings to make informed investment decisions, but the credit rating firms are paid not by investors but by the companies they rate.  And as complex, structured debt products have increased in popularity, the relationship between rater and issue became even closer – and the line between independent rater and paid advisor became blurred*.

- 36 -

*This very circumstance suggests that a potential conflict of interest – between providing objective ratings and satisfying their corporate clients may be distorting the rating agencies' judgment. That they are both coach and referee.*

116.    The current Chairman of the SEC, Christopher Cox, provided a statement to Congress on April 24, 2008, that said:

The rating agencies' performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole.

117.    On June 11, 2008, Chairman Cox made the following remarks concerning the Rating Agencies:

When the Congress passed the Credit Rating Agency Reform Act a year and a half ago, it was well understood that certain conflicts of interest were hardwired into the rating agency business model. *But we have learned since then that the ratings of structured products in the subprime area made those conflicts of interest even more acute. That's because structured products were specifically designed for each tranche to achieve a particular credit rating – and <u>the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings</u>. . . .  Selling consulting service to entities that purchased ratings became a triple A conflict of interest*.

118.    On July 8, 2008, following a ten-month investigation, the SEC released a report concerning three credit rating agencies: non-defendant Fitch Ratings ("Fitch"); defendant S&P; and defendant Moody's (the "July 8 SEC Report").  No findings were made about any other rating agency in this report.  In summarizing its "factual findings, observations and recommendations from the examination," the SEC stated: *"Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal*."

119.    The SEC stated that "[i]n some instances, analysts discussed fees for a rating."  The SEC gave the following examples of this problem:

At one firm, an analyst wrote to his manager asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be.

At another firm, a business manager in the RMBS group wrote to several analysts: ". . . if you have not done so please send me any updates to fees on your

- 37 -

transactions for this month. It is your responsibility to look at the deal list and see what your deals are currently listed at."

At two rating agencies, there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department.

On information and belief, the SEC's findings set forth above are based on evidence obtained from defendant S&P or Moody's, or both.

120.    The July 8 SEC Report also stated that "Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."  The SEC provided the following examples of this problem:

For instance, a senior *analytical manager* in the Structured Finance group wrote "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much?"  "Essentially, [names of staff] ended up agreeing with your recommendations but *the CDO team didn't agree with you because they believed it would negatively impact business*."

In another example, after noting a change in a competitor's ratings methodology, an employee stated: "[w]e are meeting with your group this week to discuss *adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals*."  In another email, following a discussion of a competitor's market share, an employee of the same firm states that *aspects of the firm's ratings methodology would have to be revisited to recapture market share from the competing rating agency*.  An additional email by an employee stated, following a discussion of losing a rating to a competitor, "*I had a discussion with the team leaders here and we think that the only way to compete is to have a paradigm shift in thinking, especially with the interest rate risk*."

Another rating agency reported to the Staff that one of its foreign ratings surveillance committees had knowledge that the rating agency had issued ratings on almost a dozen securities using a model that contained an error.  The rating agency reported to the Staff that, as a result, the committee was aware that the *ratings were higher than they should have been*.  Nonetheless, the committee agreed to continue to maintain the ratings for several months, until the securities were downgraded for other reasons. Members of the committee, all analysts or analytical managers, considered the rating agency's reputational interest in not making its error public, according to the rating agency.

121.    On information and belief, the evidence discussed above by the SEC was obtained from defendants S&P and Moody's.  These two firms controlled the overwhelming majority of the CDO market when the Cheyne SIV was issued.

122.    Indeed, the SEC's investigation further revealed that the Rating Agencies did not have enough staff to rate CDOs properly and that the Rating Agencies knew this fact.  The Rating Agencies concealed it from the Cheyne SIV investors.

- One analyst commented in an e-mail that CDOs were being rated so poorly that the firm's rating model did not capture half of the CDO's risk, and that "'***it could be structured by cows and we would rate it***.'"

- The SEC also reported: "In another email, an analytical manager in the same rating agency's CDO group wrote to a senior analytical manager that the rating agencies continue to create an '***even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters. ;0)***.'  Email No. 2: Analytical Manager to Senior Analytical Manager (Dec. 15, 2006, 8:31 PM)."

123.    On information and belief, the aforementioned CDO analysts worked either for S&P or Moody's.  Again, these ratings agencies controlled almost the entire CDO market.

124.    The July 8 SEC Report made the following observations with respect to all three agencies:

At one firm, internal communications appear to expose analytical staff to this conflict of interest by indicating concern or interest in market share when firm employees were discussing whether to make certain changes in ratings methodology. In particular, employees discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies. While there is no evidence that decisions about rating methodology or models were made based on attracting or losing market share, in most of these instances, it appears that rating agency employees who were responsible for obtaining ratings business (*i.e.*, marketing personnel) would notify other employees, including those responsible for criteria development, about business concerns they had related to the criteria.

125.    International regulatory bodies have been equally disconcerted by the recent revelations concerning the Rating Agencies' conflicts.  The International Organization of Securities Commissions ("IOSCO"), which includes over 100 securities regulators such as the SEC and the

- 39 -

United Kingdom Financial Services Authority, stated in May of 2008 that rating agencies would be banned from recommending how products should be structured in order to prevent a conflict of interest. At the forum, SEC Chairman Cox further stated "'We are going to prohibit the kinds of practices that were found to be particularly troublesome in the subprime crisis, so conflicts of interest will either be flat-out prohibited or subjected to procedures to minimize those conflicts.'"

126. Defendants' failure to disclose all of the compensation arrangements with the Rating Agencies – including "repeat player" compensation paid by Morgan Stanley in connection with other transactions – is a material omission in the Selling Documents. As noted, recent statements by industry insiders indicate that each of the Rating Agencies was paid nearly three times the amount to rate the Cheyne SIV as they would have received to rate a traditional corporate debt obligation. Among other reasons why Moody's and S&P were paid substantially more to rate the Cheyne SIV is because they helped structure – that is, create – the product. The Rating Agencies' structuring activities and attendant "pay for performance" compensation severely undermined the credibility of the "investment grade" ratings and resulted in a failure of condition to the issuance of the Capital Notes.

### E. Defendants Were Highly Motivated to Conceal Problems with the Cheyne SIV

127. Morgan Stanley shared an undisclosed proportion of the Base Fee and Performance Fee discussed below.

128. First, Morgan Stanley shared a Base Fee equal to 5 basis points of the market value of the investment assets held by the Cheyne SIV. The market value of the investments was determined by BoNY based upon "valuation sources and methodologies as agreed [to] with the Rating Agencies . . . , including, among other things, third party dealer quotes." The Base Fee was paid on each profit distribution date, or quarterly on the 20th day of March, June, September and December.

As the volume and aggregate recorded market value of assets acquired by the Cheyne SIV increased, so too did the Base Fee.

129.     Second, Morgan Stanley shared a Performance Fee equal to net distributable profits. Distributable profits are determined quarterly, two days before each profit distribution date. The amount is determined in the "sole and absolute discretion" of the Cheyne SIV's board of directors, upon the recommendation of Cheyne Capital. Distributable profits are netted against fees and costs as well as the distribution rate for all of the series of outstanding Capital Notes.

130.     The distribution rate for each series was set forth in the pricing supplement for each series, and determined based upon an increment over a specific benchmark rate. For example, plaintiff ADCB was paid 1.5% over the three-month LIBOR, which is the interest rate that banks borrow from each other in the London inter-bank market.

131.     Morgan Stanley therefore received substantial profit interests in the Cheyne SIV based on the spread between yield on invested assets and cost of funds, as represented by market interest rates required by investors for the investment grade CP and Capital Notes. This "excess spread" was also split 50/50 with the Junior Capital Notes.

132.     Because the Capital Notes were lower rated than the senior debt, they necessarily carried a higher interest rate and, as a result, diminished profits payable to Morgan Stanley.

133.     The Performance Fee did not accrue during restricted operating periods, as was the case when restricted funding, investment or enforcement events occur. Morgan Stanley therefore had powerful incentives to maintain the appearance that the SIV assets were safe and highly rated for as long as possible.

134.     In addition to their fees at the launch of the Cheyne SIV, the Rating Agencies received an ongoing monitoring fee from the Cheyne SIV. On information and belief, this fee was

derived from the market value of the assets included in the Cheyne SIV. Thus, the more Capital Notes sold from the Cheyne SIV, the larger the volume of senior debt, the greater the dollar value of the assets to be acquired by Cheyne Capital, and the larger the Rating Agencies' fees.

135.    Similarly, BoNY received substantial compensation ascertaining the market value of the Cheyne SIV's assets. On information and belief, this fee was derived from the market value of the assets included in the Cheyne SIV. Thus, the more Capital Notes sold from the Cheyne SIV, the larger the volume of senior debt, the greater the dollar value of the assets to be acquired by the Cheyne SIV, and the larger BoNY's fees. This economic incentive to grow the Cheyne SIV, even in an increasingly risky market, explains but does not justify BoNY's failure to capture and report accurate valuations of the Cheyne SIV's constituent securities.

## VIII.    DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE NOTES

136.    On August 29, 2007, *The New York Times* reported that S&P had "abruptly" downgraded short-term notes issued by the Cheyne SIV. The article stated in part:

> Reports of the downgrade sent shockwaves through the commercial paper market late yesterday, where trading has been turbulent for at least the last two weeks and investors are speculating about the next investment vehicle to fall. It also raised questions about the quality of the ratings process, given how quickly – and significantly – that S.& P. reversed course.
>
> "If the rating agencies have to downgrade six notches in a single day, it undermines investor confidence," said Alex Roever, a JPMorgan analyst who covers the commercial paper market. ***"It is sort of hard to fathom what so much has changed in that time and makes investors wonder whether the rating agencies were paying attention to what was going on in the portfolio."***
>
> *                    *                    *
>
> As problems with subprime mortgages have spread to other parts of the credit markets, investors have grown increasingly concerned about the quality of asset pools backing these vehicles. Cheyne Finance gave them added pause because of the nature of its assets.

