UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ABU DHABI COMMERCIAL BANK, et al.,    :    Civil Action No. 1:08-cv-07508
Individually and On Behalf of All Others    :
Similarly Situated,    :    <u>CLASS ACTION</u>
    :
    Plaintiffs,    :    PLAINTIFFS' MEMORANDUM OF
    :    POINTS AND AUTHORITIES IN
    :    OPPOSITION TO DEFENDANTS'
    vs.    :    MOTIONS TO DISMISS
    :
MORGAN STANLEY & CO.    :
INCORPORATED, et al.,    :
    :
    Defendants.    :
    :
———————————————————— x

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ....................................................................................1

II.    JURISDICTION .................................................................................4

    A.    Subject-Matter Jurisdiction Is Satisfied Under CAFA ............................4

    B.    Subject-Matter Jurisdiction Is Satisfied Under 28 U.S.C. §1332(a)(3) .................5

III.    STANDING ........................................................................................6

IV.    LEGAL ARGUMENTS........................................................................7

    A.    Contract Claims ........................................................................8

        1.    Breach of Contract Claims Meet Rule 8's Liberal Pleading Standard ........................................................................8

        2.    Statute of Frauds ....................................................................10

        3.    Plaintiffs Were Intended Third-Party Beneficiaries ................................10

            a.    English Law Does Not Apply ........................................................12

        4.    Defendants Tortiously Interfered with Contracts ......................................13

    B.    The AC States a Claim for Unjust Enrichment........................................14

    C.    Common Law Fraud Against MS and the Rating Agencies.................................15

        1.    The AC Alleges Defendants Made Material Misrepresentations .............16

            a.    The False Ratings Are Actionable Misrepresentations.................17

            b.    The AC Alleges When and Where Defendants Disseminated the False Ratings ....................................................18

        2.    The AC Alleges MS and the Rating Agencies Knew the Credit Ratings Were False ..................................................................19

        3.    The AC Alleges MS and the Rating Agencies Disseminated the False Credit Ratings with the Intent to Defraud Investors.........................19

        4.    The AC Alleges Reliance on the False Ratings ........................................22

    D.    Defendants Breached Fiduciary Duties Owed to Plaintiffs ....................23

                                                                                    **Page**

E.      The AC States Negligent Misrepresentation Claims .................................................27

F.      The AC States a Claim for Negligence as to the Rating Agencies and
        BoNY ...........................................................................................................30

G.      The AC States Aiding and Abetting Claims Against the Defendants ...................33

H.      The Martin Act Does Not Preclude the AC's Non-Fraud Tort Claims ................34

I.      The First Amendment Does Not Shield Defendants from Liability .....................37

V.      CONCLUSION...............................................................................................40

# TABLE OF AUTHORITIES

Page

**CASES**

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    No. 05 Civ. 9050 (LMM), 2009 WL 1249360
    (S.D.N.Y. May 6, 2009)................................................................................17, 18

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
    No. 01 Civ. 11448 (JGK), 2005 WL 2385854
    (S.D.N.Y. Sept. 26, 2005)...........................................................................29

*Am. Sav. Bank, FSB v. UBS PaineWebber, Inc.*,
    No. M8-85, 2002 WL 31833223 (S.D.N.Y. Dec. 16, 2002)...........................................30

*Andreo v. Freidlander, Gaines, Cohen, Rosenthal & Rosenberg*,
    660 F. Supp. 1362 (D. Conn. 1987)................................................................11

*Apex Oil Co. v. Vanguard Oil & Serv. Co.*,
    760 F.2d 417 (2d Cir. 1985)........................................................................9, 33

*Arthur Young & Co. v. United States Dist. Court*,
    549 F.2d 686 (9th Cir. 1977) .....................................................................23

*Ashcroft v. Iqbal*,
    __ U.S. __, 129 S. Ct. 1937 (2009)................................................................7

*B.W.P. Distribs. v. OE Plus, LTD.*,
    No. 07-CV-9588 (KMK), 2009 WL 1154102
    (S.D.N.Y. Mar. 31, 2009) ..........................................................................10

*Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*,
    No. 8:07-cv-00690-T-17-MMS, 2008 WL 4372847
    (M.D. Fla. Sept. 24, 2008) ........................................................................36

*Bergstein v. Jordache Enters.*,
    No. 90 Civ. 1461 (SAS), 1995 WL 453358
    (S.D.N.Y. Aug. 1, 1995)............................................................................8, 9

*Bresson v. Thomson McKinnon Sec., Inc.*,
    641 F. Supp. 338 (S.D.N.Y. 1986) ................................................................22

*Brook v. UnitedHealth Group, Inc.*,
    No. 06 CV 12954 (GBD), 2007 WL 2827808
    (S.D.N.Y. Sept. 27, 2007)..........................................................................4

**Page**

Bullmore v. Banc of Am. Sec. LLC,
    485 F. Supp. 2d 464 (S.D.N.Y. 2007)............................................................34

Caboara v. Babylon Core Dev., LLC,
    54 A.D.3d 79, 862 N.Y.S.2d 535 (2008) ........................................................35

Caiola v. Citibank, N.A.,
    295 F.3d 312 (2d Cir. 2002)..........................................................................22

Castellano v. Young & Rubicam, Inc.,
    257 F.3d 171 (2d Cir. 2001)..........................................................................35

Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC,
    No. 07 Civ. 7998 (HB), 2008 WL 1710910
    (S.D.N.Y. Apr. 10, 2008)..............................................................................14

Commercial Fin. Servs. v. Arthur Andersen LLP,
    94 P.3d 106 (Okla. Civ. App. 2004) ..............................................................39

Compuware Corp. v. Moody's Investors Servs.,
    499 F.3d 520 (6th Cir. 2007) .........................................................................39

Contractual Obligation Prods., LLC v. AMC Networks, Inc.,
    No. 04 Civ. 2867 (BSJ) (HBP), 2006 WL 6217754
    (S.D.N.Y. Mar. 31, 2006) ...............................................................................8

Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect,
    89 F.3d 650 (9th Cir. 1996) .............................................................................6

Cromer Fin. Ltd. v. Berger,
    No. 00 CIV. 02284 (DLC), 2001 WL 1112548
    (S.D.N.Y. Sept. 20, 2001)..............................................................................35

Di Benedetto v. Pan Am World Serv.,
    359 F.3d 627 (2d Cir. 2004)..........................................................................30

DIMON Inc. v. Folium, Inc.,
    48 F. Supp. 2d 359 (S.D.N.Y. 1999)..............................................................22

Dole Food Co. v. Patrickson,
    538 U.S. 468, 123 S. Ct. 1655 (2003)..............................................................6

Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,
    472 U.S. 749, 105 S. Ct. 2939 (1985)......................................................37, 38

Page

*E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, Inc.*,
    770 F. Supp. 202 (S.D.N.Y. 1991) ...................................................................24

*E*Trade Fin. Corp. v. Deutsche Bank AG*,
    No. 05 Civ. 0902, 2008 WL 2428225
    (S.D.N.Y. June 13, 2008) .........................................................................28

*Eagle Tenants Corp. v. Fishbein*,
    182 A.D.2d 610, 582 N.Y.S.2d 218 (1992) ...................................................30

*Estate of Pew v. Cardarelli*,
    527 F.3d 25 (2d Cir. 2008).........................................................................4

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*,
    375 F.3d 168 (2d Cir. 2004).......................................................................9

*Excellus Health Plan, Inc. v. Tran*,
    287 F. Supp. 2d 167 (W.D.N.Y. 2003) ...............................................13, 15

*Faulkner v. Beer*,
    No. 0603597/2005, 2007 N.Y. Misc. LEXIS 8829
    (N.Y. Sup. Ct. Dec. 21, 2007)..................................................................35

*First Equity Corp. v. Standard & Poor's Corp.*,
    869 F.2d 175 (2d Cir. 1989)..............................................................31, 37

*Flickenger v. Harold C. Brown & Co.*,
    947 F.2d 595 (2d Cir. 1991).....................................................................10

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007).......................................................34

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)................................................34, 36

*Frazier v. Pioneer Ams. LLC*,
    455 F.3d 542 (5th Cir. 2006) ...............................................................4, 5

*Freudenberg v. E*Trade Fin. Corp.*,
    No. 07 Civ. 8538, 2008 WL 2876373
    (S.D.N.Y. July 17, 2008) ..........................................................................7

**Page**

*Garcia v. Boyar & Miller, P.C.*,
    No. 3:06-CV-1936-D, 2007 WL 1556961
    (N.D. Tex. May 30, 2007)..............................................................................................4

*Gates v. Victor Fine Foods*,
    54 F.3d 1457 (9th Cir. 1995) ........................................................................................6

*Glanzer v. Shepard*,
    233 N.Y. 236 (1922) ..............................................................................................29, 31

*Greater Buffalo Press, Inc. v. Harris Corp.*,
    No. CIV-85-1404E, 1988 WL 85943
    (W.D.N.Y. Aug. 15, 1988)............................................................................................8

*Green v. Beer*,
    No. 6 Civ. 4156(KMW)(JCF), 2009 WL 911015
    (S.D.N.Y. Mar. 31, 2009) ...........................................................................................15

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
    50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980) .................................................................14

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007).......................................................................................10

*Hamlet on Olde Oyster Bay Home Owners Ass'n, Inc. v. Holiday Org., Inc.*,
    59 A.D.3d 673, 874 N.Y.S.2d 508 (2009) .............................................................34, 35

*Harmelin v. Man Fin. Inc.*,
    No. 06-1944, 2007 WL 2769675
    (E.D. Pa. Sept. 20, 2007) ...........................................................................................25

*Highland Capital Mgmt., LP v. Schneider*,
    460 F.3d 308 (2d Cir. 2006)........................................................................................10

*Highland Capital Mgmt. LP v. Schneider*,
    8 N.Y.3d 406, 834 N.Y.S.2d 692 (2007) ...................................................................10

*Horn v. 440 E. 57th Co.*,
    151 A.D.2d 112, 547 N.Y.S.2d 1 (1989) ....................................................................35

*Hunt v. Enzo Biochem, Inc.*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008)........................................................................22

**Page**

*Hyatt Corp. v. Stanton*,
  945 F. Supp. 675 (S.D.N.Y. 1996) .................................................................5

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*,
  227 F.3d 8 (2d Cir. 2000)................................................................28, 30

*In re Amaranth Natural Gas Commodities Litig.*,
  No. 07 Civ 6377 (SAS), 2009 WL 1138716
  (S.D.N.Y. Apr. 27, 2009) ............................................................20, 21

*In re Cardiac Devices Qui Tam Litig.*,
  221 F.R.D. 318 (D. Conn. 2004),
  *rev'd in part on other grounds*,
  469 F.3d 263 (2d Cir. 2006)........................................................16, 18

*In re Cenville Cmtys., Inc.*,
  82 Misc. 2d 418, 372 N.Y.S.2d 281
  (N.Y. Sup. Ct. 1973) ...................................................................35

*In re Columbia Sec. Litig.*,
  747 F. Supp. 237 (S.D.N.Y. 1990) .................................................17

*In re County of Orange*,
  245 B.R. 138 (C.D. Cal. 1997) .....................................................37

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  No. 98 Civ 4318(HB), 2000 U.S. Dist. LEXIS 13469
  (S.D.N.Y. Sept. 20, 2000) ..............................................................7

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005),
  *aff'd*, 446 F.3d 585 (5th Cir. 2006)...............................................31, 37, 38

*In re Enron Corp. Sec. Litig.*,
  206 F.R.D. 427 (S.D. Tex. 2002)..................................................7, 37

*In re Fitch, Inc.*,
  330 F.3d 104 (2d Cir. 2003).......................................................37, 38, 39

*In re IBM Corporate Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998)..........................................................17

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................5

**Page**

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ...........................................................7

*In re Livent Sec. Litig.*,
    148 F. Supp. 2d 331 (S.D.N.Y. 2001).............................................................21

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) .......................................................23

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ...................................................................7

*In re Nat'l Century Fin. Enters.*,
    580 F. Supp. 2d 630 (S.D. Ohio 2008) ...............................................29, 38, 39

*In re Parmalat Sec. Litig.*,
    477 F. Supp. 2d 602 (S.D.N.Y. 2007)............................................................16

*In re Ski Train Fire in Kaprun, Aus.*,
    198 F. Supp. 2d 420 (S.D.N.Y. 2002),
    *aff'd*, 67 F. App'x 24 (2d Cir. 2003)...............................................................6

*Int'l Motor Sports Group, Inc. v. Gordon*,
    No. 98 Civ. 5611 (MBM), 1999 WL 619633
    (S.D.N.Y. Aug. 10, 1999) ..............................................................................16

*Jaillet v. Cashman*,
    115 Misc. 383, 189 N.Y.S. 743 (N.Y. Sup. Ct. 1921),
    *aff'd*, 202 A.D. 805, 194 N.Y.S. 947 (1922)..................................................31

*Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs.*,
    175 F.3d 848 (10th Cir. 1999) ...............................................................17, 37

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*,
    No. 08 Civ. 9116 (PGG), 2009 WL 321222
    (S.D.N.Y. Feb. 9, 2009) .................................................................................24

