UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

ABU DHABI COMMERCIAL BANK,
KING COUNTY, WASHINGTON
Together and On Behalf of All Others
Similarly Situated,

                Plaintiffs,

           - against -

MORGAN STANLEY & CO.
INCORPORATED, MORGAN
STANLEY & CO. INTERNATIONAL
LIMITED, THE BANK OF NEW YORK
MELLON (f/k/a THE BANK OF NEW
YORK), QSR MANAGEMENT
LIMITED, MOODY'S INVESTORS
SERVICE, INC., MOODY'S
INVESTORS SERVICE LTD.,
STANDARD AND POOR'S RATINGS
SERVICES and THE McGRAW HILL
COMPANIES, INC.,

              Defendants.

------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 7508 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/2/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        Two institutional investors, King County, Washington ("King

County") and Abu Dhabi Commercial Bank ("ADCB" and, together with King

1

County, "plaintiffs"), bring this class action to recover losses stemming from the

liquidation of notes issued by a structured investment vehicle ("SIV") between

October 2004 and October 2007.[1]  Plaintiffs have sued eight defendants:  Morgan

Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited and

their affiliates (collectively, "Morgan Stanley"); The Bank of New York, now

known as The Bank of New York Mellon (the "Bank"), and its wholly-owned

subsidiary, QSR Management Limited ("QSR," and together with the Bank,

"BoNY"); Moody's Investors Service, Inc. and its affiliates, including wholly-

owned and controlled subsidiary Moody's Investors Service Ltd. (collectively,

"Moody's"); The McGraw-Hill Companies, Inc. and its affiliates, including its

wholly-owned and controlled business division Standard & Poor's Rating Services

(collectively, "S&P," and, together with Moody's, the "Rating Agencies")

(collectively, "defendants").  Plaintiffs bring thirty-two claims of common law

fraud, negligent misrepresentation, negligence, breach of fiduciary duty, breach of

contract and related contract claims, unjust enrichment, and aiding and abetting

---

[1] *See* First Amended Complaint for Common Law Fraud, Negligent
Misrepresentation, Negligence, Breach of Fiduciary Duty, Breach of Contract,
Unjust Enrichment and Aiding and Abetting ("First Amended Complaint" or
"FAC") ¶¶ 1, 15.

against defendants.[2]  Defendants now move to dismiss the First Amended

Complaint for lack of subject matter jurisdiction and for failure to state a claim

upon which relief can be granted.[3]  For the reasons that follow, BoNY's motion is

granted.  Morgan Stanley's and the Rating Agencies' motions are granted in part

and denied in part.

## II.    BACKGROUND

### A.    Facts[4]

#### 1.    Credit Ratings and the Cheyne SIV

Beginning in approximately 2004, investors, including plaintiffs,

began purchasing interests issued by non-party Cheyne Finance PLC (now known

as SIV Portfolio PLC) ("Cheyne PLC"), which is now in receivership as a

bankrupt entity, and its wholly-owned subsidiaries Cheyne Finance LLC and

---

[2]      *See id.* ¶¶ 155-398.

[3]      *See* Memorandum of Law in Support of Defendants Morgan Stanley
& Co. Incorporated, Morgan Stanley & Co. International Limited, The Bank of
New York Mellon, and QSR Management Limited's Motion to Dismiss the
Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and
12(b)(6) ("MS/BoNY Mem."); Joint Memorandum of Law in Support of the
Motion of the Rating Agency Defendants to Dismiss the First Amended Complaint
("RA Mem.").

[4]      All facts are drawn from the First Amended Complaint and are
presumed to be true for the purpose of these motions.

3

Cheyne Capital Notes LLC (collectively, "Cheyne LLC," and together with Cheyne PLC, the "Cheyne SIV").[5] The Cheyne SIV, as is typical of SIVs, issued three categories of notes, Commercial Paper, Medium Term Notes (together with Commercial Paper, "Senior Notes") and Mezzanine Capital Notes ("Capital Notes" and, together with the Senior Notes, "Rated Notes"), each of which was rated by the Rating Agencies.[6]

The notes that SIV investors purchase typically receive ratings from rating agencies as a condition precedent to purchase.[7]  Rating agencies, like Moody's and S&P, evaluate a debt offering based on public, and sometimes non-public, information regarding the assets of an issuer and assign the debt offering a rating to convey information to a potential creditor/investor about the creditworthiness of the issuer's debt.[8]

Historically, however, this was not always a rating agency's role. Prior to 1975, rating agencies provided unsolicited ratings on the creditworthiness of corporations, which were derived from publicly available information about the

---

[5]     See FAC ¶¶ 2, 15.

[6]     See id. ¶ 33.

[7]     See id. ¶ 35.

[8]     See id. ¶¶ 39, 42.

4

corporation, such as Securities and Exchange Commission ("SEC") filings, and charged a fee to the investor to view the rating.[9]  Over time, the market came to trust rating agencies for their integrity and unbiased approach to evaluating issuers and their debt offerings.[10]  Then, in 1975, the SEC created a special status to distinguish the most credible and reliable rating agencies, identifying them as "nationally recognized statistical rating organizations" or "NRSROs" to help ensure the integrity of the ratings process.[11]  According to the SEC, the "single most important criterion" to granting NRSRO status is that "the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings" and that part of awarding the NRSRO label to the company hinges on "the rating organization's independence from the companies it rates."[12]

A credit rating is important to both issuers and investors.  The Second Circuit has recognized that:

> [Issuers] have their securities rated for two reasons. First, once the security or debt has received a favorable rating,

---

[9]    *See id.* ¶ 42.

[10]   *See id.* ¶ 43.

[11]   *See id.*

[12]   *Id.* ¶¶ 42-43.

> that rating makes it easier to sell the security to investors, who rely upon [the rating agency's] analysis and evaluation. The second reason is that a favorable rating carries with it a regulatory benefit as well. Fitch, along with its direct competitors Amici Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P"), has been designated by the Securities and Exchange Commission ("SEC") as a "nationally recognized statistical rating organization" ("NRSRO") whose endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO rating.[13]

A credit rating also provides important information to potential investors in an SIV because an SIV's success depends on the credit quality of the assets acquired by the SIV.[14] If stable instruments comprise the SIV, then SIV investors are much less likely to suffer a loss.[15] These stable instruments are typically assigned high ratings of "top rated" or "investment grade" and are commonly understood in the marketplace to be stable, secure, and safe.[16] Accordingly, arrangers of the investments – Morgan Stanley in this case – are able to pay investors relatively

---

[13]     *In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) (citing Securities and Exchange Commission, Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, 5-8 (Jan. 2003) *available at* http://www.sec.gov/news/studies/creditratingreport0103.pdf).

[14]     *See* FAC ¶ 42.

[15]     *See id.* ¶ 39.

[16]     *See id.* ¶ 40.

low interest rates.[17]

An SIV's assets typically include some combination of "investment grade" rated asset-backed securities ("ABS"), residential mortgage backed securities ("RMBS"), and collateralized debt obligations ("CDOs").[18]  The Cheyne SIV and its Rated Notes were invested, in part, in RMBS securities.[19] Accordingly, the Cheyne SIV's Senior Notes were "top rated" notes, meaning that they received the highest possible credit ratings from the Rating Agencies.[20] Moody's rated the Senior Notes "Prime-1" and "AAA," and S&P rated the Senior Notes "A-1+" and "AAA."[21]  These ratings are the same as those usually assigned by the Rating Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills.[22]  The Cheyne SIV's Capital Notes received similarly high ratings of "investment grade" and "A3/A" by Moody's and S&P, respectively.[23]  These were the highest credit ratings ever given to capital

---

[17]  *See id.*

[18]  *See id.* ¶ 34.

[19]  *See id.* ¶ 13.

[20]  *See id.* ¶ 37.

[21]  *See id.*

[22]  *See id.*

[23]  *See id.* ¶ 38.

notes in any SIV.[24]  These ratings were then included in the Cheyne SIV's

Information Memoranda and other Selling Documents[25] that Morgan Stanley

distributed to potential investors for the purpose of issuing up to twenty billion

dollars in "top rated" Senior Notes and three billion dollars in "investment grade"

Capital Notes.  The Selling Documents were distributed with the knowledge and

approval of the Rating Agencies and BoNY.[26]

### 2.    Defendants' Roles in the Cheyne SIV

Morgan Stanley is an investment banking and global financial

services corporation headquartered in New York City.[27]  Morgan Stanley acted as

the Arranger and Placement Agent for the Rated Notes of the Cheyne SIV.[28]

Pursuant to these roles, Morgan Stanley was responsible for distributing to

investors Information Memoranda and other Selling Documents, containing

---

[24]    *See id.*

[25]    Selling Documents are defined in the First Amended Complaint to include the Information Memoranda, Pricing Supplements, a May 2005 S&P "pre-sale" report, documents associated with the continuous "rolling" of Senior Notes throughout the Class Period, monthly investor reports concerning Rating Agency-approved models and "ongoing" monitoring, and a July 23, 2007 Moody's report. *See id.* ¶ 62.

[26]    *See id.* ¶¶ 3, 62.

[27]    *See id.* ¶ 18.

[28]    *See id.*

information regarding the Rated Notes of the Cheyne SIV, including ratings assigned by the Rating Agencies and the terms and conditions of the purchase and sale of the notes and commercial paper of the Cheyne SIV.[29]  Morgan Stanley also engaged the Rating Agencies to rate the Cheyne SIV Rated Notes and placed the Notes with the Cheyne SIV investors.[30]

The Bank was the U.S. Agent, Principal Paying Agent, Calculation Agent, Depositary, Registrar, and U.S. Security Agent for the Rated Notes of the Cheyne SIV.[31]  QSR, its wholly-owned subsidiary, provided administrative services to the Cheyne SIV, acted as the Administrator in the sale of the Rated Notes, helped to draft and disseminate certain management agreements and was responsible for determining and reporting the market values of the Cheyne SIV's collateral assets.[32]

Although a rating agency's role as an unbiased reporter of information typically requires the rating agency to remain independent of the issuers for which it rates notes, the Rating Agencies played a more integral role in

---

[29]    *See id.*

[30]    *See id.* ¶¶ 7, 22, 44.

