UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

ABU DHABI COMMERCIAL BANK,
KING COUNTY, WASHINGTON, SEI
INVESTMENTS COMPANY, Together
and On Behalf of All Others Similarly
Situated,

                Plaintiffs,

           - against -

MORGAN STANLEY & CO.
INCORPORATED, MORGAN
STANLEY & CO. INTERNATIONAL
LIMITED, THE BANK OF NEW YORK
MELLON (f/k/a THE BANK OF NEW
YORK), QSR MANAGEMENT
LIMITED, MOODY'S INVESTORS
SERVICE, INC., MOODY'S
INVESTORS SERVICE LTD.,
STANDARD AND POOR'S RATINGS
SERVICES and THE McGRAW HILL
COMPANIES, INC.,

              Defendants.

------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 7508 (SAS)**



SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

      Three institutional investors, King County, Washington ("King

County"), SEI Investments Company ("SEI"), and Abu Dhabi Commercial Bank

("ADCB") (collectively, "plaintiffs"), bring this putative class action to recover

1

losses stemming from the liquidation of notes issued by a structured investment

vehicle ("SIV"). Only plaintiffs' claim of common law fraud survived dismissal.[1]

Plaintiffs now move to certify that claim as a class action brought on behalf of:

> all persons or entities who acquired Commercial Paper
> [("CP")], Medium Term Notes [("MTN")] (together,
> "Senior Notes") or Mezzanine Capital Notes [("MCN")]
> ("Capital Notes") (collectively, the "Rated Notes") issued
> by Cheyne Finance PLC and its wholly owned subsidiaries
> Cheyne Finance LLC and Cheyne Capital Notes LLC
> (collectively, the "Cheyne SIV") during the period of
> October 2004 to October 2007 (the "Class Period") and
> who were damaged thereby.[2]

Defendants[3] argue, with considerable force, against certifying the

proposed class. As defendants point out, this action is a collection of a relatively

small number of sophisticated, institutional investors that acquired one of three

different categories of Rated Notes, at different times, pursuant to different internal

---

[1]     *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651
F. Supp. 2d 155 (S.D.N.Y. 2009).

[2]     Memorandum of Law in Support of Plaintiffs' Motion for Class
Certification ("Pl. Mem.") at 1.

[3]     "Defendants" refers to Morgan Stanley & Co. Incorporated and
Morgan Stanley & Co. International Limited and their affiliates (together, "Morgan
Stanley"); Moody's Investors Service, Inc. and its affiliates, including wholly-
owned and controlled subsidiary Moody's Investors Service Ltd. (together,
"Moody's"); and The McGraw-Hill Companies, Inc. and its affiliates, including its
wholly-owned and controlled business division Standard & Poor's Rating Services
(together, "S&P," and, together with Moody's, the "Rating Agencies").

requirements, and after conducting different due diligence inquiries.  Plaintiffs

have not demonstrated that joinder is impracticable or that common questions of

fact or law predominate.  For theses reasons, as described in more detail below,

this action is inappropriate for class treatment and plaintiffs' motion is denied.

## II.    BACKGROUND[4]

Plaintiffs allege that during the proposed Class Period, defendants

designed, structured, and marketed three categories of Cheyne SIV Notes, each

with different ratings.[5]  During the Class Period, King County acquired CP, money

market funds managed by a wholly-owned SEI subsidiary acquired MTNs, and

ADCB acquired MCNs.[6]  The CP was rated A-1+/P-1, the MTNs were rated

AAA/Aaa, and the MCNs were rated A/A3.[7]  These "top" and "investment grade"

ratings indicated to investors that the Rated Notes were safe, secure investments.[8]

Defendants then sold the Rated Notes to investors – generating millions of dollars

---

[4]     A more detailed description of the facts underlying this action is set
forth in this Court's prior Opinion and Order, familiarity with which is assumed.
*See Abu Dhabi Commercial Bank*, 651 F. Supp. 2d 155.

[5]     *See* Second Amended Complaint for Common Law Fraud, Breach of
Contract and Aiding and Abetting ("SAC") ¶ 2.

[6]     *See id.* ¶¶ 16-18.

[7]     *See id.* ¶ 8.

[8]     See *id.* ¶ 2.

in fees – all the while knowing or recklessly disregarding that the credit ratings assigned to the Rated Notes were false and misleading.[9]

The Cheyne SIV subsequently collapsed amid the credit crisis in late 2007.[10] Because of the low quality of its assets, the Cheyne SIV was unable to repay its senior debt as it came due.[11] The Cheyne SIV was then restructured, and an auction process was instituted.[12] As a result of the liquidation of the Rated Notes at severe discounts, holders of the Senior Notes have recovered only a "fraction of their investment," and the Capital Notes "are now worthless."[13] Plaintiffs filed this action soon thereafter.

## III.   APPLICABLE LAW

### A.   Class Certification

#### 1.   Requirements Under Rule 23

Rule 23 of the Federal Rules of Civil Procedure governs class certification. "'Rule 23 is given liberal rather than restrictive construction, and

---

[9]    *See id.* ¶¶ 66-136.

[10]   *See id.* ¶ 14.

[11]   *See id.*

[12]   *See id.*

[13]   *Id.*

4

courts are to adopt a standard of flexibility.'"[14]  To be certified, a putative class

must first meet all four prerequisites set forth in Rule 23(a), commonly referred to

as numerosity, commonality, typicality, and adequacy.[15]  In addition to showing

that the proposed class satisfies the four prerequisites of Rule 23(a), plaintiffs must

show that the class is "maintainable" under Rule 23(b).  A class satisfies this

requirement if it fits into one of the three alternative categories delineated by Rule

23(b), subdivisions (1), (2), and (3).  In the case at bar, plaintiffs move for class

certification pursuant to subdivision (b)(3).

Plaintiffs bear the burden of demonstrating – by a preponderance of

the evidence – that the proposed class meets the requirements for class

certification.[16]  The Court must "'assess all of the relevant evidence admitted at the

class certification stage' when determining whether to grant a Rule 23 motion."[17]

"[T]he obligation to make such determinations is not lessened by overlap between

---

[14]     *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting
*Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87
(S.D.N.Y. 1989)).

[15]     *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier
Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).

[16]     *See id.* at 202; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d
29, 34-35 (2d Cir. 2009).

[17]     *Teamsters*, 546 F.3d at 202 (quoting *In re Initial Public Offering Sec.
Litig.* ("*Miles I*"), 471 F.3d 24, 42 (2d Cir. 2006)).

5

a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement."[18] "[I]n making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[19]

### 2. Numerosity

The numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable."[20] "Generally, courts will find that the numerosity requirement has been satisfied when the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer."[21] "[T]he presumption that a class of 40 or more is sufficiently numerous does not provide 'rigid parameters,' and 'the ultimate issue is whether the class is too large to make joinder practicable.'"[22] In deciding whether joinder is

---

[18]     *Miles I*, 471 F.3d at 41.

