UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

ABU DHABI COMMERCIAL BANK, KING :    Civil Action No. 1:08-cv-07508
COUNTY, WASHINGTON, SEI :
INVESTMENTS COMPANY, SEI :
INVESTMENT STRATEGIES, LLC, THE :    CLASS ACTION
BANK OF N.T. BUTTERFIELD & SON :
LIMITED, SFT COLLECTIVE :    SEVENTH AMENDED COMPLAINT FOR
INVESTMENT FUND, DEUTSCHE :    COMMON LAW FRAUD AND AIDING
POSTBANK AG, GLOBAL INVESTMENT :    AND ABETTING
SERVICES LIMITED, GULF :
INTERNATIONAL BANK B.S.C., BANK :    [**REDACTED**]
HAPOALIM B.M., BANK SINOPAC, :
NATIONAL AGRICULTURAL :    DEMAND FOR JURY TRIAL
COOPERATIVE FEDERATION, STATE :
BOARD OF ADMINISTRATION OF :
FLORIDA, COMMONWEALTH OF :
PENNSYLVANIA PUBLIC SCHOOL :
EMPLOYEES' RETIREMENT SYSTEM, :
COMMERZBANK AG, Together and On :
Behalf of All Others Similarly Situated, :

           Plaintiffs, :

vs. :

MORGAN STANLEY & CO. :
INCORPORATED, MORGAN STANLEY & :
CO. INTERNATIONAL LIMITED, :
MOODY'S INVESTORS SERVICE, INC., :
MOODY'S INVESTORS SERVICE LTD., :
STANDARD & POOR'S RATINGS :
SERVICES, THE McGRAW HILL :
COMPANIES, INC., :

           Defendants. :

—————————————————————— x

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................................1

  A. The Cheyne SIV........................................................................................1

  B. The Defendants Disseminated False Credit Ratings with Respect to the SIV and Breached Their Obligations Owed to Investors.........................................2

  C. The Collapse of the Cheyne SIV ............................................................6

II. PARTIES .....................................................................................................7

III. JURISDICTION AND VENUE .................................................................13

IV. BACKGROUND .........................................................................................18

  A. The Largest Financial Product of Its Kind............................................18

  B. The Structured Investment Vehicle ......................................................18

  C. The Rating Agencies' Historical Roles.................................................22

V. THE RATING AGENCIES' ROLES IN THE CHEYNE SIV .................22

  A. The Rating Agencies Helped Create and Operate the Cheyne SIV......22

  B. The Rating Agencies Were Highly Compensated for Their Services .................26

VI. FACTUAL ALLEGATIONS WITH PARTICULARITY CONCERNING THE FALSE AND MISLEADING RATINGS .........................................................26

VII. DEFENDANTS' CONTRACTUAL OBLIGATIONS .............................28

VIII. THE REASONS WHY DEFENDANTS KNEW THE STATEMENTS AND OMISSIONS WERE MATERIALLY MISLEADING..................................30

  A. Defendants Knew the Cheyne SIV Bond Ratings Differed from Ratings of Corporate Bonds ...........................................................................30

  B. Defendants Knew the Cheyne SIV Acquired Extremely Risky (Not "High Grade" or "A") Assets ...........................................................................33

    1. Representative Loans Included in the Cheyne SIV ...................................34

    2. New Century: Representative Loans and Practices of U.S. Mortgage Originators ...........................................................................36

Page

C.     The Ratings Were Devoid of Any Meaningful Factual or Statistical Basis, as Defendants Knew ........................................................................44

D.     Due to Conflicts of Interest and the Easing of Credit Rating Criteria, the Process Used to Derive Ratings Was Deeply Flawed, as Defendants Knew ........48

E.     Defendants Were Highly Motivated to Conceal Problems with the Cheyne SIV ..............................................................................................57

IX.     CHEYNE CAPITAL'S INVOLVEMENT IN THE FRAUD ...........................................58

A.     The Cheyne SIV Acquired Extremely Risky Assets .............................................60

B.     The Cheyne SIV's Model Was Flawed ..................................................................63

D.     Cheyne Capital Had No Experience in SIVs ..........................................................68

E.     Cheyne Capital Had Both the Motive and Opportunity to Commit Fraud ............69

X.     DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE NOTES ..........................................................................................71

XI.     CLASS ACTION ALLEGATIONS ................................................................................72

XII.     COUNTS ..........................................................................................................................74

XIII.     PRAYER FOR RELIEF ...................................................................................................79

XIV.     JURY DEMAND ..............................................................................................................80

606978_1

## I.   INTRODUCTION

### A.   The Cheyne SIV

1.      This case involves the collapse of the "Cheyne SIV" (as defined *infra*), a Structured Investment Vehicle ("SIV") composed of asset-backed securities, many of which involved risky nonprime mortgages.  SIVs, such as the Cheyne SIV, have been at the heart of the recent U.S. credit crisis.  At their core, SIVs are a mechanism for banks to offload exposure to these risky asset-backed securities.  Because of their complex structure, SIVs would be virtually unmarketable without high credit ratings from the rating agencies, including Moody's and S&P (as defined *infra*).

2.      In this case, defendants together designed, structured, marketed and maintained the Cheyne SIV, generating millions of dollars in fees for themselves by issuing financial instruments with artificially high credit ratings.  Defendants then used investors' money to purchase and load the SIV with securities purportedly backed by "investment grade" U.S. mortgages and other asset-backed securities, marketed the SIV as a safe, highly-rated investment, and sold billions of dollars worth of notes to investors.  Plaintiffs purchased interests in the SIV, including "top rated" Commercial Paper and Medium Term Notes (collectively, "Senior Notes") and "investment grade" Mezzanine Capital Notes ("Capital Notes") and were promised that the defendants would satisfy their obligations and duties.  Instead, defendants misrepresented that investments in the Cheyne SIV were safe and worthy of such high ratings.  Defendants also failed to carry out their agreed-upon contractual obligations owed to investors in the Senior Notes and Capital Notes (collectively, the "Rated Notes" or the "Notes").  As a result, plaintiffs have unquestionably suffered damages: the Rated Notes, which defendants represented had high investment grade credit ratings, have been liquidated at drastically discounted prices.

- 1 -

3.      In addition to providing false credit ratings, defendants caused Information Memoranda to be issued to investors for the purpose of issuing up to $20 billion in "top rated" Senior Notes and $3 billion in "investment grade" Capital Notes, which included provisions for the issuance of Junior Capital Notes, a form of "credit enhancement" or equity cushion to protect the Rated Notes.   Beginning in 2004 and into 2007, defendants distributed to investors selling documents containing the key terms and contractual provisions with respect to the Rated Notes.   In those documents, defendants emphasized that the Senior Notes would be rated A-1+/P-1 and AAA/Aaa by S&P and Moody's, respectively; that the Capital Notes would be rated A/A3 "investment grade" by S&P and Moody's, respectively; and that the entire structure was "AAA," or risk-free.   These representations highlighted the purportedly extensive due diligence and fundamental credit analyses that went into the collateral asset acquisition process.

4.      The sale of each Rated Note enabled defendants to continually increase the SIV's level of funding.   As a consequence, throughout a period of increasing quantitative and qualitative risks associated with U.S. nonprime loans, defendants continued to add more and more risky assets to the SIV.

**B.      The Defendants Disseminated False Credit Ratings with Respect to the SIV and Breached Their Obligations Owed to Investors**

5.      Defendants promised that the arrangers and placement agents for the Cheyne SIV would work closely with Moody's and S&P to ensure that the SIV's financial instruments warranted the high credit ratings assigned to them by the rating agencies, both prior to the SIV's initial launch and throughout the Class Period (October 2004 to October 2007).   In reality, defendants colluded together, in a direct conflict of interest, to guarantee *ex ante* that the SIV received and maintained its top credit ratings despite the fact that it contained large amounts of risky and poor quality assets that belied those high ratings.   Essentially, the rating agencies sold their ratings, not their work.   The

credit ratings, vital information upon which every investor in a SIV such as the Cheyne SIV relies, were simply false.  Because the credit ratings were false, defendants' representations that the SIV was a safe, highly-rated and secure financial instrument was also false.

6.      Defendants marketed the SIV's Rated Notes as highly-rated and supported by "investment grade" collateral assets and reasonable assumptions.  In reality, however, ***the models used to rate the SIV were fatally flawed and not based upon relevant data***.  In fact, the correlation assumptions used by Moody's and S&P had no basis in fact.  Because the rating agencies had no data upon which to base assumptions in rating structured finance vehicles, the rating agencies simply took a guess as to what assumptions should be used in rating SIVs such as the Cheyne SIV. Undaunted by the utter lack of ***any*** relevant data, defendants unequivocally represented that the Cheyne SIV was risk-free and worthy of its "Triple A" rating.  Even worse, defendants failed to react – directly breaching their contractual and fiduciary duties to investors – when they began receiving data during the Class Period showing that their baseless assumptions were flawed and were producing artificially high credit ratings in light of the large amount of nonprime asset-backed securities contained in the Cheyne SIV.

7.      Defendants knew the models used to generate the high ratings were inherently flawed and utterly unreliable and that the ratings themselves, upon which investors relied, were therefore false and misleading.  In particular, Morgan Stanley (as defined *infra*) represented to Moody's and S&P that it wanted top ratings for the Cheyne SIV.  In what has since been revealed as a common practice in rating structured finance vehicles, Moody's and S&P were more than willing to give "Triple A" ratings to the Cheyne SIV at any cost because if Moody's and S&P had declined to provide the top ratings sought, Morgan Stanley would have taken its business elsewhere.  Moody's and S&P gladly obliged and provided the high, albeit false, ratings because they received fees in

- 3 -

excess of ***three times*** their normal fees for rating the SIV.  As a result, defendants knew that the SIV's top credit ratings were false and misleading because they were based not on reliable models and assumptions, but on mere guesswork.  Indeed, defendants never really analyzed, much less disclosed, any of the key risks and facts that caused losses on the SIV's securities.  As a consequence, defendants ***mis***represented that the Cheyne SIV was a safe investment warranting the high credit ratings consistently given by the rating agencies.

8.      In direct conflict of interest, Moody's and S&P not only provided structuring and monitoring services to the Cheyne SIV, but also provided their "top rated" A-1+/P-1, AAA/Aaa ratings for the Senior Notes and their coveted A/A3 "investment grade" ratings for the Capital Notes – effectively grading their own work.  In fact, it was a condition precedent to the issuance of the Rated Notes that they receive such high ratings from the Moody's and S&P.  Moody's and S&P had an interest in ensuring the placement of superior credit ratings on the Rated Notes, when in fact the Rated Notes were not equivalent to other more traditional investments with the same credit ratings. To produce these high ratings, Moody's and S&P based their ratings on undisclosed and serious flaws in their models, including false, irrelevant and/or guesswork data.  Because of these failures, the Rated Notes sold to plaintiffs were secured by assets that had a much higher risk profile than investors were led to believe.  Moody's and S&P provided unreasonably high ratings in part because they faced these serious conflicts of interest.  When the U.S. Securities and Exchange Commission ("SEC") learned about the severity of the rating agencies' conflicts, it deemed it necessary to flatly prohibit the practices creating such conflicts.

9.      Moody's and S&P had a direct financial involvement in the Rated Notes issued by the Cheyne SIV.  These conflicts of interest have been recently revealed and have been the topic of congressional hearings and testimony.  One former Moody's employee testified before the Senate

- 4 -

Banking, Housing and Urban Affairs Committee, that "[t]here is a far more serious conflict of interest than is commonly believed at the root of the current rating agency business model" and went on to say that "one could make the case that whenever a rating analyst is supervised by a manager whose compensation is determined by the market share or revenue growth (rather than ratings accuracy) the objectivity of ratings is compromised." Without these compromised ratings, the Rated Notes never would have been issued or, at the very least, would not have received the high credit ratings necessary to effectively market the Rated Notes to institutional investors. Indeed, institutional investors routinely have explicit policies forbidding the purchase of non-investment grade securities.

10.     The conflicts of interest in the ratings process disabled Moody's and S&P from independently analyzing the Cheyne SIV. Instead, Moody's and S&P blindly provided the SIV with the high ratings sought by defendants knowing that they lacked the data necessary to evaluate the true, risky nature of the assets underlying the SIV. Such conflicts rendered each of the ratings issued vis-à-vis the Cheyne SIV false and misleading.

11.     Defendants further promised that they would oversee the SIV's investments and facilitate the purchase of safe and highly-rated assets consistent with the high rating of the SIV's financial instruments. To persuade investors to buy the SIV's Notes, defendants assured investors that the SIV's underlying investment portfolio would be acquired and managed in a way that legitimately justified the high credit ratings assigned to the Notes it issued. In addition, defendants even promised investors that the SIV would never contain more than a certain threshold percentage of nonprime asset-backed securities. Defendants, however, breached those obligations and promises by including large amounts of risky investments that did not legitimately support such high ratings.

Because of defendants' breaches, the Rated Notes contained hidden embedded risks known only to defendants, which caused them to plummet in value as the mortgage market collapsed.

12.     Defendants also recklessly failed to monitor and supervise the SIV's acquisition of assets, both initially and over time, as they promised they would.  Specifically, defendants failed to react when they began receiving data during the Class Period showing that the assumptions and models used to rate the SIV were producing artificially high credit ratings as the mortgage market began to collapse.  In fact, defendants continued to solicit investor money and bought more and more risky investments.  Had defendants not breached their contractual and fiduciary duties in this regard, the credit ratings assigned to the SIV's underlying assets, and thus those assigned to the Rated Notes, would have been downgraded long before August 2007.  Instead of protecting the SIV and its investors, as they promised they would, defendants exposed the SIV to significant undisclosed risks.

13.     Over time, residential mortgage backed securities ("RMBS") and related securities became even riskier.  Instead of reducing the Cheyne SIV's exposure during this period and disclosing the increasing risks to investors, defendants continued buying into the storm.  The impact of defendants' failure to price, rate and disclose the known risks and practices of U.S. nonprime mortgage lenders during the relevant time period cannot be overstated.  The Cheyne SIV was only as strong as the quality of its assets and the ratings of the instruments it issued.  Because the quality of its assets and the ratings of its instruments were all a lie, the Cheyne SIV itself was a lie.

