15G0ABUC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ABU DHABI,

4                   Plaintiff,

5              v.                          08 CV 7508

6    MORGAN STANLEY,

7                   Defendant.

8    ------------------------------x
                                          New York, N.Y.
9                                         May 16, 2011
                                          10:40 A.M.
10
     Before:
11
                        HON. SHIRA A. SCHEINDLIN,
12
                                          District Judge
13
                            APPEARANCES
14   FOR PLAINTIFFS:

15   DANIEL DROSSMAN, ESQ.
     LUKE BROOKS, ESQ.
16

17   FOR DEFENDANTS:

18   DEAN RINGEL, ESQ.
     TAMMY ROY, ESQ.
19   JASON HALL, ESQ.
     JAMES P. ROUHANDEH, ESQ.
20   ANTONIO PEREZ MARQUES, ESQ.
     MEGHAN H. SULLIVAN, ESQ.
21

22

23

24

25

15G0ABUC

```
1            (Case called)

2            THE COURT:  Okay, good morning, everyone.

3            There's been a little bit of letter writing recently.

4    I gather a lot of letter writing to the special master and some

5    other letter writing to me regarding request for judicial

6    assistance.  If you put all three together, a small amount of

7    letter writing to me, the enormous amount of letter writing to

8    special master and imposing all that judicial assistance

9    request.  You really like writing letters, I guess.  But you

10   are inundating both the judicial system and the special master.

11   I've never seen anything quite like it in terms of enjoying

12   writing letters back and forth.

13           Before me is a three-page single-spaced letter dated

14   May 10 from Mr. Rouhandeh, using one of the smaller types I

15   have seen in a long time, but asking for leave to file -- I'm

16   sorry, I guess -- oh, sorry.  Asking the Court to reconsider

17   its January 12th, 2011 order that granted plaintiff's leave to

18   amend the complaint.  The basis for this four-month tardy

19   request for reconsideration is that, as far as defendants are

20   concerned, these new plaintiffs are simply not meeting their

21   discovery obligations, and not meeting it in a timely manner.

22           Then, Friday, a response came in from Mr. Brooks and

23   he couldn't resist calling this motion nothing short of

24   outrageous.  Usually, I get one side saying they're shocked by

25   the conduct of the other.  And the other side saying it is
```

15G0ABUC

1    outrageous.  Actually, if you would skip shock and outrage, it

2    you make it easier reading for me if you left off such words.

3           Obviously outrageous, because defendants should know

4    better than to know they're not going to get their case

5    dismissed under rule 47, although a court order is violated,

6    And all they have to do is write a three-line letter saying we

7    need a discovery conference.  We think discovery is in default.

8    And that's what I had said on a phone call that we had recently

9    on one of the other issues, I forgot what it was.  We were all

10   on the phone on some issue last week.  And I said I don't think

11   you seriously are telling me I should reconsider a January 12

12   order in May, I think you are saying if plaintiffs don't

13   cooperate with discovery, then the case should be dismissed for

14   failure to cooperate with discovery.  There's plenty of

15   precedent for that.  If plaintiffs don't cooperate in

16   discovery, over the many years I am sure I have dismissed 10

17   plaintiffs cases for failure to cooperate with discovery, so

18   that's a perfectly reasonable motion.  If, indeed, plaintiffs

19   are not cooperating in discovery.

20          So I guess we're just here for a standard old

21   complaint session about who is not doing what in discovery.

22          One of the things that the plaintiffs say in their

23   letter, is they're kind of waiting for this negotiation to end

24   on the search term, because they don't want to go through I

25   guess thousands of documents more than once.  They don't want

15G0ABUC

1   to have one electronic search and then another electronic

2   search.  And that sounds right to me.  The defendants took the

3   same position in the previous search of their records.  They

4   didn't want to do repetitive runs through the same data set.

5   They want to do it once with the right search terms.  And that

6   is still being negotiated and/or ruled on.  And/or, you know,

7   they are not ready to run the search.

8         So that's one defense to it.  I don't know what the

9   other defenses are.

10        So do you want to be heard, Mr. Rouhandeh, after

11  having had a chance to see the plaintiffs reply?

12        MR. ROUHANDEH:  Yes, your Honor.

13        Just briefly for the record, the reason we sought

14  reconsideration was simply that we thought there was a

15  misrepresentation of the Court in the letter, which we didn't

16  know at the time.  In fact, we didn't know until after the time

17  period for reconsideration lapsed, that's why we brought it

18  that way.  Plus, I think the Court reconsidered an earlier

19  order, and obviously there were distinctions, but there was an

20  order that was entered in object of one year and reconsidered

21  in July.  We don't need to belabor that point, I just wanted to

22  put it on the record.  But there really hasn't been a

23  negotiation on search terms.

24        THE COURT:  I thought there was.  I thought it

25  was ongoing with Special Master Nettle, and I remanded it.  The

15G0ABUC

```
1    special master surely reached out to the two sides and has

2    tried to talk about what to do now.

3              MR. ROUHANDEH:  He --

4              THE COURT:  Surely he knows that whatever it was that

5    he ordered before produced an overly large hit rate, so to

6    speak, and it's unworkable.  And he basically said re-do this,

7    narrow it, that's why you are there.  And I thought he was

8    trying to do exactly that.

9              MR. ROUHANDEH:  He is trying to do that.  I guess I'm

10   taking issue with what they have said, that they have actively

11   conferred with the defendants to reach resolution to the search

12   terms.

13             THE COURT:  I assume he is trying to narrow it.

14             MR. ROUHANDEH:  Well, on the second set of plaintiffs,

15   they waited six weeks.  We asked them what search terms were

16   you using.  They wouldn't tell us, we had to write to the

17   Court.  This time, we asked what search terms and custodians

18   are you using.  We were told, don't hold your breath, because

19   if you did you'd suffocate.

20             THE COURT:  Oh, that's a new one to me.

21             MR. ROUHANDEH:  Yeah.  I just think that their

22   obligation is to actually tell us what they are doing.

23             With the first set of plaintiffs, it worked where we

24   told them what search terms we were going to use.  They told us

25   what search terms they were going to use.  There were some
```

15G0ABUC

1    disagreements about that.  Both parties ran their search terms

2    did their searches.  On the second set, we asked them what

3    search terms they're using.  And we found out, after the fact,

4    six weeks later, they only used Chaney and Griffin.  And we

5    said they should, they have to go beyond that.  The Court

6    appointed a special master, said I can give you some guidance,

7    you gotta go beyond Chaney and Griffin.

8              The idea that the plaintiffs are sitting here waiting

9    to work something out with the special master, we don't think

10   is correct, either.  In the objections they sent to your Honor,

11   they made clear they objected to any searches beyond Chaney and

12   Griffin.  That was the relief they asked for.

13             THE COURT:  They didn't get that relief.

14             MR. ROUHANDEH:  They haven't yet, they are still

15   persisting in that.

16             THE COURT:  You're not going to get that, Mr. Brooks.

17   It's going to be beyond Chaney and Griffin.  Now they know --

18   sit down, please.  Now they know it's going to be beyond Chaney

19   and Griffin.

20             Okay, go ahead.

21             MR. ROUHANDEH:  So as to the research, having to do

22   the search twice, by not telling us what terms they were going

23   to use in December, they set themselves up for that.  Because

24   we would have said, no, no, don't search just Chaney and

25   Griffin.  If you have a dispute, let's go to the Court and get

15G0ABUC

1    that resolved.  So, instead, they just did that, didn't tell

2    us, and now they are moving forward.

