C28JABUC                        Teleconference

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ABU DHABI COMMERCIAL BANK,
    individually, et al.,
4
                  Plaintiffs,
5
            v.                          08 Civ. 7508 SAS DCF
6
    MORGAN STANLEY & CO.
7   INCORPORATED, et al.,

8                 Defendants.

9   ------------------------------x

10

11

12                                      February 8, 2012
                                        3:30 p.m.
13

14

15

16  Before:

17              HON. SHIRA A. SCHEINDLIN,

18                                      District Judge

19

20

21

22

23

24

25
```

C28JABUC                        Teleconference

1               (Teleconference in chambers)

2               THE COURT:  Good afternoon.  Let me take roll call.  I

3     do have a court reporter here so we'll have a record.

4               For the plaintiff, I have Mr. Drosman?

5               MR. DROSMAN:  Yes.

6               THE COURT:  Mr. Brooks?

7               MR. BROOKS:  Good afternoon.

8               THE COURT:  Mr. Alvarado?

9               MR. ALVARADO:  Good afternoon.

10              THE COURT:  From Morgan Stanley, I have Mr. Rouhandeh?

11              MR. ROUHANDEH:  Good afternoon.

12              THE COURT:  Mr. Perez-Marques?

13              MR. PEREX-MARQUES:  Good afternoon, your Honor.

14              THE COURT:  For Moody's, I have Mr. Coster?

15              MR. COSTER:  Good afternoon.

16              THE COURT:  And Mr. Rubins?

17              MR. RUBINS:  Good afternoon, your Honor.

18              THE COURT:  Good afternoon.

19              For S&P and McGraw Hill, I have Mr. Ringel, right?

20              MR. RINGEL:  Good afternoon.

21              THE COURT:  And is it Ms. Roy?

22              MS. ROY:  Ms. Roy.

23              THE COURT:  So you all have to know that telephone

24     conferences are difficult.  You have to say your name before

25     you speak, and the other thing you have to do is recognize the

C28JABUC                        Teleconference

1   shortcomings of our telephone system.  I probably explained

2   this on previous telephone conferences, and that is your voice

3   will block my voice.  The way this system works, if you're

4   talking, you can't receive the signal of my voice, so to speak.

5          If you were in court and you saw the judge was trying

6   to interrupt you, you'd pause.  On the telephone you'd have to

7   just pause to give me a chance to interrupt because you don't

8   know I am trying to speak when you're speaking.  That said, let

9   me tell you why we're on the phone.

10         I received a letter, dated February 6th, 2010, from

11  Mr. Drosman, asking for what I consider to be an enormous, just

12  an enormous extension of all page limits, and I know that

13  defendants haven't yet responded, but I really don't want to

14  read three defense letter responses to this.  I think this is a

15  matter that courts should try to deal with on the telephone and

16  not read bunches of single-spaced letters.

17         To give the defendants some comfort, they're not going

18  to be prejudiced by not having had a chance to respond.  I must

19  say, I just can't give what the plaintiffs are asking, so there

20  has to be a reasonable middle ground here.  I notice that

21  plaintiffs rely heavily on a case of mine from 1998.  The hope

22  is in 14 or 15 years, you get better and you learn something.

23  Whatever I allowed in 1998, believe me, I wouldn't consider in

24  2012, some 14 years later.  I am not sure whatever I said or

25  did in Union Carbide, so that is that.

C28JABUC                         Teleconference

```
1            So there has to be a fair and realistic way to do
2     this.  I may have referenced in this case the Southern District
3     Pilot Project for Complex Cases, I think I have, and said you
4     ought to look at it.  One of the things it has suggested is to
5     do away with 56.1s entirely, which around the country are not
6     favored.  We use them in the Southern District, but they're not
7     used around the country, partly because of the kind of misuse
8     that I would see here were I to allow these extensive
9     responses.

10           The suggestion of the pilot project is to consider not
11    using them in complex cases.  They're kind of helpful in
12    one-on-one small cases where there are 10 facts in dispute, but
13    in this situation things just get out of hand, then everybody
14    puts in the expert reports or the deposition segments of the
15    transcript anyway.  So these 56.1s are like a complaint and an
16    answer.  They're just so useless.

17           That said, Mr. Drosman, the defendant's 56.1 is in,
18    and I read your letter giving me the example of your view of
19    why it is inaccurate starting right out with Paragraph 1, where
20    they make -- that is, defendants -- make the statement, and I
21    am quoting:

22           "Plaintiffs testified that they understood the
23    Cheyne's SIP credit ratings to reflect only the views of the
24    respective rating agency that issued them.  Not one plaintiff
25    has testified that it had a contrary understanding at the time
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   it invested."

2          Then you pick apart four of the exhibits that the

3   defendants cite in support of that particular statement.  Much

4   of what you put there is that they were not asked particular

5   questions or they didn't know the answer to that question.  You

6   call that a distortion and you say it would take me 25 pages to

7   take on their 25 pages, and I need another 25 for me to tell

8   you all my facts are not in dispute, to which defendants will

9   then reply telling me why yours aren't right.

