UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

ABU DHABI COMMERCIAL BANK, et al.,
Individually and On Behalf of All Others
Similarly Situated,

                    Plaintiffs,

      vs.

MORGAN STANLEY & CO.
INCORPORATED, et al.,

               Defendants.

——————————————————————— x

:   Civil Action No. 1:08-cv-07508
:
:   <u>CLASS ACTION</u>
:
:
:   PLAINTIFFS' MEMORANDUM OF LAW
:   IN SUPPORT OF THEIR OPPOSITION TO
:   DEFENDANTS' JOINT MOTION FOR
:   SUMMARY JUDGMENT PURSUANT TO
:   FEDERAL RULE OF CIVIL
:   PROCEDURE 56(c)
:
:
:
:

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ........................................................................................................2

        A.      The Ratings Are Actionable Misstatements ...........................................3

        B.      Morgan Stanley Made an Actionable Misstatement.................................6

        C.      The Evidence of Falsity and Scienter Present Disputed Issues of Fact ...................7

        D.      Plaintiffs Justifiably Relied on Defendants' False Statements .............................20

        E.      The Evidence of Loss Causation Presents Disputed Issues of Fact.....................32

                1.      Plaintiffs' Losses Were Caused by the Materialization of the Risks
                        Concealed by Defendants' Fraud..............................................................34

                2.      Plaintiffs' Losses Were Within the "Zone of Risk"..................................41

                3.      All of the Plaintiffs Were Damaged by Defendants' Fraud......................42

        F.      Generic Disclosures Do Not Negate Loss Causation or Scienter .........................44

        G.      Aiding and Abetting Has Been Established............................................................45

III.    CONCLUSION...................................................................................................45

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
269 F.R.D. 252 (S.D.N.Y. 2010) ............................................................20

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
651 F. Supp. 2d 155 (S.D.N.Y. 2009)........................................... *passim*

*ADL, LLC v. Tirakian,*
No. CV 06-5076(SJF)(MDG), 2010 WL 3925131
(E.D.N.Y. Aug. 26, 2010)..........................................................................3

*Advanced Magnetics v. Bayfront Partners,*
106 F.3d 11 (2d Cir. 1997)......................................................................32

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,*
646 F. Supp. 2d 385 (S.D.N.Y. 2009),
*aff'd,* 386 Fed. App'x 5 (2d Cir. 2010)...................................38, 40, 43

*Alexander v. Evans,*
No. 88 Civ. 5309 (MJL), 1993 WL 427409
(S.D.N.Y. Oct. 15, 1993) .......................................................................28

*Am. Optical Co. v. Curtiss,*
56 F.R.D. 26 (S.D.N.Y. 1971) ...............................................................30

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..................................................................................2

*Anschutz Corp. v. Merrill Lynch & Co.,*
785 F. Supp. 2d 799 (N.D. Cal. 2011) .....................................................4

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,*
727 F. Supp. 2d 256 (S.D.N.Y. 2010) ....................................................43

*Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,*
432 F.3d 428 (2d Cir. 2005).....................................................................2

*B.R.I. Coverage Corp. v. Air Canada,*
725 F. Supp. 133 (E.D.N.Y. 1989) ........................................................32

*Bank of N.Y. v. Tyco Int'l Grp., S.A.,*
545 F. Supp. 2d 312 (S.D.N.Y. 2008).....................................................2

Page

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995)...............................................................................30, 32

*Banque Franco-Hellenique de Commerce Int'l Maritime, S.A. v. Christophides*,
    106 F.3d 22 (2d Cir. 1997)...................................................................................29

*Brandoff v. Empire Blue Cross & Blue Shield*,
    707 N.Y.S.2d 291 (N.Y. Civ. Ct. 1999).............................................................30, 32

*Center v. Hampton Affiliates, Inc.*,
    66 N.Y.2d 782 (1985)..........................................................................................19

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007),
    *aff'd*, 354 Fed. App'x 496 (2d Cir. 2009)..............................................................8

*Chem. Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984)..................................................................................34

*China Dev. Indus. Bank v. Morgan Stanley & Co., Inc.*,
    927 N.Y.S.2d 52 (1st Dep't 2011)..........................................................................22

*Chubb & Son, Inc. v. Kelleher*,
    No. 92CV4484(TLM), 2010 U.S. Dist. LEXIS 141842
    (S.D.N.Y. Oct. 22, 2010)........................................................................................6

*Compuware Corp. v. Moody's Investors Servs.*,
    499 F.3d 520 (6th Cir. 2007)...................................................................................6

*CPC Int'l Inc. v. McKesson Corp.*,
    70 N.Y.2d 268 (1987)..........................................................................................3, 6

*Danna v. Malco Realty, Inc.*,
    857 N.Y.S.2d 688 (2d Dep't 2008).........................................................................6

*Defer LP v. Raymond James Fin., Inc.*,
    654 F. Supp. 2d 204 (S.D.N.Y. 2009)....................................................................18

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008)....................................................................45

*ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*,
    858 N.Y.S.2d 94 (1st Dep't 2008)...........................................................................6

- iii -

**Page**

*Eurycleia Partners, LP v. Seward & Kissel, LLP,*
    849 N.Y.S.2d 510 (1st Dep't 2007) ............................................................................7

*Fait v. Regions Fin. Corp.,*
    655 F.3d 105 (2d Cir. 2011) ......................................................................................5

*Gabriel Capital, L.P. v. NatWest Fin., Inc.,*
    122 F. Supp. 2d 407 (S.D.N.Y. 2000) ......................................................................16

*Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3,*
    No. CIV 09-0300 JB/KBM, 2011 WL 5840482
    (D.N.M. Nov. 12, 2011) ............................................................................................4

*Gabriel Capital, L.P. v. NatWest Fin., Inc.,*
    177 F. Supp. 2d 169 (S.D.N.Y. 2001) ................................................................20, 21

*Glatzer v. Scappatura,*
    470 N.Y.S.2d 675 (2d Dep't 1984) ............................................................................7

*Gordon & Co. v. Ross,*
    84 F.3d 542 (2d Cir. 1996) ......................................................................................20

*Hotaling v. A.B. Leach & Co.,*
    247 N.Y. 84 (1928) ..................................................................................................32

*Houbigant, Inc. v. Deloitte & Touche, LLP,*
    753 N.Y.S.2d 493 (2003) ............................................................................................8

*In re Ambac Fin. Grp., Inc.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ......................................................................39

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. (N.D. Cal. 2009) ...............................................................................39, 40

*In re Citigroup Inc. Sec. Litig.,*
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) ......................................................................18

*In re Cnty. of Orange,*
    No. CV96-0765GLT, 1997 U.S. Dist. LEXIS 22459
    (C.D. Cal. June 2, 1997) ............................................................................................3

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................................39

**Page**

*In re Eugenia VI Venture Holdings, Ltd.*,
    649 F. Supp. 2d 105 (S.D.N.Y. 2008)......................................................................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009)......................................................................45

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)........................................................................................3

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................18

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011)........................................................................................5

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................................18

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)......................................................................18

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    No. 09 MD 2030(LAP), 2011 WL 1330847
    (S.D.N.Y. Mar. 30, 2011)..........................................................................................44

*In re Metlife Demutualization Litig.*,
    262 F.R.D. 217 (E.D.N.Y. 2009)..............................................................................19

*In re Mut. Funds Inv. Litig.*,
    590 F. Supp. 2d 741 (D. Md. 2008)..........................................................................39

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)......................................................................................33

*In re Optimal U.S. Litig.*,
    No. 10 Civ. 4095(SAS), 2011 WL 6424988
    (S.D.N.Y. Dec. 21, 2011)......................................................................................5, 7

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    244 F. Supp. 2d 247 (S.D.N.Y. 2003)......................................................................43

*In re Refco Inc. Sec. Litig.*,
    No. 07 MDL 1092 (JJR), 2011 U.S. Dist. LEXIS 33554
    (S.D.N.Y. Mar. 28, 2011) ....................................................................................5, 20

**Page**

*In re Tycom Ltd. Sec. Litig.,*
No. 03-CV-1352-PB, 2005 WL 2127674
(D.N.H. Sept. 2, 2005) .................................................................................39

*In re Vivendi Univ., S.A. Sec. Litig.,*
605 F. Supp. 2d 570 (S.D.N.Y. 2009)..........................................................32

*In re Vivendi Universal, S.A. Sec. Litig.,*
765 F. Supp. 2d 512 (S.D.N.Y. 2011)..........................................................19

*In re WorldCom, Inc. Sec. Litig.,*
352 F. Supp. 2d 472 (S.D.N.Y. 2005)..........................................................18

*Int'l Design Concepts, LLC v. Saks, Inc.,*
486 F. Supp. 2d 229 (S.D.N.Y. 2007)..........................................................32

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,*
No. 01 Civ. 6600(RLC), 2007 WL 1222583
(S.D.N.Y. Apr. 25, 2007)..............................................................................34

*Janus Capital Grp., Inc. v. First Derivative Traders,*
___ U.S. ___, 131 S. Ct. 2296 (2011)................................................7, 15, 17

*Jay Dees Inc. v. Defense Tech. Sys., Inc.,*
No. 05 Civ 6954(SAS), 2008 WL 4501652
(S.D.N.Y. Sept. 30, 2008)............................................................................23

*JP Morgan Chase Bank v. Winnick,*
350 F. Supp. 2d 393 (S.D.N.Y. 2004)..........................................................28

*JSMS Rural LP v. GMG Capital Partners III, LP,*
No. 04 Civ. 8591(SAS), 2006 WL 1867482
(S.D.N.Y. July 6, 2006) ...............................................................................44

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001).................................................................7, 13, 14

*Kimmell v. Schaefer,*
637 N.Y.S.2d 147 (1st Dep't 1996),
*aff'd,* 89 N.Y.2d 257 (1996)............................................................................4

*King County v. IKB Deutsche Industriebank AG,*
708 F. Supp. 2d 334 (S.D.N.Y. 2010)............................................... *passim*

**Page**

*King County, Wash. v. IKB Deutsche Industriebank AG,*
No. 09 Civ. 8387(SAS), slip op. (S.D.N.Y. Oct. 29, 2010)....................................45

*Kuo Feng Corp. v. Ma,*
699 N.Y.S.2d 575 (1st Dep't 1998) ........................................................................19

*Lapin v. Goldman Sachs Grp., Inc.,*
506 F. Supp. 2d 221 (S.D.N.Y. 2006).....................................................................3

*Lemanik, S.A. v. McKinley Allsopp, Inc.,*
125 F.R.D. 602 (S.D.N.Y. 1989) ...........................................................................31

*Lentell v. Merrill Lynch & Co.,*
396 F.3d 161 (2d Cir. 2005)...........................................................................32, 41

*Louros v. Kreicas,*
367 F. Supp. 2d 572 (S.D.N.Y. 2005).....................................................................33

*Mandarin Trading Ltd. v. Wildenstein,*
16 N.Y.3d 173 (2011) ..............................................................................................6

*Mateo v. Senterfitt,*
918 N.Y.S.2d 438 (1st Dep't 2011) ..........................................................................7

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,*
928 N.Y.S.2d 229 (1st Dep't 2011) ........................................................................32

*McClellan v. Smith,*
439 F.3d 137 (2d Cir. 2006)......................................................................................2

*Mogul v. Jenkins Bros.,*
120 N.Y.S.2d 585 (1st Dep't 1953) ........................................................................30

*N.J. Carpenters Health Fund v. DLJ.Mortg. Capital, Inc.,*
No. 08 Civ. 5653(PAC), 2010 WL 1473288
(S.D.N.Y. Mar. 29, 2010) .......................................................................................44

*Ohio Police & Fire Pension Fund,*
No. 2:09-cv-1054, 2011 WL 4448847
(S.D. Ohio Sept. 26, 2011).......................................................................................5

*Owens v. Gaffken & Barriger Fund, LLC,*
No. 08 Civ. 8414(PKC), 2009 WL 3073338
(S.D.N.Y. Sept. 21, 2009) .......................................................................................42

Page

*Pemex-Refinacion v. Tbilisi Shipping Co. Ltd.*,
   No. 04 Civ. 02705(HB), 2004 WL 1944450
   (S.D.N.Y. Aug. 31, 2004) ....................................................................................32

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   592 F. Supp. 2d 608 (S.D.N.Y. 2009)....................................................................30

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   No. 05 Civ. 9016(SAS), 2006 WL 708470
   (S.D.N.Y. Mar. 20, 2006) ...............................................................................31, 32

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011)...................................................................................6

*Pro Bono Invs., Inc. v. Gerry*,
   No. 03 Civ. 4347(JGK), 2008 WL 4755760
   (S.D.N.Y. Oct. 29, 2008) ......................................................................................32

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) .............................................................................44

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
   No. 10 Civ. 2835(NRB), 2011 WL 4357368
   (S.D.N.Y. Sept. 19, 2011)......................................................................................18

*Ret. Sys. v. Moody's Corp.*,
   No. CGC-09-490241, slip op.
   (Cal. Super. Ct., Cnty. of San Francisco June 1, 2010) ..........................................4

*Sheehy v. New Century Mortg. Corp.*,
   690 F. Supp. 2d 51 (E.D.N.Y. 2010) ................................................................8, 20

*Shields v. Citytrust Bancorp*,
   25 F.3d 1124 (2d Cir. 1994)....................................................................................8

*Silver Oak Capital L.L.C. v. UBS AG*,
   920 N.Y.S.2d 325 (1st Dep't 2011) ..................................................................32, 45

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders
   in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
   407 F.3d 34 (2d Cir. 2005)....................................................................................30

*Tahini Invs., Ltd. v. Bobrowsky*,
   470 N.Y.S.2d 431 (2d Dep't 1984)........................................................................22

- viii -

Page

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898(SAS), 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ..................................32

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008) ..................................................................................................19

*Todd v. Pearl Woods, Inc.*,
    248 N.Y.S.2d 975 (2d Dep't 1964),
    *aff'd*, 15 N.Y.2d 817 (1965) ..................................................................................................28

*United States v. Bank of New England, N.A.*,
    821 F.2d 844 (1st Cir. 1987) ..................................................................................................18

*UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*,
    733 N.Y.S.2d 385 (1st Dep't 2001) .......................................................................................29

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) ...............................................................................................................3

*Valentini v. Citigroup, Inc.*,
    No. 11 Civ. 1355(LBS), 2011 WL 6780915
    (S.D.N.Y. Dec. 27, 2011) .......................................................................................................18

*Vandenberg v. Adler*,
    No. 98 CIV. 3544 WHP, 2000 WL 342718
    (S.D.N.Y. Mar. 31, 2000) .......................................................................................................16

*Wechsler v. Steinberg*,
    733 F.2d 1054 (2d Cir. 1984) ...................................................................................................8

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77k .............................................................................................................................................5
    §77k(a)(4) ...................................................................................................................................5
    §78j(b) ........................................................................................................................................7
    §78o-7(m) ..................................................................................................................................4

Federal Rules of Civil Procedure
    Rule 56(a) ..................................................................................................................................2
    Rule 56(c)(2) ...........................................................................................................................20
    Rule 56(d)(2) ...........................................................................................................................20

SEC Rule 2a-7 ................................................................................................................22, 26

**Page**

**LEGISLATIVE HISTORY**

Pub. L. 111-203, H.R. 4173
   §933(a) ....................................................................................................................................4

## I.      INTRODUCTION

Plaintiffs collectively purchased more than $980 million of the Cheyne SIV's Rated Notes and suffered devastating losses.  ¶40.[1]  The overwhelming evidence establishes that those losses were caused by defendants' fraud.  Plaintiffs have established a triable issue of fact as to the claims alleged.

