**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x   08 Civ. No 7508 (SAS)

ABU DHABI COMMERCIAL BANK, et al.,   :

                                       :   **ECF Case**

             Plaintiff,   :

                                         :

    vs.   :

                                         :

MORGAN STANLEY & CO. Inc., et al.,   :

                                         :

            Defendants.   :

———————————————————————— x

**DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT**
**OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION**
**FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL**
**RULE OF CIVIL PROCEDURE 56(c)**

**Confidential**
**Filed Under Seal**

## I.    INTRODUCTION AND QUALIFICATIONS

1.     I am a founding Principal at Financial Markets Analysis, LLC ("FMA"), an economic consulting and valuation firm with offices in San Diego, California and Princeton, New Jersey. FMA provides financial analyses and related economic consulting services. I have been retained on numerous occasions to provide my expert opinions relating to various economic and valuation issues that arise in securities litigations, including the issue of loss causation. I have also been qualified to testify as an expert on these subjects. A summary of my background and qualifications is attached hereto as Ex. A. My compensation is based on the number of hours worked times my billable rate, currently $450 per hour.

## II.    OVERVIEW OF ASSIGNMENT

2.     Plaintiffs' counsel has requested that I examine the issue of loss causation related to the collapse of Cheyne Finance PLC ("Cheyne"). Below, I will first provide a background of the collapse of Cheyne. Second, I will discuss the importance of the credit ratings of Cheyne, its debt and its investments, to a reasonable investor. Third, I will analyze the issue of loss causation in this matter. Fourth, I will analyze several related issues raised in defendants' summary judgment brief ("Def. Brief") dated January 23, 2012.

3.     This report is based on the evidence I have reviewed to date. I understand that expert discovery has not yet commenced and that additional information may become available. As a result, I understand that I may be asked to respond to such additional information.

## III.    BACKGROUND

4.     The Cheyne SIV was launched in August of 2005. Simply put, SIVs are limited purpose entities that invest in highly-rated long-term assets using funds obtained from shorter term borrowing. Cheyne borrowed funds by issuing debt in the form of mezzanine capital notes ("MCNs"), commercial paper ("CP") and medium term notes ("MTNs" and together with CP the "Senior Notes").

- 1 -

5.     The objective of any SIV is to generate more positive cash flows from highly rated long-term investments than it pays out on its own shorter term debt. Consequently, SIVs have to maintain a high credit rating to be able to issue its debt at a low cost (low yield) as higher ratings translates into lower yields. During normal operation, SIVs have to continuously roll over the shorter term debt as the older debt matures. It is critical for SIVs to manage market price fluctuations, handle liquidity issues, and, if necessary, execute the liquidation of the SIV's assets. This all relates to the SIV's credit quality and should be reflected in its credit rating.

6.     Unique to Cheyne's investment portfolio was its high concentration of residential mortgage backed securities ("RMBS"), which at the end of 2007 stood at 65% of its assets, more than for any other SIV.[1]  Cheyne's RMBS securities were generally backed by subprime U.S. residential mortgage-backed securities, commonly considered high-risk mortgages. Pools of these risky mortgages were divided into different tranches carrying different levels of risk. The RMBS tranches purchased by Cheyne were typically given high credit ratings by S&P and Moody's, and sufficiently high marks by Morgan Stanley and other investment banks for the SIV to pass various capital loss tests up until August of 2007.

### The Subprime Credit Crisis of 2007

7.     On April 13, 2011, the U.S. Senate issued a report summarizing the RMBS crisis. It stated, in part:

> Between 2004 and 2007, Moody's and S&P issued credit ratings for tens of thousands of U.S. residential mortgage backed securities (RMBS) and collateralized debt obligations (CDO). Taking in increasing revenue from Wall Street firms, Moody's and S&P issued AAA and other investment grade credit ratings for the vast majority of those RMBS and CDO securities, deeming them safe investments even though many relied on high risk home loans. In late 2006,

---

[1]     Cheyne also had 7.5% invested in asset backed collateralized debt obligations, 16.5% in collateralized loan obligations, and 9% in various collateralized commercial real estate debt/mortgages. Ex. B at 9-10.

high risk mortgages began incurring delinquencies and defaults at an alarming rate. Despite signs of a deteriorating mortgage market, Moody's and S&P continued for six months to issue investment grade ratings for numerous RMBS and CDO securities.

Then, in July 2007, as mortgage delinquencies intensified and RMBS and CDO securities began incurring losses, both companies abruptly reversed course and began downgrading at record numbers hundreds and then thousands of their RMBS and CDO ratings, some less than a year old. Investors like banks, pension funds, and insurance companies, who are by rule barred from owning low rated securities, were forced to sell off their downgraded RMBS and CDO holdings, because they had lost their investment grade status. RMBS and CDO securities held by financial firms lost much of their value, and new securitizations were unable to find investors. The subprime RMBS market initially froze and then collapsed, leaving investors and financial firms around the world holding unmarketable subprime RMBS securities that were plummeting in value. A few months later, the CDO market collapsed as well.

Traditionally, investments holding AAA ratings have had a less than 1% probability of incurring defaults. But in 2007, the vast majority of RMBS and CDO securities with AAA ratings incurred substantial losses; some failed outright. Analysts have determined that over 90% of the AAA ratings given to subprime RMBS securities originated in 2006 and 2007 were later downgraded by the credit rating agencies to junk status. . . . Investors and financial institutions holding the AAA rated securities lost significant value. Those widespread losses led, in turn, to a loss of investor confidence in the value of the AAA rating, in the holdings of major U.S. financial institutions, and even in the viability of U.S. financial markets.

Inaccurate AAA credit ratings introduced risk into the U.S. financial system and constituted a key cause of the financial crisis. In addition, the July mass downgrades, which were unprecedented in number and scope, precipitated the collapse of the RMBS and CDO secondary markets, and perhaps more than any other single event triggered the beginning of the financial crisis.

Ex. C at 6.

8.      On July 10, 2007, S&P placed 612 different RMBS securities on negative CreditWatch, and disclosed that it planned to "change the methods it uses to rate existing and new mortgage bonds to reflect the increased likelihood of mortgage defaults and losses." Ex. D at 2. On July 12, 2007, S&P downgraded 498 of these securities. Also on July 10, 2007, Moody's downgraded 399 RMBS securities originated in 2006, and put an additional 32 on watch for possible downgrade. A July 10, 2007, *Reuters* article stated:

The news spooked investors, driving them away from financial stocks and other riskier investments and into the safety of U.S. government bonds.

\* \* \*

"If S&P, in fact, downgrades these issues, it is an admission that they weren't appropriately rated in the first place," said Andrew Harding, chief investment officer of fixed-income at Allegiant Asset Management in Cleveland, adding the situation "is pretty ugly now."

Ex. E at 1, 2.

9.    Most of the downgrades were on the lower tranches of RMBS securities. Still, the downgrades also impacted higher rated RMBS tranches due to: (a) increased investor concerns about deteriorating credit quality, (b) increased investor skepticism regarding the accuracy of the ratings provided by S&P and Moody's, (c) decreased buffer for higher rated tranches as lower rated tranches moved towards default, and (d) concerns over potential future downgrades relating to the implementations of new credit rating methodology. Therefore, the mass downgrades also impacted RMBS tranches initially rated much higher. Ex. F.

10.    As of July 13, 2007, subordinated tranches for 37 deals owned by Cheyne had been downgraded or been put on negative watch. MS_000281111-2. On July 26, 2007, Morgan Stanley was concerned about the liquidity risk as a result of "[s]enior investors (CP & MTNs) [being] very nervous about certain asset sectors – particularly subprime and Structured Finance CDOs (Risky Assets)" and observed that "recent price action has only exacerbated this." Morgan Stanley also observed that "further deterioration in marks could cause a breach in [Cheyne's] Minor Capital Loss Test." Ex G at MS_000000001. This liquidity issue was, of course, directly tied to investors' negative views regarding credit quality.[2] Simply put, sellers of RMBS securities wanted a price that reflected the high credit ratings, while potential buyers

_____

[2]    As noted in an August 27, 2007 Moody's e-mail: "At the end of the day, some severely downgraded RMBS securities may appear in a rated MV vehicle. This credit event will create a liquidity issue." Ex. H at MDYS ADCB 093057.

wanted to pay a much lower price that relied less on credit ratings and instead reflected investors' increased concerns about credit quality, resulting in fewer transactions.

### The Collapse of Cheyne

11.    On August 15, 2007, S&P issued a report on all the SIVs they were covering, including Cheyne, in which they stated:

> "We are reviewing reports on a daily and weekly basis, and, thus far, all SIVs are passing their tests. . . . Given that SIVs are structured so they don't have to liquidate immediately due to the liability profile and are structured with liquidity facilities to address market disruptions, we believe that the structure, in conjunction with the actual portfolio level detail, enable us to maintain these ratings and communicate to the market that we will provide updates if and as appropriate."

Ex. D at 4.

An internal Morgan Stanley e-mail also dated August 15, 2007 commented:

> I cannot believe these morons would reaffirm in this market with mtm triggers threatening to wipe out the bonds. The most recent Cheyne mtm must have been ok which is amazing to me.

Ex. G at MS_000121701.