- 42 -

According to Cheyne Finance's investor report, it had at least 25 percent of its portfolio backed by pools of home equity loans as of July 31. That, Mr. Roever said, is ***the highest known concentration of real estate-related assets in any S.I.V***.

In October 2007, S&P further downgraded the short term notes issued by the Cheyne SIV.

137.    In fact, the reason for the rapid downgrade is because S&P (and Moody's) had failed to provide adequate surveillance of the ratings – notwithstanding representations to the contrary in the Selling Documents – and were reckless both in their grant and maintenance of high investment grade ratings.  This failure is consistent with the findings of the July 8 SEC Report, which noted reasons for the Rating Agencies' lack of adequate surveillance, including:

- "***Resources appear to have impacted the timeliness of surveillance efforts***."

- "***There was poor documentation of the surveillance conducted***."

- "***Lack of Surveillance Procedures***."

138.    On September 5, 2007, the Cheyne SIV entered receivership after having drawn down its liquidity lines to help repay maturing debt.

139.    The ratings of the Capital Notes owned by plaintiff were originally rated A3 by Moody's.  On October 24, 2007, Moody's dropped the rating to Ca, and on November 30, 2007, Moody's dropped the rating to C.

140.    The receivers subsequently noted problems in the original documentation which increased the difficulty in restructuring the Cheyne SIV:  "Highly complex and often opaque drafting in the original documentation has given rise to significant uncertainties which needed to be resolved."

141.    On June 17, 2008, a deal was finalized in which Goldman Sachs would purchase the Cheyne SIV's portfolio at prices determined by an auction among other investment banks, with the plan to effectively wipe out junior and mezzanine noteholders.

## IX.     CLASS ACTION ALLEGATIONS

142.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Capital Notes between October 2004 and October 2007 pursuant and/or traceable to the false and misleading information provided in (and omitted from) the Selling Documents and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

143.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are numerous members in the proposed Class.  Holders of the Capital Notes and other members of the Class may be identified from records maintained by Morgan Stanley and the Cheyne SIV or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of law that is complained of herein.

145.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

146.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants breached their fiduciary duties; whether they breached contractual obligations; whether the Selling Documents negligently

- 44 -

omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

147.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    COUNTS

### COUNT 1-A

### Claim for Breaches of Fiduciary Duties
### Against Morgan Stanley

148.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

149.    This is a claim for breaches of fiduciary duties owed to the plaintiff Class by Morgan Stanley.

150.    Morgan Stanley owed fiduciary duties to the plaintiff Class because, *inter alia*:

(a)    Morgan Stanley, its officers, agents and employees, held themselves out as having knowledge, expertise and skill in the area of the complex investments such as SIVs.

(b)    Morgan Stanley controlled the flow of information concerning the Capital Notes to investors.

(c)    Morgan Stanley was in possession of highly material non-public information concerning the performance and quality of assets selected for inclusion in the Cheyne SIV, and the

process used by the Rating Agencies to structure the SIV and assign investment grade credit ratings to the Capital Notes.

(d)    Morgan Stanley was in a unique position to prevent losses to the Capital Notes investors as it:

(i)    had an active RMBS non-public trading platform;

(ii)    operated whole loan financing with the largest mortgage lenders in the U.S., such as New Century (whose loans were sold to the Cheyne SIV);

(iii)    was the owner of subprime lender Saxon Capital Inc. (whose loans were sold to the Cheyne SIV); and

(iv)    sold billions of dollars of commercial paper to other Wall Street banks who were "senior" investors in the Cheyne SIV (and who would not have invested if they had known Cheyne SIV was invested in high-risk assets).

(e)    Morgan Stanley was uniquely positioned (i) to prevent the Cheyne SIV from taking on excessive leverage in the form of senior commercial paper in the high-risk and increasingly risky environment characterizing the mortgage marketplace during the relevant time, and (ii) to update the Information Memorandum to describe the increasing risks to which Capital Notes investors were exposed during the relevant time.  By failing to do so, Morgan Stanley deprived the Capital Notes holders of information needed to properly insure their investment or take other action, such as selling their Capital Notes.

151.    Class members necessarily reposed confidence in Morgan Stanley's knowledge, expertise and skill in creating the Cheyne SIV and growing the Cheyne SIV by continuously selling more senior debt throughout the Class Period because important information concerning the

structuring, rating, and quality of assets underlying the Capital Notes was not provided to Capital Notes investors.

152.    Morgan Stanley breached its duties to the Class by, *inter alia*:

(a)    engaging in self-dealing by selling assets or permitting assets to be sold to the Cheyne SIV that were extremely risky (such as, for example, securities including New Century loans), thereby profiting at the expense of the Capital Notes investors and undermining the "credit enhancement" Capital Notes investors were told would protect their investment;

(b)    concealing and not disclosing the breaches of contract alleged herein;

(c)    concealing and not disclosing the conduct of the other defendants alleged herein;

(d)    failing to observe care in protecting the assets of the Capital Notes holders by permitting low quality assets to be included in the Cheyne SIV; and

(e)    engaging in self-dealing by pricing the securities in a manner that did not fully capture the risks associated with the Capital Notes in order to maximize and accelerate the volume of cash flow it would collect in "excess spread," or profit interest, in the Cheyne SIV.

153.    Morgan Stanley knew of the aforementioned breaches at the time the Capital Notes were issued and throughout the relevant time period.

154.    The plaintiff Class has been damaged as a result of Morgan Stanley's breaches of its fiduciary duties in an amount to be determined at trial.

### COUNT 1-B

### Claim for Breaches of Contract
### Against Morgan Stanley

155.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

- 47 -

156.     This is a claim for contract breaches against Morgan Stanley.

157.     Each member of the plaintiff Class contracted with Morgan Stanley for the sale of the Capital Notes.  The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical presentations to prospective investors and substantially identical offering memoranda.

158.     The Capital Notes sold by Morgan Stanley did not conform to the terms of the contract.  Material terms of the contract included, *inter alia*, those setting forth:

(a)     the credit quality of the Capital Notes relative to comparably rated investment grade corporate bonds;

(b)     the credit quality of the assets supporting the Capital Notes;

(c)     the degree of protection afforded holders of Capital Notes by the Junior Capital Notes equity cushion and other capitalization and investment parameters;

(d)     the due diligence and quality control processes employed to select assets underlying the Capital Notes;

(e)     that only high-quality assets would be selected for inclusion in the Cheyne SIV;

(f)     that the Capital Notes would be issued in a benign credit environment;

(g)     that the "A" and "A3" Capital Notes were "investment grade" financial instruments, terms commonly and uniformly used and known in the industry to connote a safe, secure and stable credit quality;

(h)     that the collateral assets selected for inclusion in the Cheyne SIV were of high "investment grade" quality;

(i)    that the due diligence that would be conducted to ensure such high asset quality; and

(j)    that the collateral assets supporting the Cheyne SIV would be monitored by the Rating Agencies.

159.    The foregoing terms of the contract evidence the parties' intent that investors would acquire Capital Notes that were high-quality, low risk investments as further demonstrated by the low interest rates investors in the Capital Notes were paid for putting their investment capital at risk.

160.    Morgan Stanley materially breached its promise to sell Capital Notes conforming to the terms of the contract and consistent with the expectations of the parties because, *inter alia*:

(a)    the Capital Notes sold to investors were of lower credit quality than comparably rated corporate bonds that should have carried higher interest rates and lower credit ratings;

(b)    the credit quality of the assets supporting the Capital Notes was weak because of, *inter ali*a, lax underwriting standards employed in the origination of those assets, which assets included material exposure to suspect U.S. nonprime mortgages;

(c)    Capital Notes holders were not protected by the Junior Capital Notes equity cushion or other credit enhancement terms as a result of the adverse selection of assets by Morgan Stanley;

(d)    on information and belief, Morgan Stanley helped select the collateral assets supporting the Capital Notes but did not perform the due diligence required under the terms of the Capital Notes sales agreement;

(e)    high-quality assets were not selected for inclusion in the Cheyne SIV but rather lower-quality assets were selected;

- 49 -

(f)     the Capital Notes were issued in a precarious credit environment, marked by increasingly risky asset generation practices, such as weakening mortgage underwriting standards;

(g)     the Capital Notes were not "A," "A3" or "investment grade," and Morgan Stanley was aware of the meaning of these terms as used in the industry;

(h)     a material amount of mortgage-backed assets selected for inclusion was not of high "investment grade" quality, and Morgan Stanley was aware of the meaning of such terms as used in the industry;

(i)     due diligence processes were not done or were materially flawed as evidenced by, *inter alia*, the low quality of assets included in the SIV; and

(j)     the collateral assets were not monitored by the Rating Agencies as promised.

161.    Plaintiff and all Class members have fully performed under the terms of the Capital Notes sales contract with Morgan Stanley.

162.    Pursuant to the Information Memorandum, Morgan Stanley had a contractual obligation to provide supplemental information if the Capital Notes program was changed in a way to make the Information Memorandum "inaccurate or misleading." Morgan Stanley never prepared a new information memorandum describing the increased risks the Cheyne SIV was undertaking after the Capital Notes were issued, including, but not limited to purchasing a large volume of risky nonprime mortgages that were being generated under increasingly risky underwriting criteria.

163.    Plaintiff and all Class members have been damaged as a result of Morgan Stanley's breaches.

### COUNT 1-C

### Claim for Contract Failure of Condition
### Against Morgan Stanley

164.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

165.     This is a claim for contract breaches against Morgan Stanley.

166.     Each member of the Class contracted with Morgan Stanley for the sale of the Capital Notes.  The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical presentations to prospective investors and substantially identical offering memoranda.

167.     It was a condition precedent to the sale of the Capital Notes that they receive "A" and "A3" "investment grade" credit ratings from both Moody's and S&P.  This condition was never satisfied and failed because, *inter alia*:

     (a)     the credit ratings were based on demonstrably inaccurate quantitative and qualitative information;

     (b)     the credit ratings were based on unrealistic assumptions concerning the degree of interrelationship between and among mortgage assets supporting the Cheyne SIV as to (i) the probability of default and (ii) the severity of loss (in the event of default);

     (c)     the Rating Agencies did not adequately analyze the collateral assets that supported the Cheyne SIV; and

     (d)     the Rating Agencies were conflicted when they collaborated with Morgan Stanley to structure the Cheyne SIV.