*Kidz Cloz, Inc. v. Officially for Kids, Inc*.,
    No. 00 Civ. 6270 (DC), 2002 WL 392291
    (S.D.N.Y. Mar. 13, 2002) ...............................................................................24

*King v. Simpson*,
    189 F.3d 284 (2d Cir. 1999)...........................................................................36

**Page**

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) ........................................................23

*Kolbeck v. LIT Am.*,
    939 F. Supp. 240 (S.D.N.Y. 1996),
    *aff'd without op.*, 152 F.3d 918 (2d Cir. 1998) ................................34

*LaSala v. Bank of Cyprus Pub. Co. Ltd.*,
    510 F. Supp. 2d 246 (S.D.N.Y. 2007)............................................12

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
    951 F. Supp. 1071 (S.D.N.Y. 1996)............................29, 32, 38, 39

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous*
    *Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001)............................................36

*Levine v. Lawrence*,
    No. 03-CV-1694 (DRH) (ETB), 2005 WL 1412143
    (E.D.N.Y. June 15, 2005) ..............................................................37

*Luyster v. Textron, Inc.*,
    No. 06 CV 4166 (LMM), 2007 WL 1792505
    (S.D.N.Y. Jun. 18, 2007) ..............................................................10

*Maalouf v. Salomon Smith Barney, Inc.*,
    No. 02 Civ. 4770 (SAS), 2003 WL 1858153
    (S.D.N.Y. Apr. 10, 2003) ..............................................................13

*Md. Cas. Co. v. Cont'l Cas. Co.*,
    332 F.3d 145 (2d Cir. 2003)......................................................12, 13

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    382 F. Supp. 2d 411 (S.D.N.Y. 2003)............................................22

*Morin v. Trupin*,
    711 F. Supp. 97 (S.D.N.Y. 1989) ..................................................33

*N.Y. v. Samaritan Asset Mgmt. Servs.*,
    22 Misc. 3d 669, 874 N.Y.S.2d 698
    (N.Y. Sup. Ct. 2008) ......................................................................35

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    89 F. App'x 287 (2d Cir. 2004) ....................................................22

**Page**

*Owens v. Haas,*
    601 F.2d 1242 (2d Cir. 1979).......................................................................11

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006)........................................................................28

*Pension Comm. of the Univ. of Montreal Pension Plan*
    *v. Banc of Am. Sec., LLC,*
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)........................................24, 25, 26, 27

*Pension Comm. of the Univ. of Montreal Pension Plan*
    *v. Banc of Am. Sec., LLC,*
    592 F. Supp. 2d 608 (S.D.N.Y. 2009)..........................................................36

*Pension Comm. of the Univ. of Montreal Pension Plan*
    *v. Banc of Am. Sec. LLC,*
    No. 07-3527-cv, 2009 WL 1587870
    (2d Cir. June 9, 2009) .............................................................................33, 34

*Piccoli A/S v. Calvin Klein Jeanswear Co.,*
    19 F. Supp. 2d 157 (S.D.N.Y. 1998)............................................................11

*Podany v. Robertson Stephens, Inc.,*
    318 F. Supp 2d 146 (S.D.N.Y. 2004)...........................................................20

*Polar Int'l Brokerage Corp. v. Reeve,*
    108 F. Supp. 2d 225 (S.D.N.Y. 2000)..........................................................18

*Pollock v. Ridge,*
    310 F. Supp. 2d 519 (W.D.N.Y. 2004) ...................................................11, 12

*Port Wash. Teachers' Ass'n v. Bd. of Educ.,*
    478 F.3d 494 (2d Cir. 2007)..........................................................................5

*Powers v. British Vita, P.L.C.,*
    57 F.3d 176 (2d Cir. 1995)..........................................................................20

*Quinn v. McGraw-Hill Cos.,*
    168 F.3d 331 (7th Cir. 1999) .......................................................................23

*Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.,*
    191 A.D.2d 621, 595 N.Y.S.2d 492 (1993) .................................................30

**Page**

*Reprosystem, B.V. v. SCM Corp.*,
727 F.2d 257 (2d Cir. 1984)............................................................................14

*Rosner v. Bank of China*,
No. 06 CV 13562, 2008 WL 5416380
(S.D.N.Y. Dec. 18, 2008)...............................................................................33

*Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui"*,
639 F.2d 872 (2d Cir. 1981)..............................................................................6

*Scalp & Blade, Inc. v. Advest, Inc.*,
281 A.D.2d 882, 722 N.Y.S.2d 639 (2001) ....................................................35

*Scantek Med., Inc. v. Sabella*,
583 F. Supp. 2d 477 (S.D.N.Y. 2008)..............................................................22

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998)............................................................................37

*Sec. Investor Protection Corp. v. BDO Seidman, LLP*,
222 F.3d 63 (2d Cir. 2000).............................................................................31

*SEC v. Dunn*,
587 F. Supp. 2d 486 (S.D.N.Y. 2008).............................................................20

*Sergeants Benevolent Ass'n Annuity Fund v. Renck*,
19 A.D.3d 107, 796 N.Y.S.2d 77 (2005) ........................................................24

*Shields v. Citytrust Bancorp*,
25 F.3d 1124 (2d Cir. 1994)............................................................................21

*Skylon Corp. v. Guilford Mills*,
No. 93 Civ. 5581 (LAP), 1997 WL 88894
(S.D.N.Y. Mar. 3, 1997) ...........................................................................20, 21

*Solutia Inc. v. FMC Corp.*,
456 F. Supp. 2d 429 (S.D.N.Y. 2006).............................................................24

*Solvent Chem. Co. v. E.I. DuPont de Nemours & Co.*,
242 F. Supp. 2d 196 (W.D.N.Y. 2002)............................................................36

*Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*,
383 F. Supp. 2d 428 (S.D.N.Y. 2003).............................................................15

**Page**

*Sperry v. Crompton Corp.*,
    8 N.Y.3d 204, 831 N.Y.S.2d 760 (Ct. App. 2007) ............................................14

*Stagl v. Delta Airlines*,
    52 F.3d 463 (2d Cir. 1995)............................................................................31

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
    375 F. Supp. 2d 141 (E.D.N.Y. 2005) ............................................................20

*Strauss v. Belle Realty Co.*,
    65 N.Y.2d 399, 492 N.Y.S.2d 555 (1985) ......................................................32

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506, 122 S. Ct. 992 (2002)...............................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499 (2007).............................................................20

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F.2d 566 (2d Cir. 1991)..........................................................................11

*Ultramares Corp. v. Touche, Niven & Co.*,
    255 N.Y. 170 (1931) ....................................................................................31

*United States ex rel. Johnson v. Shell Oil Co.*,
    183 F.R.D. 204 (E.D. Tex. 1998)...............................................................16, 18

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083, 111 S. Ct. 2749 (1991)...........................................................17

*Vanguard Mun. Bond Fund, Inc. v. Cantor*,
    40 F. Supp. 2d 183 (S.D.N.Y. 1999)...............................................................33

*Vermeulen v. Renault, U.S.A., Inc.*,
    985 F.2d 1534 (11th Cir. 1993) .......................................................................6

*Vinas v. Chubb Corp.*,
    499 F. Supp. 2d 427 (S.D.N.Y. 2006)..............................................................14

*Vladimir v. Cowperthwait*,
    No. 06 Civ 5863 (JGK), 2007 WL 1964157
    (S.D.N.Y. July 3, 2007) ................................................................................11

Page

*Weiss v. La Suisse,*
    69 F. Supp. 2d 449 (S.D.N.Y. 1999)..................................................................8, 11

*White v. Guarente,*
    43 N.Y.2d 356, 401 N.Y.S.2d 474 (1977) ...............................................31, 32

*Wiener v. Lazard Freres & Co.,*
    241 A.D.2d 114, 672 N.Y.S.2d 8 (1998) .........................................................24

*Wynn v. AC Rochester,*
    273 F.3d 153 (2d Cir. 2001)................................................................................15

*Yucyco, Ltd. v. Republic of Slovenia,*
    984 F. Supp. 209 (S.D.N.Y. 1997) ...................................................................13

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78u-4(b)(2) ........................................................................................................20

28 U.S.C.
    §1332(a)(3) .......................................................................................................5, 6
    §1332(d)(5)(B) ......................................................................................................4
    §1332(d)(2) ............................................................................................................4
    §1603.................................................................................................................5, 6

N.Y. U.C.C.
    §8-113(a) & cmt..................................................................................................10

N.Y. U.C.C.
    §8-102(15)...........................................................................................................10

Federal Rules of Civil Procedure
    Rule 8 ..............................................................................................................8, 30
    Rule 8a .................................................................................................................24
    Rule 9(b) ......................................................................................................*passim*
    Rule 12(b)(6).......................................................................................................24

**Page**

## SECONDARY AUTHORITIES

*Corbin on Contracts* (2001)
    §1.12..................................................................................................................................9

Restatement (Second) of Contracts (1979)
    §302................................................................................................................................10

Restatement (Second) of the Law of Torts (1977)
    §766................................................................................................................................14

Abu Dhabi Commercial Bank ("ADCB") and King County, Washington (collectively, "plaintiffs"), respectfully submit this Memorandum of Points and Authorities in Opposition to the two Motions to Dismiss – one filed by Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited (collectively, "MS") together with The Bank of New York Mellon (f/k/a The Bank of New York) and QSR Management Limited (collectively, "BoNY") (the "MS/BoNY Brf.") and the other filed by Moody's Investors Service, Inc. and Moody's Investors Service Ltd. (collectively, "Moody's") together with Standard & Poor's Ratings Services and The McGraw Hill Companies, Inc. (collectively, "S&P," and together with Moody's, the "Rating Agencies") (the "RA Brf.") – the First Amended Complaint for Common Law Fraud, Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, Breach of Contract, Unjust Enrichment and Aiding and Abetting (the "AC").

## I.      BACKGROUND

MS, BoNY, and the Rating Agencies (collectively, "defendants"), worked closely to structure and rate a sprawling legal contraption known as a structured investment vehicle ("Cheyne SIV" or the "SIV"), fill it with billions of dollars worth of shoddy subprime mortgages, and market it as a nearly "risk free" investment.  ¶¶2, 31.[1]  When defendants' fraud and breaches of contract and fiduciary duties came to light in the fall of 2007, the SIV collapsed into bankruptcy and the value of its Notes[2] was essentially wiped out.  Today, all defendants argue plaintiffs ***cannot even state a claim*** for defendants' significant roles in structuring, monitoring and rating the SIV.

_____

[1]      Paragraph references ("¶" or "¶¶") are to the AC.  Emphasis is added and citations are omitted throughout unless otherwise indicated.

[2]      Plaintiffs purchased interests in the SIV, including "top rated" Commercial Paper and Medium Term Notes (collectively, "Senior Notes") and "investment grade" Mezzanine Capital

The SIV was composed of risky, nonprime asset-backed securities. ¶2. Instead of disclosing to investors the true risk and poor quality of the SIV's assets by providing "junk bond" ratings to the SIV, defendants represented throughout the Class Period (October 2004 to October 2007) the Senior Notes warranted A-1+/P-1 and AAA/Aaa ratings by S&P and Moody's, respectively; the Capital Notes warranted A/A3 "investment grade" ratings by S&P and Moody's, respectively; and the entire structure warranted "AAA," or risk-free ratings. ¶¶3, 59. Defendants then targeted a select group of investors to sell the Notes, which were not publicly-listed or traded on the open market. ¶63.

The SIV's credit ratings conveyed specific factual information about the Notes. Specifically, those ratings told investors, among other things, the Rated Notes and the SIV in general:

- were nearly "risk free";

- were as safe, secure, and reliable as high quality corporate or government bonds;

- had a very low probability of default;

- had a reasonably high likelihood of recovery in the rare event of default;

- had a low level of correlation among defaults in the SIV's constituent assets;

- had been rated by objective, independent third parties whose impartiality was not impaired by any significant conflicts of interest;

- had been rated on the basis of current, accurate, and complete data and analysis using reasonable and true models and assumptions; and

- would be monitored on an ongoing basis with care given to the selection of the SIV's constituent assets and the makeup of the SIV's capital structure, which would be modified as necessary in order to reflect the true credit risk associated with the SIV.

¶59; *see also* ¶¶37-38.

---

Notes ("Capital Notes") (collectively, "Senior Notes" and "Capital Notes" are referred to as the "Rated Notes" or the "Notes").

These factual representations were all a lie. Defendants knew the ratings were false because the models, data, and assumptions used to rate the SIV were unreasonable, false and based on pure guesswork. ¶¶67-72, 102-109.[3] Defendants were also aware that the Rating Agencies operated under extreme conflicts of interest, for the Rating Agencies were told what ratings were desired for the SIV and knew they would only be hired if they promised to deliver those ratings. ¶¶110-135. Thus, the Rating Agencies had a direct financial involvement in the SIV. ¶¶9, 127. When the U.S. Securities and Exchange Commission ("SEC") learned about the severity of the Rating Agencies' conflicts, it deemed it necessary to flatly prohibit the practices creating such conflicts.[4] Moreover, defendants received specific information throughout the Class Period demonstrating a dangerously-large number of assets underlying the SIV were risky, nonprime residential mortgage-backed securities ("RMBS"), which made the Notes much more likely to default than the high ratings conveyed. ¶¶77-101.