[31]    *See id.* ¶ 23.

[32]    *See id.* ¶ 24.

9

the structuring and issuing of the Cheyne SIV's Rated Notes. Here, the Rating

Agencies worked directly with Morgan Stanley to structure the Rated Notes in

such a way that they could qualify for the Rating Agencies' highest ratings.[33]  For

example, the Rating Agencies helped to determine how much equity was required

at each level of the SIV in order to support the Senior Notes' "top ratings" and the

Capital Notes' "investment grade" ratings.[34]  This determination was made, with

the Rating Agencies' instruction, at the inception of the Cheyne SIV and on an

ongoing basis throughout the alleged Class Period.[35]  Based on assistance from the

Rating Agencies, on an asset-by-asset basis, the Cheyne SIV would set aside a

predetermined amount of capital for the protection of the Rated Notes in order to

preserve their respective ratings.[36]  The Rating Agencies also monitored the

Cheyne SIV's portfolio and provided instructions on which types of assets the

Cheyne SIV could acquire.[37]

In exchange for the services the Rating Agencies provided, including

---

[33]    See id. ¶ 44.

[34]    See id. ¶ 45.

[35]    See id.

[36]    See id. ¶ 48.

[37]    See id. ¶¶ 50, 53.

issuing "top ratings" for the Cheyne SIV's Rated Notes, the Rating Agencies received fees in the range of ten or more basis points at the "launch" of the SIV – approximately six million dollars.[38] In addition, the Rating Agencies were paid ongoing fees following the launch.[39] They shared annual remuneration with several other parties of a flat fee of approximately \$1,200,000 plus 0.055 percent of the market value of the collateral assets.[40] As a result, the Rating Agencies each received fees in excess of three times their normal fees for rating the Cheyne SIV and fees that increased in tandem with the Cheyne SIV's growth.[41] The Rating Agencies' large fees were drawn from the proceeds of the Rated Notes' issuance and income owed to Rated Notes investors.[42] Unbeknownst to investors at the time, the Rating Agencies' compensation was contingent upon the receipt of desired ratings for the Cheyne SIV's Rated Notes, and only in the event that the transaction closed with those ratings.[43]

---

[38] *Id.* ¶ 56.

[39] *See id.*

[40] *See id.*

[41] *See id* ¶¶ 7, 2, 56-58.

[42] *See id.* ¶ 22.

[43] *See id.*

11

### 3. Defendants' Ongoing Responsibilities with Respect to the Cheyne SIV

Included among the Selling Documents were lists of responsibilities

undertaken by each defendant. Morgan Stanley and BoNY both had

responsibilities to (1) oversee the Cheyne SIV's investments; (2) facilitate the

purchase of safe and highly-rated assets; (3) acquire and manage the SIV's

underlying portfolio in a way that legitimately justified the high credit ratings

assigned to the Notes the SIV issued; (4) conduct capital, market sensitivity, and

liquidity tests to monitor the SIV's assets; (5) ensure that the Rated Notes would

be supported by at least forty percent "AAA" – and at least sixty percent "AA" –

collateral assets; and (6) ensure that the amount of RMBS supporting the Cheyne

SIV would never exceed fifty-five percent.[44] In addition, BoNY was required to

mark to market all of the Cheyne SIV's assets on a daily basis and deliver reports

to the Rating Agencies weekly.[45]

The Rating Agencies were responsible for (1) reviewing and

analyzing reports received from BoNY in order to observe the performance of

---

[44]     *See id.* ¶¶ 11, 52, 60-61; *see also* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss ("Pl. Opp.") at 8 n.15.

[45]     *See* FAC ¶¶ 11, 25, 52, 61; *see also* Pl. Opp. at 8 n.15.

12

collateral assets contained in the Cheyne SIV every week throughout the Class Period; (2) working with Morgan Stanley and BoNY to conduct capital, market sensitivity, and liquidity tests to monitor the SIV's assets; (3) monitoring the Cheyne SIV's covenants and breaches of those covenants; (4) determining applicable legal maturity dates and cure periods; (5) approving substitutions and changes to the SIV's portfolio of assets; (6) attending meetings held by investors and retaining the right to approve any modifications of the SIV; (7) ensuring the Rated Notes would be supported by at least forty percent "AAA" – and at least sixty percent "AA" – collateral assets; and (8) ensuring that the amount of RMBS supporting the Cheyne SIV would never exceed fifty-five percent.[46]  Defendants failed to fulfill these duties by, among other things, permitting the Cheyne SIV to fall below its guaranteed minimum percentages of "AAA" and "AA" collateral assets and exceed its maximum amount of RMBS investments.

### 4.    The Collapse of the Cheyne SIV

The Cheyne SIV collapsed amid the credit crisis and the increasing awareness of the actual quality and value of the subprime mortgages that secured the Rated Notes in the summer of 2007.[47]  Because of the low quality of its assets,

---

[46]    *See* FAC ¶¶ 11, 25, 52-53, 61; *see also* Pl. Opp. at 8 n.16.

[47]    *See* FAC ¶ 14.

13

the Cheyne SIV was unable to repay its senior debt as it came due. In August

2007, the Cheyne SIV declared bankruptcy.[48] Cheyne PLC was then restructured,

and an auction process was instituted. As a result of the liquidation of the Rated

Notes at severe discounts, holders of the Senior Notes have recovered only a

"fraction of their investment," and the Capital Notes "are now worthless."[49]

Plaintiffs now bring this action to recover their losses.

### B.    Procedural History

Plaintiffs filed their First Amended Complaint, adding King County

as a plaintiff, on March 30, 2009. Plaintiffs' First Amended Complaint alleges

thirty-two common law claims against Morgan Stanley, BoNY, and the Rating

Agencies, including (1) common law fraud;[50] (2) negligence;[51] (3) negligent

misrepresentation; (4) breaches of fiduciary duties; (5) breaches of contract

between plaintiffs and each defendant; (6) "contract failure of condition;"[52] (7)

---

[48]    *See id.*

[49]    *Id.* ¶¶ 2, 14.

[50]    Only Morgan Stanley and the Rating Agencies are alleged to have
committed common law fraud. *See id.* ¶¶ 155-167, 240-254.

[51]    Only BoNY and the Rating Agencies are alleged to have acted
negligently. *See id.* ¶¶ 255-264, 330-336.

[52]    Plaintiffs bring claims for "Contract Failure of Condition" against
each defendant. The Court is not familiar with this term. I assume that "Contract

breach of contract between the Cheyne SIV and other defendants to which

plaintiffs allege they were third-party beneficiaries; (8) breach of the implied

covenant of good faith and fair dealing; (9) unjust enrichment; (10) tortious

interference with contract between the Cheyne SIV and plaintiffs; (11) tortious

interference with contract between the Cheyne SIV and other defendants to which

plaintiffs allege they were third-party beneficiaries;[53] and (12) in the alternative,

aiding and abetting.[54]   On May 18, 2009, Morgan Stanley and BoNY, jointly, and

Moody's and S&P, jointly, moved to dismiss the First Amended Complaint.

## III.   LEGAL STANDARD

### A.   Rule 12(b)(1) Motion to Dismiss

Under Federal Rule of Civil Procedure Rule 12(b)(1), a party may

assert by motion the defense that the court lacks subject matter jurisdiction to hear

---

Failure of Condition" is a claim for breach of a condition precedent.

[53]    Only Morgan Stanley is alleged to have tortiously interfered with the contract between the Cheyne SIV and other defendants to which plaintiffs allege they were third-party beneficiaries. *See id.* ¶¶ 229-234.

[54]    *See id.* ¶¶ 155-398. Plaintiffs' aiding and abetting claims are limited to those torts that are sufficiently pled. *See id.* ¶¶ 235-239, 325-329, 394-398. In addition, plaintiffs appear to allege aiding and abetting only if the underlying tort is insufficiently pled as to that defendant but sufficiently pled against another defendant. *See id.* ¶¶ 237, 327, 396. For example, because plaintiffs have not brought a common law fraud claim against BoNY as a primary tortfeasor, they are not claiming that BoNY aided and abetted Morgan Stanley or the Rating Agencies in their fraud.

a claim.  "Federal Courts are courts of limited jurisdiction and may not entertain

matters over which they do not have subject matter jurisdiction."[55]  Section

1332(a)(3) of Title 28 of the United States Code confers subject matter jurisdiction

on the federal district courts, giving them original jurisdiction over cases, "where

the matter in controversy exceeds $75,000, exclusive of interest and costs and is

between . . . citizens of different States and in which citizens or subjects of a

foreign state are additional parties."[56]  Under section 1603(a) of the same title, a

"foreign state" is defined as "any entity . . . a majority of whose shares or other

ownership interest is owned by a foreign state."[57]

## B.    Standing

A plaintiff must "satisfy the threshold requirement imposed by Article

III of the Constitution by alleging an actual case or controversy."[58]  To meet this

burden, a plaintiff must show (1) personal injury; (2) causation evidencing a

connection between the plaintiff's injury and the defendant's alleged conduct; and

---

[55]    *Braten v. Kaplan*, No. 07 Civ. 8498, 2009 WL 614657, at *3
(S.D.N.Y. Mar. 10, 2009) (citing *Wynn v. AC Rochester*, 273 F.3d 153, 157 (2d
Cir. 2001)).

[56]    28 U.S.C. § 1332(a)(3).

[57]    28 U.S.C. § 1603(a).