[19]     *Id.*

[20]     Fed. R. Civ. P. 23(a)(1).

[21]     *Novella v. Westchester County*, 443 F. Supp. 2d 540, 546 (S.D.N.Y. 2006) (certifying a class of twenty-four members). *Accord* 5 Moore's Fed. Prac. § 23.22(1)(b) ("Many courts have found that classes numbering fewer than 21 fail to meet the numerosity requirement.").

[22]     *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 590 (D. Conn. 2000) (quoting *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998)). *Accord Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) ("Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers.") (citing *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968)).

6

practicable, courts apply the factors set out by the Second Circuit in *Robidoux v.*

*Celani.* Those factors are:

> [(1)] judicial economy arising from the avoidance of a multiplicity of actions, [(2)] geographic dispersion of class members, [(3)] financial resources of class members, [(4)] the ability of claimants to institute individual suits, and [(5)] requests for prospective injunctive relief which would involve future class members.[23]

### 3.   Predominance

Under Rule 23(b)(3), certification is appropriate where "questions of

law or fact common to class members predominate over any questions affecting

only individual members . . . ." Generally, the "'predominance inquiry tests

whether proposed classes are sufficiently cohesive to warrant adjudication by

representation.'"[24] The Second Circuit has observed that this subdivision

> encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.[25]

---

[23]    *Robidoux*, 987 F.2d at 936 (citing 1 Newberg on Class Actions 3:05 (2d Cir. 1985)). *Accord Novella*, 443 F. Supp. 2d at 546.

[24]    *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)).

[25]    *Id.* (quotations and citation omitted).

### 4. Rule 23(c)(4)

Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." For particular issues to be certified pursuant to Rule 23(c)(4), the requirements of Rule 23(a) and (b) must be satisfied only with respect to those issues.[26] "Regardless of whether [an action] as a whole satisfies Rule 23(b)(3)'s predominance requirement," courts may employ Rule 23(c)(4) to certify a class on a particular issue.[27] The Second Circuit advises that "[d]istrict courts should 'take full advantage of th[is] provision' to certify separate issues 'in order to reduce the range of disputed issues in complex litigation' and achieve judicial efficiencies."[28] Nevertheless, issue certification is not appropriate where certifying an issue "would not materially advance the litigation because it would not dispose of larger issues . . . ."[29]

---

[26]   *See* 5 Moore's Fed. Prac. § 23.86[2].

[27]   *Nassau County*, 461 F.3d at 227.

[28]   *Robinson v. Metro-N. Commuter R.R., Co.*, 267 F.3d 147, 168 (2d Cir. 2001) (quoting *Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993)) (quotation marks and alterations omitted).

[29]   *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008).

**B.    Common Law Fraud**

### 1.    Standard

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[30] "[T]o recover for a defendant's fraudulent conduct, even if that fraud is the result of a common course of conduct, each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss."[31]

### 2.    Demonstrating Reliance on a Class-Wide Basis:  Fraud-Created-the-Market Presumption

The fraud-created-the-market presumption of reliance was established by the Fifth Circuit in *Shores v. Sklar*.[32]  Under this doctrine, which has been

---

[30]    *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

[31]    *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). *Accord McLaughlin*, 522 F.3d at 223.

[32]    *See* 647 F.2d 462 (5th Cir. 1981) (en banc), *overruled on other grounds by Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 392 (5th Cir. 2007).

adopted in similar form by the Tenth and Eleventh Circuits, investors are entitled to a presumption of reliance where they are able to show that defendants brought securities onto the market that would not otherwise have been marketed and sold, but for defendants' deceptive conduct.[33]  By comparison, the fraud-*on*-the-market doctrine posits that if plaintiffs can demonstrate that the market for a security is efficient – that is, the price at which the security trades in that market embodies all publicly available information concerning the issuer and its business prospects – then reliance on the alleged misleading statement or omission can be presumed for every investor who purchased or sold shares in the market during the relevant period.[34]

### 3.     Demonstrating Reliance on a Class-Wide Basis: Common, Class-Wide Evidence

"Because proof often varies among individuals concerning what representations were received, and the degree to which individual persons relied on

---

[33]     *See id.* at 470; *see also Ross v. Bank South, N.A.*, 885 F.2d 723, 729-30 (11th Cir. 1989) (en banc) ("When the fraud alleged is so pervasive that absent the fraud the bond could not have been marketed, the reliance element is established by the buyer's reliance on the integrity of the market, *i.e.*, the actions of the market to furnish only securities that are entitled to be marketed."); *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330, 1333 (10th Cir. 1983) (adopting *Shores'* fraud-created-the-market presumption of reliance).

[34]     *See Basic v. Levinson*, 485 U.S. 224, 241-42 (1988).

10

the representations, fraud cases often are unsuitable for class treatment."[35]  As

recognized by the Rule 23 Advisory Committee Notes:

> It is only where . . . predominance exists that economies
> can be achieved by means of the class-action device.  In
> this view, a fraud perpetrated on numerous persons by the
> use of similar misrepresentations may be an appealing
> situation for a class action, and it may remain so despite the
> need, if liability is found, for separate determination of the
> damages suffered by individuals within the class.  On the
> other hand, although having some common core, a fraud
> case may be unsuited for treatment as a class action *if there
> was material variation in the representations made* or *in
> the kinds or degrees of reliance by the persons to whom
> they were addressed.*[36]

While the Second Circuit has expressly declined to adopt a blanket rule that a class

cannot be certified when individual reliance is an issue, class certification under

those circumstances is the exception, rather than the rule.[37]

---

[35]     *In re St. Jude Med., Inc.*, 522 F.3d 836, 838 (8th Cir. 2008).  *Accord McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003) ("'Claims for money damages in which individual reliance is an element are poor candidates for class treatment.'") (quoting *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001)); *Moore*, 306 F.3d at 1253 ("[L]iability for fraudulent misrepresentations cannot be established simply by proof of a central, coordinated scheme.").

[36]     Fed. R. Civ. P. 23(b)(3) Advisory Committee Note (1966 amendment) (emphasis added).  *Accord Moore*, 306 F.3d at 1253; *McLaughlin*, 522 F.3d at 225-26.

[37]     *See McLaughlin*, 522 F.3d at 225, 226 & n.7 (denying class certification, but noting that "proof of reliance by circumstantial evidence may be sufficient under certain conditions," such as where "payment" was held to

## IV.    DISCUSSION

### A.    Numerosity

Plaintiffs and defendants dispute whether the Class should be certified as one or divided into three subclasses.  On the one hand, plaintiffs contend that this Court should certify a single class consisting of all investors, regardless of whether they invested in CP, MTNs, or MCNs because plaintiffs allege that defendants engaged in a single course of wrongful conduct with regard to each category of Rated Note.[38]  Such a class would number more than one hundred.[39]

Defendants, on the other hand, argue that at least three separate classes are appropriate given the substantial difference in ratings, risk, and return

---

"constitute circumstantial proof of reliance upon a financial representation"); *Friedman v. 24 Hour Fitness USA, Inc.*, No. 06 Civ. 6282, 2009 WL 2711956, at *7 (C.D. Cal. Aug. 25, 2009) (granting a motion for class certification upon finding that common issues predominated where a club implemented a thirty days notice requirement for cancellation and, although the club offered evidence showing that members had different understandings of the thirty-day notice requirement, the club imposed post-cancellation charges in a uniform manner, relying on its own construction of the termination and without regard to what members may have understood).