**C.     The Collapse of the Cheyne SIV**

14.     By late 2007, when it was too late, the truth about the quality of mortgages that secured the Rated Notes began to be revealed to the public.  Because of the low quality of these assets, the Cheyne SIV was unable to pay senior debt as it came due and the Cheyne SIV collapsed. All of this happened in a matter of weeks.  Evidencing the falsity of the high credit ratings

- 6 -

continually given to the Cheyne SIV during the Class Period, the Rating Agencies **never** reduced the ratings on the Cheyne SIV, let alone put the Cheyne SIV on negative watch, until mere weeks before the entire structure collapsed into bankruptcy.  Investors were simply blindsided.  Cheyne PLC (as defined *infra*) was then restructured and an auction process was instituted, which wiped out much of the value of the Senior Notes and essentially wiped out any of the minimal remaining value of the Capital Notes.  Holders of Senior Notes recovered a fraction of their investments.  The Capital Notes are now worthless.  The relatively low interest rates on the Rated Notes never reflected or compensated investors for the risks to which they were exposed.  The ratings, structuring and monitoring services provided by defendants were flawed from the start.

15.     Therefore, plaintiffs bring this case as a class action on behalf of all persons who acquired the Rated Notes issued by Cheyne Finance PLC (now known as SIV Portfolio PLC) ("Cheyne PLC"), which is now in receivership as a bankrupt entity, and its wholly-owned subsidiaries Cheyne Finance LLC and Cheyne Capital Notes LLC (together, "Cheyne LLC") (collectively, the "Cheyne SIV") during the Class Period of October 2004 to October 2007 on the basis of false and misleading credit ratings and contractual obligations owed to investors that were breached by defendants.  Various entities provided management services to the Cheyne SIV, including the defendants named herein.

## II.    PARTIES

16.     The following plaintiffs acquired Commercial Paper and have been damaged thereby:

(a)     Plaintiff King County, Washington ("King County") is a domestic public entity organized under the laws of the State of Washington, United States of America.  King County acquired Commercial Paper and has been damaged thereby.

- 7 -

(b)      Plaintiff Commerzbank AG ("Commerzbank") is a bank headquartered in Frankfurt, Germany.  Commerzbank acquired Commercial Paper (and Capital Notes and Medium Term Notes, *see infra* ¶¶17(h) and 18(g)) and has been damaged thereby.

17.      The following plaintiffs acquired Capital Notes and have been damaged thereby:

(a)      Plaintiff Abu Dhabi Commercial Bank ("ADCB") is a bank headquartered in Abu Dhabi, United Arab Emirates.  ADCB acquired Capital Notes and has been damaged thereby.

(b)      Plaintiff Deutsche Postbank AG ("Postbank") is a bank headquartered in Bonn, Germany.  Postbank acquired Capital Notes and has been damaged thereby.

(c)      Plaintiff Global Investment Services Limited "(GIS") is the trustee of investment funds managed by NZ Funds.  GIS is headquartered in Sydney, Australia.  GIS acquired Capital Notes and has been damaged thereby.

(d)      Plaintiff Gulf International Bank B.S.C. ("GIB") is a bank headquartered in Manama, Kingdom of Bahrain.  GIB acquired Capital Notes and has been damaged thereby.

(e)      Plaintiff Bank Hapoalim B.M. ("Hapoalim") is a bank headquartered in Tel Aviv, Israel.  Hapoalim acquired Capital Notes and has been damaged thereby.

(f)      Plaintiff National Agricultural Cooperative Federation ("NACF") is an agricultural cooperative in South Korea.  NACF acquired Capital Notes and has been damaged thereby.

(g)      Plaintiff Bank SinoPac ("SinoPac") is a bank headquartered in Taiwan. SinoPac acquired Capital Notes and has been damaged thereby.

(h)      Plaintiff Commerzbank acquired Capital Notes and has been damaged thereby.

- 8 -

18.    The following plaintiffs acquired Medium Term Notes and have been damaged thereby:

(a)    Plaintiff Commonwealth of Pennsylvania Public School Employees' Retirement System ("PSERS") is an investment fiduciary organized under the laws of the State of Pennsylvania, United States of America.  PSERS acquired Medium Term Notes and has been damaged thereby.

(b)    Plaintiff State Board of Administration of Florida ("SBAF") is an investment fiduciary organized under the laws of the State of Florida, United States of America.  SBAF acquired Medium Term Notes and has been damaged thereby.

(c)    Plaintiff SEI Investments Company ("SEI") is a public company traded on the NASDAQ stock exchange and headquartered in Oaks, Pennsylvania.  SEI acquired Medium Term Notes and has been damaged thereby.

(d)    Plaintiff SEI Investment Strategies, LLC, is a limited liability company.  SEI Investment Strategies, LLC's sole member is SEI, a Pennsylvania corporation.  SEI Investment Strategies, LLC brings this action in its capacity as general partner for and on behalf of SEI Liquidity Fund, LP, a Delaware limited partnership, which acquired Medium Term Notes and was damaged thereby.

(e)    Plaintiff The Bank of N.T. Butterfield & Son Limited ("Butterfield") is a bank headquartered in Hamilton, Bermuda.  Butterfield acquired Medium Term Notes and has been damaged thereby.

(f)    Plaintiff SFT Collective Investment Fund ("SFT") is a company incorporated in the Cayman Islands.  SFT acquired Medium Term Notes and has been damaged thereby.

- 9 -

(g)     Plaintiff Commerzbank acquired Medium Term Notes and has been damaged thereby.

19.     Defendant Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited and their affiliates (together, "Morgan Stanley") is an investment banking and global financial services corporation headquartered in New York City.  Morgan Stanley served diversified groups of corporations, governments, financial institutions, and individuals, and acted as the Arranger and a Placement Agent for the Rated Notes.  This action charges Morgan Stanley with violations of New York law, as Morgan Stanley had in its possession, at the time it sold assets to the Cheyne SIV investors, quantitative and qualitative information demonstrating the fact that the assets backing the Cheyne SIV were far riskier than represented and were, indeed, impaired at the time the Cheyne SIV was created and grew even riskier over time.  Clearly, this was information that any reasonable investor would have wanted to know, yet Morgan Stanley elected not to disclose in violation of New York law.

20.     Defendant Moody's Investors Service, Inc. and its affiliates, including wholly-owned and controlled subsidiary Moody's Investors Service Ltd. (collectively, "Moody's"), is a credit rating agency based in the United States.  This action charges Moody's with violations of New York law.

21.     Defendant The McGraw-Hill Companies, Inc. and its affiliates, including its wholly-owned and controlled business division Standard & Poor's Ratings Services (collectively, "S&P," and together with Moody's, the "Rating Agencies"), is a credit rating agency based in the United States.  This action charges S&P with violations of New York law.

22.     The Rating Agencies intentionally or recklessly misled investors in the Cheyne SIV by means including, but not limited to, consulting on the structure of the Cheyne SIV, placing their

- 10 -

"top ratings" and "investment grade" ratings on the Cheyne SIV and its financial instruments, and providing operating instructions for the SIV. But for the Rating Agencies' violations of law, the Senior Notes and the Capital Notes never would have been issued, much less purchased. Plaintiffs necessarily relied on the Rated Notes' high credit ratings, which were false and without a reasonable basis. Had the Rating Agencies disclosed to investors the ratings had no basis in fact and that the assumptions were unreasonable, investors would have never purchased the Notes.

23.     Among other things, the Rating Agencies were involved in the structuring, rating and monitoring of the Cheyne SIV and the issuance of Rated Notes. The Rating Agencies received a substantial success fee for helping Morgan Stanley launch the Cheyne SIV, as well as fees that increased in tandem with its growth. The Rating Agencies' substantial remuneration was drawn from the proceeds of the Rated Notes' issuance, and their ongoing fees were paid out of income owed to Rated Notes investors. It was a condition precedent to the offering of Capital Notes that they receive a rating of A3 from Moody's and a rating of A from S&P. Similarly, it was a condition precedent to the offering of Senior Notes that they receive ratings of P-1 and Aaa from Moody's and ratings of A-1+ and AAA from S&P.

24.     Defendant The Bank of New York, now known as The Bank of New York Mellon (collectively, the "Bank"), was the U.S. Agent, Principal Paying Agent, Calculation Agent, Depositary, Registrar, and U.S. Security Agent for the Rated Note.

25.     Defendant QSR Management Limited is a wholly-owned subsidiary of the Bank. QSR provided administrative services to the SIV. QSR acted as the Administrator in the sale of the Rated Notes, helping to draft and disseminate the Management Agreements. QSR had

responsibilities to determine and report the market values of the Cheyne SIV's collateral assets. The Bank wholly owns QSR, and they are collectively referred to as "BoNY" herein.[1]

26. Defendant BoNY was also aware that the Cheyne SIV was falsely rated and contained large amounts of risky, nonprime asset-backed securities as they "daily" marked to market the value of all of the Cheyne SIV's collateral assets, and then reported that information to the Rating Agencies, but not to the Senior Notes and Capital Notes investors. For the same reasons, the Rating Agencies also knew that the SIV's high credit ratings were false but continued to rate the Rated Notes with the highest available credit ratings.

27. Cheyne Capital Management Limited, and its successor, Cheyne Capital Management (UK) LLP, was the Manager of the Cheyne SIV and performed certain obligations pursuant to a management agreement. Cheyne Capital International Limited was appointed the Manager Delegate to perform certain of Cheyne Capital Management (UK) LLP's investment and/or funding management obligations. Cheyne Capital Management Limited, Cheyne Capital Management (UK) LLP and Cheyne Capital International Limited are collectively referred to as "Cheyne Capital." Cheyne Capital helped create and manage the Cheyne SIV, whose corporate structure included three affiliated entities, each of which was controlled at all time by Cheyne Capital: Cheyne Finance PLC (a special purpose vehicle established under Irish law for the purpose of carrying on business as an investment company and issuing asset-backed securities) and two wholly-owned subsidiaries. The subsidiaries are Cheyne Finance LLC and Cheyne Finance Capital Notes LLC, each of which is a

---

[1]   Pursuant to the Stipulation of Voluntary Dismissal Without Prejudice and Order thereon signed by the Court on May 14, 2010, BoNY was dismissed without prejudice from this action, and plaintiffs have preserved their "right of appeal with respect to any of the claims asserted against the [BoNY] defendants by Plaintiffs in any complaint filed in this action."

limited liability company organized under the laws of the State of Delaware. These entities issued billions of dollars in fixed income securities for the purpose of acquiring the portfolio, or collateral assets, backing the Rated Notes. This action charges Cheyne Capital with violations of New York law.[2]

28.     The Rating Agencies, Cheyne Capital, Morgan Stanley and BoNY are collectively referred to as "defendants."

## III.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(3), in that plaintiffs and defendants are citizens of different states, there are foreign citizens as additional parties, and the matter in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of the State of Washington, the State of Florida, the Commonwealth of Pennsylvania, Germany, Australia, Bermuda, Israel, Taiwan, South Korea, the Kingdom of Bahrain and the United Arab Emirates, certain of the defendants are citizens of the State of New York, and none of the defendants is a citizen of the State of Washington, the State of Florida or the Commonwealth of Pennsylvania.

30.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this matter is a class action in which some members of the Class are citizens of different states than the defendants and the Class consists of more than 100 members.

---

[2]     On July 12, 2010, the Court dismissed Cheyne Capital with prejudice.

31.     Venue is proper in this District because the violations of law complained of herein occurred in part in this District, including the dissemination of the materially false and misleading credit ratings and other statements complained of herein.  Defendants conduct business in this District.  Morgan Stanley & Co. Incorporated, which is headquartered in this District, acted as the Arranger and a Placement Agent for the Rated Notes.  BoNY, which is also headquartered in this District, served as the U.S. Agent, Principal Paying Agent, Calculation Agent, Depositary, Registrar, and U.S. Security Agent for the Rated Notes, and also owns QSR, the Administrator of Cheyne PLC.

32.     Up to 100% of the investments in the underlying portfolio could be made in the United States and much of the portfolio of RMBS is based on mortgages backing U.S. real estate and other instruments backed by U.S. RMBS.  Approximately 80% of the assets were concentrated in the United States as of August 2007.  At that time, 100% of the more than $8 billion in Senior Notes were issued by the Delaware subsidiary of the Cheyne SIV.  The register of the certificateless depositary interests was to be maintained in New York.  A minimum of 75% of the portfolio was required to be denominated in U.S. dollars.  The Senior Notes, the Senior Note Purchase Agreement, the U.S. Senior Note Security Documents, the U.S. Senior Notes Agency Agreement, the Capital Notes, the Capital Notes Purchase Agreement, the U.S. Capital Notes Security Documents and the U.S. Capital Notes Agency Agreement are governed by, and construed in accordance with, the laws of the State of New York.

33.     Cheyne Capital is subject to personal jurisdiction in New York.  Cheyne Capital helped create and manage Cheyne Finance LLC, the Senior Notes issuer, and Cheyne Finance Capital Notes LLC, the Capital Notes issuer, which were both located in Melville, New York.  Through these New York entities, Cheyne Capital (along with Morgan Stanley and the Rating Agencies) orchestrated a major fraudulent bond offering in New York consisting of billions of

- 14 -

dollars in fixed income securities, including the Capital Notes and Senior Notes at issue in this action.  As manager of the Cheyne SIV, moreover, Cheyne Capital controlled the acquisition of billions of dollars of securities held as assets by the Cheyne SIV, which securities were offered and sold from New York.

34.    Cheyne Capital colluded with several other New York-based entities to launch and grow a multi-billion bond offering in New York for the purpose of defrauding investors, as described herein.  For example, Cheyne Capital colluded with all other defendants to distribute the false and misleading credit ratings in New York to investors through *Bloomberg* and other means.  In addition, Cheyne Capital colluded with the New York-based Rating Agencies to create the Cheyne SIV and its false ratings.