3         So for this third set of plaintiffs, their position is

4    we're not going to do anything until we get it all worked out

5    and they object, they basically said at the last conference

6    with the special master, we're not agreeing to anything.  And I

7    didn't know whether that meant -- to any of these searches, I

8    didn't know whether that meant we don't want to be plaintiffs

9    if we have to do all of this document production, or whether

10   they're going to appeal any order from the special master to

11   your Honor.

12         THE COURT:  Well, they can't appeal further than me.

13         MR. ROUHANDEH:  Right.

14         THE COURT:  At some point we've got to either get the

15   search terms and live with them, or drop out as plaintiffs.

16   It's really very simple.  I can understand the plaintiffs

17   saying, you know what, I don't want any part of this, it's too

18   burdensome, it's too expensive, it's too distracting, that's

19   fine, we say goodbye to that particular plaintiff.  So at some

20   point the universe of search terms has to be decided, has to be

21   run, and has to be produced.  This is not really rocket

22   science.  I don't understand why it's so combative.

23         MR. ROUHANDEH:  Well, it is -- it is, at this point,

24   so combative, because --

25         THE COURT:  I don't understand why.

15G0ABUC

 1              MR. ROUHANDEH:  Because we are not getting -- we don't

 2     think we're getting cooperation in discovery.  We're not being

 3     told what they are doing and when they are doing it.

 4              THE COURT:  The cooperation is the latest word in

 5     discovery.  Everybody is cooperating.  Are you the only two

 6     lawyers left in this country that aren't getting it?  About the

 7     need for cooperation.  And who said that about, "don't hold

 8     your breath, if you do you'll suffocate."  Who said that?

 9              MR. BROOKS:  I did.

10              THE COURT:  That was a terrible comment.

11              MR. BROOKS:  It was an offhanded remark.  And there

12     has been many offhanded remarks made during these meet and

13     confers, and I'm not repeating them for your Honor because --

14              THE COURT:  All right.  Yeah, well, I don't like that

15     one, it's like saying go die.  It's terrible.

16              MR. BROOKS:  What we were talking about is, look, we

17     can't perform these piecemeal searches because it is very

18     expensive.

19              THE COURT:  Right.

20              MR. BROOKS:  And so what we had told them is once this

21     search term issue is resolved, which we are actively pursuing

22     to resolve.  And just for the record, we never told the special

23     master we're not willing to do anything.  We had a lengthy meet

24     and confer with the special master.  I think it lasted for an

25     hour and a half.  If we had told him we're not willing to do

15G0ABUC

1  anything, then I don't know what there was to talk about,

2  because we went back and forth about the propriety of various

3  search term combinations.

4          THE COURT:  You obviously adjusted to doing more than

5  Chaney and Griffin.

6          MR. BROOKS:  Absolutely.  We went ahead and said to

7  the special master, why don't we go ahead and run searches for

8  these various search terms within 15 words, and within 45

9  words.  And we committed to providing him with the data on

10  those searches.  So I'm not sure what Mr. Rouhandeh is

11  referring to when he says we're not going to do anything, when

12  we are talking about multiple searches beyond Griffin and

13  Chaney, when we're going to supply the special master with new

14  data relating to the number of hits attained.  We're actively

15  working --

16          THE COURT:  He did say he was waiting to hear from one

17  of your experts, I had forgotten, something like that.  But it

18  was your side or their side --

19          MR. BROOKS:  I think it was our side.

20          THE COURT:  -- but he was waiting to hear back from

21  somebody.

22          MR. BROOKS:  Right.  Our vendor had said -- we said

23  can you please do these 15 and 45 searches.  And we asked our

24  vendor to do it.

25          THE COURT:  The reason I know this, is because I

15G0ABUC

```
1    e-mailed him yesterday to see if he wanted to join this

2    conference.  He was not able to.  He is somewhere in Delaware

3    doing something else.  He said I'm waiting to hear back from

4    somebody's vendor.

5          MR. BROOKS:  What was distressing to us, is when we

6    got back on the call with the special master, after you had

7    remanded the report and recommendation number three --

8          THE COURT:  Yeah.

9          MR. BROOKS:  -- is we said, look, some of these search

10   combinations like Morgan Stanley within the same document as

11   investment when you ask six banks to do this search, they are

12   just unworkable.  Or S&P within the same document as rating, it

13   is just unworkable.  And defendants said, no, no, no, we think

14   that is absolutely proper, we're not going to bend, we want

15   those searches run.

16         THE COURT:  I mean the point of the special master was

17   not to listen to we're-not-going-to-bend language, but just

18   decide what it should be and make it reasonable and be done

19   with the problem.

20         Do you do your conferences separately?  Do you speak

21   to him separately for an hour and a half, or defense was on the

22   phone.

23         MR. BROOKS:  All of the parties were on the phone.

24         THE COURT:  Always.  So when you were on the phone an

25   hour and a half, the defense knows you were on the phone for an
```

15G0ABUC

1    hour and a half.

2           MR. BROOKS:  Right.

3           THE COURT:  So Mr. Rouhandeh, why do you say they

4    aren't talking to the special master.  Your side was on the

5    call for hour and a half.

6           MR. ROUHANDEH:  We were saying they won't meet and

7    confer with us, and they take a hard-line position, which is --

8    today was the first time I heard that they have actually said

9    that they would produce documents beyond Chaney and Griffin.

10   We hadn't heard that before.

11          THE COURT:  What was the hour and a half about?

12          MR. ROUHANDEH:  It was about the trying to restrict

13   some of the search terms that hit broader --

14          THE COURT:  I know if they were trying to restrict it,

15   they were well beyond Chaney and Griffin.

16          MR. ROUHANDEH:  Well, no.  No, it was the special

17   master trying to restrict it.  In a response to what he said,

18   they said, well, we're not going to -- special master is trying

19   to get an agreement between the parties so that he doesn't have

20   to issue a report and recommendation and then wait 20 days to

21   object.  They're not agreeing to that.  And to say we are

22   unwilling to get rid of any search, that is misleading.

23          THE COURT:  I'll amend the 20-day rule, make it 48

24   hours.  This is silly.

25          MR. ROUHANDEH:  That is a request that we have asked

15G0ABUC

1    for.

2           THE COURT:  I'm sure the plaintiff will agree.  You

3    don't want a 20-day delay every time he has a report.  These

4    reports, I read these reports in a minute.  I go to the last

5    page.  I read three reports this morning.  I must tell you, I

6    only go to the end to see if the deposition is allowed or not,

7    where it is going to be held or not.  I don't care about all of

8    those citations and recitations.  It's meaningless.  I can read

9    them in a minute, therefore you can object to them in 48 hours

10   or less.

11          MR. BROOKS:  As you know, as plaintiffs, we want to

12   move this case forward.  We're the ones who want to get on to

13   trial.

14          THE COURT:  I assume you would be happy to change rule

15   to 48 hours.

16          MR. BROOKS:  Maybe we could have a few more, say

17   three, four days to object; something like that.

18          THE COURT:  Seventy-two hours.

19          MR. BROOKS:  Something like that; something like that.

20          THE COURT:  Not something like that, the new rule, the

21   order is hereby amended, all objections to reports and

22   recommendations are due in 72 hours.  Okay, we took care of

23   that.