10          If I went along with your suggestion, you know, I

11   would have a hundred pages, I would have 25, 50 and 25, and

12   there is no way.  I am not going to do it.  I am not going to

13   do it.  It is called self-preservation.  It is out of hand, so

14   we'll get back to that.

15          Then the next thing you want, you want 20 different

16   declarations, that defense has put in one of an attorney, but

17   you want 20 and you say the reason you need 20 is to do one

18   from each plaintiff, all of whom I assume have been deposed, or

19   one from every expert, all of whom I assume have prepared an

20   expert report, and then one from the attorney attaching the

21   requisite number of exhibits.

22          I understand the attorney's affidavit, but with

23   respect to 15 plaintiffs, if they're going to say something now

24   in an affidavit that they didn't manage to say in discovery,

25   where they produced their records, they were deposed, then it

C28JABUC                         Teleconference

```
 1    just opens up another round of discovery.  The defendants are
 2    going to say they've now put in an affidavit that for the first
 3    time says X.  It is nowhere in the documents, nowhere in the
 4    deposition transcript, this isn't fair, and I think that is
 5    right.
 6              These parties have given discovery and were deposed.
 7    Why is it you need to put in another affidavit from each of
 8    them when you could simply cite to the page and line of their
 9    deposition or to some documents they produced that make the
10    identical point?
11              Then you want a declaration of every expert.  That is
12    another problem.  These experts have written expert reports,
13    have they not, Mr. Drosman?
14              MR. DROSMAN:  They have, your Honor.  I think the
15    reports in this case have not been contemplated by the
16    schedule, so the parties have not exchanged expert reports.
17              THE COURT:  Then I can't have an expert declaration
18    for another reason.  The defense will say they have never seen
19    this before and the declaration only opens the door asking them
20    for a deposition.  Did the defense put in any expert testimony
21    at all on its motion, Mr. Rouhandeh, Mr. Coster, Mr. Ringel?
22              MR. ROUHANDEH:  No, we did not.
23              THE COURT:  So if they didn't, I don't understand what
24    you're going to do by opening up expert discovery, so to speak,
25    before we're having expert discovery.  These are supposed to
```

C28JABUC                          Teleconference

1    be, are there material issues of fact in dispute precluding

2    summary judgment.

3         MR. ROUHANDEH:  Your Honor, if I may?  I am not sure

4    if you're finished.

5         THE COURT:  I guess I was.  I got through the 15

6    affidavits request for each plaintiff with, I might add, 15

7    exhibits each, which total 225 exhibits.  It is not going to

8    happen.  And expert affidavits with 15 exhibits?

9         Don't you see that you're papering the court to death?

10   I can't deal with it this way because the defendants will have

11   to come back and ask for the chance to either depose these

12   experts now before reports, before expert discovery, or to

13   counter every one of the new things with equally long -- I

14   cannot be papered to death this way.  This is not what summary

15   judgment practice is supposed to be.

16        I think you have to meet this motion, so to speak, on

17   its own terms without making it so huge a record that you

18   essentially hope to win by default.  Your view must be if I put

19   in, you know, 700 pages -- I didn't total it, but whatever it

20   is, and it may well be that with 15 affidavits and 225

21   exhibits, with 15 pages each and 50 page 56.1, it might be a

22   thousand pages.  Of course, she will deny summary judgment

23   because it is overwhelming, comes in boxes, too much to go

24   through so she will say somewhere in these thousand pages there

25   must be a disputed issue of fact.

1          Surely there is a leaner way to do that.  Is it

2     correct all 15 plaintiffs were deposed?

3          A VOICE:  It is, your Honor.

4          THE COURT:  Who is that just for the record?  I know

5     who it was because I know who I asked the question of.

6          MR. DROSMAN:  Mr. Drosman, your Honor.

7          THE COURT:  Anyhow, please remember to state your

8     name, all of you, when you do speak.

9          There has to be a far more rational way to do this.  I

10    said I would circle back to the 56.1.  We can start there.  It

11    is as good a place to start as any, but there is no way it will

12    be 50 pages.  You will have to figure out how do I get it done

13    in 25 pages.  Can I simply deny all of theirs and then state

14    mine or can I group theirs and say here is where it is

15    inaccurate with one cite.

16         There has to be some intelligent lawyering here.  I am

17    not taking 50 pages from you and then with the 25 new pages, so

18    to speak, on your undisputed facts, they will come back and

19    demand 25 pages.  As I said, that is a hundred pages of 56.1.

20    The answer is no.  A court has complete power not to limit the

21    right to make summary judgment, but to limit the submissions.

22         Years ago we had a famous old judge here that said I

23    will read the first 25 pages and the rest will go in the

24    wastebasket.  You can write 50 or 60 or 70, but the rest goes

25    into the wastebasket.  That was Judge Pollack.  In any event,

C28JABUC                        Teleconference

1    we have to figure this out.  Now having heard all I have to

2    say, Mr. Drosman, what can you propose that is rational because

3    the letter is irrational.