All defendants made materially false statements.  The evidence establishes that the ratings had materially false components and defendants had no reasonable basis to believe the assigned ratings were justified.  Each defendant knew of or recklessly disregarded the falsity of the alleged misstatements.  All defendants knew that the data and assumptions used to rate the Cheyne SIV notes were unreliable and insufficient to support the ratings.  They knew that the assets the Cheyne SIV held were not accurately rated and that the ratings were not commensurate with the risk.  The defendants ignored these facts and issued top ratings without a basis in fact for doing so.  Kai Gilkes, S&P's most senior quantitative analyst in Europe when the Cheyne SIV was launched, summed it up:

> So it is a factual statement that the ratings of those [structured investment] vehicles were inappropriate because the ratings of the underlying assets were not appropriate. ***So it leads to the conclusion that they should not have been rated***, but that is not necessarily my – is not necessarily my belief.  It is just a factual statement.

¶3(w).  Nevertheless, defendants issued the fraudulent ratings, which arose out of the rating agencies' unquenchable thirst for market share and Morgan Stanley's ("MS") desire to feed its lucrative mortgage securitization machine.

Every plaintiff (or its investment advisor) testified that the ratings assigned to the Rated Notes were a substantial factor in each of the plaintiffs' decision to purchase the Rated Notes.  This

---

[1]      Unless otherwise indicated, all "¶" and "¶¶" references are to Plaintiffs' Response to Defendants' Joint Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.

testimony is corroborated by contemporaneous documents.  Moreover, because of the complexity

and opacity of the Cheyne SIV, plaintiffs had no choice but to rely on the ratings to assess the credit

risk of these investments.   Defendants' fraud pervaded the Cheyne SIV so deeply that no

investigation conducted by the plaintiffs could have revealed that the ratings were false.

There is no question that plaintiffs' losses were proximately caused by defendants' fraud.

When the market realized the true quality of the Cheyne SIV and its assets, the SIV collapsed.  As

Moody's conceded: "[T]he undoing of the SIVs . . . is primarily explained by the overly aggressive

ratings of underlying assets, from the market's perspective."   ¶30(b).   As a result, the Senior

Noteholders incurred substantial losses, and the Mezzanine Capital Notes ("MCN") investors lost

everything.  ¶39(a).

## II.   ARGUMENT

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "'[I]n assessing the record to determine whether there is a genuine issue as to a material fact,

the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of

the party against whom summary judgment is sought.'"  *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432

F.3d 428, 433 (2d Cir. 2005).[2]  To that end, "'[i]t is a settled rule that "[c]redibility assessments,

choices between conflicting versions of the events, and the weighing of evidence are matters for the

jury, not for the court on a motion for summary judgment."'"  *Bank of N.Y. v. Tyco Int'l Grp., S.A.*,

545 F. Supp. 2d 312, 318 (S.D.N.Y. 2008) (quoting *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

2006)).   Thus, a court should consider granting summary judgment "with caution."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The record in this case is replete with genuine

---

[2]      Emphasis is added and citations are omitted unless otherwise noted.

688258_1

disputes of material fact that preclude summary judgment.

A.     **The Ratings Are Actionable Misstatements**

Notwithstanding defendants' renewed attack, the Court has already "reject[ed] the argument

that the Rating Agencies' ratings are nonactionable opinions," stating that the "ratings [on the

Cheyne SIV] were not mere opinions but rather actionable misrepresentations." *Abu Dhabi*

*Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 176 (S.D.N.Y. 2009).[3]   Contrary

to defendants' contention, an "opinion" is actionable (1) "'if the speaker does not genuinely and

reasonably believe it'" ***or*** (2) if the "'opinion'" "'is without basis in fact.'" *Id.* (quoting *In re IBM*

*Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998)); *accord Va. Bankshares, Inc. v. Sandberg*, 501

U.S. 1083, 1095 (1991) (rejecting the argument that statements containing opinions or beliefs could

not be a basis for an action for federal securities fraud); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F.

Supp. 2d 221, 240-41 (S.D.N.Y. 2006).[4]   In New York, "even statements of opinion are actionable if

they are made in bad faith or ***are not reasonably supported by the available evidence.*** *See CPC Int'l*

*Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 286 . . . (1987)." *ADL, LLC v. Tirakian*, No. CV 06-

5076(SJF)(MDG), 2010 WL 3925131, at *12 (E.D.N.Y. Aug. 26, 2010).   Under New York law,

therefore, "'"where one party does have superior knowledge, the expression of an opinion implies

that the declarant knows facts which support that opinion and that he knows nothing which

---

[3]       Defendants claim erroneously that the "only alleged misstatement in this case is the credit rating opinions . . . ." *See* Defendants' Joint Memorandum of Law in Support of Their Motion for Summary Judgment ("MSJ") at 3.   To the contrary, plaintiffs identified false and misleading statements regarding, *inter alia*: "eligibility criteria, portfolio parameters, mark-to-market procedures," "minimum overcollateralization requirement," "portfolio composition," "sensitivity tests," and "leverage and capital adequacy measures and triggers." *See* ¶2(i).

[4]       *See also In re Cnty. of Orange*, No. CV96-0765GLT, 1997 U.S. Dist. LEXIS 22459, at *19 (C.D. Cal. June 2, 1997) (holding that "the professional opinion cases imply the general tenor of opinions such as S&P's ratings is to support, not negate, the impression the rating is an assertion of fact, or at least substantially based on facts assessed by S&P").

- 3 -

contradicts the statement."'" *Kimmell v. Schaefer*, 637 N.Y.S.2d 147, 149 (1st Dep't 1996), *aff'd*, 89 N.Y.2d 257 (1996).[5]

The rating agencies concede that the "***ratings are opinions developed out of an analysis of facts.***"  ¶1(a); *see also* ¶1(b).  And the ratings are statements regarding the known risk of an investment based upon observed facts, the truth of which are known at the time they are made.[6] According to the rating agencies, the risk to investors in AAA rated assets was extraordinarily low: "***A triple-A . . . should survive the equivalent of the US Great Depression, undoubtedly with downgrades but with no loss to Aaa holders***."  ¶1(c).  Similarly, single-A rated assets had a 99.95% likelihood of repayment.  *Id.*

The evidence establishes that the ratings on the Rated Notes issued by the Cheyne SIV had materially false components and that defendants had no reasonable basis to believe the assigned ratings were justified.  *See* Declaration of Sanjiv Das ("Das Decl."), ¶6; ¶1(d).  As Moody's conceded: "***most of the time we rate MBS deals using arbitrary rule of thumb***."  ¶1(e); *see also* ¶1(d), ¶1(g), 1(f).  When S&P's former Global Practice Leader for CDOs, Richard Gugliada, was asked, "[i]f you didn't have the data, and you're a data-based credit rating agency, why not walk away" from rating the deals, he responded: "***The revenue potential was too large***."  ¶¶1(i)-(j).  And a senior MS executive celebrated a concession MS had exacted from the rating agencies on the Cheyne SIV, writing: "Cheyne has the flexibility to do financing trades and other ***wacky things***

---

[5]     Indeed, several courts have recently held the rating agencies liable for their ratings. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co.*, 785 F. Supp. 2d 799 (N.D. Cal. 2011); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, No. CIV 09-0300 JB/KBM, 2011 WL 5840482 (D.N.M. Nov. 12, 2011); *Cal. Pub. Emps.' Ret. Sys. v. Moody's Corp.*, No. CGC-09-490241, slip op. (Cal. Super. Ct., Cnty. of San Francisco June 1, 2010).

[6]     *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173 §933(a); 15 U.S.C. §78o-7(m) (clarifying that statements made by rating agency "shall not be deemed forward-looking statements").

- 4 -

688258_1

. . . ." ¶¶1(k)-1(l).  Thus, defendants are not "'shielded from liability by raising the word "opinion"

as a shibboleth.'"  *Abu Dhabi*, 651 F. Supp. 2d at 176 n.126.  This evidence also rebuts defendants'

incorrect assertion that "there is no evidence that the ratings on the Cheyne SIV were 'wrong' when

issued."  *See* MSJ at 8.

The cases on which defendants rely are principally federal securities cases construing the

statutory framework of §11 of the Securities Act of 1933 ("1933 Act"), which limits liability to

statutorily-enumerated parties, and are therefore inapplicable.  As the Court recently held in *In re*

*Optimal U.S. Litig.*, No. 10 Civ. 4095(SAS), 2011 WL 6424988, at *11 (S.D.N.Y. Dec. 21, 2011),

principles flowing from the statutory language of the federal securities laws should not be grafted

onto common law fraud.  For example, in *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d

167, 184 (2d Cir. 2011), the court refused to impose §11 liability on the rating agencies because

"expanding §11 to cover the conduct of the Rating Agencies [as underwriters] would contradict that

section's specific enumeration of liable parties."  *Id.*  The *Lehman* court determined that the rating

agencies should be "evaluated under the 'expert' provision of § 11," comparing them to

"'accountant[s], engineer[s], or appraiser[s],'" and decided that their lack of "consent" failed to give

rise to liability under 15 U.S.C. §77k(a)(4).  *Id.* at 183-84; *cf. In re Refco Inc. Sec. Litig.*, No. 07

MDL 1092 (JJR), 2011 U.S. Dist. LEXIS 33554, at *30 (S.D.N.Y. Mar. 28, 2011).  Likewise, in *Fait*

*v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), the court never even mentioned, much less

analyzed, credit ratings, but determined that plaintiff's allegations regarding goodwill were

inadequate to give rise to liability under §§11 and 12.  *Id.* at 111-12.[7]

---

[7]    Defendants' remaining cases – many from other circuits – are similarly inapplicable to the
common law fraud alleged in this action.  *See, e.g., Ohio Police & Fire Pension Fund*, No. 2:09-cv-
1054, 2011 WL 4448847, at *5-*8, *13 (S.D. Ohio Sept. 26, 2011) (analyzing ratings under the
Ohio Securities Act and expressly distinguishing the complaint in that case from the complaint in

### B.   Morgan Stanley Made an Actionable Misstatement

MS's assertion that it made no actionable misstatement misses the mark. In *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 285-86 (1987), the New York Court of Appeals reinstated common law fraud claims against MS and certain individual defendants because all defendants were involved in a "scheme . . . devised and executed for the specific purpose of defrauding the prospective purchaser by selling it the Mueller stock for more than it was worth." In New York, therefore, "[l]iability for fraud may be premised on knowing participation in a scheme to defraud, even if that participation does not by itself suffice to constitute the fraud." *Danna v. Malco Realty, Inc.*, 857 N.Y.S.2d 688, 689 (2d Dep't 2008); *see also Chubb & Son, Inc. v. Kelleher*, No. 92CV4484(TLM), 2010 U.S. Dist. LEXIS 141842, at *24-*25 (S.D.N.Y. Oct. 22, 2010).

The evidence in this case establishes that MS devised and executed the fraudulent scheme: MS designed, structured, maintained, marketed and sold the Cheyne SIV. *See* ¶2(a). MS also created and disseminated the false ratings through the Information Memorandum and other key deal documents. *Id.*, ¶2(e), ¶2(b). MS actually ***authored*** Moody's ratings report. ¶2(c). MS also revised S&P's Pre-Sale Report before it was issued on May 17, 2005. *See* ¶2(d). Because MS was responsible for the SIV from cradle to grave, MS is liable for the fraudulent ratings and for its omission of material facts from the Cheyne SIV documents it created and distributed. *See id.*, ¶2(f),

---

*Abu Dhabi* because it contained only "bare allegation[s]" of falsity, without "further factual enhancements"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011) (First Circuit case analyzing §§11 and 12 claims); *Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520 (6th Cir. 2007) (Sixth Circuit case analyzing defamation claim); *ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*, 858 N.Y.S.2d 94, 95 (1st Dep't 2008) (finding remark that "Southeast Cruise was a great project" to be a "'nonactionable expression[] of opinion, mere puffing'"); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 177, 179 (2011) (refusing to hold an author of a letter liable where the letter containing a "belief" as to a painting's value was addressed to a non-party and neither indicated "the purpose of the letter nor who requested the valuation of the painting").

¶2(g).