12.    Two weeks later, on August 28, 2007, it was reported that Cheyne had breached its Major Capital Loss Test (Net Asset Value < 50% of Capital Notes) and, therefore, would enter enforcement mode (orderly wind down). It was the first SIV to do so. Also on August 28, 2007, S&P lowered Cheyne's MCNs *ten* levels to B- (*i.e.*, below investment grade) from A, its MTNs *six* levels to A- from AAA, and its CP *two* levels to A-2 from A-1+. An August 29, 2007, New York Times article stated:

> Reports of the [Cheyne] downgrade sent shockwaves through the commercial paper market late yesterday, where trading has been turbulent for at least the last two weeks and investors are speculating about the next investment vehicle to fall. It also raised questions about the quality of the ratings process, given how quickly - - and significantly - - that S&P reversed course.
>
> "If the rating agencies have to downgrade six notches in a single day, it undermines investor confidence," said Alex Roever, a JPMorgan analyst who

covers the commercial paper market. "It is sort of hard to fathom what so much has changed in that time and makes investors wonder whether the rating agencies were paying attention to what was going on in the portfolio."

Ex. D at 7.

13.     On September 5, 2007, Moody's downgraded Cheyne's MCNs *eleven* levels to Caa2 (*i.e.*, below investment grade) from A3, and put its CP and MTNs (P-1 and Aaa) on review for possible downgrade. Cheyne was the only SIV out of the six SIVs mentioned in the report that had its debt downgraded. On September 7, 2007, S&P downgraded Cheyne's MCNs *three* levels to CCC- from B-. On October 4, 2007, Moody's downgraded Cheyne's MTNs *twelve* levels to Ba3 (*i.e.*, below investment grade) from Aaa (highest rating), and its CP to Not Prime (*i.e.*, below investment grade) from P-1 (highest rating). On October 17, 2007, Cheyne's receivers (Deloitte & Touche) notified Cheyne's trustee of an "insolvency event," meaning that the SIV was unable to pay its debts to senior creditors and all assets were to be sold. On October 19, 2007, S&P downgraded Cheyne's CP and MTNs to D (Default).

14.     On July 17, 2008, all of Cheyne's assets were sold. A vertical slice of Cheyne's portfolio was sold through a competitive auction process that involved 11 bidders. The winning bid came in at 43.9% of face value. Ex. D at 9. The remaining assets were then sold to Goldman Sachs at the same price received in the auction and transferred into a new entity, Gryphon Funding Limited ("Gryphon"). Plaintiffs with Senior Notes (CP and MTN) could chose whether to receive cash or new long-term Gryphon Notes backed by the Gryphon assets acquired from Goldman Sachs. Plaintiffs who owned MCNs received nothing.

## IV.     IMPORTANCE OF CREDIT RATINGS

15.     Credit ratings are assessments provided by the rating agencies (Moody's, S&P and Fitch) about the credit risk associated with a particular debt security. The probability of

default can be translated into a matrix showing the percentage of securities whose ratings gets

upgraded, downgraded or maintained within a given time period, as shown below.[3]

| % | 1983 2003 RMBS Rating Transition Matrix (1Y Table) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B | Default | Total |
| Aaa | 99.347 | 0.383 | 0.114 | 0.037 | 0.003 | 0.012 | 0.105 | 100.00 |
| Aa | 6.441 | 91.705 | 0.988 | 0.453 | 0.101 | 0.090 | 0.222 | 100.00 |
| A | 3.173 | 3.335 | 91.926 | 0.701 | 0.228 | 0.171 | 0.466 | 100.00 |
| Baa | 0.905 | 0.865 | 2.916 | 92.837 | 0.292 | 0.426 | 1.760 | 100.00 |
| Ba | 0.290 | 0.193 | 1.825 | 3.423 | 92.171 | 0.385 | 1.712 | 100.00 |
| B | 0.000 | 0.000 | 0.000 | 1.042 | 0.422 | 94.832 | 3.705 | 100.00 |
| Default | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 100.000 | 100.00 |

From the matrix above, 99.3% of Aaa securities would be expected to maintain their Aaa rating

one year later, and less than 1% would be expected to be downgraded to Aa or below. As can be

seen from the matrix above, the probability of Aaa or Aa securities being downgraded to below

investment grade (Ba or below) has traditionally been very remote.[4]

16.    Credit ratings are important to investors for many reasons. First, the credit ratings

provide investors with an independent assessment of the debt securities' respective default risks.

Second, companies being rated generally provided rating agencies with better information than

that publicly available. Third, for complex investments such as a SIV, rating agencies are well

positioned to assess the risk because they generally also have provided ratings for the underlying

debt securities in the SIV. Fourth, ratings are also important because of the importance placed

on ratings by other investors. Many SIV investors are risk averse, and some can only invest in

securities with high credit ratings, *i.e.*, they "base their investment decision on the rating

attributed by the rating agencies." Ex. I at 85.

---

[3]    "Cheyne Finance: Simulation Model Memo," dated July 20, 2005. MS_000481051.

[4]    One academic paper published in 2008 explained: "No one was expecting, until recently, a triple-A asset to be downgraded to junk status within a few weeks or even a few days." Ex. I at 85. Of course, that is exactly what happened to Cheyne in 2007.

## V.    LOSS CAUSATION

17.    For the purpose of my analysis, loss causation relates to the existence of economic losses that can be causally connected to the alleged fraud, as opposed to other unrelated factors. I define economic loss causation as the difference between an investor's: (a) actual loss, less (b) loss that still would have been incurred absent the alleged fraud. Plaintiffs' actual investment losses are known. Consequently, the loss causation analysis below focuses primarily on what investment losses plaintiffs would have incurred in the absence of the alleged fraud.

### Actual Investment Loss

18.    Plaintiffs' investment losses in this case are derived from: (a) not receiving a full return of their principal, and (b) not receiving lost interest on their principal. For MCN holders, interest payments stopped in the summer of 2007, and the auction proceeds from the July 17, 2008 sale of Cheyne's assets were insufficient to return any of their principal. Prior to the auction, the CP and MTN holders did receive various payments from Cheyne. However, the auction proceeds obtained in the July 17, 2008 sale of Cheyne's assets, at 43.9% of face value, were insufficient to fully return plaintiffs' principal and lost interest on principal. Below I will analyze whether these investment losses are causally connected to the alleged fraud.

### Loss Causation Analysis

19.    One way to assess loss causation is to analyze what would have happened if defendants had disclosed the alleged truth. In this case, the alleged truth is that the credit ratings by S&P and Moody's were false and that the credit risks associated with Cheyne's debt securities were much greater than represented by defendants. If the alleged truth had been disclosed, it is reasonable to conclude that plaintiffs would not have invested in Cheyne's debt securities (at least not at the prices offered), and, therefore, not suffered any losses from their

respective Cheyne investments.[5]   As a result, under this view of loss causation, but for the alleged fraud, plaintiffs would not have suffered any losses from the collapse of Cheyne because they would not have made an investment in Cheyne.

20.     Another way to assess loss causation is to analyze what would happen if Cheyne had been as represented, *i.e.*, if Cheyne's debt had been a safe investment with minimal credit risk, consistent with defendants' representations and credit ratings. In other words, how would the triple-A rated CP and MTNs, and A-rated MCNs be expected to perform? If the ratings were correct, the probability of default (not receiving payments as promised) would be similar to that reflected in the one-year transition matrix in ¶15 above, *i.e.*, it would be minimal. Of course, had Cheyne repaid the principal and all interest thereon, as one would expect triple-A and A rated securities to do, plaintiffs would not have suffered any investment losses.

21.     A related analysis would be to examine the performance of other SIVs with similar credit ratings prior to Cheyne's collapse. There are two important caveats. First, some of the other SIVs may also have had similar credit issues as those plaintiffs allege defendants concealed at Cheyne (such as Rhinebridge & Axon). Consequently, even if Cheyne performed similar to other SIVs with similar credit issues, this does not necessarily mean that plaintiffs' investment losses do not relate to the allegedly concealed credit quality issues. Second, Cheyne was the first SIV downgraded. This initial downgrade was severe (MCN lowered 12 levels) and undoubtedly raised concerns about the accuracy of the credit ratings for SIVs in general, thereby putting pressure on all SIVs regardless of their respective credit risks.[6]

---

[5]     Financial theory holds that there is an inverse relationship between the risk and the value of securities, *i.e.*, the higher the risk (lower credit rating), the lower the value (higher yield). Fabozzi, CFA, *Fixed Income Analysis*, 2nd ed., John Wiley & Sons, Inc. (2007), Chapter 4.

[6]     An internal August 26, 2007, Moody's e-mail stated: "If we only take [an] action on one SIV the markets may be even more disrupted and waiting for the 'other shoe to drop' or may

22.     Cheyne was different than most other SIVs in that it had much greater exposure to

RMBS securities. For example, an internal August 25, 2007 Moody's e-mail (prior to any

official downgrade) stated:

> We would like to place on review the two most junior tranches of a SIV called
> Cheyne Finance Capital. This is the first "traditional" SIV (i.e., a SIV which is
> not a SIV lite) that we place on review. However, unlike most – but not all – the
> other traditional SIVs, Cheyne has a large exposure to US RMBS (63%).