168.     It was a condition precedent to the sale of the Capital Notes that the assets selected for inclusion in the Cheyne SIV be "high quality" and merit "investment grade" ratings.  These

conditions were never satisfied because the nonprime loans supporting the Cheyne SIV were generated with lax and weakening underwriting standards.

169.    It was a condition precedent to the sale of the Capital Notes that thorough due diligence be conducted on all of the assets included in the Cheyne SIV.  But for this condition, the Capital Notes would have been unmarketable given the fact that the success of the SIV depended largely on the quality of the assets it held.

170.    Neither plaintiff nor any of the Class members waived any of the foregoing conditions precedent.

171.    Plaintiff and all Class members have fully performed under the terms of the Capital Notes sales agreements with Morgan Stanley.

172.    Plaintiff and all Class members have been damaged as a result of Morgan Stanley's breaches.

## COUNT 1-D

### Claim for Breaches of Covenant of Good Faith and Fair Dealing
### Against Morgan Stanley

173.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

174.    This is a claim for breaches of the covenant of good faith and fair dealing implied in the agreements set forth, above, against Morgan Stanley.

175.    Morgan Stanley breached the covenant of good faith and fair dealing implied in its agreements with Capital Notes investors by, *inter alia*:

(a)    failing to inform plaintiff of Morgan Stanley's cooperative efforts with the Rating Agencies to achieve "investment grade" ratings on the Capital Notes when they did not merit such ratings;

(b)       selling low quality mortgage-backed assets to the Cheyne SIV for its own benefit and account when Morgan Stanley was already richly compensated by investors for arranging, structuring and selling securities of the Cheyne SIV;

(c)       arranging and marketing the Cheyne SIV transaction and growing the Cheyne SIV by continuously selling more senior debt throughout the Class Period, all premised on "high quality" assets, when Morgan Stanley was aware, based on its experiences as a lender and financial partner to U.S. mortgage lending companies, that lending companies were employing weak and weakening lending practices to originate and sell mortgage loans into the fixed income market place; and

(d)       by failing to advise Capital Notes investors of the weak and deteriorating credit conditions in the mortgage credit markets – markets that are not as transparent as equity markets and in which Morgan Stanley operates trading desks and to which Morgan Stanley has superior access – in order to allow Capital Notes holders to take steps to insure, sell or protect their investments.

176.    Plaintiff and all Class members have fully performed under the terms of the Capital Notes sales agreements with Morgan Stanley.

177.    Plaintiff and all Class members have been damaged as a result of Morgan Stanley's breaches.

## COUNT 1-E

### Claim for Unjust Enrichment
### Against Morgan Stanley

178.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

179.    This is a claim for unjust enrichment or quasi contract against Morgan Stanley.

180.    Morgan Stanley received millions of dollars in compensation for selling the Capital Notes to investors.

181.    Morgan Stanley directly contributed to the destruction of billions of dollars in investment value as a result of its arranging, structuring, selling and doing business with the Cheyne SIV.  Morgan Stanley stood in conflicted positions relative to the Cheyne SIV and its investors.  Morgan Stanley failed to exercise reasonable care in overseeing the Cheyne SIV but was paid substantial profits and fees out of the Capital Notes investment capital and income on capital.

182.    Morgan Stanley received a profit interest in the Cheyne SIV, and other fees, which should have been retained at all times to protect the Capital Notes' value.

183.    Having destroyed billions of dollars in investment capital allocated to the Cheyne SIV, and having taken conflicted positions relative to the Cheyne SIV and its investors, it is against equity and good conscience to permit Morgan Stanley to retain any profits or remuneration received in connection with the Cheyne SIV.

184.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is one of the leading financial centers in the world.  Morgan Stanley's ill-gotten gains should be disgorged in favor of the plaintiff Class in order to protect and promote this public policy.

## COUNT 1-F

### Claim for Tortious Interference with Contract
### Against Morgan Stanley

185.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

186.    This is a claim for tortious interference with contract against Morgan Stanley.

187.    This claim is pled in the alternative to Counts 1-B, 1-C and 1-D.

188.    A valid contract exists between the Capital Notes holders and the Cheyne SIV, among others, governing the characteristics of investments that may be acquired by the Cheyne SIV. The terms of the contract permit only "high grade," "zero expected loss" assets and no "lower quality credits." Among other things, such high quality, safe, stable assets were to protect the Capital Notes holders' principal investment "in difficult market conditions." This contract is evidenced, *inter alia*, by uniform presentation materials delivered to each Capital Notes holder.

189.    In addition, the Information Memorandum is a valid contract between the Capital Notes holders and the Cheyne SIV, among others. Pursuant to the terms of this contract, the Cheyne SIV is permitted to invest in only "investment grade" assets.

190.    Morgan Stanley is aware of the terms of such agreements because Morgan Stanley promoted their existence to all Capital Notes holders by way of substantially identical written presentation materials.

191.    Morgan Stanley caused the Cheyne SIV to breach the terms of such agreements by selling to the Cheyne SIV low quality assets backed by subprime mortgages that did not satisfy the terms of the contracts.

192.    The terms of the contract were actually breached.

193.    Plaintiff and the rest of the Class members have suffered damages as a result of Morgan Stanley's actions.

### COUNT 1-G

### Claim for Breach of Contract (Third Party Beneficiary)
### Against Morgan Stanley

194.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

195.    This is a claim for contract breaches against Morgan Stanley based on the Class's contractual rights as a third-party beneficiary.  It is alleged in the alternative to Count 1-B.

196.    Morgan Stanley entered into the contractual obligations referenced herein with the Cheyne SIV, the Rating Agencies, BoNY and/or Cheyne Capital, for the purpose and intent to benefit directly the plaintiff Class.

197.    Morgan Stanley repeatedly represented the benefits that would accrue to Capital Notes investors as a result of the Rating Agencies' rating, structuring and monitoring products and services.

198.    As a consequence of the Rating Agencies' breach of contract, the plaintiff Class was damaged.

## COUNT 1-H

### Claim for Tortious Interference with Contract (Third Party Beneficiary) Against Morgan Stanley

199.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

200.    This is a claim for tortious interference with contract against Morgan Stanley.

201.    This claim is pled in the alternative to Counts 1-B, 1-C and 1-D.

202.    A valid contract exists between, among others, Cheyne Capital and the Cheyne SIV governing the manner in which the Class's investment capital may be managed by Cheyne Capital. Among other things, the contract permits the acquisition of only high-quality, safe, secure and stable assets.

203.    Morgan Stanley is aware of this contract because its terms are set forth in the Selling Documents, which Morgan Stanley distributed to all of the Capital Notes investors.

204.    Morgan Stanley caused the Cheyne SIV to breach the terms of such contract by selling to the Cheyne SIV and/or Cheyne Capital low quality assets backed by problematic mortgage loans issued to borrowers whose valid income levels did not justify the size of the mortgage loans granted to them that did not satisfy the terms of the contract.

205.    The terms of the contract were actually breached.

206.    Plaintiff and the rest of the Class members have suffered damages as a result of Morgan Stanley's actions.

## COUNT 1-I

### Claim for Common Law Fraud
### Against Morgan Stanley

207.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

208.    This is a claim for common law fraud against Morgan Stanley.

209.    This claim is pled in the alternative to Counts 1-B, 1-C, 1-D, 1-F, 1-G and 1-H.

210.    Morgan Stanley made materially inaccurate written representations and omissions in substantially identical written materials distributed to each Class member.

211.    The false and misleading written Selling Documents are identified above.

212.    Morgan Stanley made the false and misleading statements on or about the dates the Selling Documents were distributed to members of the plaintiff Class.

213.    Such statements and the reasons why they are false and misleading are set forth with particularity above.

214.    Morgan Stanley knew or recklessly disregarded the false and misleading nature of its representations and omissions.  The bases for Morgan Stanley's knowledge or reckless disregard are set forth with particularity above.

- 57 -

215.    Morgan Stanley made the materially misleading statements and omissions for the purpose of inducing members of the plaintiff Class to buy and retain the Capital Notes.

216.    The Class justifiably relied on Morgan Stanley's materially misleading statements and omissions as they went to the core of their investment decision on the Capital Notes: the risk attending such notes and determination of whether the interest adequately compensated investors. The Capital Notes would not have issued and would have been unmarketable but for Morgan Stanley's misleading statements and omissions.

217.    Morgan Stanley's misrepresentations and omissions went to the credit quality of the Capital Notes and the underlying collateral assets.  When the truth regarding these assets was revealed, the Cheyne SIV collapsed.

218.    Morgan Stanley continued throughout the relevant time period to conceal information about the credit quality of the Capital Notes and the collateral assets acquired by the Cheyne SIV.

219.    Morgan Stanley undertook to sell hundreds of millions of dollars in Capital Notes to investors.  Having elected to make representations to investors in order to sell Capital Notes to them, Morgan Stanley owed such investors a duty to disclose all material information, including adverse information.

220.    Morgan Stanley was in a superior position to Capital Notes investors as a consequence of its selling and trading assets such as collateral assets.  Knowing that investors entrusted hundreds of millions of dollars to Morgan Stanley and knowing that such investors were sold Capital Notes that were represented to be secure and stable investments, Morgan Stanley had a duty to report to Capital Notes investors that their investment capital and income was at risk of increasingly deteriorating credit conditions.

221.    All of the Class members have been injured as their Capital Notes are worthless or almost worthless.

## COUNT 1-J

### Claim for Negligent Misrepresentation
### Against Morgan Stanley

222.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

223.    This is a claim for negligent misrepresentation against Morgan Stanley.

224.    Morgan Stanley made materially inaccurate written representations and omissions in substantially identical written materials distributed to each Class member.