Defendants also made promises in Information Memoranda ("IM"), Pricing Supplements, reports, and other written and oral representations (the "Selling Documents") to oversee the SIV's investments and facilitate the purchase of safe and highly-rated assets consistent with the top ratings of the Rated Notes. ¶¶61-63. Defendants were obligated to subject the SIV's portfolio of assets to various daily and monthly tests and analyses to ensure the Rated Notes deserved such high ratings.

---

[3]     In fact, in 2004 the Rating Agencies unveiled a new credit rating model, essentially pulled from thin air, which eased ratings standards and opened the floodgates for creating SIVs backed by nonprime assets. ¶67. Before the relaxation of ratings standards, deals such as the SIV could not have been written. *Id.*

[4]     Recent admissions by former employees of the Ratings Agencies confirm the Rating Agencies knew their ratings on investment pools such as the SIV were false: "I knew it was wrong at the time," said a form S&P Managing Director. ¶124. When the subject of tightening ratings criteria was raised at S&P, senior management said: "'Don't kill the golden goose.'" ¶128.

¶61.  Defendants even assured investors the SIV would never contain more than a certain threshold percentage of nonprime asset-backed securities.  ¶¶11, 61.  Defendants breached these promises by failing to monitor and supervise the acquisition of assets and failing to react when data showed the assets were deteriorating.  ¶¶11-12, 76.  Defendants also included a large percentage of low-quality assets in the SIV in breach of their contractual duties.  ¶76.  Had defendants not breached their contractual and fiduciary duties in this regard, the false credit ratings would have been exposed long before August 2007 when the SIV came crashing down, causing billions of dollars in losses.  ¶12.

Defendants now argue there is no claim for which they can ever be found liable.

## II.    JURISDICTION

### A.    Subject-Matter Jurisdiction Is Satisfied Under CAFA

Plaintiffs allege the minimal diversity requirements of 28 U.S.C. §1332(d)(2) and an amount in controversy exceeding $5 million, establishing jurisdiction under the Class Action Fairness Act ("CAFA").[5]  Defendants do not dispute that the AC pleads these two *prima facie* elements, but conjecture the number of class members *might* be less than 100.  *See* MS/BoNY Brf. at 30.

Defendants bear the burden of showing an exception to jurisdiction, *i.e.*, that "the number of members of [plaintiffs' class] is less than 100."  28 U.S.C. §1332(d)(5)(B).[6]  In this case, allocating this burden to defendants is particularly appropriate because defendants control the evidence

---

[5]    *See, e.g.*, ¶¶2-3, 15-20, 27, 149-150, 165-166; *see also Estate of Pew v. Cardarelli*, 527 F.3d 25, 30 (2d Cir. 2008); *Frazier v. Pioneer Ams. LLC*, 455 F.3d 542 (5th Cir. 2006).

[6]    *See Brook v. UnitedHealth Group, Inc.*, No. 06 CV 12954 (GBD), 2007 WL 2827808, at *3 (S.D.N.Y. Sept. 27, 2007) ("once CAFA jurisdiction is established, the burden of proof to establish the existence of an exception rests with [objecting party]"); *Garcia v. Boyar & Miller, P.C.*, No. 3:06-CV-1936-D, 2007 WL 1556961, at *4 (N.D. Tex. May 30, 2007) ("§1332(d)(5)(B), as a component of one of the exceptions set out in §1332(d)(3)-(5), is an exception to jurisdiction that the party opposing [federal jurisdiction] must establish").

- 4 -

necessary to determine whether CAFA's "small class" exception applies. *See Frazier*, 455 F.3d at 546. Defendants have failed to carry their burden.[7] Accepting plaintiffs' allegations as true, and drawing all reasonable inferences in favor of plaintiffs, the AC alleges CAFA jurisdiction.[8] *See Port Wash. Teachers' Ass'n v. Bd. of Educ.*, 478 F.3d 494, 498 (2d Cir. 2007).

**B.    Subject-Matter Jurisdiction Is Satisfied Under 28 U.S.C. §1332(a)(3)**

The AC alleges jurisdiction under 28 U.S.C. §1332(a)(3) because the amount in controversy exceeds $75,000 and this matter is between citizens of the State of Washington and citizens of the State of New York with additional parties who are citizens or subjects of foreign states. ¶26. Defendants argue ADCB is a "foreign state," and not a "citizen or subject" of a foreign state, because "ADCB is 64.8%-owned by the government of Abu Dhabi." MS/BoNY Brf. at 29-30. This argument misconstrues ADCB's ownership structure. The controlling interest in ADCB is held by Abu Dhabi Investment Counsel ("ADIC"), an entity that is separate and independent from the government of Abu Dhabi. *See* Plaintiffs' Rule 7.1 Disclosure Statement, filed August 25, 2008. And even if ADIC is considered an "instrumentality" or "agency" of the Abu Dhabi government, courts have repeatedly held "[a] corporation a majority of whose shares are owned by an agency or instrumentality is not a foreign state under [§1603]." *Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 690 (S.D.N.Y. 1996). Only entities directly owned by a foreign state are considered a "foreign state"

---

[7]    In fact, the "small class" exception to CAFA does not apply. From defendants' very limited jurisdictional discovery responses, it is clear that there were, at a minimum, 37 investors (excluding secondary market purchasers) in the Capital Notes. As of September 4, 2007, the monetary value of the SIV's outstanding Senior Notes was more than *12 times* that of the Capital Notes. Therefore, the total number of investors in the SIV's Rated Notes during the Class Period was more than 100.

[8]    Plaintiffs are under no obligation to affirmatively establish the damages suffered by members of the proposed Class at the motion to dismiss stage. *See* MS/BoNY Brf. at 30; *see also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 (S.D.N.Y. 2003).

under 28 U.S.C. §1603.[9]  Because ADIC, not Abu Dhabi, owns the controlling interest in ADCB,

defendants' contention that a majority of ADCB's "shares or other ownership interest is owned by a

foreign state" fails.[10]

## III.    STANDING

Defendants cannot identify a single case supporting their contention that "any claims based

on the purchase of [Medium Term Notes] must be dismissed because neither plaintiff purchased

them."  *See* MS/BoNY Brf. at 13.  In class actions, holders of one type of security have standing to

represent holders of other types of securities, "so long as the plaintiffs have alleged a single course

---

[9]      The concept of "tiering" in connection with state ownership under §1603(b)(3) has been
soundly rejected.  *See In re Ski Train Fire in Kaprun, Aus.*, 198 F. Supp. 2d 420, 423-26 (S.D.N.Y.
2002) ("the term 'foreign state' as used in section 1603(b)(2) does *not* include agencies or
instrumentalities but refers solely to foreign states proper") (emphasis in original), *aff'd*, 67 F. App'x
24 (2d Cir. 2003); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 474, 123 S. Ct. 1655, 1660
(2003) (finding "Congress had corporate formalities in mind," holding "only **direct ownership** of a
majority of shares by the foreign state satisfies the statutory requirement [of §1603(b)(2)]"); *Gates v.
Victor Fine Foods*, 54 F.3d 1457, 1462 (9th Cir. 1995) (holding that a fully-owned subsidiary of an
"organ of a foreign state" is not an "agency or instrumentality of a foreign state").

[10]     Even if ADCB could satisfy the "foreign state" definition under §1603, such a finding would
not prevent this Court from having jurisdiction under §1332(a)(3).  Defendants' cases are inapposite
because each involved situations where a **defendant** was asserting its **own** "foreign state" status as a
shield in order to **avoid** being subject to the court's jurisdiction.  *See Vermeulen v. Renault, U.S.A.,
Inc.*, 985 F.2d 1534, 1542-43 (11th Cir. 1993); *Ruggiero v. Compania Peruana de Vapores "Inca
Capac Yupanqui"*, 639 F.2d 872, 875 (2d Cir. 1981).  Defendants cite no authority for their
contention that the Foreign Sovereign Immunities Act ("FSIA") may be used as a sword to **prevent a
plaintiff** from submitting to the court's jurisdiction.  This lack of authority is not surprising,
considering the stated purposes of the Act and the well-establish doctrine of express waiver under
the FSIA.  *See, e.g.*, *Patrickson v. Dole Food Co*., 251 F.3d 795, 806 (9th Cir. 2001) (discussing
legislative intent of FSIA and noting "[t]he FSIA seeks to avoid affronting other governments by
making it hard for private litigants to haul them into court"), *aff'd, in part, cert. dismissed, in part*,
538 U.S. 468, 123 S. Ct. 1655 (2003); *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V.
v. M/T Respect*, 89 F.3d 650, 653-54 (9th Cir. 1996) (discussing waiver under FSIA).

of wrongful conduct with regard to each security."[11]  Here, defendants engaged in a "single course of wrongful conduct" with regard to each type of Rated Note.  *See* ¶¶59, 61, 66.  Furthermore, defendants have failed to establish any divergence between the interests of the named plaintiffs and the Medium Term Note purchasers.[12]  Finally, plaintiffs' ability to represent purchasers of Medium Term Notes is a non-issue at this stage of the proceedings.[13]

## IV.  LEGAL ARGUMENTS

Defendants are not entitled to dismissal because a complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009).  A complaint is plausible when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

---

[11]     *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318(HB), 2000 U.S. Dist. LEXIS 13469, at *8 (S.D.N.Y. Sept. 20, 2000); *see also In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 445 (S.D. Tex. 2002) ("[C]ourts have repeatedly concluded that stock purchasers can represent purchasers of debt instruments and vice versa in the same action."); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008) (same).

[12]     *See Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2008 WL 2876373, at *6 (S.D.N.Y. July 17, 2008) (courts "***often appoint purchasers of one type of securities to represent purchasers of other types of securities of the same issuer where the interests of those purchasers are aligned***").

[13]     *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 (D.N.J. 1998) (whether investors in one type of stock could represent investors who purchased other types of stock is better addressed at the class certification stage).

### A.    Contract Claims

#### 1.    Breach of Contract Claims Meet Rule 8's Liberal Pleading Standard

"[T]here is no requirement in the Federal Rules of Civil Procedure that the details of a breach of contract claim be pleaded with particularity. Instead, the short, plain notice rule of Fed. R. Civ. P. 8 applies."[14] Nonetheless, defendants contend the AC fails to plead any contracts were formed, the specific details of those contracts, or that any party intended to be bound. MS/BoNY Brf. at 16-18; RA Brf. at 18-19. The AC alleges that MS and BoNY issued the Selling Documents containing the key terms of their obligations. ¶¶62-64.[15] The Rating Agencies made written promises in the Selling Documents as well.[16] Plaintiffs purchased Rated Notes. Nothing more is required to plead the existence of contracts.[17] *Contractual Obligation Prods.*, 2006 WL 6217754, at *6.

---

[14]    *Weiss v. La Suisse*, 69 F. Supp. 2d 449, 462 (S.D.N.Y. 1999); *see also Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, No. 04 Civ. 2867 (BSJ) (HBP), 2006 WL 6217754, at *6 (S.D.N.Y. Mar. 31, 2006). "[G]eneral averments to certain promises by [defendant] and agreements between the parties are sufficient to allege the first element of a breach of contract claim – the existence of an agreement." *Contractual Obligation Prods.*, 2006 WL 6217754 at *19; *see also Greater Buffalo Press, Inc. v. Harris Corp.*, No. CIV-85-1404E, 1988 WL 85943, at *1 (W.D.N.Y. Aug. 15, 1988) (denying motion to dismiss breach of contract claim where it was argued that the complaint failed "to allege specifically the existence of any agreements").

[15]    MS and BoNY promised to: (1) oversee the Cheyne SIV's investments; (2) facilitate the purchase of safe and highly-rated assets; (3) acquire and manage the SIV's underlying portfolio in a way that legitimately justified the high credit ratings assigned to the SIV; (4) conduct capital, market sensitivity, and liquidity tests to monitor the SIV's assets; (5) ensure the Rates Notes would be supported by at least 40% "AAA" – and at least 60% "AA" – collateral assets; (6) ensure the amount of RMBS supporting the Cheyne SIV would never exceed 55%; and (7) with respect to BoNY, to "mark to market" all of Cheyne SIV's assets on a daily basis and deliver reports to the Rating Agencies for review. ¶¶11, 52, 61.

[16]    The Rating Agencies agreed to: (1) review and analyze reports received from BoNY in order to observe the performance of collateral assets contained in the Cheyne SIV every week throughout the Class Period; (2) work with MS and BoNY to conduct capital, market sensitivity, and liquidity tests to monitor the SIV's assets; (3) monitor the Cheyne SIV's covenants and breaches of those covenants; (4) determine applicable "legal maturity dates" and "cure periods"; (5) approve

Moreover, "[i]t is quite possible for two persons to reach an agreement and to express that fact in words or other conduct, without going through the specific process of an offer made by one, followed by a separate and independent acceptance by the other." *Corbin on Contracts* §1.12 (2001). Where no written contract is readily identifiable, "the existence of a contract may be established through conduct of the parties recognizing the contract." *Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985). Here, defendants made promises in the Selling Documents to structure, market, and monitor the SIV in the manner described above. Plaintiffs invested billions of dollars based on the key terms in those documents.[18] The parties' conduct clearly evinces contractual relations. Any argument that the parties did not ***intend*** to contract, aside from being disingenuous, is a trial issue. *Bergstein*, 1995 WL 453358, at \*5-\*6.