[58]    *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citations
omitted).

(3) redressability, or some, non-speculative, likelihood that the plaintiff's injury can be remedied by the relief requested of the court.[59] A putative class representative lacks standing to bring a claim if it did not suffer the injury that gives rise to that claim.[60] Where multiple claims are brought, at "least one *named* plaintiff must have standing to pursue each claim alleged."[61]

   In misrepresentation cases, a plaintiff bringing claims on the basis of the purchase or sale of securities must actually be a purchaser of the securities at issue.[62] The purpose of this rule is to "limit[] the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or

---

   [59]   *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008).

   [60]   *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (plaintiffs with one type of injury lack standing to challenge a different, though perhaps related, injury, because "standing is not dispensed in gross").

   [61]   *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004). *Accord Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim"); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003) (same).

   [62]   *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 531 (S.D.N.Y. 2008) (holding that plaintiffs lacked standing to bring securities claims relating to funds that plaintiffs did not own) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975) (holding only purchasers and sellers of securities can recover under Section 10(b) and Rule 10b-5)).

17

omission relates."[63]  "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."[64]

## C.    Rule 12(b)(6) Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true all of the factual allegations contained in the complaint"[65] and "draw all reasonable inferences in the plaintiff's favor."[66]  However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[67]

---

[63]    *Blue Chip Stamps*, 421 U.S. at 747.

[64]    *Lewis*, 518 U.S. at 357 (quoted in *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005)).

[65]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[66]    *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[67]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation omitted).  *Accord Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949

To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[68]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[69] Plausibility "is not akin to a probability requirement;" rather plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[70]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[71]  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."[72]

Depending on the claim asserted, a plaintiff's pleading burden can differ.  For some claims, a plaintiff need only meet the pleading burden set forth in Federal Rule of Civil Procedure Rule 8(a).  Under Rule 8(a)(2), a pleading must

---

(May 18, 2009).

[68]    *See Twombly*, 550 U.S. at 564.

[69]    *Iqbal*, 129 S. Ct. at 1949 (quotation omitted).

[70]    *Id.* (quotation omitted).

[71]    *Id.* (quotation omitted).

[72]    *Id.* at 1950 (internal quotations marks and citation omitted).

contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."[73]  While Rule 8(a) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, [ ] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."[74]  Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[75]

For other claims, such as those based on fraud, a plaintiff must satisfy an additional, heightened, burden as set forth in Federal Rule of Civil Procedure Rule 9(b).  Specifically, to satisfy the Rule 9(b) pleading standard, a fraud claim alleging material misstatements or omissions must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."[76]

---

[73]     Fed. R. Civ. P. 8(a)(2).

[74]     *Iqbal*, 129 S. Ct. at 1950.

[75]     *Id.* at 1949.

[76]     *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 187 (2d Cir. 2004) (quotation marks omitted).

20

## IV.    APPLICABLE LAW

### A.    Common Law Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[77]   Because the elements of common law fraud under New York law are "substantially identical to those governing Section 10(b)," an "identical analysis applies."[78]

Common law fraud claims must be pled with particularity in accordance with the requirements set forth in Rule 9(b).[79]   Where defendants are insiders or affiliates participating in the offer of securities, the Second Circuit has held "that reference to an offering memorandum satisfies 9(b)'s requirement of

---

[77]    *Wynn*, 273 F.3d at 156.

[78]    *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ 11448, 2005 WL 2385854, at *16 (S.D.N.Y. Sept. 25, 2005) (citation and quotation marks omitted).

[79]    *See Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008).

identifying time, place, speaker, and content of representation . . . ."[80] The

pleading requirements for the knowledge – or scienter – element of common law

fraud claims under New York law are similar to the pleading requirements for

scienter under federal securities law.[81]   A plaintiff must allege facts indicating that

the defendant possesses an "'intent to deceive, manipulate or defraud.'"[82]  To

satisfy the pleading requirements with respect to scienter, a plaintiff may either

plead "motive and opportunity to commit fraud" or "strong circumstantial

evidence of conscious misbehavior or recklessness."[83]  To the extent that a

plaintiff relies on allegations of motive or improper intent, plaintiff must plead

facts that give rise to an inference that is "more than merely plausible or

reasonable – it must be cogent and at least as compelling as any opposing

---

[80]      *Ouaknine v. MacFarlane*, 897 F.2d 75 (2d Cir. 1990) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) *and Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986)).

[81]      *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104-05 (2d Cir. 2001) (confirming the need to establish the defendant's knowledge or recklessness to succeed on a common law fraud claim).

[82]      *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[83]      *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (quotations and citations omitted).

inference of nonfraudulent intent."[84]  Adequately pleading "[m]otive would entail

concrete benefits that could be realized by one or more of the false statements and

wrongful nondisclosures alleged," while adequately pleading "opportunity would

entail the means and likely prospect of achieving concrete benefits by the means

alleged."[85]

> In addition to alleging scienter, plaintiffs must show that they

reasonably relied on the false and misleading statements to their detriment.

> Reasonable reliance entails a duty to investigate the
> legitimacy of an investment opportunity where plaintiff
> was placed on guard or practically faced with the facts.
> Only [w]hen matters are held to be peculiarly within
> defendant's knowledge [ ] [is it] said that plaintiff may rely
> without prosecuting an investigation, as he ha[d] no
> independent means of ascertaining the truth.[86]

A plaintiff must allege "that its reliance on the alleged misrepresentations was not

so utterly unreasonable, foolish or knowingly blind as to compel the conclusion

that whatever injury it suffered was its own responsibility."[87]

---

[84]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

[85]    *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

[86]    *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) (alterations and omissions in original) (quotation marks omitted).

[87]    *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 182 (2d Cir. 2007).

**B.    New York's Martin Act**

New York's Martin Act makes it unlawful to, among other things, use

or employ "any fraud, deception, concealment, suppression, false pretense or

fictitious or pretended purchase or sale . . . where engaged in to induce or promote

the issuance, distribution, exchange, sale, negotiation or purchase within or from

this state of any securities . . . ."[88]  Under the Martin Act, the New York Attorney

General possesses exclusive power to regulate the sale of securities.[89]  Courts have

held that the Martin Act bars both private claims brought directly under the statute

and "common-law claims based on facts that provide the Attorney General

grounds for instituting an action under the Act."[90]  The Martin Act extends only to

those common law claims that do not require "proof of deceitful intent," and are

based on conduct that is "within or from" New York.[91]  The Martin Act preempts,

at least, the following common law claims when they are predicated on the

---

[88]    N.Y. Gen. Bus. Law § 352-c(1).

[89]    *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001).

[90]    *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001).

[91]    *Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003).

purchase or sale of securities within or from New York: negligence;[92] breach of fiduciary duty;[93] negligent misrepresentation;[94] unjust enrichment;[95] and aiding and abetting any of these claims.[96]  Where, however, the Attorney General has no enforcement power, common law causes of action may proceed.[97]

### C.    Breach of Contract and Related Claims

#### 1.    Breach of Contract

To make out a breach of contract claim under New York law plaintiffs must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4)

---

[92]    *See Lehman Bros. Commercial Corp.*, 179 F. Supp. 2d at 162.

[93]    *See id.*

[94]    *See id.*

[95]    *See Pro Bono Inv., Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005).

[96]    *See, e.g., Jana Master Fund, Ltd. v. J.P. Morgan Chase & Co.*, 859 N.Y.S.2d 903 (Table), 2008 WL 746540, at *5 (Sup. Ct. N.Y. Co. Mar. 12, 2008) (dismissing claim for aiding and abetting breach of fiduciary duty because claims for "breach of fiduciary duty in connection with the purchase and sale of securities have been found to be barred by the Martin Act").

[97]    *See Nanopierce Tech., Inc.*, 2003 WL 22052894, at *6 ("[T]he New York courts did not intend to eviscerate New York's common law causes of action, except where those causes of action fell squarely within the range of cases on which the Attorney General has been empowered to act.").

damages."[98] A breach of contract claim "that fails to allege facts sufficient to

show that an enforceable contract existed between the parties is subject to

dismissal."[99] However, a plaintiff alleging a breach of contract claim is required

only to provide defendants with a "short, plain notice" of the claims against them

pursuant to Rule 8.[100]

## 2. Third-Party Beneficiary

New York law requires that plaintiffs alleging that they are third-

party beneficiaries to a contract "establish that the parties to the contract intended

to confer a benefit on the third-party."[101] The New York Court of Appeals has

declared section 302 of the Restatement (2d) of Contracts to be an accurate

statement of New York third-party beneficiary law.[102] Section 302(1) states that:

---

[98]     *Eternity Global Master Fund Ltd.*, 375 F.3d at 177 (quotation marks omitted).

[99]     *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (quotation marks omitted).

[100]     *Contractual Obligation Prods., LLC v. AMC Networks, Inc.,* No. 04 Civ. 2867, 2006 WL 6217754, at *19 (S.D.N.Y. Mar. 31, 2006) (citing *Weiss v. La Suisse*, 69 F. Supp. 2d 449, 462 (S.D.N.Y. 1999)).

[101]     *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (citing *State of Cal. Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434-35 (2000)).

[102]     *See id.*

26

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.[103]

Under New York law, a third-party is an intended beneficiary only if "'no one other than the third-party can recover if the promisor breaches the contract' or the contract language should otherwise clearly evidence 'an intent to permit enforcement by the third-party.'"[104] "[D]ismissal of a third-party-beneficiary claim is appropriate . . . where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant."[105]

### D.    Aiding and Abetting

When proceeding under an aiding and abetting theory of liability under New York law, a plaintiff must show "(1) the existence of a . . . violation by

---

[103]    Restatement (2d) Contracts § 302.

[104]    *Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250, 263-64 (S.D.N.Y. 2006) (quoting *Artwear, Inc. v. Hughes*, 615 N.Y.S.2d 689, 692 (1994)).