[38]      *See* Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pl. Reply") at 13.

[39]      *See* Pl. Mem. at 4 (citing 9/21/07 Liability Report, Ex. 1 to Pl. Mem., at 786-792).

on each Rated Note.[40] The different ratings reflected the different risks presented

by the Rated Notes – namely that the MCNs were subordinate to the Senior Notes

and, thereby, more likely to suffer a loss or default.[41] These varied ratings also

resulted from the different methodologies used in arriving at a rating.[42] In addition

to receiving its own rating based on individual risk, each category of Rated Note

---

[40]    *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp.") at 3-4.

[41]    *See* Deposition of James Smigiel, 30(b)(6) representative for SEI ("Smigiel Dep."), Ex. 8 to the Declaration of James P. Rouhandeh, defendants' counsel, in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Rouhandeh Decl.") at 244:25-245:9; *id.*, Ex. 9 to Rouhandeh Decl., at 385:20-386:8; 4/05 Cheyne Capital Management Limited, Presentation to Prospective Capital Note Investors, Ex. 13 to the Declaration of Antonio J. Perez-Marques, defendants' counsel, in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Perez-Marques Decl."), at 708.

[42]    *Compare* 2/14/06 S&P's RatingsDirect Report, New Issue: Cheyne Finance PLC, Ex. 14 to Perez-Marques Decl., at 293 ("When considering the rating on the senior notes, [S&P's] main concern was the potential impact of Cheyne Finance entering [into] restricted funding or enforcement at any stage from the first day of the transaction. [S&P's] analyzed the ability of Cheyne Finance to sell assets and repay its senior liabilities as they come due while maintaining a 'AAA/A-1+' rating until maturity."), *with id.* at 292 (explaining the rating methodology for the MCNs involved considering the potential impact of Cheyne Finance entering into restricted funding or enforcement "[s]ince the [MCNs]. . . are subordinated to the senior notes, it is very likely that in restricted funding or enforcement, the [MCNs] . . . will suffer a loss").

was sold pursuant to different information memoranda[43] and marketing materials[44]

that were revised at various points in time.[45]  Investors then purchased their Rated

Notes on different dates between 2005 and 2007 in individually negotiated and

priced transactions.[46]  If the purported class is divided into three classes divided by

category of Rated Note, the approximate numbers of each class drops to numbers

that may be below forty or are, at best, right on the cusp.[47]  Although defendants

---

[43]    *See* MCN Information Memorandum, Ex. 1 to Rouhandeh Decl.; CP Information Memorandum, Ex. 15 to Perez-Marques Decl.; MTN Information Memorandum, Ex. 16 to Perez-Marques Decl.

[44]    *See* Marketing Materials, Exs. 13, 17 to Perez-Marques Decl.

[45]    *Compare, e.g.*, 7/29/05 MCN Information Memorandum, Ex. 1 to Rouhandeh Decl. *with* 8/30/06 MCN Information Memorandum, Ex. 18 to Perez-Marques Decl.

[46]    *See* MCN Investor List – August 2007, Ex. 2 to Rouhandeh Decl.; Senior Note Investor List, Ex. 3 to Rouhandeh Decl.; MCN Information Memorandum, Ex. 1 at 538 ("The Placement Agent(s) may place the Capital Notes in individually negotiated transactions at varying prices."); *see also* CP Information Memorandum, Ex. 15 to Perez-Marques Decl., at 702 ("Yield Basis: The Notes may be issued at a discount or may bear fixed or floating rate interest or a coupon calculated by reference to an index or formula."); MTN Information Memorandum, Ex. 16 to Perez-Marques Decl., at 556 ("Issue Price:  Par, unless otherwise agreed between the Issuer and the purchaser.").

[47]    *See* Pl. Reply at 13 (asserting that there are "at least 40" investors when CP and MTN are counted together and thirty-nine MCN investors).  At a June 9, 2010 conference, plaintiffs raised concerns that defendants' calculations of the separate classes was deceptively low because defendants aggregated corporate affiliates – meaning, for example, that if two corporate affiliates separately purchased Rated Notes, defendants counted those two separate affiliates as one potential class member.  Whether defendants appropriately aggregated corporate

14

have, by far, the more persuasive position, it is irrelevant which parties' proposed class definition – and, thus, proposed class size – is ultimately accepted. An analysis of the *Robidoux* factors demonstrates that plaintiffs cannot meet the numerosity requirement under either calculation.

*First*, plaintiffs fail to show why class certification as opposed to joinder would better serve the interests of judicial economy in avoiding a multiplicity of actions. Plaintiffs have failed to establish that a consolidated action "would be somehow less efficient than class certification in resolving this dispute."[48] Indeed, this Court efficiently and effectively managed consolidated actions of ninety-six institutional investors with many more claims than the single common law fraud claim at issue here.[49] Plaintiffs also provide no evidence that joinder of the proposed class members would be difficult to accomplish. Plaintiffs already have at their finger tips information sufficient to identify a large majority

---

affiliations is irrelevant for purposes of class certification because plaintiffs' own proposal does not satisfy the *Robidoux* factors.

[48] *Deen v. New Sch. Univ.*, No. 05 Civ. 7174, 2008 WL 331366, at *3 (S.D.N.Y. Feb. 4, 2008) ("Plaintiffs provide no evidence that joinder of the proposed class members into a consolidated action would be difficult to accomplish, or that this method of adjudication would be somehow less efficient than class certification in resolving this dispute. Without such a showing, Plaintiffs cannot satisfy the judicial economy factor.").

[49] *See Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Secs. LLC*, No. 05 Civ. 9016 (S.D.N.Y., filed Oct. 24, 2005).

15

of potential class members.[50]  That plaintiffs have the ability to contact more than

three quarters of the prospective class members eases the burden placed on them to

join other investors to this action.[51]  Consequently, plaintiffs cannot satisfy the

judicial economy factor.[52]

As for the second *Robidoux* factor, the proposed class members

appear to be geographically dispersed.  For example, ADCB is headquartered in

Abu Dhabi, United Arab Emirates, King County is organized under the laws of the

State of Washington, and SEI is headquartered in Oaks, Pennsylvania.[53]

"[A]lthough this dispersion weighs in favor of finding that joinder is impracticable,

---

[50]    *See* Pl. Mem. at 13 (noting the possibility that only twenty-five
possible class members may be "unaccounted for").