███████████████████████████ Without New York's

capital markets infrastructure, the Cheyne SIV would not have existed and could not have operated,

and all defendants knew it.

36.     Cheyne Capital is subject to personal jurisdiction in New York pursuant to

N.Y.C.P.L.R. §302(1) as it transacted business within New York and contracted to provide services

in this state as described above (including the management of a multi-billion dollar fraudulent note

program centered principally in New York).  The causes of action in this case arise directly from

Cheyne Capital transactions purposefully directed at New York.  At least $8 billion worth of the

fraudulent Rated Notes were issued from New York and sold by New York broker dealers.  Cheyne

Capital was responsible for promoting and managing this issuance along with the other defendants.

37.     In addition, Cheyne Capital is subject to personal jurisdiction in this state pursuant to

N.Y.C.P.L.R. §302(2) and (3).  Directly or through agents, Cheyne Capital communicated false and

misleading information to investors in New York, injured investors in New York (including New

York residents), derived substantial revenue from services rendered in this state and expected or

reasonably should have expected the management of a multi-billion dollar fraudulent investment

fund centered in New York to have consequences in New York. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Cheyne Capital also derives substantial revenue from interstate or

international commerce.  In sum, N.Y.C.P.L.R. §302(a)(1), (2) and (3) confer personal jurisdiction over Cheyne Capital based on its direct acts and the acts of its agents.[3]

38.     All entities comprising the Cheyne SIV are subject to personal jurisdiction in New York pursuant to N.Y.C.P.L.R. §302(a)(1), (2) and (3).  With the Rating Agencies, Morgan Stanley and Cheyne Capital (which entities at all times controlled the Cheyne SIV's fraudulent issuance of securities with false and misleading credit ratings), Cheyne Finance PLC and its two wholly-owned Delaware subsidiaries, Cheyne Finance LLC and Cheyne Finance Capital Notes LLC, issued billions of dollars worth of fraudulent securities in New York, through New York broker dealers, by means of New York's capital markets infrastructure described above and through the use of a New York-based *Bloomberg* investment platform and other means.  These entities signed agreements with New York broker dealers for the purpose of issuing the fraudulent Rated Notes.  The Cheyne SIV entities committed the tortious acts described herein both within New York directly or through agents and outside New York causing injury in New York, including by selling fraudulent securities to New York residents.  Before essentially going bankrupt, the Cheyne SIV did expect or reasonably should have expected its fraudulent conduct to have consequences in New York, and the Cheyne SIV derived substantial revenues from New York or international commerce.

39.     Further, the three Cheyne SIV entities irrevocably submitted to litigating claims relating to the Rated Notes in New York.  They agreed to waive any objections to suit in New York (including any *in personam* jurisdiction objections) in any action or proceeding in connection with or arising out of the Rated Notes, including with respect to the offer or sale of the Rated Notes.  These

---

[3]     While these acts are sufficient for personal jurisdiction purposes, Cheyne Capital does business in New York and is additionally subject to personal jurisdiction under N.Y.C.P.L.R. §301.

- 17 -

entities appointed Global Securitization Services, LLC, with offices at 445 Broad Hollow Road, Suite 239, Melville, New York 11747, as their agent for service of process.

40.     All of the foregoing transactions are directly related to the fraud alleged herein.  The three Cheyne SIV entities purposefully directed their activities to achieve numerous benefits in New York and are subject to personal jurisdiction in New York pursuant N.Y.C.P.L.R. §302(a)(1), (2) and (3) based on such acts and the acts of their agents.

## IV.     BACKGROUND

### A.     The Largest Financial Product of Its Kind

41.     Defendants created and helped operate the Cheyne SIV.  The high credit ratings on the SIV promoted it as a means to generate stable financial returns, with exposure to only safe, high-grade assets.  High-grade assets had to be acquired because the financial structure of the Cheyne SIV depended on a great deal of "leverage," or debt financing.  Because of this leveraged structure, Morgan Stanley could not have raised investment capital had it disclosed to investors it had acquired low-quality assets.

42.     As detailed herein, however, defendants knew that this financial product – the largest ever of its kind – had serious design flaws and had a set of operating instructions that allowed investors' capital to be squandered on low-quality, high-risk U.S. mortgage products.

### B.     The Structured Investment Vehicle

43.     A structured investment vehicle is a special purpose entity that borrows money by issuing short- and medium-term debt and then uses that money to buy longer-term securities, including mortgage bonds and other asset-backed securities.  An SIV is sometimes called a "conduit," because it raises short-term funds and channels those funds into longer-term assets.  An SIV's business model resembles that of a bank: it seeks to earn a spread between the interest rate at

which it borrows and the interest rate at which it lends.  And like a bank, an SIV has both assets and liabilities.

44.     An SIV typically has three categories of liabilities: Commercial Paper ("CP"), Medium Term Notes ("MTNs"), and other medium-term debt, often called "capital notes."  The CP and MTNs are senior in priority to the capital notes, which bear the first loss if an SIV's assets decline in value.  Moreover, the equity of an SIV typically is of nominal value, which renders the credit quality of an SIV's assets extremely important to the SIV's investors.

45.     An SIV's assets typically include "investment grade" rated asset-backed securities ("ABS"), RMBS, and collateralized debt obligations ("CDOs").  ABS investments typically entitle investors to principal and interest drawn from pools of student loans, credit cards, or auto loans.  The term is sometimes used more broadly to include RMBS.  RMBS are backed by a variety of residential mortgages.  CDOs invest in ABS and RMBS.  SIVs typically are designed to invest in high grade and highly-rated assets in these investment categories.

46.     The "liabilities" or bond (note) investors in SIVs typically receive "top rated" or "investment grade" ratings from Rating Agencies.  These ratings are derived in large measure from the quality of the assets backing the structure, as well as structural features such as "credit enhancement."  Credit enhancement can take a number of forms, but is often accomplished through structural subordination.  For example, in the Cheyne SIV, the Senior Notes investors were protected by a subordinated series or "tranche" of Capital Notes and the Capital Notes investors were protected by a subordinated series or tranche of Junior Capital Notes.

47.     During the relevant times, the Rating Agencies did not distinguish between "structured finance" bonds and corporate bond ratings.  In other words, according to the Rating

- 19 -

Agencies, a structured finance investment with a particular rating had the same default probability and loss severity (should default occur) as a corporate bond with that same rating.

48. The Senior Notes were "top rated" notes, meaning that they received the highest possible credit ratings from the Rating Agencies. These ratings are the same as those typically assigned by the Rating Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills. Indeed, the Information Memoranda defined "Triple A"-rated investments as "**risk-free**." Defendants described the ratings for the Senior Notes in the following way:

Moody's:    **P-1**: Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

\*        \*        \*

**Aaa**: Obligations rated Aaa are judged to be of the highest quality, with minimal credit risk.

S&P:    **A-1+**: Obligor's capacity to meet its financial commitment on the obligation is strong.

**AAA**: The best quality borrowers, reliable and stable (many of them governments).

49. The Capital Notes were rated A3/A by defendants Moody's and S&P, respectively. These were the highest credit ratings ever given to capital notes in any SIV. Defendants described these ratings in the following way:

Moody's:    Obligations rated A are considered upper-medium grade and are subject to low credit risk.

S&P:  An obligation rated 'A' is somewhat more susceptible to the adverse effects of Changes and economic conditions than obligations in higher-rated categories.  However, the obligor's capacity to meet its financial commitment on the obligation is still strong.

50. The ratings assigned to any structured credit communicate specific information to investors about the assets backing their bonds (notes).  This information is important because an SIV's success depends directly on the credit quality of the assets acquired by the SIV.  If stable, highly-rated instruments comprise the SIV, then SIV investors are much less likely to suffer a loss.  Because the SIV's only purpose is to use its investors' funds to purchase assets, any losses on assets acquired by the SIV are applied directly to the SIV's investors.  In other words, the Rated Notes-holders' investments are only as good as the weakest instruments acquired by the SIV.  SIV investors are willing to invest in large part because of the high credit ratings assigned to all of the Rated Notes, which are largely a reflection of the high ratings assigned to the assets acquired by the SIV.

51. Of course, with safety comes a "cost."  "Top rated" and "investment grade" products are commonly understood in the marketplace to be stable, secure and safe.  Accordingly, arrangers of those investments, such as Morgan Stanley, are able to pay investors relatively low interest rates.

52. Before the risks and realities of the Rated Notes began to be revealed in August 2007, the conservative economics of these instruments (*i.e.*, low risk and low reward) appeared to make sense.  The ratings assigned to the Notes and written materials distributed by Morgan Stanley repeated the same messages: the Rated Notes are safe, secure and stable.

### C.    The Rating Agencies' Historical Roles

53.    Historically, the Rating Agencies were conservative institutions more like governmental entities or publishers than market actors.  The Rating Agencies often liken themselves to reporters.  That is because in the past they provided unsolicited "opinions" on the creditworthiness of corporations and had a subscription-based business model.  Their evaluations were often derived from publicly available information such as filings with the SEC.

54.    Over time, the Rating Agencies earned the trust of the marketplace for their integrity and unbiased approach to evaluating bonds.  Similarly, in 1975 the SEC provided the Rating Agencies a special status of "nationally recognized statistical rating organization" or NRSRO to help insure the integrity of the ratings process.  According to the SEC, the "single most important criterion" to granting NRSRO status is that "the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings" and that part of awarding the NRSRO label to a company hinges on "the *rating organization's independence* from the companies it rates."

## V.    THE RATING AGENCIES' ROLES IN THE CHEYNE SIV

### A.    The Rating Agencies Helped Create and Operate the Cheyne SIV

55.    The Rating Agencies did not perform their historical functions with respect to the Cheyne SIV.  Instead, the Rating Agencies were actively involved in its creation and ongoing operation.  Indeed, the Rating Agencies understood that Morgan Stanley wanted the Cheyne SIV to be "top rated" and, if it was not rated as such, Morgan Stanley would not engage the Rating Agencies to service the SIV going forward and the Rating Agencies would lose the large fee associated with the successful rating of the SIV.  As such, instead of acting as an independent policing force for the SIV, as investors believed was the case, the Rating Agencies worked directly

- 22 -

with Morgan Stanley to ensure that the Cheyne SIV was rated "Triple A" regardless of what the true ratings should have been. These "Triple A" ratings were given despite the fact that the Rating Agencies used fatally flawed and irrelevant data to substantiate such ratings.

56.    For example, the Rating Agencies helped determine how much "equity" was required at each level of the SIV in order to support the Senior Notes' "top ratings" and the Capital Notes' "investment grade" ratings. This determination was made, with the Rating Agencies' instruction, at the inception of the Cheyne SIV and on an ongoing basis throughout the Class Period.

57.    On an ongoing basis, the Cheyne SIV would set a capital buffer for the Rated Notes based on a "simulation model" that was agreed upon with S&P and Moody's. That model, in turn, was based on rating transition matrices agreed upon with the Rating Agencies to simulate asset performance. A "rating transition" occurs when a rating agency changes the grade assigned to a particular asset. In other words, the Rating Agencies were key not only in determining the relative proportions of the various tranches of debt and equity issued by the Cheyne SIV, but also in continuing to make that determination on an ongoing basis.

58.    The Rating Agencies also provided "capital matrices" to determine the base minimum amount of capital allowed before the Cheyne SIV would be required to operate in a more conservative way. These operating instructions are themselves based on the ratings of the assets that the Cheyne SIV would acquire. Each time the Cheyne SIV selected a potential investment to be acquired, it would determine the weighted average life of the asset, its credit rating and the industry – such as nonprime mortgage-backed securities – from which the investment is drawn.

59.    Based on these parameters, on an asset-by-asset basis, the Cheyne SIV would set aside a predetermined amount of capital for the protection of the Rated Notes, and to preserve their respective ratings. The percentage of capital required was agreed upon with the Rating Agencies.

- 23 -

60.     The volume of the Cheyne SIV's equity or equity-like capital, junior and senior debt can be understood to represent the "liability" side of the Cheyne SIV.  These liabilities represent the Cheyne SIV's financial obligations to its investors.

61.     The Rating Agencies also provided instructions on which types of assets the Cheyne SIV could acquire.  As noted above, some of the capital reserve instructions were derived from the asset class acquired by the Cheyne SIV.  The quality of the assets determines how much capital should be set aside to protect the ratings of the Notes, which depend directly upon those assets for the service of interest and return of principal.

62.     After examining both the assets and the liabilities of the Cheyne SIV, Moody's and S&P each provided a "Triple A" rating to the entire structure.  Without such a high rating, the Cheyne SIV could not have issued the Senior Notes – its primary source of funding – as cheaply, or entered into a variety of counterparty transactions at favorable rates.  In fact, without the Moody's and S&P's "Triple A" ratings, the SIV would never have been created or sold to the investing public.

63.     Defendants provided that every week the Rating Agencies were supposed to receive reports from defendant BoNY (through its subsidiary QSR).  BoNY was required to "mark to market" all of Cheyne SIV's assets on a "daily" basis and "deliver reports to rating agencies weekly."  It was required to conduct more frequent valuations "if directed by the rating agencies." The Rating Agencies thus were to observe the performance of the collateral assets every week throughout the Class Period.

64.     Further, as described in the Information Memoranda, the Rating Agencies had an ongoing involvement in the transaction and were an integral part of the monitoring of Cheyne SIV's covenants and covenant breaches.  The Rating Agencies' approval was required for a determination of "legal maturity date."  They were to be involved in determining any "cure period."  A "cure

- 24 -

period" in structured finance is the period in which issuers raise additional collateral following non-payment of a material financial obligation or otherwise act to cure the failure of a particular test. The Rating Agencies were involved in approving substitutions and changes to the portfolio. They were involved in many meetings held by investors and retained approval rights of modifications made by investors. They received monthly asset reports, placed restrictions on the portfolio and monitored the portfolio over time.