24          Now, where are we up to on these darn search terms.

25          MR. BROOKS:  Look, here is our --

15G0ABUC

1      THE COURT:  When do you expect to come to a ruling on

2 here, soon?

3      MR. BROOKS:  Our hope is soon.  What's -- we're not

4 particularly sanguine, because on the last call, Mr. Rouhandeh

5 said we don't see any burden after we provided this data and --

6      THE COURT:  Well, I have already remanded report

7 recommendation three.  That was too burdensome.  That was

8 clearly overbroad.  If it was producing the number of hits it

9 was producing, I didn't like it.  And you're kind of stuck with

10 me.  You can't get any higher right now.  So that's the end of

11 the matter, that was too broad.

12      All right.  So I know it's going to be less than that.

13 Doesn't matter what Mr. Rouhandeh said because the judge,

14 namely me, has said that was too broad.  So I know it's going

15 to be less than the original and more than Griffin and Chaney.

16 So I know I know it is somewhere between those extremes.

17      MR. BROOKS:  Sure.  And I think that what's telling is

18 the -- you know, the footnote number 4 in our brief, where we

19 said --

20      THE COURT:  In your brief?

21      MR. BROOKS:  Letter.  In our letter.

22      THE COURT:  Okay.

23      MR. BROOKS:  Footnote number 4 where we say --

24 actually, number 5 on page 3, where we say, look, you know, we

25 performed these broad searches.  Out of these broad searches

15G0ABUC

```
1    we're looking at 2.5 percent that capture Chaney and Griffin.

2              Now, obviously this case is broader than Chaney and

3    Griffin.  We understand that.  They have said it.  Everybody

4    agrees.

5              THE COURT:  You have said it.

6              MR. BROOKS:  But it's not 98 percent everything else

7    and 2 percent Chaney and Griffin.  And I think your Honor would

8    agree --

9              THE COURT:  But we're well beyond the "everything

10   else."  I have sent R&R 3 back.  That means I rejected it.  The

11   defense is not dumb here.  They are like eight of the brightest

12   lawyers I have ever seen.  They got the message.  They know I'm

13   not going with it.  Right, Mr. Rouhandeh?

14             MR. ROUHANDEH:  Absolutely.

15             THE COURT:  Yeah, see, they knew.  They were so smart

16   that they knew.  So we know what is left and what it was.  And

17   I know it is more than Chaney and Griffin.  Now it's just a

18   matter of refining.

19             How much longer do we think that is going to take?

20             MR. ROUHANDEH:  We had a conference on Tuesday with

21   the special master and he asked for the data.  Which we

22   thought -- it was not their idea, it was the special master's

23   idea.  It was a very good idea to take a search that uses "and"

24   and replace it with 15 and 45 to see the number of hits.  I

25   don't believe we have that data yet.
```

15G0ABUC

1            THE COURT:  When do you think he is going to get that

2       data?

3            MR. DROSSMAN:  Three of the plaintiffs that we are

4       using as sort of exemplar plaintiffs.

5            THE COURT:  Of course, yes.

6            MR. DROSSMAN:  I believe that two of them we'll have

7       the data today.

8            THE COURT:  Okay.

9            MR. DROSSMAN:  Last I was informed, Judge, and I have

10      been travelling.  But the third, which is a very large data set

11      that needed to be indexed in advance of actually running the

12      searches will be at some point this week, but a little bit

13      later.

14           THE COURT:  So some of that information will be in the

15      special master's hands today.  Some will be here before the end

16      of the week.  It sounds like, with some luck, you'll have the

17      recommendation no later than a week from today.  And of course

18      I'll drop an e-mail saying I'm deeply hopeful to have a

19      recommendation by the 23rd as to the search terms.  And then I

20      hope you can live with it and run the search and produce the

21      stuff.

22           Now, how long will it take to do that?

23           MR. DROSSMAN:  Obviously, Judge, it depends on what

24      the volume is.

25           THE COURT:  Yeah, but you know what the data set is.

15G0ABUC

```
 1   Now, it's just the number of terms.
 2            MR. DROSSMAN:  Well, right.  But the documents that
 3   were yielded by the first terms, which I know we're not going
 4   with, but were 288,000 documents.  Not pages, not gigabytes
 5   288,000 documents.
 6            THE COURT:  For all of the --
 7            MR. DROSSMAN:  For one plaintiff.  For one plaintiff,
 8   Judge.  And so, obviously, you know, we have to get the
 9   documents from -- we'll run the searches, we'll get the
10   documents.  We'll have to do a review.  We'll do it as soon as
11   we possibly can, your Honor.
12            THE COURT:  Do you have a 502(d)order in place here?
13            MR. DROSSMAN:  I don't believe so.
14            THE COURT:  Why don't you?
15            MR. DROSSMAN:  I don't know, your Honor.
16            THE COURT:  You don't know.  Well, why don't you
17   submit one, I'll sign it.  Period.
18            No reason you don't want one.  That helps with review.
19   I really have never seen a case where the lawyers don't want a
20   502(d) order.  There is nothing bad about it, only good.  Do
21   you have a feeling against those orders?
22            MR. DROSSMAN:  To be honest, I don't know what a
23   502(d) order is.
24            THE COURT:  Oh, the new federal rule of evidence
25   502(d) that says:  If inadvertently something is produced.
```

15G0ABUC

1        MR. DROSSMAN:  We do have a protective order in the

2    case that provides for --

3        THE COURT:  This is even better.  Because it protects

4    you in any litigation, State or federal, anywhere else.  Once I

5    put my name on it, you're totally protected against any

6    inadvertent waiver.  So people who have 502(d) orders in place

7    are a little more casual to review, because it doesn't have to

8    be evaluated for having been a good review.  Takes you off the

9    hook of 502(b) in a helpful way.  Maybe you can get through the

10    review a little bit more quickly.

11        MR. DROSSMAN:  We hope so, Judge.  We really hope that

12    we can get through this stuff very fast.

13        THE COURT:  That's what I'm saying, especially if you

14    have that order in place, which you ought to draft and submit.

15        MR. DROSSMAN:  We'll draft and submit one.

16        THE COURT:  You should.

17        MR. DROSSMAN:  We will, your Honor.  And we'll do it

18    as fast as we can.

19        THE COURT:  Just curious, I want to do a survey.

20        Defense bar back there, do you have 502(d) orders in

21    most big cases nowadays?  If you do, raise your hand.

22        THE COURT:  I think we have not done a good job of

23    publicizing 502(d).

24        MR. ROUHANDEH:  I think we're all still putting it in

25    the protective orders.  We're putting the old provision in

15G0ABUC

1    there, where I think we should asking for the order.

2            THE COURT:  Oh, you should be.  Really, we have not

3    done a good enough job if the cream of the defense bar isn't

4    using it.  This is a problem.

5            Okay.  Anyway, back to the point.  So, the point is

6    it's going to be lots produced, then you have to review it,

7    then you have to produce it.

8            MR. DROSSMAN:  I just don't want to make a commitment

9    on time without knowing what the scope of the search and the

10   hits will be.  But, I can assure the Court --

11           THE COURT:  How many new plaintiffs are there?

12           MR. DROSSMAN:  Well, there are essentially 12, your

13   Honor.  Or 11, actually, that we're going to have to run new

14   hits on, new searches on.  Some of them have done the Chaney

15   and Griffin and produced those documents.  This set has not.