4           MR. DROSMAN:  Why don't we take the Rule 56.1

5    statement first, if that is okay with your Honor?  This is Dan

6    Drosman, by the way.

7           If we look at that, I guess we're concerned because

8    the local rules require us to respond to each fact identified

9    by defendants with obviously an admission or denial, and then

10   where a fact is denied, provide support for that denial.  You

11   can imagine when they cite to simply deposition testimony for

12   15 clients for a certain proposition, and it isn't supported by

13   that testimony, our concern is, as we pointed out in the

14   letter, that misrepresentation takes a little time and space to

15   unravel.

16          THE COURT:  Not really because I can read, too, so

17   what you could say is, "Denied.  See Plaintiff X's deposition,

18   at Page 10."  We'll turn to Page 10.

19          MR. DROSMAN:  I guess what we could do to

20   short-circuit this process is we can just simply alter the

21   local rules so we will be permitted to deny without

22   providing --

23          THE COURT:  No, I didn't say that.  I said, "Denied.

24   See Plaintiff X's deposition, at Page 10."

25          MR. DROSMAN:  Right.  A lot of it is what they say the

1  plaintiffs said the plaintiffs didn't say.

2          THE COURT:  I understand that.  "See Plaintiff X's

3  deposition, at Page 10."  I'll turn to Page 10 and I will see

4  for myself.  You don't need to write a sentence.  You don't

5  need to make an argument.  You are denying with factual

6  support.  "Denied.  See Plaintiff Jones' deposition, at Page

7  12."  That is it.  I'll turn to Page 12.

8          MR. DROSMAN:  Okay.  It sounds like that is what is

9  going to happen.  We'll do that and maybe we can move on to the

10  issue with the affidavits.

11          THE COURT:  No, I don't think we are ready for that.

12  So now you get through these denials, and I don't know that you

13  will admit any of the 140, but if you do, that is nice and

14  you'll deny the rest with just a citation to where I look.

15          Then how many do you need to do and how much support

16  are you going to carry on with?  Again you can say such and

17  such a fact is disputed -- no.  Are you cross-moving?

18          MR. DROSMAN:  No, we are not.

19          THE COURT:  So why do you have to put in facts that

20  are not in dispute?  Why did you need the extra 25 pages to put

21  in your own facts?

22          MR. DROSMAN:  Obviously, there are facts that support

23  a genuine issue of material fact such that summary judgment

24  should be denied.

25          THE COURT:  Right, but isn't that going to be in your

1   denials each time where you say, "Denied.  See Jones

2   deposition, Page 12"?

3             MR. DROSMAN:  No, not necessarily.  They simply

4   ignored quite a bit of evidence that raises a material issue of

5   fact, material dispute of fact.  To the extent they simply

6   glossed over denied evidence, we need to put in affirmative

7   evidence to support our opposition.

8             THE COURT:  That doesn't sound like a 56.1.  I thought

9   in a 56.1 you put in facts that you say are not in dispute.

10             MR. DROSMAN:  Let me give you an example.

11             THE COURT:  If you say --

12             MR. DROSMAN:  If you read their brief, they really

13   don't mention the fact that there were conflicts of interest

14   that resulted in inflated ratings.  They don't mention that,

15   for obviously reasons.

16             THE COURT:  Right.

17             MR. DROSMAN:  One of the facts that support their

18   scienter here is that there are conflicts that defendants

19   admitted caused them to inflate their rates.  Obviously, we

20   have to -- this is one example of several.

21             I am trying to put it in concrete terms.  We have to

22   be permitted to put in evidence, regarding both deposition and

23   documentary evidence, regarding these facts in order to support

24   our contention and our belief that summary judgment is unwanted

25   here because there is, unwarranted here because there is quite

C28JABUC                          Teleconference

1    a bit of material facts in dispute with respect to the

2    defendants' scienter.

3              THE COURT:  So after you finish admitting or denying

4    each of their 140, you need to put in some more, not all more

5    because some of those will be in the denials, but some more

6    facts that you say, and here's a list of facts we say are

7    disputed and are material that have not already been brought to

8    your attention.

9              MR. DROSMAN:  Right.

10             THE COURT:  That is not 25 pages.  It can't be.  It is

11   a list of the facts and the citation again.  At most I would

12   think that's what?  How many of those could there be, 10 pages?

13             MR. BROOKS:  Your Honor, this is Luke Brooks.  The

14   defendants have submitted 25 pages.

15             THE COURT:  Right.

16             MR. BROOKS:  Essentially to say plaintiffs have not

17   met their evidentiary burden and there is nothing here.  The 25

18   pages basically is seeking to shift the burden on us to support

19   our case with material facts.

20             THE COURT:  Right.

21             MR. BROOKS:  It took them 25 pages to do that.

22             THE COURT:  Right.

23             MR. BROOKS:  They're not establishing anything.

24   They're seeking to establish an absence of something.

25             THE COURT:  Right.

1          MR. BROOKS:  Now, in response, we have to

2     affirmatively come forward with our evidence.

3          THE COURT:  This is not, Mr. Brooks, this is not news

4     to me.  You know how long I have been doing summary judgment?