Faced with this clear and convincing evidence, MS relies on cases where the plaintiffs could not show that the expressions of opinion lacked a reasonable basis or identify facts that undermined the defendants' stated belief. In *Eurycleia Partners*, for instance, the court made the unremarkable observation that lawyers who had rendered legal advice to a fund on its formation and tax law were not liable to plaintiffs who "d[id] not challenge either the propriety of the fund's formation or the tax advice." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 849 N.Y.S.2d 510, 511 (1st Dep't 2007).[8] *Janus Capital Grp., Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296 (2011) is also inapplicable. The critical distinction between analyzing common law fraud claims in this case and federal securities law claims is that federal securities law claims are tethered to the limited statutory language that creates them. As this Court has recognized, "[l]imitations imposed on a cause of action because it is an implied right of action under a federal statute should not be used to limit the common law." *See In re Optimal*, 2011 WL 6424988, at *11. Applying that sound reasoning, this Court expressly held that *Janus* does not "limit New York common law fraud claims." *Id.*[9]

## C.    The Evidence of Falsity and Scienter Present Disputed Issues of Fact

A plaintiff may satisfy the scienter element by establishing either (1) "motive and opportunity to commit fraud" *or* (2) "'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Abu Dhabi*, 651 F. Supp. 2d at 171; *see Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.

---

[8]    *See also Mateo v. Senterfitt*, 918 N.Y.S.2d 438, 440 (1st Dep't 2011) (defendant played no role in drafting a fraudulent operating agreement supplied to it by a third party and did not know that the operating agreement was fraudulent); *Glatzer v. Scappatura*, 470 N.Y.S.2d 675, 676 (2d Dep't 1984) (dismissing allegations with leave to replead because allegations were too "conclusory" to state a cause of action).

[9]    The fact that courts employ a similar analysis when evaluating common law fraud and §10(b) claims does not change the result. As this Court observed in *In re Optimal*, "[a]lthough the analysis for common law fraud claims mostly mirrors the analysis for federal securities law claims, *several aspects of Janus indicate that it applies uniquely to federal securities laws claims*." *Id.*

2001).  Scienter can be shown by evidence of "'guilty knowledge or willful ignorance.'"  *See Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007), *aff'd*, 354 Fed. App'x 496 (2d Cir. 2009); *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Under New York law, a "plaintiff need not show that defendant had a 'specific intent' to induce acts by the plaintiff."  *Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 68 n.14 (E.D.N.Y. 2010); *see Houbigant, Inc. v. Deloitte & Touche, LLP*, 753 N.Y.S.2d 493, 499 (2003).  "Issues of motive and intent are usually inappropriate for disposition on summary judgment."  *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984).

As the Court previously held, knowledge of fraud can be established through evidence that "Morgan Stanley [and the rating agencies] knew that the ratings process was flawed, knew that the portfolio was not a safe, stable investment, and knew that the rating agencies could not issue an objective rating because of the effect it would have on their compensation."  *Abu Dhabi*, 651 F. Supp. 2d at 179.  All of the defendants knew that the data and assumptions used to rate the Cheyne SIV notes were unreliable and insufficient to support the ratings.  ¶¶1(e)-(f), ¶¶1(j)-(k), ¶¶3(a)-(ppp).  Furthermore, all defendants knew that the assets held by the Cheyne SIV were not accurately rated and that the ratings were not commensurate with the risk.  *Id.*  The defendants ignored these facts and issued top ratings without a basis in fact for doing so.  *Id.*

Critical data that defendants used to develop the Cheyne SIV rating models was either non-existent or unreliable, and defendants knew it.  Before the SIV was launched, S&P's lead analyst conceded internally: "I had difficulties explaining 'HOW' we got to those numbers since ***there is no science behind it***."  ¶3(a).  S&P also admitted internally that at the time it rated Cheyne there was a "***paucity of historical data, especially for single ABS sectors***" – the precise sectors held by the Cheyne SIV.  ¶3(b).  Prior to the SIV's launch, MS proposed that Moody's use the same spread

- 8 -

volatility assumptions for HELs (securitizations backed by risky U.S. subprime home loans) as it had used for prime home loans (a safer and less volatile asset class). Moody's lead analyst on the deal observed that there was "***no actual data backing the current model assumptions***," but nonetheless "accept[ed] the proposal." ¶3(c). The defendants were unperturbed by the lack of data supporting the critical assumptions in the Cheyne SIV model. As MS's lead structurer Gregg Drennan acknowledged, the solution was simple: "***Moody's will fix the inputs to get the outputs they want!***" ¶3(d). According to a Moody's senior executive, Henry Tabe, the managing director responsible for the Cheyne SIV rating process, "***disregarded the [SIV model] output and made up haircuts that were palatable to SIV issuers***." ¶3(ggg).

MS manipulated the Cheyne SIV modeling process to create the ratings it desired. In 2004, Drennan wrote that MS had "***shaped rating agency technology***" for the SIV, "develop[ed] a new model for the [Cheyne SIV] transaction" and "adapt[ed] and creat[ed] a new form of SIV methodology that was presented to the rating agencies and the client for their approval." ¶3(e); *see* ¶3(f). Drennan boasted about MS's "***ability to push the envelope***" on SIVs, including the Cheyne SIV. ¶¶3(g)-(h). As MS senior executive Dorothee Fuhrmann put it: "***[W]e in fact buil[t] EVERYTHING***." ¶3(i). The "novel structural features" that MS pressured the rating agencies to include "result[ed] in a ***very profitable*** transaction for Morgan Stanley," but ultimately contributed to the SIV's collapse. *See* ¶3(j); Das Decl., ¶¶6, 10, 11.

One of the structural modifications was to include HELs – a subprime structured product that ***no*** other SIVs had been permitted to hold. ¶3(ppp). As one senior MS executive noted, the Cheyne SIV was not economically viable without HELs: "If we can't get the hel product in my concern is

the deal does not work." ¶3(k); *see* ¶3(l).[10]   In the same e-mail, this MS executive expressed grave misgivings about the Cheyne SIV: "***The more I think about this trade the worse I feel about the risk/reward that it has***." ¶3(k).   For the rating agencies, colluding with MS was a slippery slope – once they approved HELs, MS strong-armed them into classifying HELs as "liquid" in performing critical liquidity tests. ¶3(m).   Moody's later admitted that this "***was a mistake***." ¶3(n).

MS also coerced the rating agencies to issue "A" ratings on Cheyne's MCNs, an unprecedented public rating that no other SIV had obtained. ¶3(o).   After first insisting that a 1% capital buffer to protect the MCNs from losses was a "***pillar of [its] analysis***," S&P ultimately acquiesced to pressure from MS and allowed Cheyne to reduce the buffer by 25%. ¶3(p).   S&P's Lapo Guadagnuolo informed MS that the targeted "A" rating on the Cheyne MCNs was not possible and that S&P was willing to assign only a "BBB" to the Cheyne MCNs. ¶3(q).   The next day, Drennan wrote a threatening e-mail to Mr. Guadagnuolo's boss, Perry Inglis, "mak[ing] it clear that [MS] believe[s] the position committee is taking is very inappropriate." *Id.*   Again, S&P acquiesced to pressure from MS and agreed to assign an "A" rating to the Cheyne MCNs (despite the lower capital buffer). ¶3(r).[11]   After the SIV was launched, Drennan boasted that MS's efforts "***did get us the rating we wanted in the end***." ¶3(t).

MS and the rating agencies were also well aware, but failed to disclose, that the structured finance assets held by Cheyne had inflated ratings and were riskier than represented.   Because the Cheyne SIV's rating was heavily dependent on the ratings of the underlying collateral, the increased risk and false ratings on that collateral translated into false ratings on the SIV notes themselves.   *See*

---

[10]   Plaintiffs' expert, Dr. Sanjiv Das, analyzed this issue and also came to the conclusion that the SIV would not have been viable without HELs. Das Decl., ¶¶6, 10-11.

[11]   *See also* ¶3(s) ("[T]he step we needed to undertake in order to rate the capital notes was to assume a probability of enforcement of less than 100%.   This '*relaxation*' *of our methodology would apply ONLY for capital notes seeking a rating up to* '*A*.'").

¶3(u); *see also* ¶3(v).  Kai Gilkes, S&P's most senior quantitative analyst in Europe when the Cheyne SIV was launched, testified that SIVs containing subprime RMBS – such as the Cheyne SIV – should *never* have been rated at all:

> So it is a factual statement that the ratings of those [structured investment] vehicles were inappropriate because the ratings of the underlying assets were not appropriate. ***So it leads to the conclusion that they should not have been rated***, but that is not necessarily my – is not necessarily my belief.  It is just a factual statement.  ¶3(w).

In November 2004, Stephen McCabe, Gilkes' subordinate and the lead quantitative analyst on the Cheyne SIV deal, wrote an e-mail to Gilkes remarking that S&P's default rates on ABS transactions were purely guesswork: "***[F]rom looking at the numbers it is obvious that we have just stuck our preverbal [sic] finger in the air***!"  ¶3(x).  Gilkes, who supervised McCabe's work on the Cheyne SIV, testified that he understood that the Cheyne SIV contained ABS assets.  ¶¶3(y)-(z).  In June 2005, just two months before the Cheyne SIV was launched, Gilkes was concerned about S&P's CDO methodology, writing: "arbitrary tweaks to the assumptions may be dangerous in the long run" because they "might lead to inaccurate ratings."  ¶¶3(aa)-(bb); *see also* ¶3(cc).  The criteria Moody's used to rate the assets in the Cheyne SIV were similarly inadequate and Moody's knew it.  "There are no company-wide guidelines or standards for methodologies," and "[t]here wasn't enough historical data on new variants of adjustable rate loans to allow for reasonable predictions of performance."  ¶3(dd).  Moreover, the "[l]ayering [of] risks" embodied in Moody's models gave "rise to '***perfect storm***' situations."  *Id.*

Defendants' deliberate use of inadequate data and assumptions resulted in dramatically inflated ratings.  Plaintiffs' quantitative modeling expert, Dr. Sanjiv Das, analyzed whether the ratings of the Rated Notes issued by the Cheyne SIV were justified and appropriate and concluded that they were not.  Das Decl., ¶¶5-6.  Specifically, Dr. Das concluded that if the Cheyne SIV had used proper data and statistical methodologies known and available at the time, its ratings would

have been far lower and the SIV would not have been economically viable.  Das Decl., ¶6; *see* Das Decl., ¶19 ("This makes the Aaa rating of the Senior Notes unsupportable.").

The inflated ratings arose out of the rating agencies' unquenchable thirst for market share and MS's desire to feed its lucrative mortgage securitization machine.  S&P knew that "there ha[d] been ***rampant appraisal and underwriting fraud*** in the industry for quite some time as pressure . . . mounted to feed the origination machine."  ¶3(jj).  Market pressure caused S&P to ratchet down its criteria for rating subprime RMBS and CDOs.  For example, an S&P analyst explained in March 2005 that S&P's new, more accurate RMBS rating model "could've been released months ago . . . if we didn't have to ***massage the sub-prime and Alt-A numbers to preserve market share***."  ¶3(ee); *see* ¶3(ddd).  Similarly, in August 2004, S&P held a meeting with senior directors to devise a plan to "***adjust[] criteria for rating CDOs of real estate assets . . . because of the ongoing threat of losing deals***."  ¶3(ff).  Frank Raiter, S&P's Director of RMBS, testified that S&P's models were the "linchpin of the ratings process" and that had the accurate model been implemented, there would have been "an early warning about the performance of many of the new products that subsequently led to such substantial losses."  ¶3(nnn); *see also* ¶3(zz), ¶3(mmm), ¶3(cc).  Raiter testified that on several occasions before April 2005, he pleaded with senior executives at S&P (*e.g.*, Global Head of RMBS Pat Jordan and Chief Quality Officer for structured finance ratings Tom Gillis) to implement the new, more accurate model, which did a "better job of assigning ratings."  ¶3(ooo).  S&P's management responded:  "[L]ook, we have 94 percent market share, like why do we need a better model"; "if we're not going to gain more revenue why should we spend money to do that?"  *Id.*

In relation to CDO criteria changes, Perry Inglis, the head of the S&P group that rated the Cheyne SIV notes, wrote: "[I]t would be good to get an idea of how far these would have to change for us to be 'competitive' on these types of deals.  I'm a bit unclear if it is a big change or a '***wee itty***

- 12 -

bitty no-one's going to notice' change!'" ¶3(gg); *see* ¶3h.  On the same topic, Gilkes wrote to Inglis:

"As usual, ***things reach crisis level due to competitive pressures***, rather than being properly thought-

out and debated over time."  ¶3(hh).  Two months before the Cheyne SIV launched, Gilkes

lamented, "[r]emember the dream of being able to defend the model with sound empirical research?

The sort of activity a true quant CoE should be doing perhaps?  If we are just going to make it up in

order to rate deals, then quants are of precious little value."  ¶3(ii).  Frank Parisi, S&P's Chief Credit

Officer for structured finance, testified that the RMBS model in effect in 2005 and 2006 was only

marginally more accurate than "if you ***just simply flipped a coin***."  ¶3(fff).

Key members of S&P's Cheyne SIV rating committee, including Perry Inglis (the

Chairperson of the Cheyne rating committee) and Nikhil Khakee, testified that they did ***not*** comply

with S&P's policy prohibiting them from engaging in rating committee decisions at the same time

that they pursued new business. ¶3(hhh).  While acknowledging that it was "important" to separate

analytical functions from commercial activity, Inglis testified that he engaged in both functions

simultaneously because the policy somehow did not apply to him (even though he is expressly

identified in an attachment to the policy). *Id.*  Khakee testified that he, too, engaged in prohibited

analytical activity because an S&P senior executive had told him that he was exempt from the policy

(although he had no documentation of that exemption). *Id.*  Violations of company policy give rise

to a finding of scienter. *Kalnit*, 264 F.3d at 142-43.

Due to market pressures, the rating agencies engaged in an improper practice known as

"grandfathering," which uses old, outdated models to rate new deals.  In late 2005, Elwyn Wong, an

S&P executive, responded to pressure from MS to grandfather existing deals by writing: "***Lord help***

***our fucking scam*** . . . this has to be the stupidest place I have worked at."  ¶3(kk); *see also* ¶1(d),

¶1(j).  An S&P structured finance employee conceded: "[I]t could be structured by cows and we

- 13 -

would rate it." ¶3(ll).  Another S&P structured finance employee remarked: "Let's hope we are all wealthy and retired by the time this house of card[s] falters."  ¶3(mm).