Ex. H at MDYS ADCB 093060.

23.     Similarly, a September 3, 2007 Morgan Stanley analyst report also explained that

"All SIVs were not created equal." Ex. J at 1. Specifically, it explained:

> **Asset allocation and liquidity problems** together caused the current difficulties
> for Cheyne, a relatively young SIV. The larger, much older and often bank-
> sponsored SIVs that make up the bulk of the sector's assets have less exposure to
> recent ABS vintages, longer investment histories and potential sponsor support.
> 
> \* \* \*
> 
> It is not unreasonable to assume that Cheyne's relatively high exposure to US
> subprime and CDOs drove the NAV down.[7]

Ex. J at 1, 4, emphasis in original.

24.     On October 22, 2007, following Cheyne's insolvency event, J.P. Morgan issued a

report that stated:

> This recent development with Cheyne should not be taken as a harbinger for the
> SIV market. Cheyne's portfolio had about 56% RMBS, 6% CDOs of ABS, and
> 38% of other assets (corporates, non-ABS CDOs, and CMBS), with the majority
> of its RMBS exposure in the form of US subprime assets as of early September

---

challenge us on similar SIVs." Ex. H at MDYS ADCB 093060. A Moody's e-mail on August
27, 2007 stated: "The market will have two questions why this SIV now? And what about the
other ones?" Ex. H at MDYS ADCB 093062. Following the initial downgrade, an August 29,
2007 New York Times article quoted a JPMorgan analyst stating: "If the rating agencies have to
downgrade six notches in a single day, it undermines investor confidence." Ex. D at 7.

[7]     The Morgan Stanley research analyst initially determined that Cheyne's difficulties were
caused by "asset quality" and "liquidity" problems, but was asked to change "asset quality" to
"asset allocation." Ex. G at MS_000001236-7.

according to Moody's. This asset mix does not represent the majority of SIV since it is heavily concentrated in subprime-related assets.

Ex. K at 4.

25.     SIVs that invested in assets with poor credit quality performed significantly worse than SIVs that did not. A May 22, 2008, S&P report issued roughly 9-months after its initial downgrade of Cheyne's debt stated:

> Those SIVs with the highest concentration of U.S. RMBS, whether classified as "Alternative-A" (Alt-A), "midprime," or "subprime," and CDOs of ABS have generally experienced the most acute loss in market value of the securities in their asset portfolios and, therefore, a resultant drop in capital note investor net asset value. There has been unprecedented rating and price volatility for these sectors, as widely discussed in the market of late, and this reflects uncertainty with regard to the 2005-2007 vintages. In our opinion, this uncertainty results from both the lending and underwriting standards that were common during those vintage years and the high leverage these vintages exhibit.

Ex. B at 7.

26.     The May 22, 2008, S&P report also disclosed that, as of December 31, 2007, Cheyne had invested more than 65% of its portfolio in U.S. RMBS assets, more than any other SIV. Rhinebridge was number two at 62% and Axon number three at 54%. These were the only other SIVs to default in 2007. The remaining SIVs averaged less than 15%. Also, my review of the 27 investment vehicles rated in the report, shows that the vast majority (or 22), were still rated triple-A (19) or AA- (3) as of May 22, 2008. Ex. B at 1-2. In other words, had Cheyne performed as most of the other SIVs, it would not have collapsed as it did in 2007.

27.     Finally, I analyzed more specifically what caused Cheyne's collapse. First, I focused on Cheyne's breach of the Major Capital Loss test that put it into enforcement. Specifically, I analyzed the marks at the time of the breach. I found that from August 24 through August 31, 2007, the marks from Morgan Stanley declined on average 12%, and that Morgan Stanley marks accounted for approximately 63% of the related mark-to-market losses although they only made up 9% of the notional value. Ex. L. Second, I reviewed trustee reports for

securities in Cheyne's investment portfolio with marks substantially below par (< 90% of par) and found that these securities were backed by a large amount of troubled loans, *i.e.*, delinquent loans, foreclosures, bankruptcies and Real Estate Owned (REO loans), that would be an indication of credit losses going forward. Ex. M. Third, I examined whether the credit risk related to the troubled loans materialized. Specifically, I analyzed the performance of the relevant securities in Cheyne's investment portfolio following the October 17, 2007 default. Based on this analysis, I estimated that the losses in this portfolio through February 10, 2012 are at least $2.25 billion.[8] Ex. N. In other words, investors who discounted the credit ratings as a result of concerns regarding the credit quality of the underlying assets turned out to be correct, while the credit ratings largely turned out to be incorrect.

28. Based on the above, it is my opinion that the collapse of Cheyne was directly related to the poor credit quality of the underlying assets — poor credit quality that was inconsistent with S&P and Moody's initial credit ratings for Cheyne's debt. Furthermore, as a result of Cheyne's collapse, all of the plaintiffs identified in the Complaint suffered substantial economic losses from their respective purchases of Cheyne's CP, MTNs and MCNs.[9]

## VI. LOSS CAUSATION ISSUES RAISED BY DEFENDANTS

29. I have reviewed defendants' arguments that: (a) it was "an unprecedented market disruption [that] caused investors' losses," (b) "at the time of the ratings downgrade investors had suffered no loss at all," and (c) that damages for Senior Note holders who received Gryphon

---

[8]  Analysis only includes unrealized losses on securities for which current prices were available, and realized losses on securities for which trustee reports were available.

[9]  Declaration of Plaintiffs Regarding Damages in Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c).

Notes are "speculative and unknowable." Def. Brief, at 26-32.  Below I will address each of these issues separately.

30.    Defendants contend that plaintiffs' losses "were a result of a decline in market prices, not credit performance."   Def. Brief, at 27.  With the term "credit performance" defendants focus on whether any of the "underlying securities had stopped paying or been downgraded," thereby effectively limiting the credit quality issue to the existing credit ratings. Def. Brief, at 27.  However, the market prices reflect investors' assessment of all factors relevant to credit quality, including, but not limited to, the credit ratings.  Market prices may have been inconsistent with "credit performance," as defined by defendants, but consistent with the securities' true credit quality.  In fact, my analyses of the credit quality of Cheyne's portfolio and its subsequent poor performance validate the market's view, and show that the actual credit quality was inconsistent with the high credit ratings given by the credit rating agencies at that time.  Ex. M and N.

31.    Defendants attribute plaintiffs' losses to an "unprecedented and market-wide . . liquidity crisis."  Def. Brief, at 28.  Liquidity relates to the ability to sell securities quickly at their full value. It is true that during the summer of 2007, it was difficult to sell RMBS securities at prices that reflected their credit ratings.  However, this relates to investors becoming concerned about the validity of these credit ratings, and commonly assessing the credit quality of RMBS securities differently.[16]  Because sellers wanted a price that reflected the higher credit rating, while potential buyers now relied less on the credit rating and instead wanted to pay a much lower price that reflected their own increased concerns about credit quality, fewer transactions took place.  In other words, this resulting liquidity issue relates to credit quality.

---

[16]    *Supra*, ¶¶ 7, 8 and 12.

- 13 -

32.    Defendants also point out that in enforcement mode (triggered in August 2007),
Cheyne "was required to sell its assets to meet maturing liabilities, even if this resulted in a 'fire
sale' liquidation in an unfavorable market." Def. Brief, at 27. However, even if true, this
liquidity risk was supposed to be reflected in Cheyne's credit ratings. In fact, both S&P and
Moody's specifically discussed the enforcement scenario and liquidity risk when issuing their
initial ratings. MS_000051811-17, MDYS ADCB 084921-32.

33.    Defendants also claim that plaintiffs "did not suffer any loss when the Cheyne
SIV entered enforcement and its notes were downgraded." Def. Brief, at 30. In other words,
they contended that if Cheyne had "sold its assets at the market prices then, the senior
noteholders would have recovered in full, and the capital noteholders would have recovered all
or nearly all of their investments as well." Def. Brief, at 30. Instead of focusing on what would
have happened absent the alleged fraud, this is simply an alternative scenario in which Cheyne
would have acted differently and, purportedly, reduced or eliminated plaintiffs' losses.
Defendants provide no evidence that Cheyne could have sold its assets at prices that would have
made Senior Noteholders whole. Investor concerns at that time about the credit quality of the
assets Cheyne owned strongly suggest that they could not.

34.    Regardless of what actions Cheyne took, on August 28, 2007, its MCNs were
downgraded to B-, its MTNs to A- and CP to A-2, implying that the credit quality of these
securities now was lower. Additionally, the rating agencies continued to downgrade Cheyne's
debt securities until the SIV became insolvent. *See* ¶13, *supra*. This also meant that the debt
securities now were less valuable. Furthermore, although the price Cheyne would have received
if it had sold its assets immediately in a "fire sale" is not knowable, it would likely be lower than
in a carefully managed competitive auction. On July 17, 2008 Cheyne sold all its assets in such
an auction.