225.    The Information Memorandum and other Selling Documents distributed by Morgan Stanley told investors to rely upon it.  Morgan Stanley expected investors to rely upon it.

226.    The Information Memorandum and other Selling Documents contained materially false and misleading statements and omissions as alleged above.

227.    The Class did rely upon these documents.  It was the Class's reasonable expectation – as is common industry practice and sound business practice – that Morgan Stanley would update the Information Memorandum to reflect material changes in the Capital Notes.

228.    Morgan Stanley had a special duty of care to accurately and completely represent all material facts to the Capital Notes investors because:

(a)    it owed such investors a fiduciary duty as alleged above; and

(b)    it made an undertaking in the Information Memorandum to provide updates to reflect significant changes in the credit quality of the investment portfolio.

229.    Morgan Stanley was responsible for distributing the Information Memorandum to each Class member.  Morgan Stanley therefore knew or should have known that investors would act or refrain from taking action on the basis of information provided in it.

230.    All members of the Class took action or refrained from taking action on the basis of Morgan Stanley's negligent statements and omissions:

(a)    if Morgan Stanley had imparted complete and accurate information in the Information Memorandum, the Capital Notes would have demanded a higher interest rate to compensate investors for the true risk of the investment;

(b)    if Morgan Stanley had properly updated the Information Memorandum consistent with its duties and undertakings, the Capital Notes investors would have protected their investment capital by (i) insuring against the increased risk; or (ii) selling their Capital Notes to less risk-averse investors, such as distressed asset investors;

(c)    if Morgan Stanley had properly executed its duties and undertakings, the Capital Notes would not have received "investment grade" ratings, which was a condition to the acquisition and holding of the Capital Notes; and

(d)    but for Morgan Stanley's misrepresentations and omissions, the Capital Notes would not have issued and would have been unmarketable.

231.    All members of the Class have suffered damages as a result of Morgan Stanley's negligent misrepresentation.

## COUNT 1-K

### Claim for Aiding and Abetting
### Against Morgan Stanley

232.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

- 60 -

233.    This is a claim against Morgan Stanley for aiding and abetting the other defendants' violations of law alleged herein.

234.    This claim is alleged in the alternative to each Count against Morgan Stanley to the extent such claim does not proceed.

235.    Morgan Stanley knew of each defendants' violations of laws and substantially assisted in such violations.

236.    The Class was damaged thereby.

### COUNT 2-A

### Claim for Breaches of Fiduciary Duties
### Against the Rating Agencies

237.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

238.    This is a claim for breaches of fiduciary duties owed to the plaintiff Class by the Rating Agencies.

239.    The Rating Agencies owed fiduciary duties to the plaintiff Class because, *inter alia*:

(a)    The Rating Agencies, their officers, agents and employees, held themselves out as having knowledge, expertise and skill in the area of rating, structuring and monitoring complex investments such as SIVs.

(b)    The Rating Agencies published or otherwise communicated information concerning the Capital Notes to investors.

(c)    The Rating Agencies were in possession of highly material non-public information concerning the performance and quality of assets selected for inclusion in the Cheyne SIV, and also were involved in the process used to structure the SIV and assign investment grade credit ratings to the Capital Notes.

- 61 -

(d)    The Rating Agencies were in a unique position to prevent losses to the Capital Notes investors as they:

(i)    had a direct source of monthly information on monthly statistical performance information on hundreds of billions of dollars in RMBS backed by U.S. mortgages;

(ii)    were capable of and able to, at a bare minimum, place the investments sold to the Capital Notes holders for millions of dollars on "negative watch" when the data demonstrated that the performance of the subprime mortgages included in the Cheyne SIV diverged markedly from the data used to model and structure the Cheyne SIV – in this way, the Cheyne SIV investors' principal investment may have been reduced in value but the investors would have avoided the 100% loss they have suffered;

(iii)    received weekly reports from defendant BoNY that provided the exact composition of the Cheyne SIV portfolio as well as a determination of the market value of those assets;

(iv)    provided the capital matrices to the Cheyne SIV purportedly used to determine how much capital should be set aside to ensure that the Capital Notes remained low-risk, safe and secure "investment grade" products; and

(v)    provided simulation models used by the Cheyne SIV to "confirm" the "investment grade" ratings on the Capital Notes.

(e)    The Rating Agencies were uniquely positioned:

(i)    to prevent the Cheyne SIV from taking on excessive leverage in the form of senior CP in the high-risk and increasingly risky environment characterizing the subprime marketplace during the relevant times; and

(ii)    to cause updates to the Information Memorandum to be issued, describing the increasing risks to which Capital Notes investors were exposed during the relevant time.  By failing to do so, the Rating Agencies deprived the Capital Notes holders of information needed to properly insure their investments or take other action, such as selling their Capital Notes.

240.    Class members necessarily reposed confidence in the Rating Agencies' knowledge, expertise and skill in creating and rating the Cheyne SIV because important information concerning the structuring, rating, and quality of assets underlying the Capital Notes was not provided to Capital Notes investors.  The processes and methods the Rating Agencies used to structure the "first ever" public ratings of the Capital Notes were not provided to the Capital Notes investors.

241.    The Rating Agencies breached their duties to the Class by, *inter alia*:

(a)    issuing and maintaining "investment grade" ratings;

(b)    concealing and not disclosing information related to the ratings;

(c)    concealing and not disclosing the conduct of the other defendants alleged herein;

(d)    failing to observe care in protecting the assets of the Capital Notes holders by permitting low quality assets to be included in the Cheyne SIV and not *increasing*, substantially, the amount of capital that the Cheyne SIV was required to set aside each time it acquired a constituent security;

(e)    engaging in self-dealing by rating the securities in a manner that did not fully capture the risks associated with the Capital Notes in order to allow the Cheyne SIV to issue billions of dollars in senior capital which also required more ratings services from (and more fees for) the Rating Agencies, which allowed the Cheyne SIV to buy more assets that also generated substantial fees for the Rating Agencies; and

(f)    failing to observe care by repeating the "investment grade" ratings throughout the relevant time period.

242.    The Rating Agencies knew of the aforementioned breaches at the time the Capital Notes were issued and throughout the relevant time period.

243.    The plaintiff Class has been damaged as a result of the Rating Agencies' breaches of their fiduciary duties in an amount to be determined at trial.

**COUNT 2-B**

**Claim for Breaches of Contract
Against the Rating Agencies**

244.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

245.    This is a claim for contract breaches against the Rating Agencies.

246.    Each member of the plaintiff Class agreed to a contract that included the issuance of "investment grade" ratings by the Rating Agencies related to the sale of the Capital Notes.  The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical sales materials to prospective investors and substantially identical offering memoranda.

247.    The Capital Notes did not conform to the terms of the contract.  Material terms of the contract included, *inter alia*, those setting forth:

(a)    the credit quality of the Capital Notes relative to comparably rated investment grade corporate bonds;

(b)    the credit quality of the assets supporting the Capital Notes;

(c)    the degree of protection afforded holders of Capital Notes by the Junior Capital Notes equity cushion and other capitalization and investment parameters;

- 64 -

(d)      the due diligence and quality control processes employed to select assets underlying the Capital Notes;

(e)      that only high-quality assets would be selected for inclusion in the Cheyne SIV;

(f)      that the Capital Notes would be issued in a benign credit environment;

(g)      that the "A" and "A3" Capital Notes were "investment grade" financial instruments, terms commonly and uniformly used and known in the industry to connote a safe, secure and stable credit quality;

(h)      that the collateral assets selected for inclusion in the Cheyne SIV were of high "investment grade" quality (as demonstrated by the ratings data the Rating Agencies tied to the sale of their rating and structuring of the Cheyne SIV);

(i)      that only assets of at least A-/A3 (investment grade) quality would be selected for inclusion in the Cheyne SIV and the overwhelming majority of assets would be "AAA," or the highest credit designation possible, comparable in risk to securities back by the full faith and credit of the United States Government; and

(j)      that the collateral assets supporting the Cheyne SIV would be monitored by the Rating Agencies.

248.    The foregoing terms of the contract evidence the parties' intent that investors would acquire Capital Notes that were high-quality, low risk investments as further demonstrated by the low interest rates investors in the Capital Notes were paid for putting their investment capital at risk.

249.    The Rating Agencies materially breached their promise to issue and maintain "investment grade" ratings conforming to the terms of the contract and consistent with the expectations of the parties because, *inter alia*:

(a)     the Capital Notes sold to investors were of lower credit quality than comparably rated corporate bonds that should have carried higher interest rates and lower credit ratings;

(b)     the credit quality of the assets supporting the Capital Notes was weaker than the Rating Agencies' ratings indicated because of, *inter alia*, lax underwriting standards employed in the origination of those assets, which assets included material exposure to U.S. subprime mortgages;

(c)     Capital Notes holders were not protected by the credit enhancement designed by the Rating Agencies in the Junior Capital Notes equity cushion or other credit enhancement terms (including the capital reserve terms, set by rating agency-approved capital matrices) as a result of the flawed processes the Rating Agencies used to design the credit enhancement;

(d)     the Rating Agencies did not assign the appropriate amount of capital to be set aside each time the Cheyne SIV acquired assets, but rather allowed thin capital reserves in an increasingly risky credit environment;

(e)     high-quality assets were not selected for inclusion in the Cheyne SIV, as indicated by the Rating Agencies' ratings, but rather lower quality assets were selected, as indicated by the data the Rating Agencies received from their billions of dollars in rated RMBS and the RMBS they rated that were included in the Cheyne SIV;

(f)     the Capital Notes were issued in a precarious credit environment, marked by increasingly risky asset generation practices, such as weakening underwriting standards;

(g)     the Capital Notes were not "A," "A3" or "investment grade," and the Rating Agencies were aware of the meaning of these terms as used in the industry;

(h)    a material amount of subprime assets selected for inclusion was not of high "investment grade" quality, and the Rating Agencies were aware of the meaning of such terms as used in the industry;

(i)    the Cheyne SIV included assets of far worse quality than whatever level of quality is quantitatively or qualitatively implied by the "A" and "AAA" and "high grade" and other like promises and representations made to investors; and

(j)    the collateral assets were not monitored by the Rating Agencies as promised.