---

substitutions and changes to the SIV's portfolio of assets; (6) attend meetings held by investors and retain approval rights of modifications to the SIV; (7) ensure the Rates Notes would be supported by at least 40% "AAA" – and at least 60% "AA" – collateral assets; and (8) ensure that the amount of RMBS supported the Cheyne SIV would never exceed 55%. ¶¶11, 52-53, 61.

[17]     At the ***summary judgment stage***, where, as here, the terms of the contracts were alleged to be "evidenced by various writings and oral exchanges," it is improper to determine as a matter of law that the parties did not intend to enter a contract. *Bergstein v. Jordache Enters.*, No. 90 Civ. 1461 (SAS), 1995 WL 453358, at \*5-\*6 (S.D.N.Y. Aug. 1, 1995). Here, at the ***pleading stage***, plaintiffs have more than sufficiently pled contractual relationships between and among plaintiffs and defendants.

[18]     Defendants do not dispute plaintiffs' allegations that there was a breach and damages. ¶¶6, 11-12, 189, 284, 357. Thus, plaintiffs have alleged elements sufficient to state a claim for breach of contract. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004). Additionally, even if the Court entertains defendants' argument that failure of condition is not a separate claim, *see* MS/BoNY Brf. at 18 n.6, at a minimum defendants' failure to deliver "investment grade" Rated Notes demonstrates their breach. ¶8. Defendants do not contend they fulfilled ***any*** of the conditions alleged in the AC.

### 2. Statute of Frauds

BoNY contends the Statute of Frauds ("SOF") defeats plaintiffs' contract allegations.[19]

However, "'[a] plaintiff need not affirmatively allege a writing to survive a motion to dismiss; to the

contrary, the Statute of Frauds is an ***affirmative defense***, as to which the burden of pleading and

proof is on the defendant.'" *B.W.P. Distribs. v. OE Plus, LTD.*, No. 07-CV-9588 (KMK), 2009 WL

1154102, at *5 (S.D.N.Y. Mar. 31, 2009). BoNY has failed to ***plead and prove*** precisely why the

SOF should bar this action. The SOF encompasses "'only those contracts which, by their terms,

"have absolutely no possibility in fact and law of full performance within one year."'" *Guilbert v.*

*Gardner*, 480 F.3d 140, 151 (2d Cir. 2007). BoNY has not met this burden of proof. Finally, the

alleged contracts are exempt from the SOF because they involved the purchase or sale of securities.

*See* N.Y. U.C.C. §8-102(15).[20]

### 3. Plaintiffs Were Intended Third-Party Beneficiaries

"New York law follows the Restatement (Second) of Contracts §302 (1979) in allowing a

third party to enforce a contract if that third party is an intended beneficiary of the contract."

*Flickenger v. Harold C. Brown & Co.*, 947 F.2d 595, 599-600 (2d Cir. 1991). Under §302, and at

---

[19]    BoNY alternatively argues all claims against it should be dismissed because the AC fails to allege veil piercing. But both The Bank of New York Mellon and QSR Management Limited are alleged to be responsible for the misconduct vis-à-vis the SIV. ¶¶23-24. Thus, no veil piercing analysis is necessary. *See Luyster v. Textron, Inc.*, No. 06 CV 4166 (LMM), 2007 WL 1792505, at *2 (S.D.N.Y. Jun. 18, 2007) (no corporate veil piercing analysis necessary where "[defendant] remains a defendant because [p]laintiff has alleged that [defendant] is directly liable"). Even if veil piercing was an issue, "the Court need not reach the issue of piercing the corporate veil to resolve [defendant's] role at [the motion to dismiss] stage in the litigation." *Id.*

[20]    *See also* N.Y. U.C.C. §8-113(a) & cmt. (noting that the SOF does not apply to contracts for the purchase or sale of securities because "the statute of frauds is ***unsuited to the realities of the securities business***"); *Highland Capital Mgmt., LP v. Schneider*, 460 F.3d 308 (2d Cir. 2006) (same). The Rated Notes qualify as "securities" under New York's broad definition of that term. *See Highland Capital Mgmt. LP v. Schneider*, 8 N.Y.3d 406, 834 N.Y.S.2d 692 (2007).

- 10 -

the pleading stage, "[t]he requirement of an intent to permit enforcement by the third party is satisfied by demonstrating an intent to benefit that party." *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 163 (S.D.N.Y. 1998). That intent "may be gleaned from the contract as a whole and the party need not be named specifically as a beneficiary." *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991) ("it is well-settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract").

The AC alleges facts demonstrating defendants contracted with the intent to benefit the SIV investors. ¶¶20, 51-53, 61, 207, 301, 373.[21] These contracts were created "for the purpose and intent to benefit directly the plaintiff Class." ¶206. There was no other purpose for defendants' contracts than to generate revenue for themselves by providing service to the SIV and its investors. *See Piccoli*, 19 F. Supp. 2d at 163. Defendants breached these contracts when they failed to monitor and manage the SIV in the manner promised. ¶¶11-12. Third-party beneficiary claims are thus pleaded.[22]

---

[21]    To the extent defendants argue that the AC does not adequately allege the existence of contracts between defendants (*see* MS/BoNY Brf. at 23; RA Brf. at 20), this argument should be rejected. The AC alleges in detail that defendants contracted with one another to carry out duties for the Cheyne SIV. *See* ¶¶51-53, 61; *see also Weiss*, 69 F. Supp. 2d at 462 ("[T]here is no requirement in the Federal Rules of Civil Procedure that the details of a breach of contract claim be pleaded with particularity."). Put simply, but for the Cheyne SIV investors the Cheyne SIV would never have existed, and but for the Cheyne SIV the contracts entered into between the defendants would never have been formed. The Cheyne SIV investors were thus the intended, direct beneficiaries of those contracts.

[22]    *See Andreo v. Freidlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1373 (D. Conn. 1987) (although the complaint did "not set forth any specific language of the contract or other evidence tending to show that the parties intended to create a direct obligation to plaintiffs, that [was] *a matter of proof not of pleading*"); *see also Vladimir v. Cowperthwait*, No. 06 Civ. 5863 (JGK), 2007 WL 1964157, at *1-*2 (S.D.N.Y. July 3, 2007); *Pollock v. Ridge*, 310 F. Supp. 2d 519, 527 (W.D.N.Y. 2004) (finding plaintiff's third-party beneficiary claim "better resolved on summary

### a.    English Law Does Not Apply

Defendants assert "English law *may* apply" to the third-party beneficiary claims.  MS/BoNY Brf. at 21 & n.8.  The *only* basis for this assertion is that one IM related to the Mezzanine Capital Notes is governed by English law.  *See id.*  At the same time, the Rating Agencies attach an information memorandum that specifies New York law applies.  *See* Affirmation of Dean Ringel in Support of RA Brf., Ex. 1 at 19.  In any event, plaintiffs do not claim to be third-party beneficiaries of any IM.  Rather, the relevant contracts are those between and among BoNY, MS, the Rating Agencies, and the Cheyne SIV, which were created "for the purpose and intent to benefit directly the plaintiff Class."  ¶206; *see also* ¶¶300, 372.  Because defendants have failed to identify *any* relevant facts supporting their contention that the U.K. has the "'most significant relationship to the transactions and the parties,'" U.K. law does not apply to the AC's third-party beneficiary claims. MS/BoNY Brf. at 22 (quoting *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 266 (S.D.N.Y. 2007)).

New York has "'"'the most significant relationship to the transaction and the parties,'"'" *LaSala*, 510 F. Supp. 2d at 266, and the "'most significant contacts with the matter in dispute.'" *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003).[23]  "[T]he domicile or place of business of the contracting parties" is also a factor to consider.  *Id.* at 152.  As *four of the five*

---

judgment or at trial" because "[i]n order to determine whether plaintiff is an intended beneficiary, the Court must examine the language of the contract and perhaps other relevant evidence").

[23]    The AC alleges: (1) "100% of the more than $8 billion in Senior Notes were issued by the Delaware subsidiary of the Cheyne SIV"; (2) "[t]he register of the certificateless depositary interests was to be maintained in New York"; (3) "[u]p to 100% of the investments in the underlying portfolio could be made in the United States"; (4) "[a]pproximately 80% of the [Cheyne SIV's] assets were concentrated in the United States as of August 2007"; and (5) at minimum, "75% of the [Cheyne SIV] portfolio was required to be denominated in U.S. dollars."  ¶29.

alleged contracting parties – the two Rating Agencies, MS, and BoNY – maintain their place of business in New York, this is another factor militating the application of New York law. *Id.* at 151; *see also* ¶¶16-25, 28.[24]

### 4.    Defendants Tortiously Interfered with Contracts

Plaintiffs need only plead: (1) existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the breach of that contract; and (4) damages. *See Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 224 (S.D.N.Y. 1997).  Defendants argue the first and third elements have not been pled.  MS/BoNY Brf. at 19-20; RA Brf. at 23-24.  The AC alleges the existence of contracts between plaintiffs and the SIV, *see supra* §IV.A.1.,[25] therefore the only remaining issue is intent, which is a "highly fact-based" question that "often involves sifting through circumstantial evidence."[26]  And a claim for tortious interference with contract requires only

---

[24]    For the same reasons, defendants musing that English law might apply to the AC's other allegations, *see* MS/BoNY Brf. at 21 n.8, should be rejected.  Defendants assert the U.K. does not recognize the breach of covenant of good faith and fair dealing claims, but admit that New York does.  *Id.* at 23 n.9.  Their alternative argument, which suggests plaintiffs' contract claims are "duplicative" of their breach of covenant of good faith and fair dealing claims, is equally unpersuasive as plaintiffs have alleged ***different facts*** in support of these claims.  *Compare* ¶¶184-192 (breach of contract) *with* ¶¶209-214 (breach of covenant of good faith and fair dealing); *compare* ¶¶279-287 (breach of contract) *with* ¶¶305-310 (covenant of good faith and fair dealing); *compare* ¶¶351-358 (breach of contract) *with* ¶¶375-379 (covenant of good faith and fair dealing).

[25]    Likewise, the AC alleges contracts between the SIV and the Rating Agencies and BoNY under which plaintiffs were third-party beneficiaries (*see* §IV.A.3., *supra*) to support the tortious interference claim against MS with respect to these contracts.  ¶¶229-234; *see also Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 176 (W.D.N.Y. 2003) (finding tortious interference with contract to be adequately pled even without specification of any contractual terms).

[26]    *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770 (SAS), 2003 WL 1858153, at *8 (S.D.N.Y. Apr. 10, 2003) ("'Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case'" of tortious interference.) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 997-98 (2002)).

"improper" conduct.[27]  Plaintiffs need not show malice to prevail.[28]  Defendants' improper conduct is alleged, including, but not limited to, deliberately selling nonprime assets to the SIV and permitting the SIV to purchase those impaired assets (¶¶226, 322), bestowing false and inaccurate credit ratings on the SIV (¶322), and systematically reporting inaccurate information about the SIV (¶391).  This conduct caused plaintiffs' damage.

### B.     The AC States a Claim for Unjust Enrichment

Under New York law, "a plaintiff seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the defendant, and then show that as between the two parties enrichment of the defendant was unjust."[29]  Defendants argue plaintiffs' unjust enrichment claims fail because the AC does not allege plaintiffs directly paid defendants' fees.  To the contrary, the AC alleges defendants received "substantial profits and fees *out of the Rated*

---

[27]     *See Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 434 (S.D.N.Y. 2006); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189-90, 428 N.Y.S.2d 628, 631 (1980) (observing that the "keystone" of tortious interference with contract as set forth in Restatement (Second) of the Law of Torts (1977), §766, is "the adverb 'improperly[,]' a term selected in preference to the phrase 'without justification' appearing frequently in judicial decisions").

[28]     *Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998 (HB), 2008 WL 1710910, at *4 (S.D.N.Y. Apr. 10, 2008) ("It must be emphasized that to state a claim for tortious interference with contract under New York law, [plaintiff] need not allege malice on the part of [defendant] . . . .").

[29]     *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir. 1984).  To the extent defendants argue that a relationship between the parties be demonstrated before a claim for unjust enrichment can lie, this argument lacks merit.  *See* RA Brf. at 22 (citing *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 831 N.Y.S.2d 760, 766 (Ct. App. 2007)); MS/BoNY Brf. at 16 n.5.  *Sperry* held there must be some "connection" between the parties, they "need not be in privity."  8 N.Y.3d at 215, 831 N.Y.S.2d at 766.  Because the AC alleges contracts between plaintiffs and defendants, *see supra* §IV.A.1., this point is moot.

*Notes' investment capital and income on capital*." ¶¶56, 218, 314, 383.[30]  Additionally, the AC

alleges the "Rating Agencies' substantial remuneration was drawn from the proceeds of the Rated

Notes' issuance, and their ongoing fees were paid **out of income owed to Rated Notes investors**."