[105]    *Subaru Distribs. Corp.*, 425 F.3d at 124-25 (citing *First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P.*, 688 N.Y.S.2d 25, 27 (1999) and *Artwear, Inc.*, 615 N.Y.S.2d at 693)).

the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."[106] For claims of aiding and abetting to survive a motion to dismiss, they must be pled with some level of specificity and may not consist solely of a broad, conclusory, repetition of the elements of aiding and abetting.[107]

## V.    DISCUSSION

### A.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction under section 1332(a)(3) because the amount in controversy exceeds $75,000, and this matter is between a citizen of the State of Washington (King County), and citizens of the State of New York (defendants) and citizens or subjects of a foreign state (ADCB). ADCB is a

---

[106]    *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006) (quotation marks omitted) (omission in original). *Accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006).

[107]    *See, e.g., Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir. 1982) (dismissing allegations of aiding and abetting liability that are "so broad and conclusory as to be meaningless"); *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (holding that allegations that the defendants "provided substantial assistance and encouragement to the other defendants . . . in connection with the breaches by such other defendants of duties owed by them to the plaintiffs" were "too broad to be sustained").

"citizen or subject" of Abu Dhabi, and not, as defendants assert,[108] a foreign state itself, because the government of Abu Dhabi does not directly own the majority interest in ADCB.  Majority ownership of a corporation by an "agent" or "instrumentality" of a government does not make the corporation an "agent" or "instrumentality" itself for purposes of section 1603.[109]  ADCB is 64.8 percent owned by Abu Dhabi Investment Counsel ("ADIC").[110]  Regardless of whether ADIC is considered an "instrumentality" or "agent" of the Abu Dhabi government, ADCB is not an "agent" or "instrumentality" of the Abu Dhabi government.  As a result, subject matter jurisdiction is satisfied under section 1332(a)(3), and defendants' motion to dismiss for lack of subject matter jurisdiction is denied.[111]

---

[108]    *See* MS/BoNY Mem. at 29-30; RA Mem. at 4 n.3.

[109]    *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) (holding "that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement" outlined in section 1603); *Filler v. Hanvit Bank*, 378 F.3d 217-20 (2d Cir. 2004) (applying *Dole Food* and holding that a foreign agency's majority ownership of two banks did not render the banks "foreign states" under section 1603)).

[110]    *See* Pl. Opp. at 5 (citing 8/25/08 Pl. Rule 7.1 Disclosure Statement).

[111]    Because subject matter jurisdiction is properly conferred pursuant to section 1332(a)(3), an evaluation of plaintiffs' argument that this Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act is unnecessary.  *See* Pl. Opp. at 4-5.

## B.    Standing

Defendants argue that plaintiffs lack standing to bring claims based on the Medium Term Notes because neither King County nor ADCB purchased the Medium Term Notes.[112]  In response, and relying on cases assessing the standing and adequacy of representation of proposed lead plaintiffs at the class certification stage, plaintiffs argue that "holders of one type of security have standing to represent holders of other types of securities, 'so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security'" and suggest that, nevertheless, standing is better assessed at the class certification stage.[113]

Plaintiffs' response misses the mark.  Standing is a threshold question for any case brought before a federal court, regardless of whether plaintiffs bring

---

[112]    *See* MS/BoNY Mem. at 12-13 (referencing Transcript at 13, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508 (S.D.N.Y. argued May 4, 2009) (statement by plaintiffs' counsel that King County purchased Commercial Paper only and not both Commercial Paper and Medium Term Notes as alleged in the First Amended Complaint).  This statement is considered for purposes of this motion under the doctrine of judicial admissions. *See Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994).

[113]    Pl. Opp. at 6-7 (quoting *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2008)).

the case as a class action.[114]  While plaintiffs are correct that they may be deemed

adequate class representatives for claims based on securities they did not purchase,

one of the named plaintiffs must have purchased those securities.[115]  To hold

otherwise would potentially permit King County, ADCB, and the putative class

members to recover for injuries they did not actually sustain.  Because no named

plaintiff purchased the Medium Term Notes, all claims based upon the purchase of

those Notes are dismissed.[116]

### C.    Common Law Fraud

#### 1.    False and Misleading Misrepresentations

The parties dispute whether plaintiffs have sufficiently alleged an

actionable misrepresentation and whether the Rating Agencies or Morgan Stanley

---

[114]    *See Hoffman*, 591 F. Supp. 2d at 532 ("The standing question is antecedent to the class certification issue to the extent that a court can only certify a class for claims over which it has power.") (citing *Lewis*, 518 U.S. at 357).  *See also In re Alliancebernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753, at *9.

[115]    *See In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d at 496 ("[T]he selection of lead plaintiff does not remove the basic requirement that at least one *named* plaintiff must have standing to pursue each claim alleged.").

[116]    Because none of the claims alleged against any of the defendants appear to be based solely on the purchase or sale of the Medium Term Notes, however, no claims are dismissed.

31

can be held liable for the alleged statements.[117]  Plaintiffs allege that (1) the high ratings assigned to the Cheyne SIV's Rated Notes, as well as the definitions of the ratings and similar statements regarding the investments' relative safety and stability were issued by the Rating Agencies, (2) with the assistance and influence of Morgan Stanley, (3) these ratings and the information they conveyed were false and misleading, (4) these ratings were disseminated, with the Rating Agencies' knowledge and/or approval, by Morgan Stanley in each Information Memorandum and other circulated Selling Documents throughout the Class Period, (5) to potential investors, including plaintiffs.  Based on these allegations, plaintiffs have sufficiently alleged an actionable misstatement against the Rating Agencies and Morgan Stanley.

### a.    The Rating Agencies

The Rating Agencies argue that plaintiffs have not pled an actionable misrepresentation because (1) the Rating Agencies are entitled to immunity under the First Amendment and (2) even if the Rating Agencies could be held liable, their ratings are nonactionable opinions.[118]

It is well-established that under typical circumstances, the First

---

[117]    *See* MS/BoNY Mem. at 9-12; RA Mem. at 2-4; Pl. Opp. at 16-18.

[118]    *See* RA Mem. at 7-9, 26.

32

Amendment protects rating agencies, subject to an "actual malice" exception, from liability arising out of their issuance of ratings and reports because their ratings are considered matters of public concern.[119] However, where a rating agency has disseminated their ratings to a select group of investors rather than to the public at large, the rating agency is not afforded the same protection.[120] Here, plaintiffs have plainly alleged that the Cheyne SIV's ratings were never widely disseminated, but were provided instead in connection with a private placement to a select group of investors.[121] Thus, the Rating Agencies' First Amendment argument is rejected.

I also reject the argument that the Rating Agencies' ratings in this

---

[119]    *See, e.g. Compuware Corp. v. Moody's Inv. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (affirming the dismissal of claims against rating agencies brought on the basis of credit ratings on First Amendment grounds); *Jefferson County Sch. Dist. No. R-1 v. Moody's Inv. Servs., Inc.*, 175 F.3d 848, 856 (10th Cir. 1999) (same); *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) (same).

[120]    *Compare Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-62 (1985) (holding that a credit report published to five subscribers did not involve a matter of public concern because it was intended for a "specific business audience") *and In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 640 (S.D. Ohio 2008) (refusing to apply the First Amendment where Moody's ratings had been disseminated to a "select class of institutional investors") *with Compuware Corp.*, 499 F.3d at 525-29 (applying the First Amendment where Moody's had rated a publicly-held corporation).

[121]    *See FAC ¶ 63.*

33

case are nonactionable opinions.[122]  "[A]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact."[123]  For the reasons discussed below,[124] plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned to the Rated Notes were accurate and had a basis in fact.  As a result, the Rating Agencies' ratings were not mere opinions but rather actionable misrepresentations.

For the same reasons, the disclaimers in the Information Memoranda that "[a] credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities,"[125] are unavailing and insufficient to protect the Rating Agencies from liability for promulgating misleading ratings.[126]  I conclude that

---

[122]    *See* RA Mem. at 7-9.

[123]    *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998). *Accord Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991) (rejecting the argument that statements containing opinions or beliefs could not be a basis for an action for federal securities fraud).

[124]    *See infra* Part V.C.2.

[125]    RA Mem. at 7 n.8 (and citations therein).

[126]    *See Jefferson County Sch. Dist. No. R-1*, 175 F.3d at 856 ("[T]he fact that Moody's article describes its evaluation as an opinion is not sufficient, standing alone, to establish that Moody's statements are protected" and that "[i]f

plaintiffs have sufficiently alleged that the ratings issued by the Rating Agencies

on the Rated Notes are actionable misstatements.

### b. Morgan Stanley

Morgan Stanley argues that plaintiffs have impermissibly

"clump[ed]" Morgan Stanley together with the Rating Agencies as "defendants"

and that in doing so plaintiffs have failed to meet the heightened pleading

requirements of Rule 9(b).[127]  It is well-settled that "[w]here multiple defendants

are asked to respond to allegations of fraud, the complaint should inform each

defendant of the nature of [its] alleged participation in the fraud."[128]  However, the

group pleading doctrine provides an exception "'to the requirement that the

fraudulent acts of each defendant be identified separately in the complaint.'"[129]

"[N]o specific connection between fraudulent representations in [an] [o]ffering

[m]emorandum and particular defendants is necessary where, as here, defendants

---

such an opinion were shown to have materially false components, the issuer
should not be shielded from liability by raising the word 'opinion' as a
shibboleth").

[127]    MS/BoNY Mem. at 10.

[128]    *DiVittorio*, 822 F.2d at 1247.