[51]    *See Ansari*, 179 F.R.D. at 115 (noting that knowledge of proposed
class members' whereabouts "should provide comfort to [plaintiff] who, if he so
chooses, can contact each of [the proposed class members], apprise each of his
lawsuit, and invite each to join"); *Primavera Familienstiftung v. Askin*, 178 F.R.D.
405, 410 (S.D.N.Y. 1998) (explaining that "[k]nowledge of names and existence of
members has been called the most important factor, precisely because it renders
joinder practicable") (quotation marks omitted).

[52]    *See Primavera*, 178 F.R.D. at 410 (denying class certification of a
proposed class of approximately 118 members where plaintiff failed to show the
benefit of class certification as opposed to joinder in terms of promoting judicial
economy).

[53]    *See* SAC ¶¶ 16-18.

16

dispersion is not dispositive."[54]

Plaintiffs also fail to demonstrate that the proposed class members lack the financial resources to join plaintiffs' lawsuit or that they are otherwise incapable of bringing individual lawsuits in satisfaction of the third and fourth *Robidoux* factors. No potential class member is "incarcerated, unsophisticated, or elderly."[55] Rather, each is a sophisticated, institutional investor whose alleged losses range in the *multiple millions* of dollars.[56] Where, as here, the size of the proposed class members' respective claims is significant and individual plaintiffs are capable of paying for and litigating their own action, joinder is practicable.[57]

---

[54]     *Ansari*, 179 F.R.D. at 115 (citing *Block v. First Blood Assocs.*, 125 F.R.D. 39, 42 (S.D.N.Y. 1989)). *Accord Primavera*, 178 F.R.D. at 410.

[55]     *Ansari*, 179 F.R.D. at 115.

[56]     *See* MCN Investor List – August 2007, Ex. 2 to Rouhandeh Decl. (showing the average MCN investment as approximately twenty million dollars); Senior Note Investor List, Ex. 3 to Rouhandeh Decl. (showing the average Senior Note investment as over eight-five million dollars).

[57]     *See Primavera*, 178 F.R.D. at 411 (holding that "the principle of protection for weaker plaintiffs which underlies Rule 23 [could not] be invoked, nor [could] joinder be said to be impracticable" where "the majority of potential class members invested well over $1 million, with some investing in the tens of millions and none investing less than $100,000"); *Ansari*, 179 F.R.D. at 116 (holding that potential award of approximately $90,000 "is hardly the type of de minimus recovery that would discourage individual class members from joining [plaintiff's] lawsuit"); *Stoudt v. E.F. Hutton & Co. Inc.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988) ("When the size of each claim is significant, and each proposed class member therefore possesses the ability to assert an individual claim, the goal of obtaining redress can be accomplished without the use of the class action

17

Finally, there is no concern that there are "persons who may be injured in the future and who are, therefore, impossible to identify in the present."[58] Here, the proposed class consists of a "finite number of people all of whom are identifiable and all of whom have been injured, if at all, in the past."[59] There is no risk that the existence of future class members makes joinder impracticable.

Therefore, although plaintiffs are geographically dispersed, the remaining four *Robidoux* factors weigh heavily in favor of concluding that joinder is not impracticable in this case.[60] Plaintiffs have failed to meet the numerosity requirement of Rule 23(a)(1).

## C. Predominance

In addition to failing to meet the numerosity requirement, plaintiffs cannot establish that common questions of law or fact predominate over

device.").

[58] *Ansari*, 179 F.R.D. at 116 (citing Moore's Fed. Prac. § 23.22[7]). *Accord Robidoux*, 987 F.2d at 936 (noting that the "fluctuating membership" of a proposed class is relevant to determining whether joinder is practicable).

[59] *Ansari*, 179 F.R.D. at 116.

[60] *See Deen*, 2008 WL 331366, at *3-*5 (denying class certification where a proposed class comprised of approximately 110 individuals could not satisfy the *Robidoux* factors); *Liberty Lincoln Mercury v. Ford Mktg. Corp.*, 149 F.R.D. 65, 74 (D.N.J. 1993) (denying class certification where the court concluded that "whether viewed as a potential class of 38 or 123 members . . . there are no practical impediments to joinder or to affording complete relief in this case absent a class action").

individualized issues of reliance, loss causation, or damages.

## 1.   Reliance: Fraud-Created-the-Market

To demonstrate that common questions of reliance predominate, plaintiffs first invoke the fraud-created-the-market doctrine.[61]  Plaintiffs argue that the Rated Notes would have never issued – much less been purchased by investors – if not for defendants allegedly fraudulent scheme.[62]  Plaintiffs contend that the price or yield of the Rated Notes was tied directly to its rating.  Had the rating been lower, "'the Cheyne SIV would have been uneconomic and unmarketable to investors.'"[63] On this basis, plaintiffs urge this Court to conclude that they are entitled to the fraud-created-the-market theory.[64]

Conveniently omitted from their opening brief, and left notably unaddressed on Reply, is the fraud-created-the-market doctrine's inapplicability to this case.  The fraud-created-the-market presumption has never been adopted by any court in this Circuit[65] and has been rejected by the Sixth and Seventh

---

[61]    *See* Pl. Mem. at 18-21.

[62]    *See id.* at 20-21.

[63]    *Id.* at 20 (quoting Declaration of Charles C. Cox, plaintiffs' expert, in Support of Plaintiffs' Motion for Class Certification ("Cox Decl.") ¶¶ 20-21).

[64]    *See id.*

[65]    *See In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 318 (S.D.N.Y. 2009) ("This Circuit has never adopted this presumption and it has been criticized

19

Circuits.[66]  Those courts that have criticized the fraud-created-the-market doctrine

have done so because, unlike cases where the fraud-on-the-market theory of

reliance is applied, cases involving newly issued securities lack an efficient market.

The price of the newly issued security depends on a pricing scheme controlled by

the underwriter, placement agent, or issuer instead of reflecting a consensus about

the security's value based on publicly available information.  Without an efficient

market, it is not a fair presumption that an investor in a newly issued security

necessarily relied on certain information when making that investment decision.[67]

Consistent with such a conclusion, the Second Circuit has refused to permit the

---

by at least two other Courts of Appeals."); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 377 n.143 (S.D.N.Y. 2003) (Scheindlin, J.) ("It is unclear whether the fraud created the market theory is good law in this circuit.").

[66]     *See Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1160 (6th Cir. 1994) ("[W]e question the validity of the fraud created the market theory."); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993) ("the linchpin of *Shores* – that disclosing bad information keeps securities off the market, entitling investors to rely on the presence of the securities just as they would rely on statements in a prospectus – is simply false") (quotation marks omitted)).