65. In sum, without the "top ratings" for the Senior Notes and the "investment grade" ratings for the Capital Notes, the Cheyne SIV would not have existed in the first place and could not have operated on an ongoing basis. Indeed, once the Rating Agencies' conflicts of interest and models based on flawed or nonexistent data and unreasonable model assumptions started to become apparent in late 2007, the Rating Agencies were forced to drop their ratings and the SIV's structure began to unravel. The ratings declines cut off the Cheyne SIV's funding, and thus marked the end of the SIV and revealed it was nothing more than a shell containing impaired assets ready for a distressed auction at deep discounts.

66. Whatever their historical roles, the Rating Agencies were deeply entrenched in the creation and operation of the Cheyne SIV. They did not merely provide an "opinion." A Group Managing Director of Moody's confirmed that Moody's did in fact provide structuring services for structured finance entities, such as the Cheyne SIV. *The Wall Street Journal* reported the following acknowledgement in an article dated June 7, 2008:

> [A Group Managing Director] acknowledges that accepting the subprime mortgage ratings at face value didn't work out as planned. "***We have to create additional robustness in the structures to account for the volatility***" in the underlying mortgage securities, she says. "***We didn't necessarily do enough of that***."

606978_1

**B.      The Rating Agencies Were Highly Compensated for Their Services**

67.      The Information Memoranda stated there were U.S. $15 million in "upfront costs" (paid out of the proceeds of the Rated Notes' investment) to be shared among a number of parties. On information and belief, the Rating Agencies were paid fees in the range of 10 or more basis points at the "launch" of the SIV.  Assuming an approximate $3 billion launch value, the Rating Agencies would have been paid $6 million.

68.      The Rating Agencies were also paid ongoing fees following the launch.  They shared annual remuneration with several other parties of approximately $1,200,000 and 0.055% of the market value of the collateral assets.

69.      As discussed below, investors were unaware that the Rating Agencies were paid ***only if*** they provided the desired ratings and ***only in the event*** that the transaction closed with those ratings.  More importantly, investors were unaware of the manner in which such conflicts affected the ratings process.

**VI.      FACTUAL ALLEGATIONS WITH PARTICULARITY CONCERNING THE FALSE AND MISLEADING RATINGS**

70.      Defendants repeatedly communicated, or authorized the communication of, materially false and misleading information regarding the Rated Notes and the Cheyne SIV to plaintiffs and all members of the Class.  Specifically, defendants communicated to Rated Notes investors that:

(a)      the Senior Notes were rated A-1+/P-1 and AAA/Aaa for the CP and MTN, respectively, the Capital Notes were rated A/A3, and the Cheyne SIV, as an entity, was rated "Triple A," all of which was understood by investors to represent that,

(i)      the Rated Notes were nearly "risk free";

(ii)      the Rated Notes were as safe, secure and reliable as high quality corporate or government bonds;

- 26 -

   (iii) the Rated Notes had a very low probability of default;

   (iv) the Rated Notes had a reasonably high likelihood of recovery in the event of default;

   (v) there was a relatively low level of correlation among defaults in the Cheyne SIV investment portfolio;

   (vi) the Rated Notes and the Cheyne SIV had been rated by an objective, independent third-party whose impartiality was not impaired by any significant conflicts of interest, such as the payment of triple-sized fees for the provision of their rating services and the payment of ongoing fees in proportion to the amount of capital raised by the notes being issued;

   (vii) the Rated Notes and the Cheyne SIV had been rated on the basis of current, accurate and complete data and analysis, as well as reasonable and true models and assumptions, not mere "guess work" and speculation; and

   (viii) the high credit ratings assigned to the Rated Notes and the Cheyne SIV were based, in part, on the existence and implementation of legitimate and reliable procedures to monitor, on an ongoing basis, the selection of the SIV's assets, the quality, value and diversification of its portfolio and the soundness of its capital structure;

   (b) the low rates of return offered by the Rated Notes were appropriate and reflective of the true level of risk associated with the Notes; and

   (c) the high credit ratings assigned to the Rated Notes and the Cheyne SIV were being monitored on an ongoing basis throughout the Class Period and would be modified by defendants as necessary in order to reflect the true amount of credit risk associated with the Rated Notes.

- 27 -

71.     The foregoing information was disseminated by defendants to the plaintiffs and the plaintiff Class on each day throughout the Class Period by various private information services.

## VII.   DEFENDANTS' CONTRACTUAL OBLIGATIONS

72.     Defendants contracted with members of the Class and/or other defendants in connection with the operation of the Cheyne SIV and the issuance of the Rated Notes.  The terms of the agreements entered into by defendants required defendants to perform specific duties and satisfy specific obligations.  Specifically, these contracts provided that:

(a)     the Rated Notes would be supported by highly-rated eligible investments, subject to approval and ratings by the Rating Agencies;

(b)     the Rated Notes would be subjected to daily investment portfolio parameter tests, which would include, under certain circumstances, consultation, approval, agreement, and monitoring by the Rating Agencies;

(c)     the Rated Notes would be subjected to daily market sensitivity and liquidity tests, which would include, under certain circumstances, consultation, approval, agreement, and monitoring by the Rating Agencies;

(d)     the Rated Notes would be subjected to daily capital tests, which would include, under certain circumstances, consultation, approval, agreement, and monitoring by the Rating Agencies;

(e)     the characteristics of the various tests applicable to the Rated Notes would be agreed upon with the Rating Agencies from time to time;

(f)     the amount of RMBS supporting the Cheyne SIV would not exceed 55%;

(g)     the Rated Notes would be supported by at least 40% "AAA" – and at least 60% "AA" – collateral assets;

- 28 -

(h)      the Cheyne SIV would only acquire assets with an investment grade rating of A-/A3 or higher;

(i)      the Rated Notes were protected by the fact that the Cheyne SIV would be well diversified, with a maximum 4% exposure to a single AAA obligor; a maximum of 2% exposure to a single AA obligor; and no more than 0.5% exposure to any single A obligor; and

(j)      the Cheyne SIV had a sound mechanism in place to calculate and accurately record the market value of the collateral assets backing the Rated Notes' investment capital, which would be used "daily" throughout the Class Period.

73.      The terms of these agreements are set forth in various documents, some of which have not yet been provided to plaintiffs.  Specifically, these documents include, but are not limited to:

(a)      preliminary and final Information Memoranda (provided by Morgan Stanley and, on information and belief, with the knowledge, participation and approval of the Rating Agencies and BoNY), which were distributed to Rated Notes investors throughout the Class Period, including, but not limited to, on August 2005, October 2006 and April 2007;

(b)      numerous Pricing Supplements (provided by Morgan Stanley and, on information and belief, with the knowledge, participation and approval of the Rating Agencies and BoNY), which were issued in conjunction with purchases throughout the Class Period;

(c)      a May 2005 "pre-sale" report issued by S&P (report provided by Morgan Stanley to investors and, on information and belief, with S&P's approval);

(d)      documents associated with the continuous "rolling" of Senior Notes throughout the Class Period (provided by Morgan Stanley and the Rating Agencies);

(e)      monthly investor reports concerning Rating Agency-approved models and "ongoing" monitoring, which were distributed to Rated Notes holders throughout the Class Period;

(f)      a July 23, 2007 report by Moody's, which reported that SIVs were "an oasis of calm in the subprime maelstrom"; and

(g)      on information and belief, written agreements among and between the various defendants, to which plaintiffs were not a party, but which were intended for the direct benefit of the plaintiff Class.

74.      Upon information and belief, defendants made substantially similar representations to all members of the plaintiff Class throughout the Class Period.  The Rated Notes were not publicly offered, but it was defendants' practice to provide substantially similar sales materials each time they endeavored to sell additional Notes, repeating substantially identical information to each Class member.

75.      The documents described above are referred to as the "Selling Documents."

## VIII.   THE REASONS WHY DEFENDANTS KNEW THE STATEMENTS AND OMISSIONS WERE MATERIALLY MISLEADING

76.      The statements set forth above were false and misleading and failed to include material information when made and throughout the Class Period, as described below.

77.      The false and misleading ratings communicated to plaintiffs and all members of the plaintiff Class that the Rated Notes represented a stable, low-risk, safe and secure investment.  At a base minimum, the ratings did not reflect the objective reality of the risks associated with the Notes.

### A.      Defendants Knew the Cheyne SIV Bond Ratings Differed from Ratings of Corporate Bonds

78.      In August 2004, Moody's unveiled a new credit-rating model.  The formula allowed securities firms to sell more top-rated, nonprime mortgage-backed bonds than ever before.  A week

later, S&P moved to ease its credit-rating methods because of the threat of losing deals to Moody's. The easing of the Rating Agencies' standards opened the floodgates for creating SIVs backed by nonprime securities like the Cheyne SIV. Before the relaxation of ratings standards, deals such as the Cheyne SIV could not have been written.

79.     With respect to credit ratings, defendants never disclosed to investors the SIV ratings were materially different from other ratings, including corporate bond ratings. In fact, the Rating Agencies represented that the Rated Notes had the same default probability and loss severity (should default occur) as corporate bonds with the same ratings. The SIV ratings differ from corporate bond ratings in several important ways, and defendants were aware of these crucial differences, none of which were disclosed to plaintiffs and the class members.

80.     For example, because SIVs involve numerous assets, the Rating Agencies do not use only estimates of expected loss and/or probability of default in determining SIV credit ratings as they do with corporate bonds. Instead, the agencies also employ one or more sophisticated mathematical credit risk models based on random event simulations to assess the estimated loss distributions associated with those numerous assets. These models require the rating agencies to make many estimates and assumptions regarding each of the various assets, including the degree to which losses on these assets would be correlated with each other. Upon information and belief, the defendants other than the Rating Agencies also were aware of these models, had access to these models or similar models, and also used different models to generate their own proprietary estimates of credit risk. None of these models would have been necessary for evaluating corporate bond ratings.

81.     In order to provide ratings for the Rated Notes, which were to be backed by numerous underlying assets, the Rating Agencies made assumptions about how frequently those assets would default together, or in tandem. The apparent safety of the Rated Notes depended significantly on the

- 31 -

degree of "correlation" among the defaults on the underlying assets. The high ratings of the Rated Notes reflected the assumption by the Rating Agencies about the correlation of these defaults. A lower correlation assumption reflected greater safety for the Rated Notes, because, if the correlation of defaults is low, it is less likely that a large number of the underlying assets will default at the same time. By making unreasonably low correlation assumptions, the Rating Agencies were able to conclude that the Rated Notes deserved high ratings. These correlation assumptions were unreasonable and false, and were not based on relevant data. Unlike the correlation assumptions the Rating Agencies use for rating other instruments, such as corporate bonds, the correlation assumptions used for the Cheyne SIV were mere speculation. They were not based on actual default experience, data, or studies. Moreover, the limitations and assumptions regarding correlation were not disclosed to investors. Had defendants made reasonable and true assumptions about correlation, or had they disclosed the truth about their correlation assumptions to investors, the Rated Notes would have received lower ratings, and the Cheyne SIV would not have been structured or sold.

82. In addition to fabricating the correlation assumptions for rating the SIV, defendants compounded the problem by failing to incorporate the true facts concerning the underlying assets of the SIV as they became known throughout the Class Period. As explained herein, defendants knew that the SIV's assets were deteriorating such that the SIV did not deserve its top "Triple A" rating. Rather than incorporating this information into their models and appropriately downgrading both the Cheyne SIV and the Rated Notes, defendants did nothing until mere weeks before the SIV's total implosion. Only then did investors know of any problems with the SIV and by then it was much too late.

83. Further, as defendants well knew, the "top ratings" assigned to the Senior Notes, as well as the "investment grade" ratings assigned to the Capital Notes, were not reflective of the actual

risks associated with the securities included in the SIV's investment portfolio.  Despite defendants'

attestations that the portfolio would consist of no more than 55% RMBS, the actual portfolio was

made up of much more than 55% RMBS, most of which were nonprime mortgages.  The defendants

concealed the lending practices that had been used to generate the underlying mortgages, including

stated income loans where the stated income was unreasonably high as compared to the stated job

title.  These were referred to in the industry as "liar loans."  The nonprime RMBS also included

mortgages based on artificially inflated appraisals and loans to nonprime borrowers with "silent

seconds," where the down payment was in reality another loan.  These lending improprieties

dramatically increased the probability of delinquencies, defaults, foreclosures and, ultimately, losses.

The credit ratings on the RMBS were consequently not indicative of the riskiness of these securities,

and the ratings on the Rated Notes were similarly misleading.  When the real risks were exposed, the

Cheyne SIV lost its funding ability and collapsed.

> **B.** **Defendants Knew the Cheyne SIV Acquired Extremely Risky (Not "High Grade" or "A") Assets**

84.    As defendants well knew, the Cheyne SIV's investment portfolio included many

securities derived from mortgages issued under extremely dubious circumstances.  Whether the

mortgage loans were categorized as to "prime" or "nonprime" borrowers, many of the mortgages

were granted in amounts not justified by the borrowers' income.  Many borrowers were qualified

under stated income applications (usually reserved for self-employed individuals who could not

provide Form W-2s) even though such borrowers were wage earners.  Many borrowers qualified

under pay-option adjustable rate mortgages ("ARMs") which would, after the initial teaser period,

adjust to such high payment amounts that it would be impossible for the borrowers to make the

payments.  The SIV's assets undermined its high credit ratings.

1.     **Representative Loans Included in the Cheyne SIV**

85.   For example, the following are characteristics of certain securities that were eventually placed in the investment portfolio:

- A $9.2 million investment ARS1 2006-M1 originally rated AA+ and Aa1 by S&P and Moody's, respectively, the securities have since been downgraded to BB and Ba3. The loan portfolio underlying ARS1 2006-M1 has an astounding 40.78% of its mortgages in the 60+ day category (which includes loans 60 days delinquent) those in foreclosure or those in Real Estate Owned ("REO"). Even though the ARS1 2006-M1 is a 2006 deal, some 17.16% of the loans are already in REO, with an additional 16.73% in foreclosure. This is not entirely unpredictable given that 81% of the loans in the portfolio were originated by Argent Mortgage Company, LLC ("Argent"), a lender with a poor reputation in the industry. Argent, referred to by *The New York Times* as a "troubled subprime mortgage" entity, had been granting stated income loans at relatively high loan-to-value ratios. Argent had been accused by state regulators of failing to monitor new brokers and correspondents and failing to perform due diligence of brokers and correspondents, including reconciling adverse information found in database searches during the broker approval process. Argent had agreed to a cease-and-desist order in Georgia which required it to implement "Common Sense Underwriting" procedures to ensure that terms and conditions of loan programs match the status of the borrowers (*e.g.*, a salaried, large firm employee should apply for a full document program rather than a stated income loan).