16   Obviously, both sets are going to have to go back and run

17   whatever the new search is.  And so I think it's 11, because

18   there is one --

19           THE COURT:  Which was the one that turned up the

20   288,000 or something?

21           MR. DROSSMAN:  Butterfield, your Honor.  Which is not

22   one of the ones here.  It is one of the second set of added

23   plaintiffs.

24           THE COURT:  Oh, I see. Not the third set anyway.

25           MR. DROSSMAN:  Right.  We have one of the third set,

15G0ABUC

1    Commerce Bank, in the sort of sample that we're using, as well

2    as Florida, FSBA.  And so those two are from the additional

3    plaintiffs.

4         THE COURT:  That's the one that, as of the date of Mr.

5    Rouhandeh's letter, had produced all of two documents.

6         MR. DROSSMAN:  Well, they haven't run the Griffin and

7    Chaney searches because, as we explained to the Court, we

8    didn't want to run these searches and go back and research.

9    And the process was ongoing as we received their document

10   requests.  And we're responding to them on -- you know, the

11   search is just taking longer.

12        THE COURT:  Let me ask the lawyers here.

13        Once the search terms are in place and, hopefully,

14   without appeals and rulings and all that, and run, and

15   documents produced, then will plaintiffs have met their

16   obligations.  Is that essentially what is missing, is the big

17   document production for every one of the new plaintiffs.

18        MR. ROUHANDEH:  Absolutely.  We can't really begin any

19   of the depositions.

20        THE COURT:  Right.  So then you get this big bunch of

21   documents and then you're ready to depose these people.

22        MR. ROUHANDEH:  Yes.  And there may be followup

23   requests.  And we may learn from the first time, deep into this

24   case, that there is an investment advisor we didn't know about

25   in followup discovery.  But we don't have anything to be able

15G0ABUC

1   to even start digging our teeth into and looking at.

2              THE COURT:  Right.  What are the numbers we're up to.

3   How many plaintiffs of the original group, how many is in the

4   second group, and how many in the third.

5              MR. DROSSMAN:  Fifteen, total.

6              THE COURT:  Fifteen, total?

7              MR. DROSSMAN:  Or 15 or 14.

8              MR. BROOKS:  It's 15.

9              MR. ROUHANDEH:  It's three in first group, five in the

10  second, and six in the third group.

11             MR. DROSSMAN:  I don't know if you are counting SCI as

12  the same.

13             There are 15, total, Judge.

14             THE COURT:  Okay.  I have 14.  Three, five, and six?

15             MR. ROUHANDEH:  It's actually, three, six and six.

16             THE COURT:  Three, six, and six.  What that means is

17  almost half the case, or maybe more, I don't know where you

18  stand on the second group.  But half of the case is still in

19  the early stages of discovery, meaning documents are not yet

20  produced and depositions are surely not taken.  I understand

21  you would like to get to trial, but apparently half of these

22  plaintiffs are in early stage of discovery.

23             MR. DROSSMAN:  No depositions have been taken --

24             THE COURT:  Well, the original three have, because

25  they're going for round two I saw on the R&R today.

15G0ABUC

1        MR. DROSSMAN:  Sure.  They took 30(b)(6) depositions.

2   And they have now taken third-party depositions.  They have not

3   taken the employee depositions that they intend to take of the

4   originals.

5        The second set, my understanding is that they have

6   wanted to wait until, even though we have produced the Griffin

7   and Chaney, they wanted to wait until this search term issue is

8   resolved before beginning depositions of the second set.  And

9   obviously the third set, they don't have the documents to do

10  it.

11       Your Honor, it was not our hope that this would take

12  as long as it has taken.  You know, we just -- we had to make

13  an election whether we were going to object to this very, very

14  broad search or not, Judge.  And we --

15       THE COURT:  Right.

16       MR. DROSSMAN:  -- spent time explaining to the special

17  master just how big it was, the searches that the defendants

18  were asking for.  But we didn't apparently get through to him,

19  and so now we're back for a second round.  I mean the Court

20  sent this to the special master in February.  We're not

21  intending to drag our feet.  We really didn't want it to take

22  this long.  We would like to get through the plaintiff's

23  discovery and get this thing over with.

24       THE COURT:  I would, too, because someday we have to

25  be in motion stage, which is a great big time toller, the

15G0ABUC

 1   inevitable motion for summary judgment where the defense looks

 2   you straight in the eye and says there is no issue of fact

 3   whatsoever, all right.  And then if we ever get passed that,

 4   someday there is either going to be resolution or trial.  So

 5   it's a long way out, long way out.

 6           MR. ROUHANDEH:  If I could just -- they said they

 7   couldn't persuade the special master.  The special master

 8   didn't see the hits until they waited the last day, 20 days,

 9   and sent the objections to your Honor.  I believe that was the

10   first time that he knew the number of hits.  And he put in the

11   mechanism which is if anything hits more than 30 thousand, come

12   back and tell him.  They didn't do that.  They, instead,

13   objected to your Honor, said we don't want to produce anything

14   beyond Chaney and Griffin.  So there are lots of hits, 288,000

15   documents.  Despite the fact that the defendants have all

16   reviewed more, and in many cases produced more in that number

17   of documents, we have said, okay, well, let's go back and look

18   at this before you take a search off the table and just throw

19   it away, look at some of the documents.  Sample some.

20           Undoubtedly, there are going be lots and lots of

21   documents that we do not want, that we don't care about.  But

22   the only way that you can focus on the ones that you want and

23   get rid of the ones you don't want, is to see what they are

24   hitting.  Because they could hit all sorts of inadvertent

25   things.  That helps you refine the search.  And so that's what

15G0ABUC

 1    we think should be done.  The way the special master has said

 2    is, well, let's just, instead of using "and," so it's anywhere

 3    in the document, use 15 on 45.  That may solve the issue, it

 4    may not.

 5          But what the real issue here is, we need -- when he --

 6    when the special master issues that order, we really need a

 7    deadline for their production.  Because what's happened so far

 8    is if something -- if they have been ordered to produce

 9    something, they say we can't do anything until it's all worked

10    out.  And I guess what that means is we have 12 plaintiffs who

11    we can't really start the depositions as to those plaintiffs,

12    because they're not going to want people deposed twice, and we

13    don't want to depose people twice.

14          And our principle concern in writing this letter and

15    coming here is, we're concerned that the delay in the case is

16    going to substantively affect us.  Because, at the end of the

17    day, it's just human nature that everybody wants to get things

18    done at the end.  And if the case drags on too long, and we get

19    the documents and we're -- you know, we'll work as hard -- we

20    have three law firms and work as hard and fast as we can.  But

21    we need time to look at the documents, see if there are any

22    followup requests, and do the depositions.  And that's the

23    process we're afraid is going to get short shrift.  And so the

24    solution is to move it along with deadlines and with the

25    special master giving a recommendation with the deadline in it,

15G0ABUC

1    your Honor, considering it, and then producing those documents

2    in a timely fashion.  And then giving us a fair shot to take

3    the deposition.

4            THE COURT:  Why can't we schedule all that out now?

5            MR. DROSSMAN:  The sticking point, your Honor, on how

6    long it is going to take for the production, is what the

7    production is going to look like.