5     You do it in 25 pages total, that's it, no extensions.  I don't

6     think you need it.  I think you need to do it efficiently and

7     cleverly, and I already told you how.

8          I am going on the denials.  Say Denied.  See X

9     deposition, page whatever.  That is it.  On the ones you think

10    are in dispute, do it the same way.  Do it in 25 pages.  There

11    is no reason for extension on the 56.1, and that is the end of

12    it.  Whether you think I am right or wrong, that is what you

13    are getting.

14         We move on to this notion of the declarations you want

15    with a total of 225 exhibits, and every exhibit can be 50

16    pages.  That won't happen, either, but you can talk about it

17    now.  I am ready to hear you talk about why you should be

18    putting in a declaration for plaintiffs and 15 exhibits each.

19    I just can't understand, but I am happy to hear about it.

20         MR. DROSMAN:  We'll take the affidavits/declarations

21    first.

22         THE COURT:  Yes.

23         MR. DROSMAN:  Obviously when our clients were deposed,

24    they were asked questions, they were noticed by the defendants

25    and asked questions the defendants wanted to ask them.  We

C28JABUC                        Teleconference

1    didn't depose our own clients because we believed that we would

2    simply call them at trial to offer testimony.  They weren't

3    asked a lot of questions that would enable us to provide the

4    affirmative evidence that we need to provide, so there is not a

5    way that we can cite to the deposition record because the

6    deposition record simply doesn't contain the information that

7    our clients will be prepared to testify at trial with respect

8    to their reliance and other issues.

9            So it is extremely important that we be permitted to

10   provide at least one declaration per plaintiff so that they

11   have an opportunity to explain to the court, provide the court

12   with a proffer of evidence that they would give at trial.

13           THE COURT:  What do they have to say other than, "I

14   relied on the credit rating when I made this purchase"?

15           MR. DROSMAN:  They need to discuss their reliance.

16           THE COURT:  What do they have to say, Mr. Drosman?  "I

17   relied.  That is one of the things I relied on when I made this

18   purchase."  That's their statement.  That could be one

19   affidavit.  The following 15 plaintiffs all state under oath

20   and have signed this declaration at the end that they relied in

21   part on the rating for this vehicle when they bought it, one

22   sentence, 15 signatures.

23           MR. DROSMAN:  I am not sure it is that simple.

24           THE COURT:  I am not sure it is not.  I am not sure it

25   matters what you think if I am satisfied that puts the fact in

C28JABUC                          Teleconference

 1    dispute.  You won, you know?  I just can't try cases on summary

 2    judgment.  People have got to get realistic about summary

 3    judgment and what it really is.

 4            If they say they -- excuse me.  I was still speaking,

 5    Mr. Drosman, I was still speaking.  Now you have to wait

 6    anyway.  Hold on, please, hold on.

 7            (Pause)

 8            THE COURT:  Sorry for the interruption.  I am now

 9    getting my train of thought back.

10            You said you don't think it is that simple, but I am

11    not trying a case on summary judgment.  I have to draw every

12    inference in favor of the non-moving party if it swears under

13    oath to reliance at least in part.  That is the reliance

14    argument.  It said so.  Who am I to say they're lying?  They

15    say they relied, so they relied.  So reliance isn't going to be

16    easy for the defendant.

17            Causation is trickier, that is, I admit that is

18    trickier, but what do you want to say about reliance other than

19    if they're willing to swear under oath they relied at least in

20    part on the credit rating in making this purchase, the problem

21    is maybe some of them have said the opposite in deposition, I

22    don't know.  If somebody already said under oath I didn't pay

23    the least bit of attention to the credit rating and it meant

24    nothing to me, you have a hard road to hoe if somebody already

25    said that.

C28JABUC                          Teleconference

1          MR. DROSMAN:  Your Honor, this is one example of the

2     distortion.  There was an investment advisor when the

3     plaintiffs who had guidelines that required them to invest in

4     only AAA instruments.

5          THE COURT:  Right.

6          MR. DROSMAN:  That is why they would have cited this

7     stuff to you and persuaded you our clients didn't rely on the

8     ratings when, in fact, that is not the case.

9          THE COURT:  I am still saying on reliance, if they

10    swear so under oath, what is there to say?  It is for another

11    day for somebody to believe them or not.  I can't.

12         MR. DROSMAN:  In terms of logistics, would it make

13    more sense to provide a one or two-page declaration from each

14    or do you want a single declaration from all?

15         THE COURT:  I am thinking a single declaration for all

16    on reliance.  Call it the reliance declaration because that is

17    pretty simple at this point, not trial, but summary judgment.

18    They testified they relied.  You know they relied.  That is

19    fine.

20          Now the damages issue is trickier.  There is this

21    issue of one, they said -- hold on.  The defendant says the

22    senior note holders have no damages at all.  With the others,

23    they say there is no evidence that their reliance, so to speak,

24    on statements or ratings or whatever caused the loss.  That is

25    trickier.  There are two different damages issue.  One group

C28JABUC                         Teleconference

1    they say had no damages.  I don't know who the senior note

2    holder plaintiffs are.  How many of them are there?