Moody's also subjugated its rating criteria to market share.  William Harrington, a former Moody's senior analyst, attended a training session concerning SIV methodology in 2005 and determined "***nothing about SIVs added up***."  ¶3(ggg).  Results "that were palatable to SIV issuers" were substituted for analytical results.  *Id.*  Brian Clarkson, Moody's President, acknowledged that market pressure influenced Moody's ratings: "Competitive issues (ex. ***Rating inflation, successful rating shopping***, notching below investment grade for mono-line insured deals, etc.)."  ¶3(nn).  In a 2006 report to top Moody's executives (including President Brian Clarkson), Moody's structured finance employees described the pervasive manipulation of ratings criteria to appease issuers: "Competition between rating agencies seems to impact the integrity of senior management"; "There were instances where I felt that we compromise[d] our rating due to pressure from senior management that wanted to please big clients"; and "Manager focuses on making bankers happy instead of focusing on the issues involved with respect to the transactions." ¶3(oo); *see* ¶3(pp).  One former Moody's executive explained: "[T]he rating agencies faced the age old and pedestrian conflict between long term product quality and short term profits.  They chose the latter."  ¶3(qq). Another former Moody's executive agreed: "Unfortunately, the major rating firms willingly traded their reputations for short-term profits.  They allowed themselves to be played off of one another in an effort to maintain (or perhaps increase) market share."  ¶3(rr); *see also* ¶3(ss).

MS was also aware of the poor quality of the subprime loans held by Cheyne.  In 2005, MS began observing through due diligence that an increasing number of the loans reviewed by MS for purchase "do not make sense" and that "[o]verall . . . the loans were riskier than [those] seen in the past."  ¶3(tt).  Although MS observed an "unusually high amount of layered risk" and "***very***

*flagrant*" appraisal inflation, it sought to "clear as many borderline loans" into its securitizations "as possible." *See* ¶3(uu); *see* ¶¶4(d)-(e). MS waived bad loans into its securitizations on an astonishing scale. A study done by MS's due-diligence provider, Clayton, found that 64% of the exceptions identified as "material" were overturned by MS, meaning that MS securitized those loans despite their questionable quality. ¶3(vv). In structuring the specific RMBS ultimately held by Cheyne, MS included non-compliant loans at an even higher rate of 71%. ¶3(ww). These loans had insufficient borrower employment verification, insufficient borrower credit quality, incomplete appraisals and excessive loan-to-value ratios. *Id.* MS also waived in loans to bankrupt borrowers, and seriously delinquent and foreclosed loans. ¶3(xx). Thus, the same MS traders responsible for selling the subprime loan pools to the Cheyne SIV knew that these subprime assets were filled with toxic loans. *See* ¶4(d) (MS traders Frank Telesca and Steven Shapiro "were the folks responsible for making the decisions about [the] purchase and exit of subprime mortgage loans.").[12]

Defendants' misconduct must be put in context with the enormous fees and increased market share generated by the Cheyne SIV. While motive is not necessary to establish scienter, "Morgan Stanley and the Rating Agencies had the motive and opportunity to communicate these allegedly false and misleading ratings to potential investors in the Cheyne SIV." *Abu Dhabi*, 651 F. Supp. 2d at 179.[13] ***First***, MS's fees on the Cheyne SIV deal were huge – between $25 and $30 million – which MS's Drennan described as "***ms's big fat upfront fees***." ¶¶7(a)-(b). "Morgan Stanley's fees [were] dependent on [the] successful launch of [the Cheyne SIV] and placement of capital notes." ¶7(c); *see* ¶7(d). MS's senior executive on the Cheyne deal, Robert Rooney, wrote: "I am very

---

[12]     MS argues that six MS-sponsored assets in the Cheyne SIV "continue paying interest to this day." MSJ at 12. The argument is deceptive. The six MS-sponsored assets are at or near default and have lost a substantial amount of their principal value. *See* ¶5(f).

[13]     Defendants do not dispute that they had the opportunity to commit fraud. Nor can they. *See Abu Dhabi*, 651 F. Supp. 2d at 180; ¶3(yy).

focused on . . . [g]etting this [Cheyne] deal done to get NY to stop freaking out" and "[t]o make our money."  ¶7(e); *see also* ¶7(o) ("Having the [Cheyne] deal not happening . . . [is] bad for us [MS] and our franchise.").  Rooney concluded, "*our motive is a Fee*."  ¶7(r).[14]  Further, MS was "taking [a] big warehouse risk," which meant that MS would be left holding the bag with billions of dollars in risky assets if the Cheyne SIV did not close.  ¶7(g); *see* ¶¶7(h)-(i).[15]  And MS understood that the SIV would not launch without the ratings it sought on the Rated Notes.  ¶7(f), ¶3(iii).

*Second*, MS used the Cheyne SIV as a receptacle in which to dump more than $700 million of its riskiest ABS assets when the SIV launched.  ¶7(k) (MS sold the SIV "a very healthy 68%" of Cheyne's lowest-rated assets and $190 million of U.S. subprime mortgage-backed assets).  Over the course of the deal, MS unloaded more than $1.6 billion of its deals on the SIV.  ¶3(q), ¶3(kkk).  MS also pressured Cheyne to purchase assets for the SIV that were riskier than Cheyne felt appropriate.  ¶3(jjj), ¶4(a).  In addition, MS approved every asset that went into the Cheyne SIV.  ¶4(b).[16]  *Third*, MS "exploit[ed]" the Cheyne SIV as a launching pad to "win new SIV" business and obtain "a key head start above our competitors."  ¶7(m).  A senior executive at MS recognized that "[t]he Cheyne

---

[14]     Notwithstanding defendants' assertion to the contrary, this Court and numerous other courts in this District have found the desire to earn lucrative fees sufficient to establish scienter for purposes of a fraud violation. *See, e.g.*, *Abu Dhabi*, 651 F. Supp. 2d at 179-80; *Vandenberg v. Adler*, No. 98 CIV. 3544 WHP, 2000 WL 342718, at *9 (S.D.N.Y. Mar. 31, 2000) (desire to secure underwriter fees found sufficient); *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 423-24 (S.D.N.Y. 2000) (rejecting defendants' argument that the desire to earn fees from an offering is insufficient to demonstrate motive).

[15]     Defendants contend that plaintiffs' motive allegations are "not plausible" because MS had an interest in the ongoing success of the SIV.  But "[t]he incentives for the 'fee based' structuring investment bank were clear: get the deal closed, and if there's a problem later on, it was just another case of 'IBGYBG' – 'I'll be gone, you'll be gone.'"  ¶7(j).

[16]     This evidence rebuts MS's contention that it had no role in selling assets to the Cheyne SIV. In fact, in 2006, MS's subprime assets represented the largest share of the riskiest and lowest rated assets held in the Cheyne SIV portfolio. "*The maximum exposure to the lowest rated obligor currently is 38bps, the obligor being Morgan Stanley*."  ¶7(l).

SIV will also be very profitable for Morgan Stanley" because it "will allow Morgan Stanley to do more transactions with more clients." ¶7(n). ***Finally***, MS's fee was tied to Cheyne's excess spread. ¶7(d) (MS "will receive a 25% share in the excess spread of the vehicle (worth over $20m in our base case)"). "Morgan Stanley therefore had a motive to maintain the appearance that the SIV assets were safe and highly rated." *Abu Dhabi*, 651 F. Supp. 2d at 180. Likewise, the requirement that MS sell $387 million in MCNs in order to earn its "full structuring fee" also incentivized MS to "maintain the appearance that the SIV assets were safe and highly rated" – at least until it dumped its MCNs on investors. *Id.*; ¶¶7(o)-(p).

The rating agencies, too, had a compelling motive to commit fraud. ***First***, the rating agencies understood that if they refused to assign the top ratings sought by MS, MS would simply take its business elsewhere. ¶9(a). In a 2004 internal e-mail, Moody's President Brian Clarkson candidly summed it up: "Therefore, and to put it bluntly, in the ABS market: the issuer could take its business elsewhere ***unless*** the rating agency provides a higher rating." ¶9(b) (emphasis in original). ***Second***, the rating agencies provided the top ratings on the Cheyne SIV because they received three times their normal corporate rating fees for rating the SIV. *See* ¶8(a), ¶¶9(c)-9(d); *see also* ¶8(b). Moody's and S&P both acknowledged that the ratings on structured products like CDOs and SIVs were "cash cow[s]." ¶¶9(e)-(f). And the rating agencies' fees would have been sharply diminished if the SIV did not close. ¶8(f), ¶9(h). ***Finally***, as described above, there is ample evidence that credit quality took a back seat to market share, and the poor performance of Cheyne's ratings is primarily a result of senior management's directive to maintain or increase market share. *See also* ¶8(c). Raiter testified that "there was a big breakdown between the people that were trying to maximize profits and the people that were trying to maximize the credit ratings methodology and activities. And that the people with the profit motive won." ¶8(e). Specifically, it was "Joanne

- 17 -

Rose, Vickie Tillman, Terry McGraw," senior managers and S&P's CEO, "that were in charge [and] just wanted to get as much of the [revenue] as they saw." *Id.*; *see* ¶8(d), ¶9(g).[17]

Despite the overwhelming evidence of their scienter, defendants argue that they evade liability unless "the actual speaker made the alleged misstatement with the requisite state of mind." MSJ at 10. Plaintiffs have demonstrated that members of the Cheyne rating committees knew the ratings were false when they were assigned. Defendants also misstate the law. "In fact, courts in this District have recently emphasized that there is no requirement 'that the same individual who made the alleged misstatement on behalf of a corporation personally possessed the required scienter.'" *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).[18] As Judge Kaplan explained, this makes sense:

> There are good reasons for imputing the collective knowledge of employees or agents to their corporate principal. Doing so creates incentives for the entity to create and maintain effective internal communications and, more importantly, serves to protect third parties with which it does business.

*Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218-19 (S.D.N.Y. 2009).[19]

---

[17]    The rating agencies say that the Court should ignore evidence that they were motivated to issue fraudulent rulings on the Rated Notes because "the market had long been aware of the rating agencies' 'issuer pays' model." MSJ at 15. This Court already rejected defendants' argument in *King County*: "Plaintiffs assert that Fitch, along with the other defendants, defrauded them by issuing credit ratings they knew were false and misleading – not that Fitch misstated its independence or intentionally concealed its conflicts of interest. Plaintiffs point to Fitch's conflict of interest as one factor among numerous others in which it can be inferred that Fitch acted with scienter when it issued the ratings." *King County* Hrg. Tr. dated May 18, 2010, at 10.

[18]    *See In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005); *United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987); *Valentini v. Citigroup, Inc.*, No. 11 Civ. 1355(LBS), 2011 WL 6780915 (S.D.N.Y. Dec. 27, 2011); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835(NRB), 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236-37 (S.D.N.Y. 2010); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010).

[19]    New York courts are in accord: "While it is true that none of the appellants individually committed all of the acts constituting the fraud, this is not, as appellants contend, an exculpating

Defendants' reliance on *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) is misplaced. *Dynex* stands merely for the legal principle that, "[w]hen the defendant is a company, scienter refers to the state of mind of one or more of the company's agents." *In re Metlife Demutualization Litig.*, 262 F.R.D. 217, 234 (E.D.N.Y. 2009). Nor does *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011) help defendants. In that case, the court concluded that the "significant evidence" of scienter admitted against Vivendi, but not the individual defendants, could have led the jury to conclude that there was sufficient evidence of scienter as to Vivendi even if the jury was unable to conclude that the plaintiffs met their burden of proof as to the individual defendants. *Id.* at 549-53.

MS's contention that it had a financial stake in the Cheyne SIV's underlying assets is meritless. There is no evidence that MS had any economic interest in the Cheyne SIV's underlying assets. In fact, the purported residual interest that MS identified – Series R Notes – was described by MS as worthless. *See* ¶5(d). Tellingly, MS fails to mention the hundreds of millions of dollars that MS made from structuring and selling these deals. ¶3(lll), ¶5(e). Likewise, MS's assertion that it was caught flat-footed by the collapse of the subprime crisis is simply untrue. To the contrary, MS's $9 billion loss resulted from a botched strategy to short the subprime market by buying credit default swaps on pools of subprime mortgages. *See* ¶6(a) ("By the end of 2004, [Howie Hubler] was skeptical of the subprime mortgage business, and craved new ways to bet against it."); ¶6(b). At the same time that Hubler was betting against subprime assets, he and others were stuffing subprime assets into the Cheyne SIV. ¶6(c); *see also* ¶6(d) (Hubler "is keen" to obtain "very significantly"

---

circumstance. It is well established that liability for fraud may be premised on knowing participation in a scheme to defraud, even if that participation does not by itself suffice to constitute the fraud." *Kuo Feng Corp. v. Ma*, 699 N.Y.S.2d 575, 576 (1st Dep't 1998); *see Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985).

lower haircuts on single-A HELs in the Cheyne SIV so HELs can "be the major part of the single-A bucket").[20]

### D. Plaintiffs Justifiably Relied on Defendants' False Statements

Under New York law, reliance is "ordinarily a jury question." *See Refco*, 2011 U.S. Dist. LEXIS 33554, at *55. Moreover, "[t]he proper test of reliance in a fraud case is not 'reasonable' reliance, it is 'justifiable' reliance, a clearly less burdensome test." *Gordon & Co. v. Ross*, 84 F.3d 542, 546 (2d Cir. 1996). Here, plaintiffs need demonstrate only that the ratings were a "'"substantial factor"'" in their decision to purchase the Rated Notes. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 261 (S.D.N.Y. 2010); *accord Sheehy*, 690 F. Supp. at 67-68. The record evidence in this case easily meets this standard. As the Court recently explained, "I have to draw every inference in favor of the non-moving party if it swears under oath to reliance at least in part. . . . They say they relied, so they relied. So reliance isn't going to be easy for the defendant." 2/8/2012 Hrg. Tr. at 15:11-16; *see Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 177 F. Supp. 2d 169, 174 (S.D.N.Y. 2001) (Scheindlin, J.).