- 14 -

35. Defendants also argue that for plaintiffs who received Gryphon Notes, their losses are "speculative and unknowable" as they "continue to hold and receive payments on those notes, and will do so for the next 10-30 years." Def. Brief, at 32. In this case, all of Cheyne's assets were sold in a competitive auction on July 17, 2008, at 43.9% of face value. The fact that some plaintiffs elected to receive Gryphon Notes, as opposed to cash, represents a new investment decision. In my opinion, just as a further decline in the value of the Gryphon Notes would not increase the relevant loss in this case, an increase would not reduce it either because this is related to the performance of a new and different investment.

36. Regardless, if it becomes necessary, the value of the Gryphon Notes can be determined either based on the market prices for the Gryphon Notes, or based on an analysis of Gryphon's underlying assets and their future expected cash flows. The latter analysis could involve identifying the losses in the Gryphon investment portfolio, both the realized losses and the unrealized losses, similar to the analysis I performed in Ex. N.

37. For the reasons explained above, it is my opinion that the collapse of Cheyne was directly related to the poor credit quality of the underlying assets – poor credit quality that was inconsistent with S&P and Moody's initial credit ratings for Cheyne's debt.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 28th day of February, 2012, in San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT, CFA

# EXHIBIT A

# Bjorn I. Steinholt, CFA

Financial Markets Analysis, L.L.C
9909 Mira Mesa Boulevard, Suite 260, San Diego, CA 92131
Telephone: (858) 549-4900  •  Facsimile: (858) 549-9317

## Employment History

- **2000 - Present   Financial Markets Analysis, LLC, San Diego, California**

*Founding Member.*  Mr. Steinholt provides a broad range of capital markets consulting, including financial and economic analyses relating to mergers and acquisitions, initial public offerings, fairness opinions and private placements.  His practice area includes the valuation of whole businesses, financial securities and intangible assets.  Furthermore, he provides consulting relating to complex securities litigations.

- **1998 - 2000   Business Valuation Services, Inc., San Diego, California**

*Principal.*  Mr. Steinholt provided valuations of businesses and financial securities, including common stock, warrants, options, preferred stock, debt instruments and partnership interests, of companies in a myriad of industries.  In addition, he performed valuations of intangible assets such as patents, trademarks, software, customer lists, work force and licensing agreements.  Mr. Steinholt provided financial and economic analyses for a variety of purposes relating to mergers and acquisitions, initial public offerings, fairness opinions, bank financing, financial reporting requirements, tax-related issues, general advisory services and shareholder disputes.

- **1990 - 1998   Princeton Venture Research, Inc., San Diego, California**

*Senior Vice President.*  Mr. Steinholt was a co-manager of Princeton Venture Research's San Diego office where he provided various financial and economic analyses for venture capital, investment banking and consulting assignments, including shareholder disputes.  Among other things, he helped identify and evaluate prospective emerging technology companies in need of venture capital funding.  In addition, Mr. Steinholt performed financial analyses related to market, industry and company economics and provided business valuation services involving different types of securities, including derivative securities.

- **1988 - 1989   University of San Diego, San Diego, California**

*Research Assistant -- Graduate Fellow.*  Mr. Steinholt assisted with research regarding the performance of international equity markets following the 1987 stock market crash.  He also developed computer programs related to the portfolio theory, including risk minimization and portfolio optimization based on quadratic programming techniques.

**Testimony**

*In re: Qwest Communications Securities Litigation* (United States District Court for the District of Colorado), QwestDex Hearing, January 28, 2003.

*In re: CBT Group PLC Securities Litigation* (United States District Court, Northern District of California, San Jose Division), Deposition, November 5, 2003.

*In re: America West Securities Litigation* (United States District Court, District of Arizona), Deposition, October 28, 2004.

*In re: Howard Yue vs. New Focus* (Superior Court of the State of California, County of Santa Clara), Deposition, July 28, 2005 and August 9, 2005.

*In re: AB Liquidating Corp., fka Adaptive Broadband Corporation v. Ernst & Young, LLP* (American Arbitration Association), Arbitration, March 23, 2006.

*In re: AOL Time Warner, Inc. Securities and "ERISA" Litigation, Consolidated Opt-Out Action* (United States District Court, Southern District of New York), Deposition, September 28, 2006.

*In re: Ohio Public Employees Retirement System vs. Richard Parsons, et al.* (Court of Common Pleas of Franklin County, Ohio), Deposition, March 22, 2007.

*In re: Flowserve Corporation Securities Litigation* (United States District Court, Northern District of Texas, Dallas Division), Deposition, June 15, 2007.

*In re: Oracle Corporation Securities Litigation* (United States District Court, Northern District of California), Deposition, July 2, 2007.

*In re: NeoPharm, Inc. Securities Litigation* (United States District Court, Northern District of Illinois, Eastern Division), Deposition, January 22, 2008.

*In re: HealthSouth Corporation Securities Litigation* (United States District Court, Northern District of Alabama, Southern Division), Deposition, February 1, 2008.

*In re: Advo, Inc. Securities Litigation* (United States District Court, District of Connecticut), Deposition, September 16, 2008.

*In re: HealthSouth Corporation Securities Litigation* (United States District Court, Northern District of Alabama, Southern Division), Deposition, January 30, 2009.

Page   2

*In re: Huffy Corporation Securities Litigation* (United States District Court, Southern District of Ohio, Western Division (at Dayton)), Deposition, November 12, 2009.

*In re: PMI Group Securities Litigation* (United States District Court for the Northern District of California), Deposition, June 14, 2010.

*In re: Dendreon Corporation Securities Litigation* (United States District Court, Western District of Washington at Seattle), Deposition, June 18, 2010.

*In re: The Boeing Company Securities Litigation* (United States District Court, Northern District of Illinois, Eastern Division), Deposition, November 5, 2010.

*In re: Novatel Wireless Securities Litigation* (United States District Court, Southern District of California), Deposition, February 1, 2011.

*In re: FCStone Group, Inc.* (United States District Court, Western District of Missouri), Deposition, January 5, 2012.

## Formal Education

- **Master of International Business**
  University of San Diego, 1989

- **Bachelor of Science in Computer Science,**
  **Computer Science and Engineering**
  California State University, Long Beach, 1987

## Accreditations and Affiliations

- **Chartered Financial Analyst**
  CFA Institute

- **Sivilingeniør** - (Norwegian graduate level engineering designation)
  University of Trondheim, Norway

- **Member, CFA Institute**

- **Member, Financial Analysts Society of San Diego**

# EXHIBIT B



The McGraw-Hill Companies

**STANDARD & POOR'S**     **RatingsXpress™ Credit Research**

RESEARCH                                                                    s

# A First Look At Structured Investment Vehicles' Remaining Debt Outstanding And Their Asset Portfolio Sector Allocations

| | |
|---|---|
| **Publication date:** | 22-May-2008 |
| **Primary Credit Analysts:** | Nik Khakee, New York (1) 212-438-2473; nik_khakee@standardandpoors.com |
| | Katrien van Acoleyen, London (44) 20-7176-3860; katrien_vanacoleyen@standardandpoors.com |
| **Secondary Credit Analysts:** | Zachary Wolf, New York (1) 212-438-1127; zachary_wolf@standardandpoors.com |
| | Lapo Guadagnuolo, London (44) 20-7176-3507; lapo_guadagnuolo@standardandpoors.com |
| **Surveillance Credit Analysts:** | Jing Xie, New York (1) 212-438-7101; jing_xie@standardandpoors.com |
| | Amit Sohal, London (44) 20-7176-3845; amit_sohal@standardandpoors.com |

In an effort to move forward with the 27 steps that Standard & Poor's Ratings Services announced in February 2008 to bring greater transparency to the market, we have reviewed the asset allocations and liability profiles of our rated structured investment vehicles (SIVs), based on the sector at year-end 2007 and again at the end of March 2008.

We have published various articles detailing the SIV market since March 2007—when SIVs reached their peak debt issuance--as the sector has faced continuing and increasing pressure from price erosion of their asset portfolios and the realized losses incurred as they liquidated assets due to their inability to roll their financing. (Note: This increasing pressure was taking place at the same time the broader financial markets began de-leveraging.) As the SIV sector as a whole continues to pay down, individual SIVs have been trying to manage through the de facto wind-down of its structures. For many SIVs, the decision was made to secure 100% support agreements (liquidity or credit facilities, or both) with a sponsoring bank. In turn, each bank has informed us that it has taken an approach that considered its own liquidity position, as well as investor requests and concerns. As demonstrated in the current environment, SIVs gain financial strength and flexibility by having access to 100% liquidity coverage through liquidity agreements. As always, if the banks fund their obligations under these liquidity agreements to pay the SIVs' maturing senior liabilities, they may use their existing cash on hand or benefit from their access to funding at the central bank windows, such as the Federal Reserve Bank or the European Central Bank.

The current structural status of each SIV and the one limited purpose finance company (LPFC) that we rate, Sigma Finance Corp. (Sigma), can be found in table 1.