250.    Plaintiff and all Class members have fully performed under the terms of the contract with the Rating Agencies.

251.    Pursuant to the Information Memorandum, the Rating Agencies had a contractual obligation to prepare a new information memorandum if the Capital Notes program was changed in a way to make the Information Memorandum "inaccurate or misleading." The Rating Agencies never prepared a new information memorandum describing the increased risks the Cheyne SIV was undertaking after the Capital Notes were issued, including, but not limited to, purchasing a large volume of risky subprime mortgages that were being generated under increasingly risky underwriting criteria.

252.    Plaintiff and all Class members have been damaged as a result of the Rating Agencies' breaches.

### COUNT 2-C

### Claim for Contract Failure of Condition
### Against the Rating Agencies

253.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

254.    This is a claim for contract breaches against the Rating Agencies.

- 67 -

255.    Each member of the plaintiff Class agreed to a contract with the Rating Agencies for the sale of structuring, monitoring and rating services.  The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical presentations to prospective investors and substantially identical offering memoranda.

256.    It was a condition precedent to the sale of the Capital Notes that they receive "A" and "A3" "investment grade" credit ratings from both Moody's and S&P.  Despite the fact that Capital Notes investors paid the Rating Agencies millions of dollars of compensation out of their investment capital and income, this condition was never satisfied and failed because, *inter alia*:

    (a)    the credit ratings were based on demonstrably inaccurate quantitative and qualitative information;

    (b)    the credit ratings were based on unrealistic assumptions concerning the degree of interrelationship between and among mortgages supporting the Cheyne SIV as to (i) the probability of default and (ii) the severity of loss (in the event of default);

    (c)    the Rating Agencies did not analyze or undertake a reasonable investigation of the collateral assets that supported the Cheyne SIV;

    (d)    the Rating Agencies were conflicted when they collaborated with Morgan Stanley to structure the Cheyne SIV;

    (e)    the Rating Agencies seriously doubted the validity of their own rating, monitoring and structuring services, services they were richly compensated to provide for the benefit of the Capital Notes investors; and

(f)     the structuring, rating and monitoring processes and practices of the Rating Agencies were unreasonable, and investors would not have shared their investment capital with the Rating Agencies if such processes and practices had been clearly explained.

257.     It was a condition precedent to the sale of the Capital Notes that the assets selected for inclusion in the Cheyne SIV be "high quality" and merit "investment grade" ratings. These conditions were never satisfied because the subprime loans supporting the Cheyne SIV were generated with lax and weakening underwriting standards.

258.     Neither plaintiff nor any of the Class members waived any of the foregoing conditions precedent.

259.     Plaintiff and all Class members have fully performed under the terms of the Capital Notes sales agreements with the Rating Agencies.

260.     Plaintiff and all Class members have been damaged as a result of the Rating Agencies' breaches.

## COUNT 2-D

### Claim for Breach of Contract (Third Party Beneficiary)
### Against the Rating Agencies

261.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

262.     This is a claim for contract breaches against the Rating Agencies based on the Class's contractual rights as a third-party beneficiary. It is alleged in the alternative to Counts 2-B and 2-C.

263.     The Rating Agencies entered into the contractual obligations referenced herein with the Cheyne SIV, Morgan Stanley, BoNY and/or Cheyne Capital, for the purpose and intent to benefit directly the plaintiff Class.

264.    Morgan Stanley repeatedly represented the benefits that would accrue to Capital Notes investors as a result of the Rating Agencies' rating, structuring and monitoring products and services.

265.    As a consequence of the Rating Agencies' breach of contract, the plaintiff Class was damaged.

### COUNT 2-E

### Claim for Breaches of Covenant of Good Faith and Fair Dealing Against the Rating Agencies

266.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

267.    This is a claim for breaches of the covenant of good faith and fair dealing implied in the agreements set forth above against the Rating Agencies.

268.    The Rating Agencies breached the covenant of good faith and fair dealing implied in their sales agreement with Capital Notes investors by, *inter alia*:

(a)    failing to inform plaintiff:

(i)    of the Rating Agencies' acute conflicts of interest vis-à-vis plaintiff, since the Rating Agencies were paid only if the deal closed with the right rating and were paid in part based on the size of the transaction, which undermined the independence of the ratings;

(ii)    that the Rating Agencies were suffering from staffing shortages and did not have enough people to structure and rate the Cheyne SIV and its constituent securities properly;

(iii)    that employees of the Rating Agencies seriously doubted the efficacy of their own structuring and rating services during the relevant time;

(iv)     that the Rating Agencies had discovered errors in their models for other complex securities during the relevant time;

(v)     that the Rating Agencies were increasingly focused on market share, which compromised the objectivity of their ratings processes; and

(vi)     that the Rating Agencies observed greater statistical risks associated with certain mortgage loan products (such as those carrying high LTV, "second liens" and "silent seconds") but did not change any of their prior ratings to reflect this reality, known to the Rating Agencies during the relevant time;

(b)     failing to inform plaintiff of Morgan Stanley's practice of pressuring the Rating Agencies to provide high credit ratings on fixed income products, including some supporting the Cheyne SIV;

(c)     facilitating and approving the sale of low quality subprime assets to the Cheyne SIV for their own benefit and account when the Rating Agencies were already richly compensated by investors for arranging and helping to monitor and structure the Cheyne SIV;

(d)     structuring the Cheyne SIV transaction (including *inter alia*, providing instructions on how much leverage the Cheyne SIV could withstand given capital requirements and asset quality) premised on "high quality" assets, when the Rating Agencies were aware that lending companies were employing weak and weakening lending practices to originate and sell mortgage loans into the fixed income market place, based on, *inter alia*:

(i)     their receipt and analysis of material, non-public information from the top U.S. subprime lending companies (with whom the Rating Agencies have intimate dealings based on the ratings they provide on the billions of dollars in secured and unsecured debt, as well as securitization transactions they structure and rate);

- 71 -

(ii)     their receipt and analysis of statistical information regarding mortgage loan performance on billions of dollars in RMBS; and

(iii)     their receipt of weekly reports from defendant BoNY that provided the exact composition of the Cheyne SIV portfolio as well as a determination of the market value of those assets; and

(e)     by failing to advise Capital Notes investors of the weak and deteriorating credit conditions in the credit markets – markets that are not as transparent as equity markets and in which the Rating Agencies operate extensive consulting services, and to which the Rating Agencies had superior access – in order to allow Capital Notes holders to take steps to insure, sell or protect their investments.  The Rating Agencies could have easily placed the Capital Notes' ratings on "warning" when data demonstrated that the performance of loans included in the U.S. marketplace or in the Cheyne SIV was materially worse than the data used by the Rating Agencies to structure and rate the Cheyne SIV.

269.    Plaintiff and all Class members have fully performed under the terms of the Capital Notes agreements with the Rating Agencies.

270.    Plaintiff and all Class members have been damaged as a result of the Rating Agencies' breaches.

## COUNT 2-F

### Claim for Unjust Enrichment
### Against the Rating Agencies

271.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

272.    This is a claim for unjust enrichment or quasi contract against the Rating Agencies.

273.    The Rating Agencies received millions of dollars in compensation for selling the Capital Notes to investors:

(a)    On information and belief, each of the Rating Agencies received approximately 10 basis points for structuring and rating the Cheyne SIV. The fee was likely higher. Including the senior debt, at the $3 billion "launch" of the Cheyne SIV, each of the Rating Agencies was paid millions of dollars in closing fees. Given the number of other advisors in the transaction, it is likely the Rating Agencies made more in fees than some of the law firms that worked on the transaction.

(b)    The Rating Agencies received an ongoing monitoring fee from the Cheyne SIV. On information and belief, this fee was derived from the market value of the assets included in the Cheyne SIV. Thus, the more Capital Notes sold from the Cheyne SIV, the larger the volume of senior debt, the greater the dollar value of the assets to be acquired by the Cheyne SIV, and the larger the Rating Agencies' fees.

(c)    The Rating Agencies were paid for data services relating to the constituent securities.

274.    The Rating Agencies directly contributed to the destruction of billions of dollars in investment value as a result of their structuring, rating and doing business with the Cheyne SIV. The Rating Agencies stood in conflicted positions relative to the Capital Notes. The Rating Agencies failed to exercise reasonable care in conducting their specific oversight roles in the Cheyne SIV but were paid substantial profits and fees out of the Capital Notes' investment principal and income.

275.    The Rating Agencies drew millions of dollars of value out of the Cheyne SIV, which should have been retained at all times to protect the Capital Notes' value.

276.    Having destroyed billions of dollars in investment capital allocated to the Cheyne SIV, and having taken conflicted positions relative to the Cheyne SIV and its investors, it is against equity and good conscience to permit the Rating Agencies to retain any profits or remuneration received in connection with the Cheyne SIV.

277.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is one of the leading financial centers in the world.  The Rating Agencies' ill-gotten gains should be disgorged in favor of the plaintiff Class in order to protect and promote this public policy.

## COUNT 2-G

### Claim for Tortious Interference with Contract
### Against the Rating Agencies

278.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

279.    This is a claim for tortious interference with contract against the Rating Agencies.

280.    This claim is pled in the alternative to Counts 2-B, 2-C, 2-D and 2-E.

281.    A valid contract exists between the Capital Notes holders and the Cheyne SIV, among others, governing the characteristics of investments that may be acquired by the Cheyne SIV.  The terms of the contract require  the acquisition of assets that are at least rated A/A3 "investment grade" securities, and require the majority of the assets to be acquired to be of even higher ratings.  Even under extraordinary circumstances, the Cheyne SIV is not permitted to purchase any securities that are not "investment grade" and even after purchase is not permitted to own more than 1%, total, of any securities that are below "investment grade."

282.    Among other things, such purportedly high quality, safe, stable assets were to protect the Capital Notes holders' principal investment "in difficult market conditions." This contract is evidenced, *inter alia*, by uniform presentation materials delivered to each Capital Notes holder.