¶22.  But for the investments made by the SIV investors defendants would not have received their

substantial fees.[31]  Defendants destroyed billions of dollars in investment value as a result of their

arranging, structuring, and selling the Rated Notes to investors, while operating under extreme

conflicts of interest and without reasonable care.  It violates equity and good conscience to permit

defendants to retain the many millions of dollars in profit while investors lose billions.

## C.    Common Law Fraud Against MS and the Rating Agencies

To state a claim for fraud under New York law, plaintiffs must allege: (1) a material

misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to

defraud; and (4) reasonable reliance on the part of the plaintiff; (5) that causes damage to the

plaintiff.  *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).  The AC adequately pleads

each of these elements as to defendants MS and the Rating Agencies.[32]

---

[30]    *See Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 449 (S.D.N.Y. 2003) (permitting defendant to retain plaintiffs' $500,000 investment would be unjust "[s]ince plaintiffs ha[d] adequately pled that a benefit was conferred upon the defendants and that the defendants' enrichment was unjust and at the plaintiffs' expense"); *see also Excellus*, 287 F. Supp. 2d at 180 (holding allegations plaintiff "ha[d] wrongfully withheld payments due for services rendered, resulting in unjust enrichment" sufficient to withstand motion to dismiss).

[31]    *See Green v. Beer*, No. 6 Civ. 4156(KMW)(JCF), 2009 WL 911015, at *4 (S.D.N.Y. Mar. 31, 2009) (noting "whether Plaintiffs' fees benefitted Defendants directly or indirectly is irrelevant to Plaintiffs' unjust enrichment claim" and holding allegations "the ten individual Plaintiffs '*paid fees to the Defendants' and others*" sufficient to allege unjust enrichment on a motion to dismiss).

[32]    Rule 9(b) requires, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The Rule also states, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*  As such, the heightened pleading requirements of Rule 9(b) relate only to the first

- 15 -

### 1.    The AC Alleges Defendants Made Material Misrepresentations

Courts hold that "to satisfy the requirements of Rule 9(b), a plaintiff's complaint must (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 332 (D. Conn. 2004), *rev'd in part on other grounds*, 469 F.3d 263 (2d Cir. 2006). Courts also routinely recognize that "[s]pecific pieces of information . . . are required under Rule 9(b) *only as necessary to serve its underlying purposes*." *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 611-12 (S.D.N.Y. 2007).[33]

Moreover, courts frequently find that, "in cases involving complex or extensive schemes of fraud," the pleading requirements of Rule 9(b) must be "relaxed."[34] These courts recognize, "[t]o approach the issue otherwise would allow the more *sophisticated* to escape liability under [Rule 9(b)] due to the *complexity of their scheme* and their deviousness in escaping detection." *Shell Oil*, 183 F.R.D. at 207.

---

element of a claim for common fraud – namely, the allegation of a material misrepresentation or omission of fact.

[33]    *See also Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611 (MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug. 10, 1999) ("plaintiff need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based'").

[34]    *See Cardiac Devices*, 221 F.R.D. at 333-34 (collecting cases and finding "courts have tempered the heightened pleading requirements of Rule 9(b) when the underlying purposes of Rule 9(b) have been met or when pleading each instance of the allegedly fraudulent conduct would be impractical"); *see also United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) ("It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend 'upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'").

The AC alleges (1) credit ratings were communicated to Rated Notes investors, (2) by each of the defendants, (3) through the Selling Documents and private information services, on each day throughout the Class Period, and (4) that such ratings conveyed false information about the SIV and the Rated Notes. ¶¶59-60. Given the nature and complexity of defendants' fraudulent scheme, these allegations more than adequately satisfy Rule 9(b) and provide notice to defendants.[35]

### a.    The False Ratings Are Actionable Misrepresentations

The ratings assigned to the SIV and the Rated Notes constituted material misrepresentations because they falsely conveyed the Rated Notes were, for example, nearly "risk free," much like a high-quality government or corporate bond. ¶¶37-38, 59.[36] These ratings were not opinions, but were instead false statements of fact. ¶59.[37] Even if the credit ratings could properly be viewed as "opinion," they are still actionable. *See Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05 Civ. 9050 (LMM), 2009 WL 1249360, at *33 (S.D.N.Y. May 6, 2009) ("fairness opinion" actionable as investment bank had "intimate knowledge" of company's undisclosed financial condition). Thus, whether the ratings are viewed as opinions or not, they are actionable misrepresentations.

---

[35]    *See In re Columbia Sec. Litig.*, 747 F. Supp. 237, 241 (S.D.N.Y. 1990) ("Rule 9(b) 'imposes no requirement of prolixity,' . . . rather, it simply seeks to insure that the defendant has a fair opportunity to respond to the plaintiff's charges . . . .").

[36]    As alleged, these facts were all false. ¶¶44-60, 65-142. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94, 111 S. Ct. 2749, 2758 (1991) ("conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading").

[37]    A defendant cannot transform an actionable statement of fact into an inactionable statement of opinion, merely by wording and framing it as such. *See Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d 848, 856 (10th Cir. 1999) ("that Moody's article describes its evaluation as an opinion is not sufficient, standing alone, to establish that Moody's statements are protected"); *see also In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998) (holding "an opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact").

> **b.      The AC Alleges When and Where Defendants Disseminated the False Ratings**

MS, along with the Rating Agencies, played a vital role in the ratings process.  ¶¶44, 69. Without each defendant's active participation in structuring, operating, and marketing the SIV, the false ratings never would have been issued.  *Id.*[38]  Thus, the false ratings are misrepresentations attributable to each of the defendants under the group pleading doctrine, which serves as "an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint."[39]  As a result of defendants' collective misconduct, the false ratings were communicated directly to investors via the Selling Documents and private information services.  ¶¶60, 62-64, 157, 292.  And these communications occurred on each day throughout the Class Period.  ¶60.[40]  The AC adequately alleges when and where the misrepresentations were made.[41]

---

[38]    The AC also alleges that, in addition to its role in the ratings process, MS, as the Arranger and Placement Agent for the Rated Notes, actually communicated the false ratings directly to investors.  *See* ¶¶62-64, 157.

[39]    *See Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) ("Group pleading allows plaintiffs to 'rely on a presumption that statements in . . . group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'").  Although the group pleading doctrine has most frequently been applied in the context of attributing a company's written statements to the insiders who created the document in question, its rationale is equally applicable here, where defendants effectively were the "insiders" of the SIV.

[40]    This fact is supported by the magnitude of the SIVs offerings throughout the Class Period and plaintiffs' allegations that defendants were under a duty to update and monitor the false ratings assigned to the SIV and the Notes.  ¶¶59, 105-106, 174-175, 179, 261-263, 274.  By failing to correct the false ratings, defendants effectively repeated the false misrepresentations on each day throughout the Class Period.

[41]    Defendants take issue with the fact that the AC does not allege the time and place for each fraudulent misrepresentation with greater specificity.  *See* MS/BoNY Brf. at 11-12; RA Brf. at 6-7. However, this is an unavoidable consequence of the manner in which defendants' fraud was perpetrated on Rated Notes investors, and therefore should not serve to immunize defendants from liability under Rule 9(b).  *See Cardiac Devices*, 221 F.R.D. at 333; *Shell Oil*, 183 F.R.D. at 206-07.

2.     **The AC Alleges MS and the Rating Agencies Knew the Credit Ratings Were False**

Defendants were undeniably aware of specific information that contradicted the "Triple A" and "investment grade" ratings they assigned to the SIV and its Rated Notes.  ¶¶6-10, 54, 67-71, 73-100, 102-142.  The AC alleges MS and the Rating Agencies had *actual* knowledge that the SIV's ratings were false.  As to MS, among other things, it received due diligence reports from Clayton Holdings regarding the toxic subprime loans contained in the SIV.  ¶92.  MS provided mortgage and commercial banking services to subprime loan originators, such as New Century.  ¶32.  MS had access to the Rating Agencies' models and knew the SIV's ratings were incomparable to high-quality government and corporate bonds. ¶69.  And as arranger of the SIV, MS colluded to generate biased ratings by funneling investors' capital into the Rating Agencies' success fee.  ¶¶5, 110-135.

As to the Rating Agencies, they received non-public information from subprime mortgage originators due to their privileged Regulation FD status. ¶99. They rated the SIV's toxic subprime assets (¶100), which are described throughout the AC. They knew their models could not and did not capture exotic mortgage products because such products previously did not exist and because their actual performance did not match their "assumptions."  ¶¶103-109.  The Rating Agencies knew they were generating biased ratings (¶¶110-135) and received the equivalent of an investment banker's success fee for closing the SIV transaction for *triple* their usual fee (¶¶56-58).  The SEC made similar findings.  ¶118.

3.     **The AC Alleges MS and the Rating Agencies Disseminated the False Credit Ratings with the Intent to Defraud Investors**

Rule 9(b) provides "[m]alice, intent, knowledge, and other conditions of a person's mind *may be alleged generally*."  Fed. R. Civ. P. 9(b).  Thus, the scienter requirement in common law

fraud actions "is not subject to the rigorous standard of Rule 9(b)." *Skylon Corp. v. Guilford Mills*, No. 93 Civ. 5581 (LAP), 1997 WL 88894, at *3 (S.D.N.Y. Mar. 3, 1997).[42]  In fact, the Second Circuit has held plaintiffs alleging scienter under Rule 9(b) need only ""provide some **minimal factual basis** for conclusory allegations . . . that give rise to a strong inference" of fraudulent intent.'" *Id.*[43]  This "strong inference" of intent may be satisfied by alleging either (1) a "motive and a clear opportunity to commit the fraud," or (2) "facts constituting strong circumstantial evidence of conscious behavior or recklessness on behalf of defendants." *Skylon*, 1997 WL 88894, at *3 (citing *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995)).  Here, plaintiffs have provided facts sufficient to satisfy both.

First, the AC alleges both MS and the Rating Agencies had an incentive to issue false ratings because they received remuneration in excess of **three times** their normal fees for creating, operating, and rating the SIV, and further, that the SIV never would have existed without the false

---

[42]    The Rating Agencies argue plaintiffs' allegations of scienter must be pled with particularity. RA Brf. at 9-10.  This contention conflates the pleading standards for cases brought under Rule 9(b) with the standards applicable to actions asserted under the PSLRA, which explicitly requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. §78u-4(b)(2); *see also Podany v. Robertson Stephens, Inc.*, 318 F. Supp 2d 146, 153 (S.D.N.Y. 2004) (citing PSLRA).  Contrary to the Rating Agencies' assertion, courts in the Second Circuit hold Rule 9(b) does ***not*** require plaintiffs to plead scienter with particularity.  *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 153 (E.D.N.Y. 2005).

[43]    The Rating Agencies argue the Court should apply the pleading standards set forth in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007), which require an inference of fraudulent intent that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See* RA Brf. at 9-10.  *Tellabs* dealt only with the scienter requirement for cases brought under the PSLRA, not Rule 9(b).  *See* 551 U.S. at 313-14, 127 S. Ct. at 2504.  Courts in the Second Circuit hesitate to extend *Tellabs*' holding to cases outside the scope of the PSLRA. *See In re Amaranth Natural Gas Commodities Litig.*, No. 07 Civ. 6377 (SAS), 2009 WL 1138716, at *4 n.32 (S.D.N.Y. Apr. 27, 2009) (citing *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008)).

credit ratings.  ¶¶7-9, 22, 44, 54, 56-58, 136-142.[44]  Moreover, because the Rating Agencies were responsible for formally announcing the false credit ratings to the Rated Notes investors, and because MS was absolutely vital to that process, the AC alleges MS and the Rating Agencies had the opportunity to disseminate the false credit ratings.[45]

Second, the AC alleges defendants were aware of the false factual information the ratings conveyed.  ¶¶59-60, 65-135; *see also* §IV.C.2., *supra*.  Thus, the AC adequately alleges that defendants' dissemination of the false ratings amounted to conscious misbehavior.[46]  At the very least, plaintiffs have satisfied the standard for recklessness by alleging that defendants had access to information that contradicted the "Triple A" and "investment grade" ratings assigned to the SIV and the Rated Notes.[47]

---

[44]    *See Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. . . .  In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed *economic self-interest*."); *see also In re Livent Sec. Litig.*, 148 F. Supp. 2d 331, 366 (S.D.N.Y. 2001) ("fairness opinion" actionable and pecuniary interest in transaction supports scienter).

[45]    *See Shields*, 25 F.3d at 1130 ("Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."); *see also Skylon*, 1997 WL 88894, at *3 ("'clear opportunity' to commit fraud implies that defendants are 'well positioned to carry out the fraudulent transaction'").

[46]    *See Amaranth*, 2009 WL 1138716, at *4 (defining conscious misbehavior as "'"conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it"'").

[47]    *See id.* at *15-*16 ("Recklessness can be shown by 'defendants' knowledge of facts or access to information contradicting their public statements.'").