[129]    *Adelphia Recovery Trust v. Bank of Am., N.A.*, – F. Supp. 2d – , No.
05 Civ. 9050, 2009 WL 1249360, at *17 (S.D.N.Y. May 6, 2009) (quoting *Polar
Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000)).

are insiders or affiliates participating in the offer of the securities in question."[130] The group pleading doctrine applies where group-published information, such as an offering memorandum, "are the collective work of those individuals with direct involvement in the everyday business of the company."[131]

Here, plaintiffs have alleged that the defendants, including Morgan Stanley, "together designed, structured, marketed and maintained the Cheyne SIV."[132] In addition, Morgan Stanley is alleged to have obtained the ratings assigned to the Rated Notes by the Rating Agencies.[133] Morgan Stanley also is alleged to have provided to potential investors, with the knowledge, participation and approval of the Rating Agencies and BoNY, the alleged misleading ratings, accompanying definitions of the ratings, and statements regarding the Rated Notes' safety and stability through preliminary and final Information Memoranda, "numerous" Pricing Supplements, a May 2005 "pre-sale" report issued by S&P,

---

[130]    *Luce*, 802 F.2d at 55.

[131]    *Adelphia Recovery Trust*, 2009 WL 1249360, at *17 (applying the group pleading doctrine where documents were prepared and approved by the defendants, the defendants worked with the issuer to draft and disseminate documents, and they had knowledge of the everyday business of the issuer) (quotation marks omitted).

[132]    FAC ¶ 2.

[133]    *See id.* ¶ 7.

and documents associated with the continuous "rolling" of Senior Notes.[134]

Defendants rely on *DiVittorio v. Equidyne Extractive Industries, Inc.* and this Court's holdings in *Polar International Brokerage Corp. v. Reeve* and *Scone Investments, L.P. v. American Third Market Corp.*[135] These cases are distinguishable. In each of these cases, plaintiffs had failed to establish any inside link between the defendant and the issuer or a direct connection between the defendant and the document alleged to contain the misstatements.[136] The facts of these cases stand in stark contrast to plaintiffs' allegations against Morgan Stanley. Therefore, plaintiffs have adequately pled that the misleading statements are attributable to Morgan Stanley through the group pleading doctrine.

---

[134]    *See id.* ¶¶ 59-64, 157.

[135]    *See* MS/BoNY Mem. at 9-11 (citing *DiVittorio*, 822 F.2d at 1247, *Polar Int'l Brokerage Corp.*, 108 F. Supp. 2d at 237, and *Scone Invs., L.P.*, No. 97 Civ. 3802, 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998)).

[136]    *See DiVittorio*, 822 F.2d at 1248-49 (noting that none of the defendants against whom the fraud claims were dismissed were "tied" or "linked" to the offering memorandum at issue in any way); *Polar Int'l Brokerage Corp.*, 108 F. Supp. 2d at 237-38 (permitting the plaintiffs to rely on the group pleading doctrine as to claims against, among others, the private equities firm initiating the tender offer and the investment banks working on the tender offer, but declining to apply the group pleading doctrine to an insurance company that was a mere investor in the issuer); *Scone Invs., L.P.*, 1998 WL 205338, at *4 (noting only that certain paragraphs in the complaint that had lumped defendants together "add[ed] nothing to [the] consideration of the [defendant's] motion to dismiss;" the group pleading doctrine was not addressed).

## 2.    Knowledge of the Falsity

Plaintiffs have sufficiently pleaded facts showing that defendants knew that the credit ratings were false. In the summer of 2004, both Rating Agencies independently unveiled new credit-rating models that eased the Rating Agencies' standards for evaluating the creditworthiness of nonprime securities like the Cheyne SIV.[137] In addition, the Rating Agencies assigned ratings that, on the surface, appeared to investors to equate the Rated Notes to other investments, such as stable corporate bonds, but, in reality, and unbeknownst to investors, differed materially.[138] Moreover, defendants knew that although the actual portfolio consisted of "much more" than fifty-five percent of RMBS, the Information Memoranda stated that the Cheyne SIV's portfolio would consist of no more than fifty-five percent of such securities.[139] Both Morgan Stanley and the Rating Agencies knew that an SIV portfolio that consisted of more than fifty-five percent RMBS made the SIV a risky investment and certainly not deserving of high ratings.[140]

---

[137]    *See* FAC ¶ 67.

[138]    *See id.* ¶¶ 67-71.

[139]    *Id.* ¶ 72.

[140]    *See id.*

Further, in addition to eight other examples of nonprime mortgage loans originated during the alleged Class Period and acquired by the Cheyne SIV, plaintiffs provide facts illustrating Morgan Stanley's awareness of, and involvement in, the default of New Century Mortgage Corporation ("New Century") in March 2007.[141]  Plaintiffs allege that Morgan Stanley – New Century's fourth largest creditor – received non-public information that would have directly contradicted the high ratings assigned to the Cheyne SIV's Rated Notes as a result of the Cheyne SIV's large investment in New Century.[142]  This amounts to more than mere access to information; rather, it illustrates that Morgan Stanley possessed actual information that contradicted the high ratings that the Cheyne SIV had received.  Plaintiffs also allege that the Rating Agencies were in possession of non-public information that would have contradicted the assignment of high ratings to the Rated Notes.[143]

Plaintiffs also painstakingly detail the conflicts of interest that arise when rating agencies rate entities in which they have a financial stake.[144]  The

---

[141]    *See id.* ¶ 74.

[142]    *See id.* ¶¶ 82, 92-98.

[143]    *See id.* ¶¶ 99, 251, 274, 308.

[144]    *See id.* ¶¶ 110-135.

conflicts of interest were well known to both the Rating Agencies and Morgan

Stanley.[145]  In fact, former employees of the Rating Agencies, former SEC

chairmen, and a Congressional Representative, have stated publicly that the Rating

Agencies and industry insiders like Morgan Stanley knew at the time the Cheyne

SIV's ratings were issued that the process used to derive ratings generally was

deeply flawed and unreliable.[146]  Contrary to past practices where they were paid

by investors, the Rating Agencies were compensated by the Cheyne SIV and

Morgan Stanley at a fee substantially larger than normally received and a fee that

was directly connected to the success of the Cheyne SIV. [147]  This structure created

a conflict of interest that compromised the objectivity of the ratings.[148]  There is no

---

[145]    *See id.*

[146]    *See id.*

[147]    *See id* ¶¶ 7, 2, 56-58.

[148]    *See id.* ¶ 115 ("Now, investors are relying on credit ratings to make
informed investment decisions, but the credit rating firms are paid not by investors
but by the companies they rate. . . . This very circumstance suggests that a
potential conflict of interest – between providing objective ratings and satisfying
their corporate clients may be distorting the rating agencies' judgment." (quoting
11/27/07 Speech of former SEC Chairman Arthur Levitt, Jr.)); ¶ 114 ("The credit-
rating firms were double-dipping; profiting first from helping to put these shady
securities together, and then collecting fees for deliberately rating these risky
products at a higher value than they were worth"(quoting 9/5/07 Testimony of
U.S. Congressional Rep. Gary Ackerman to Committee on House Financial
Services)).

question that companies can conduct business legally, even in the face of conflicts

of interest, provided that proper safeguards are in place.   The existence of

conflicts of interest alone typically is not sufficient to establish that defendants

"knowingly" made a false and misleading statement.   But where both the Rating

Agencies and Morgan Stanley knew that the ratings process was flawed, knew that

the portfolio was not a safe, stable investment, and knew that the Rating Agencies

could not issue an objective rating because of the effect it would have on their

compensation, it may be plausibly inferred that Morgan Stanley and the Rating

Agencies knew they were disseminating false and misleading ratings.

### 3.    Scienter

Plaintiffs have also pled facts permitting the plausible inference that

Morgan Stanley and the Rating Agencies had the motive and opportunity to

communicate these allegedly false and misleading ratings to potential investors in

the Cheyne SIV.  The Rating Agencies sought Morgan Stanley's business and

knew that if they refused to assign the Cheyne SIV's Rated Notes the high rating

that Morgan Stanley desired, "Morgan Stanley would have taken its business

elsewhere."[149]  In exchange for their allegedly unreasonably high ratings, the

Rating Agencies each received fees in excess of three times their normal fees for

---

[149]      *Id.* ¶¶ 7, 44.

rating the SIV as well as fees that increased in tandem with the Cheyne SIV's growth.[150]  The Rating Agencies' large fees were "drawn from the proceeds of the Rated Notes' issuance, and their ongoing fees were paid out of income owed to Rated Notes investors."[151]  Plaintiffs allege that the Rating Agencies knew that their remuneration was dependent upon the successful sale of the Rated Notes.[152]  They also allege that the Rating Agencies knew that the Rated Notes would sell successfully only if they were highly rated.[153]  Effectively, "the Rating Agencies were paid only if they provided the desired ratings and only in the event that the transaction closed with those ratings."[154]  This may be sufficient to support a finding of motive.  Because the Rating Agencies were responsible for determining and issuing their ratings and devised the models that produced the allegedly unreasonably high ratings, the Rating Agencies had the opportunity to assign misleading ratings.  Plaintiffs have thus sufficiently pled scienter as to the Rating Agencies.

---

[150]    *See id.* ¶¶ 2, 7, 56-58.

[151]    *Id.* ¶ 22.

[152]    *Id.* ¶ 58.  *Accord id.* ¶ 141.

[153]    *See id.* ¶ 58.