[67]     *See Ockerman*, 27 F.3d at 1160 (noting that investors in new securities do not rely on the research of other investors to fix the price because, for example, there are no investors between the primary sellers and the plaintiff on whom to rely (*i.e.*, underwriters and issuers have notably different incentives than other investors) and it is unreasonable for plaintiffs to rely on other investors to examine the distributed disclosure documents and information memoranda, particularly if plaintiffs themselves did not examine them).

fraud-*on*-the market theory for newly issued securities,[68] rendering it even less

likely that the Second Circuit would adopt the fraud-created-the-market theory.

Even if the Second Circuit were to adopt the fraud-created-the-market

theory, it would not apply in this case because the fraud-created-the-market

doctrine appears to be applicable only in the context of *federal* securities fraud

actions. Every case cited by plaintiffs in support of applying the fraud-created-the-

market theory involves a federal securities fraud claim.[69] This Court is unaware of

*any* case applying the doctrine in the context of a common law fraud claim.[70]

Because the Second Circuit has not applied the fraud-on-the-market presumption to

common law fraud claims,[71] there is no reason to conclude that it would uphold

applying the related fraud-created-the-market presumption to such claims.

---

[68]     *See Miles I*, 471 F.3d at 42 (explaining that "[a] primary market for newly issued securities is not efficient or developed under any definition of these terms") (quotation marks and alteration omitted).

[69]     *See* Pl. Mem. at 18-20 (citing cases).

[70]     *Cf. Alter v. DBLKM, Inc.*, 840 F. Supp, 799, 811 (D. Colo. 1993) (noting that, although the Tenth Circuit's "guiding precedent" permits use of the fraud-created-the-market doctrine in federal securities claims, "substitute theories of reliance are not available under the common law; a plaintiff must prove actual reliance as an essential element of a fraud claim").

[71]     *See Securities Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000) ("[F]ederal courts repeatedly have refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context.") (collecting cases).

21

### 2.    Reliance:  Common Evidence Applicable Class-Wide

In the absence of a presumption of reliance, plaintiffs must

demonstrate that they can present evidence that the credit ratings were a

"'substantial factor'" in each investor's decision to purchase the Rated Notes.[72]

Such evidence must be common to the entire class in order to find that common

questions of reliance predominate.  Yet, the record evidence reveals material

differences among investors with regard to their decision making processes,

investment guidelines, due diligence inquiries, and communications with those

involved in selling the Rated Notes.  These dissimilarities require an assessment of

reliance on an investor-by-investors basis.[73]

As plaintiffs admit, investors in the Cheyne SIV made investment

decisions for different reasons and "every manager has a different process,

so . . . there is nothing terribly standard."[74]  Even Charles C. Cox –  former

Commissioner of the United States Securities and Exchange Commission ("SEC")

---

[72]    Pl. Mem. at 15 (quoting *Curiale v. Peat, Marwick, Mitchell & Co.*,
630 N.Y.S.2d 996, 214 A.D.2d 16, 27 (1st Dep't 1995) (emphasis omitted)).
*Accord* Pl. Reply at 8-9.

[73]    *See In re St. Jude Med., Inc.*, 522 F.3d at 839 (reversing a district
court's grant of class certification in a common law fraud action where a trial
would require a plaintiff-by-plaintiff inquiry into each plaintiff's source of
information and credibility of his or her assertion of reliance).

[74]    Smigiel Dep., Ex. 8 to Rouhandeh Decl., at 44:12-45:7.

and plaintiffs' expert – who asserts that investors must have relied on the credit

ratings – [75] recognizes this fact:

> Q. Do institutional investors . . . consider the risks that
> could lead to default other than by reference to the ratings?
> A. Some may, some may not.   Q.   It depends on the
> investor?   A. Probably.[76]

Although some investors' investment guidelines required that they

only invest in financial instruments with top ratings, others investors' investment

guidelines, such as those of ADCB, permitted them to invest in lower rated or

unrated products.[77]   In fact, some investors, including ADCB, invested in Cheyne

---

[75]    *See* Cox Decl. ¶¶ 2-3.  Defendants quarrel with whether Cox is
qualified to testify as an expert to the matters in his declaration because defendants
claim that Cox "lacks the specialized experience to support his conclusion[s]," "has
never conducted any research into investment strategies, investor guidelines, or
structured products at all, and has never worked for an institutional investor."  Def.
Opp. at 18.  On these bases, defendants requested permission to file a *Daubert*
motion if the Court was inclined to rely on Cox's declarations in deciding this
motion.  *See id.* at 19 n.9.  Because plaintiffs fail to meet the predominance
requirement even when relying on Cox's opinions, defendants' request to file a
*Daubert* motion is denied without prejudice to renew at a later stage in the
litigation, if necessary.

[76]    Deposition of Charles C. Cox, Ex. 12 to Rouhandeh Decl., at 32:25-
33:17

[77]    *See* ADCB Investment Strategy Paper, Ex. 34 to Perez-Marques Decl.,
at 66; Deposition of Vikas Vijayan, 30(b)(6) representative for ADCB, Ex. 6 to
Rouhandeh Decl., at 226:12-229:10 (noting that ADCB's investment guidelines
permitted investments in unrated SIV notes, as well as SIV notes rated below
single A).

SIV *before* the ratings were issued in August 2005, rendering it unlikely that any rating played a substantial role in those investors' decisions to invest in the Rated Notes.[78]  Plaintiffs attempt to refute this evidence by citing a statement by Olivia Birchall, ADCB's 30(b)(6) witness, that ADCB "[w]ould . . . not have invested in [notes] had they not been rated."[79]  But this statement indicates only that ADCB required that the Notes have *some* rating – not that they have the high ratings that were in fact assigned.  According to Birchall, "'[h]ad Cheyne been rated a lower rating, it may . . .' underlined '. . . have been recommended but would depend on lots of other factors guided by the investment policy.'"[80]

Plaintiffs also cherry-pick one sentence from the testimony of Rany Moubarak – a Morgan Stanley analyst who worked on the Cheyne SIV during the Class Period –  that "all investors" requested information on the ratings before

---

[78]    *See* MCN Investor List – August 2007, Ex. 2 to Rouhandeh Decl.; Senior Note Investor List, Ex. 3 to Rouhandeh Decl.; Cheyne Report to Senior NoteHolders for the Quarter ended 31 March 2007, Ex. 19 to Perez-Marques Decl., at 48-49.

[79]    Deposition of Olivia Birchall, 30(b)(6) representative for ADCB, ("Birchall Dep."), Ex. 5 to Declaration of Luke O. Brooks, plaintiffs' counsel, in Support of Plaintiffs' Motion for Class Certification, at 289:6-15.