- An $11.1 million investment in ARS1 2006-W2, of which 100% of the underlying mortgage loans were originated by Argent. Given the poor underwriting, it is not surprising that 45.76% of the loans fall into the 60+ day category with 21.02% in foreclosure.

- A $7.3 million investment in CMLTI 2007-AHL3, which were 100% originated by American Home Mortgage Corp. ("AHM"). Even though this security was created as recently as 2007, already 10.96% of its loans are in foreclosure and 3.36% are in REO. In order to post desired loan production, AHM was as a matter of course granting exceptions even where compensating factors did not exist. AHM's business was dependent on continually increasing volume. Thus, it became even more aggressive in early 2007 when AHM made $16.7 billion in mortgage loans. A third of its mortgages were pay-option ARMs, which allowed borrowers to make payments which were less ***than the interest amount accruing on the loan***, resulting in the difference being added to the principal balance each month. AHM granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own

- 34 -

balance sheet.  In fact, AHM went bankrupt in August 2007, after loan volumes dropped.

- A $6.5 million investment in CARR 2005-NC3, which has 31.13% of its portfolio in the 60+ day category.  These loans were 100% originated by New Century Mortgage Corporation ("New Century"), which has since failed due to its improper lending practices.

- A $7.4 million investment in FFMER 2007-3, another 2007 deal which already has 12.44% of its loans in foreclosure.  These loans were all originated by First Franklin, a subprime lender.

- An $11.5 million investment in FHLT 2006-C, which has 17.19% of its mortgage loans in foreclosure.  This poor performance was not unexpected given the loans were all originated by Fremont Investment & Loan ("Fremont").  Fremont, which acquired as much as 90% of its mortgages through brokers, did not perform the quality control procedures as represented.  In fact, its brokers had the reputation among other mortgage brokers of doing any deal.  In October 2007, Fremont was sued by Morgan Stanley due to misrepresentations about borrowers' assets, income, employment and occupancy.  Fremont was accused of not meeting its own underwriting guidelines, including rent verification, credit history information and credit scores.  The loans in question in the *Morgan Stanley* suit were purchased from August 30, 2005 to December 28, 2006.  In March 2007, Fremont ceased offering subprime loans and was forced to clean up its underwriting by a cease-and-desist order by federal regulators.  Staff inside Fremont had a nickname for no-down-payment loans for subprime borrowers: "pulse products," meaning that if a borrower had a pulse he or she could qualify for one of Fremont's products.

- A $9.8 million investment in LBMLT 2006-2, which was originally rated Aa2 by Moody's but has subsequently been downgraded to B3-.  Indicative of the poor quality of the mortgages, some 49.95% of the loans are now in the 60+ day category with 17.05% in REO.  A $9.5 million investment in LBMLT 2006-4 has had similar performance.

- A $24.2 million investment in AHM 2006-a, comprised of purportedly "prime" borrowers, has 15.73% in the 60+ day category due to AHM's aggressive lending practices.

- A $46.3 million investment in BCAP 2007-AA1, which was serviced by Countrywide Mortgage and IndyMac Bank, two lenders known for their aggressive practices.  Unsurprisingly, some 14.32% of these loans are in the 60+ day category even though the loans were purportedly made to prime borrowers and are of recent vintage.  IndyMac Bank has since failed due to its improper lending practices.  In the fall of 2008, Bank of America paid $4

- 35 -

billion in stock, rescuing Countrywide Financial from bankruptcy due to its lending practices.

86.     The foregoing loans are representative of nonprime mortgage loans originated during the Class Period and acquired by the Cheyne SIV.  By mid-2005, when the Cheyne SIV was launched, just five U.S. originators controlled approximately 40% of the U.S. nonprime market, including New Century.  As discussed below, the Cheyne SIV acquired New Century loans.  This industry concentration undermined the advertised diversification requirement of the Cheyne SIV.

87.     By including low quality assets in the SIV, defendants breached their agreement that all assets would be subject to strict due diligence and monitoring processes.  One reason why proper asset selection (which can be derived only from a proper investigation into the qualities of those assets) was a prerequisite to the creation of the SIV is because the success of the Cheyne SIV depended on that process.  For reasons set forth above and below, defendants breached their contractual obligations to plaintiffs and knew representations made to investors as to the ratings were false and remained false throughout the Class Period.

### 2.     New Century: Representative Loans and Practices of U.S. Mortgage Originators

88.     Throughout 2005 and 2006, New Century was forced to buy back an increasing volume of its loans because those loans were in breach of the representations and warranties New Century made to buyers in securitization transactions.  The quality of New Century's loans started to deteriorate substantially – relative to its *own* historical "nonprime" lending patterns and origination standards – in 2005, and throughout 2006 and into 2007.  New Century loans acquired by the Cheyne SIV were originated during this time period.  None of the nonprime RMBS acquired by the Cheyne SIV were "high grade" or "investment grade" or any grade other than "extremely low grade."

- 36 -

89.     New Century declared bankruptcy on April 2, 2007.  Morgan Stanley knew that New Century was about to go bankrupt because it participated in a March 6, 2007 conference call with New Century senior management shortly before the company collapsed.  This information was reported by *The Wall Street Journal* on March 29, 2007:

- "In February, New Century mortgages that had been worth $8 billion fell by more than $300 million within days, someone familiar with the matter says."

- "New Century was running out of options.  It was unable to get new financing and in violation of its existing lending agreements, in part because it was low on cash.  So the company convened the ***March 6 conference call with its 11 lenders***."

- "The bankers listened without indicating whether they'd help.  In private meetings after hanging up, some expressed shock at New Century's precarious state, given its depleted cash supply.  'That told us the situation was more dire than we thought,' says a banker on the call."

- "***That night, Citigroup moved forward with a decision to declare New Century in default.  Others followed.  The next day, Mr. Einhorn resigned from New Century's board.  Though Morgan Stanley agreed to a $265 million loan, it demanded as collateral a loan portfolio worth even more, and reversed course a few days later and cut off additional financing***."

Morgan Stanley was New Century's fourth largest creditor.  It seized nearly $2.5 billion in loans and conducted a fire sale of those loans on or about March 26, 2007.

90.     Defendants never alerted Rated Notes investors to the fact New Century and other low-quality loans were included in the Cheyne SIV portfolio.  Instead, Rated Notes investors continued to believe defendants' false and misleading ratings and that defendants would perform under their contracts: (i) to monitor the market value of the Cheyne SIV portfolio on a daily basis; (ii) to take action and inform the Rated Notes investors of any problems with the Cheyne SIV or its assets; (iii) to confirm on at least a monthly basis the "investment grade" ratings continued to roll uninterrupted; and (iv) that the Rating Agencies "top ratings" on the Senior Notes (again, reflecting

- 37 -

the purportedly high-quality assets in the Cheyne SIV) as well as the "investment grade" rating of Capital Notes were accurate.

91.     The extent of Morgan Stanley's knowledge of the real risks associated with the RMBS nonprime mortgage market are further evidenced by the information that surfaced following New Century's bankruptcy.  The U.S. Bankruptcy Court of the District of Delaware presiding over the New Century case appointed an examiner (the "Examiner") to work with governmental agencies to investigate New Century's accounting practices, among other things.  The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting.  The Examiner provided a final report to the Bankruptcy Court dated February 29, 2008 (the "New Century Bankruptcy Report").

92.     The New Century Bankruptcy Report concluded that the "increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007."  The Examiner made numerous findings that are directly applicable to the New Century loans included by defendants in the Cheyne SIV.

93.     These facts were known to defendants because both Morgan Stanley and the Rating Agencies were active participants in the mortgage credit market.  Morgan Stanley clearly communicated with New Century management.  Despite its knowledge of New Century's risky loan originations practices, Morgan Stanley never notified investors of the potential deterioration in asset credit quality or any negative trends across the Cheyne SIV portfolio.  Indicators of this deterioration included loan delinquencies, loan kickouts in new transactions and early payment defaults in existing RMBS transactions.

94.     "Kickouts" and "early payment defaults" ("EPDs") are important loan quality metrics. Kickouts occur in the context of bulk or "whole loan" sales by New Century to bulk buyers

of its loans such as Morgan Stanley who, in turn, sell those loans to investors via securitization transactions. New Century sold the vast majority of the loans it originated. It sold nearly all of those loans (except for four direct securitizations in 2005) in whole loan transactions. Before acquiring loans in such bulk sales transactions, buyers are afforded the opportunity to conduct due diligence on the subject loan pool. At that time, buyers can refuse to acquire certain loans from that particular pool. Those rejected loans are so-called "kickouts." Bulk buyers explain to originators the reasons why such loans are being rejected, such as deviation from the originator's stated underwriting standards, defective home appraisals, or missing documentation.

95.    The Examiner made the following finding with respect to the reasons why New Century's loans were often rejected in kickouts:

> As noted, investors primarily kicked out loans due to defects in the loan origination processes, such as defective appraisals, unacceptable exceptions made to underwriting guidelines and missing documentation, each of which was an indication of the quality of the loans that were originated, since most loans rejected by purchasers reflected deviations by New Century from its loan origination processes.

96.    New Century experienced serious deterioration in loan quality from 2005 through early 2007. Defendants were aware of these facts. They did not disclose such facts to the Cheyne SIV investors.

97.    For example, with respect to New Century loans originated in 2005, the Examiner found that EPDs increased steadily from 6.58% in April 2005 to 9.24% in December of 2005. Similarly, "kickouts" from whole loan sales steadily increased from 5.64% in January of 2005 to 8.77% in December of 2005, which amounted to nearly $2.3 ***billion*** in loans. Importantly, among the top reasons given for kicking out loans were: property value, documentation, compliance and excessive debt-to-income issues. Approximately $280 million of loans were kicked out "due to loan files that were missing required documentation – loans that never should have been funded until the

files were complete."  As discussed below, Morgan Stanley was a New Century whole-loan buyer and therefore had first-hand knowledge of its deteriorating loan quality.

98.  From an already deteriorated loan quality condition in 2005, the Examiner made the following findings concerning New Century's loans in 2006 and 2007:

> ***New Century's loan quality trends worsened dramatically in 2006 and early 2007***.  The most important metrics by which New Century tracked loan quality, EPD and kickouts, showed large increases throughout the year.  Further, in March and September 2006, it became clear that loans originated by New Century in 2005 and early-2006 had ***significantly greater delinquency rates*** than similar loans originated by New Century in 2003 and 2004 . . . .

99.  The Examiner found that the same problems causing loan quality to deteriorate in 2005, such as defective property appraisals and missing documentation, continued throughout 2006. EPDs continued to increase, rising from 8.37% in January of 2006 to 16.82% in December of 2006. Kickout percentages increased from 6.92% in January of 2006 to 14.95% in December of 2006. "The same sorts of problems were identified as the chief causes of the kickouts, again indicating that loan quality was inadequate and that the recurring problems in the loan origination processes had not yet been fixed."  In 2006, there were a total of over $5.2 ***billion*** in kickouts (almost double 2005's already alarming $2.3 billion amount) and $693 million were due to the risk of missing documentation (more than double 2005's $280 million worth of missing documents).

100.  Consistent with the Examiner's findings, New Century loans included in the Cheyne SIV had atrocious – and undisclosed – performance characteristics ***at the time they were included in the Cheyne SIV***.  The Cheyne SIV included loans pools with alarming delinquency statistics by any measure.  As a point of comparison, for all of New Century's 2005 loans, it reported that 2.42% of those loans fell within its "60+" (or nearly three months late in payment) loan delinquency category as of the end of 2005.  New Century loans included in the Cheyne SIV had delinquency statistics that

were more than double that amount by the beginning of 2006, and nearly ten times that figure by early 2007.

101.    The Rating Agencies received extensive statistical information on the loan pools supporting the assets sold to investors via the Cheyne SIV.  They obtained this information as a matter of contractual right with respect to the billions of dollars in RMBS they rated and as a consequence of the weekly reports on the Cheyne SIV portfolio they received from BoNY.  BoNY was obligated to review this information.

102.    Morgan Stanley also had direct, inside knowledge of the kickout, EPD and credit quality deterioration characterizing New Century's loans during the relevant time.  Morgan Stanley had a longstanding relationship with New Century and regularly purchased large pools of mortgages from New Century in whole loan transactions and provided large loans or "warehouse" financing to New Century.  In 2005 alone, Morgan Stanley bought $5.8 billion in loans originated by New Century.  In 2004, Morgan Stanley bought $14.1 billion of New Century's loans.  In addition to Morgan Stanley's whole loan acquisitions, it underwrote over $10 billion in New Century securities from 1998 through 2006.  Further, Morgan Stanley provided billions of dollars in "warehouse" financing to New Century.  Those loans were backed by New Century's mortgages.  Prior to the end of the Class Period, Morgan Stanley conducted a fire sale of $2.5 billion of such mortgages.

103.    On information and belief, Morgan Stanley also received due diligence reports from an external firm, Clayton Holdings Inc. ("Clayton"), when it acquired loans from New Century and other lenders whose mortgages were backing the Cheyne SIV.  This belief is based on the fact that Morgan Stanley was one of Clayton's largest clients in 2005 and 2006.  In the first nine months of 2007, nearly 20% of Clayton's total revenue came from Morgan Stanley and Lehman Brothers.

- 41 -

104.    Defendants failed to inform investors that Clayton was generating due diligence reports for Morgan Stanley detailing the number of "exceptions" to the already materially misleading underwriting standards disclosed in the Information Memoranda.  A recent investigation by *The New York Times* has revealed the following information, reported on January 27, 2008:

- "Clayton Holdings, a company based in Connecticut that vetted home loans for many investment banks, has agreed to provide important documents and the testimony of its officials to the New York attorney general, Andrew M. Cuomo, ***in exchange for immunity from civil and criminal prosecution in the state***."