8            THE COURT:  Yeah, but it's still per plaintiff.  It's

9    not that hard to estimate.

10           MR. DROSSMAN:  Well, your Honor --

11           THE COURT:  Even when the -- even when the overbroad

12   search produced 288,000 documents, for that plaintiff, how long

13   did it take to cull the 288.  I mean in the electronic age,

14   what did it take.  Less than a week?  Once they applied the

15   search terms through the data set and it produced 288, how long

16   did it take to do that?  Probably days.

17           MR. DROSSMAN:  I think that the process of indexing

18   and setting documents aside is a shorter process.  And the

19   larger piece of the process --

20           THE COURT:  Is the review.

21           MR. DROSSMAN:  Is the review.

22           THE COURT:  I understand that.  But that's where the

23   lawyer resources come into the picture.  So I still say if the

24   final parameters are set no later than next Monday, the 23rd of

25   May, then it sounds like whatever the run produces will be in

15G0ABUC

| | |
|---|---|
| 1 | your hands no later than the 31st of May.  Because it is just |
| 2 | days to run it.  Then you need a period of time to review it. |
| 3 | What do you need?  Three weeks?  Four weeks?  Two weeks?  What |
| 4 | do you think?  I mean I want to schedule this out, it is to |
| 5 | your benefit. |
| 6 | MR. DROSSMAN:  I know, your Honor.  Just to put it in |
| 7 | the context, Moody's just did a recent review and production of |
| 8 | documents that was, apparently, they reviewed 50,000 documents. |
| 9 | And the Court had ordered them to review and produce by |
| 10 | April 1st, giving them two months.  They appealed -- |
| 11 | THE COURT:  Two months from when? |
| 12 | MR. DROSSMAN:  Two months from February 1. |
| 13 | THE COURT:  From when?  From what stage of the effort? |
| 14 | MR. DROSSMAN:  From the stage of identifying the |
| 15 | searches that would be run. |
| 16 | THE COURT:  Well, you're going to be beyond that. |
| 17 | We're going to be, as I said, May 31st sounds to me like the |
| 18 | document will be in your hands for review. |
| 19 | MR. DROSSMAN:  But just to complete my thought, Judge, |
| 20 | it took them 3 months to do it, to do the review and |
| 21 | production. |
| 22 | THE COURT:  I don't look at it that way, Mr. Brooks, |
| 23 | you're wasting your breath.  And I'm not going to go through |
| 24 | the second half of that and tell you what might happen if he |
| 25 | waives too much of it.  I wouldn't want it to fall into the air |

15G0ABUC

```
 1    that Mr. Drossman fell into.  But anyway, on May 31, if you
 2    have the actual documents for review, and you should have them
 3    on electronic review platform, it shouldn't be in a box
 4    anymore.  Then you start putting your team on review.  And
 5    there is no reason you shouldn't have a rolling production,
 6    which I know I said in this case, particularly I remember with
 7    Ruiz, I said don't wait until it is all done, start rolling it
 8    all out.  Which is true.  Review one plaintiff, and another,
 9    and then another, you don't need to wait until plaintiff 12 to
10    produce one through six, right.  So I would think that in a
11    rolling production, you would be able to produce throughout
12    June and maybe complete it by say July 8th.  I think that's
13    plenty.
14               MR. DROSSMAN:  I think that's going to be very
15    difficult, your Honor.  And we'll do our best --
16               THE COURT:  Well, it's summer.  You can get lots of
17    law students.
18               MR. DROSSMAN:  I want to say one thing.
19               THE COURT:  Yes.
20               MR. DROSSMAN:  So that certain of the collections can
21    be done, I think, in a week or a week and a half time frame.
22               THE COURT:  I'm giving five weeks for the whole thing.
23    And you just get organized.  You do it by plaintiff.  You get
24    teams together.  I wasn't kidding about law students.  It is
25    the summer.  They are better than off-shore.  They have a
```

15G0ABUC

1   better idea of what relevance and privilege are about.

2   Honestly, people outsource these things to the most terrible

3   places.  But July 8th, seems to me, all documents should be in

4   defendant's hands.  You would be setting up depositions.  You

5   would have July, August, September.  That's enough, three

6   months to complete all depositions.  I don't know how this

7   compares to the old schedule, but I'm roughing it out and

8   saying by September 30th you would have completed all of the

9   depositions.

10          What's the defense reaction to that, September 30

11   complete them all.  All.

12          MR. ROUHANDEH:  Yes, your Honor.  Just by way of

13   background, it's not really a disagreement with that.  Twice

14   before when the Court set a deadline, we had 4 months from the

15   date of production.  We think we can probably do it in 3 months

16   to review all of those documents.

17          THE COURT:  You also have summer associates.  It's a

18   good time.  You have to keep them all busy, learn a lot.

19          MR. ROUHANDEH:  The only hesitation to -- and not just

20   saying thank you, we'll do it, was that sometimes there might

21   be some followup document discovery.  Which sometimes delays --

22   if they produced everything on July 8 and we got the running

23   start, okay.  But if -- if --

24          THE COURT:  They'll produce it before then, because

25   they are going to be doing it on a rolling basis, I hope.  You

15G0ABUC

```
 1    know, they are going to focus and say we're going to do the

 2    first two plaintiffs right away.  You'll have them.  Two more

 3    the next week.  Two more the next week.  You gotta do it,

 4    Mr. Brooks.  You want this big case, I know it is painful.  But

 5    somebody has to do that document review.  I'd volunteer myself,

 6    given the salaries, but I have a few other things to do.  I

 7    can't do it.  But anyway.

 8              MR. ROUHANDEH:  Past experience, doing this many

 9    times, August is a very hard month to take depositions.  I feel

10    we're going to do all of them in September.

11              THE COURT:  We can't rule out July and August.  You

12    just have to spread them around.  I know the foreign people,

13    they are smart enough to take one-month holiday.  They don't

14    work like Americans.  Americans are a little nutty about work.

15              MR. ROUHANDEH:  Most of these plaintiffs are --

16              THE COURT:  No, but then I was just looking.

17    Florida State Board of Administration, Pennsylvania Public

18    School Employees, National Agricultural Cooperative.  You have

19    a lot of Americans.  Americans are not good at vacationing.

20    Very poor.

21              MR. ROUHANDEH:  Three of the 12 are U S.

22              THE COURT:  I must have found those three.

23              MR. ROUHANDEH:  Yeah.

24              MR. DROSSMAN:  The last is actually Korean, Judge.

25              THE COURT:  The last is Korean?
```

15G0ABUC

1          MR. DROSSMAN:  The National Agricultural Collective.

2          THE COURT:  Korean.  I don't know how good they are at

3    vacationing.  I know Europeans are very good.

4          MR. BROOKS:  New Zealanders don't take off August.

5    They flip their schedule.  They take off January.

6          THE COURT:  Anyway, I realize the difficulty, but it's

7    matter of scheduling.  You have to focus on who can do what

8    when.  So do the Americans in August.  Do the others in July

9    and September.  But that's a schedule.  It's at least, you

10   know, a hope of getting something done.  I'll issue it as an

11   order.

12         What else?  So, then, after that would be concluded,

13   what is left to do before we talk about this inevitable motion

14   that you're gearing up for?