3             MR. BROOKS:  Off the top of my head, I am not

4    positive, but there are a number of each.  There are a number

5    of senior note holders and number of --

6             THE COURT:  Starting with the senior note holders, the

7    defense said they had no damages.  I suppose they would have to

8    put in some evidence that they lost money.

9             MR. BROOKS:  Your Honor, that is part of what we

10   intended to do with --

11            THE COURT:  You have to what, put in declarations?

12            Let's have this one thing called the reliance

13   declaration, one thing as I said signed by 15 people.  That is

14   the easiest one.  On these damages, you might need five

15   separate ones for the five senior note holders at least

16   explaining that they lost money, if they did.

17            MR. BROOKS:  Sure, your Honor, they did all lose

18   money.

19            THE COURT:  I haven't read the defendants' brief, but

20   I see at Page 32 of the table of contents, it said they have no

21   evidence of damages.

22            MR. BROOKS:  They assert that because, among other

23   things -- I don't want to paraphrase all their assertions, but

24   they assert because they exchanged their Cheyne note for some

25   other investment, a Griffin note when the Cheyne note went in

C28JABUC                          Teleconference

1   receivership and was restructured, that they, in fact, still

2   hold something that is related to the investment.  Whether or

3   not that is the case is a fact for dispute.

4              THE COURT:  Well, well --

5              MR. BROOKS:  And that --

6              THE COURT:  If they still hold it and it still has

7   value, they haven't yet lost any money.

8              MR. BROOKS:  Your Honor, it does not have the same

9   value that they invested in the Cheyne note.  Even if it did,

10  they are now tied into I think a 30-year investment when they

11  made a 90 day or 8 month commitment when they bought the Cheyne

12  note.

13             THE COURT:  Still, still I don't know that they

14  suffered the loss yet.  This 30-year note, can they sell it?

15             MR. BROOKS:  Can they sell the note, your Honor.

16         There is a market for it.  There is evidence that

17  plaintiffs have attempted to try.  Of course, what they get

18  back is not the same amount they purchased Cheyne for.  The

19  market is less, and that is because the note is supported by

20  assets that were held in Cheyne that are not performing as --

21             THE COURT:  Well, maybe those 7 or 6 or 10, whatever

22  it is, can do one group thing also because it is not

23  fact-specific.  All of them, all of that group exchanged the

24  Cheyne note for the Griffin note which has completely different

25  terms and conditions.  At this point it has far less value, and

1    that is your factual record on the senior note holders.

2              With the loss causation problem, how are you planning

3    to contest that?  They say there is no proof of loss causation.

4              MR. BROOKS:  We have an expert who we intended to

5    submit a declaration from who will explain why defendants'

6    fraud caused plaintiffs' loss.

7              THE COURT:  Now finally after 27 minutes we turn to

8    whoever wants, from the defense side wants to speak to that.

9              If the plaintiffs put in an expert declaration

10   explaining loss causation, what are you going to do in reply?

11   And which of the defense counsel wants to think about that?

12             MR. ROUHANDEH:  Jim Rouhandej, your Honor.

13             We want to see it first and see what it says because

14   it is possible that we would want to just respond to it in our

15   brief.  It is also possible that we might want to put an expert

16   in.  I know we are wary of just having dueling experts on this

17   issue, but we might also conceivably, I suppose, ask the

18   court's permission for a deposition or even a Daubert motion.

19             I don't think --

20             THE COURT:  That is what worries me.  That is the only

21   way, Mr. Brooks -- Mr. Brooks or Drosman -- that you intended

22   to address loss causation was through your expert?

23             MR. BROOKS:  That was our plan, Judge.

24             THE COURT:  Is that one expert, Mr. Brooks?

25             MR. BROOKS:  For loss causation, yes.

1    THE COURT:  Then that one expert can put in a

2  declaration.  Obviously, you have to.

3          We talked about the group of senior note holders maybe

4  doing one declaration together called the damages declaration

5  as a group explaining what you just explained on this record

6  about exchanging the notes and why they claim that that is

7  economic loss, and we'll have the expert declaration on loss

8  causation and the attorney's declaration, to the extent you

9  still need one, to put in however many exhibits you need to

10  contest the attorney declaration with its exhibits, but that is

11  it.

12          MR. DROSMAN:  Your Honor, in addition, there is a

13  percipient witness who would testify at trial and has very

14  highly relevant information.  He was not deposed, and we had

15  intended to put in a declaration from him as well.

16          THE COURT:  On what issue?

17          MR. DROSMAN:  On the scienter issue, defendants'

18  eligible fraud.

19          THE COURT:  How come this person wasn't disclosed in

20  the Rule 26 disclosures?

21          MR. DROSMAN:  Defendants knew about this person.  They

22  have known about this person since Mr. Jones' declaration.

23          MR. BROOKS:  They noticed his deposition and decided

24  not too take it.

25          THE COURT:  Mr. Rouhandeh, do you know exactly who he

1    is talking about?