The ratings assigned to the Rated Notes purchased by the plaintiffs and assigned to the Cheyne SIV's underlying assets were a substantial factor in each plaintiff's decision to purchase the Rated Notes. ¶28(a). Without the ratings, which remained unchanged on each day during the relevant period until they were downgraded, none of the plaintiffs would have purchased the Rated Notes or maintained their investments in the Rated Notes after their purchase. *Id.* At no time were any of the plaintiffs or their sub-advisors permitted to purchase knowingly securities whose ratings

---

[20]     These arguments are also completely improper and should be precluded because MS persistently refused to provide discovery on these topics. *See* Plaintiffs' Fed. R. Civ. P. 56(c)(2) Objection to Certain Evidence Offered by Defendants ("Objection to Evidence"). In the alternative, plaintiffs should be permitted to explore these subjects in discovery. *See* Fed. R. Civ. P. 56(d)(2).

were false and had any of the plaintiffs known that the ratings assigned to the Rated Notes and the

SIV's underlying assets were false, none of the plaintiffs would have purchased or permitted their

sub-advisors to purchase the Rated Notes.  *Id.*  Reliance on ratings was particularly critical and

necessary due to the SIV's complexity and the limited information available to plaintiffs.  *Id.*  An

independent evaluation could not have revealed that the ratings were false.  *Id.*

*ADCB* relied in substantial part on the A/A3 ratings assigned to the MCNs it purchased and

on statements regarding the purported quality of the Cheyne SIV and its underlying assets.  ¶24(a).

MS urged ADCB to purchase MCNs, explaining that "Morgan Stanley have [sic] a big commitment

to this deal," that "[t]he deal has a very reputed manager (Cheyne)," and that "[t]he underlying

portfolio is a high quality one."  ¶24(b); *see also* ¶24(c).  The A/A3 ratings assigned to the MCNs

were a substantial factor and a "***major aspect***" in ADCB's investment decision.   ¶¶24(d)-(e).

ADCB's investment memorandum explicitly relied on the A/A3 credit ratings on the MCNs and the

high ratings on the Cheyne SIV's underlying assets.  ¶24(f).  ADCB's investment guidelines

required that ADCB rely on the assigned ratings.  ¶24(g).

*Butterfield's* investment guidelines required Butterfield to rely on the A-1+/P-1 and

AAA/Aaa ratings assigned to the CP and MTNs it purchased because they "***ha[d] to be A1 or A1***

***plus [under Butterfield's investment guidelines].  So yes, [Butterfield] considered the rating.  I can***

***guarantee you that***."  ¶16(a); *see also* ¶16(b).  Put simply, the ratings were a "***major factor***" in

Butterfield's investment decision.  ¶16(c).  Butterfield's investment guidelines required Butterfield

to rely on the ratings assigned to the CP and MTNs.  ¶16(d).  Butterfield had to rely on the ratings

assigned to the CP and MTNs, in part, because Butterfield itself was rated AAA by S&P and could

only purchase top-rated securities in order to maintain that rating.  ¶16(e).

*Commerzbank* acquired Gryphon notes from Dresdner Bank ("Dresdner") when it merged

- 21 -

with Dresdner in May 2009 (Dresdner had exchanged its CP and MTNs for Gryphon notes prior to the merger).  ¶19(a).[21]   The Dresdner employees responsible for purchasing the CP and MTNs indicated that they relied in substantial part on the A-1+/P-1 and AAA/Aaa ratings assigned to the CP and MTNs, respectively.  ¶19(b).  At the time of its investment in the CP and MTNs, Dresdner's money market fund (the Allianz Dresdner Daily Asset Fund) was governed by SEC Rule 2a-7 – a rule that **required** the fund to rely on the "highest short term ratings."  ¶¶19(c)-(d).  Commerzbank also relied in substantial part on the A/A3 ratings assigned to the MCNs and the Cheyne SIV's underlying assets.  ¶19(e); *see also* ¶19(e) (Commerzbank "definitely [relied on] the rating," which "played an important role for [Commerzbank's] decision."), ¶19(f) (the ratings were a "*key item[]*" relied upon by Commerzbank).  MS urged Commerzbank to purchase MCNs and highlighted that they were "dual rated by BOTH Moody's and S&P > 'A3/A'" and that the Cheyne's "assets will largely be AAA and AA ABS."  ¶19(g).  Commerzbank's credit applications for the MCNs explicitly relied on the A/A3 ratings.  ¶19(h).

*SFTCIF* relied in substantial part on the AAA/Aaa ratings assigned to the MTNs it purchased and on the ratings assigned to the Cheyne SIV's underlying assets.  ¶21(a).  SFTCIF testified that "*in order to even look at it, it had to be AAA rated*," that SFTCIF "look[ed] at the rating agencies for their AAA rating at first and then look[ed] at the underlying assets that would fall into that category."  ¶21(b).  Put simply, "the AAA rating was . . . the *gateway or the threshold* to meet before you could actually look at the underlying [assets]."  ¶21(c).  SFTCIF's Chief Investment

---

[21]     Defendants argue that Commerzbank could not have relied because of a representation letter.  MSJ at 22 n.17.  But that letter explicitly directs Commerzbank to rely on the Offering Memorandum, which *includes* the false ratings.  This argument was recently advanced by MS in a separate fraud action, *China Dev. Indus. Bank v. Morgan Stanley & Co., Inc.*, 927 N.Y.S.2d 52, 53 (1st Dep't 2011), and was explicitly rejected.  *See also Tahini Invs., Ltd. v. Bobrowsky*, 470 N.Y.S.2d 431, 433 (2d Dep't 1984).

Officer mandated that SFTCIF could only purchase AAA-rated securities.  ¶21(d).[22]

*FSBA* relied, through its investment sub-advisor, Victory Capital Management ("Victory"),[23] in substantial part on the AAA/Aaa ratings assigned to the MTNs it purchased and on the ratings assigned to the Cheyne SIV's underlying assets.  ¶22(a).  FSBA purchased "only top tier commercial paper with the highest short-term credit ratings available" from S&P and Moody's.  ¶22(b).  FSBA's investment advisor testified that the assigned ratings were a "*significant factor*" and, indeed, the "*initial door-opener*" before Victory could even consider the MTNs for inclusion in FSBA's portfolio.  ¶22(c).[24]  The investment guidelines governing Victory's purchase of the MTNs on FSBA's behalf provided that "'asset-backed securities . . . *must have a rating of AAA*.'"  ¶22(d).

*GIB* relied in substantial part on the A/A3 ratings assigned to the MCNs it purchased, as well as statements regarding the purported quality of the Cheyne SIV and its underlying assets.  ¶13(a).  GIB testified that "we relied on the pitch book.  We relied on the investor summary.  We relied on the communication we had with Morgan Stanley.  We relied on the rating of [the MCNs]."  ¶13(b); *see also* ¶13(c) ("*we had a [A/A3] rating from both S&P and Moody's that we relied upon* . . . in our proposal").  MS urged GIB to purchase MCNs, explaining that they were "[r]ated by *BOTH* Moody's (A3) and S&P (A)."  ¶13(d).  The credit approval application prepared before GIB's investment explicitly relied on the A/A3 credit ratings on the MCNs and the high ratings on the

---

[22]    Defendants cite to two isolated e-mails concerning CDOs and CLOs unrelated to the Cheyne SIV to argue that an SFTCIF employee believed the rating agencies to be "stupid" and "dumb." MSJ at 23.  These two, irrelevant e-mails do nothing to rebut the fact that the ratings were the "*gateway or the threshold*" required to even consider the MTNs, especially where SFTCIF testified that "that is the opinion of [a portfolio manager], not of the firm or . . . the CIO."  ¶21(c), ¶21(e).

[23]    *See Jay Dees Inc. v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954(SAS), 2008 WL 4501652, at *5 (S.D.N.Y. Sept. 30, 2008) (Scheindlin, J.) ("Reliance need not result from direct communication from defendant to plaintiff.  There is no reason why a misrepresentation to the plaintiff's agent does not suffice.").

[24]    For this reason, Victory's internal rating score is irrelevant.

- 23 -

Cheyne SIV's underlying assets. ¶13(e). GIB's investment guidelines required that GIB rely on the assigned ratings. ¶13(f).

*GIS* purchased Combination Capital Notes ("CCNs") that were comprised primarily of MCNs rated A/A3 along with a small portion of unrated Junior Capital Notes ("JCNs"). MS and the rating agencies communicated the ratings on the CCNs to GIS. ¶25(a). The A/A3 ratings and the high ratings on the Cheyne SIV's underlying assets were a substantial factor in GIS's decision to purchase the CCNs. ¶25(b) ("we wanted to buy some higher rated instruments to offset the risk that was in the junior capital notes"). GIS testified that "*[t]he role of the credit ratings was very important*." ¶25(c); *see also* ¶25(d) (GIS purchased the CCNs "because the collateral was supposedly highly rated"). Although GIS was permitted to purchase unrated securities, its investment guidelines required that GIS rely on the ratings assigned to securities it purchased. ¶25(e).

*Hapoalim* relied in substantial part on the A/A3 ratings assigned to the MCNs it purchased as well as statements regarding the purported quality of the Cheyne SIV and its underlying assets. ¶¶17(a)-(b). MS urged Hapoalim to purchase MCNs, highlighting the purported "advantages" the Cheyne SIV had over bank-sponsored SIVs, "Morgan Stanley's commitment to the vehicle," and MS's "ongoing structuring support to the vehicle." ¶17(c). The investment application prepared before Hapoalim's investment explicitly relied on the A/A3 credit ratings on the MCNs and the high ratings on the Cheyne SIV's underlying assets. ¶17(d). Hapoalim's investment guidelines relied on credit ratings, providing that additional due diligence on complex and opaque structured finance instruments has "no significant added value over the rating agency's analysis." ¶17(e).

*King County* relied in substantial part on the A-1+/P-1 ratings assigned to the CP it purchased. ¶27(a). King County testified that "the communication we relied on was the credit

rating" and "***the most critical item we look at is the ratings by, in this case Moody's and Standard & Poor's, was the most important thing that we relied on in placing the trade***." ¶27(b); *see also* ¶27(c) (King County "believed that [the rating agencies] had done sufficient analysis to justify the ratings"). King County's investment policies and Washington state law governing King County's investments required King County to rely on the ratings assigned to the CP. ¶27(d).

*NACF* relied in substantial part on the A/A3 ratings assigned to the MCNs it purchased as well as statements regarding the purported quality of the Cheyne SIV and its underlying assets. ¶14(a). "The rating was the ***prime factor***" and the "***most important information***." ¶14(b); *see also* ¶14(c) ("As far as [the] Cheyne SIV investment is concerned, we looked at the explanations given by Morgan Stanley and especially pa[id] attention to investment ratings."); ¶14(d). NACF's investment regulations required it to rely on the ratings assigned to the MCNs. ¶14(e).

*Postbank* relied in substantial part on the A/A3 ratings assigned to the MCNs it purchased as well as statements regarding the purported quality of the Cheyne SIV and its underlying assets. ¶18(a). As Postbank explained, "we were ***particularly interested*** in the ratings by S&P and Moody" and "[i]n evaluating the risk, ***we relied on the A3 [rating of Moody's] and A rating of S&P***." ¶18(b). The investment approval memorandum prepared in connection with Postbank's purchase explicitly relied on and highlighted the A/A3 ratings and the high ratings on the underlying assets and characterized those ratings as "pros" in support of the purchase. ¶18(c). Regulations governing Postbank's investment required Postbank to rely on the ratings assigned to the MCNs. ¶18(d).

*PSERS* relied, through its outside investment advisor, Credit Suisse Asset Management ("CSAM"), in substantial part on the AAA/Aaa ratings assigned to the MTNs it purchased and on the ratings assigned to the Cheyne SIV's underlying assets. ¶20(a). As CSAM explained, ratings are an "indicator of credit worthiness of a particular security" and "an important item to understand

. . . [the ratings are] very relevant to the investments for a variety of reasons, including sometimes guidelines, limit, a particular type of . . . rating." ¶20(b); *see also* ¶20(c).   Under PSERS's investment guidelines, CSAM was required to rely on the assigned ratings when making investments on PSERS's behalf.  ¶¶20(d)-(g).

*SEI* relied in substantial part on the AAA/Aaa ratings assigned to the MTNs it purchased and on the ratings assigned to the Cheyne SIV's underlying assets.  ¶¶23(a)-(b).[25]  As SEI explained, "[w]e need to rely on the ratings . . . since we don't have [access] to the underlying [assets].  *SEI had no investments under AAA in its money market funds*." ¶23(c).  SEI's investment sub-advisor, CMA, explained: If a security did not have top ratings from Moody's and S&P, "then it wouldn't be looked at.  As a preliminary screen.  [The ratings were] a *substantial factor*" in the investment decision.  ¶23(d).  At the time of its investment in MTNs, SEI was governed by SEC Rule 2a-7 – a rule that *required* SEI to rely on the ratings assigned to the MTNs.[26]  The investment guidelines governing its purchase of the MTNs on SEI's behalf *required* CMA to rely on the ratings.  ¶23(g).

*SEI Strategies* relied in substantial part on the ratings, testifying that "[t]he rating reports from the credit rating agencies [were] always at the forefront" of SEI Strategies' investment decision and "the ratings *opened the door* for [SEI Strategies] to … even be able to consider this SIV for investment.  *[SEI Strategies] would not have looked at it had it not carried those ratings* because it wouldn't have been in compliance with the guidelines that I need to follow." ¶26(a).  Put simply,

---

[25]     SEI's MTNs were purchased on its behalf by Columbia Asset Management, LLC ("CMA") in its capacity as sub-advisor to money market funds for which SEI's wholly-owned subsidiary, SEI Investments Management Corporation, served as advisor.  SEI Strategies is the general partner of SEI Liquidity LP, which purchased MTNs directly.