**Table 1**

Current SIV And LPFC Structure Status

| Name | Sponsor | Structure | Senior debt outstanding (mil. $)* | Outstanding as-of date | Rating | CreditWatch/outlook |
|---|---|---|---|---|---|---|
| Alpha Finance Corp. | Citibank International PLC | Retired (rating withdrawn on Sept. 29, 1998) | N/A | N/A | NR | N/A |
| Beta Finance Corp. | Citibank International PLC | Traditional SIV with increased capital | 10,848.85 | May 12, 2008 | AAA/A-1+ | Negative |
| Centauri Corp. | Citibank International PLC | Traditional SIV with increased capital | 10,979.38 | May 12, 2008 | AAA/A-1+ | Negative |
| Dorada Corp. | Citibank International PLC | Traditional SIV with increased capital | 5,233.84 | May 12, 2008 | AAA/A-1+ | Negative |
| Five Finance Corp. | Citibank International PLC | Traditional SIV with increased capital | 5,326.06 | May 12, 2008 | AAA/A-1+ | Negative |
| Sedna Finance Corp. | Citibank International PLC | Traditional SIV with increased capital | 3,385.04 | May 9, 2008 | AAA/A-1+ | Negative |
| Vetra Finance Corp. | Citibank International PLC | SIV with low leverage | 256.55 | May 12, 2008 | AAA/A-1+ | Negative |

| | | | | | | |
|---|---|---|---|---|---|---|
| Zela Finance Corp. | Citibank International PLC | Traditional SIV with increased capital | 1,056.91 | May 12, 2008 | AAA/A-1+ | Negative |
| Tango Finance Corp. | Rabobank International | Traditional SIV with increased capital | 2,118.11 | May 9, 2008 | AAA/A-1+ | Negative |
| Hudson-Thames Capital Ltd. | MBIA | Retired | N/A | -- | NR | N/A |
| K2 Corp. | Dresdner Kleinwort | SIV with 100% support | 12,079.89 | May 9, 2008 | AAA/A-1+ | Negative |
| Links Finance Corp. | Bank of Montreal | SIV with 100% liquidity support | 8,274.32 | May 9, 2008 | AA-/A-1+ | Negative |
| Parkland Finance Corp. | Bank of Montreal | SIV with 100% liquidity support | 738.60 | May 9, 2008 | AA-/A-1+ | Negative |
| Premier Asset Collateralized Entity Ltd. (PACE) | Societe Generale | SIV with 100% liquidity support | 3,814.50 | May 9, 2008 | AAA/A-1+ | Negative |
| Carrera Capital Finance Ltd. | HSH Nordbank | SIV with 100% liquidity support | 4,170.06 | May 2, 2008 | AAA/A-1+ | Negative |
| Nightingale Finance Ltd. | Banque AIG | SIV with 100% liquidity support | 1,824.28 | May 9, 2008 | AAA/A-1+ | Negative |
| Cullinan Finance Ltd. | HSBC Bank PLC | Alternative structures launched to take out SIV investors | 23,266.00 | March 31, 2008 | AAA/A-1+ | Negative |
| Asscher Finance Ltd. | HSBC Bank PLC | Alternative structures launched to take out SIV investors | 6,846.00 | March 31, 2008 | AAA/A-1+ | Watch Neg |
| Harrier Finance Funding Ltd. | WestLB/Brightwater Capital | Partial increased liquidity support | 10,584.00 | May 2, 2008 | AAA/A-1+ | Watch Neg |
| Kestrel Funding PLC | WestLB/Brightwater Capital | Partial increased liquidity support | 2,974.00 | May 2, 2008 | AAA/A-1+ | Watch Neg |
| Abacas Investments Ltd | N.S.M. Capital Management/Emirates Bank | Low-leverage, low-risk assets, such as U.S. government securities | N/A | N/A | AAA/A-1+ | Negative |
| Cortland Capital Ltd. | Ontario Teachers Pension Fund | Low-leverage, low-risk assets, such as short commercial paper and MMFs | N/A | N/A | AAA/A-1+ | Negative |
| Whistlejacket Capital Ltd (merged with White Pine Corp. Ltd.) | Standard Chartered Bank | First bank-sponsored SIV to default after the bank stated it would provide full support | 2,997.72 | May 1, 2008 | NR | N/A |
| White Pine Corp. Ltd. (merged with Whistlejacket Capital Ltd.) | Standard Chartered Bank | -- | 3,148.90 | May 1, 2008 | NR | N/A |
| Orion Finance Corp. | Eiger Capital Management | Stopped current payments | 775.09 | Jan. 4, 2008 | D | N/A |
| Victoria Finance Ltd. | Ceres Capital Partners | Stopped current payments | 6,294.93 | Feb. 8, 2008 | D | N/A |
| Cheyne Finance PLC | Cheyne Capital Management Ltd | Stopped current payments | 5,793.00 | May 2, 2008 | D | N/A |
| Axon Financial Funding LLC | TPG (Private Equity) | Stopped current payments | 8,294.00 | March 31, 2008 | D | N/A |
| Rhinebridge PLC | IKB Credit Asset Management GmbH | Stopped current payments | 866.00 | Oct. 18, 2007 | D | N/A |
| Eaton Vance Variable Leveraged Fund Ltd. | Eaton Vance Asset Management (Mutual Funds) | Restructured as a market value CDO | 480.00 | May 12, 2008 | AAA | Watch Neg |
| Sigma Finance Corp. | Gordian Knot LLC | Continues | 33,371.83 | May 1, 2008 | AA-/A-1+ | Watch Neg |
| Total senior debt, repurchases, and drawn liquidity still outstanding | - | -- | 176,884.12 | -- | -- | -- |
| Total nondefaulted remaining maturities | - | -- | 148,714.48 | - | - | - |

*The senior liabilities include a liquidity facility and senior repurchase funding. NR--Not rated. N/A--Not applicable.

## Bank Sponsors Take Alternative Routes To Support SIVs

The SIVs sponsored by Citibank International PLC (Citibank), including **Centauri Corp., Beta Finance Corp., Dorada Corp., Five Finance Corp., Sedna Finance Corp., Vetra Finance Corp.** (Vetra), and **Zela Finance Corp.**, continue to slowly liquidate their assets and, except for the lowest-levered Vetra, have, in our view, benefited from new capital support from Citibank. Citibank has also increased its committed liquidity resource. None of the Citibank-sponsored SIVs, however, are fully supported by capital or liquidity agreements and, therefore, will rely on whatever liquidity is offered from the markets as they gradually liquidate their assets.

Other SIVs, including six nondefaulted vehicles (**K2 Corp., Links Finance Corp., Parkland Finance Corp., Premier Asset Collateralized Entity Ltd.** (PACE), **Carrera Capital Finance Ltd.**, and **Nightingale Finance Ltd.**), have restructured and secured from their bank sponsors 100% support primarily with liquidity facility coverage for their senior obligations.

HSBC Bank PLC (HSBC) pursued another option for its two SIVs, **Cullinan Finance Ltd.** and **Asscher Finance Ltd.**: it has launched three new vehicles, **Barion Funding Corp., Mazarin Funding Corp.,** and **Malachite Funding Corp.,** and has offered them as alternative investment options, in effect an offer of senior debt exchange, to its existing SIV investors. HSBC will provide 100% liquidity support to the senior noteholders while retaining its ability to, in certain circumstances, use repurchase (repo) funding in these new vehicles.

**Eaton Vance Variable Leverage Fund Ltd.** (Eaton Vance), which is sponsored by its asset manager, Eaton Vance Management, has converted itself into a market-value collateralized loan obligation (CLO) structure and, therefore, has refinanced its short-term funding into long-term financing. As a result, our surveillance capital adequacy test for Eaton Vance reflects more of a market-value CLO framework, such as a shorter liquidation horizon.

WestLB AG's approach for its sponsored SIVs, **Kestrel Funding PLC** and **Harrier Finance Funding Ltd.**, was to offer partial liquidity support to its investors. This means that the senior debt owned by non-WestLB affiliates has full liquidity support, while the senior debt held by WestLB affiliates is supported only by the two SIVs' pools of assets and WestLB's ability to continue to fund those assets.

In December 2007, we reported that even as asset prices continued to fall, SIVs that were sponsored by financial institutions were generally seeing improving prospects as a result of formal liquidity support arrangements or restructurings. These efforts were largely successful, but there was one casualty along the way: **Whistlejacket Capital Ltd.** (Whistlejacket). Whistlejacket is the first and, to date, the only bank-sponsored SIV that, despite Standard Chartered Bank's (its sponsor) public statements of support, subsequently experienced a default on Feb. 22, 2008. (For more information on Whistlejacket, please see **"Whistlejacket Capital Ltd. SIV Ratings Lowered To 'D',"** published Feb. 22, 2008, on RatingsDirect.)

As of March 31, 2008, SIVs still had approximately $176 billion of senior debt (including senior repo funding and drawn liquidity) outstanding and $161 billion of par core assets (excluding cash) under management.

## SIV Asset And Liability Disclosure

As part of our 27 steps, we are bringing greater transparency to the asset and liability sides of SIVs' balance sheets. To that end, we are providing a snapshot of each SIV's asset sector breakdown for both December 2007 and March 2008 (see charts 1-4). While the sector distribution does not shift much during this time period, some SIV assets have experienced rating downgrades. Overall, 'AAA' ratings made up 64.45% of the portfolio in December 2007 and 58.94% in March 2008; 'BBB' ratings (including 'BBB+' and 'BBB-') made up 0.44% of the portfolio in December 2007 and 1.25% in March 2008; and non-investment-grade ratings made up 0.46% of the portfolio in December 2007 and 1.70% in March 2008. (Note: We may go into greater vintage detail in future reports to clarify the differentiating characteristics between holding, for example, vintage 2004 U.S. residential mortgage-backed securities (RMBS) versus vintage 2006 U.S. RMBS.)