283.    In addition, the Information Memorandum is a valid contract between the Capital Notes holders and the Cheyne SIV, among others. Pursuant to the terms of this contract, the Cheyne SIV is permitted to invest only as set forth above.

284.    The Rating Agencies were aware of the terms of such agreements. The Rating Agencies recently have represented publicly that they review such documentation when they advise on and rate structured finance transactions such as the Cheyne SIV.

285.    The Rating Agencies caused Cheyne Capital and the Cheyne SIV to breach the terms of such agreements by, *inter alia*:

(a)    failing to inform Cheyne Capital that the assets selected for inclusion in the Cheyne SIV did not merit the "investment" grade ratings assigned to them;

(b)    "grandfathering" inaccurate ratings and permitting the Cheyne SIV to continue using such ratings with respect to each purchase, *inter alia*; and

(c)    facilitating the sale of and permitting the Cheyne SIV to continue purchasing impaired assets.

286.    The terms of the contract were actually breached.

287.    Plaintiff and the rest of the Class members have suffered damages as a result of the Rating Agencies' actions.

## COUNT 2-H

### Claim for Tortious Interference with Contract (Third Party Beneficiary) Against the Rating Agencies

288.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

289.     This is a claim for tortious interference with contract against the Rating Agencies.

290.     This claim is pled in the alternative to Counts 2-B, 2-C, 2-D and 2-E.

291.     A valid contract exists between, among others, Cheyne Capital and the Cheyne SIV governing the manner in which the Class's investment capital may be managed by Cheyne Capital and the types of assets that may be acquired.  Among other things, the contract permits the acquisition of only high-quality, safe, secure and stable assets.

292.     The Rating Agencies were aware of this contract because its terms are set forth in the Information Memorandum.  The Rating Agencies have publicly represented they review such documentation when they advise on and rate transactions.

293.     The Rating Agencies caused the Cheyne SIV and/or Cheyne Capital to breach the terms of such agreements by:

(a)     failing to inform the Cheyne SIV and/or Cheyne Capital that the assets selected for inclusion in the Cheyne SIV did not merit the "investment" grade ratings assigned to them;

(b)     "grandfathering" inaccurate ratings and permitting the Cheyne SIV and/or Cheyne Capital to continue using such ratings with respect to each purchase, *inter alia*; and

(c)     facilitating the sale of and permitting the Cheyne SIV and/or Cheyne Capital to continue purchasing impaired assets.

294.     The terms of the contract were actually breached.

295.     Plaintiff and the rest of the Class members have suffered damages as a result of the Rating Agencies' actions.

## COUNT 2-I

### Claim for Common Law Fraud
### Against the Rating Agencies

296.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

297.     This is a claim for common law fraud against the Rating Agencies.

298.     The Rating Agencies made materially inaccurate written representations and omissions in substantially identical written materials distributed to each Class member.

299.     The false and misleading written documents include the Selling Documents.

300.     The Rating Agencies made the false and misleading statements on or about the dates the foregoing written materials were distributed to members of the plaintiff Class.

301.     The Rating Agencies made false and misleading statements and omissions weekly and monthly following the "launch" of the Cheyne SIV.  They knew, based on the services and products provided by them to the Cheyne SIV, review of transaction documentation, and collaboration with Morgan Stanley and the Cheyne SIV, that a failure to communicate a ratings change would be exactly the same as communicating "no change" to the Capital Notes investors.

302.     Such statements and the reasons why they are false and misleading are set forth with particularity herein.

303.     The Rating Agencies knew or recklessly disregarded the false and misleading nature of their representations and omissions.  The bases for the Rating Agencies' knowledge or reckless disregard are set forth with particularity above.

304.    The Rating Agencies made the materially misleading statements and omissions for the purpose of inducing members of the plaintiff Class to buy and retain the Capital Notes.

305.    The Class justifiably relied on the Rating Agencies' materially misleading statements and omissions as they went to the core of their investment decision on the Capital Notes: the risk attending such notes and determination of whether the interest adequately compensated investors. The Capital Notes would not have issued and would have been unmarketable but for the Rating Agencies' misleading statements and omissions.

306.    The Rating Agencies' misrepresentations and omissions went to the credit quality of the Capital Notes and the underlying collateral assets.  When the truth regarding these assets was revealed, the Cheyne SIV collapsed.

307.    The Rating Agencies continued throughout the relevant time period to conceal information about the credit quality of the Capital Notes and the collateral assets acquired by the Cheyne SIV; continued to affirmatively repeat the "A" rating throughout the relevant time period through the "agreed upon" confirmation processes; and continued to repeat the "AAA" designation for the entire Cheyne SIV structure so that it could continue to build more and more leverage through the issuances of senior debt and build more and more exposure to impaired, unsafe, and poorly underwritten U.S. subprime mortgage loans.

308.    The Rating Agencies undertook to sell and communicate their rating services to the specific group of "private placement" investors who acquired the Capital Notes.  Having elected to make representations to those investors in order to sell ratings and services to them, and having received millions of dollars in compensation therefor, the Rating Agencies owed such investors a duty to disclose all material information, including adverse information.

309.    The Rating Agencies were in a superior position to Capital Notes investors as a consequence of the rating and monitoring of collateral assets, as well as, *inter alia*:

(a)    their receipt and analysis of material, non-public information from the top U.S. subprime lending companies (with whom the Rating Agencies have intimate dealings based on the ratings they provide on the billions of dollars in secured and unsecured debt, as well as securitization transactions they structure and rate);

(b)    their receipt and analysis of mortgage loan performance statistical information on billions of dollars in RMBS which indicated that such companies were employing weak and weakening lending practices to originate and sell mortgage loans into the fixed income market place;

(c)    their receipt of weekly reports from defendant BoNY that provided the exact composition of the Cheyne SIV portfolio as well as a determination of the market value of those assets; and

(d)    their review of material non-public information provided by U.S. mortgage lenders in connection with the Rating Agencies' review of such lenders' credit quality.

310.    Knowing that investors entrusted hundreds of millions of dollars to the Rating Agencies and knowing that such investors were sold Capital Notes that were represented to be secure and stable investments, the Rating Agencies had a duty to report to Capital Notes investors that their investment capital and income was at risk due to increasingly deteriorating credit conditions.

311.    The Capital Notes would not have been issued without the defendants' misrepresentations, including the high "investment grade" credit ratings.

312.    All of the Class members have been injured as their Capital Notes are worthless.

## COUNT 2-J

### Claim for Negligent Misrepresentation
### Against the Rating Agencies

313.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

314.     This is a claim for negligent misrepresentation against the Rating Agencies.

315.     The Rating Agencies made materially inaccurate written representations and omissions in substantially identical written materials distributed to each Class member, including Selling Documents such as the Information Memorandum.

316.     The Information Memorandum and Selling Documents were reviewed and approved for distribution to the Capital Notes investors, who were told to rely upon them.  The Rating Agencies knew at all times that specific Capital Notes investors to whom the Information Memorandum and Selling Documents were provided would and did rely upon their representations and omissions.

317.     The Information Memorandum and Selling Documents contained materially false and misleading statements and omissions as alleged above.

318.     The Class did rely upon these documents.  It was the Class's reasonable expectation – as is common industry practice and sound business practice – that the Rating Agencies would update the Information Memorandum and other Selling Documents to reflect material changes in the Capital Notes by, at the very least, issuing a "supplement" when data demonstrated that the performance of loans included in the U.S. marketplace or in the Cheyne SIV was materially worse than the data used by the Rating Agencies to structure and rate the Cheyne SIV.

319.     The Rating Agencies' obligations are contained in the agreements under which they owed obligations to the Capital Notes investors as alleged herein.

320.    Further, the Rating Agencies had a special duty of care to accurately and completely represent all material facts to the Capital Notes investors because, *inter alia*:

(a)    they owed such investors a fiduciary duty as alleged herein;

(b)    they made an undertaking in the Information Memorandum to provide updates to reflect material changes affecting the Capital Notes; and

(c)    they are registered investment advisors under the Investment Advisers Act of 1940, 15 U.S.C. §80b-1, *et. seq*., and along with the special privileges that follow from that designation (including monopoly-like market control), owe a statutory duty to the Class to base their ratings on current and accurate information.

321.    The Rating Agencies were responsible for reviewing and did review the Information Memorandum before it was distributed to each Class member.  The Rating Agencies also reviewed other Selling Documents, and even prepared some such documents, including "pre-sale" reports. Further, the Rating Agencies recently have represented publicly that they review such documentation when they advise on and rate structured finance transactions such as the Cheyne SIV.  Based on this fact alone, the Rating Agencies therefore knew or should have known that investors would act or refrain from taking action on the basis of information provided in it.

322.    Further, it is a matter of common knowledge in the fixed income industry – and plaintiff will adduce expert and other evidence at trial supporting the facts – that fixed income investors, such as those in the Capital Notes, rely on the Rating Agencies because until recently they were understood, *inter alia*, to have:

(a)    provided objective, independent, unbiased analyses and rating services;

(b)    provided ratings that were based on reality, as opposed to ratings based on inaccurate and false information as well as ratings based on "assumptions" that, if disclosed

properly, would have made it possible for investors and other credit rating services (who were prevented from competing in the marketplace by Moody's and S&P in part because of the secrecy of their structuring and rating methodologies) to understand the real risks posed to their investments;

(c)     grasped the difference between key characteristics of corporate bonds and structured finance bonds, and accounted for those differences in their ratings and structuring methodologies and practices;

(d)     applied reasonably consistent methodologies and used reasonable assumptions and models in their ratings when, in fact, the Rating Agencies do not even know what processes were applied to particular historical deals;

(e)     conducted some verification of the information provided by arrangers (including Morgan Stanley) of the Cheyne SIV's constituent securities;

(f)     sound processes and practices for monitoring the constituent securities of the Cheyne SIV, which they were contractually obligated to do on an "ongoing" basis for the Cheyne SIV;

(g)     *no* serious doubts about the validity of their own rating methodologies and practices in respect of structured finance securities (which was, not incidentally, a primary if not the primary reason for their recent dramatic financial growth);

(h)     *no* awareness, as revealed by a *Wall Street Journal* report dated August 16, 2007 that "[t]he firms said that the soaring market of 2005-06 had reduced the relevance of their statistical models and historical data," since the Cheyne SIV depended fundamentally on those models for its structure and operation; and

(i)     *no* awareness, as further revealed by *The Wall Street Journal* interview of defendant Moody's President Brian Clarkson (now ex-President having been scapegoated by

- 82 -

Moody's) dated April 11, 2008, that "subprime mortgages, for example, we know these are bad loans, by their nature" and "[w]e knew that there was fraud" in U.S. mortgages and tried to model around the fraud.