- 21 -

### 4.    The AC Alleges Reliance on the False Ratings

There is no dispute investors actually and justifiably relied on the materially false and misleading credit ratings in deciding to acquire the Rated Notes. *See, e.g.*, ¶¶7, 21, 162.[48] Defendants contend plaintiffs' reliance on the false credit ratings was unreasonable, in light of purported "disclaimers" contained in one IM and the fact that plaintiffs are "sophisticated investors." MS/BoNY Brf. at 13-15; RA Brf. at 10-12.[49]  Any disclaimers do not protect defendants from liability where, as here, information regarding the falsity of the ratings was unavailable to plaintiffs.[50]

Defendants were aware of specific information that contradicted the ratings assigned to the Notes. *See* §IV.C.2, *supra*. This information was not available to plaintiffs, regardless of their level of sophistication. ¶109.[51] Neither did the boilerplate disclaimers defendants rely on allude to the

---

[48]    Contrary to defendants' assertions, Rule 9(b) does not require plaintiffs to plead the element of reasonable reliance with particularity. *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F. Supp. 338, 347 (S.D.N.Y. 1986) ("Rule 9(b) does not require that reliance be specifically pleaded.").

[49]    As the Second Circuit has noted, the question of whether actual reliance is justifiable or reasonable, is generally not suitable for determination as a matter of law. *See Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 292 (2d Cir. 2004).

[50]    Defendants' argument also fails because the so-called "disclaimers" defendants rely on consist of nothing more than boilerplate language, which failed to alert plaintiffs to any of the actual risks or misrepresentations associated with the Rated Notes. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002)).

[51]    *See Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 599 (S.D.N.Y. 2008) ("plaintiffs' sophistication as investors does not presumptively negate a finding of reliance," and finding plaintiffs' reliance reasonable because "[d]efendants [did] not suggest that plaintiffs had access to any 'means of ascertaining the truth' of the alleged misrepresentations"); *see also DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999) ("'when matters are . . . peculiarly within the defendant's knowledge, . . . plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth'"); *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477,

possible existence of information contradicting the accuracy of the ratings.[52]  If investors' reliance

on Moody's and S&P's ratings were truly "unreasonable," these companies would have been out of

business well before the SIV was created and never would have made ***millions*** off of this SIV.

Finally, the AC alleges the Rated Notes, which were not traded on the open market, would

have been unmarketable and never would have been issued but for the false credit ratings

disseminated by defendants.  ¶¶1, 8-9, 54.  Plaintiffs are entitled to the "fraud created the market"

presumption under these circumstances.  *See In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1303

(E.D. Wash. 2007)  ("***This presumption [of reliance] may be claimed when the Plaintiff 'alleges***

***that a security not traded on the open market could not have been issued but for the fraud of the***

***defendants***.'") (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 723 (11th Cir. 1987)); *see*

*also Arthur Young & Co. v. United States Dist. Court*, 549 F.2d 686, 695 (9th Cir. 1977).

### D.    Defendants Breached Fiduciary Duties Owed to Plaintiffs

New York courts "look to whether a party reposed confidence in another and reasonably

relied on the other's superior expertise or knowledge" to determine the existence of a fiduciary

---

495 (S.D.N.Y. 2008) ("'even an explicit waiver will not be given effect "when the facts are
peculiarly within the knowledge of the party invoking the disclaimer"'").

[52]    Defendants' cases do not warrant a different result.  In each of those cases, the court relied
heavily on the fact that, in addition to defendants' general disclaimers of reliance, plaintiffs had
received significant warning signs about the reliability of the misrepresentations, which should have
informed them of the need to conduct additional due diligence before relying on defendants'
misrepresentations. *See, e.g.*, *Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 336 (7th Cir. 1999) (basing
its holding on plaintiff's awareness that "over $ 1 million of the mortgage loans were more than 30
days delinquent, the reserve fund balance was only $ 131,051, and the FHA Title I Insurance balance
was $ 600,385").  By contrast, there were no similar warning signs given to plaintiffs and any
additional due diligence conducted on their behalf would have been futile.

relationship.[53]  Any inquiry into whether a fiduciary obligation exists is "necessarily fact-specific to the particular case." *Wiener*, 241 A.D.2d at 122, 672 N.Y.S.2d at 14.  The "ongoing conduct between parties" may give rise to a fiduciary relationship and a writing is not required.  *Id.*

The AC pleads claims for breaches of fiduciary duty under Rule 8(a).[54]  A fiduciary relationship existed due to MS's superior access to confidential information.[55]  *Pension Comm.*, 446 F. Supp. 2d at 195-96 ("Whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge is a 'fact-specific inquiry.'"); *see also Solutia Inc. v. FMC*

---

[53]    *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 110, 796 N.Y.S.2d 77, 79 (2005); *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122, 672 N.Y.S.2d 8, 14 (1998) (same); *see also JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 321222, at *9 (S.D.N.Y. Feb. 9, 2009) ("While the 'exact limits' of what constitutes a fiduciary relationship are 'impossible of statement,' a fiduciary relationship may be found in any case 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'").  The existence of a fiduciary relationship is not determined by rigid formulas and there is no mandatory requirement that the relationship be in writing.  *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, No. 00 Civ. 6270 (DC), 2002 WL 392291, at *9 (S.D.N.Y. Mar. 13, 2002).

[54]    *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 196 (S.D.N.Y. 2006) ("Where a plaintiff alleges a breach of fiduciary duty by conduct not amounting to fraud, such as breach of duty of care, disclosure or loyalty, the general pleading standards set out by Rule 8(a) of the Federal Rules of Civil Procedure, not the heightened standards of Rule 9(b) apply."); *E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, Inc.*, 770 F. Supp. 202, 205 (S.D.N.Y. 1991) (refusing to dismiss claims for breach of fiduciary duty against sales representative where the claim of a fiduciary relationship had some plausibility).  Moreover, "[b]ecause the inquiry as to whether a fiduciary relationship exists is 'necessarily fact-specific,' a 'claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6).'" *JPMorgan*, 2009 WL 321222, at *9.

[55]    During the Class Period, MS had in its possession quantitative and qualitative information demonstrating the assets backing the SIV were far riskier than represented, were impaired at the time the SIV was created, and grew even riskier over time.  ¶91.  For example, MS received non-public information that the credit quality of the loans which made up the vast majority of the SIV's underlying assets were not as safe as represented.  ¶¶92-98.  This non-public information came from many sources.  ¶¶91-95, 98.

*Corp.*, 456 F. Supp. 2d 429, 456 (S.D.N.Y. 2006) ("New York law does recognize that a fiduciary duty may arise out of 'a relationship of confidence, trust, or superior knowledge or control.'").

Under New York law, BoNY, as the fund administrator responsible for the determination and reporting of the market value of the SIV's collateral assets (¶¶23-24), had a fiduciary duty "to investors to ensure the accuracy of reports concerning the valuation of the Fund's assets and reviewing statements to investors for accuracy."[56] In *Pension Comm.*, this Court held that a fund administrator, such as BoNY, had a fiduciary duty to investors when the fund administrator held itself out as having policies and procedures in place to ensure the fund's valuations would be accurate and fair. 446 F. Supp. 2d at 196-97. BoNY's superior position to plaintiffs and its access to confidential information also establish a fiduciary relationship.[57]

---

[56] *Harmelin v. Man Fin. Inc.*, No. 06-1944, 2007 WL 2769675, at *2 (E.D. Pa. Sept. 20, 2007) (applying New York law). BoNY argues because they had no contractual relationship with plaintiff, no fiduciary relationship can be found. MS/BoNY Brf. at 28. As discussed, *supra*, "Contractual relations or formal writings are not required to establish a fiduciary duty. 'Rather, the ongoing conduct between the parties must be considered.'" *Pension Comm.*, 446 F. Supp. 2d at 196. In any event, the distinction is moot because BoNY contracted with plaintiffs. *See* §IV.A.1., *supra*.

[57] Throughout the Class Period, BoNY promised it would, on a daily basis, run "mark to market" valuations of all assets and "deliver reports to rating agencies weekly." ¶52. Also, under the terms of the Selling Documents, BoNY reviewed statistical information on the loan pools supporting the assets sold to investors via the SIV. ¶90. Also, BoNY was obligated to provide this information to the Rating Agencies on a weekly basis. *Id.* BoNY was thus knowledgeable that the SIV was falsely rated and contained large amounts of risky, nonprime asset-backed securities. ¶¶25, 52.

As Nationally Recognized Statistical Rating Organizations ("NRSROs"),[58] the Rating Agencies owed investors fiduciary duties of truth, candor, disclosure and loyalty (avoiding conflicts of interest). As NRSROs, the Rating Agencies were required to act as independent gatekeepers between the investing public and the other defendants. Instead, the Rating Agencies colluded with the other defendants and abrogated their independence in order to earn ***three times*** their normal fee by rating the SIV. ¶¶5, 7. The Rating Agencies were required to disclose to investors that their ratings were not independent and unbiased and that, in fact, the ratings were sold to the highest bidder to guarantee *ex ante* that the SIV received top credit ratings. ¶¶5, 110-135.

Ratings issued by an NRSRO are especially important when it comes to structured investment vehicles. A structured investment vehicle's success depends directly on the credit quality of the assets acquired by the structured investment vehicle and the rating those assets receive. Investors in structured investment vehicles are willing to invest in large part because of the high credit ratings assigned to notes sold to investors, which are largely a reflection of the high ratings assigned to the assets acquired by a structured investment vehicle. ¶39. Moreover, the Rating Agencies are exempted from Regulation FD, and obtain information on publicly-traded mortgage originators that ***no other*** market participant has. ¶99. Further, as NRSROs, the Rating Agencies are entrusted to provide "independen[t]" ratings. ¶43. Finally, the data used by the Rating Agencies and their models and assumptions were invisible to plaintiffs.

─────────────────────

[58]     The Rating Agencies were granted NRSRO status in the mid 1970s to insure the integrity of the ratings process. In order to be granted NRSRO special status, the "single most important criterion," is that "the rating organization is recognized in the United States as an issuer of ***credible*** and ***reliable*** ratings by the predominant users of securities ratings." ¶43. As a designated NRSRO, the Rating Agencies are held out to the investing public as "***ratings organization's independen[t] from the companies it rates***." *Id.* As stated recently by former SEC Chairman Arthur Levitt, Jr., "***investors are relying on credit ratings to make informed investment decisions***." ¶115.

The Rating Agencies in this case did more than simply rate the Rated Notes – they placed themselves in a position of trust and confidence with investors.  The Rating Agencies promised to perform, among others, the following obligations: (1) approve and rate the collateral assets supporting the Rated Notes; (2) consult, approve, agree and monitor the daily investment portfolio parameter tests; (3) consult, approve, agree and monitor the daily market sensitivity and liquidity tests; and (4) consult, approve, agree and monitor the daily capital tests.  ¶¶53, 61-62.  Additionally, the Rating Agencies occupied a position of superior knowledge and had access to confidential information not known to investors.  *Id.*  The Rating Agencies obtained confidential and superior information by working closely with MS on the capital structure of the SIV and the mortgage originators directly.  *See, e.g.*, ¶¶99, 104.  This allowed them to obtain information not available to investors regarding the collateral underlying the Notes.  ¶109.

The Rating Agencies' claim that they did not accept the confidence or trust placed in them by plaintiffs defies common sense.  The Rating Agencies **applied for** and **marketed** their status as NRSROs.  They **held themselves out** to SIV investors as providers of independent and unbiased ratings.  It is illogical for the Rating Agencies to now say they did not expect investors, especially those in this complex SIV, to rely on the integrity and truthfulness of their ratings.  One who earns a living providing so-called independent and unbiased ratings cannot be surprised that someone actually believed that the ratings were independent and unbiased.

### E.    The AC States Negligent Misrepresentation Claims

As the Second Circuit articulated:

Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

The AC alleges each of the elements of negligent misrepresentation against defendants, though plaintiffs need only address the first, second and fourth elements here, as these are the only elements in dispute.[59]  *See* RA Brf. at 12, 17; MS/BoNY Brf. at 8, 11.

First, the AC alleges each defendant had a "'special relationship'" with plaintiffs giving rise to a duty to provide plaintiffs with accurate information.[60]  *Hydro Investors*, 227 F.3d at 20.  As the court in *E*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05 Civ. 0902, 2008 WL 2428225 (S.D.N.Y. June 13, 2008), explained, "[a] special relationship can arise where the defendant either (1) possesses 'unique or specialized expertise' *or* (2) occupies a 'special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'"  *Id.* at *24.  The AC adequately alleges all defendants owed plaintiffs contractual and fiduciary duties.  *See* §§IV.A.1. and IV.D., *supra*.

In addition, each defendant possessed unique or specialized expertise giving rise to a "special relationship."  The Rating Agencies possessed "'unique or specialized expertise'" concerning the SIV and occupied "'a special position of confidence and trust'" with plaintiffs.  *E*Trade*, 2008 WL 2428225, at *24.  The AC alleges they were responsible for structuring, rating and monitoring the SIV.  *See* ¶¶44-55.  BoNY's expertise focused on monitoring the market values of the SIV's assets.  ¶¶52, 97, 142.  MS's investment banking expertise focused on arranging, operating and rating the

---

[59]    *See Patterson v. Balsamico*, 440 F.3d 104, 114 n.5 (2d Cir. 2006) (arguments not raised in opening brief are waived).