[154]    *Id.*

Plaintiffs have also successfully pled that Morgan Stanley had the motive and opportunity to commit fraud. High ratings are important because "an SIV's success depends directly on the credit quality of the assets acquired by the SIV,"[155] and Morgan Stanley's remuneration was dependent upon the successful sale of the SIV's Rated Notes.[156] Morgan Stanley's fees were awarded in two ways. Morgan Stanley received a fee that was equal to five basis points of the market value of the investment assets held by the Cheyne SIV.[157] Morgan Stanley also received a fee that was equal to a portion of the Cheyne SIV's net distributable profits.[158] This second fee did not accrue during restricted operating periods – during restricted funding, investment or enforcement events.[159] The implication is that had the Cheyne SIV's rating, or its assets' ratings, dropped below the levels indicated in the Selling Documents, Morgan Stanley would not have received this fee. Morgan Stanley therefore had a motive to maintain the appearance that the SIV assets were safe and highly rated. Morgan Stanley also

---

[155]    *Id.* ¶ 39.

[156]    *See id.* ¶¶ 136-140.

[157]    *See id.* ¶ 137.

[158]    *See id.* ¶ 138.

[159]    *See id.* ¶ 140.

knew that the Rated Notes of the Cheyne SIV would not sell without the Rating
Agencies' highest ratings and was motivated to ensure that the Rated Notes
received high ratings, whether or not those ratings were justified.[160] In fact,
obtaining these high ratings was a condition precedent to the offering of the Rated
Notes.[161]

Morgan Stanley also had the opportunity to disseminate the false and
misleading ratings. "A 'clear opportunity' to commit fraud implies that defendants
are 'well positioned to carry out the fraudulent transaction.'"[162] Morgan Stanley is
alleged to have exerted influence over the Rating Agencies and their issuance of
the false and misleading ratings. It was through Morgan Stanley's distribution of
the Selling Documents that the false and misleading ratings reached investors.
Both of these allegations establish that Morgan Stanley was well positioned to
cause the false and misleading ratings to be disseminated to investors, thereby
establishing Morgan Stanley's opportunity to commit the alleged fraud. Thus,

---

[160]    *See id.* ¶¶ 22, 54.

[161]    *See id.* ¶¶ 22, 51, 54.

[162]    *Skylon Corp. v. Guilford Mills, Inc.*, No. 93 Civ. 5581, 1997 WL
88894, at *3 (S.D.N.Y. Mar. 3, 1997) (quoting *Powers v. British Vita, P.L.C.*, 57
F.3d 176, 185 (2d Cir. 1995) and citing *Shields*, 25 F.3d at 1130 ("Opportunity
would entail the means and likely prospect of achieving concrete benefits by the
means alleged.")).

plaintiffs have adequately pled a plausible inference of scienter as to Morgan
Stanley.

### 4.    Reliance

Morgan Stanley and the Rating Agencies next argue that plaintiffs
acted unreasonably in relying on the allegedly false and misleading ratings
because (1) plaintiffs are sophisticated investors; (2) the Information Memoranda
and other Selling Documents contained express disclaimers of liability; and (3)
plaintiffs were instructed to perform, and had the capacity to perform, their own
due diligence before investing.[163]  Morgan Stanley and the Rating Agencies assert
that based on these facts, plaintiffs are precluded from asserting reliance.[164]

With regard to the sophisticated investor, the Second Circuit has held:

> The law is indulgent of the simple or untutored; but the
> greater the sophistication of the investor, the more inquiry
> that is required. Where sophisticated businessmen engaged
> in major transactions enjoy access to critical information
> but fail to take advantage of that access, New York courts
> are particularly disinclined to entertain claims of justifiable
> reliance.  In assessing the reasonableness of a plaintiff's
> alleged reliance, we consider the entire context of the
> transaction, including factors such as its complexity and
> magnitude, the sophistication of the parties, and the content

---

[163]    *See* MS/BoNY Mem. at 13-15; RA Mem. at 10-12.

[164]    *See* MS/BoNY Mem. at 13-15; RA Mem. at 10-12.

of any agreements between them.[165]

As discussed above,[166] the market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and, at least in this case, the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain. Plaintiffs accordingly have adequately pled their reasonable reliance on the ratings. For the foregoing reasons, plaintiffs have sufficiently alleged common law fraud under New York law against Morgan Stanley and the Rating Agencies. These defendants' motions to dismiss the common law fraud claims are denied.[167]

## D.    The Martin Act

Defendants argue that plaintiffs' claims for negligence, negligent misrepresentation, breach of fiduciary duty, tortious interference with contract, unjust enrichment, and aiding and abetting any of these claims are barred by New

---

[165]    *Crigger*, 443 F.3d at 235 (quotation marks and citations omitted).

[166]    *See supra* Part II.A.1.

[167]    Plaintiffs' claims against Morgan Stanley and the Rating Agencies for breach of condition precedent and breach of the covenant of good faith and fair dealing are pled in the alternative to plaintiffs' common law fraud claims. *See* FAC ¶¶ 195, 211, 290, 307. As a result, these claims are dismissed.

York's Martin Act.[168] Not surprisingly, plaintiffs disagree.

While there is some disagreement among New York's appellate courts as to whether the Martin Act preempts common law claims,[169] the Second Circuit has adopted the First Department's rule that the Martin Act preempts common law tort claims in the securities context.[170] Plaintiffs argue that these claims do not fall within the Martin Act because they do not arise "within or from" New York.[171] However, "[t]here is consensus in this District that a transaction is 'within or from' New York for purposes of the Martin Act if a plaintiff alleges that a 'substantial portion of the events' giving rise to a claim occurred in New York."[172] Here, plaintiffs concede that "[t]he majority of the conduct alleged in

---

[168]    *See* RA Mem. at 4-6; MS/BoNY Mem. at 29 n.12.

[169]    *See* Pl. Opp. at 34-35 (collecting cases); RA Mem. at 5 n.6 (collecting cases).

[170]    *See Castellano*, 257 F.3d at 190.

[171]    *See* Pl. Opp. at 34-37.

[172]    *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 611 n.9 (S.D.N.Y. 2008). *Accord Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120, 2005 WL 1902780, at *21 (S.D.N.Y. Aug. 9, 2005) ("The scope of the Martin Act, however, includes more [than] the actual purchase or sale of securities within or from New York."). *Cf. Pension Comm. of Univ. of Montreal Pension Plan v. Bank of Am. Sec., LLC*, 592 F. Supp. 2d 608, 639-40 (S.D.N.Y. 2009) (finding the only conduct occurring in New York to be the regular communication between a defendant and plaintiffs, but otherwise finding that most of defendants' work was done outside of the United States, most of the

the [First Amended Complaint] occurred in New York," but nevertheless argue

that neither of the two named plaintiffs are citizens of New York, certain

defendants reside outside of New York, and certain acts took place outside New

York.[173]  The acts occurring outside of New York appear to be limited to the

issuance of the U.S. Notes by Delaware entities and Euro Notes by foreign

entities.[174]

      In contrast, plaintiffs allege the following connections with New

York:  (1) both Morgan Stanley and BoNY are headquartered in this District;[175] (2)

the register of the certificateless depositary interests was to be maintained in New

York;[176] (3) the Senior Notes, Senior Note Purchase Agreement, the U.S. Senior

Note Security Documents, the U.S. Senior Notes Agency Agreement, the Capital

--------

securities were marketed and sold to foreign investors, and only a limited number
of investors in the United States participated); *Lehman Bros. Commercial Corp.*,
179 F. Supp. 2d at 165 (determining that the negotiation of the sale of securities
among traders located in London, Hong Kong, and Beijing did not meet the
Martin Act requirements of within or from New York).

    [173]    Pl. Opp. at 36 n.74.

    [174]    *See id.* (citing FAC ¶ 29; Information Memorandum, Ex. A to 5/18/09
Declaration of James Rouhandeh, counsel to Morgan Stanley, in Support of
MS/BoNY Mem. ("Rouhandeh Decl."), at 3).

    [175]    *See* FAC ¶ 18.

    [176]    *See id.* ¶ 29.

Notes, the Capital Notes Purchase Agreement, the U.S. Capital Notes Security

Documents and the U.S. Capital Notes Agency Agreement are governed by and

construed in accordance with the laws of New York;[177] (4) "New York has a

public policy interest in fostering the integrity and transparency of financial

markets since it is one of the leading financial centers in the world;"[178] and (5) "the

violations of law complained of [in the First Amended Complaint] occurred in part

in this District, including the dissemination of the materially false and misleading

credit ratings and other statements complained of [in the First Amended

Complaint]."[179]  Furthermore, in their Opposition, plaintiffs argue that New York

law should apply to their third-party beneficiary claims because "New York has

the most significant relationship to the transaction and the parties and the most

significant contacts with the matter in dispute."[180]

      In light of plaintiffs' own admission that a "majority" of the conduct

took place in New York and plaintiffs' limited ability to point to acts in the First

Amended Complaint that occurred outside of New York, I conclude that plaintiffs'

---

[177]    *See id.*

[178]    *Id.* ¶¶ 221, 317, 386.

[179]    *Id.* ¶ 28.

[180]    Pl. Opp. at 12.

claims for negligence, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, and aiding and abetting each of these claims are preempted by the Martin Act. Therefore, defendants' motions to dismiss these claims are granted.

Despite defendants' assertion that plaintiffs' claim for tortious interference with contract is preempted by the Martin Act,[181] they offer no support for this assertion, nor have I found any. In fact, to hold that a claim for tortious interference – which requires an allegation of intentional interference – is preempted by the Martin Act directly contradicts the principle that the Martin Act does not preempt claims requiring proof of deceitful intent. Moreover, courts that have found certain tort-based claims preempted by the Martin Act and simultaneously had the opportunity to consider claims of tortious interference with contract, including *Sedona Corporation v. Ladenburg Thalmann & Co., Inc.* – a case cited by defendants in support of their Martin Act argument –,[182] have consistently evaluated the tortious interference with contract claims separately from any consideration of the Martin Act's preemption.[183] Plaintiffs' tortious

_____

[181] *See* RA Mem. at 4-6; MS/BoNY Mem. at 29 n.12.

[182] *See* RA Reply Mem. at 2 n.2.