[80]    *Id.*, Ex. 7 to Rouhandeh Decl., at 240:2-5 (quoting her own, hand-written notes regarding a conversation she had with Neil Sharp, another ADCB employee).

investing.[81]  When read in context, however, Moubarak's testimony lends further

support to the conclusion that individual investor guidelines played a substantial

role in whether and to what extent investors relied on credit ratings:

> All investors you talked to [asked for ratings], so both the
> capital note investors and the senior note investors asked
> for ratings.  But then again, *it depends on the guidelines*, on
> the investment guidelines of every single investor[].  Some
> of them ask for ratings.  Some of them don't care about
> ratings.  So its really, like, various investors asking [for]
> various rating requirements.[82]

In addition, although some investors may have relied substantially or

exclusively on the ratings they received, others may have placed comparatively

more weight on their own independent credit assessments.  For example, SEI

employed an unaffiliated sub-manager – Columbia Management Advisors, LLC

("CMA") – to assist in making its investment decisions.  On behalf of SEI, CMA

conducted a detailed pre-investment analysis of Cheyne SIV including using its

own "proprietary risk model" and "[i]ndependent research team, not tied to

statistical rating organizations," and noting that its "[c]redit analysts generate

---

[81]     *See* Pl. Mem. at 17.

[82]     Deposition of Rany Moubarak, Ex. E to Cox Decl., at 88:9-18
(emphasis added).

25

independent ratings, going beyond rating-agency recommendations."[83]  CMA

concluded that the Rated Notes "present[ed] minimal credit risk" even after the

Notes had been downgraded by the Rating Agencies and again after Cheyne

defaulted.[84]

      Calyon, another investor in the Rated Notes, submitted a due diligence

questionnaire with more than one hundred questions on a wide variety of topics as

"a first step of its due diligence," but did not ask any questions about ratings.[85]  Yet

another investor, Mizuho, developed its own credit model and indicated that it

could not invest without sufficient information to run its model.[86]

      Similarly, while some investors conducted detailed, painstaking due

diligence inquiries into the Cheyne SIV prior to investing, others conducted no due

—————————————

[83]    2/4/09 SEI Investments: Liquidity Strategies Overview, Ex. 70 to
Perez-Marques Decl., at 36, 46, 51.

[84]    8/29/07 Memorandum to SEI from CMA, Ex. 71 to Perez-Marques
Decl., at 74. *Accord* 10/21/07 Memorandum to SEI from CMA, Ex. 72 to Perez-
Marques Decl., at 67 (stating that CMA "continues to believe that it is not in the
best interest of each Fund to dispose the Notes. [CMA] has also determined that
the Notes continue to present minimal credit risk.").

[85]    Calyon Required Information & Due-Diligence Questionnaire, Ex. 4
to Rouhandeh Decl., at 741.

[86]    *See* 7/17/06 Email, Ex. 31 to Perez-Marques Decl., at 19 (stating that
Mizuho had requested more information on Cheyne and was not willing to buy the
mezzanine capital notes of another SIV because that SIV "does not disclose their
portfolio, hence Mizuho can not run their own model").

diligence at all. For those that conducted some due diligence, they asked different questions regarding different issues.[87] Some, but not all, investors asked about the ratings and the methodology employed by the rating agencies.[88] By comparison, King County may not have known that Cheyne was an SIV,[89] did not conduct an in-depth analysis of the underlying assets,[90] did not inquire as to the methodology by which the Rated Notes were rated,[91] may not have read any Rating Agency

---

[87] These topics included, *inter alia*, (1) the underlying portfolio of assets, *see* 8/6/06 Email, Ex. 28 to Perez-Marques Decl.; 5/30/05 Email, Ex. 43 to Perez-Marques Decl.; (2) the inclusion of home equity loans in the portfolio, *see* 6/22/05 Email and attachments, Ex. 44 to Perez-Marques Decl., 4/7/06 Email, Ex. 45 to Perez-Marques Decl.; (3) Cheyne's experience and track record, *see* 4/5/06 Email, Ex. 46 to Perez-Marques Decl.; (4) Cheyne's incentive structure and commitment to the SIV, 4/19/05 Email, Ex. 47 to Perez-Marques Decl.; (5) Cheyne's financial strength, 7/6/06 Email, Ex. 48 to Perez-Marques Decl.; (6) the administrator of the SIV, 11/4/05 Email, Ex. 50 to Perez-Marques Decl., 6/1/05 Email, Ex. 51 to Perez-Marques Decl.; (7) the capital structure, *see* 8/9/06 Email, Ex. 52 to Perez-Marques Decl.; (8) the market risks, *see* 8/18/05 Email, Ex. 53 to Perez-Marques Decl.; and (9) the modeling that Cheyne would perform to comply with capital tests, *see* 1/4/05 Email, Ex. 42 to Perez-Marques Decl.

[88] *See* 8/4/05 Email, Ex. 54 to Perez-Marques Decl.; 6/3/05 Email, Ex. 55 to Perez-Marques Decl.

[89] *See* Deposition of Kenneth Guy, 30(b)(6) representative for King County ("Guy Dep."), Ex. 10 to Rouhandeh Decl., at 89:9-25; *id.*, Ex. 11 to Rouhandeh Decl., at 197:5-198:13.

[90] *See id.*, Ex. 10 to Rouhandeh Decl., at 130:13-17.

[91] *See id.* at 154:20-24.

27

report or similar material prior to investing,[92] and was unable to say how long it spent analyzing the Rated Notes before making its investment.[93]

In the same vein, investors varied in the communications they had with those selling the Rated Notes and the information they received prior to purchasing. As already described, different information memoranda and marketing materials were circulated for each Rated Notes and these materials were modified over time – including after some investors had already made their purchases. Moreover, Morgan Stanley and/or Cheyne Capital Management Limited prepared no less than fifty-six individualized memoranda to potential Cheyne SIV investors answering questions and due diligence inquiries by these investors.[94] Still other investors may have had no contact with Morgan Stanley or Cheyne Capital Management Limited at all. For example, neither SEI nor King County can

---

[92]    *See id.* at 115:12-116:4.

[93]    *See id.* at 87:24-89:6. *Cf. McLaughlin*, 522 F.3d at 226 (stating that "differences in plaintiffs' knowledge and levels of awareness" can defeat a finding of class-wide reliance); *In re Livent, Inc. Noteholders Secs. Litig.*, 211 F.R.D. 219, 223-24 (S.D.N.Y. 2002) (finding that plaintiffs were unable to demonstrate that common issues of reliance predominated where some plaintiffs spent no time investigating while others conducted their own substantial diligence).