- Clayton conducted due diligence investigations on certain mortgage loan portfolios, creating statistical information that "***Clayton promised . . . it would provide as evidence***."

- A principal for Clayton stated: "'This information that we provided to the attorney general is ***the same information that we provided to our clients***.'"

- "As part of the [immunity] deal, ***Clayton has told the prosecutors that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions***.  In an another sign that the industry was becoming less careful, ***some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio***, a person familiar with the investigation said."

105.    *The New York Times* further reported: "It is unclear how many lending exceptions are contained in the $1 trillion subprime mortgage market, ***but industry participants cite figures ranging from about 50 percent to 80 percent for some loan portfolios they examined***."

106.    A January 27, 2008 *Reuters* report corroborates the fact that Clayton's due diligence findings were not disclosed and were ignored by investment banks such as Morgan Stanley.  The report quotes the president of Clayton as saying: "'In some cases we felt that we were potted plants.'"  Defendants failed to disclose such material lapses in quality control over the mortgage loan pools and failed to disclose the processes actually followed to originate, acquire and package the mortgage loans for sale to the investors.

- 42 -

107.    Defendants failed to disclose: (i) the percentage, if any, of the loans backing the Cheyne SIV that were actually reviewed for compliance with laws and the representations and warranties for the applicable loan pools; (ii) the percentage of "exception loans" discovered throughout any due diligence process conducted by any entity (whether independent or conflicted); and (iii) how the percentage of "exception loans" varied over time with respect to particular originators and with respect to the mortgage pools created and sold by Morgan Stanley.

108.    BoNY failed to disclose to investors in the Cheyne SIV material facts regarding their conflicts of interest and relationships with the various defendants.  For example, QSR and the Rating Agencies had an ongoing relationship that included structuring and establishing new finance vehicles.  QSR offered assistance to a range of clients in structuring and rating agency negotiation. QSR had extensive experience in structured vehicles and the complex process of structuring and establishing new vehicles, including coordination with the Rating Agencies.

109.    Given the due diligence processes reported by the Examiner in the New Century Bankruptcy, Morgan Stanley's acquisition of billions of dollars of mortgages from New Century, and the due diligence services provided to Morgan Stanley by Clayton, Morgan Stanley clearly reviewed non-public information concerning the deteriorating credit quality of loans originated by New Century and other lenders underlying the Cheyne SIV.  Morgan Stanley failed to provide such material information to the Cheyne SIV investors.

110.    Moreover, the Rating Agencies had access to non-public information about the collateral underlying the SIV from their involvement in rating the originators of the mortgages purchased by the SIV.  Because the Rating Agencies are exempt from SEC Regulation FD (Fair Disclosure), they have access to such non-public information.

- 43 -

111.    If any defendant had disclosed the material non-public information in their possession, the Cheyne SIV would not have received its high ratings from S&P and Moody's and the Notes would not have been issued.  Indeed, without their ratings, the securities supporting the Cheyne SIV would not have even been *eligible* for issuance on a "shelf takedown" basis under the SEC rules.  The reason the SEC permits securities such as the RMBS backing the Cheyne SIV to be issued on Form S-3 – which involves far less oversight by the SEC than in a typical registration – is because of the very low risk such securities represent to the investment community as a result of the high-quality, low risk nature of securities that receive "investment grade" ratings.

112.    Throughout the Class Period, the holders of the Rated Notes could have exercised contractual rights to force the Cheyne SIV to buy only the "investment grade" assets they promised to acquire.  In the event the Cheyne SIV refused to do so, they could have sold their Capital Notes or insured them to preserve at least *some* value.

### C.    The Ratings Were Devoid of Any Meaningful Factual or Statistical Basis, as Defendants Knew

113.    Defendants repeatedly stated that the Rated Notes were "top rated" or "investment grade," that the assets supporting their investment were "investment grade," and that the entire Cheyne SIV was "investment grade."  Investors believed in the integrity of the ratings; that Rated Notes warranted only a small rate of return.  Defendants never disclosed that the correlation assumptions – vital to rating the SIV and the assets contained therein – were untested and were not backed by any relevant data.  Accordingly, the credit ratings produced for the SIV, based on the flawed correlation assumptions, were false and misleading.  Defendants never disclosed this material information to investors.

114.    For example, defendants used models and assumptions based on historical information preceding 2000 that was previously used to rate corporate bonds but that had no

- 44 -

relevance to rating the Cheyne SIV. This information did not reflect the true state of the mortgage market during the Class Period because from the period 2001-2005, (i) the percentage of "subprime" mortgage loans tripled; (ii) the combined LTV (or loan-to-value) ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" adjustable rate mortgages quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Capital Notes – experienced over a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.

115.    The exotic mortgage products characterizing the U.S. marketplace in 2005 performed poorly, and defendants knew it. Each month the Rating Agencies received performance data on billions of dollars in U.S. loans. Under the contractual terms of the many RMBS they rate, the Rating Agencies are provided such monthly performance data, including delinquency information. Thus, by the time the Rating Agencies provided "top ratings" on the Senior Notes and "investment grade" certifications to the Capital Notes in August 2005, they knew that their historical data no longer reflected market realities and that mortgage credit quality was rapidly deteriorating. This deterioration continued throughout the Class Period, as the Rating Agencies knew but failed to disclose until much too late.

116.    Despite the fact that the decrease in lending standards and increase in exotic mortgage products rendered Moody's and S&P's pre-2000 loan performance data obsolete and irrelevant to rating the SIV, and the fact that more current and accurate information was available during the Class Period, the rating agencies did not update their models to reflect these changes. According to

- 45 -

Frank Raiter – the Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000.  These models better captured the changes in the post-2000 mortgage landscape and were therefore better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest ratings market share amongst the three major rating agencies).  As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new subprime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  The current President of S&P, Deven Sharma, agreed, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . .  [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

117.    The use of outmoded models and inaccurate information was not limited to S&P.  In fact, Moody's did not update its key assumptions for rating structured finance Collateral Debt Obligations until December of 2008 – when, among other changes, Moody's increased the average assumed asset correlations by "a factor of roughly two to three times the previous levels."  Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the decrease in lending standards.  In a confidential presentation to Moody's Board of Directors, Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's

Mortgage Model (M3) needs investment." McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "'We should have done a better job monitoring that [decrease in underwriting standards].'"

118.    None of this information was disclosed to the Rated Notes investors. At the time of the issuance of the Rated Notes, and throughout the Class Period, the Rating Agencies and the other defendants knew that the Cheyne SIV was buying into one of the riskiest mortgage markets in U.S. history. Yet defendants said nothing about the dramatic changes in the U.S. mortgage market.

119.    The Information Memoranda stated that the S&P rating addressed "the ability of [the Cheyne SIV] to make ultimate payment of principal and interest." The Moody's rating addressed "the credit risk factors associated with" the Rated Notes. The Information Memoranda disclosed generic risks associated with most investments and concluded that the "risks are subject to monitoring and control pursuant to the funding and investment criteria agreed [to] with the Rating Agencies." The Information Memoranda also disclosed that "there may be other criteria agreed [to] with the Rating Agencies that are not disclosed."

120.    However, defendants concealed that they worked together in developing the structure of the note classes in the Cheyne SIV to ensure that the SIV received its top rating. Defendants failed to disclose that the correlation assumptions were false and were not based on research, statistical analysis, or relevant data. On the basis of the faulty correlation assumptions, the Notes received high investment grade ratings from both S&P and Moody's. Because Moody's and S&P consulted with Morgan Stanley on the structure of the Rated Notes program, they obtained information not available to investors regarding the collateral underlying the Notes. The Rating

- 47 -

Agencies assisted Morgan Stanley in coordinating the structure and collateral underlying the Rated Notes so that the Rating Agencies could then give investment grade ratings. By colluding with Morgan Stanley to develop the structure of the Cheyne SIV, the Rating Agencies introduced inherent conflicts into their services and completely compromised the required, and advertised, objectivity in rating the Notes. Then, in willful, reckless or negligent disregard for the true risks associated with the Notes, the Rating Agencies falsely issued their highest ratings for the Senior Notes and investment grade ratings for the Capital Notes, which made it possible for the SIV to sell the Rated Notes to investors. In fact, the Rating Agencies ignored their own internal policies, which prevented them from issuing ratings in situations where there was insufficient data to make reasonable assumptions.

      **D.**      **Due to Conflicts of Interest and the Easing of Credit Rating Criteria, the Process Used to Derive Ratings Was Deeply Flawed, as Defendants Knew**

121.    As noted, it was a condition precedent to the issuance of the Rated Notes that they receive the highest ratings for the Senior Notes and "investment grade" ratings for the Capital Notes. Defendants failed to disclose to the Rated Notes investors that the Rating Agencies would be compensated only if they provided such ratings. Investors placed their trust in the credit ratings largely because they were supposed to be independent and unbiased agencies. None of the Cheyne SIV investors knew the integrity of the ratings had been compromised. If they had, they would not have bought the securities.

122.    Serious conflicts of interest at the Rating Agencies have been revealed recently. Such conflicts undermined the credibility of the ratings at the time they were issued. One former Moody's employee testified on April 22, 2008, to the Senate Banking, Housing and Urban Affairs Committee, that "[t]here is a far more serious conflict of interest than is commonly believed at the root of the

current rating agency business model."  This same witness went on to say that "one could make the case that whenever a rating analyst is supervised by a manager whose compensation is determined by market share or revenue growth (rather than ratings accuracy) the objectivity of ratings is compromised."

123.    As reported on April 11, 2008, in *The Wall Street Journal*, a former Moody's analyst further stated that while there was no explicit directive to abandon ratings objectivity to earn business from investment banks, such as defendant Morgan Stanley, there was "'a palpable erosion of institutional support for rating analysis that threatened market share.'"

124.    It was reported in the same article that "Moody's agreed to switch analysts on deals after bankers complained."  The Chief Executive Officer of Moody's recently confirmed that they were in fact pressured to provide strong ratings: "Everybody always seeks to pressure us.  Anyone with a position in the credit markets will hope that the credit-rating agencies agree with its opinion. It's a conflict of interest question."

125.    United States Congressional Representative Gary Ackerman made the following additional statements on September 5, 2007, to the Committee on House Financial Services regarding the rating agency conflicts:

> Originators then took these [mortgage] loans – many of which should have been assessed as much riskier than they were – and packaged them into securities to sell to investors.  ***If there had been full disclosure, smart and careful investors would have judged that these mortgage backed bonds carried a disproportionately high level of risk***.
>
> *       *       *
>
> ***The credit-rating firms were double-dipping; profiting first from helping to put these shady securities together, and then collecting fees for deliberately rating these risky products at a higher value than they were worth***.  It's like hiring a judge to advise you as to how to commit an act and then paying him to decide whether you have committed a crime.

- 49 -

126.     The former Chairman of the SEC, Arthur Levitt, Jr., made the remarks quoted below on November 27, 2007, in Ontario, at a forum for securities regulators and market participants to discuss important capital markets issues.  Mr. Levitt's remarks were entitled "Strengthening the Gatekeepers: The importance of independence and accountability to capital markets."

In terms of market meltdowns and the degree of pain inflicted on the financial system, the subprime mortgage crisis has the potential to rival just about anything in recent financial history including the post-Enron turndown of a few years ago.

The scope of this crisis is not the only similarity to the Enron-era scandals. They also share root causes that include conflicts of interest, a lack of accountability, and limited transparency leavened with a healthy dose of naive greed.

*Indeed, the subprime meltdown – which is still roiling the markets and the economic health of the world – is yet another example of what happens when independence and accountability is compromised among key market actors . . . of what happens when trust breaks down*.

*Just like we did in the months after the implosion of Enron and WorldCom, we are now learning that a number of critical gatekeepers and market actors did not perform as we had hoped*.

First, consider the credit rating agencies.

Until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions.

But then the business model changed, and the issuers of securities themselves became the ones who paid to be rated . . . and as structured finance increased in popularity, it deepened this relationship between issuer and rater.

Now, *investors are relying on credit ratings to make informed investment decisions, but the credit rating firms are paid not by investors but by the companies they rate.  And as complex, structured debt products have increased in popularity, the relationship between rater and issue became even closer – and the line between independent rater and paid advisor became blurred*.

*This very circumstance suggests that a potential conflict of interest – between providing objective ratings and satisfying their corporate clients may be distorting the rating agencies' judgment.  That they are both coach and referee*.

127.    The former Chairman of the SEC, Christopher Cox, provided a statement to Congress on April 22, 2008, that said:

> The rating agencies' performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole.

128.    On June 11, 2008, former Chairman Cox made the following remarks concerning the Rating Agencies:

> When the Congress passed the Credit Rating Agency Reform Act a year and a half ago, it was well understood that certain conflicts of interest were hardwired into the rating agency business model. *But we have learned since then that the ratings of structured products in the subprime area made those conflicts of interest even more acute. That's because structured products were specifically designed for each tranche to achieve a particular credit rating – and the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings. Selling consulting service to entities that purchased ratings became a triple-A conflict of interest*.

129.    On July 8, 2008, following a ten-month investigation, the SEC released a report concerning three credit rating agencies: non-defendant Fitch Ratings ("Fitch"); defendant S&P; and defendant Moody's (the "July 8 SEC Report"). No findings were made about any other rating agency in this report. In summarizing its "factual findings, observations and recommendations from the examinations," the SEC stated: "*Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal*."

130.    The SEC stated that "[i]n some instances, analysts discussed fees for a rating." The SEC gave the following examples of this problem:

> At one firm, an analyst wrote to his manager asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be.

> At another firm, a business manager in the RMBS group wrote to several analysts: ". . . if you have not done so please send me any updates to fees on your transactions for this month. It is your responsibility to look at the deal list and see what your deals are currently listed at."

- 51 -

At two rating agencies, there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department.

On information and belief, the SEC's findings set forth above are based on evidence obtained from defendant S&P or Moody's, or both.