15         MR. ROUHANDEH:  Experts.

16         THE COURT:  Why does it have to be done before the

17   motion?  I'm of the firm view that most experts have nothing to

18   do with the summary judgment motion.  Either there is an issue

19   of fact or not.  Experts are for trial.  They are not for

20   motions.  They always say the opposite of each other.  They

21   indicate issues of fact anyway.  So, really, I don't see how

22   they are going to help me on summary judgment motion.  But some

23   do.  You know, some experts don't really clearly don't relate,

24   let's say damages expert.  That doesn't make me do summary

25   judgment.  Some of them you might feel do relate.  You have to

15G0ABUC

1    look at them one by one.  And we can put off this whole group

2    after the motion, because they don't relate, they are trial

3    experts.

4              MR. ROUHANDEH:  That might work.  We might actually

5    have agreement on that, I hesitate to say.  It is possible we

6    might have an agreement on that.  I do think loss causation

7    experts might be one that both sides --

8              THE COURT:  Maybe.  Is the Supreme Court getting their

9    work done?  Have they figured out loss causation as a term yet,

10   or not.  Have we got the opinion down?

11             MR. ROUHANDEH:  I don't think it's down.

12             THE COURT:  Not down.

13             Well, all right but it's almost June.  We're going to

14   know in this case where we are in loss causation.

15             MR. DROSSMAN:  It may not affect this case, Judge,

16   just because we don't of the official market here.  We're not

17   on --

18             THE COURT:  Well, that's true.  Let's see what they

19   write.

20             MR. DROSSMAN:  We can see, of course.  I tend to agree

21   with Mr. Rouhandeh that if they're going to move on loss

22   causation -- and I think they have indicated throughout this

23   case that they have planned to -- then we may need experts.

24             THE COURT:  I want to see that Supreme Court says, I'm

25   serious.  They may give us review of loss causation at this

15G0ABUC

1    stage of the game.

2            Let's just think where we're up to.  So where is the

3    plaintiffs discovery efforts with respect to the defendants?

4            MR. DROSSMAN:  Well, so, that's why I stood up, your

5    Honor.

6            THE COURT:  All right.

7            MR. DROSSMAN:  Because, we have had some staggered

8    discovery cut-off situations with the defendants as well.

9    Moody's discovery is ongoing.  We got their document production

10   on April 29th.  And so we've we submitted, Friday, I believe,

11   proposed schedules to the special master for a discovery.

12   cutoff.  And our proposal was that within two months of

13   April 29th, we would finish Moody's discovery.  We also have

14   some outstanding documents where we had made --

15           THE COURT:  Is that in dispute?  Why isn't that a

16   reasonable proposal, just agree to it.  Who needs a special

17   master for that?  I think they are agreeing, are you Ms.

18   Sullivan?

19           MS. SULLIVAN:  Yes, your Honor.  Our understanding is

20   that plaintiffs have until July 1 to finish depositions.

21           THE COURT:  So that's it, that's done.

22           MR. DROSSMAN:  Sure.

23           There is another issue, your Honor.  There are some

24   outstanding motions that we made back in January to the special

25   master, that relate to underlying assets that Morgan Stanley

15G0ABUC

1    arranged for the SIB.  We have -- we're waiting for a report

2    and recommendation on that.  We thought that we had an

3    agreement, fundamentally, that we would be able to take

4    depositions relating to those topics after May 1st.  That was

5    omitted from the proposal that Morgan Stanley sent.  And so if

6    the Court's going to issue a schedule, we just want to make

7    sure that we can take depositions relating to essentially

8    outstanding discovery requests, where we haven't received the

9    documents yet.

10           THE COURT:  I don't know how to respond to that.

11   That's sort of sub judice.

12           MR. ROUHANDEH:  Before the special master.  Exactly

13   what I was going to say.  Whether they get it and what the

14   consequences.

15           THE COURT:  I just have to wait.  It won't be much

16   longer.  He's pretty fast.

17           Why are you folks fighting about Carl Dasher and

18   Andrew Wilkin?  I haven't read this, but I'm surprised to see

19   every day another dispute from you people.

20           MR. DROSSMAN:  Well, your Honor, all of our

21   oppositions to certain of the relief or letters rogatory or

22   Walsh Act requests the defendants made.  For the most part,

23   those oppositions were based on our understanding that the

24   discovery cutoff was May 1.  And our position that foreign

25   depositions, so we filed those all before you ruled.  We filed

15G0ABUC

 1   our oppositions before you ruled.  Carl dasher is a separate

 2   issue.

 3        THE COURT:  So Wilkinson is going to go away?

 4        MR. DROSSMAN:  I believe, Judge.  If the rule is that

 5   they have until July 1 to do whatever they want, then that's

 6   the rule.  And you know, I don't think we can -- our objection

 7   was based on the timing, not on --

 8        THE COURT:  So Wilkinson is the same as the one I

 9   ruled on.

10        MR. DROSSMAN:  Sure.

11        THE COURT:  Maybe I can just close that one.

12        MR. DROSSMAN:  Right.

13        THE COURT:  With respect to Dasher.

14        MR. DROSSMAN:  With respect to Mr. Dasher, you know,

15   they have moved under the Walsh Act seeking permission.  He is

16   a U.S. citizen living in London, I believe, seeking permission

17   to take his deposition.  They did this before the Court reduced

18   their deposition number from 65 to 35.  And, in our view,

19   Mr. Dasher is not a relevant actor.  He was the chief financial

20   officer at SEI.  During the time frame, he didn't have any

21   involvement in the investments.  And he was several levels up

22   from the investments.  We don't think that they have satisfied

23   what is required under the Walsh Act showing that there is some

24   sort of extraordinary need to take this guy's deposition.  He

25   lives overseas.  But they've dropped at least one deposition

15G0ABUC

1   since the Court issued its order reducing the numbers.  I'm not

2   sure if they intend to do that with Mr. Dasher.  If so --

3           THE COURT:  We're awaiting Morgan Stanley's reply.

4   Are you going to submit a reply brief on that one?

5           MR. ROUHANDEH:  Yes, we are.  On Wednesday.

6           But that just raised a question.  And these are all

7   issues that I think we need to consider among all of the

8   defendants.  Because your Honor did reduce the number of

9   depositions.

10          THE COURT:  I did.

11          MR. ROUHANDEH:  And there are some we're going to take

12  off the table, and others we're not.

13          THE COURT:  So if you're going to take Dasher off for

14  any reason, I don't need to do extra work.  It's not funny.

15  You don't understand.  I don't have teams.  I have a couple of

16  hundred cases.  This one gets a disproportionate amount of my

17  time.  I have some very heavy cases.  I would like to know if I

18  don't have to do the work at the earliest possible time.  Let's

19  assume if you submit the reply on Wednesday, then you're

20  sticking with Dasher.  But if you choose not to, you'll submit

21  letter saying, given everything, we are withdrawing that

22  request.

23          MR. ROUHANDEH:  Okay.  We'll do that.

24          THE COURT:  Okay.  So I can close Wilkinson, and

25  you'll let me know about Dasher.

15G0ABUC

1          MR. ROUHANDEH:  Thank you, your Honor.

2          THE COURT:  Right?  Okay.

3          MR. DROSSMAN:  Your Honor, there maybe -- I don't know

4     if there are others pending.  There is a whole slew; some in

5     front of special master, some in front of you depending on

6     whether they are asking for letters rogatory or simply noticing

7     depositions.  But if there are others, other than Mr. Dasher,

8     any of their requests for letters rogatory, if we have opposed

9     them to date, they are all based on the discovery cutoff issue.