2              MR. ROUHANDEH:  Actually, I have no idea.

3              THE COURT:  Who is it?

4              MR. DROSMAN:  Jason Rowe, your Honor

5              THE COURT:  Mr. Rouhandeh, do you know who Jason Rowe

6    is?

7              MR. ROUHANDEH:  I think he was their investigator and

8    I think they claimed privilege over any communications with any

9    witnesses had with Mr. Rowe.  I think he is employed by or has

10   a contract with Mr. Drosman's firm.

11             THE COURT:  Right, Mr. Drosman?

12             MR. DROSMAN:  No, your Honor.  We provided the

13   investigative memoranda that he authored with respect to Kai

14   Gilkes.

15             THE COURT:  Would you spell that?

16             MR. DROSMAN:  K A I, and G I L K E S.  He is a fairly

17   senior member of S&P and former employee, quantitative analyst

18   for S&P that worked directly on the Cheyne S&P.

19             Mr. Rowe spoke to him on three different occasions,

20   and the information that Mr. Rowe obtained from Mr. Gilkes, it

21   is extremely important your Honor see it.  It alone precludes

22   summary judgment on the issue of scienter.

23             THE COURT:  Let's go back to the deposition situation.

24             The defendants' first notice, Mr. Rouhandeh withdrew

25   their notice all without your having claimed privilege?

1          MR. DROSMAN:  I don't believe we ever claimed

2     privilege over Mr. Rowe.  I don't know that they withdrew --

3          THE COURT:  I don't know.  Mr. Rouhandeh just said so.

4     He said if his recollection is right you did claim privilege

5     and that is why they didn't go forward with the deposition.  I

6     don't know whose memory --

7          MR. DROSMAN:  Maybe there is some confusion.  Some of

8     the information that Mr. Rowe has may be privileged, so we may

9     have issued an objection that said on privilege grounds, but

10    clearly the information related to communication with Kai

11    Gilkes was already provided to defendants much in advance of

12    that.  Those objections were not privileged and we didn't

13    intent to assert privilege and we already provided it to

14    defendants.  If defendants had intended to ask questions about

15    other interviews which were not --

16         THE COURT:  Are those, Mr. Drosman, are those other

17    interviews going to be the subject of his declaration or is it

18    limited to Kai Gilkes?

19         MR. DROSMAN:  Limited to Kai Gilkes, your Honor.

20         THE COURT:  Then they have the paperwork that says

21    what Gilkes says.  If that is all he is going to put in, so be

22    it.  That shouldn't cause a problem, either, but he can't go to

23    others that you said were off limits before and then put it up

24    for the first time on summary judgment.  It is limited to Kai

25    GIlkes.

C28JABUC                        Teleconference

1           We are going to have the investigator, we are going to

2     have the expert, we are going to have a group affidavit on

3     reliance and a group affidavit for the senior note holders who

4     did the exchange and the attorneys.  That is five.  That is it.

5           MR. DROSMAN:  Your Honor, if we could have one more

6     declaration, making a total of six, I will tell you what it is

7     and why we need it.

8           We have an expert who has worked extensively in

9     modeling and rating areas and he has taken a look at the

10    assumptions and the data that was used to model and rate the

11    Cheyne SIP, and his conclusions are that after performing

12    extensive analysis, that the substance and data are completely

13    unfounded and unsupported.

14          THE COURT:  What does that go to, an actionable

15    misstatement?

16          MR. DROSMAN:  It goes to falsity, recklessness and

17    scienter, your Honor.  There is no reasonable basis to

18    believe --

19          THE COURT:  No, no, I understand the point, sort of.

20          It goes to scienter, but the first point in the brief

21    says there is no evidence of any actionable misstatement.

22    There is, according to you, an actionable misstatement by the

23    rating agency, and that's what he is going to contest?  He is

24    going to say of course it was a misstatement, there is no basis

25    for it?

C28JABUC                     Teleconference

1           MR. DROSMAN:  Right.  He has also looked at the data

2    that Morgan Stanley has provided to the rating agencies.

3    You'll say --

4           THE COURT:  Yes, I know there is a claim they made a

5    misstatement, too, I understand.  So it goes to basically

6    Points 1 and 2 in the defense brief?

7           MR. DROSMAN:  Right.

8           THE COURT:  The actionable misstatement and evidence

9    of scienter?

10          MR. DROSMAN:  Right.

11          THE COURT:  That is an expert?

12          MR. DROSMAN:  Yes.

13          THE COURT:  Mr. Rouhandeh, when I talked to you a

14   moment ago about the loss causation expert, you said in a very

15   lawyerly way, "Before I would decide what to do about it, I

16   have to see it."

17          Obviously, you would say the same thing again, but we

18   can't try the case on summary judgment.  I am sure you could

19   put up an expert who would say that we were absolutely rational

20   and we had plenty of bases for the rating we gave, and then it

21   is just a battle of the experts.  One will simply cancel the

22   other.  Surely you have an expert ready to say that the rating

23   was accurate or had a basis, or both?