[26]     *See* ¶23(e) (Rule "2a-7 requires that investors use identified rating agencies to invest in structured credit . . . in the 2a-7 fund so they have to use the rating agency"; in light of Rule 2a-7, SEI "wouldn't have been able to buy Cheyne without the rating attached to it"); ¶23(f) ("So from a 2a-7 perspective . . . [ratings] are a *big factor*.").

the ratings assigned to the MTNs were a "***substantial factor***" and "***the most important factor***" in SEI's purchase decision.  ¶26(b); *see also* ¶28(c).

*SinoPac* purchased Combination Capital Notes ("CCNs") that were comprised primarily of MCNs rated A/A3 along with a small portion of unrated JCNs.  The A/A3 ratings and the high ratings on the Cheyne SIV's underlying assets were a substantial factor in SinoPac's decision to purchase the CCNs.  ¶15(a).  The investment approval memorandum and analysis report prepared before SinoPac's investment explicitly relied on the A/A3 credit ratings on the MCNs and the high ratings on the Cheyne SIV's underlying assets.  ¶15(b).

The foregoing conclusively establishes that each plaintiff substantially relied on the ratings. In addition, because the ratings were directly tied to the yield, and because – as defendants concede – all investors rely on yield when purchasing bonds (¶28(b)), it is axiomatic that the plaintiffs relied on the ratings assigned to the Rated Notes.  ¶¶28(c)-(e); *see also* ¶28(f).  Significantly, the ratings on the Rated Notes were required in order for the Cheyne SIV to exist in the first instance.  The A/A3 ratings on the MCNs were a "condition[] precedent" to marketing the Rated Notes.  ¶¶28(g)-(i), ¶28(zz).  Similarly, "***AAA/Aaa [ratings] by S&P and Moody's . . . [were] needed on the Senior Notes*** programmes."  ¶28(j); *see* ¶¶28(k)-(l).  As Mr. Tabe explained, "***the Aaa ratings assigned to SIVs [enabled] them to sell their securities to the market***."  ¶28(l); *see* ¶28(m).

Defendants further admit that plaintiffs had to rely on the ratings assigned to the Rated Notes because of the opaque nature of complex structured finance instruments like the Cheyne SIV and the limited information available to investors.  ¶28(n); *see also* ¶¶28(o)-(q).  MS conceded that "disclosure [for SIVs] is significantly less than a typical CDO as many of the specific details are contained in the operating manual," which was not publicly available.  ¶28(aaa); *see also* ¶¶28(r)-(u).  Put simply: "***Investors rely on credit ratings***, among other tools, to make investment

- 27 -

decisions." ¶28(x).  As Moody's CEO Raymond McDaniel explained, "in the structured finance market, there is insufficient public information" so "investors are unable to conduct their own analysis and develop their own independent views about potential or existing investments." ¶28(y); *see also* ¶¶28(z)-(cc).  Likewise, S&P has admitted that structured finance investors "rel[y] on S&P for review of the transaction, and for S&P to identify the credit risk (ratings) associated with the tranches they intend to purchase."  ¶28(dd); *see also* ¶28(d), ¶28(ee).  As S&P recognized, "S&P's business model involves assigning ratings to deals so issuers are able to attract investors."  ¶28(ff); *see also* ¶28(gg).

In response, defendants advance several factually incorrect and irrelevant arguments.  First, defendants posit that because some plaintiffs "might" have been able to purchase other securities with lower ratings and higher yields, they did not rely on the ratings.  But the fact that some plaintiffs might have been able to purchase riskier products in return for a higher yield does not undermine their reliance here.  For example, when asked whether it would have purchased lower-rated Cheyne SIV notes, Butterfield responded: "I don't know. . . *they weren't rated AA, they were rated AAA, so it's impossible to answer that question*."  ¶28(hh); *see also* ¶¶28(ii)-(jj).

Similarly, the level of due diligence individual plaintiffs performed is irrelevant here, where the facts necessary to uncover defendants' fraud were "peculiarly within the knowledge of the defendants," and where due diligence would not have revealed that the ratings were false.  *See* ¶28(a), ¶¶28(kk)-(pp); ¶28(tt); *Todd v. Pearl Woods, Inc.*, 248 N.Y.S.2d 975, 977 (2d Dep't 1964), *aff'd*, 15 N.Y.2d 817 (1965); *see also JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004); *Alexander v. Evans*, No. 88 Civ. 5309 (MJL), 1993 WL 427409, at *17 (S.D.N.Y. Oct. 15, 1993) ("the reliance requirement was not designed to shield perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest money, lest the seller be

- 28 -

manipulative or deceptive"). Plaintiffs testified that they relied on the ratings assigned to the Rated Notes in part because of their inability to replicate defendants' complex, proprietary analyses. *See, e.g.*, ¶28(a), ¶28(qq). Moreover, given the yield and tenor of the Rated Notes, it was not economically feasible to perform extensive independent due diligence on the complex SIV and its hundreds of underlying assets. ¶28(a), ¶28(ss).[27]

Defendants also assert that CMA and Hapoalim "disagreed" with the ratings. MSJ at 17. Not so. CMA testified: "[B]ased on the [CMA] credit report, there was a conclusion by CMA" that the notes it purchased for SEI "were *Tier 1* ratings. There's also an indication that Moody's and S&P . . . had rated Cheyne *Tier 1*." ¶23(h). Furthermore, CMA testified that: (i) CMA was obligated to rely on the AAA/Aaa ratings, (ii) CMA would not have even looked at the Cheyne SIV without the AAA/Aaa ratings, and (iii) that the AAA/Aaa ratings were a "substantial factor" and a "big factor" in CMA's purchase. ¶23(j). That Hapoalim assigned an internal numerical score of "5-5" is similarly irrelevant because, as Hapoalim explained, that score is a "very common rating" and "*doesn't correlate with any agency ratings*." ¶17(f). Indeed, a "5-5" score was assigned by Hapoalim to investments with ratings ranging from B/B3 all the way up to AAA/Aaa. ¶17(g).

Defendants' argument that ADCB, GIB, GIS, and NACF purchased MCNs "before the

---

[27]     The cases defendants cite to suggest that plaintiffs' reliance was not justifiable stand for the unremarkable and inapposite proposition that "[a] heightened degree of diligence is required where the victim of fraud had hints of its falsity" or where plaintiff had access to information sufficient to verify defendants' false statements. *See Banque Franco-Hellenique de Commerce Int'l Maritime, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997) (plaintiff "had heard about the" misconduct "two months before" the transaction at issue); *UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (1st Dep't 2001) (same); *In re Eugenia VI Venture Holdings, Ltd.*, 649 F. Supp. 2d 105, 118 (S.D.N.Y. 2008) (finding that plaintiff failed to prove justifiable reliance where the plaintiff had "unfettered access" to information, knew it was investing in a company that "was, and had long been, treading choppy financial waters," and "made its investment, at least in part, with the express purpose of helping AMC get back on its feet"). The plaintiffs in this case did not know about defendants' fraud before they purchased or have equal access to information.

ratings were ever issued" is a red herring. MSJ at 17. These plaintiffs' trades were not actually consummated until August 3, 2005 – the date that the A/A3 ratings assigned to the MCNs became final. As in virtually every investment in which provisional ratings are assigned, plaintiffs understood that the final ratings would match the provisional ratings and would not have completed their purchase had the final ratings differed. ¶28(a); *see also* ¶13(g). With respect to the Cheyne SIV, "the difference between a provisional rating and a definitive rating is **only** the signing of documents." ¶¶28(uu)-(ww). Defendants admit that "the assignment of a **provisional rating is very much a final rating**." ¶28(xx). Prior to the SIV's launch, MS informed plaintiffs that the MCNs "are **now** dual rated by BOTH Moody's and S&P > 'A3/A.'" ¶28(yy).[28]

Further, Butterfield, Commerzbank, Hapoalim, and SEI have standing. "New York law does not require specific boilerplate language to accomplish the transfer of causes of action sounding in tort. Rather, 'any act or words are sufficient which "show an intention of transferring the chose in action to the assignee.'"" *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 151-52 (2d Cir. 1995); *see also Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 52 (2d Cir. 2005) (noting New York's "liberal approach to claim assignability"); *Brandoff v. Empire Blue Cross & Blue Shield*, 707 N.Y.S.2d 291, 293 (N.Y. Civ. Ct. 1999).[29]

---

[28]    Accordingly, defendants' reliance on *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 629 ('S.D.N.Y. 2009), misses the mark. There, the plaintiff did not receive the statements upon which he purportedly relied until *after* purchasing the bonds at issue. *Id.* Here, plaintiffs relied upon provisional ratings that they understood would match the final ratings, would not have purchased the MCNs had the final ratings not matched the provisional ratings, and, in any event, plaintiffs' purchases were not consummated until the ratings were finalized. ¶28(a).

[29]    Moreover, defendants have failed to establish that the law they cite to attack the validity of plaintiffs' assignment applies, and thus have not met their *prima facie* burden on this issue. *See Am. Optical Co. v. Curtiss*, 56 F.R.D. 26, 29 (S.D.N.Y. 1971); *Mogul v. Jenkins Bros.*, 120 N.Y.S.2d 585

- 30 -

Here, Hapoalim purchased MCNs pursuant to a Note Purchase Agreement ("NPA") and a Loan Asset Purchase Agreement ("LAPA") on behalf of a fully-sponsored commercial paper conduit, Venus Funding Corporation ("Venus"). Hapoalim, and not Venus, selected, analyzed and purchased the MCNs on Venus's behalf, relying on the A/A3 ratings. *See* ¶28(a). In September 2007, Hapoalim acquired "through an assignment" and pursuant to the LAPA and NPA the whole of Venus's MCNs at par (¶17(h)), which included "all rights" and "all present and future claims, demands, causes and choses in action in respect of" the MCNs. ¶17(i); *see* ¶28(a). Similarly, SEI was forced to purchase MTNs from its money market funds at par to prevent the funds from "breaking the buck." ¶17(k). SEI was assigned "all of the [money market funds'] rights to and under all claims with respect to the Cheyne Notes, including, without limitation, any and all claims, suits, and/or causes of action arising under or relating to the Cheyne notes." ¶23(i); *see* ¶28(a). Butterfield and Commerzbank also purchased all of the Rated Notes held by their money market funds and acquired entities, respectively. ¶16(f), ¶19(j); *see* ¶28(a).[30] Furthermore, Butterfield and Commerzbank acquired all rights and claims relating to the Rated Notes. *See* ¶28(a).

Butterfield, Commerzbank, Hapoalim, and SEI, moreover, have standing because they acquired the Rated Notes and were thus record owners of the notes before bringing suit. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016(SAS), 2006 WL 708470, at *4 (S.D.N.Y. Mar. 20, 2006) (Scheindlin, J.); *Lemanik, S.A. v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 607 (S.D.N.Y. 1989). And, for the avoidance of doubt, each plaintiff has ratified that (1) it is authorized to pursue recovery related to the Rated Notes and (2) agrees to be

---

(1st Dep't 1953).

[30]    In addition, Commerzbank purchased MCNs on its own behalf. Defendants do not challenge Commerzbank's standing to pursue claims relating to those notes. ¶19(k).

bound by any decisions or judgments. *See* ¶28(a).[31]

Further, a transfer of "all assets" to Butterfield, Commerzbank, Hapoalim and SEI is "broad enough to encompass all causes of action owned by" the transferor. *Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229, 237 (S.D.N.Y. 2007); *see also Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347(JGK), 2008 WL 4755760 (S.D.N.Y. Oct. 29, 2008); *Brandoff*, 707 N.Y.S. 2d at 293. Finally, Commerzbank and Hapoalim have standing for the additional reason that the funds and entities from which they acquired the Rated Notes are no longer in existence. ¶17(j), ¶19(l), ¶28(a); *see Banque Arabe*, 57 F.3d at 153; *Int'l Design*, 486 F. Supp. 2d at 237; *Pro Bono Invs.*, 2008 WL 4755760, at \*18.

### E.   The Evidence of Loss Causation Presents Disputed Issues of Fact

For loss causation, the Second Circuit requires "that the loss be foreseeable, *and* that the loss be caused by the materialization of the concealed risk."[32]  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).  "Plaintiffs need not demonstrate that defendants' misstatements or omissions caused *all* of plaintiffs' losses."  *King County v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010) (emphasis in original).  Rather,

---

[31]   *See also Pension Comm.*, 2006 WL 708470, at \*4 (plaintiffs have standing where "plaintiffs also submitted sworn affidavits from representatives for the [plaintiffs], supporting the claim that each one of them has authority to bring this action"); *Pemex-Refinacion v. Tbilisi Shipping Co. Ltd.*, No. 04 Civ. 02705(HB), 2004 WL 1944450, at \*4 (S.D.N.Y. Aug. 31, 2004); *Advanced Magnetics v. Bayfront Partners*, 106 F.3d 11, 18-21 (2d Cir. 1997); *In re Vivendi Univ., S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 584-85 (S.D.N.Y. 2009); *B.R.I. Coverage Corp. v. Air Canada*, 725 F. Supp. 133 (E.D.N.Y. 1989).

[32]   Under New York law, loss causation is shown where it is "foreseeable that [the plaintiff] would suffer losses as a result of relying on [defendants'] alleged misrepresentations about the mortgage loans." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235 (1st Dep't 2011) (citing *Silver Oak Capital L.L.C. v. UBS AG*, 920 N.Y.S.2d 325, 326 (1st Dep't 2011); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898(SAS), 2005 WL 2148919, at \*12 (S.D.N.Y. Sept. 6, 2005); *Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 93 (1928) ("The loss sustained is directly traceable to the original misrepresentation of the character of the investment the plaintiff was induced to make.")).

plaintiffs need only come forth with evidence "that would allow a factfinder to ascribe some **rough proportion** of the whole loss to [the defendant's alleged] misstatements." *Id.* (emphasis in original). Here, the evidence establishes a triable issue of fact as to the element of loss causation.