Chart 1



Aggregate SIV And LPFC Portfolio Breakdown By Asset Type (As Of December 2007)*

*Data includes 29 SIVs and one limited purpose finance company (LPFC). Among the 30 vehicles, 27 SIVs and one LPFC still had assets in December 2007. The remaining two SIVs had no assets left except cash. ¶On average, CDOs of ABS have more than 50% exposure to RMBS. The lowest exposure in deals reviewed was 1%. HELOC—Home equity line of credit. Alt-A—Alternative-A. CRE—Commercial real estate. TruPS—Trust preferred securities. SME—Small and midsize enterprise.

© Standard & Poor's 2008.

Chart 2



Aggregate SIV And LPFC Portfolio Breakdown By Rating (As Of December 2007)*

*Data includes 29 SIVs and one limited purpose finance company (LPFC). Among the 30 vehicles, 27 SIVs and one LPFC still had assets in December 2007. The remaining two SIVs had no assets left except cash. NR—Not rated.

© Standard & Poor's 2008.

Chart 3



Aggregate SIV And LPFC Portfolio Breakdown By Asset Type (As Of March 2008)*

*Data includes 29 SIVs and one limited purpose finance company (LPFC). Among the 30 vehicles, 23 SIVs and one LPFC still had assets on March 31, 2008. The remaining six SIVs had no assets left except cash. ¶CDOs of ABS on average have more than 50% exposure to RMBS. The lowest exposure in deals reviewed was 1%. HELOC—Home equity line of credit. Alt-A—Alternative A. CRE—Commercial real estate. TruPS—Trust preferred securities. SME—Small and midsize enterprise.

© Standard & Poor's 2008.

Chart 4



© Standard & Poor's 2008

Over the past 10 months, we have received numerous inquiries that ultimately focused on attempts to gauge potential price movements on asset-backed securities (ABS) assets. These questions include:

- What are the remaining liability maturity dates for each vehicle?
- Can you send us the CUSIP information about the assets in specific SIV portfolios?

These questions highlight the fact that SIVs' liquidation structures and the related disclosures for transparency purposes have potential relevance in the market that can be quite different when compared with term-funded or fully supported vehicles. Namely, in so-called "market-value structures," asset liquidations are the ultimate repayment source for investors. As a result, the important considerations for market participants as they establish their own trading strategies and market views include when market-value transactions may sell their assets and with what volume.

In our view, it is important, from a credit perspective, not only to understand which types of assets may be sold into the market from this sector in 2008, but also, perhaps more importantly, which types of assets banks will be funding through these liquidity and capital support arrangements in 2008 and beyond. It is also critical to review SIVs' liability maturity profiles. Because these vehicles are not 30-day liquidation structures, the funding that could come from banks should reflect the SIV liability maturity profile and should be spread out over months and years. As we have previously stated, the tests that encourage this time laddering—the net cumulative outflow and weighted average life of liability tests—were intended to enable the SIVs to withstand a short-term asset market disruption. As a result, SIVs were generally able to avoid having to sell all their assets in a brief time period.

The SIV structure ultimately provided most bank-sponsored SIVs with enough time to decide to step in to support the vehicles and then to make those support arrangements. The framework SIVs adopted to manage the liabilities also spared highly rated banks the risk of having to draw immediately on tens of billions of dollars in liquidity support in a single draw. This more gradual draw on cash has generally allowed highly rated banks to better manage their own liquidity. SIVs' liability structures also enable these vehicles to try to find better pricing on asset sales. As time goes on, assets roll down the maturity curve and distressed debt funds may start to buy these assets in an attempt to avoid missing the bottom of the distressed ABS prices.

While massive asset sales were a global market concern in late 2007, in our view, banks faced an even greater challenge: How were they going to finance the approximately $300 billion in SIV assets that remained beginning in July 2007? Now, as we head further into 2008, we attempt to understand SIVs' financing needs and determine what is left to be financed.

### SIV liabilities

As of March 31, 2008, approximately $176 billion of outstanding senior liabilities remained (including senior repo funding and drawn liquidity), and approximately $73.5 billion matured between Jan. 1, 2008, and March 31, 2008. The average monthly maturities in April, May, and June were approximately $22 billion.

In addition, approximately 70% of the liabilities that are expected to mature between April 1, 2008, and Dec. 31, 2008, were issued by bank-sponsored SIVs (see chart 5). As of May 21, 2008, Abacus Investments Ltd. and **Cortland Capital Ltd.** no longer had any outstanding senior liabilities. In contrast with the nonbank-sponsored SIVs, which faced enormous difficulties as a result of their inability to roll over their liabilities and fund their investments, and the ensuing disagreements among senior obligors on how best to proceed, Sigma, the only LPFC we rate, continues to access the repo funding market. Therefore, in our opinion, Sigma has thus far been able to manage through the market illiquidity. We have included Sigma in this report because its liabilities either have been or will need to be refinanced in the repo market. (For more information on Sigma, see **"Sigma Finance Corp. ICR And Long-Term Debt Ratings Lowered; Short-Term Debt Rating Affirmed,"** published April 7, 2008, on RatingsDirect.) Approximately $35 billion of SIV senior liabilities have defaulted as of March 2008. This represents approximately 10% of the approximately $350 billion that was outstanding in March 2007. Incidentally, an additional $49.75 billion of outstanding senior liabilities will mature after 2008.

**Chart 5**



Total Outstanding SIV And LPFC Senior Liabilities Due From April-December 2008*

'Data includes 29 SIVs and one limited purpose finance company (LPFC). Among the 30 vehicles, 25 SIVs and one LPFC still have senior liabilities due after March 31, 2008. The remaining four SIVs have no senior liabilities due after March 31, 2008. The senior liabilities include a liquidity facility and senior repurchase funding. Data for all of the vehicles' senior liabilities was as of March 31, 2008, except four SIVs whose senior liabilities data was as of Dec. 21, 2007.

### Breaking Down The Individual SIV Asset Portfolios

Historically, SIVs benefited from a diverse asset base across many different asset sectors, including many ABS sectors, such as credit cards and student loans; commercial mortgage-backed securities (CMBS); and RMBS, in addition to financial institutions and sovereign debt. The more recent SIV sector entrants, particularly the nonbank-sponsored SIVs, generally increased their asset concentrations in RMBS and collateralized debt obligations (CDOs).

Those SIVs with the highest concentration of U.S. RMBS, whether classified as "Alternative-A" (Alt-A), "midprime," or "subprime," and CDOs of ABS have generally experienced the most acute loss in market value of the securities in their asset portfolios and, therefore, a resultant drop in capital note investor net asset value. There has been unprecedented rating and price volatility for these sectors, as widely discussed in the market of late, and this reflects uncertainty with regard to the 2005-2007 vintages. In our opinion, this uncertainty results from both the lending and underwriting standards that were common during those vintage years and the high leverage these vintages exhibit.

As the SIV market began to deteriorate in 2007, Standard & Poor's initiated an effort to publish SIV-specific asset sector breakdowns. This effort produced extensive work dedicated to attempts to reconcile managers' investor reporting with Standard & Poor's industry sector codes and collateral code classifications. As a result of these discussions with managers, Standard & Poor's is now better positioned to systematically request future information in formats that will enable our

efforts to bring greater transparency to the markets. Through our manager discussions, the one thing that became clear is that there is significant disagreement as to the appropriate definitions for terms such as "midprime" and "subprime." Indeed, some managers state that Alt-A is "like prime" while others call it "just above subprime." Standard & Poor's has tried to respect these varying views while still largely using the codes identified in our databases to provide reporting consistency across all vehicles. In addition, we divided the assets into two sections: those that are not wrapped by monoline providers and those that are wrapped by monolines. We used portfolio information that includes only cash assets and does not represent any exposure to credit default swaps (CDS), whether long or short. However, CDS exposure is generally a minor factor for SIVs.

A breakdown of each SIV's and the LPFC's assets by sector and rating in December 2007 and again in March 2008 are shown in tables 2-5. The super senior 'AAA' rated exposures in CDO assets as reported by the managers in both December 2007 and March 2008 are shown in tables 6-7.