323.    All members of the Class took action and/or refrained from taking action on the basis of the Rating Agencies' negligent and/or malicious statements and omissions:

(a)    if the Rating Agencies had imparted complete and accurate information in the Information Memorandum or other Selling Documents, the Capital Notes would have demanded a higher interest rate to compensate investors for the true risk of the investment;

(b)    if the Rating Agencies had properly updated the Information Memorandum consistent with their duties and undertakings, the Capital Notes investors would have protected their investment capital by:

(i)    insuring against the increased risk; or

(ii)    selling their Capital Notes to less risk-averse investors, such as distressed asset investors;

(c)    if the Rating Agencies had properly executed their duties and undertakings, the Capital Notes would not have received "investment grade" ratings, which was a condition to the acquisition and holding of the Capital Notes; and

(d)    but for the Rating Agencies' misrepresentations and omissions, the Capital Notes would not have issued and would not have been marketable.

324.    All members of the Class have suffered damages as a result of the Rating Agencies' negligent misrepresentations and/or omissions.

## COUNT 2-K

### Claim for Aiding and Abetting
### Against the Rating Agencies

325.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

326.    This is a claim against the Rating Agencies for aiding and abetting other defendants' violations of law alleged herein.

327.    This claim is alleged in the alternative to each Count against the Rating Agencies to the extent such claim does not proceed.

328.    The Rating Agencies knew of the defendants' violations of laws and substantially assisted in such violations.

329.    The Class was damaged thereby.

## COUNT 3-A

### Claim for Breaches of Fiduciary Duties
### Against BoNY

330.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

331.    This is a claim for breaches of fiduciary duties owed to the plaintiff Class by BoNY.

332.    BoNY owed fiduciary duties to the plaintiff Class because, *inter alia:*

(a)     BoNY, its officers, agents and employees, held themselves out as having knowledge, expertise and skill in the area of the valuation of complex securities comprising SIV collateral assets;

(b)     BoNY was in possession of highly material non-public information concerning the performance and quality of assets selected for inclusion in the Cheyne SIV and the methods used to determine their "market" value; and

(c)    BoNY was uniquely positioned to report accurately the market asset values of the Cheyne SIV and, by failing to do so, enabled the Cheyne SIV to build billions of dollars in senior debt obligations backed by low quality assets.

333.    Class members necessarily reposed confidence in BoNY's knowledge, expertise and skill in creating and rating the Cheyne SIV because important information concerning the structuring, rating, and quality of assets underlying the Capital Notes was not provided to Capital Notes investors.

334.    BoNY breached its duties to the Class by, *inter alia*:

(a)    concealing and not disclosing the breaches of contract alleged herein;

(b)    concealing and not disclosing the conduct of the other defendants alleged herein; and

(c)    failing to observe care in protecting the assets of the Capital Notes holders by permitting low quality assets to be included and failing to "mark to market" accurately the assets included in the Cheyne SIV.

335.    BoNY knew of the aforementioned breaches at the time the Capital Notes were issued and throughout the relevant time period.

336.    The plaintiff Class has been damaged as a result of BoNY's breaches of its fiduciary duties in an amount to be determined at trial.

## COUNT 3-B

### Claim for Breaches of Contract
### Against BoNY

337.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

338.    This is a claim for contract breaches against BoNY.

339.     Each member of the plaintiff Class agreed to pay BoNY out of their Capital Notes principal and interest for BoNY's reporting and valuation services with respect to the collateral assets backing the Capital Notes.

340.     The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical sales materials to prospective investors and substantially identical offering memoranda.

341.     BoNY did not provide the agreed upon services.  Material terms of the contract required BoNY to "mark to market" accurately the collateral assets on a "daily" basis.

342.     Plaintiff and all Class members have fully performed under the terms of the Capital Notes sales contract with BoNY.

343.     Pursuant to the Information Memorandum, BoNY had a contractual obligation to prepare a new information memorandum if the Capital Notes program was changed in a way to make the Information Memorandum "inaccurate or misleading." BoNY never prepared a new information memorandum describing the increased risks the Cheyne SIV was undertaking after the Capital Notes were issued, including, but not limited to purchasing a large volume of risky subprime mortgages that were being generated under increasingly risky underwriting criteria and whose riskiness began to materially impact the market values of securities comprising the Cheyne SIV no later than February 2007.

344.     Plaintiff and all Class members have been damaged as a result of BoNY's breaches.

## COUNT 3-C

### Claim for Contract Failure of Condition
### Against BoNY

345.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

346.    This is a claim for contract breaches against BoNY.

347.    Each member of the Class contracted with Morgan Stanley for the sale of the Capital Notes and operation of the Cheyne SIV.  The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical presentations to prospective investors and substantially identical offering memoranda.

348.    It was a condition precedent to the sale of the Capital Notes that they receive "A" and "A3" "investment grade" credit ratings from both Moody's and S&P.  This condition was never satisfied and failed because, *inter alia*:

(a)    BoNY did not adequately analyze the collateral assets that supported the Cheyne SIV; and

(b)    BoNY did not accurately determine the "market value" of the collateral assets.

349.    It was a condition precedent to the sale of the Capital Notes that the assets selected for inclusion in the Cheyne SIV be "high quality" and merit "investment grade" ratings.  These conditions were never satisfied because the nonprime loans supporting the Cheyne SIV were generated with lax and weakening underwriting standards.

350.    It was a condition precedent to the sale of the Capital Notes that thorough due diligence be conducted on all of the assets included in the Cheyne SIV.  BoNY had an obligation to review actual assets included in the Cheyne SIV to determine their "market value."  But for this condition, the Capital Notes would have been unmarketable given the fact that the success of the SIV depended largely on the quality of the assets it held.

351.    Neither plaintiff nor any of the Class members waived any of the foregoing conditions precedent.

352.     Plaintiff and all Class members have fully performed under the terms of the Capital Notes sales agreements with Morgan Stanley.

353.     Plaintiff and all Class members have been damaged as a result of Morgan Stanley's breaches.

## COUNT 3-D

### Claim for Breaches of Contract (Third Party Beneficiary)
### Against BoNY

354.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

355.     This is a claim for contract breaches against BoNY based on the Class's contractual rights as a third-party beneficiary.  It is alleged in the alternative to Count 3-B.

356.     BoNY entered into the contractual obligations referenced herein with the Cheyne SIV and/or Morgan Stanley for the purpose and intent to benefit directly the plaintiff Class.

357.     Morgan Stanley repeatedly represented the benefits that would accrue to Capital Notes investors as a result of BoNY's "daily" market-based valuation services.

358.     As a consequence of BoNY's breach of contract, the plaintiff Class was damaged.

## COUNT 3-E

### Claim for Breaches of Covenant of Good Faith and Fair Dealing
### Against BoNY

359.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

360.     This is a claim for breaches of the covenant of good faith and fair dealing implied in the agreements set forth in herein against BoNY.

361.     BoNY breached the covenant of good faith and fair dealing implied in its sales agreement with Capital Notes investors by, *inter alia*:

(a)     failing to inform plaintiff that their reports to the Cheyne SIV and the Rating Agencies in respect of the collateral assets did not accurately reflect market values of securities acquired by the Cheyne SIV;

(b)     failing to inform plaintiff that their inability to determine the market values of the collateral assets undermined the Cheyne SIV's business model, which was premised on the purported strength of the collateral assets supporting the Cheyne SIV's funding; and

(c)     failing to advise Capital Notes investors of the weak and deteriorating credit conditions in the nonprime credit markets – markets that are not as transparent as equity markets and in which BoNY operates extensive price discovery and valuation services, and to which BoNY had superior access – in order to allow Capital Notes holders to take steps to insure, sell or protect their investments.  BoNY could have easily reported the accurate market values of the assets underlying the Cheyne SIV, which would have limited the Cheyne SIV's ability to continue taking on additional debt to acquire such weak assets.

362.     Plaintiff and all Class members have fully performed under the terms of the Capital Notes agreements with BoNY.

363.     Plaintiff and all Class members have been damaged as a result of BoNY's breaches.

## COUNT 3-F

### Claim for Unjust Enrichment
### Against BoNY

364.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

365.     This is a claim for unjust enrichment or quasi contract against BoNY.

366.     BoNY received substantial compensation for selling the Capital Notes to investors. On information and belief, this fee was derived from the market value of the assets included in the

Cheyne SIV. Thus, the more Capital Notes sold from the Cheyne SIV, the larger the volume of senior debt, the greater the dollar value of the assets to be acquired by the Cheyne SIV, and the larger BoNY's fees. This economic incentive to grow the Cheyne SIV, even in an increasingly risky market, explains but does not justify BoNY's failure to capture and report accurate valuations of the Cheyne SIV's constituent securities.

367.    BoNY directly contributed to the destruction of billions of dollars in investment value as a result of its structuring, rating and doing business with the Cheyne SIV. BoNY stood in conflicted positions relative to the Capital Notes. BoNY failed to exercise reasonable care in conducting its specific oversight roles in the Cheyne SIV but was paid substantial profits and fees out of the Capital Notes' investment principal and income.

368.    BoNY drew value out of the Cheyne SIV, which should have been retained at all times to protect the Capital Notes' value.

369.    Having destroyed billions of dollars in investment capital allocated to the Cheyne SIV, and having taken conflicted positions relative to the Cheyne SIV and its investors, it is against equity and good conscience to permit BoNY to retain any profits or remuneration received in connection with the Cheyne SIV.