[60]    Notably, only the Rating Agencies dispute that plaintiffs have adequately alleged the existence of a "special relationship."  *See* RA Brf. at 12-15.

entire SIV, and its commercial and mortgage banking expertise focused on the assets included in this SIV.  ¶¶18, 69, 73-101, 138.

Under similar circumstances, courts have found a special relationship to exist and have denied rating agencies' motions to dismiss negligent misrepresentation claims.[61]  Plaintiffs here, like the plaintiffs in *LaSalle Nat'l Bank* and *Nat'l Century Fin.*, have alleged a "special relationship" existed between investors and the Rating Agencies because the Rating Agencies prepared their ratings with knowledge that they would be disseminated to a select group of investors as part of private offering and that investors would rely on that information.  *See* ¶63; *see also* §IV.D, *supra*.  As in *Glanzer v. Shepard*, 233 N.Y. 236, 238-39 (1922), plaintiffs' use of the ratings in this case "was not an indirect or collateral consequence of the action of the [Rating Agencies]" but "was a consequence which, to the [Rating Agencies'] knowledge, was the end and aim of the transaction."

Second, as set forth fully in §IV.C.1., *supra*, the AC sufficiently alleges defendants MS and the Rating Agencies made false representations regarding the SIV they should have known were false.  The AC also pleads with the requisite particularity defendant BoNY made representations concerning the SIV it should have known were false.  ¶¶25, 52.

Finally, the AC pleads reasonable reliance.  "[T]he issue of whether an investor reasonably relied on a defendant's misrepresentations is a fact-intensive inquiry that cannot be decided on this motion to dismiss."  *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448

---

[61]    *See, e.g.*, *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1093 (S.D.N.Y. 1996) (special relationship existed between rating agency and plaintiff investors where plaintiffs alleged the rating agency "knew that a select group of qualified investors would rely on the inaccurate rating contained in the Information Memoranda"); *see also In re Nat'l Century Fin. Enters.*, 580 F. Supp. 2d 630, 646-48 (S.D. Ohio 2008) (upholding negligent misrepresentation claim against Moody's where plaintiffs alleged that "Moody's prepared the bond ratings knowing its ratings would be seen on the offering materials given to only a select group of qualified investors").

(JGK), 2005 WL 2385854, at *9 n.5 (S.D.N.Y. Sept. 26, 2005). Despite the early state of this litigation, the AC sufficiently alleges plaintiffs "reasonably relied" upon defendants' misrepresentations. *Hydro Investors*, 227 F.3d at 20. Further, §IV.C.4., *supra*, sets forth plaintiffs' reasonable reliance.

### F.     The AC States a Claim for Negligence as to the Rating Agencies and BoNY

At this stage, plaintiffs are only required to recite the elements of negligence under Rule 8's notice pleading standard.[62] This standard is satisfied. ¶¶265-271, 330-336. Nonetheless, the Rating Agencies ask this Court to grant them absolute immunity from negligence liability for their faulty structuring and monitoring activities.[63]

The Rating Agencies owed plaintiffs a duty of care because they assisted in both structuring and monitoring the SIV, received private compensation for their ratings, and provided the ratings for private dissemination.[64]  ¶¶32, 45-50, 56-58, 63.  The Rating Agencies do not enjoy special treatment under these circumstances. *Cf. Am. Sav. Bank, FSB v. UBS PaineWebber, Inc.*, No. M8-85, 2002 WL 31833223, at *3 (S.D.N.Y. Dec. 16, 2002) (no reporter's privilege where rating agency

---

[62]     The elements of negligence are: "(1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Di Benedetto v. Pan Am World Serv.*, 359 F.3d 627, 630 (2d Cir. 2004).

[63]     The Rating Agencies argue both the AC's negligence and negligent misrepresentations claims are preempted by the Martin Act but they are wrong for the reasons stated in §IV.H., *infra*. Moreover, the AC's allegations of negligence differ from the negligent misrepresentation claims because the latter claims are based on what was ***communicated*** to investors while the former claims are based on the Rating Agencies' actions in ***structuring and monitoring*** the SIV.  ¶¶45-50, 53.

[64]     *Cf. Eagle Tenants Corp. v. Fishbein*, 182 A.D.2d 610, 611, 582 N.Y.S.2d 218, 219 (1992) (analyzing "fiduciary's duty to ***disclose***"); *Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.*, 191 A.D.2d 621, 622, 595 N.Y.S.2d 492, 494 (1993) (analyzing "cause of action to recover damages for negligent ***misrepresentation***").

paid fee in private transaction); *see also* §IV.I., *infra*.  The cases relied upon by the Rating Agencies are thus inapposite.[65]

As such, the general duty rule of negligence applies in this case:

> whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

*Stagl v. Delta Airlines*, 52 F.3d 463, 469 (2d Cir. 1995); *accord Glanzer*, 233 N.Y. at 238-39.  Given the SIV's complex nature, the Rating Agencies should have recognized that by failing to take care to investigate the assets supporting the SIV's capital structure, and failing to respond when those assets began to deteriorate over time, would cause injury to plaintiffs.

Courts essentially undertake a fairness analysis to determine whether there "was some contact between defendant and plaintiff" sufficient to give rise to a duty.  *Sec. Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir. 2000).  In *White v. Guarente*, 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 477-78 (1977), for example, the court determined an accountant owed a duty to the limited partners of a partnership to conduct an audit with care, even though the limited partners were not parties to a contract governing the auditing services.[66]  In an analogous context,

---

[65]    *See Jaillet v. Cashman*, 115 Misc. 383, 384, 189 N.Y.S. 743, 744 (N.Y. Sup. Ct. 1921) (news ticker services provided "to the *public* is the same as that of a publisher of a *newspaper*"), *aff'd*, 202 A.D. 805, 194 N.Y.S. 947 (1922); *First Equity Corp. v. Standard & Poor's Corp.*, 869 F.2d 175, 176, 179 (2d Cir. 1989) (analyzing a publication sent to "*7500 subscribers*, including investment advisers and *libraries*" concerning "a large number of companies"); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 827 (S.D. Tex. 2005) (analyzing "credit reports [that] were distributed *to the world at large*" where plaintiffs did not even purchase the bonds at issue), *aff'd*, 446 F.3d 585 (5th Cir. 2006).

[66]    The *White* court reasoned that plaintiffs were not "faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components."  *Id.* (and distinguishing *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y.

*LaSalle Nat'l Bank*, 951 F. Supp. at 1093, construed negligent misrepresentation and concluded a ***duty*** was owed and that "***[k]nowledge of the identity of each particular plaintiff is not necessary***, however, if the defendant's representation is designed to target a 'select group of qualified investors' rather than 'the public at large.'"  *LaSalle*'s reasoning should apply here because the SIV was a private transaction marketed to qualified investors.  ¶63.

Moreover, the Rating Agencies' multiple roles in structuring, monitoring and rating the SIV allowed the them to determine the size of the group at issue, *i.e.*, the investors, on their own.  As compared to the accountants in *White,* the Rating Agencies in this case could actually determine the class of persons who could be harmed by their "audit" work (*i.e.*, structuring and monitoring services) by simply refusing to rate any additional notes.  Without the ratings, the Rated Notes would not issue.  Thus, the Rating Agencies had the power to determine whether new "limited partners" (the Rated Note investors) could be admitted to the limited group of private investors whose property would be at risk in the absence of ordinary care.

Plaintiffs have adequately alleged negligence as to BoNY based on their failure to monitor and value the assets included in the SIV with ordinary care.  ¶¶330-336.  BoNY only challenges the existence of a duty.  Unlike the Rating Agencies, BoNY does not argue that the Martin Act applies to the facts of this case.  They argue privity is required for both negligence and negligent misrepresentation claims.  As noted above, this is not true, *see also Strauss v. Belle Realty Co*., 65 N.Y.2d 399, 402, 492 N.Y.S.2d 555, 557 (1985) ("[d]uty in negligence cases is defined neither by

---

170, 183 (1931), which involved an "indeterminate class of persons who, presently or in the future, might deal with the [accounting] company in reliance on the audit").

foreseeability of injury nor by privity of contract"), and the cases BoNY cites do not call for a contrary result.[67]

In sum, BoNY challenges only plaintiffs' negligent misrepresentation claims. These are addressed in §IV.E., *supra*.

### G. The AC States Aiding and Abetting Claims Against the Defendants

To state an aiding and abetting claim, plaintiffs must (1) plead violations of law; (2) "knowledge" of these violations on the part of the other defendants (the aiders and abettors); and (3) "substantial assistance" by the aider and abettors in the achievement of the co-defendants' violations. *Morin v. Trupin*, 711 F. Supp. 97, 112 (S.D.N.Y. 1989). The AC pleads defendants' primary violations of law as described herein.

The AC alleges defendants colluded together, in a direct conflict of interest, to, among other things, load the SIV with nonprime assets (¶226), permit the SIV to purchase impaired assets (¶322), issue false credit ratings on the SIV (*id.*), and systematically report false information and fail to update with relevant information (¶391). This is sufficient to plead knowledge and substantial assistance at the pleading stage, for under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind" can be "alleged generally." *See Rosner v. Bank of China*, No. 06 CV 13562, 2008 WL 5416380, at *4 (S.D.N.Y. Dec. 18, 2008).[68] Further, "willful blindness" satisfies

---

[67] BoNY cites *Vanguard Mun. Bond Fund, Inc. v. Cantor*, 40 F. Supp. 2d 183, 193 (S.D.N.Y. 1999), for the proposition that "*Vanguard* makes clear, the failure to allege a relationship of privity requires dismissal of both plaintiffs' negligence **and** negligent misrepresentation claims." MS/BoNY Brf. at 15. This assertion is difficult to square with the plain statement in that opinion that "[h]ere, in contrast, plaintiffs only claim is for negligent misrepresentation." *Vanguard*, 40 F. Supp. 2d at 193.

[68] *See also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, No. 07-3527-cv, 2009 WL 1587870 (2d Cir. June 9, 2009) (holding general allegations that aiding and abetting defendants knew they were assisting breaches of fiduciary duties sufficient to state a claim).

the knowledge requirement, as there is "no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007). Finally, defendants provided substantial assistance by "'affirmatively assist[ing], help[ing] [to] conceal, or by virtue of [their] failing to act when required to do so enable[d] [the collapse of the Cheyne SIV] to proceed.'" *Kolbeck v. LIT Am.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996), *aff'd without op.*, 152 F.3d 918 (2d Cir. 1998). The AC properly pleads aiding and abetting liability.[69] This assistance caused plaintiffs' injuries.

### H.    The Martin Act Does Not Preclude the AC's Non-Fraud Tort Claims

Plaintiffs' non-fraud tort claims are not preempted by the Martin Act for two reasons. First, recent New York State appellate court authority holds the Martin Act does ***not*** prohibit a private claimant from asserting tort claims even when those tort claims do not require a showing of scienter. Next, the Martin Act has a limited geographic scope and only preempts claims based upon conduct that is "confined to New York." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 410 (S.D.N.Y. 2005).

In *Hamlet on Olde Oyster Bay Home Owners Ass'n, Inc. v. Holiday Org., Inc.*, 59 A.D.3d 673, 874 N.Y.S.2d 508 (2009), plaintiffs brought an action, *inter alia*, to recover damages for fraudulent inducement and negligent misrepresentation. In reversing the trial court's dismissal of plaintiffs' claims, the Appellate Division explained:

---

[69]    The AC pleads defendants' misconduct was the proximate cause of plaintiffs' losses on the aiding and abetting claim. ¶2; *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464 (S.D.N.Y. 2007); *see also Pension Comm.*, 2009 WL 1587870 (holding "[i]t is a fair inference of the complaint" that defendants' aiding and abetting caused plaintiffs' injuries).

The Supreme Court also *erred in granting . . . defendants' motion which was to dismiss the causes of action alleging negligent representation* insofar as asserted against them as "[n]othing in the clear import of the language of the Martin Act requires a conclusion that the Legislature intended to abrogate *any common-law remedy* arising from conduct prohibited under the act."

59 A.D.3d at 677, 874 N.Y.S.2d at 512 (citing *Caboara v. Babylon Core Dev., LLC*, 54 A.D.3d 79, 83, 862 N.Y.S.2d 535, 539 (2008)).[70]

Still, defendants argue the only tort claims permitted (*i.e.*, not "preempted") under the Martin Act are those that require proof of scienter. But defendants rely upon cases that *predate* the Appellate Division's holdings in *Hamlet*, *Caboara*, *Scalp & Blade*, and the holdings in *Faulkner* and *Cromer Fin.*[71] All of the district court cases that defendants cite were decided without the benefit of the Appellate Division's most recent pronouncement in *Hamlet*. The most recent appellate authority mandates that none of the AC's claims are preempted by the Martin Act.