[183] *See, e.g., Sedona Corp.,* 2005 WL 1902780, at *18-*19, *23 (dismissing plaintiff's negligence, negligent misrepresentation and breach of

interference with contract claims are therefore not preempted by the Martin Act.[184]

### E.    Contract Claims

Although the pleading is somewhat lacking in clarity, plaintiffs appear to allege the existence of at least seven contracts on which plaintiffs' various contract claims are based.  They are: (1) a contract between Morgan Stanley and plaintiffs;[185] (2) a contract between BoNY and plaintiffs;[186] (3) a contract between Rating Agencies and plaintiffs;[187] (4) a contract between Morgan Stanley and/or BoNY, on the one hand, and/or the Cheyne SIV, on the other hand, to which plaintiffs were third-party beneficiaries;[188] (5) a contract between Morgan Stanley and the Rating Agencies to which plaintiffs were third-party

---

fiduciary duty claims as preempted by the Martin Act and separately dismissing plaintiff's tortious interference with contract claim for failure to plead breach of contract); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 292-95 (S.D.N.Y. 1998) (dismissing plaintiffs' negligent misrepresentation claim as preempted by the Martin Act and separately dismissing plaintiffs' tortious interference with contract claim for failure to plead proximate cause).

[184]    Nevertheless, the tortious interference claims cannot stand for the reasons discussed below.

[185]    *See* FAC ¶¶ 184-192; Pl. Opp. at 8 n.15.

[186]    *See* FAC ¶¶ 351-358; Pl. Opp. at 8 n.15.

[187]    *See* FAC ¶¶ 279-287; Pl. Opp. at 8 n.16.

[188]    *See* FAC ¶¶ 206, 372.

beneficiaries;[189] (6) a contract between the Cheyne SIV and plaintiffs, as to which all defendants are alleged to have tortiously interfered;[190] and (7) a contract between the Cheyne SIV and the Rating Agencies or BoNY, as to which plaintiffs were third-party beneficiaries and Morgan Stanley is alleged to have tortiously interfered.[191]  Plaintiffs claim  – directly and as third-party beneficiaries – breach of each of these alleged contracts, breach of a condition precedent, breach of the implied covenant of good faith and fair dealing, and tortious interference with contract.

To avoid dismissal of their contract claims, plaintiffs must allege that the parties entered into an agreement.[192]  While plaintiffs need only plead "a short, plain notice" under Rule 8, the pleadings still must provide some plausible claim for relief.[193]  Because plaintiffs fail to plead the existence of any contract that they

---

[189]    *See id.* ¶ 300.

[190]    *See id.* ¶¶ 222-228, 318-324, 387-393.

[191]    *See id.* ¶¶ 229-234.

[192]    *See Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (dismissing a breach of contract claim where counterclaim plaintiff failed to "set forth a single fact relating to the formation of the contract, the date it took place, the contract's major terms, the parties to the contract, or [counter-defendant's] assent to its terms") (quotation marks omitted).

[193]    *See Iqbal*, 129 S. Ct. at 1949.

can enforce, plaintiffs' contract claims are dismissed.

### 1.    Existence of a Contract

Plaintiffs' pleadings are inadequate with regard to the alleged

existence of the contracts between plaintiffs and each defendant and the contract

between plaintiffs and the Cheyne SIV. "For a breach of contract claim, [p]laintiff

must provide specific allegations as to the agreement between the parties, the

terms of that agreement, and what provisions of the agreement were breached as a

result of the acts at issue."[194]  Plaintiffs allege that a contract between plaintiffs

and defendants is evidenced by the Selling Documents' inclusion of a number of

written promises made by each defendant.[195]  Yet, plaintiffs fail to provide any

facts about how this contract was formed, the date of formation, the consideration,

or the contract's major terms.  Plaintiffs also fail to plead that the defendants

intended to create a binding contract by distributing the Selling Documents.  The

First Amended Complaint is also bereft of any facts indicating how plaintiffs

---

[194]     *See Levy v. Bessemer Trust Co., N.A.*, No. 97 Civ. 1785, 1997 WL
431079, at *5 (S.D.N.Y. July 30, 2007); *Sedona Corp.*, 2005 WL 1902780, at *20
(holding that a "laundry list of alleged breaches" of "myriad alleged oral and
written agreements" was insufficient to provide defendants with notice of the
breach of contract claim).

[195]     *See* FAC ¶¶ 3, 61-64, 189, 281, 291, 353.

accepted these promises – whether acceptance occurred upon purchase of the
Rated Notes or some other action. By contrast, defendants' responsibilities
enumerated in the Selling Documents reflected a contract between defendants and
the issuer. The listing of these responsibilities in the Selling Documents had the
incidental benefit of providing useful information to potential investors.

Plaintiffs' allegation that a contract existed between plaintiffs and the
Cheyne SIV is similarly deficient. Plaintiffs do not provide any indication that the
Cheyne SIV made an offer to plaintiffs other than to sell the Rated Notes or that it
intended to undertake any further obligation to plaintiffs after the sale of the Rated
Notes. The First Amended Complaint similarly lacks any facts related to the
formation of this contract, when it occurred, its terms and conditions, its
consideration, or what constituted an offer and acceptance of the contract.
Plaintiffs do not provide any support for the contention that the mere purchase and
sale of securities, without more, gives rise to an enforceable contract. Thus,
plaintiffs have also failed to plead that a contract existed between plaintiffs and
the Cheyne SIV. As a result, plaintiffs' claims based on the existence of these
contracts are dismissed.

### 2. Third-Party Beneficiary

Plaintiffs additionally allege breach of contract and tortious

54

interference claims on the basis of three alleged contracts by and among the various defendants and/or the Cheyne SIV to which plaintiffs allege they were third-party beneficiaries.[196] Once again, the First Amended Complaint lacks any facts regarding when these contracts were formed and their major terms. Drawing all reasonable inferences in plaintiffs' favor, it is plausible that the defendants entered into contracts with each other and/or the Cheyne SIV pursuant to which each defendant contracted to oversee and manage the Cheyne SIV's investment portfolio. Plaintiffs do not, however, sufficiently plead that they were the intended third-party beneficiaries of any of these contracts.

The parties dispute whether English law or New York law applies to the analysis of whether plaintiffs are third-party beneficiaries.[197] A choice of law analysis is unnecessary, however, because plaintiffs' claims fail under both English and New York law. Defendants make clear, and plaintiffs do not dispute, that if English law were to apply, plaintiffs would not be entitled to bring a claim as a third-party beneficiary to the contracts at issue in this case.[198] Nor do

---

[196]    The three contracts are a contract between Morgan Stanley and/or BoNY, on the one hand, and the Cheyne SIV, on the other hand, a contract between Morgan Stanley and the Rating Agencies, and a contract between the Cheyne SIV and the Rating Agencies or BoNY.

[197]    *See* MS/BoNY Mem. at 21-23; Pl. Opp. at 12-13.

[198]    *See* MS/BoNY Mem. at 21-23; Pl. Opp. at 12-13.

plaintiffs qualify as intended third-party beneficiaries under New York law, which only permits an intended beneficiary of a contract to enforce the contract as a third-party beneficiary. According to the New York Court of Appeals, third-party beneficiary status is conferred only where "no one other than the third-party can recover if the promisor breaches the contract or that the language of the contract otherwise clearly evidences an intent to permit enforcement by the third-party as by fixing the rate or price at which the third-party can obtain services or goods . . . ."[199] Plaintiffs do not qualify as intended third-party beneficiaries on the ground that no other party can recover under the contract. Indeed, the parties to the contracts at issue would have the right to enforce such a contract had it been breached.

Plaintiffs have similarly failed to allege contract language or other facts sufficient to give rise to a plausible inference that any of these contracts "clearly evidence[ ] an intent to permit enforcement" by plaintiffs. "While the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party

---

[199]    *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.* 66 N.Y.2d 38, 44 (1985) (citations omitted).

be shown on the face of the contract."[200]  Plaintiffs base their third-party

beneficiary claims on the conclusory statement that the defendants entered into the

"contractual obligations" referenced in the First Amended Complaint for "the

purpose and intent to benefit directly the plaintiff Class."[201]  Plaintiffs' only other

allegations are that Morgan Stanley "repeatedly represented the benefits that

would accrue to Rated Notes investors" as a result of "the Rating Agencies' rating,

structuring and monitoring products and services"[202] and "BoNY's 'daily' market-

based valuation services."[203]  Neither of these statements evidence an intent to

permit plaintiffs to enforce any contract.

Plaintiffs also argue that because "[t]here was no other purpose for

defendants' contracts than to generate revenue for themselves by providing service

to the SIV and its investors," plaintiffs were intended third-party beneficiaries.[204]

In support of this argument, plaintiffs cite only to *Piccoli A/S v. Calvin Klein*

---

[200]    *Synovus Bank of Tampa Bay v. Valley Nat'l Bank*, 487 F. Supp. 2d
360, 368 (S.D.N.Y. 2007).

[201]    FAC ¶ 206.  *Accord id.* ¶¶ 206, 231, 300, 372.

[202]    *Id.* ¶ 207.  *Accord id.* ¶ 301.

[203]    *Id.* ¶ 373.

[204]    Pl. Opp. at 11.

57

*Jeanswear Co.*[205]  The contract presented in *Piccoli*, however, differs from the one alleged by plaintiffs.[206]  In *Piccoli*, the contract included express provisions limiting the contract's benefits to the contract's parties and prohibiting assignments.[207]  From these express provisions, the court concluded that the plaintiffs were *not* intended third-party beneficiaries of the contract.[208]  In the instant case, plaintiffs have not provided any express contract provisions from which an analogy could be drawn to *Piccoli*.  Moreover, *Piccoli* holds, contrary to the outcome plaintiffs seek here, that third-party beneficiary status under those circumstances was not appropriate.  Thus, *Piccoli* provides no support for plaintiffs' argument.