[94]    *See* Single-Topic and Investor-Specific Memoranda Prepared for Prospective Cheyne SIV Investors, Exs. 5.01-5.56 to Perez-Marques Decl.; *see also* Morgan Stanley Excel Spreadsheet, Ex. 27 to Perez-Marques Decl. (indicating the status of responses to individual inquiries by potential Cheyne SIV investors).

identify any communications they had with Morgan Stanley or the Rating Agencies prior to investing and neither purchased their Rated Notes from Morgan Stanley.[95]  This evidence shows that the question of reliance requires hearing from each investor as to what it did, what it relied on when deciding to invest in the Cheyne SIV, and whether it relied substantially on the credit ratings, minimally on the ratings, or did not rely on them at all.  It is precisely this "personal idiosyncratic choice," that necessitates individualized proof of reliance.[96]

        To be clear, plaintiffs have offered evidence that some number of investors likely placed great weight on the ratings.[97]  Plaintiffs have provided a series of statements that support the common sense conclusion that investors typically rely on ratings in making investment decisions.  For instance, plaintiffs cite a January 2003 SEC report stating that "'[c]redit ratings can play a significant role in the investment decisions of investors, and the value investors place on such ratings is evident from, among other things, the impact ratings have on an issuer's

---

[95]     *See* Smigiel Dep., Ex. 8 to Rouhandeh Decl., at 79:3-13, 201:21-202:9; SEI's Supplemental Responses and Objections to Morgan Stanley's First Set of Interrogatories, Ex. 68 to Perez-Marques Decl., at 10; King County Trade Ticket, Ex. 74 to Perez-Marques Decl.; Guy Dep., Ex. 10 to Rouhandeh Decl., at 76:20-79:20.

[96]     *McLaughlin*, 522 F.3d at 226 n.7.

[97]     *See* Pl. Mem. at 13-18.

29

ability to access capital.'"[98]   Plaintiffs likewise claim that "[t]he credit ratings

assigned to the Cheyne SIV were especially important here because investors had

access to very little other information . . . ."[99]

Plaintiffs also offer Cox's declaration, in which he opines that "[i]n

making their decisions to invest in the Cheyne SIV, investors relied on the Rating

Agencies' ratings which reflected the output of the Cheyne SIV Model."[100]

---

[98]   *Id.* at 16 (quoting January 2003 SEC Report, Ex. C to Cox Decl.).

[99]   *Id.* at 18. On April 29, 2010, plaintiffs submitted what they termed
"supplemental authority" – an April 23, 2010 United States Senate Permanent
Subcommittee on Investigations Memorandum attaching documents that made
additional statements regarding the importance of credit ratings to investors. *See*
Ex. A to Notice of Recent Authority in Support of Plaintiffs' Motion for Class
Certification at 3 ("The more resecuritizations, the more opaque and complex the
instruments become, and the more reliant they are on high credit ratings to be
marketable); *id.* ("'Ratings are important because investors generally accept ratings
by the major public rating agencies in lieu of conducting a due diligence
investigation of the underlying assets and the servicer.'") (citation omitted).
Defendants urge this Court to reject plaintiffs' supplemental authority as improper
and irrelevant. *See* 5/3/10 Letter from Rouhandeh, at 1.  These documents merely
add to the conclusion that investors *generally* rely on credit ratings and do not tip
the scales in plaintiffs' favor.  Accordingly, I need not decide the appropriateness
of plaintiffs' submission.

[100]   Cox Decl. ¶ 12. Cox also opines that "[h]ad the ratings assigned to
the Rated Notes been lower, there is reason to believe that the Rated Notes would
not have been economically marketable." *Id.*  Plaintiffs offer this opinion only in
support of their argument that they are entitled to a presumption of reliance based
on the fraud-created-the-market doctrine and therefore it need not be addressed.
*Compare* Pl. Mem. at 13-18 (outlining plaintiffs' position that "reliance . . . can be
established class-wide through common circumstantial proof" and citing Cox Decl.
¶¶ 13-18) *with id.* at 18-21 (outlining plaintiffs' position that they are entitled to a

However, Cox's opinion is not based on evidence from this record. Rather, it is

supported by his knowledge and understanding of investment vehicles generally

and statements by government organizations and non-governmental organizations

about the importance of rating agencies.[101]  On April 14, 2009, Moody's Chief

Executive Officer and President, Raymond W. McDaniel, expressed a view similar

to that of plaintiffs and Cox in a prepared statement before the SEC, in which he

stated that:

> unlike in the corporate market, where investors and other
> market participants can reasonably develop their own
> informed opinions based on publicly available information,
> in the structured finance market, there is insufficient public
> information to do so. . . . *In the absence of sufficient data*,
> investors are unable to conduct their own analysis and
> develop their own independent views about potential or
> existing investments.[102]

In arguing that these generalized statements should be enough to find

class-wide reliance, plaintiffs cite those few cases in which courts have found that

where defendants made materially uniform misrepresentations, plaintiffs' reliance

---

presumption of reliance arising from the fraud-created-the-market doctrine and
citing Cox Decl. ¶¶ 19-21).

[101]   *See* Cox Decl. ¶¶ 13-18 (and citations therein).

[102]   4/15/09 Statement of McDaniel Before the SEC, Ex. 1 to Rebuttal
Declaration of Charles C. Cox in Support of Plaintiffs' Motion for Class
Certification, at 9. *Accord* Pl. Reply at 6.

on these misrepresentations can be established class-wide through common evidence.[103] However, these cases are inapposite because each involves a type of uniformity of misrepresentation and reliance that simply does not exist in this case.[104] While the evidence presented by plaintiffs here is convincing on the question of whether investors generally rely on credit ratings, it does nothing to refute the fact that in *this* case some sophisticated investors chose not to rely – or relied only minimally – on the credit ratings prior to investing in the Rated Notes.

Perhaps recognizing this weakness in their position on Reply, plaintiffs conflate the evidence used to support the fraud-created-the-market theory

---

[103]    *See* Pl. Mem. at 13-15.

[104]    *See, e.g.*, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) (certifying a class where defendant HMOs allegedly misrepresented in uniform contracts submitted to each plaintiff that they would pay them certain rates); *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 255 F.R.D. 284, 301-03 (D. Conn. 2009) (granting class certification where all plaintiffs released their insurance claims in exchange for an agreed-upon dollar amount, from which fifteen percent was then surreptitiously and uniformly deducted); *Ersler v. Toshiba Am., Inc.*, No. 07 Civ. 2304, 2009 WL 454354, at *5 (E.D.N.Y. Feb. 24, 2009) (finding it reasonable to assume that purchasers of high-end television sets relied on the representation that bulbs required for those sets to function will not be defective); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 237-38 (C.D. Cal. 2003) (granting class certification where plaintiff travel agencies made payments to defendant airlines in connection with allegedly fraudulent bills, finding the fact that the agencies paid the fraudulent bills in the amount of the invoice was proof that they relied on them); *Chisolm v. Transouth Fin. Corp.*, 194 F.R.D. 538, 561 (E.D. Va. 2000) (certifying a class of individuals who made payments to obtain repossessed cars relied on representations in standard form regarding repossession/sale process).

with common, circumstantial evidence of reliance by arguing that without

defendants' fraudulent conduct, the Rated Notes could not have issued.[105]

Plaintiffs' main contention is to reaffirm their fraud-created-the-market argument

that the Rated Notes' price or yield was tied directly to its rating, indicating that

any investor that purchased a Rated Note "necessarily" relied on the allegedly false

and misleading credit ratings.[106] Not only is plaintiffs' theory of "necessary"

reliance no more than a reformulation of presuming reliance under the rejected

fraud-created-the-market doctrine, the evidence just described directly contradicts

plaintiffs' theory that investors in the Rated Notes substantially relied on the

ratings in *every* instance.