131.    The July 8, 2008 SEC Report also stated that: "Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."  The SEC provided the following examples of this problem:

For instance, a senior **analytical manager** in the Structured Finance group wrote "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much?"  "Essentially, [names of staff] ended up agreeing with your recommendations but **the CDO team didn't agree with you because they believed it would negatively impact business**."

In another example, after noting a change in a competitor's ratings methodology, an employee stated: "[w]e are meeting with your group this week to discuss **adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals**."  In another email, following a discussion of a competitor's market share, an employee of the same firm states that **aspects of the firm's ratings methodology would have to be revisited to recapture market share from the competing rating agency**.  An additional email by an employee stated, following a discussion of losing a rating to a competitor, "**I had a discussion with the team leaders here and we think that the only way to compete is to have a paradigm shift in thinking, especially with the interest rate risk**."

Another rating agency reported to the Staff that one of its foreign ratings surveillance committees had knowledge that the rating agency had issued ratings on almost a dozen securities using a model that contained an error.  The rating agency reported to the Staff that, as a result, the committee was aware that the **ratings were higher than they should have been**.  Nonetheless, the committee agreed to continue to maintain the ratings for several months, until the securities were downgraded for other reasons.  Members of the committee, all analysts or analytical managers, considered the rating agency's reputational interest in not making its error public, according to the rating agency.

132.    On information and belief, the evidence discussed above was obtained from defendants S&P and Moody's.  These two firms controlled the overwhelming majority of the CDO market when the Cheyne SIV was issued.

133.    Indeed, the SEC's investigation further revealed that the Rating Agencies did not have enough staff to rate CDOs properly and that the Rating Agencies knew this fact.  The Rating Agencies concealed this fact from the Cheyne SIV investors.

134.    On information and belief, the aforementioned CDO analysts worked either for S&P or Moody's.  Again, these ratings agencies controlled almost the entire CDO market.

135.    Recent admissions by former employees of the Rating Agencies confirm the Rating Agencies knew their ratings on investment pools such as the Cheyne SIV were false, as reported in a September 25, 2008 *Bloomberg* article:

- "'I knew it was wrong at the time'" said a former S&P Managing Director;

- "'It was either that or skip the business.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'"

- Another former S&P Managing Director commented "'[S&P] thought they had discovered a machine for making money that would spread the risks so far that nobody would ever get hurt.'"

136.    The July 8, 2008 SEC Report made the following observations with respect to all three agencies:

At one firm, internal communications appear to expose analytical staff to this conflict of interest by indicating concern or interest in market share when firm employees were discussing whether to make certain changes in ratings methodology.  In particular, employees discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies.  While there is no evidence that decisions about rating methodology or models were made based on attracting or losing market share, in most of these instances, it appears that rating agency employees who were responsible for obtaining ratings business (i.e., marketing personnel) would notify other employees, including those responsible for criteria development, about business concerns they had related to the criteria.

- 53 -

137.    International regulatory bodies have been equally disconcerted by the recent revelations concerning the Rating Agencies' conflicts.  The International Organization of Securities Commissions ("IOSCO"), which includes over 100 securities regulators such as the SEC and the United Kingdom Financial Services Authority, stated in May of 2008 that rating agencies would be banned from recommending how products should be structured in order to prevent a conflict of interest.  Former SEC Chairman Cox stated: "'We're going to prohibit the kinds of practices that were found to be particularly troublesome in the subprime crisis, so conflicts of interest will either be flat-out prohibited or subjected to procedures to minimize those conflicts.'"

138.    Defendants failed to disclose all of the compensation arrangements with the Rating Agencies – including "repeat player" compensation paid by Morgan Stanley in connection with other transactions.  As noted, recent statements by industry insiders indicate that each of the Rating Agencies was paid nearly three times the amount to rate the Cheyne SIV as they would have received to rate a traditional corporate debt obligation.  Among other reasons why Moody's and S&P were paid substantially more to rate the Cheyne SIV is because they helped structure – that is, create – the product.  The Rating Agencies' structuring activities and attendant "pay for performance" compensation undermined the credibility of their ratings to such a significant degree as to make those ratings completely false and misleading – a fact that every defendant was well aware of.

139.    It is not surprising that S&P and Moody's repeatedly eased their ratings standards in order to capture more market share of the ratings business given the conflicts of interest between the Rating Agencies and the entities for whom they performed rating work.  As reported in the September 25, 2008 *Bloomberg* article, a former S&P Managing Director stated that when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher, said: "'Don't kill the golden goose.'"

- 54 -

140.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

Shah:  btw – that deal is ridiculous

Mooney:  i know right . . . *model def[initely] does not capture half of the rish* [sic]

Mooney:  *risk*

Shah:  *we should not be rating it*

Mooney:  *we rate every deal*

Mooney:  *it could be structured by cows and we would rate it*

Shah:  but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

141.    In a December 15, 2006 email, a S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters*."

142.    The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons, a former Managing Director for Credit Quality at Moody's, indicated during his October 22, 2008 testimony before the U.S. House of Representatives' Committee on Oversight and Government Reform that due to profit concerns, a loosening of ratings standards took place at his company:  "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

143.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with*

- 55 -

*the lowest standards, engendering a race to the bottom in terms of rating quality*." Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another." Fons said it was this business model that "***prevented analysts from putting investor interests first***."

144.     Recently, Fons further explained the deep conflicts at Moody's. Fons was a frequent in-house critic of Moody's overly-optimistic letter ratings, but was not able to persuade Moody's to change its policies. In a March 16, 2009 opinion editorial for *The New York Times*, Fons stated that "one of us worked at Moody's and was a frequent in-house critic of how the agencies put troubled companies on artificial 'watch lists' while they maintained overly optimistic letter ratings."

145.     Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards. In a presentation to Moody's Board of Directors in October 2007, McDaniel told the Board: "The real problem is not that the market . . . underweights ratings quality but rather that, in some sectors, it actually penalizes quality . . . . It turns out that ***ratings quality has surprisingly few friends*** . . . ." He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different rating firm.

146.     As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, ***Fitch and S&P, went nuts. Everything was investment grade. It didn't really matter***." Due to the Rating Agencies easing of credit rating criteria, the Rating Agencies made the Cheyne SIV appear to be far

less risky than it really was.  This easing of credit rating criteria and the true risk of the Cheyne SIV was not disclosed to the Cheyne SIV investors.  Defendants' failure to disclose this information was fraud.

### E.   Defendants Were Highly Motivated to Conceal Problems with the Cheyne SIV

147.   Morgan Stanley shared an undisclosed proportion of the Base Fee and Performance Fee discussed below.

148.   First, Morgan Stanley shared a Base Fee equal to five basis points of the market value of the investment assets held by the Cheyne SIV.  The market value of the investments was determined by BoNY based upon "valuation sources and methodologies as agreed [to] with the Rating Agencies . . .  including, among other things, third party dealer quotes."  The Base Fee was paid on each profit distribution date, or quarterly on the 20th day of March, June, September and December. As the volume and aggregate recorded market value of assets acquired by the Cheyne SIV increased, so too did the Base Fee.

149.   Second, Morgan Stanley shared a Performance Fee equal to net distributable profits. Distributable profits are determined quarterly, two days before each profit distribution date. Distributable profits are netted against fees and costs as well as the distribution rate for all of the series of outstanding Notes.   The distribution rate for each series was set forth in the pricing supplement for each series, and determined based upon an increment over a specific benchmark rate. For example, plaintiff ADCB was paid 1.5% over the three-month LIBOR, which is the interest rate that banks borrow from each other in the London inter-bank market.

150.   Morgan Stanley therefore received substantial profit interests in the Cheyne SIV based on the spread between yield on invested assets and cost of funds, as represented by market interest rates required by investors for the investment grade Rated Notes.

151.    The Performance Fee did not accrue during restricted operating periods, as was the case when restricted funding, investment or enforcement events occur.  Morgan Stanley therefore had powerful incentives to maintain the appearance that the SIV assets were safe and highly rated for as long as possible.

152.    In addition to their fees at the launch of the Cheyne SIV, the Rating Agencies received an ongoing monitoring fee from the Cheyne SIV.  On information and belief, this fee was derived from the market value of the assets included in the Cheyne SIV.  Thus, the more Rated Notes sold from the Cheyne SIV, the larger the volume of funding available for the SIV and the greater the dollar value of the assets to be acquired by Cheyne Capital, and ultimately, the larger the Rating Agencies' fees.

153.    Similarly, BoNY received substantial compensation for ascertaining the market value of the Cheyne SIV's assets.  On information and belief, this fee was derived from the market value of the assets included in the Cheyne SIV.  Thus, the more Rated Notes sold from the Cheyne SIV, the larger the volume of funding available for the SIV and the greater the dollar value of the assets to be acquired by the Cheyne SIV, and the larger BoNY's fees.  This economic incentive to grow the Cheyne SIV, even in an increasingly risky market, explains but does not justify BoNY's failure to capture and report accurate valuations of the Cheyne SIV's constituent securities as contractually required.

## IX.   CHEYNE CAPITAL'S INVOLVEMENT IN THE FRAUD

154.    The high ratings assigned to the Cheyne SIV's Rated Notes, as well as the definitions of the ratings and similar statements regarding the investments' relative safety and stability, were issued by the Rating Agencies, with the assistance and influence of Cheyne Capital and Morgan Stanley.  These ratings and the information they conveyed were false and misleading.  Cheyne

- 58 -

Capital and Morgan Stanley (with the Rating Agencies' knowledge and approval) communicated the false ratings to investors via private information services, including *Bloomberg*, and in the Cheyne SIV's Information Memoranda and other Selling Documents, which Cheyne Capital and Morgan Stanley distributed to potential investors for the purpose of issuing the Rated Notes. Indeed, Cheyne Capital and Morgan Stanley controlled the flow of information concerning the Rated Notes to investors. The false ratings distributed by Cheyne Capital and the other defendants repeated the same message: the Rated Notes are safe, secure and stable.

155.    Cheyne Capital and Morgan Stanley engaged the Rating Agencies to rate the Cheyne SIV Rated Notes. The Rating Agencies worked directly with Cheyne Capital and Morgan Stanley to structure the Rated Notes in such a way that qualified the Rated Notes for the Rating Agencies' highest ratings.

156.    Cheyne Capital, together with Morgan Stanley and the Rating Agencies, designed, structured, marketed and maintained the Cheyne SIV. Cheyne Capital and Morgan Stanley obtained the ratings assigned to the Rated Notes by the Rating Agencies. Cheyne Capital and Morgan Stanley provided to potential investors the misleading ratings, accompanying definitions of the ratings, and statements regarding the Rated Notes' safety and stability through preliminary and final Information Memoranda, Pricing Supplements, pre-sale reports, pitch books, and documents associated with the continuous rolling of the Rated Notes.

157.    Cheyne Capital and Morgan Stanley worked with the Rating Agencies to monitor the Cheyne SIV's portfolio of assets and to determine what types of assets the Cheyne SIV could acquire.



By performing these responsibilities, Cheyne Capital knew or recklessly disregarded that the ratings assigned to the Rated Notes were false and misleading.

### A.    The Cheyne SIV Acquired Extremely Risky Assets

158.    At the time it closed in August 2005, the Cheyne SIV was one of the largest SIVs with a portfolio size of $3.5-$4 billion.  By the time the Cheyne SIV collapsed in August 2007, the Cheyne SIV's portfolio was approximately $9 billion.



Despite this knowledge, defendants sold the Notes as safe, investment-grade securities.

- 60 -

160.    The Notes were not "top rated" or "investment grade" securities.  The Cheyne SIV included hundreds of millions of dollars worth of low-quality securities that belied the Notes' high credit ratings.

161.    As discussed in ¶¶84-112, *supra*, Cheyne Capital caused the Cheyne SIV to buy risky assets in its portfolio that were not a true representation of their investment grade rating.





165.    Prior to the Cheyne SIV's launch, subprime bonds, already a risky asset class, grew even riskier as their credit quality deteriorated due to several factors, including eroding lending standards. 



166.    It was Cheyne Capital's job to know exactly what was occurring in the U.S. subprime mortgage market and every other market it invested in with the Cheyne SIV investors' capital.

**B.    The Cheyne SIV's Model Was Flawed**

167.    The Cheyne SIV was designed and operated around a series of basic instructions, rules and parameters commonly known as a "model."  In this case, Morgan Stanley, Cheyne Capital and the Rating Agencies knowingly created a flawed model in order to generate the high credit ratings to launch the Cheyne SIV.



- 63 -



169.    The model was flawed because, among other things, it was based on false assumptions and contained numerous errors.  As described in detail at ¶¶113-120, the model depended upon irrelevant historical information preceding 2000.  From the period 2001-2005, however, (i) the percentage of "subprime" mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans nearly quadrupled; (iv) "interest only" and "option" adjustable rate mortgages quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Capital Notes – experienced over a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.



606978_1



606978_1



177.   In order to mitigate risk, most SIVs carried a capital buffer – an amount of cash or cash equivalents that could absorb normal market fluctuations, which would otherwise cause the Cheyne SIV to enter a restrictive state or be downgraded.  The bigger the capital buffer, the less risk of loss.

606978_1



**D.      Cheyne Capital Had No Experience in SIVs**

180.      Cheyne Capital had no experience in creating or managing an SIV.



182.    Cheyne Capital was also aware of the deep, debilitating conflicts of interest the Rating Agencies labored under in rating the Cheyne SIV.  *See* ¶¶121-146.  In fact, former employees of the Rating Agencies, former SEC chairmen, and a Congressional Representative, have stated publicly that the Rating Agencies and industry insiders, like Cheyne Capital, knew at the time the Cheyne SIV's ratings were issued that the process used to derive ratings generally was deeply flawed and unreliable.  *Id.*  Cheyne Capital's knowledge of these debilitating conflicts is further demonstrated by the fact that, contrary to past practices where Rating Agencies were paid by investors, Cheyne Capital itself compensated the Rating Agencies for rating the Cheyne SIV at a fee substantially larger than the Rating Agencies normally received.  Moreover, Cheyne Capital knew the Rating Agencies' compensation was directly connected to the success of the Cheyne SIV and knew that the Rating Agencies' compensation would grow ***in tandem*** with the Cheyne SIV's growth.  This structure created conflicts of interest that undermined the objectivity of the Cheyne SIV's ratings.