10         THE COURT:  All were the same except Dasher.  Maybe

11    you can write me a letter withdrawing the opposition to Mr. So

12    and So, and So and So, and So and So, so I know which ones I

13    can close.

14         MR. DROSSMAN:  Sure.

15         THE COURT:  All you have to do is look through your

16    oppositions, okay.  Say give me your ruling on so and so.  You

17    know.  But defense has to be pretty careful about the numbers.

18         MR. DROSSMAN:  Wilkinson may be the only other one.

19         THE COURT:  All right.  Maybe.

20         MS. SULLIVAN:  There is one discrete Moody-specific

21    issue that we're hoping to spare the Court a letter-writing

22    campaign on.  The deposition of Brian Clarkson, former Moody's

23    executive, who had nothing to do with the ratings at issue, his

24    deposition is currently scheduled for the end of next week.  We

25    believe that his deposition should be limited to one day, as

15G0ABUC

1    the Court has done with former employees of the defendants.

2         THE COURT:  I think two-day depositions are ridiculous

3    all around.  I think I read in one of the special masters

4    rulings today, he's giving two more days on some of these

5    30(b)(6) people for the plaintiff.  I don't understand.  There

6    is nothing good lawyers can't get done in seven hours.  That's

7    why the federal rules said so.  I don't understand this.  Two

8    days is a waste of time.  People are wasting time.  Time is

9    money.  Time is precious.  And time is delay.

10        MS. SULLIVAN:  Agreed.  And I raised this with

11   plaintiff's counsel just briefly before the hearing.  We're

12   happy to give them the full seven hours.

13        THE COURT:  Well, how are you getting two days for

14   these 30(b)(6) people that I read this morning.  Why?  It's a

15   second bite.  You're redoing the same people, right.  And the

16   special master writes don't go over the same ground, it better

17   be a different issue, that you were not allowed to take before

18   because there were class issues, now there's merits.  Okay, so

19   he said, yes, you can have them.  Did he say two days?

20        MR. ROUHANDEH:  Those might in fact be one day.  But

21   for other 30(b)(6) depositions for the 12 plaintiffs, there I

22   think it is going to be two days because we have -- especially

23   if we're limited, we don't take fact depositions, there are

24   many, many topics and it has taken -- they took --

25        THE COURT:  Are you limited to one day on those second

15G0ABUC

1   round 30(b)(6), the same people that you took once before when

2   you were limited to class certificate issues and now he says

3   there are distinctions, there are new issues?  Those should be

4   limited to one day.

5           MR. ROUHANDEH:  That's fine with us.

6           THE COURT:  You can't ask --

7           MR. ROUHANDEH:  Yeah, that's fine.

8           THE COURT:  -- Brooks to be limited to one day, when

9   he takes, whoever, Clarkson, and then stand there and want two

10  days, which are unnecessary on round two.  So, you agree to be

11  limited to one day on the people you are deposing for the

12  second time.

13          MR. ROUHANDEH:  That's fine, your Honor.

14          THE COURT:  That's one day.  Now, about you with this

15  guy, Clarkson.

16          MR. DROSSMAN:  Sure.  Your Honor, Mr. Clarkson is the

17  person they pointed to and said don't take Mr. McDaniel's

18  deposition, take Mr. Clarkson's deposition.  He can tell you

19  everything that Mr. McDaniel who doesn't want to sit for a

20  deposition, everything that Mr. McDaniel knows, Mr. Clarkson

21  knows.  We have a lot of documents for him, Judge.

22          I do want to just briefly tell the Court that they --

23  they raised this issue with another witness previously with the

24  special master.  And we've said -- the way this evolved, your

25  Honor, is that we began taking one day depositions in this

15G0ABUC

 1   case.  Citing your standing order, the defendants began -- they

 2   said we want two-day depositions of the plaintiffs.  And so

 3   they took two-day depositions.  And throughout most of this

 4   case, two-day depositions were the norm.  Then after awhile,

 5   they started objecting and saying there should only be one day.

 6   We're fine with one day going forward.  We are fine with two

 7   days going forward.  Just that the order, the rule, is

 8   reciprocal.  So we just want -- you know, we want parody in

 9   this.  And they have not agreed to do it.  And they have said,

10   well, you have taken most of your depositions, so we should get

11   two days going forward.  But for any remaining depos, no matter

12   how important they are or how you care about them, they should

13   only be one day for you.

14         So I guess, Judge, we're fine either way.  We would

15   prefer to have two days for Mr. Clarkson.  We have a lot

16   material to go through with him.  But if we're getting limited,

17   time after time, to one day on these depositions, then we feel

18   like they should have the same limitation.

19         THE COURT:  Theoretically that sounds good, everybody

20   plays by the same rules.  But all witnesses are not the same

21   that's why I have a special master.  Because you might have to

22   evaluate one witness as different than another witness.  And

23   you shouldn't say, well, if all are two, then I want two.  I

24   mean that's childish.  Some just don't need two.  And some may

25   need two.  And it sounds like instead of just saying I want

15G0ABUC

| | |
|---|---|
| 1 | what they get on every single witness, I'm willing to evaluate |
| 2 | this case by case.  I just said those re-dos or do-overs on |
| 3 | plaintiffs already been deposed must be one, he says, okay. |
| 4 | You said so it has to be.  But for the new ones, we have so |
| 5 | many topics, well that's what you're saying about Clarkson. |
| 6 | MS. SULLIVAN:  The key distinction in your ruling on |
| 7 | the one-day depositions.  Depositions have been limited to one |
| 8 | day, in contrast to plaintiff, the depositions plaintiffs have |
| 9 | taken which have gone two days of party deponents.  Gail Scott, |
| 10 | former S&P employee.  Clarkson same boat, former Moody's |
| 11 | executive, they have no basis of taking, of a nonparty, two |
| 12 | days worth of deposition. |
| 13 | THE COURT:  Well, you're at risk.  Seems to me if they |
| 14 | can prove up that they still need McDaniel, because you didn't |
| 15 | give them what they need with Clarkson, then they're going to |
| 16 | waste time re-asking for McDaniel, and we're all going to have |
| 17 | to look at that again. |
| 18 | MS. SULLIVAN:  Fair enough. |
| 19 | THE COURT:  If you give them what they need from |
| 20 | Clarkson, they aren't going to ask for McDaniel because they |
| 21 | would have gotten the answers. |
| 22 | MS. SULLIVAN:  Well, having seen both Mr. Drossman and |
| 23 | Brooks in action, I have no doubt they can get what they need |
| 24 | in one day from Mr. Clarkson. |
| 25 | THE COURT:  I think that was a compliment.  Used to |

15G0ABUC

1    her advantage, but it was a compliment.

2              I really do think good lawyers can get whatever they

3    need during one day, as long as there is not wasted objections

4    and waste of time and defense lawyer making sure you don't

5    really get to use your time.