24          MR. ROUHANDEH:  I think from Morgan Stanley's

25   perspective, our answer is we would want to see it, but our

 1    answer may be simply a legal answer that we would want to take

 2    a good look at it.  It is hard for us --

 3         THE COURT:  Right.  Maybe I should hear from the

 4    rating agency because this person will say Morgan Stanley gave

 5    bad information, but in addition the rating agency said there

 6    is no basis for the ratings.

 7         MR. COSTER:  Jim Coster from Moody's.

 8         I think we are in the same boat.  We want to see what

 9    the affidavit said.  What we have left here is a fraud claim.

10         THE COURT:  But the essence of it is there was no

11    basis for the rating.  It is going to explain in many, many

12    pages and in detail why that person reaches that conclusion.

13         That is the essence of it.  I am saying surely you

14    have an expert from Moody's that will say surely there was

15    basis.  Where does that get me unless we are going to have

16    Daubert at the same time as summary judgment, which we may as

17    well throw away the motion because we haven't had the reports,

18    we haven't had the depositions, we are not ready for this, we

19    cannot do a Daubert challenge to these people.

20         Therefore, if they're accepted as experts for the

21    purpose of this motion, there will be a counter-expert saying

22    the opposite.  Where does that get us?  Any of the lawyers on

23    the phone can think about that.  The plaintiffs' expert says

24    there was no basis for the rating and the defense expert says

25    of course there was a basis for the rating.  Unless those

C28JABUC                        Teleconference

 1    experts are completely discredited as in Daubert, they can't be

 2    accepted on summary judgment, then I have a disputed issue of

 3    fact.

 4            MR. COSTER:  We understand exactly what you're saying,

 5    but we have to assert the right to make that challenge.

 6            THE COURT:  I understand.  It is not going to get us

 7    anywhere.  I know you can do it.  You have an employee or an

 8    expert who will say, of course, we had a basis, but I can't

 9    weigh those competing reports.

10            Even in today's world, in the post-Walmart world I

11    don't weigh expert opinions.  There is no question about it.

12    Courts have been writing about this.  I cannot weigh the

13    experts.  I am not the fact-finder.  I can't do it.  As long as

14    the expert can pass the smell test of Daubert that they have

15    the experience, you know, and they studied in this and that,

16    and I am sure the expert has a Ph.D in something or 35 years of

17    business experience in something, I am sure that these experts

18    can pass that test.

19            What is there to do?  All right.  I am just making the

20    point.  If either side thinks they're going to dump paper here,

21    they're wrong.  That is six affidavits.  Let's talk about those

22    six affidavits.  It doesn't make if they're affidavits or

23    declarations, but anyway, six of them?  They should be quite

24    short in pages.  There is the group reliance one and the group

25    senior note holder damages one, I don't see how either of those

1   two should be more than three pages.  That is two three-page

2   declarations.  The attorney one, the expert one, the

3   investigator one and the other expert -- sorry, two experts,

4   the investigator and the attorney, I guess they can go to the

5   usual 15 if need be.

6          But with respect to exhibits, I don't think there

7   should be any exhibits on the reliance or on the senior note

8   holders.  Let them explain the situation.

9          With respect to the two experts, I don't know that

10  they need exhibits, either.  They're going to be giving,

11  basically they're going to be setting out their own

12  qualifications, the work they did to reach the conclusion and

13  the conclusion they reached.  I don't know what exhibits have

14  to do with that.

15         That leaves the investigator who would put in the

16  report that the defense has already seen -- but I haven't --

17  with respect to Kai Gilkes, however you say it.  He has to put

18  in those exhibits, and the other expert on this scienter

19  misstatement on rating agencies and Morgan Stanley, he may have

20  to use exhibits to support his opinion.  He is the only one or

21  it is a she, maybe we got very lucky it is a she, I don't know,

22  but that person can put in 15 exhibits if needed.

23         That is where I am coming out is that the attorney can

24  put in 15, the expert on misstatement and scienter can put in

25  15, but the other, the investigator just puts in the reports on

C28JABUC                         Teleconference

1    Kai Gilkes.  The group reliance should have none essentially,

2    and the group exchange of the one note for the other, maybe a

3    few exhibits if you need to that just show the different terms

4    of the notes.  Like you say, one was eight months and one was

5    30 years.  I guess I have to see that, but very limited.

6              That is it.

7              MR. BROOKS:  Your Honor, as we noted in our letter,

8    the defendants have submitted on a disk to the court hundreds

9    of exhibits they cited in support of their motion, and they

10   submitted 15 pages of deposition testimony.

11             THE COURT:  The hundreds you're talking about on this

12   disk I haven't seen.  I assume those are the ones that

13   correlate to the 56.1s where they say see deposition transcript

14   at X or deposition transcript at Y, and I suggested you do the

15   same.  So hopefully those so-called hundreds -- there was no

16   authority for putting in hundreds other than if they're

17   absolutely tied to the 56.1.  Is that what all those hundreds

18   are, Mr. -- I don't know to to call on -- Mr. Coster or Mr.