Defendants' false statements and omissions led plaintiffs to believe that Cheyne was an exceptionally strong obligor supported by a healthy portfolio of high-quality assets and highly robust structural protections. *Supra*, §§II.A.-B., D.  The false ratings signified a safe, secure and reliable investment with an extremely low probability of transitioning to "junk" status, and a high likelihood of full recovery even in the extraordinary event of a default. *Supra*, §II.A.  Concealed from plaintiffs was the poor quality of the Cheyne SIV's toxic assets, the risks posed by the Cheyne SIV's woefully insufficient structural protections, and a deeply flawed ratings process. *Supra*, §II.A.-C.; *see also* ¶3(eee).  Plaintiffs' substantial losses were directly caused by the false ratings when the concealed risks were realized because the value of Cheyne's toxic subprime assets declined, taking the SIV down with them.  ¶29(a).

> That the SIV would collapse was utterly foreseeable.
>
> [T]he risk that caused plaintiffs' losses – that [Cheyne] consisted of toxic assets that would become worthless – was precisely within the zone of risk concealed by the Top Ratings.  That plaintiffs would suffer losses when these toxic assets collapsed and [Cheyne] entered receivership was reasonably foreseeable.  Therefore, . . . the materialization of the risk concealed by the Top Ratings caused plaintiffs' losses.

*King County*, 708 F. Supp. 2d at 340; *see also Louros v. Kreicas*, 367 F. Supp. 2d 572, 579 (S.D.N.Y. 2005) (loss foreseeable and summary judgment denied where broker represented that investments were "'conservative,'" and "'safe'" when, in fact, the investments were highly risky securities).  A depreciation in the value of the underlying assets causing the SIV to fail was precisely within the "zone of risk" that is "determined by the purposes of the securities laws, *i.e.*, 'to make sure that buyers in securities get what they think they are getting.'"  *In re Omnicom Grp., Inc. Sec.*

- 33 -

*Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)).  "Stated differently, the concealed negative information . . . cause[d] the [plaintiffs'] loss because 'the concealed information eventually cause[d] the transaction to fail.'" *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600(RLC), 2007 WL 1222583, at *3 (S.D.N.Y. Apr. 25, 2007).

**1.   Plaintiffs' Losses Were Caused by the Materialization of the Risks Concealed by Defendants' Fraud**

The Cheyne SIV was driven into receivership when investors began to realize that the ratings on the subprime assets held by Cheyne did not represent the actual risk inherent in those securities. ¶29(a).  Prices dropped as investor concern about poor credit quality in subprime securitizations increased, and the SIV was forced into enforcement, receivership and ultimately liquidation. *Id.*  As a result, Senior Note plaintiffs incurred substantial losses, and the MCN plaintiffs lost their entire investment.  ¶39(a).

By early 2007, the defendants recognized that the risk concealed by their false ratings was threatening to emerge.  S&P experienced "serious pressure to respond to the burgeoning poor performance of sub-prime deals" and recognized internally that subprime RMBS ratings were "not going to hold through 2007."  ¶¶29(c)-(h).  On March 16, 2007, Moody's began to monitor Cheyne and three other SIVs "closely," "given their exposures to US subprime."  ¶29(o), ¶29(pp), ¶29(i), ¶¶29(k)-(l).  By late March 2007, MS knew that the "liquidity" of the Rated Notes had "diminished" and responded by seeking to "[i]nstill confidence" to prevent "a flood of selling."  ¶¶29(m)-(r).  In April, Cheyne and other "vehicles with large US RMBS exposure" suffered "large [negative] movement(s) in NAV" (Net Asset Value) when "compare[d] to the sector average."  ¶29(s).  The spreads on Cheyne's debt began to widen as investors grew concerned about the SIV's exposure to subprime.  ¶29(t).  On July 5, 2007, Cheyne warned Morgan Stanley that "alarm[ing]" spread

- 34 -

widening on Cheyne's MCNs threatened the economics of the SIV.  ¶29(u).

On July 10, 2007, Moody's downgraded 399 RMBS assets, and put an additional 32 on watch for a possible downgrade.  ¶29(v).  S&P also placed 612 RMBS assets on Creditwatch with negative implications and downgraded 498 of those securities two days later.  ¶29(a).  The downgrades adversely impacted Cheyne.  *See* Declaration of Bjorn I. Steinholt in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Steinholt Decl."), ¶9.  In internal documents, MS analysts concluded on July 10 that the Cheyne deal was "***worse than I thought it was***," that the price of MCNs should be discounted by 10%-15%, and that "the deal ***could unravel***."  ¶29(x).  By July 20, MS had reached the conclusion that if proper market prices were used the "HEQs" – home equity securities – would "trigger outright" the Major Capital Loss Test, sending Cheyne into enforcement.  ¶29(y); *see also* ¶2(f).  Yet, MS kept "try[ing] to push SIVs through the franchise," seeking to maximize profits even though its "senior MDs [were] saying SIVs are going to blow up."  ¶29(z).  Moody's, too, sought to prop up the Cheyne SIV by releasing a report titled: "SIVs: An Oasis of Calm in the Sub-prime Maelstrom," assuring investors that SIVs had various protections in place that would "obviate[] the need to liquidate large buckets of assets at potentially the worst period in the life of the vehicle."  ¶¶29(aa)-(bb).  Internally, however, Moody's knew Cheyne was in trouble precisely because of its exposure to subprime.  ¶¶29(bb)-(cc).

By the end of July, Cheyne was "selling [its] highest quality assets" causing it to "really stand out as high-proportion subprime."  ¶¶29(dd)-(ff).  As a result, after August 2, 2007, investors stopped buying Senior Notes (¶29(hh)), and at least one MCN investor exited the security – still rated A – at a 30% loss.  ¶29(ii).  By August 9, 2007, Cheyne was in trouble because senior note investors were "very nervous about certain asset sectors – particularly ***subprime*** and Structured Finance CDOs."  ¶29(hh); *see also* ¶29(jj).  Still, on August 14, 2007, S&P published an article,

"SIV Ratings Are Weathering Current Market Disruptions," and affirmed ratings on 30 SIVs including Cheyne.  ¶29(kk).  MS "[could] not believe these morons would reaffirm in this market with mtm triggers threatening to wipe out the bonds."  ¶29(ll).  Less than a week later, Cheyne breached its Minor Capital Loss Test.  ¶29(mm).  The "*[m]arket ha[d] singled out Cheyne as [the] most likely SIV to come down given its portfolio [of] HELs and CDOs.*"  ¶29(mm), ¶29(bb).

On August 28, 2007, Cheyne went into enforcement.  S&P downgraded the MTNs six notches to A-, the CP two notches to A-2 and the MCNs ten notches to B- (below investment grade).  On September 5, Moody's downgraded Cheyne's MCNs 11 levels to Caa2 and put the Senior Notes on review for possible downgrade.  The ratings actions were an acknowledgment that the credit risk of Cheyne's subprime assets did not match their ratings.  ¶29(a), ¶29(nn).  The downgrades continued on September 7, 2007 (S&P) and October 4, 2007 (Moody's).  On October 17, 2007, pursuant to a court order, Cheyne's receivers (Deloitte & Touche) notified the Trustee of an "insolvency event," meaning that the SIV was unable to pay its debts to senior creditors and all assets were to be sold. ¶29(qq).  On October 19, 2007, S&P downgraded Cheyne's CP and MTN to D (Default).  ¶29(a).  Again, the rating agencies attributed their continued downgrades to the *subprime assets* held by Cheyne.  *Id.*  Ultimately, the Cheyne SIV portfolio was auctioned off for 43.9 cents on the dollar.  ¶29(oo), ¶39(a).  MCN investors were wiped out completely, and Senior Note purchasers lost more than 30% of their investment. ¶39(a).  Plaintiffs' losses were a direct and foreseeable result of defendants' gross understatement of the Rated Notes' risk.  Steinholt Decl., ¶¶30-31, 37.

Defendants contend that plaintiffs' losses were caused by a decline in market prices that was completely unrelated to credit performance.  MSJ at 27-30.  To prevail, defendants must "*prove* that plaintiffs' losses were, in fact, caused *entirely* by an intervening event."  *King County*, 708 F. Supp.

2d at 346. However, as Moody's put it, defendants cannot "escape from the fact that the undoing of SIVs . . . is ***primarily explained*** by the ***overly aggressive ratings*** of underlying assets, from the market's perspective." ¶30(b); *see* Steinholt Decl., ¶¶27-28, 30-31. According to Moody's, "the fact that the portfolio assets [were] still highly rated" when Cheyne failed simply "highlight[ed] the disconnect between our ratings and what the market [was] telling us about the quality of the assets." ¶30(e).

The market's actions were entirely rational and directly connected to severe ***credit*** problems in Cheyne's constituent portfolio. Steinholt Decl. The mark-to-market declines that drove Cheyne into enforcement on August 28, 2007, occurred on subprime securities. ¶30(f). By that time, 101 of the SIV's constituent assets had been marked down by more than 10%. ¶30(g). Their market prices dropped for a reason – 99 of the 101 were subprime HEL securitizations. ¶30(h). The securities contained high percentages of troubled loans, and based on this information the market correctly anticipated substantial future losses, driving prices down. ¶30(i). Defendants rely heavily on the contention that none of these securities had been downgraded by August 28, 2007. MSJ at 20. As plaintiffs' loss causation expert Steinholt explains, however, this argument incorrectly confines the question of credit quality to the ratings, which is inappropriate given the overwhelming empirical evidence and defendants' own admissions establishing that by August 28, 2007, the market had a diverging view. Steinholt Decl., ¶¶30-31. In fact, 37 of Cheyne's assets ***had*** experienced downgrades in their lower tranches (or had been put on watch for downgrades), portending future losses for the tranches Cheyne held. ¶30(j). These assets continued to suffer increasing ***credit*** problems driving the SIV into insolvency and liquidation. ¶30(k). Today, 98 of the 101 highly impaired assets have themselves been downgraded and 96 trade below 90% of face value. ¶30(g). If the assets had been impaired by liquidity, but not credit issues, they would not have been

downgraded and they would trade at or above par today, more than *three years* after defendants'

supposed liquidity crisis.  ¶29(a), ¶30(l).[33]

     In this context, observations by a few of the plaintiffs' employees that Cheyne's enforcement

was triggered by failure of the Major Capital Loss Test based on market prices, and

contemporaneous attempts to value Cheyne or its constituent assets based on partial information are

irrelevant.  The evidence shows that prices were driven down because of credit issues.  Furthermore,

those "observations" simply parrot the information made available by the defendants and Cheyne, all

of whom had an interest in promoting that theory. *See, e.g.*, ¶¶31(a)-(d).  Defendants' selective and

misleading quotations of certain of the plaintiffs' employees regarding credit "fundamentals" is

equally unavailing.  These statements were plucked from documents and testimony describing the

effects that the undeniable credit problems existing in subprime securities had on securities that were

*completely unrelated* to subprime.  ¶¶31(e)-(f).  The same documents and testimony make it clear

that in late September/early October, *before* Cheyne was declared insolvent, "fundamental[s] came

back into play."  ¶¶31(e)-(h).[34]

     Plaintiffs' lay opinions at best give rise to a triable issue of fact, for at the time, *all* of the

defendants differentiated Cheyne from the vast majority of SIVs, attributing Cheyne's failure

squarely to its subprime exposure.[35] **<u>Moodys</u>**: "This is the first 'traditional' SIV (*i.e.* a SIV which is

---

[33]     Dr. Sanjiv Das analyzed the SIV and concluded that without its high concentration of HELs,"the SIV would not have failed in second-half of 2007."  Das Decl., ¶6.

[34]     Likewise, defendants' reference to losses some of the plaintiffs suffered through other toxic structured finance investments like those held by Cheyne establishes nothing.

[35]     *See AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 400 (S.D.N.Y. 2009) (denying motion for new trial where certain plaintiffs testified that a third party had caused plaintiffs' loss from a structured security because "the lay opinion of various witnesses that First Union's servicing failure caused the plaintiffs' losses are not very probative"), *aff'd*, 386 Fed. App'x 5 (2d Cir. 2010).

- 38 -

not a SIV lite) that we place on review.   However, **unlike most** – but not all [of] – the other

traditional SIVs, **Cheyne has a large exposure to US RMBS (63%)**." ¶¶31(i)-(j).   **S&P**:  Senior

employees emphasized that "non-prime RMBS exposures" explained Cheyne's collapse.  ¶31(l)-

(m).  **MS**:  A research analyst, Sarah Barton (who was not involved in the fraud) attempted to publish

a research report correctly attributing Cheyne's collapse to "[a]sset quality" problems.  ¶31(n).

Ultimately, Ms. Barton was forced by senior executives (who participated in the fraud) to delete all

references to Cheyne's "asset quality" problems from the published report.  ¶31(n).

Defendants' statistics concerning outstanding commercial paper are equally unavailing.  MSJ

at 29.  More than a month after Cheyne's short term funding dried up, MS "reiterate[d]" to the

market "that **the majority of SIVs** (at least those with the majority of the market's assets) **are still**

**financing themselves**," and "**there is liquidity to be had** in the US and Europe."  ¶31(n), ¶33(a).

SIVs with less subprime exposure than Cheyne were issuing short-term paper into 2008.  ¶¶33(a)-

(c).  MS itself "cut off all SIVs from trading" because of "the wind down of the Cheyne SIV."

¶33(c).[36]

Defendants' contention that the Cheyne SIV had enough value in August to pay the Senior

Notes is legally irrelevant and factually incorrect.  The Rated Notes did not trade in an efficient

market like shares of stock in a traditional federal securities fraud claim.  "[P]roving loss causation

---

[36]       *See In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010) (rejecting argument that defendants were victims of a "global economic collapse" because such were "premised on a **convenient confusion of cause and effect**" where the defendants were "active participant[s] in the collapse of their own business, and of the financial markets in general, rather than merely . . . passive victim[s]"); *In re Tycom Ltd. Sec. Litig.*, No. 03-CV-1352-PB, 2005 WL 2127674, at *12 n.15 (D.N.H. Sept. 2, 2005) (same); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. at 534, 547-48 (N.D. Cal. 2009) (describing "a 'run on the fund' scenario: as losses mounted, more and more investors sought to withdraw their investments, forcing the fund to liquidate assets at low prices, which in turn contributed to the share-price decline"); *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 748 (D. Md. 2008) (recognizing loss causation regarding "'flight damages.'").