**Table 2a**

**Individual SIV And LPFC Portfolio Breakdown By Asset Type** (As Of December 2007)*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (%) | | | | | |
| | Five Finance Corp. | | | Asscher Finance Ltd. | | | Axon Financial Funding LLC | | |
| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
| ABS aircraft | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.99 | 1.99 |
| ABS auto | 1.08 | 0.00 | 1.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABS credit card | 5.48 | 0.00 | 5.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABS other | 0.00 | 0.00 | 0.00 | 0.00 | 3.25 | 3.25 | 0.00 | 2.05 | 2.05 |
| ABS SME loan | 0.83 | 0.00 | 0.83 | 3.64 | 0.00 | 3.64 | 1.99 | 0.00 | 1.99 |
| ABS student loan | 4.18 | 0.00 | 4.18 | 5.71 | 0.00 | 5.71 | 0.55 | 0.00 | 0.55 |
| CDO corporate bonds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.51 | 0.00 | 6.51 |
| CDO of CDO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of emerging markets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of ABS | 0.07 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 10.40 | 0.00 | 10.40 |
| CDO of TruPS | 3.71 | 0.00 | 3.71 | 0.00 | 0.00 | 0.00 | 0.68 | 0.05 | 0.74 |
| CDO other | 1.96 | 0.00 | 1.96 | 1.44 | 0.00 | 1.44 | 0.36 | 0.39 | 0.75 |
| CLO | 2.98 | 0.00 | 2.98 | 12.23 | 0.00 | 12.23 | 6.30 | 0.00 | 6.30 |
| CMBS | 6.98 | 0.00 | 6.98 | 17.36 | 0.00 | 17.36 | 5.95 | 0.00 | 5.95 |
| Corporate debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRE CDO/CDO CMBS | 0.14 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 8.96 | 0.00 | 8.96 |
| Financial institutions debt | 42.99 | 0.00 | 42.99 | 9.04 | 0.00 | 9.04 | 0.00 | 0.00 | 0.00 |
| Insurance debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Non-U.S. RMBS nonprime | 0.00 | 0.00 | 0.00 | 7.18 | 0.00 | 7.18 | 0.00 | 0.00 | 0.00 |
| Non-U.S. RMBS prime | 14.57 | 0.00 | 14.57 | 12.83 | 0.00 | 12.83 | 0.00 | 0.00 | 0.00 |
| Public finance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sovereign | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS Alt-A | 5.29 | 1.88 | 7.17 | 22.28 | 0.00 | 22.28 | 21.54 | 4.04 | 25.58 |
| U.S. RMBS closed-end second lien | 0.00 | 0.00 | 0.00 | 0.00 | 1.11 | 1.11 | 5.75 | 5.59 | 11.35 |
| U.S. RMBS HELOC | 0.57 | 4.63 | 5.20 | 0.00 | 3.94 | 3.94 | 0.23 | 7.52 | 7.75 |
| U.S. RMBS other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.22 | 0.00 | 2.22 |
| U.S. RMBS prime | 2.66 | 0.00 | 2.66 | 0.00 | 0.00 | 0.00 | 4.28 | 0.00 | 4.28 |
| U.S. RMBS subprime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.53 | 1.10 | 2.63 |
| Total | 93.49 | 6.51 | 100.00 | 91.70 | 8.30 | 100.00 | 77.26 | 22.74 | 100.00 |

| | Beta Finance Corp. | | | Carrera Capital Finance Ltd. | | | Centauri Corp. | | |
|---|---|---|---|---|---|---|---|---|---|
| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
| ABS aircraft | 0.00 | 0.00 | 0.00 | 0.00 | 1.84 | 1.84 | 0.00 | 0.00 | 0.00 |
| ABS auto | 0.07 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
|---|---|---|---|---|---|---|---|---|---|
| ABS credit card | 4.83 | 0.00 | 4.83 | 0.00 | 0.00 | 0.00 | 7.10 | 0.00 | 7.10 |
| ABS other | 0.71 | 0.19 | 0.90 | 2.95 | 4.89 | 7.84 | 0.69 | 0.00 | 0.69 |
| ABS SME loan | 0.80 | 0.00 | 0.80 | 0.33 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 |
| ABS student loan | 8.56 | 0.22 | 8.78 | 6.55 | 0.00 | 6.55 | 6.29 | 0.14 | 6.43 |
| CDO corporate bonds | 0.00 | 0.00 | 0.00 | 1.27 | 0.00 | 1.27 | 0.36 | 0.00 | 0.37 |
| CDO of CDO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of emerging markets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of ABS¶ | 0.08 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.23 |
| CDO of TruPS | 2.36 | 0.00 | 2.36 | 1.04 | 0.86 | 1.90 | 2.06 | 0.00 | 2.06 |
| CDO other | 2.14 | 0.00 | 2.14 | 0.48 | 0.00 | 0.48 | 0.00 | 0.00 | 0.00 |
| CLO | 3.86 | 0.00 | 3.86 | 14.52 | 0.00 | 14.52 | 4.37 | 0.00 | 4.37 |
| CMBS | 6.49 | 0.00 | 6.49 | 13.59 | 0.00 | 13.59 | 8.72 | 0.24 | 8.95 |
| Corporate debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRE CDO/CDO CMBS | 0.24 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.39 |
| Financial institutions debt | 43.81 | 0.00 | 43.81 | 20.14 | 0.00 | 20.14 | 45.46 | 0.00 | 45.46 |
| Insurance debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Non-U.S. RMBS nonprime | 0.00 | 0.00 | 0.00 | 3.53 | 0.00 | 3.53 | 0.00 | 0.00 | 0.00 |
| Non-U.S. RMBS prime | 12.61 | 0.00 | 12.61 | 16.87 | 0.00 | 16.87 | 12.73 | 0.00 | 12.73 |
| Public finance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sovereign | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS Alt-A | 6.77 | 0.53 | 7.30 | 0.00 | 0.90 | 0.90 | 5.47 | 0.48 | 5.95 |
| U.S. RMBS closed-end second lien | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS HELOC | 0.27 | 3.94 | 4.20 | 0.00 | 0.00 | 0.00 | 0.23 | 3.77 | 4.00 |
| U.S. RMBS other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS prime | 1.53 | 0.00 | 1.53 | 0.00 | 0.00 | 0.00 | 1.27 | 0.00 | 1.27 |
| U.S. RMBS subprime | 0.00 | 0.00 | 0.00 | 10.25 | 0.00 | 10.25 | 0.00 | 0.00 | 0.00 |
| Total | 95.13 | 4.87 | 100.00 | 91.51 | 8.49 | 100.00 | 95.36 | 4.64 | 100.00 |

| | Cheyne Finance PLC | | | Cortland Capital Ltd. | | | Cullinan Finance Ltd. | | |
|---|---|---|---|---|---|---|---|---|---|
| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
| ABS aircraft | 0.00 | 0.00 | 0.00 | 0.00 | 6.87 | 6.87 | 0.00 | 0.00 | 0.00 |
| ABS auto | 0.00 | 0.00 | 0.00 | 1.37 | 0.00 | 1.37 | 0.40 | 0.70 | 1.10 |
| ABS credit card | 0.00 | 0.00 | 0.00 | 24.12 | 0.00 | 24.12 | 0.18 | 0.00 | 0.18 |
| ABS other | 0.00 | 9.29 | 9.29 | 0.00 | 13.04 | 13.04 | 0.00 | 2.93 | 2.93 |
| ABS SME loan | 0.34 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 1.30 | 0.00 | 1.30 |
| ABS student loan | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7.51 | 0.20 | 7.70 |
| CDO corporate bonds | 0.33 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 |
| CDO of CDO | 0.64 | 0.00 | 0.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of emerging markets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 |
| CDO of ABS¶ | 7.49 | 0.00 | 7.49 | 0.00 | 0.00 | 0.00 | 0.38 | 0.00 | 0.38 |
| CDO of TruPS | 0.00 | 0.00 | 0.00 | 2.58 | 0.00 | 2.58 | 0.75 | 0.00 | 0.75 |
| CDO other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.81 | 0.00 | 1.81 |
| CLO | 16.47 | 0.00 | 16.47 | 10.76 | 0.00 | 10.76 | 8.78 | 0.00 | 8.78 |
| CMBS | 4.33 | 0.00 | 4.33 | 5.73 | 0.00 | 5.73 | 12.90 | 0.00 | 12.90 |
| Corporate debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRE CDO/CDO CMBS | 4.81 | 0.00 | 4.81 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.37 |
| Financial institutions debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.43 | 0.00 | 20.43 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Insurance debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Non-U.S. RMBS nonprime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.97 | 0.04 | 6.00 |
| Non-U.S. RMBS prime | 0.08 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 6.37 | 0.34 | 6.71 |
| Public finance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sovereign | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS Alt-A | 6.42 | 2.14 | 8.56 | 0.00 | 0.00 | 0.00 | 16.01 | 0.56 | 16.57 |
| U.S. RMBS closed-end second lien | 0.00 | 0.83 | 0.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.50 |
| U.S. RMBS HELOC | 0.00 | 13.47 | 13.47 | 0.00 | 0.00 | 0.00 | 0.00 | 4.50 | 4.50 |
| U.S. RMBS other | 0.64 | 0.00 | 0.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS prime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS subprime | 41.05 | 0.68 | 41.73 | 24.05 | 11.48 | 35.53 | 6.53 | 0.48 | 7.01 |
| Total | 82.59 | 17.41 | 100.00 | 68.61 | 31.39 | 100.00 | 89.69 | 10.31 | 100.00 |