370.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is one of the leading financial centers in the world. BoNY's ill-gotten gains should be disgorged in favor of the plaintiff Class in order to protect and promote this public policy.

## COUNT 3-G

### Claim for Tortious Interference with Contract
### Against BoNY

371.　　Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

372.　　This is a claim for tortious interference with contract against BoNY.

373.　　This claim is pled in the alternative to Counts 3-B and 3-C.

374.　　A valid contract exists between the Capital Notes holders and the Cheyne SIV, among others, governing the characteristics of investments that may be acquired by it.  The terms of the contract require the acquisition of assets that are at least rated A/A3 "investment grade" securities, and require the majority of the assets to be acquired to be of even higher ratings. Even under extraordinary circumstances, the Cheyne SIV is not permitted to purchase any securities that are not "investment grade" and even after purchasing securities, the Cheyne SIV is not permitted to own more than 1%, total, of any securities that are below "investment grade."

375.　　Among other things, such purportedly high quality, safe, stable assets were to protect the Capital Notes holders' principal investment "in difficult market conditions."  This contract is evidenced, *inter alia*, by the Selling Documents.

376.　　BoNY was aware of the terms of such agreements as it was responsible for creating and providing valuation reports per their terms.

377.　　BoNY caused the Cheyne SIV to breach the terms of such agreements by, *inter alia*:

(a)　　failing to inform the Cheyne SIV that the assets selected for inclusion in the Cheyne SIV did not merit the "investment" grade ratings assigned to them;

(b)　　facilitating the sale of and permitting the Cheyne SIV to continue purchasing impaired assets; and

- 91 -

(c)      reporting inaccurate information to the Cheyne SIV.

378.     The terms of the contract were actually breached.

379.     Plaintiff and the rest of the Class members have suffered damages as a result of BoNY's actions.

## COUNT 3-H

### Claim for Tortious Interference with Contract (Third Party Beneficiary) Against BoNY

380.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

381.     This is a claim for tortious interference with contract against BoNY.

382.     This claim is pled in the alternative to Counts 3-B and 3-C.

383.     A valid contract exists between Cheyne Capital and the Cheyne SIV, among others, governing the characteristics of investments that may be acquired by it.  The terms of the contract require the acquisition of assets that are at least rated A/A3 "investment grade" securities, and require the majority of the assets to be acquired to be of even higher ratings. Even under extraordinary circumstances, the Cheyne SIV is not permitted to purchase any securities that are not "investment grade" and even after purchase is not permitted to own more than 1%, total, of any securities that are below "investment grade."

384.     BoNY was aware of the terms of such agreements as it was responsible for creating and providing valuation reports per their terms.

385.     BoNY caused the Cheyne SIV and/or Cheyne Capital to breach the terms of such agreements by, *inter alia*:

       (a)     failing to inform the Cheyne SIV and/or Cheyne Capital that the assets selected for inclusion in the Cheyne SIV did not merit the "investment grade" ratings assigned to them;

       (b)     facilitating the sale of and permitting the Cheyne SIV and/or Cheyne Capital to continue purchasing impaired assets; and

       (c)     reporting inaccurate information to the Cheyne SIV and/or Cheyne Capital.

386.    The terms of the contract were actually breached.

387.    Plaintiff and the rest of the Class members have suffered damages as a result of BoNY's actions.

## COUNT 3-I

### Claim for Common Law Fraud
### Against BoNY

388.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

389.    This is a claim for common law fraud against BoNY.

390.    BoNY made materially inaccurate written representations and omissions in substantially identical written materials distributed to each Class member.

391.    The false and misleading written documents include the Selling Documents. Based on information and belief, material omissions were made in BoNY's reports. This belief is based upon, *inter alia*, the fact that, at the very latest, by February of 2007 the Cheyne SIV constituent assets included in the Cheyne SIV reflected neither their intrinsic nor their market values as discussed above.

392.    BoNY made the false and misleading statements on or about the dates the foregoing written materials were distributed to members of the plaintiff Class, and made material omissions on a "daily" basis throughout the Class Period concerning the assets included in the Cheyne SIV.

393.    BoNY made false and misleading statements and omissions on a daily basis following the "launch" of the Cheyne SIV.  BoNY knew based at least upon review of transaction documentation and collaboration with Morgan Stanley and the Cheyne SIV that a failure to report accurately the asset values of the securities included in the Cheyne SIV would have a material negative effect on the Capital Notes investors.

394.    Such statements and the reasons why they are false and misleading are set forth with particularity, above.

395.    BoNY knew or recklessly disregarded the false and misleading nature of its representations and omissions.  The bases for BoNY's knowledge or reckless disregard are set forth with particularity, herein.

396.    BoNY made the materially misleading statements and omissions for the purpose of inducing members of the plaintiff Class to buy and retain the Capital Notes.

397.    The Class justifiably relied on BoNY's materially misleading statements and omissions as they went to the core of their investment decision on the Capital Notes: the risk attending such notes and determination of whether the interest adequately compensated investors.

398.    BoNY's misrepresentations and omissions went to the credit quality of the Capital Notes and the underlying collateral assets.  When the truth regarding these assets was revealed, the Cheyne SIV collapsed.

399.    BoNY continued throughout the relevant time period to conceal information about the credit quality of the Capital Notes and the collateral assets acquired by the Cheyne SIV, and BoNY's

failure to value properly the Cheyne SIV's collateral assets made it possible for the other defendants to continue piling senior debt obligations on top of the Capital Notes.

400.    BoNY was in a superior position to Capital Notes investors as a consequence of rating and monitoring collateral assets, as well as, *inter alia*, its access to material non-public pricing information concerning the Cheyne SIV's collateral assets.

401.    Knowing that investors entrusted hundreds of millions of dollars to BoNY and knowing that such investors were sold Capital Notes that were represented to be secure and stable investments, BoNY had a duty to report to Capital Notes investors that their investment capital and income was at risk due to increasingly deteriorating credit conditions, as increasingly reflected in the market values of the Cheyne SIV's assets.

402.    The Capital Notes would not have been issued without the defendants' misrepresentations, including the high "investment grade" credit ratings.

403.    All of the Class members have been injured as their Capital Notes are worthless or almost worthless.

## COUNT 3-J

### Claim for Negligent Misrepresentation
### Against BoNY

404.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

405.    This is a claim for negligent misrepresentation against BoNY.

406.    BoNY made materially inaccurate written representations and omissions in substantially identical written materials distributed to each Class member, including the Selling Documents such as the Information Memorandum.

407. The Information Memorandum was reviewed and approved for distribution to the Capital Notes investors, who were told to rely upon it. BoNY knew at all times that specific Capital Notes investors to whom the Information Memorandum was provided would and did rely upon its representations and omissions.

408. The Information Memorandum contained materially false and misleading statements and omissions as alleged above.

409. The Class did rely upon the materially false and misleading statements and omissions made in written materials distributed to each Class member, including the Selling Documents such as the Information Memorandum. It was the Class's reasonable expectation – as is common industry practice and sound business practice – that BoNY would update the Information Memorandum to reflect material changes in the Capital Notes by, at the very least, issuing a "supplement" when data demonstrated that the performance of loans included in the U.S. marketplace or in the Cheyne SIV was materially worse that the data used by BoNY to structure and rate the Cheyne SIV.

410. BoNY's obligations are contained in the agreements under which they owed obligations to the Capital Notes investors as alleged herein.

411. Further, BoNY had a special duty of care to accurately and completely represent all material facts to the Capital Notes investors because, *inter alia*:

(a) they owed such investors a fiduciary duty as alleged herein; and

(b) they made an undertaking in the Information Memorandum to provide updates to reflect material changes to the Capital Notes.

412. BoNY was responsible for reviewing and did review the Information Memorandum before it was distributed to each Class member.

413.    All members of the Class took action and/or refrained from taking action on the basis of BoNY's negligent and/or malicious statements and omissions:

(a)    if BoNY had imparted complete and accurate information in the Information Memorandum or other Selling Documents, the Capital Notes would have demanded a higher interest rate to compensate investors for the true risk of the investment;

(b)    if BoNY had properly updated the Information Memorandum consistent with its duties and undertakings, the Capital Notes investors would have protected their investment capital by:

(i)    insuring against the increased risk; or

(ii)    selling their Capital Notes to less risk-averse investors, such as distressed asset investors;

(c)    if BoNY had properly executed their duties and undertakings, the Capital Notes would not have received "investment grade" ratings, which was a condition to the acquisition and holding of the Capital Notes; and

(d)    but for BoNY's misrepresentations and omissions, the Capital Notes would not have been issued and would have been unmarketable.

414.    All members of the Class have suffered damages as a result of BoNY's negligent and/or misrepresentations and omissions.

### COUNT 3-K

### Claim for Aiding and Abetting
### Against BoNY

415.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

416.    This is a claim against BoNY for aiding and abetting other defendants' violations of law alleged above.

417.    This claim is alleged in the alternative to each Claim against BoNY to the extent such claim does not proceed.

418.    BoNY knew of each of the defendants' violations of laws and substantially assisted in such violations.

419.    The Class was damaged thereby.

## XI.    PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Awarding compensatory damages in favor of plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.    Awarding rescission or a rescissory measure of damages; and

D.    Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## XII.    JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 25, 2008                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD


                                           _____
                                                  */S/ Samuel H. Rudman*
                                              SAMUEL H. RUDMAN

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)

                                           COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                           PATRICK J. COUGHLIN
                                           DAVID C. WALTON
                                           PATRICK W. DANIELS
                                           DANIEL S. DROSMAN
                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101-3301
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)

                                           COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                           JASON C. DAVIS
                                           100 Pine Street, Suite 2600
                                           San Francisco, CA 94111
                                           Telephone:  415/288-4545
                                           415/28804534 (fax)

                                           Attorneys for Plaintiff

C:\DOCUME~1\janets.000\LOCALS~1\Temp\MetaSave\Cpt Morgan Stanley SIV.doc