Even if this Court were to find the Martin Act prohibits a private party from asserting non-fraud tort claims, the Martin Act's jurisdiction is limited only to acts that take place in New York.[72]

---

[70]     *See also Scalp & Blade, Inc. v. Advest, Inc.*, 281 A.D.2d 882, 883, 722 N.Y.S.2d 639, 640 (2001) (rejecting defendants' assertion that plaintiffs' common-law breach of fiduciary duty and negligent misrepresentation claims were preempted by the Martin Act); *Faulkner v. Beer*, No. 0603597/2005, 2007 N.Y. Misc. LEXIS 8829, at *16-*17 (N.Y. Sup. Ct. Dec. 21, 2007) (holding plaintiffs' breach of fiduciary duty and negligent misrepresentation claims not barred by the Martin Act); *Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 02284 (DLC), 2001 WL 1112548, at *3-*5 (S.D.N.Y. Sept. 20, 2001) (holding plaintiffs' negligence claims not precluded by the Martin Act).

[71]     *See Horn v. 440 E. 57th Co.*, 151 A.D.2d 112, 547 N.Y.S.2d 1 (1989); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) (relying upon the now-outdated *Horn* case in reaching its decision and never addressing the Appellate Division's holding in *Scalp & Blade* (decided just months before *Castellano*) that plaintiffs' breach of fiduciary duty and negligent misrepresentation claims were *not* preempted by the Martin Act).

[72]     The Martin Act was passed to protect New York citizens and does not apply to redressing injury to out of state residents because the state has no interest in those matters. *See In re Cenville Cmtys., Inc.*, 82 Misc. 2d 418, 421, 372 N.Y.S.2d 281, 285 (N.Y. Sup. Ct. 1973); *N.Y. v. Samaritan Asset Mgmt. Servs.*, 22 Misc. 3d 669, 674, 874 N.Y.S.2d 698, 702 (N.Y. Sup. Ct. 2008); *see also*

As noted by this District, if after "construing the Complaint in the light most favorable to plaintiffs, it appears that the [defendants'] conduct was not confined to New York and, indeed, that some plaintiffs may have interacted with defendants exclusively outside of New York" then the Court "cannot say that plaintiffs can prove no facts in support of their claim that would entitle them to relief even if defendants' [Martin Act] preemption argument is correct." *Fraternity Fund*, 376 F. Supp. 2d at 410.[73]  In such a case the Court must deny defendants' motion.  *Id.*

Here, it is clear "some plaintiffs may have interacted with defendants exclusively outside of New York." *Fraternity Fund*, 376 F. Supp. 2d at 410.  All U.S. notes were issued by Delaware entities.  ¶29.  Euro Notes were issued outside the United States.  *See* Declaration of James Rouhandeh in Support of MS/BoNY Brf. ("Rouhandeh Decl."), Ex. A at 3.  Neither named plaintiff is a New York citizen.[74]  ¶26.  Given the multi-national and multi-state nature of the SIV, it is not clear defendants' conduct in this case was "confined to New York."  *King v. Simpson*, 189 F.3d 284, 286-87 (2d Cir. 1999).[75]

---

*Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, No. 8:07-cv-00690-T-17-MMS, 2008 WL 4372847, at *3 (M.D. Fla. Sept. 24, 2008) ("the jurisdiction for the **Martin Act is limited to acts that take place with their entirety in the State of New York**").

[73]     The Martin Act will also not apply where defendants "performed most of their work for the funds . . . [abroad and] the securities were mostly marketed and sold to foreign investors . . . ." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 639-40 (S.D.N.Y. 2009).  Nor will it apply where the securities "were not sold within or from New York." *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 165 (S.D.N.Y. 2001).

[74]     The majority of the conduct alleged in the AC occurred in New York, but certain defendants reside outside of New York and certain acts took place outside of New York.  Defendant MS & Co. International Limited is a U.K. entity.  Defendant QSR Management Limited is a U.K.-based, wholly-owned subsidiary of BoNY.  *See* Rouhandeh Decl., Ex. A at 76.

[75]     When a party moves to dismiss a complaint based upon a defense, such as preemption, that is not clear from the face of the complaint, the Court must deny the motion.  *See, e.g.*, *Solvent Chem.*

- 36 -

I.      **The First Amendment Does Not Shield Defendants from Liability**

The Ratings Agencies cannot use the First Amendment to shield themselves from liability because they stepped far outside their historical role of gathering information and publishing independent unsolicited ratings when they rated the SIV.[76] ¶¶44-58.  Here, the Rating Agencies entered into a ***private contract*** with MS which required them to structure, rate, and monitor the SIV, and were generously compensated in exchange for their involvement.  *Id.*  The SIV's ratings were never widely disseminated to the world, but rather, were provided in connection with a ***private placement to a select group of investors***.  ¶63.  Therefore, the Rating Agencies are not entitled to the heightened First Amendment protections afforded to professional journalists.  *In re Fitch, Inc.*, 330 F.3d 104, 110 (2d Cir. 2003).  Consequently, plaintiffs are not required to plead facts showing the Rating Agencies acted with "actual malice," as the Rating Agencies suggest.[77]  *See LaSalle Int'l*

---

*Co. v. E.I. DuPont de Nemours & Co.*, 242 F. Supp. 2d 196, 211 (W.D.N.Y. 2002) (denying motion to dismiss where preemption defense not clear from face of complaint); *see also Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) (denying motion to dismiss when defense of qualified immunity not clear from face of complaint); *Levine v. Lawrence*, No. 03-CV-1694 (DRH) (ETB), 2005 WL 1412143, at *10 (E.D.N.Y. June 15, 2005) (denying motion to dismiss where immunity defense not clear from face of complaint).

[76]     Therefore, the Rating Agencies' reliance on cases where a rating agency ***was*** acting in its historical capacity is misplaced.  *See, e.g.*, *Jefferson County*, 175 F.3d 848 (rating agency was ***not paid to rate the bond*** and ***published its rating through various national news services***); *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988) (rating agency received ***no compensation*** for issuing its rating, which it ***published in its subscriber-based publication***), *aff'd*, 869 F.2d 175 (2d Cir. 1989); *Enron*, 511 F. Supp. 2d at 826-27 (concerned "***nationally published*** credit agency rating reports" regarding "a powerful ***public*** corporation"); *In re County of Orange*, 245 B.R. 138, 145 (C.D. Cal. 1997) (ratings were "'directly provided ***to anyone who subscribe[d] to S&P's information services***, such as S&P's CreditWeek,'" and were "'***widely publicized in debt markets***'").

[77]     Even if application of the "actual malice" standard was appropriate here, which it is not, the AC's allegations meet that standard.  "Actual malice" is present where a statement is made "'with ***reckless disregard*** of whether it was false or not.'"  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755, 105 S. Ct. 2939, 2943 (1985).  Here, unlike the complaint in *Enron* – which

- 37 -

*Bank*, 951 F. Supp. at 1097 ("***the Supreme Court has held the . . . 'actual malice' standard inapplicable to a credit reporting agency***") (citing *Dun & Bradstreet*, 472 U.S. at 762, 105 S. Ct. at 2947).

The Supreme Court, the Second Circuit, and district courts within this Circuit have refused to extend heightened First Amendment protection to rating agencies where, as here, they receive private compensation in exchange for their ratings, participate in structuring the debt offering they have been hired to rate, and/or provide their ratings for the purpose of private dissemination.[78] ¶¶15, 44-58, 141; *see also Fitch*, 330 F.3d at 110-11[79] (Rating Agencies are not protected under the First Amendment when they "play[] an active role in structuring the transaction," as this level of "involvement with the client's transactions is not typical of the relationship between a journalist and the activities upon which a journalist reports.").

---

merely alleged that the rating agencies "could have and should have known" of the misrepresentations or omissions in their creditworthiness reports – the AC specifically alleges that "[t]he Rating Agencies ***knew or recklessly disregarded*** the false and misleading nature of their misrepresentations and omissions." 511 F. Supp. 2d at 826; ¶245. The AC then pleads facts supporting its allegation that the Rating Agencies issued their ratings with reckless disregard for their truthfulness. *See, e.g.*, ¶¶45, 90, 107.

[78]     *See, e.g.*, *Dun & Bradstreet*, 472 U.S. at 761, 105 S. Ct. at 2946-47 (declining to apply heightened First Amendment protection to rating agency where rating was prepared "solely in the individual interest of the speaker and its specific business audience"); *Fitch*, 330 F.3d at 110 (no heightened First Amendment protection applies where rating agency ***privately contracted (in exchange for a fee)*** to provide a rating and ***"played an active role in structuring the transactions"***); *LaSalle Nat'l Bank*, 951 F. Supp. at 1095-96 (First Amendment protection inapplicable where "***rating was privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication***"); *Nat'l Century Fin.*, 580 F. Supp. 2d at 653 (refusing a to apply heightened First Amendment protection to Moody's because its "***ratings [concerned] a private note issuance***" and "***were targeted to a select class of [institutional] investors***").

[79]     The Rating Agencies ignore this case.

- 38 -

Even after the Rating Agencies gave their false ratings to the SIV, they earned additional fees for serving and monitoring the SIV throughout the Class Period.  ¶¶52-53, 57.  The Rating Agencies reviewed the performance of the collateral assets each week, approved substitutions and changes to the portfolio and received monthly asset reports.[80]  ¶¶52-53, 57.  Where, as here, a rating agency "performs its ratings based on a private contractual agreement," the First Amendment does not provide a shield.  In *Commercial Fin. Servs. v. Arthur Andersen LLP*, 94 P.3d 106 (Okla. Civ. App. 2004), the court addressed the issue of private compensation of the rating agencies head-on, distinguishing the *Jefferson County* case heavily relied upon by the Rating Agencies.  *Id.* at 110.  There, the court held the rating agency defendant was not protected by the First Amendment because, unlike the rating agencies in *Jefferson County*, it was "asked to rate the bonds" and thus "the relationship between [the rating agency and investors] [went] beyond a relationship between a journalist and subject."  *Id.*

Finally, the SIV was marketed only to a ***select group of investors***, not the public at large.  ¶65.  Private ratings such as these are not protected by the First Amendment.[81]  The Rating Agencies' assertion that the "'pre-sale' report and an article concerning SIVs" were published on ***one*** of the Rating Agency's websites has been expressly rejected by the Second Circuit.  *See Fitch*, 330 F.3d at 107 (refusing to apply heightened First Amendment protection to a rating agency where

---

[80]    *See Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520, 534 (6th Cir. 2007) ("actual malice" standard inapplicable where the relevant agreement ***called for the parties to do something other*** than publish protected expression").

[81]    *See LaSalle Nat'l Bank*, 951 F. Supp. at 1095-97 (rating was "privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication"); *Nat'l Century Fin.*, 580 F. Supp. 2d at 640 (ratings not "published to the investing public at large" and only appeared "in the offering materials given to the select class of investors").

- 39 -

it "communicate[d] its rating to the client, but also [made] rating information available to the public for free for a limited time on its website").  Because the Rating Agencies assisted in both the structuring and the monitoring of the SIV, received private compensation for their ratings, and provided the ratings for private dissemination, they are not entitled to heightened First Amendment protection and the "actual malice" standard does not apply.

## V.     CONCLUSION

For the reasons set forth above, defendants' motions to dismiss should be denied in full.  In the alternative, plaintiffs request leave to amend the AC consistent with the Court's rulings.

DATED:  June 15, 2009                    Respectfully submitted,

                                         COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         PATRICK J. COUGHLIN
                                         DANIEL S. DROSMAN
                                         ANNE L. BOX
                                         JESSICA T. SHINNEFIELD
                                         MICHAEL F. GHOZLAND
                                         NATHAN R. LINDELL
                                         DARRYL J. ALVARADO


                                         _____
                                               s/ ANNE L. BOX
                                               ANNE L. BOX

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-3301
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         SAMUEL H. RUDMAN
                                         JARRETT S. CHARO
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

- 40 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JASON C. DAVIS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiffs

S:\CasesSD\Morgan Stanley SIV\omd00059925.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 15, 2009.

s/ ANNE L. BOX
ANNE L. BOX

COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:AnneB@csgrr.com

# Mailing Information for a Case 1:08-cv-07508-SAS

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Darryl J. Alvarado**
  dalvarado@csgrr.com

- **Anne L. Box**
  anneb@csgrr.com

- **Andrea Rose Butler**
  abutler@cahill.com

- **Jarrett S. Charo**
  jcharo@csgrr.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com,jrubins@ssbb.com

- **Patrick J. Coughlin**
  e_file_sd@csgrr.com

- **Jason Cassidy Davis**
  jdavis@csgrr.com

- **Daniel S. Drosman**
  ddrosman@csgrr.com,jillk@csgrr.com,E_File_SD@csgrr.com,tholindrake@csgrr.com,nlindell@csgrr.com,jcharo@csgrr.com

- **Michael Fred Ghozland**
  mghozland@csgrr.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Nathan R. Lindell**
  nlindell@csgrr.com

- **Damien Jerome Marshall**
  dmarshall@bsfllp.com,NYC_Managing_Clerk@bsfllp.com

- **Antonio Jorge Perez-Marques**
  antonio.perez@dpw.com,ecf.ct.papers@dpw.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **Jonathan Henry Sherman**
  jsherman@bsfllp.com,NYC_Managing_Clerk@bsfllp.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com

- **Adam Nelson Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**David C. Walton**
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301