Instead, the Seventh Circuit's holding in *Quinn v. McGraw-Hill Companies, Inc.* is more persuasive.[209]  In *Quinn*, the court found that a contract between an issuer and a rating agency was not intended to benefit the investor.[210]

---

[205]    *Id.* (citing *Piccoli A/S*, 19 F. Supp. 2d 157 (S.D.N.Y. 1998)).

[206]    *See Piccoli A/S*, 19 F. Supp. 2d at 164.

[207]    *See id.*

[208]    *See id.*

[209]    *See Quinn v. McGraw-Hill Cos., Inc.*, 168 F.3d 331, 334-35 (7th Cir. 1999) (applying Illinois law).

[210]    *See id.* at 335.

As a result, the investor was not entitled to bring a breach of contract claim against the rating agency as an intended third-party beneficiary.[211]  The court held that such a contract was an agreement entered into for the direct benefit of the issuer and that any benefit to the investor was incidental.[212]  The court further stated that to permit a non-party to bring a breach of contract claim on the basis of this contract

> underestimated the direct value of a rating to the issuer. Once an issuer knows the rating its instruments will earn, it has a better idea of which customers are likely to be interested, what interest rate (or other element of price) to attach to the placement, and where it stands relative to others in its line of business. . . . We do not . . . infer that the ultimate consumers who benefit from contracts whose purpose is to generate information are third-party beneficiaries of those contracts and thus entitled to sue for breach.[213]

Although applying Illinois third-party beneficiary law, the court's rationale is compelling.  To hold that plaintiffs may bring a breach of contract claim as a third-party beneficiary to a contract between the Cheyne SIV and the Rating Agencies or Morgan Stanley would undervalue the benefits that these contracts provide directly to the Cheyne SIV – namely providing ratings,

---

[211]     *See id.*

[212]     *See id.*

[213]     *Id.* at 334-35.

59

placement assistance, and other services. Plaintiffs' pleadings lack any contractual term from which it could be plausibly inferred that the defendants intended plaintiffs to be third-party beneficiaries of their contracts. Plaintiffs further fail to identify any meetings, correspondence, or any other indication of intent on the part of any of the defendants to benefit plaintiffs. Without more, plaintiffs' claims based on their third-party beneficiary status are dismissed.

### F.    Aiding and Abetting

For an aiding and abetting claim to survive a motion to dismiss, a plaintiff must adequately plead the existence of a primary tort.[214] Other than the common law fraud claims pled against Morgan Stanley and the Rating Agencies,[215] plaintiffs have failed to adequately plead any other primary violation against defendants or a non-party. Plaintiffs' claims for aiding and abetting are pled "in the alternative to each Count against [each defendant] to the extent such a claim does not proceed."[216] It does not appear from this language that plaintiffs are asserting an aiding and abetting common law fraud claim against BoNY because plaintiffs do not allege a common law fraud claim against BoNY.

---

[214]    *See Design Strategy, Inc.*, 469 F.3d at 303.

[215]    *See supra* Part V.C.

[216]    FAC ¶¶ 237, 327, 396.

60

Even if plaintiffs intended to plead that BoNY aided and abetted Morgan Stanley and the Rating Agencies in their fraud, plaintiffs' allegations fall short. "To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"[217]  Plaintiffs' BoNY-specific allegations are limited. Plaintiffs allege that BoNY was responsible for marking to market all of the Cheyne SIV's assets on a daily basis and delivering reports to the Rating Agencies.[218]  Plaintiffs further allege that Morgan Stanley distributed the Information Memoranda and other Selling Documents with the knowledge, participation and approval of the Rating Agencies and BoNY.[219]  BoNY was compensated for ascertaining the market value of the Cheyne SIV's assets.[220]  Its compensation was derived from the market value of those assets.[221]  None of these facts indicate that BoNY was actually aware that the ratings were false and misleading or that BoNY undertook

---

[217]    *Lerner*, 459 F.3d at 292 (quoting *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)).

[218]    *See* FAC ¶¶ 52, 90.

[219]    *See id.* ¶ 62.

[220]    *See id.* ¶ 142.

[221]    *See id.*

substantial steps to assist Morgan Stanley or the Rating Agencies. Assuming *arguendo* plaintiffs intended to bring an aiding and abetting claim of common law fraud against BoNY, they have failed to adequately do so. Because plaintiffs have not sufficiently pled any other primary torts against Morgan Stanley, the Rating Agencies, BoNY, or non-parties, no aiding and abetting claims can stand. As a result, defendants' motions to dismiss plaintiffs' aiding and abetting claims are granted.

### G.    Leave to Replead

"Rule 15(a) provides that, other than amendments as a matter of course, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."[222] However, "whether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion."[223] While "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," such leave should be denied where the proposed amendment would be futile.[224]

---

[222]    *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quotation marks omitted).

[223]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quotation omitted).

[224]    *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949

Leave to replead is denied with respect to those claims barred by the

Martin Act and plaintiffs' third-party beneficiary claims. Given plaintiffs'

statements regarding New York's interest in this matter and the amount of conduct

alleged to have occurred in New York, it would be futile to permit plaintiffs to

plead additional facts of conduct that is not "within or from" New York for

purposes of the Martin Act. As a result, plaintiffs may not replead their claims of

negligence, negligent misrepresentation, breach of fiduciary duty, unjust

enrichment, or aiding and abetting any of these claims. Allowing plaintiffs to

amend their complaint to plead that they were intended third-party beneficiaries to

a contract among the defendants and the Cheyne SIV also would be futile. There

is no indication that plaintiffs could show that they are the only party that could

recover under such contracts or that the production of the contracts would reveal

that the parties unequivocally intended to confer third-party beneficiary status on

plaintiffs. As a result, leave to replead plaintiffs' third-party beneficiary claims is

denied.

Leave to replead is granted with regard to plaintiffs' other contract

claims, but only if plaintiffs can provide evidence of the contract's formation,

---

F.2d 42, 48 (2d Cir. 1991)). *Accord Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir.
2003) ("[L]eave to amend a complaint need not be granted when amendment
would be futile.").

consideration, and major terms. Plaintiffs may be able to provide additional facts indicating that the Cheyne SIV intended to enter into a contract with investors based on terms set forth in the Information Memoranda and Selling Documents, but more facts are needed. Allegations that the Information Memoranda and Selling Documents alone give rise to a contract between defendants and plaintiffs are plainly inadequate. Finally, given another opportunity, plaintiffs could more clearly allege their aiding and abetting claims as to each defendant and the remaining common law fraud and contract-based claims. Therefore, leave to amend is granted with respect to plaintiffs' dismisssed contract claims – other than plaintiffs' third-party beneficiary claims and those pled in the alternative to common law fraud – and aiding and abetting claims against all defendants, including BoNY.

## VI.   CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are hereby granted in part and denied in part. In sum, BoNY's motion to dismiss is granted in its entirety. Morgan Stanley and the Rating Agencies' motions to dismiss the common law fraud claims (Counts 1A and 2A, respectively) are denied. Morgan Stanley and the Rating Agencies' motions to dismiss the remaining claims (Counts 1B-1K and 2B-2K, respectively) are granted.

Plaintiffs are granted leave to file an amended complaint consistent with the terms of this Opinion and Order within twenty days. To be clear, plaintiffs may amend the following claims: breach of contract (Counts 1D, 2E, 3D); tortious interference (Counts 1I, 2J, 3I); breach of condition precedent and breaches of the covenant of good faith and fair dealing against BoNY (Counts 3E, 3G);[225] and aiding and abetting any of these claims or common law fraud (Counts 1K, 2K, 3J). The Clerk of the Court is directed to close these motions (Docket Nos. 47 and 55). A conference is scheduled for October 1, 2009, at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 2, 2009

---

[225]      Plaintiffs' claim for breach of condition precedent against BoNY was pled in the alternative to plaintiffs' negligence claim against BoNY. *See* FAC ¶ 361. Because plaintiffs' negligence claim cannot stand, plaintiffs may amend this claim against BoNY only. Plaintiffs' claim for breach of the covenant of good faith and fair dealing against BoNY were not pled in the alternative to any claim. *See* FAC ¶¶ 375-379. As a result, plaintiffs may only amend this claim as to BoNY.

## - Appearances -

**For Plaintiffs:**

Patrick J. Coughlin, Esq.
Daniel S. Drosman, Esq.
Anne L. Box, Esq.
Jessica T. Shinnefield, Esq.
Nathan R. Lindell, Esq.
Darryl J. Alvarado, Esq.
David C. Walton, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, California 92101-3301
(619) 231-1058

Michael F. Ghozland, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
9601 Wilshire Boulevard, Suite 510
Los Angeles, California 90210
(310) 859-3100

Samuel H. Rudman, Esq.
Jarrett S. Charo, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

Jason C. Davis, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, California 94111
(415) 288-4545

**For Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited:**

James P. Rouhandeh, Esq.
Antonio J. Perez-Marques, Esq.
Russell Capone, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000


**For Defendants The Bank of New York Mellon and QSR Management Limited:**

Jonathan H. Sherman, Esq.
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, District of Columbia 20015
(202) 237-2727

Damien J. Marshall, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
New York, New York 10504
(954) 377-4230

**For Defendants Moody's Investors Service, Incorporated and Moody's Investors Service Limited:**

Joshua M. Rubins, Esq.
James J. Coster, Esq.
Glenn C. Edwards, Esq.
Justin E. Klein, Esq.
Aaron M. Zeisler, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200


**For Defendants Standard & Poor's Rating Services and The McGraw-Hill Companies, Incorporated:**

Floyd Abrams, Esq.
Dean I. Ringel, Esq.
Adam N. Zurofsky, Esq.
Andrea R. Butler, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000