      This Court does not doubt the accuracy of the sentiment that investors

generally rely on credit ratings. Indeed, this Court has previously recognized the

importance of credit ratings to the public at large.[107] However, for purposes of

---

[105]    *See* Pl. Reply at 3-10 (citing evidence and cases used in plaintiffs' opening memorandum to support its fraud-created-the-market theory under the heading that "plaintiffs have established that class-wide reliance can be proven through common evidence").

[106]    *Id.* at 3.

[107]    *See Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 165 (acknowledging that "'[a] credit rating is important to both issuers and investors'" and "'once the security or debt has received a favorable rating, that rating makes it easier to sell the security to investors, who rely upon [the rating agency's] analysis and evaluation.'") (quoting *In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003)).

class certification this Court must determine as a *procedural* matter whether *these specific* investors relied on *these specific* ratings when purchasing *these specific* Rated Notes. The substantial differences outlined above make such a determination on a class-wide basis impossible. As a result, I conclude that plaintiffs' theory of common, circumstantial, evidence of class-wide reliance fails. That is not to say that each investor does not have a legitimate claim on the merits. Rather, each investor must bring its claim individually – or, preferably, join this action – to recover its losses.

### 3. Loss Causation and Damages

In the alternative, plaintiffs contend that even if reliance requires an individualized inquiry, common issues such as falsity, scienter, loss causation, and damages predominate.[108] I disagree. Because individuals may have relied on defendants' misrepresentations to varying degrees in deciding to invest in a Cheyne SIV, loss causation cannot be resolved by way of generalized proof.[109]

---

[108]     *See* Pl. Reply at 10.

[109]     *See McLaughlin*, 522 F.3d at 226 ("[T]he issue of loss causation, much like the issue of reliance, cannot be resolved by way of generalized proof. As we noted above, individuals may have relied on defendants' misrepresentation to varying degrees in [making their decisions]; some may have relied completely, some in part, and some not at all. Thus, establishing the first link in the causal chain – that defendants' misrepresentations caused an increase in market demand – would require individualized proof . . . .").

34

Similarly, plaintiffs have not articulated any common method by which damages could be assessed on a class-wide basis

This Court recognizes that at least one issue may be common among all plaintiffs – *i.e.,* whether the ratings assigned to the CP, MTN, and MCN, respectively, were false or misleading.[110] But given the individual issues necessarily involved in determining liability and damages, common issues do not predominate over individual issues that must be litigated to resolve plaintiffs' claims.[111] As a result, this action is unsuitable for class treatment.[112]

---

[110]   *Cf. Moore*, 306 F.3d at 1255 (explaining that "evidence of materially uniform misrepresentations is sufficient to demonstrate the nature of the misrepresentation; an individual plaintiff's receipt of and reliance upon the misrepresentation may then be simpler matters to determine," but affirming a district court's denial of class certification where the case required each plaintiff to "prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss . . . a common course of conduct does not demonstrate that any specific statements made pursuant to that scheme were actionable").

[111]   *See McLaughlin*, 522 F.3d at 223-24 (holding that where issues of reliance, loss causation, and damages presented individualized questions, the predominance requirement was defeated even where a common scheme to defraud was the same across all potential class members).

[112]   I also note that defendants have raised compelling arguments regarding typicality, adequacy, and superiority. *See* Def. Opp. at 23-25, 27-30. These arguments need not be addressed in light of plaintiffs' failure to demonstrate numerosity or predominance – either of which is sufficient grounds on which to deny class certification.

## C.    Rule 23(c)(4)

Plaintiffs requested on Reply that in the event the class could not be certified as a whole, this Court certify the class under Rule 23(c)(4) "for all the other issues common to the class."[113] As already described above, plaintiffs cannot satisfy the numerosity requirement. This impediment to their motion to certify the class as a whole makes issue certification inappropriate for similar reasons. In addition, because of the significant, individualized issues of reliance, causation, and damages in this case, issue certification would not meaningfully reduce the range of issues in dispute or promote judicial economy.[114] As a result, plaintiffs' request for issue certification is denied.

## V.    CONCLUSION

The majority, if not all, of the common issues in this action can be resolved efficiently and effectively by joinder. Given plaintiffs' inability to meet the numerosity requirement and the overwhelming predominance of individualized

---

[113]    Pl. Reply at 11 n.8.

[114]    *See McLaughlin*, 522 F.3d at 234 (refusing plaintiffs' request for issue certification under Rule 23(c)(4) where "[c]ertifying . . . the issue of defendants' scheme to defraud would not materially advance the litigation because it would not dispose of larger issues such as reliance, injury, and damages" and thus "would not 'reduce the range of issues in dispute and promote judicial economy'") (quoting *Robinson*, 267 F.3d at 168); *Dungan v. Academy at Ivy Ridge*, 249 F.R.D. 413, 417 (N.D.N.Y. 2008) (citing *McLaughlin* and denying plaintiffs' request for issue certification on similar facts), *aff'd*, 344 Fed. Appx. 645 (2d Cir. 2009).

inquiries in this case, class certification is not warranted.  Accordingly, plaintiffs'

motion for class certification is denied.

The Clerk of the Court is directed to close this motion (Docket No.

87).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      June 15, 2010
            New York, New York

37

## - Appearances -

**For Plaintiffs:**

Patrick J. Coughlin, Esq.
Daniel S. Drosman, Esq.
Anne L. Box, Esq.
Jessica T. Shinnefield, Esq.
Nathan R. Lindell, Esq.
Darryl J. Alvarado, Esq.
David C. Walton, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, California 92101-3301
(619) 231-1058

Michael F. Ghozland, Esq.
Robbins Geller Rudman & Dowd LLP
9601 Wilshire Boulevard, Suite 510
Los Angeles, California 90210
(310) 859-3100

Samuel H. Rudman, Esq.
Jarrett S. Charo, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
100 Pine Street, Suite 2600
San Francisco, California 94111
(415) 288-4545

**For Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited:**

James P. Rouhandeh, Esq.
Antonio J. Perez-Marques, Esq.
Russell Capone, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

**For Defendants The Bank of New York Mellon and QSR Management Limited:**

Jonathan H. Sherman, Esq.
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, District of Columbia 20015
(202) 237-2727

Damien J. Marshall, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
New York, New York 10504
(954) 377-4230

**For Defendants Moody's Investors Service, Incorporated and Moody's Investors Service Limited:**

Joshua M. Rubins, Esq.
James J. Coster, Esq.
Glenn C. Edwards, Esq.
Justin E. Klein, Esq.
Aaron M. Zeisler, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200


**For Defendants Standard & Poor's Rating Services and The McGraw-Hill Companies, Incorporated:**

Floyd Abrams, Esq.
Dean I. Ringel, Esq.
Adam N. Zurofsky, Esq.
Andrea R. Butler, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

40