### E.    Cheyne Capital Had Both the Motive and Opportunity to Commit Fraud

183.    Cheyne Capital was motivated to communicate false and misleading credit ratings on the Cheyne SIV because the Cheyne SIV's success depended directly on the quality of its assets and

- 69 -

the ratings assigned to the Rated Notes.  Cheyne Capital's remuneration was wholly dependent upon the successful sale of the Rated Notes.

187.    Cheyne Capital and Morgan Stanley had the opportunity to participate in the creation and dissemination of the false and misleading ratings.  Cheyne Capital and Morgan Stanley exerted

- 70 -

influence over the Rating Agencies and their issuance of the false and misleading ratings. It was through Cheyne Capital's and Morgan Stanley's distribution of the false credit ratings via private information services, Information Memoranda, and the Selling Documents that the false and misleading ratings reached investors.

## X.  DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE NOTES

188.  On August 29, 2007, *The New York Times* reported that S&P had "abruptly" downgraded short-term notes issued by the Cheyne SIV. The article stated in part:

> Reports of the downgrade sent shockwaves through the commercial paper market late yesterday, where trading has been turbulent for at least the last two weeks and investors are speculating about the next investment vehicle to fall. It also raised questions about the quality of the ratings process, given how quickly – and significantly – that S.& P. reversed course.

> "If the rating agencies have to downgrade six notches in a single day, it undermines investor confidence," said Alex Roever, a JPMorgan analyst who covers the commercial paper market. "*It is sort of hard to fathom what so much has changed in that time and makes investors wonder whether the rating agencies were paying attention to what was going on in the portfolio*."

> \*       \*       \*

> As problems with subprime mortgages have spread to other parts of the credit markets, investors have grown increasingly concerned about the quality of asset pools backing these vehicles. Cheyne Finance gave them added pause because of the nature of its assets.

> According to Cheyne Finance's investor report, it had at least 25 percent of its portfolio backed by pools of home equity loans as of July 31. That, Mr. Roever said, is *the highest known concentration of real estate-related assets in any S.I.V.*

189.  In fact, the reason for the rapid downgrade was because S&P (and Moody's) had failed to provide adequate surveillance of the ratings – notwithstanding representations to the contrary– and were reckless both in their grant and maintenance of high investment grade ratings for the Rated Notes. This failure is consistent with the findings of the July 8 SEC Report, which noted reasons for the Rating Agencies' lack of adequate surveillance, including:

- 71 -

- "***Resources appear to have impacted the timeliness of surveillance efforts***."

- "***There was poor documentation of the surveillance conducted***."

- "***Lack of Surveillance Procedures***."

190.     On September 5, 2007, the Cheyne SIV entered receivership after having drawn down its liquidity lines to help repay maturing debt.

191.     The Senior Notes were originally rated A-1+ and AAA by S&P.  On October 19, 2007, S&P dropped both of these ratings to D.  Capital Notes were originally rated A3 by Moody's. On October 24, 2007, Moody's dropped the rating to Ca, and on November 30, 2007, Moody's dropped the rating to C.

192.     The receivers subsequently noted problems in the original documentation which increased the difficulty in restructuring the Cheyne SIV: "Highly complex and often opaque drafting in the original documentation has given rise to significant uncertainties which needed to be resolved."

193.     On June 17, 2008, a deal was finalized in which Goldman Sachs would purchase the Cheyne SIV's portfolio at prices determined by an auction among other investment banks, with the plan to effectively wipe out junior and mezzanine noteholders.

## XI.   CLASS ACTION ALLEGATIONS

194.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Rated Notes between October 2004 and October 2007 on the basis of false and misleading representations, including false investment grade credit ratings and/or other false and misleading information provided in (and omitted from) the Selling Documents and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

195.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believes that there are over 100 members of the proposed Class.  Class members may be identified from records maintained by Morgan Stanley and the Cheyne SIV or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

196.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of law that is complained of herein.

197.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

198.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants falsely misrepresented the ratings of the Cheyne SIV and the Notes issued therefrom; whether they breached contractual obligations; and to what extent the members of the Class have sustained damages and the proper measure of damages.

199.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

- 73 -

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   COUNTS

### COUNT 1-A

**Claim for Common Law Fraud**
**Against Morgan Stanley**

200.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

201.    This is a claim for common law fraud against Morgan Stanley.

202.    Morgan Stanley made materially false and misleading representations and omissions concerning the ratings of the Notes and the Cheyne SIV.  These false and misleading ratings were communicated to, and relied upon by plaintiffs and each member of the Class.

203.    Morgan Stanley made the false and misleading statements to plaintiffs and the members of the plaintiff Class on each day throughout the Class Period through various private information services.

204.    Such ratings and the reasons why they are false and misleading are set forth with particularity above.

205.    Morgan Stanley knew or recklessly disregarded the false and misleading nature of its representations and omissions.  The bases for Morgan Stanley's knowledge or reckless disregard are set forth with particularity above.

206.    Morgan Stanley made the materially misleading statements and omissions for the purpose of inducing plaintiffs and the members of the plaintiff Class to buy and retain the Rated Notes.

- 74 -

207.    Plaintiffs and the members of the plaintiff Class justifiably relied on Morgan Stanley's materially misleading statements and omissions as they went to the core of their investment decision regarding the Rated Notes – namely, the attendant amount and nature of risk associated with the Rated Notes and the determination of whether the respective rates of return associated with the Notes adequately compensated investors for such risks.  The Rated Notes would have been unmarketable and would not have issued but for Morgan Stanley's misleading statements and omissions concerning the ratings of the Notes and the rating of the Cheyne SIV.

208.    Morgan Stanley's misrepresentations and omissions went to the credit quality of the Rated Notes and the underlying collateral assets.  When the truth regarding these assets was revealed, the Cheyne SIV collapsed.

209.    Morgan Stanley continued throughout the relevant time period to misrepresent and actively conceal information about the credit quality of the Rated Notes and the collateral assets acquired by the Cheyne SIV.

210.    Morgan Stanley undertook to sell billions of dollars in Rated Notes to investors. Having elected to make representations to investors in order to sell Rated Notes to them, Morgan Stanley owed such investors a duty to disclose all material information, including adverse information.

211.    Morgan Stanley was in a superior position to Rated Notes investors as a consequence of its selling and trading assets such as collateral assets.  Knowing that investors entrusted billions of dollars to Morgan Stanley, and knowing that such investors were sold Rated Notes that were represented to be secure and stable investments, Morgan Stanley had a duty to report to these investors that their investment capital and income was at risk due to increasingly deteriorating credit conditions.

212.     Plaintiffs and all of the Class members have been injured as a result of Morgan Stanley's fraudulent conduct and misrepresentations, in an amount to be determined at trial.

### COUNT 1-B

**Claim for Aiding and Abetting**
**Against Morgan Stanley**

213.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

214.     This is a claim against Morgan Stanley for aiding and abetting the other defendants' violations of law alleged herein.

215.     Morgan Stanley knew of each defendants' violations of laws and substantially assisted in such violations.

216.     Plaintiffs and the Class were damaged thereby.

### COUNT 2-A

**Claim for Common Law Fraud**
**Against the Rating Agencies**

217.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

218.     This is a claim for common law fraud against the Rating Agencies.

219.     The Ratings Agencies assigned materially false and misleading credit ratings to the Cheyne SIV and the Rated Notes.  These false and misleading ratings were communicated to, and relied on by, plaintiffs and each member of the Class.

220.     The Rating Agencies made the false and misleading statements to plaintiffs and members of the plaintiff Class on a daily basis throughout the Class Period through various private information services.

- 76 -

221.    Such statements and the reasons why they are false and misleading are set forth with particularity above.

222.    The Rating Agencies knew or recklessly disregarded the false and misleading nature of their misrepresentations and omissions.  The bases for the Rating Agencies' knowledge or reckless disregard are set forth with particularity above.

223.    The Rating Agencies made the materially misleading statements and omissions for the purpose of inducing plaintiffs and the members of the plaintiff Class to buy and retain the Rated Notes.

224.    Plaintiffs and the Class justifiably relied on the Rating Agencies' materially misleading statements and omissions as they went to the core of their investment decision regarding the Rated Notes – namely, the attendant amount and nature of risk associated with the Rated Notes, and the determination of whether the respective rates of return associated with the Notes adequately compensated investors for those risks.  The Rated Notes would have been unmarketable and would not have issued but for the Rating Agencies' misleading statements and omissions concerning the ratings of the Notes and the rating of the Cheyne SIV.

225.    The Rating Agencies' misrepresentations and omissions went to the credit quality of the Rated Notes and the underlying collateral assets.  When the truth regarding these assets was revealed, the Cheyne SIV collapsed.

226.    The Rating Agencies continued throughout the Class Period to conceal information about the credit quality of the Rated Notes and the collateral assets acquired by the Cheyne SIV; continued to affirmatively repeat the respective credit ratings of the Notes throughout the Class Period; and continued to repeat the "AAA" designation for the entire Cheyne SIV structure so that it

could continue to build more and more leverage and build more and more exposure to impaired, unsafe, and poorly underwritten U.S. nonprime mortgage loans.

227.    The Rating Agencies undertook to sell and communicate their rating services to the Rated Notes investors through private information services.  Having elected to make representations to those investors in order to sell ratings and services to them, and having received millions of dollars in compensation therefor, the Rating Agencies owed such investors a duty to disclose all material information, including adverse information.

228.    The Rating Agencies were in a superior position to Rated Notes investors as a consequence of the rating and monitoring of collateral assets, as well as, *inter alia*:

(a)     their receipt and analysis of material, non-public information from the top U.S. nonprime lending companies (with whom the Rating Agencies have intimate dealings based on the ratings they provide on the billions of dollars in secured and unsecured debt, as well as securitization transactions they structure and rate);

(b)     their receipt and analysis of mortgage loan performance statistical information on billions of dollars in RMBS which indicated that such companies were employing weak and weakening lending practices to originate and sell mortgage loans into the fixed income marketplace;

(c)     their receipt of weekly reports from defendant BoNY that provided the exact composition of the Cheyne SIV portfolio, as well as a determination of the market value of those assets; and

(d)     their review of material non-public information provided by U.S. mortgage lenders in connection with the Rating Agencies' review of such lenders' credit quality.

229.    Knowing that investors entrusted billions of dollars to the Rating Agencies and knowing that such investors were sold Rated Notes that were represented to be secure and stable

- 78 -

investments, the Rating Agencies had a duty to report to Rated Notes investors that their investment capital and income was at risk due to increasingly deteriorating credit conditions and faulty monitoring procedures, facts that were concealed from plaintiffs and the Class members by the false credit ratings assigned to the Rated Notes and the Cheyne SIV.

230.    The Rated Notes would not have been issued without the false and misleading credit ratings that the Rating Agencies assigned to the Senior Notes, the Capital Notes and the Cheyne SIV.

231.    Plaintiffs and all of the Class members have been injured as a result of the Rating Agencies' fraudulent conduct and misrepresentations, in an amount to be determined at trial.

**COUNT 2-B**

**Claim for Aiding and Abetting
Against the Rating Agencies**

232.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

233.    This is a claim against the Rating Agencies for aiding and abetting the other defendants' violations of law alleged herein.

234.    The Rating Agencies knew of the defendants' violations of laws and substantially assisted in such violations.

235.    Plaintiffs and the Class were damaged thereby.

**XIII.   PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages in favor of plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.      Awarding plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.      Awarding rescission or a rescissory measure of damages; and

D.      Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  February 18, 2011                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                             SAMUEL H. RUDMAN

                                             _____
                                             SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com

- 80 -

606978_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
PATRICK W. DANIELS
DANIEL S. DROSMAN
X. JAY ALVAREZ
JESSICA T. SHINNEFIELD
JARRETT S. CHARO
DARRYL J. ALVARADO
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
patrickd@rgrdlaw.com
dand@rgrdlaw.com
jaya@rgrdlaw.com
jshinnefield@rgrdlaw.com
jcharo@rgrdlaw.com
dalvarado@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
JASON C. DAVIS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
lukeb@rgrdlaw.com
jdavis@rgrdlaw.com

Attorneys for Plaintiffs

- 81 -

606978_1

POMERANTZ HAUDEK GROSSMAN
  & GROSS LLP
MARC I. GROSS
TAMAR A. WEINRIB
100 Park Avenue
New York, NY  10017-5516
Telephone:  212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
taweinrib@pomlaw.com

Additional Attorneys for Plaintiff State Board of
Administration of Florida

606978_1

## CERTIFICATE OF SERVICE

I, Kelly Stadelmann, hereby certify that on February 18, 2011, I caused a true and correct copy of the attached:

SEVENTH AMENDED COMPLAINT FOR COMMON LAW FRAUD AND AIDING AND ABETTING

to be: (i) filed by hand with the Clerk of the Court of the Southern District of New York; and (ii) served by United States mail to all counsel listed on the attached service list.

_Kelly Stadelmann_
Kelly Stadelmann

MORGAN STANLEY SIV

Service List - 2/16/2011   (08-0168)

Page 1 of 1

### Counsel For Defendant(s)

Dean  Ringel
Floyd  Abrams
Andrea R. Butler
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY  10005-1702
  212/701-3000
  212/269-5420 (Fax)

James P. Rouhandeh
Russell  Capone
William R. Miller, Jr.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017
  212/450-4000
  212/701-5800 (Fax)

Joshua M. Rubins
James J. Coster
Aaron M. Zeisler
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY  10169
  212/818-9200
  212/818-9606 (Fax)

### Counsel For Plaintiff(s)

Marc I. Gross
Tamar A. Weinrib
Pomerantz Haudek Grossman & Gross LLP
100 Park Avenue
New York, NY  10017-5516
  212/661-1100
  212/661-8665 (Fax)

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Patrick J. Coughlin
Daniel S. Drosman
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)

Jason C. Davis
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
  415/288-4545
  415/288-4534 (Fax)