6              Where is this guy, is he in New York?

7              MR. DROSSMAN:  New York.

8              MS. SULLIVAN:  Right here, New York.

9              THE COURT:  So, it's no real burden, I suppose.  It's

10   all silliness as to whether it is one day or two days.  It

11   should be no more than two days, obviously, with best efforts

12   for one day.  But if at the end of seven hours he is tired and

13   doesn't want to keep going, I guess they can have a part of the

14   second day until they're done.  But I would ask everybody to

15   try hard to finish it in one day.  So I would treat it as

16   aspirational, not a ruling.  This is the way to avoid McDaniel,

17   which is what you want to avoid.  Then let's get it done.  I

18   would ask you to try to get it done one day.  Even be an eight

19   hour day, or even a nine hour day.  If you can't get it done,

20   I'll let you go into a second day, as long as you don't abuse

21   it.  Not going to make it a one-day cutoff for him.

22             MR. DROSSMAN:  Thank you, your Honor.

23             One last dispute that's arisen.  And rather than write

24   letters and take it up the chain.

25             THE COURT:  Yes.  Terrible, terrible.

15G0ABUC

1              MR. DROSSMAN:  Among the witnesses that the defendants

2     are now seeking to depose that they had not really during this

3     entire period is Chaney.  Chaney is obviously a big player.

4     Apparently Chaney has agreed to sit in London to provide a

5     30(b)(6) witness in London to sit for a deposition.  And we

6     expect that this deposition probably will be trial testimony.

7     It's in London.  And we've told them, there are a lot of

8     documents that Chaney has produced in this case.  They have

9     noticed --

10             THE COURT:  Chaney is an entity, not a person.

11             MR. DROSSMAN:  30(b)(6) witness.

12             THE COURT:  Okay.

13             MR. DROSSMAN:  There are a lot of documents.

14             THE COURT:  And it will be taken in London?

15             MR. DROSSMAN:  Going to be taken in London.  And we've

16    asked the defendants that we get half the time for Chaney.

17    It's a deposition that -- if it's going to -- if Chaney is

18    going to be in this case we need to have --

19             THE COURT:  When you say "half the time," you mean

20    defendants are deposing him?

21             MR. DROSSMAN:  The defendants have noticed Chaney's

22    deposition for two days.  And we would like to take a day of

23    testimony from Chaney.

24             THE COURT:  So you are saying you want half as much as

25    the defendants get.  If they question this person for two solid

15G0ABUC

1   days, you want a third day.  Is that --

2            MR. DROSSMAN:  Right.  I mean my thinking was that

3   perhaps everybody could -- we think we can get our examination

4   done in a day or less.

5            THE COURT:  Yes.

6            MR. DROSSMAN:  But we want to have that opportunity.

7   And because Chaney is sitting under, my understanding,

8   voluntarily.

9            THE COURT:  I understand.  So you want a day.

10           MR. DROSSMAN:  Yes, we do.

11           THE COURT:  Whatever they take, whether they take one

12   or two, you still want a day.

13           MR. DROSSMAN:  That's right.

14           THE COURT:  Who objects to that?

15           MR. ROUHANDEH:  That's fine.  As long as we get two

16   days.  I mean there were discussions on this deposition with

17   Chaney, setting the date.  And then they decided not to take

18   it.  And when they found out we were taking it, suddenly now

19   they want to limit us to one day and they get one day.  We

20   think it is an important deposition.

21           THE COURT:  It is important.  Both parties have

22   questions to ask.  I think droning on for two days reveals a

23   certain lack of ability to question a witness.  It doesn't take

24   two days.  It's my view, I told you, good lawyers can get any

25   deposition done in seven hours or less.  That's my view.  But

15G0ABUC

```
1    since I think you're good lawyers, you should be able to get it

2    done in seven hours.  I don't understand, maybe you're not

3    doing the questioning.  Less competent counsel is, I don't

4    know.  I believe you can get it done in seven hours if you want

5    to.  However, since you have been dealing with two days all

6    along, I won't limit you.  But you can have your day.

7             MR. DROSSMAN:  Thank you.

8             THE COURT:  It's only fair.

9             So that's that.  So we have a bit of a schedule, which

10   we'll try to put in writing.  And I would see you, I hope it

11   would be at the motion stage, in October, ready for premotion

12   conference, to see if the defense really thinks this is a

13   motion case, in all respects or partial.

14            MR. ROUHANDEH:  Okay.

15            MR. DROSSMAN:  Okay.

16            MR. ROUHANDEH:  Set a date or --

17            THE COURT:  That's what I am thinking.  Not that I

18   expect to get away without seeing you between now and then,

19   because I'm sure you'll find discovery disputes or appeals or

20   something to bring to my attention.  But I will still set a

21   date.

22            I know you all travel, but it is still -- the best day

23   for me would be Friday, October 14th, at 4:30 be all right or

24   not.  I know you don't like Friday.

25            MR. DROSSMAN:  Fine for us, your Honor.
```

15G0ABUC

1       THE COURT:  All right.  With that much notice, maybe

2   you can turn it into a good weekend here.  So October 14th at

3   4:30, in the hope that this would be a premotion conference so

4   we can actually discuss the merits a little.

5       MR. DROSSMAN:  Is it anticipated that we would have an

6   exchange of letters --

7       THE COURT:  Absolutely.  I have individual rules.

8   Surely all those lawyers know how to find them.  That would be

9   pathetic if they don't know how to find individual rules.

10      So Therefore you do, don't you, defense lawyers?

11      MR. ROUHANDEH:  Absolutely.

12      THE COURT:  Yeah, they know how.  They write the

13  moving letter, and you respond, all that.  My rules say when in

14  advance of the conference.

15      If, for some shocking reason, they decide there is no

16  motion at all, we would still have to conference and discuss

17  what happens next.

18      Are you folks discussing settlement anywhere?  I have

19  not asked that question in ages.  Is there any effort?

20      MR. BROOKS:  There hasn't been, your Honor.

21      THE COURT:  In complex financial cases, sometimes

22  people think it is worth paying one of the select group of

23  mediators out there who do a lot of complex financial cases.

24  Or we can provide you free help with either a magistrate judge

25  or a hit-or-miss court mediation program.  So there is three

15G0ABUC

1    options.  Somebody you get off the list here that you don't

2    know and that's free.  Or a magistrate judge.  Or you go out

3    and hire one in that group that everybody knows who they are

4    and they make a lot of money and they help people settle

5    financial cases.

6        Which of those three do you think might be good in

7    this case.

8        MR. BROOKS:  We have used paid mediators in the past.

9    And we have had, obviously, a lot of success with paid

10   mediators.  I think the predicate, though, is that you have to

11   have both sides that want to reach a resolution and that are

12   interested in discussing settlement.  And while we're happy to

13   sit down and we would be glad to talk settlement, I don't think

14   the defendants share that interest.  So I'm not sure that any

15   of those three options would make sense when you don't have a

16   willing party.

17       THE COURT:  Well, that may be right.  It may change as

18   discovery winds up, or after the motions stage, I don't know.

19       At this point, has Mr. Drossman correctly assessed

20   things, that there is not a lot of interest in working with a

21   mediator in helping to try to reach a resolution?

22       MR. ROUHANDEH:  I think that's true at this point,

23   yes.

24       THE COURT:  Well, all right then.  We can grind along

25   with discovery and motion practice.  And I will continue to ask

15G0ABUC

1    that question.  But Mr. Rouhandeh says this group is not a

2    willing partner right now.

3              Okay.  All right.

4              MR. ROUHANDEH:  Thank you, your Honor.

5              MR. DROSSMAN:  Thank you.

6              THE COURT:  Maybe I will or won't see you before

7    October, we don't know.

8              ALL:  Thank you.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25