19   Rouhandeh?

20             MR. ROUHANDEH:  Yes, and also it is linked to the

21   cases.

22             THE COURT:  Why linked to the cases?  I will be very

23   nice to you.  If that is part of the hundreds, that is

24   discounted right there.  I don't need them.

25             MR. DROSMAN:  The hundreds that I was referring to in

1   the letter, I wasn't referring to cases or even deposition

2   testimony.  What I was referring to are documents produced in

3   discovery.  If you look at their 56.1 statement, they simply

4   cite to Bates numbers, and then all of those hundreds of

5   documents are then provided to the court on a disk a week after

6   summary judgment, which I thought was what the court objected

7   to and then in the Sgalambo case.

8          THE COURT:  Yes, I do, and I sent it back and made

9   them do it again.  I don't know why those hundreds are there.

10  There is nothing in my rules that would allow that.  I thought

11  it, as I said, it correlates to the 56.1 to check the fact

12  against the cited document.  If there is anything outside of

13  the 56.1, they should resubmit that disk appropriately.

14         MR. ROUHANDEH:  That is exactly what you said, just so

15  you can check the cite from the docket, there if is nothing

16  more --

17         THE COURT:  Every document is cited in the 56.1?

18         MR. ROUHANDEH:  Yes.

19         THE COURT:  Well, obviously you can do the same then,

20  Mr. Drosman.

21         MR. DROSMAN:  And I guess our concern is that, my

22  concern has always been we want to make sure that the documents

23  are part of the record on summary judgment.  Just to the extent

24  there is any appellate issues, the appellate court will be able

25  to access them.  If we can file this electronic document, I

C28JABUC                         Teleconference

1    suppose that takes care of the issue.

2            As long as the appellate court has access to it, I

3    have no problem in whatever format.

4            THE COURT:  There is no point in docketing it now.

5    There is no appellate review.  Unless the defendants prevail,

6    it is perfectly acceptable to docket it now.  I get those

7    letters all the time now they would like to make part of the

8    record in the lower court for the purposes of appeal the

9    following 10 submissions, and I so order it and it gets

10   docketed.

11           MR. DROSMAN:  Fine.

12           THE COURT:  We don't need to clutter because if you

13   survive, it all merges with the judgment, as you know.

14           Okay?  All right?

15           So you're obviously going to have to order this record

16   because there was all kinds of rulings on the page limits and

17   exhibit limits and everything else, but I guess you will have

18   to do your 56.1 the same way, and it is not a good thing.  It

19   is all an end-run around my rules because basically you're

20   saying to my chambers to wade through our 56.1, you have to

21   look at 300 documents.  That is not what we're supposed to be

22   doing.  That is what is wrong with 56.1, and that is why the

23   rest of the country doesn't use it.  Nobody wants it.  It is a

24   relic in New York.  Nobody wants it.  When they try to make it

25   part of the federal rules, it was shouted down by both sides

1    and courts don't use it.

2              All right.  I don't think I can do anything more

3    today.

4              MR. COSTER:  Jim Coster.  Given the tight frame, tight

5    time-frame, I wonder if plaintiffs will identify who the rating

6    agency expert is, who it is that is putting the affidavit in.

7              THE COURT:  When is your affidavit due, Mr. Drosman?

8              MR. DROSMAN:  February 29th, your Honor.  I think it

9    is 20 days.

10             THE COURT:  When are you prepared to identify this

11   person?  Surely you know who it is.

12             MR. DROSMAN:  We were going to provide them with all

13   the information on the 29th.

14             THE COURT:  No.  He is saying don't wait until the

15   last day, we need time, we don't want to have to ask the court

16   for an extension to reply.  We can start researching this

17   person.  There is no secret.  Who is this person?

18             MR. DROSMAN:  Would it be acceptable to the court if

19   we provided them with that information on the 20th, your Honor?

20             THE COURT:  Today is only the 8th, right?

21             MR. DROSMAN:  Correct.

22             THE COURT:  Why chew up 12 days of letting them

23   research who this guy is?  It is not a report.

24             MR. DROSMAN:  That is fine.  If your Honor wants us to

25   identify the person, we are happy to do it.

C28JABUC                          Teleconference

1          THE COURT:  Yes, they can look up his name, his

2    publications, affiliations, experience.  Who is it?

3          MR. DROSMAN:  The person is Sanji Das, a former

4    professor at Harvard, and he currently runs the business school

5    at Santa Clara University.

6          THE COURT:  His last name is spelled how?

7          MR. DROSMAN:  D A S.

8          THE COURT:  That is the rating agency expert?

9          MR. DROSMAN:  That's right.  I should say that is --

10   that's right, your Honor.

11         THE COURT:  I understand he will say about Morgan

12   Stanley and the rating agency.  Who is the other expert we are

13   talking about?

14         MR. DROSMAN:  Loss causation expert, that is Bjorn

15   Steinhold, S T E I N H 0 L D.

16         THE COURT:  All right, folks, I have to go take care

17   of a criminal matter.

18              (Court adjourned)

19

20

21

22

23

24

25