- 39 -

in connection with the sale of privately-offered, asset-backed securities such as [the Rated Notes] is a different undertaking from proving loss causation in a typical stock drop case." *AIG*, 646 F. Supp. 2d at 403 (affirmed by Second Circuit); *see also Charles Schwab*, 257 F.R.D. at 547.  In a case like this one, an immediate price decline upon disclosure that the ratings were incorrect is not required. Loss causation may be established by demonstrating a causal link between the fraud and the "decrease in the amount of money returned to [plaintiffs] over the course of the securitization." *AIG*, 646 F. Supp. 2d at 403.

Defendants' argument also presupposes that the portfolio's marks were accurate, and that all of the assets could have been liquidated without any liquidation discount.  The evidence proves otherwise.  As MS knew, if the Cheyne SIV had correctly priced "the assets at the bid side" (*i.e.*, the price market participants were actually willing to pay), the SIV would have "fail[ed] the entire portfolio trigger for both the Minor and Major Test[s]" on July 20, 2007, more than a month before enforcement.  ¶36(a); *see* ¶¶36(b)-(d).  By that point, MS's calculations showed that the Senior Notes had suffered a loss (¶36(b)), and MS admitted that the Cheyne Senior Notes were "*a CProach motel we check in but can't check out.*"  ¶36(c).  Additionally, unloading the SIV's assets on the market in an unplanned, disorderly sale would have resulted in even more losses than plaintiffs actually suffered.  ¶35(e); Steinholt Decl., ¶¶33-34.  Thus, defendants' argument is divorced completely from economic reality.  *Id.*

Furthermore, defendants' use of the enforcement date to assess the portfolio's value is arbitrary because the rating agencies continued to downgrade Cheyne after August 28, 2007 and into 2008, when the SIV portfolio was liquidated and plaintiffs' losses were crystallized.  ¶29(a). Finally, the entire receivership from enforcement through insolvency and liquidation was anticipated and designed by the defendants who falsely designated the whole structure worthy of top ratings.

- 40 -

¶30(m).

Defendants' refusal to produce discovery on the topic bars them from advancing any argument relying on the failure of other SIVs.  *See* Objection to Evidence.  In any event, defendants cannot lump Cheyne in with other SIVs because, as discussed, the evidence establishes that Cheyne failed because of its subprime holdings.  As of May 2008, moreover, seven months after Cheyne went into enforcement and two months before its liquidation, the vast majority of SIVs were still top rated.  On that date, S&P admitted:

> Those SIVs with the highest concentration of U.S. RMBS . . . and CDOs of ABS have generally experienced the most acute loss in market value of the securities in their asset portfolios and, therefore, a resultant drop in capital note investor net asset value.

¶32.  Defendants have not provided any evidence of the actual losses incurred by investors in other SIVs, the cause of any such losses or when and why those SIVs failed.  In sum, defendants have failed to carry their burden.  *King County*, 708 F. Supp. 2d at 346.

### 2.     Plaintiffs' Losses Were Within the "Zone of Risk"

Under *Lentell*, plaintiffs need not prove that defendants knew the precise event that would cause plaintiffs' losses, but only that the harm suffered by plaintiffs was in the "zone of risk concealed by the misrepresentations and omissions."  *King County*, 708 F. Supp. 2d at 338 & n.27 (quoting and following *Lentell*, 396 F.3d at 173).  The Second Circuit holds that "[t]he zone of risk is determined by the purposes of the securities laws, *i.e.*, '***to make sure that buyers of securities get what they think they are getting***.'"  *Id.*

Here, plaintiffs believed they were buying top-rated securities.  Actually, they received something much riskier.  Defendants concede that they knew the SIV was susceptible to credit risk, market risk and liquidity risk when it was launched.  MSJ at 31-32.  But, they falsely assured plaintiffs that those risks had been properly accounted for in the rating, and, in combination with all

- 41 -

other risks, had a minimal chance of materializing.  ¶¶37(a)-(c).  Defendants cannot disprove causation, under such circumstances, by pointing to a general downturn in the market.  For the risk of such downturns is the very reason that risk-averse investors are well-advised to seek highly-rated investments with well-protected, conservative portfolios.  *See King County*, 708 F. Supp. 2d at 343 & n.63; *Owens v. Gaffken & Barriger Fund, LLC*, No. 08 Civ. 8414(PKC), 2009 WL 3073338, at *8 (S.D.N.Y. Sept. 21, 2009).

As insiders, defendants did foresee the problems they claim could not be predicted.  MS knowingly waived doomed loans into securitizations that contaminated the market, and the rating agencies knowingly inflated ratings on subprime securitizations to keep the machine rolling.  *See* §II.C., *supra*.  As S&P admitted two weeks after Cheyne collapsed, the economic slowdown was "[n]ot surprising" (¶37(c)), given that there were several "[e]arly [w]arning [s]igns" in 2005 of a "Housing Bubble Forming As a Result of Low Rates."  ¶37(d).  *See* ¶¶37(e)-(h).  In short, plaintiffs' losses were a foreseeable result of defendants' fraud.

### 3.    All of the Plaintiffs Were Damaged by Defendants' Fraud

All of the plaintiffs suffered substantial and cognizable damages as a result of defendants' fraud.  The MCN Plaintiffs[37] lost ***100%*** of their principal investments, a fact that defendants do not dispute.  ¶39(a), ¶39(d), ¶39(f).  After the Cheyne SIV was declared insolvent, all of SIV's assets were sold.  *Id.*  A vertical slice of the SIV's portfolio was sold through a competitive auction process that involved 11 bidders.  The winning bid came in at 43.9% of notional value.  *Id.*  The remaining assets were then sold to Goldman Sachs International ("GSI") at the same price as in the auction.  *Id.*  The assets purchased by GSI were then sold to a "newly formed" entity, Gryphon Funding Limited

---

[37]    ADCB, Hapoalim, SinoPac, Postbank, NACF, GIB and GIS.  Commerzbank purchased both Mezzanine Capital and Senior Notes.

("Gryphon"). *Id.* The Senior Noteholders[38] chose whether to receive cash (from the sale of a vertical slice) or "re-invest" in "new notes" issued by Gryphon. *See* ¶¶39(a)-(d).

Defendants contend that plaintiffs who chose Gryphon cannot prove damages because they continue to hold Gryphon notes. But, the acquisition of Gryphon was a new investment decision concerning a completely different note. "[T]he Gryphon Offers [were] not part of the Receivership or the Receivership Process," and "none of SIV Portfolio plc (in receivership), Cheyne Finance LLC or the Receivers" had "any role" or responsibility for their issuance. ¶39(f). The performance of Gryphon, a new security with an indeterminate duration (potentially 30-100x longer than their Cheyne investments) and no coupon, is irrelevant. ¶39(g). Whether that decision was a success or a failure has no bearing on the losses those plaintiffs can recover, just as King County or PSERS's investment of the proceeds from the cash-out would have no bearing on theirs. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003). Regardless of what happened after Cheyne's assets were sold, the plaintiffs' loss is measured by the "decrease in the amount of money returned to them over the course of the securitization." *AIG*, 646 F. Supp. 2d at 401-04. By that measure, all plaintiffs have suffered substantial losses. ¶39(h).[39]

In addition, even if the value of Gryphon and payments received from that new investment are used to measure loss, plaintiffs have still suffered damages. ¶39(a). Butterfield sold all and SFTCIF sold a portion of their Gryphon Notes, and both incurred a loss. ¶39(i). Courts have routinely rejected the argument defendants advance as "'too cramped a reading of damages.'" *See*

---

[38]     King County, PSERS, SEI, SEI Strategies, SFTCIF, FSBA and Butterfield.

[39]     Even if it were permissible to apply Gryphon proceeds as an offset, establishing that offset would be **defendants**' burden, which they have not even attempted to satisfy. *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d 256, 289-90 (S.D.N.Y. 2010) ("New York state courts . . . consistently require the party that would benefit from the offset . . . to prove its entitlement to a reduction of damages.").

- 43 -

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 107-08 (S.D.N.Y. 2011) (collecting cases). The law is clear, and defendants cite no contrary authority, that plaintiffs are not required to sell in order to sue.[40] Further, Gryphon will never fully repay the Senior Noteholders. A substantial number of Gryphon's assets have defaulted or stopped paying, which guarantees that the Gryphon notes will incur a loss. ¶39(a), ¶39(j). Given the poor quality of the assets backing the portfolio, substantial future defaults are nearly certain. The locked-in losses and the anticipated future losses on principal are reflected in the bid prices for Gryphon notes, which currently stand at 28% of face value. ¶39(a). Damages can be established based on these prices. *Pub. Emps. Ret. Sys.*, 277 F.R.D. at 107-08; *see* ¶39(a). Finally, plaintiffs' expert described several methods for valuing Gryphon. *See* Steinholt Decl., ¶¶35-36. Nothing more is required. *JSMS Rural LP v. GMG Capital Partners III, LP*, No. 04 Civ. 8591(SAS), 2006 WL 1867482, at *3 (S.D.N.Y. July 6, 2006) (Scheindlin, J.).

### F.  Generic Disclosures Do Not Negate Loss Causation or Scienter

Risk disclosures have no bearing on the elements of loss causation and scienter. That an SIV could potentially face market risk was not a secret. Here, however, "[t]he disclosures fail[ed] to make clear the magnitude of the risk." *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653(PAC), 2010 WL 1473288, at *6 (S.D.N.Y. Mar. 29, 2010). What defendants knew and plaintiffs did not was that: (i) the SIV's Top Ratings were false, (ii) the Rated Notes were not safe, sound and stable, (iii) the SIV held assets that defendants knew were far riskier than represented, and (iv) the SIV did not have adequate structural protections to prevent losses with

---

[40]    *Pub. Emps. Ret. Sys.*, 277 F.R.D. at 107-08 (damages established where plaintiffs showed "that the Certificates were no longer marketable at anywhere near the prices paid by Plaintiffs at the time of the suit"); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030(LAP), 2011 WL 1330847, at *11 (S.D.N.Y. Mar. 30, 2011).

nearly the expectation signified by the Top Ratings. In short, "the general disclaimers contained in the private placement memorandum" do not "avail [defendants] since they [are] not specifically applicable to the alleged misrepresentation at issue." *Silver Oak*, 920 N.Y.S. 2d at 327. Instead, they "are invalid" because notwithstanding any disclaimer, the true risk was concealed by the false ratings, and "'"the information required to confirm or disprove the validity of the [ratings] was peculiarly within [defendants'] knowledge."'" *King County, Wash. v. IKB Deutsche Industriebank AG*, No. 09 Civ. 8387(SAS), slip op. at 15 (S.D.N.Y. Oct. 29, 2010) (brackets in original); *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").[41]

G.    **Aiding and Abetting Has Been Established**

As detailed herein, there is ample evidence that defendants had actual knowledge of the fraud. Since it cannot be disputed that MS and the rating agencies worked hand-in-hand to create and disseminate the false ratings, substantial assistance is established. As with the primary fraud claims, a triable issue of fact exists as to plaintiffs' aiding and abetting claims.

III.   **CONCLUSION**

Defendants' motion for summary judgment should be denied in its entirety.

---

[41]    Defendants' contention also fails because cautionary words cannot negate any element, where, as here, the misrepresentation is a present fact, and the cautionary words do not "directly address the risk that plaintiffs claim was not disclosed." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009).

- 45 -

DATED: February 29, 2012                    Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            PATRICK J. COUGHLIN
                                            DANIEL S. DROSMAN
                                            JESSICA T. SHINNEFIELD
                                            DARRYL J. ALVARADO


                                            _____
                                                    DANIEL S. DROSMAN

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101-3301
                                            Telephone: 619/231-1058
                                            619/231-7423 (fax)
                                            patc@rgrdlaw.com
                                            dand@rgrdlaw.com
                                            jshinnefield@rgrdlaw.com
                                            dalvarado@rgrdlaw.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone: 631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            LUKE O. BROOKS
                                            JASON C. DAVIS
                                            Post Montgomery Center
                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
                                            Telephone: 415/288-4545
                                            415/288-4534 (fax)
                                            lukeb@rgrdlaw.com
                                            jdavis@rgrdlaw.com

                                            Attorneys for Plaintiffs

- 46 -

POMERANTZ HAUDEK GROSSMAN
   & GROSS LLP
MARC I. GROSS
TAMAR A. WEINRIB
100 Park Avenue
New York, NY  10017-5516
Telephone:  212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
taweinrib@pomlaw.com

Additional Attorneys for Plaintiff State Board of
Administration of Florida

- 47 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on February 29, 2012, declarant served PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(c) by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 29, 2012, at San Diego, California.

TERESA HOLINDRAKE

MORGAN STANLEY SIV
Service List - 2/28/2012   (08-0168)
Page 1 of 1

### Counsel For Defendant(s)

Dean Ringel
Floyd Abrams
Andrea R. Butler
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005-1702
  212/701-3000
  212/269-5420 (Fax)

James P. Rouhandeh
William R. Miller, Jr.
Andrew D. Schlichter
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
  212/450-4000
  212/701-5800 (Fax)

Joshua M. Rubins
James J. Coster
Aaron M. Zeisler
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY 10169
  212/818-9200
  212/818-9606 (Fax)

### Counsel For Plaintiff(s)

Marc I. Gross
Tamar A. Weinrib
Pomerantz Haudek Grossman & Gross LLP
100 Park Avenue
New York, NY 10017-5516
  212/661-1100
  212/661-8665 (Fax)

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
  631/367-7100
  631/367-1173 (Fax)

Patrick J. Coughlin
Daniel S. Drosman
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)

Jason C. Davis
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
  415/288-4545
  415/288-4534 (Fax)