| | Dorada Corp. | | | Eaton Vance Variable Leveraged Fund Ltd. | | | Harrier Finance Funding Ltd. | | |
|---|---|---|---|---|---|---|---|---|---|
| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
| ABS aircraft | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABS auto | 1.13 | 0.00 | 1.13 | 0.00 | 0.00 | 0.00 | 0.00 | 1.63 | 1.63 |
| ABS credit card | 12.20 | 0.00 | 12.20 | 0.00 | 0.00 | 0.00 | 11.89 | 0.45 | 12.34 |
| ABS other | 0.48 | 0.32 | 0.80 | 0.00 | 0.00 | 0.00 | 1.88 | 2.73 | 4.62 |
| ABS SME loan | 0.24 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.92 | 0.00 | 0.92 |
| ABS student loan | 14.32 | 0.00 | 14.32 | 0.00 | 0.00 | 0.00 | 2.78 | 0.00 | 2.78 |
| CDO corporate bonds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.04 | 0.33 | 1.38 |
| CDO of CDO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of emerging markets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.41 |
| CDO of ABS | 0.25 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 1.20 | 0.15 | 1.35 |
| CDO of TruPS | 5.34 | 0.00 | 5.34 | 0.00 | 0.00 | 0.00 | 0.83 | 0.00 | 0.83 |
| CDO other | 0.90 | 0.00 | 0.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.36 | 0.36 |
| CLO | 0.71 | 0.00 | 0.71 | 0.00 | 0.00 | 0.00 | 6.75 | 0.00 | 6.75 |
| CMBS | 0.58 | 0.00 | 0.58 | 0.00 | 0.00 | 0.00 | 19.98 | 0.00 | 19.98 |
| Corporate debt | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 100.00 | 0.45 | 0.14 | 0.59 |
| CRE CDO/CDO CMBS | 1.41 | 0.00 | 1.41 | 0.00 | 0.00 | 0.00 | 7.72 | 0.00 | 7.72 |
| Financial institutions debt | 23.34 | 0.00 | 23.34 | 0.00 | 0.00 | 0.00 | 12.85 | 0.00 | 12.85 |
| Insurance debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 1.36 | 1.47 |
| Non-U.S. RMBS nonprime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.05 |
| Non-U.S. RMBS prime | 16.44 | 0.00 | 16.44 | 0.00 | 0.00 | 0.00 | 1.69 | 0.00 | 1.69 |
| Public finance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.28 | 1.28 |
| Sovereign | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS Alt-A | 12.25 | 0.85 | 13.10 | 0.00 | 0.00 | 0.00 | 6.90 | 1.31 | 8.21 |
| U.S. RMBS closed-end second lien | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.66 | 0.00 | 0.66 |
| U.S. RMBS HELOC | 0.36 | 6.05 | 6.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| U.S. RMBS other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 |
| U.S. RMBS prime | 2.82 | 0.00 | 2.82 | 0.00 | 0.00 | 0.00 | 0.64 | 0.00 | 0.64 |
| U.S. RMBS subprime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.20 | 3.25 | 11.45 |
| Total | 92.77 | 7.23 | 100.00 | 100.00 | 0.00 | 100.00 | 86.55 | 13.45 | 100.00 |

| | K2 Corp. | | | Kestrel Funding PLC | | | Links Finance Corp. | | |
|---|---|---|---|---|---|---|---|---|---|
| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
| ABS aircraft | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.32 | 0.49 |

| | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
|---|---|---|---|---|---|---|---|---|---|
| ABS auto | 4.97 | 2.19 | 7.16 | 0.00 | 2.29 | 2.29 | 1.42 | 0.00 | 1.42 |
| ABS credit card | 5.68 | 0.24 | 5.92 | 7.18 | 0.00 | 7.18 | 2.90 | 0.00 | 2.90 |
| ABS other | 0.56 | 3.79 | 4.35 | 0.00 | 3.50 | 3.50 | 0.00 | 0.74 | 0.74 |
| ABS SME loan | 6.79 | 0.00 | 6.79 | 0.13 | 0.00 | 0.13 | 3.98 | 0.03 | 4.02 |
| ABS student loan | 6.32 | 0.12 | 6.44 | 1.97 | 0.00 | 1.97 | 3.79 | 0.00 | 3.79 |
| CDO corporate bonds | 0.87 | 1.00 | 1.87 | 0.23 | 0.00 | 0.23 | 0.65 | 0.19 | 0.84 |
| CDO of CDO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of emerging markets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.17 |
| CDO of ABS¶ | 0.00 | 0.00 | 0.00 | 2.13 | 0.00 | 2.13 | 1.45 | 0.24 | 1.69 |
| CDO of TruPS | 0.00 | 0.00 | 0.00 | 0.82 | 0.00 | 0.82 | 0.11 | 0.00 | 0.11 |
| CDO other | 1.33 | 0.38 | 1.71 | 0.00 | 0.00 | 0.00 | 3.08 | 0.00 | 3.08 |
| CLO | 9.76 | 0.04 | 9.79 | 6.08 | 0.00 | 6.08 | 10.48 | 0.48 | 10.96 |
| CMBS | 2.83 | 0.00 | 2.83 | 10.82 | 0.00 | 10.82 | 2.27 | 0.00 | 2.27 |
| Corporate debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRE CDO/CDO CMBS | 0.10 | 0.00 | 0.10 | 9.10 | 0.00 | 9.10 | 0.26 | 0.01 | 0.27 |
| Financial institutions debt | 28.90 | 0.00 | 28.90 | 6.12 | 0.00 | 6.12 | 42.83 | 0.00 | 42.83 |
| Insurance debt | 9.48 | 0.00 | 9.48 | 0.00 | 0.00 | 0.00 | 2.47 | 0.00 | 2.47 |
| Non-U.S. RMBS nonprime | 0.00 | 0.00 | 0.00 | 4.63 | 0.00 | 4.63 | 0.30 | 0.00 | 0.30 |
| Non-U.S. RMBS prime | 11.88 | 0.00 | 11.88 | 12.51 | 0.00 | 12.51 | 12.08 | 0.00 | 12.08 |
| Public finance | 0.00 | 0.00 | 0.00 | 0.00 | 1.64 | 1.64 | 0.00 | 0.00 | 0.00 |
| Sovereign | 0.95 | 0.00 | 0.95 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.11 |
| U.S. RMBS Alt-A | 0.00 | 0.70 | 0.70 | 11.93 | 0.00 | 11.93 | 2.00 | 0.44 | 2.45 |
| U.S. RMBS closed-end second lien | 0.00 | 0.00 | 0.00 | 2.23 | 0.00 | 2.23 | 0.00 | 0.30 | 0.30 |
| U.S. RMBS HELOC | 0.00 | 0.64 | 0.64 | 0.00 | 0.00 | 0.00 | 0.06 | 5.22 | 5.28 |
| U.S. RMBS other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.09 |
| U.S. RMBS prime | 0.49 | 0.00 | 0.49 | 0.00 | 0.00 | 0.00 | 1.33 | 0.00 | 1.33 |
| U.S. RMBS subprime | 0.00 | 0.00 | 0.00 | 16.70 | 0.00 | 16.70 | 0.01 | 0.00 | 0.01 |
| Total | 90.90 | 9.10 | 100.00 | 92.57 | 7.43 | 100.00 | 91.76 | 8.24 | 100.00 |

| | Nightingale Finance Ltd. | | | Orion Finance Corp. | | | Premier Asset Collateralized Entity Ltd. (PACE) | | |
|---|---|---|---|---|---|---|---|---|---|
| S&P sector | N-M | Monoline | Total | N-M | Monoline | Total | N-M | Monoline | Total |
| ABS aircraft | 1.39 | 0.00 | 1.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABS auto | 1.68 | 0.00 | 1.68 | 0.00 | 0.00 | 0.00 | 5.00 | 2.07 | 7.07 |
| ABS credit card | 0.00 | 0.00 | 0.00 | 3.00 | 0.00 | 3.00 | 7.98 | 0.00 | 7.98 |
| ABS other | 4.88 | 0.00 | 4.88 | 0.51 | 4.32 | 4.83 | 0.81 | 3.00 | 3.81 |
| ABS SME loan | 0.86 | 0.00 | 0.86 | 0.00 | 0.00 | 0.00 | 4.00 | 0.15 | 4.15 |
| ABS student loan | 5.12 | 0.00 | 5.12 | 9.82 | 2.62 | 12.43 | 4.64 | 0.00 | 4.64 |
| CDO corporate bonds | 0.00 | 0.00 | 0.00 | 9.42 | 0.49 | 9.91 | 0.00 | 0.00 | 0.00 |
| CDO of CDO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of emerging markets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CDO of ABS¶ | 13.83 | 0.00 | 13.83 | 10.71 | 0.00 | 10.71 | 3.29 | 0.00 | 3.29 |
| CDO of TruPS | 0.00 | 0.00 | 0.00 | 1.80 | 0.00 | 1.80 | 0.00 | 4.64 | 4.64 |
| CDO other | 3.14 | 0.00 | 3.14 | 0.00 | 3.04 | 3.04 | 3.84 | 0.00 | 3.84 |
| CLO | 17.11 | 0.00 | 17.11 | 3.31 | 0.00 | 3.31 | 14.22 | 0.00 | 14.22 |
| CMBS | 16.53 | 0.00 | 16.53 | 7.13 | 0.00 | 7.13 | 1.74 | 0.00 | 1.74 |
| Corporate debt | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRE CDO/CDO CMBS | 0.00 | 0.00 | 0.00 | 0.90 | 0.00 | 0.90 | 0.00 | 0.00 | 0.00 |