**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

**ABU DHABI COMMERCIAL BANK, KING**
**COUNTY, WASHINGTON, SEI**
**INVESTMENTS COMPANY, SEI**
**INVESTMENT STRATEGIES, LLC, THE**
**BANK OF N.T. BUTTERFIELD & SON**
**LIMITED, SFT COLLECTIVE INVESTMENT**
**FUND, DEUTSCHE POSTBANK AG,**
**GLOBAL INVESTMENT SERVICES**
**LIMITED, GULF INTERNATIONAL BANK**
**B.S.C., NATIONAL AGRICULTURAL**
**COOPERATIVE FEDERATION, STATE**
**BOARD OF ADMINISTRATION OF**
**FLORIDA, COMMONWEALTH OF**
**PENNSYLVANIA PUBLIC SCHOOL**
**EMPLOYEES' RETIREMENT SYSTEM,**
**BANK SINOPAC, BANK HAPOALIM B.M.,**
**COMMERZBANK AG, and KBL EUROPEAN**
**PRIVATE BANKERS S.A.,**

            **Plaintiffs,**

            **- against -**

**MORGAN STANLEY & CO.**
**INCORPORATED, MORGAN STANLEY &**
**CO. INTERNATIONAL LIMITED, MOODY'S**
**INVESTORS SERVICE, INC., MOODY'S**
**INVESTORS SERVICE LTD., STANDARD**
**AND POOR'S RATINGS SERVICES and THE**
**McGRAW HILL COMPANIES, INC.,**

            **Defendants.**

-----------------------------------------------------------------X

**OPINION AND**
**ORDER**

**08 Civ. 7508 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## Table of Contents

**Page**

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

II.      **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

         A.     **Undisputed Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

         B.     **Procedural History** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

III.     **LEGAL STANDARDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

         A.     **Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

         B.     **Summary Judgment Standard for Fraud and Aiding and Abetting Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

IV.     **APPLICABLE LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

         A.     **Fraud** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

         B.     **Aiding and Abetting** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

         C.     **Standing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

V.      **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

         A.     **Standing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

                 1.     **SEI** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

                 2.     **Butterfield** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

                 3.     **Commerzbank** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

                 4.     **Hapoalim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

i

**B.**     **Actionable Misstatements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

     **1.**     **Morgan Stanley** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

         **a.**     **Participation in a Scheme to Defraud** . . . . . . . . . . **23**

         **b.**     **Whether the Ratings May Be Attributed to Morgan Stanley** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

     **2.**     **Rating Agencies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

         **a.**     **Whether Credit Ratings Are Opinions** . . . . . . . . . . **32**

         **b.**     **When Opinions Are Actionable** . . . . . . . . . . . . . . . **36**

         **c.**     **Whether Plaintiffs Have Proof that the Ratings Were Both Misleading and Disbelieved When Made** . . . . **38**

**C.**     **Scienter** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

     **1.**     **Whether the Rating Agencies Had the Required Intent** . . **43**

     **2.**     **Disclosure of the Risks** . . . . . . . . . . . . . . . . . . . . . . . . . **47**

     **3.**     **Hindsight** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

     **4.**     **Motive** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

**D.**     **Reliance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

     **1.**     **GIB** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **54**

     **2.**     **NACF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **56**

     **3.**     **SinoPac** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **58**

     **4.**     **Hapoalim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

5. Postbank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

6. Commerzbank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

7. PSERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

8. SFT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

9. FSBA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

10. SEI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

11. ADCB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

12. GIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

13. SEI Strategies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

14. King County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

E. Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

1. The Cause of Plaintiffs' Losses . . . . . . . . . . . . . . . . . . . . . 74

2. Whether Plaintiffs Suffered Losses When the Ratings Were
   Downgraded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

3. Disclosure of the Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

4. The Senior Noteholders' Evidence of Damages . . . . . . . . . 80

F. Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

1. The Rating Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

2. Morgan Stanley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

**VI.   ADDENDUM** .............................................. **88**

**VII.  CONCLUSION** ............................................ **89**

## I.    INTRODUCTION

Plaintiffs — institutional investors who invested in the Cheyne structured investment vehicle ("SIV") — initiated this action on August 25, 2008, seeking to recover losses stemming from the liquidation of notes issued by the SIV between October 2004 and October 2007.[1]  Plaintiffs assert New York common law claims of fraud and negligent misrepresentation against:  Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited (collectively "Morgan Stanley"); Moody's Investors Service, Inc. and Moody's Investors Service Ltd. (collectively "Moody's"); and Standard & Poor's Ratings Services and The McGraw Hill Companies, Inc. (collectively "S&P," and, together with Moody's, the "Ratings Agencies").  Morgan Stanley and the Rating Agencies now move for summary judgment on plaintiffs' fraud claims.  For the reasons discussed below, summary judgment is granted in part and denied in part.

---

[1]    *See* First Amended Complaint for Common Law Fraud, Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, Breach of Contract, Unjust Enrichment and Aiding and Abetting ("First Amended Complaint" or "FAC"), ¶¶ 1, 15.

## II.    BACKGROUND[2]

### A.    Undisputed Facts

An SIV is a special purpose entity designed to undertake arbitrage by issuing short-term commercial paper and medium-term notes to finance the acquisition of long-term fixed-income assets such as mortgage bonds and asset-backed securities, including residential mortgage-backed securities ("RMBSs").[3] Cheyne Finance PLC (now known as SIV Portfolio PLC) ("Cheyne PLC") — which is now in receivership as a bankrupt entity — and its wholly-owned subsidiaries Cheyne Finance LLC and Cheyne Capital Notes LLC (collectively, "Cheyne LLC," and together with Cheyne PLC, the "Cheyne SIV") were authorized to issue four categories of notes:  (1) Senior Capital Notes ("senior notes" ), also known as Commercial Paper ("CP"); (2) Mezzanine Capital Notes ("MCNs"), also known as Medium Term Notes ("MTNs"); (3) Junior Capital

---

[2]     The following facts are derived from the Ninth Amended Complaint for Common Law Fraud, Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, and Aiding and Abetting ("NAC"), defendants' Answers, and the parties' Rule 56.1 statements and supporting documents.  For facts derived from the NAC, defendants have either denied knowledge of them or declined to dispute them with specificity.  Otherwise, the facts are undisputed unless noted; where disputed, they are construed in the light most favorable to the plaintiffs.  *See, e.g.*, *Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

[3]     *See* NAC ¶ 43.

Notes ("junior notes" or "capital notes"); and Combination Capital Notes ("CCNs") which contain a mix of the other three.[4]   The CP and MCNs are senior to the junior notes, which bear the first loss if an SIV declines in value.[5]   The Cheyne SIV had additional structural features such as "credit enhancements" — senior note investors were protected by a subordinated series or "tranche" of Capital Notes, and Capital Note investors were protected by a subordinated tranche of Junior Capital Notes.[6]

Morgan Stanley acted as the Arranger and Placement Agent for the Rated Notes of the Cheyne SIV.[7]   Pursuant to these roles, Morgan Stanley was responsible for distributing to investors IMs and other Selling Documents, containing information regarding the notes issued by the Cheyne SIV, including ratings assigned by the Rating Agencies and the terms and conditions of the purchase and sale of the notes.[8]   Morgan Stanley also engaged the Rating Agencies

---

[4]      *See id.* ¶ 44; Cheyne Capital PLC Information Memoranda ("IMs"), at MS_000014806.  I use some of these terms — for example MCNs and MTNs — interchangeably throughout this opinion, in each instance deferring to the usage of the terms in the documents, deposition transcripts, and the parties' memoranda of law and Rule 56.1 statements.

[5]      *See* NAC ¶ 44.

[6]      *See id.* ¶ 46; IMs at MS_000014813 to -814.

[7]      *See* NAC ¶ 46.

[8]      *See id.*

to rate the Cheyne SIV Rated Notes and placed the Notes with the Cheyne SIV investors.[9]

Moody's and S&P are "nationally recognized statistical rating organizations" or "NRSROs," having a special status that was created by the SEC in 1975.[10]  The Second Circuit has recognized that:

> [Issuers] have their securities rated for two reasons. First, once the security or debt has received a favorable rating, that rating makes it easier to sell the security to investors, who rely upon [the rating agency's] analysis and evaluation. The second reason is that a favorable rating carries with it a regulatory benefit as well. Fitch, along with its direct competitors Amici Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P"), has been designated by the Securities and Exchange Commission ("SEC") as a "nationally recognized statistical rating organization" ("NRSRO") whose endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO rating.[11]

On May 17, 2005, S&P assigned a credit rating of AAA to the MTNs issued by the

---

[9]      *See id.* ¶ 7; IMs at MS_000014800 to -801, -814 to -815.

[10]     *See* NAC ¶ 54.

[11]     *In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) (citing Securities and Exchange Commission, Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, 5-8 (Jan. 2003), *available at* http://www.sec.gov/news/studies/creditratingreport0103.pdf).

Cheyne SIV and a credit rating of A-1+ to the CP issued by the Cheyne SIV.[12]  On

or around July 29, 2005, Moody's assigned a credit rating of Aaa to the senior

MTNs issued by the Cheyne SIV and a credit rating of Aaa/P-1 to the CP issued by

the Cheyne SIV.[13]  The Cheyne SIV launched on August 3, 2005.[14]

   Plaintiffs are large institutional investors who acquired notes issued

by the Cheyne SIV.[15]  On August 28, 2007, Cheyne breached its "Major Capital

Loss Test," thus triggering "enforcement," an irreversible operating state requiring

---

[12]  *See* Answer of Defendants Standard & Poor's Rating Services and the
McGraw Hill Companies, Inc. to Plaintiffs' Ninth Amended Complaint, ¶ 48.

[13]  *See* Moody's Answer to Plaintiffs' Ninth Amended Complaint, ¶ 48;
Moody's New Issue Report for the Cheyne SIV ("NIR"), at MS_000077900 to -
903.

[14]  *See* Defendants' Joint Statement of Undisputed Material Facts
Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 27.

[15]  *See* NAC ¶¶ 2, 16-18.  The sixteen plaintiffs in this action are Abu
Dhabi Commercial Bank ("ADCB"); Bank Hapoalim B.M. ("Hapoalim"); The
Bank of N.T. Butterfield & Son Limited ("Butterfield"); Bank Sinopac
("Sinopac"); Commerzbank AG ("Commerzbank"); Commonwealth of
Pennsylvania Public School Employees' Retirement System ("PSERS"); Deutsche
Postbank AG ("Postbank"); Global Investment Services Limited ("GIS"); Gulf
International Bank B.S.C. ("GIB"); King County, Washington ("King County");
National Agricultural Cooperative Federation ("NACF"); SEI Investments
Company ("SEI"); SEI Investment Strategies, LLC ("SEI Strategies"); SFT
Collective Investment Fund ("SFT"); State Board of Administration of Florida
('FSBA"); and KBL European Private Bankers S.A ("KBL").  This opinion does
not address the claims of KBL because none of the parties mentioned this plaintiff
in their memoranda of law.

that a receiver be appointed to manage the SIV in order to sell its assets and repay maturing liabilities.[16]  Plaintiffs now seek to recover losses they claim they suffered as a result of Cheyne's liquidation.

### B.   Procedural History

Plaintiffs filed their First Amended Complaint on March 30, 2009, alleging thirty-two common law claims against Morgan Stanley, The Bank of New York ("BoNY"), and the Rating Agencies, including (1) common law fraud;[17] (2) negligence;[18] (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) breach of contract between plaintiffs and each defendant; (6) "contract failure of condition;" (7) breach of contract between the Cheyne SIV and other defendants to which plaintiffs allege they were third-party beneficiaries; (8) breach of the implied covenant of good faith and fair dealing; (9) unjust enrichment; (10) tortious interference with the contract between the Cheyne SIV and plaintiffs; (11) tortious interference with the contract between the Cheyne SIV and other

---

[16]     *See* Def. 56.1 ¶ 107.

[17]     Only Morgan Stanley and the Rating Agencies were alleged to have committed common law fraud.  *See* FAC ¶¶ 155-167, 240-254.

[18]     Only BoNY and the Rating Agencies were alleged to have acted negligently.  *See id.* ¶¶ 255-264, 330-336.

defendants to which plaintiffs allege they were third-party beneficiaries;[19] and (12) in the alternative, aiding and abetting.[20]  On May 18, 2009, Morgan Stanley and BoNY jointly, and Moody's and S&P jointly, moved to dismiss.  On September 2, 2009, I granted BoNY's motion in full, and — based on the then-settled Second Circuit rule that New York's Martin Act preempted the common law tort claims[21] — I dismissed all claims against Morgan Stanley and the Rating Agencies except for fraud and aiding and abetting fraud.[22]

On December 20, 2011, the New York Court of Appeals ruled that the Martin Act does *not* preempt common law claims in the securities context,[23] and on January 10, 2012, the plaintiffs filed the NAC — which once again included claims of negligence against the Rating Agencies, and claims of negligent

---

[19]    Only Morgan Stanley was alleged to have tortiously interfered with the  contract between the Cheyne SIV and other defendants to which plaintiffs allege they were third-party beneficiaries.  *See id.* ¶¶ 229-234.

[20]    *See id.* ¶¶ 155-398.

[21]    *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (noting that the New York Court of Appeals had yet to consider whether the Martin Act preempted common law claims involving securities, and following decisions from the First and Second Departments).

[22]    *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 172 (S.D.N.Y. 2009).

[23]    *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 353 (2011) ("[W]e conclude that plaintiff's breach of fiduciary duty and gross negligence claims are not barred by the Martin Act.").

7

misrepresentation, breach of fiduciary duty, and aiding and abetting those causes of action against Morgan Stanley and the Rating Agencies.  The NAC also included a new claim against Morgan Stanley for negligence.  On May 4, 2012, I dismissed the causes of action for negligence, breach of fiduciary duty, and aiding and abetting, but allowed plaintiffs' negligent misrepresentation claim to proceed.[24]  At around the same time that defendants filed their motions to dismiss the re-pleaded non-fraud claims, they filed this motion for summary judgment on plaintiffs' claims for fraud and aiding and abetting fraud.  Accordingly, only these claims — and not plaintiffs' negligent misrepresentation claims — are currently before the Court.

## III.   LEGAL STANDARDS

### A.   Summary Judgment

"Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict."[25]  Thus, summary judgment is only appropriate "if the pleadings, the discovery and disclosure

---

[24]     *See* May 4 Order (Docket No. 404), referring to *King County, Washington v. IKB Deutsche Industriebank AG* (*King County II*), No. 09 Civ. 8387, --- F. Supp. 2d ---, 2012 WL 1592193, at *14 (S.D.N.Y. May 4, 2012), *reconsideration denied*, Nos. 09 Civ. 8387, 08 Civ. 7508, --- F. Supp. 2d ---, 2012 WL 2160285 (S.D.N.Y. June 7, 2012).

[25]     *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[26] "For summary judgment  purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor."[27]  "'A fact is material when it might affect the outcome of the suit under governing law.'"[28] [T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[29] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[30]

In a summary judgment setting, "[t]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists."[31]  "When

---

[26]    Fed. R. Civ. P. 56(c).

[27]    *Sanchez v. Connecticut Natural Gas Co.*, 421 Fed. App'x 33, 34 (2d Cir. 2011) (quoting *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).

[28]    *Carter v. Incorporated Vill. of Ocean Beach*, 415 Fed. App'x 290, 292 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[29]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citation omitted).

[30]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[31]    *Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *1 (2d Cir. Sept. 7, 2011) (citing *Gallo v. Prudential*

the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[32]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[33]  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[34] and cannot "'rely on conclusory allegations or unsubstantiated speculation.'"[35]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[36]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of

---

*Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)).

[32]     *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[33]     *Id.*

[34]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[35]     *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[36]     *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

10

legitimate inferences from the facts are jury functions, not those of a judge.'"[37]

"'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[38]

### B.  Summary Judgment Standard for Fraud and Aiding and Abetting Claims

In New York, a plaintiff alleging fraud must establish each element of its fraud claim by "clear and convincing evidence."[39]  The same is true for a plaintiff asserting a claim of aiding and abetting fraud.[40]  Thus, the appropriate summary judgment question is whether the evidence on the record could support a reasonable jury finding that the plaintiff has shown each element of either a fraud or an aiding and abetting claim by clear and convincing evidence.[41]

---

[37]     *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[38]      *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[39]     *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).

[40]     *See de Abreu v. Bank of America Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) ("'A claim for aiding and abetting fraud must be proven by clear and convincing evidence.'") (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 488 (S.D.N.Y. 2001)).

[41]     *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253-56 (1986).

11

## IV.   APPLICABLE LAW

### A.   Fraud

To recover damages for fraud under New York law, a plaintiff must prove: "'(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury.'"[42]  "The claim also requires a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'"[43]

The standard for evaluating whether plaintiffs have presented sufficient evidence of scienter is the same under New York common law as it is under Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act").[44]

---

[42]   *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).

[43]   *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 104-05 (2d Cir. 2001) (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986)).

[44]   *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 639 (S.D.N.Y. 2009).

Plaintiffs need not establish intent to defraud; rather "[p]laintiffs may satisfy the scienter requirement by producing 'evidence of conscious misbehavior or recklessness.'"[45] The Second Circuit has described recklessness as:

> "[A]t the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[] "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."[46]

The Second Circuit has further directed courts to be "'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'"[47]

In addition to establishing scienter, plaintiffs must show that they reasonably relied on the false and misleading statements to their detriment.

---

[45]   *Gould v. Winstar Commc'ns, Inc.*, Nos. 10 Civ. 4028, 10 Civ. 4280, --- F.3d ---, 2012 WL 2924254, at *7 (2d Cir. July 19, 2012) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).

[46]   *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*,  570 F.2d 38, 47 (2d Cir. 1978) and *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F. Supp. 256, 259 (S.D.N.Y. 1989)) (additional citations omitted).

[47]   *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

> Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts. Only [w]hen matters are held to be peculiarly within defendant's knowledge [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth.[48]

An "evaluation of the reasonable-reliance element [should involve] many factors to 'consider and balance,' no single one of which is 'dispositive.'"[49] "Accordingly, reasonable reliance is often a question of fact for the jury rather than a question of law for the court."[50]

## B. Aiding and Abetting

"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"[51] Under New York law, a defendant must be shown to possess

---

[48]   *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) (alterations and omissions in original) (quotation marks omitted).

[49]   *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) (quoting *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)).

[50]   *Id.*

[51]   *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quoting *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)).

actual knowledge of the underlying fraud.[52]

"The 'knowledge' element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud."[53]  While a strong inference of scienter can be satisfied by a showing of "'facts that constitute strong circumstantial evidence of . . . recklessness,'" aiding and abetting requires a reasonable inference of actual knowledge.[54]  The "substantial assistance" requirement is satisfied where "'a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach [or fraud] to occur.'"[55]  "[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."[56]

---

[52]     *See id.* (citing *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996)).

[53]     *Winnick*, 406 F. Supp. 2d at 253 n.4.

[54]     *Id.* (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). *Accord id.* at 254 (finding plaintiffs' evidence sufficient to give rise to an inference of the defendants' actual knowledge of the fraud where e-mails submitted by plaintiffs "contain[ed] language which could reasonably be understood to demonstrate [the defendants'] actual knowledge" of the fraud).

[55]     *Lerner*, 459 F.3d at 295 (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (1st Dep't 2003)). *Accord Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

[56]     *Lerner*, 459 F.3d at 295 (quotation marks omitted).

15

### C.     Standing

"Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue."[57]  The plaintiff bears the burden of establishing standing, which, at summary judgment requires setting forth "specific facts," showing: (1) "injury in fact"; (2) "a causal connection between the injury and [defendants' conduct]"; and (3) likelihood that "injury will be redressed by a favorable decision."[58]  Standing is "assessed as of the time the lawsuit is brought."[59]

An assignee who holds "legal title to an injured party's claim has constitutional standing to pursue the claim. . . ."[60]  New York law permits "free assignability of [fraud] claims,"[61] and "any act or words are sufficient which show

---

[57]     *Sierra Club v. Morton*, 405 U.S. 727, 731-32 (1972). *Accord National Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 87 (2d Cir. 1988).

[58]     *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[59]     *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994) (citing *Lujan*, 504 U.S. at 571 n. 4 (1992)).

[60]     *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (citing *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 271 (2008)).

[61]     *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

16

an intention of transferring the chose in action to the assignee."[62]  For example,

transferring "all rights, title and interest" in a given transaction is "sufficient to

effect the assignment of tort claims based on fraud."[63]  "'An assignment may be

made by an oral communication.'"[64]

## V.   DISCUSSION

### A.   Standing

#### 1.   SEI

SEI is suing on six investments made on behalf of three money market

mutual funds sponsored by SEI ("the SEI Funds").[65]  In September 2008 and

March 2009, SEI purchased the MTNs from the SEI Funds.[66]  On September 22,

2009, the SEI Funds assigned "all of their rights, obligations, and claims arising

---

[62]      *Id.* at 151-52.

[63]      *Id.*  The transaction at issue in *Banque Arabe* was participation in a
particular loan.

[64]      *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, Nos. 93 Civ.
6876, 94 Civ. 2713, 2000 WL 1876915, at *1 (S.D.N.Y. Dec. 22, 2000) (quoting
*American Banana Co. v. Venezolana Internacional de Aviacion S.A.*, 411 N.Y.S.2d
889, 890 (1st Dep't 1979)).

[65]      *See* Def. 56.1 ¶ 94; Declaration of Plaintiffs Regarding Reliance in
Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary
Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Reliance Decl."), ¶
10.

[66]      *See* Reliance Decl. ¶ 10.

17

out of or related to the MTNs to SEI."[67]  Because the SEI Funds assigned all *claims* arising out of the MTNs as of the filing of the Second Amended Complaint, in which SEI was first named as a plaintiff,[68] SEI has standing to pursue tort claims stemming from the SEI Funds' investment in Cheyne.

### 2.    Butterfield

Butterfield is suing on an investment made by the Butterfield Money Market Fund ("BMMF"), which was managed by Butterfield's wholly-owned subsidiary, Butterfield Asset Management ("BAM").  Defendants argue that Butterfield lacks standing to sue on behalf of BMMF because there is no evidence that BMMF assigned its right of action to Butterfield.[69]  In its declaration on reliance, Butterfield asserts that through its purchase of "CP and MTNs at par from wholly-owned affiliate, [BMMF], on July 11, 2008," it "acquired BMMF's entire interest in the CP and MTNs."[70]  However, the mere purchase of notes is insufficient to establish an assignment of rights, and the bare assertion that

---

[67]    *Id.*, Ex. F.

[68]    *See* Second Amended Complaint for Common Law Fraud, Breach of Contract and Aiding and Abetting.

[69]    *See* Defendants' Joint Memorandum of Law in Support of Their Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Def. Mem."), at 19, 20-21.

[70]    Reliance Decl. ¶ 7.

Butterfield "acquired all rights and claims relating to the Rated Notes" — without any supporting facts — is insufficient to withstand summary judgment.[71]  Finally, because standing is assessed at the time the complaint is filed, a "ratification" in a 2012 Reliance Declaration[72] does not cure the deficiency.  Thus, Butterfield's claims arising out of BMMF's investments are dismissed for lack of standing.

### 3.  Commerzbank

Commerzbank is suing both on MCNs it purchased for itself and on the Allianz-Dresdner Daily Asset Fund's ("DAF") investments in Cheyne. Dresdner Bank A.G. ("Dresdner") purchased the DAF notes on October 9, 2007, and Commerzbank acquired Dresdner in May 2009.[73]  Although Commerzbank offers evidence that it has acquired any potential rights of action possessed by Dresdner, it has provided no evidence that DAF assigned its rights of action to Dresdner.  Commerzbank argues that it nonetheless has standing by virtue of the

---

[71]     Plaintiffs cite to this Court's decision in *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2006 WL 708470, at *4 (S.D.N.Y. Mar. 20, 2006) for the proposition that the Court should accept their declarations of authority to sue.  Even if the situations were analogous, that decision was on a motion to dismiss, in which the plaintiffs were entitled to "considerable procedural leeway."  *Id.*

[72]     *See* Reliance Decl. ¶ 7 ("For the avoidance of doubt, BMMF ratifies that Butterfield is authorized to pursue recovery related to the CP and MTNs and BMMF agrees to be bound by any decisions or judgments in this action.").

[73]     *See* Def. 56.1 ¶ 82.

fact that it "acquired the Rated Notes and [was] thus record [owner] of the notes before bringing suit."[74]   However, Commerzbank provides no support for its assertion that, under New York law, the record holder of a rated note may bring fraud claims on behalf of prior holders, even without an assignment.[75]   Because Commerzbank has provided no evidence that it has standing to bring a fraud claim based on DAF's purchase of the notes, these claims are dismissed.

### 4.   Hapoalim

Hapoalim is suing on MCNs purchased pursuant to a Note Purchase Agreement ("NPA") and a Loan Asset Purchase Agreement ("LAPA") on behalf of a fully-sponsored commercial paper conduit, Venus Funding Corporation ("Venus").[76]   Hapoalim made the decision to invest for Venus, and in September 2007, Hapoalim acquired "through an assignment" and pursuant to the LAPA and

---

[74]   Plaintiffs' Memorandum of Law in Support of Their Opposition to Defendants' Joint Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Pl. Mem."), at 31.

[75]   *Lemanik, S.A. v. McKinley Allsopp* — cited by plaintiffs — holds only that *in federal securities* cases under *federal law*, "[t]he record holder of securities is a 'real party in interest' who may sue in his own name for securities fraud."  125 F.R.D. 602, 607 (S.D.N.Y. 1989).

[76]   *See* Def. 56.1 ¶ 72; Pl. Mem. at 31.

NPA the whole of Venus's MCNs at par.[77]  This assignment included "all rights"

and "all present and future claims, demands, causes and choses in action in respect

of" the MCNs.[78]  Thus, Hapoalim may sue on the notes that were initially

purchased by Venus.

## B.    Actionable Misstatements

### 1.    Morgan Stanley

In its motion to dismiss plaintiffs' fraud claims, Morgan Stanley

argued that plaintiffs had failed to identify any actionable misstatements that could

be attributed to it.[79]  I denied Morgan Stanley's motion on the basis of the group

pleading doctrine,[80] which "provides an exception 'to the requirement that the

---

[77]     *See* Def. 56.1 ¶ 72; Deposition of Frederic Becker, Hapoalim's 30(b)(6) designee ("Becker Dep."), at 19:7-20:25, 28:2-5 (explaining that Hapoalim took "over the credit responsibility of the issuer, [took] an assignment of the notes and step[ped] into the shoes" of Venus); Reliance Decl. ¶ 9.

[78]     Note Purchase Agreement, BHA0002647 at -654; Liquidity Asset Purchase Agreement, BHA0002606 at -614.

[79]     *See* Memorandum of Law in Support of Defendants Morgan Stanley & Co. Incorporated, Morgan Stanley & Co. International Limited, the Bank of New York Mellon, and QSR Management Limited's Motion to Dismiss the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6) (Docket No. 56), at 10.  The Bank of New York Mellon and QSR Management Limited were dismissed from this action in 2009.  *See Abu Dhabi*, 651 F. Supp. 2d at 188.

[80]     *See Abu Dhabi*, 651 F. Supp. 2d at 177 ("[P]laintiffs have adequately pled that the misleading statements are attributable to Morgan Stanley through the

21

fraudulent acts of each defendant be identified separately in the complaint.'"[81]

Group pleading, however, is only a pleading device, and plaintiffs cannot rely on it

at this stage of the proceedings.[82]

Morgan Stanley now argues that it cannot be liable for fraud because

as a matter of law, the ratings — which are the only alleged misstatements[83] — are

---

group pleading doctrine.").

[81]     *Id.* (quoting *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 315 (S.D.N.Y. 2009)).

[82]     *See SEC v. Espuelas*, 699 F. Supp. 2d 655, 660 (S.D.N.Y. 2010) ("There is good reason, moreover, to think that group pleading is and has always been just a pleading device, designed to aid plaintiffs at the pleading stage and prior to discovery but not to free them of their ultimate burden to link the defendant to the making of a misstatement.").

[83]     *See* NAC ¶¶ 202-211.  Plaintiffs assert that they identified additional false or misleading statements made by Morgan Stanley to plaintiffs.  *See* Pl. Mem. at 3.  The only evidence plaintiffs cite for this assertion is a response to an interrogatory and several paragraphs in their Complaint.  *See* Plaintiffs' Response to Defendants' Joint Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 2(i).  Yet the cited paragraphs do not identify any additional representation made by any of the defendants to any of the plaintiffs, *see* NAC ¶¶ 171-179, and a single plaintiff's response to an interrogatory — without more — is not sufficient to create a disputed issue of fact as to whether defendants made any actionable misrepresentation to plaintiffs other than the ratings.  In their 56.1 statement, plaintiffs cite a host of additional sources in support of their assertion that "Morgan Stanley made an actionable misstatement."  Pl. 56.1 ¶ 2.  Many of these sources are communications within and among defendants, and from defendants to Cheyne.  *See id.*  Not one of the sources cited in this section of plaintiffs' 56.1 statement contains evidence of a communication — other than the ratings — made by Morgan Stanley to the plaintiffs.

attributable solely to the Rating Agencies.[84]  Plaintiffs argue that: (1) the ratings are attributable to Morgan Stanley; and (2) the question of attribution "misses the mark" as Morgan Stanley may be liable for fraud on the basis of its conception and execution of a fraudulent scheme.[85]  Thus, this Court must answer the following two questions: (1) whether — as a matter of law — a party that devised and executed a fraudulent scheme may be liable for common law fraud in New York even though no actionable misstatement can be attributed to it; and (2) if not, whether any actionable misstatement may be attributed to Morgan Stanley.

### a.    Participation in a Scheme to Defraud

In support of their argument that Morgan Stanley can be liable even if it made no actionable misstatement, plaintiffs rely on *CPC International, Inc. v. McKesson Corp.*, in which the New York Court of Appeals reversed the Appellate Division's dismissal of common law fraud claims against Morgan Stanley and other defendants based on allegations that all defendants were involved in a "scheme . . . devised and executed for the specific purpose of defrauding the prospective purchaser by selling [a stock] for more than it was worth."[86]  The

---

[84]    *See* Def. Mem. at 3-4.

[85]    Pl. Mem. at 6.

[86]     *CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 286 (1987).

defendants in *CPC International* did, however, make actionable misstatements[87] —

the question presented was whether some defendants could be liable for fraud even

though the plaintiff relied on misstatements made by other defendants.   At no

point did the Court of Appeals suggest that a defendant could be liable for fraud

even if it made no actionable statement.[88]  *CPC International* is not helpful to

plaintiffs for two additional reasons:  (1) it was decided at the pleading stage as

opposed to summary judgment;[89] and (2) it made no distinction between fraud and

---

[87]    *See id.* at 285-86 ("[I]n furtherance of this scheme, Morgan Stanley
and the individual defendants prepared and distributed a set of false and fictitious
financial projections to plaintiff and others; that these projections, while including
a disclaimer of warranties, also stated that 'Morgan Stanley believe[s] that the
financial and other information contained herein is accurate.'").

[88]    On the contrary, it explained that "[i]n order to state a cause of action
for common-law fraud, it is sufficient for plaintiff to allege that 'defendant
knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and
that the plaintiff was thereby deceived and damaged.'"  *Id.* at 285 (quoting
*Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 406 (1958)).

[89]    *See id.* at 286.  Although the Court of Appeals did not discuss fraud
pleading standards and how they might differ from summary judgment standards,
the Court did specify that it was giving the complaint "its 'most favorable
intendment.'"  *Id.*  Thus, although the Court of Appeals reinstated fraud claims
based on "fraudulent scheme" allegations, it is possible that its holding was
influenced by the same considerations that underlie the group pleading doctrine
(*i.e.* an acknowledgment that prior to discovery, it is difficult for a plaintiff to plead
each defendant's role in a fraudulent scheme with specificity).  *See In re BISYS
Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005).

aiding and abetting fraud.[90]  This latter point supports Morgan Stanley's argument

that a defendant who made no actionable misstatement, can be liable for, at most,

aiding and abetting fraud.[91]  Indeed, plaintiffs' definition of fraud — as including

*any* knowing participation in a scheme to defraud — is so broad that it

encompasses aiding and abetting fraud, thus obliterating the distinction between

the two causes of action.[92]

>        Plaintiffs cite several additional cases for the proposition that a

defendant may be liable under New York law based on its knowing participation in

a scheme to defraud.  But plaintiffs have not cited a single New York case in which

a common law fraud claim against a defendant who made no actionable

misstatement survived summary judgment.  Plaintiffs cite *Danna v. Malco Realty,*

*Inc.* for the proposition that "[l]iability for fraud may be premised on knowing

participation in a scheme to defraud, even if that participation does not by itself

---

[90]    *See CPC Int'l*, 70 N.Y.2d at 285 ("[T]he Appellate Division
determined that these defendants, 'like other agents, can be held liable for aiding
and abetting their principal in the commission of a fraud, but not when the fraud
committed is different from the one they may have believed they were participating
in[.]'  We disagree.") (quoting *CPC Int'l Inc. v. McKesson Corp.*, 507 N.Y.S.2d
984, 989 (1st Dep't 1986)).

[91]    *See* Def. Mem. at 4.

[92]    While plaintiffs' definition of fraud would allow the same conduct to
serve as the basis of a claim for either fraud or aiding and abetting fraud, there is a
difference in the type of knowledge required for each.  *See supra* Part IV.B.

suffice to constitute the fraud."[93]   Yet *Danna*, like *CPC International*: (1) failed to

distinguish between fraud and aiding and abetting fraud; and (2) was a decision on

a motion to dismiss.[94]   Although the other case plaintiffs cite — *Chubb & Son Inc.

v. Kelleher* — was decided on summary judgment, the defendant there admitted to

making a false statement.[95]   In sum, plaintiffs have failed to provide a single

example of a New York fraud claim surviving summary judgment despite the lack

---

[93]     857 N.Y.S.2d 688, 689 (2d Dep't 2008).

[94]     Although the Appellate Division's opinion in *Danna* does not
reference the group pleading doctrine, plaintiffs-respondents' arguments that their
claims should survive a motion to dismiss were based on reasoning identical to that
underlying the doctrine.  *See* Brief for Plaintiffs-Respondents, *Danna v. Malco
Realty, Inc.*, 857 N.Y.S.2d 688 (2d Dep't 2008), No. 2007-07673, 2008 WL
2570591, at *11-12 ("Appellant argues that the lower Court's denial of his motion
to dismiss was in error because Respondents failed to set forth any fraudulent
representation made by Appellant. However, the law is clear that when determining
whether a cause of action for fraud meets the particularity requirements of CPLR
3016(b), the issue is 'simply whether the allegations are set forth in sufficient
detail to clearly inform a defendant with respect to the incidents complained of and
this rule of pleading must not [be] interpreted so strictly as to prevent an otherwise
valid cause of action in situations where it may be impossible to state in detail the
circumstances constituting fraud.' The stated rationale for this is that '[i]t is almost
impossible to state in detail the circumstances constituting a fraud where those
circumstances are peculiarly within the knowledge of the party against whom the
fraud is being asserted.'") (quoting *Caprer v. Nussbaum*, 825 N.Y.S.2d 55, 76 (2d
Dep't 2006) and *Jered Constr. Corp. v. New York City Tr. Auth.*, 22 N.Y.2d 187,
194 (1968)).

[95]     *See Chubb & Son Inc. v. Kelleher*, Nos. 92 Civ. 4484, 95 Civ. 0951,
2010 WL 5978913, at *5 (E.D.N.Y. Oct. 22, 2010) ("Zerring admitted to making
false statements with the intent of inducing Chubb to pay an inflated claim for fire
and water loss.").

26

of any actionable misstatements or omissions attributable to the defendant. Thus, if no actionable misstatement can be attributed to Morgan Stanley,[96] it can be liable for aiding and abetting fraud, but not fraud.[97]

### b.    Whether the Ratings May Be Attributed to Morgan Stanley

In its memoranda of law, Morgan Stanley relies heavily on *Eurycleia Partners, LP v. Seward & Kissel, LLP*[98] to support its argument that the ratings

---

[96]    Whether Morgan Stanley made an *omission* is irrelevant. This is because under New York law, it is well-settled that "'[a]n omission does not constitute fraud unless there is a fiduciary relationship between the parties.'" *Cobalt Partners, L.P. v. GSC Capital Corp.*, 944 N.Y.S.2d 30, 35 (1st Dep't 2012) (quoting *SNS Bank v. Citibank*, 777 N.Y.S.2d 62, 66 (1st Dep't 2004)). I have already determined that Morgan Stanley did not have a fiduciary relationship with plaintiffs. *See* May 4 Order, referring to *King County II*, 2012 WL 1592193, at *14 ("[T]he relationship between the parties is too attenuated to give rise to a fiduciary duty.").

[97]    New York does recognize a cause of action for conspiracy to commit fraud. *See Brackett v. Griswold*, 20 N.E. 376, 379 (1889). The elements of such a claim include: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Barkley v. United Homes, LLC*, No. 04 Civ. 875, 2012 WL 2357295, at *14 (E.D.N.Y. June 20, 2012) (citing *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009)). However, plaintiffs have neither pleaded nor argued that defendants engaged in a conspiracy to commit fraud. Thus, this Court need not consider it. *See Crigger*, 443 F.3d at 237 ("The district court [properly] refused plaintiffs' request to charge the jury on . . . aiding and abetting the fraud . . . because that legal theory was not pleaded in the complaint.").

[98]    849 N.Y.S.2d 510 (1st Dep't 2007).

27

contained in the IMs may be attributed only to the Rating Agencies, not Morgan Stanley.[99]  In *Eurycleia*, plaintiffs were investors asserting fraud claims against a law firm that drafted an offering memorandum for a hedge fund.  The offering memorandum included both legal opinions and representations regarding the fund's investment strategy.[100]  The appellate court granted the motion to dismiss because "plaintiffs [did] not allege that [the law firm] made any representation, fraudulent or otherwise, to them."[101]  The court held that although the legal advice in the offering memorandum could be attributed to the law firm, the portions of the memorandum containing the fund's investment strategy were "representations made by the fund — not [the law firm]."[102]

In a more recent case, *Mateo v. Senterfitt*,[103] a New York appellate court suggested that a party who prepares a document which incorporates actionable misstatements made by a third party may be liable for at most aiding and abetting fraud.  In *Mateo*, plaintiffs alleged that "defendant relied on a

---

[99]    *See* Def. Mem. at 4; Defendants' Joint Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Def. Reply Mem."), at 2, 4.

[100]    *See Eurycleia*, 849 N.Y.S.2d at 511-12.

[101]    *Id.* at 512.

[102]    *Id.*

[103]    918 N.Y.S.2d 438 (1st Dep't 2011).

fraudulent operating agreement supplied to it by [a third party, and] took no further steps to verify the actual ownership of the company in drafting the relevant transactional documents."[104]  The appellate court granted defendant's motion to dismiss the fraud claim, concluding that any misrepresentations in the transactional document were "misrepresentations attributable to [the third party]."[105]  The court in *Mateo* further clarified that

> To the extent plaintiffs contend that defendant made actionable misrepresentations in the transactional documents it drafted by incorporating [the third party]'s misrepresentations into the documents, they are alleging substantial assistance by defendant to aid and abet [the third party]'s fraud.  However, the complaint fails to state a cause of action for aiding and abetting because it does not allege that defendant had actual knowledge of any fraud perpetrated by [the third party].[106]

Thus, under New York law, although some of the statements in the IMs may be attributable to Morgan Stanley, the *ratings* are attributable only to the Rating Agencies that issued them.  Even if Morgan Stanley had actual knowledge that the ratings were false, it could only be liable for aiding and abetting fraud.[107]

---

[104]     *Id.* at 440.

[105]     *Id.*

[106]     *Id.* (citations omitted).

[107]     Morgan Stanley also relies on the recent Supreme Court decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, in which the Court held that under Rule 10b-5, the "maker" of a statement is only the one with "ultimate

This conclusion of law is supported by the following evidence: (1) the IMs indicate that Morgan Stanley is not responsible for and has not verified the information contained in the ratings;[108]  (2) an acknowledgment by plaintiffs' expert on class certification that ratings are "well understood in the market" to be the opinions of the Rating Agencies;[109] and (3) testimony from various plaintiffs that they understood the ratings to reflect the opinions only of the Rating Agencies that issued them.[110]

Plaintiffs nonetheless argue that Morgan Stanley authored the rating report based on an e-mail in which a Morgan Stanley employee says "I attach the Moody's [NIR] (that we ended up writing)."[111]  However, this statement is

---

authority over the statement, including its content and whether and how to communicate it."  131 S. Ct. 2296, 2302 (2011).  I need not consider whether *Janus* has any relevance to plaintiffs' fraud claims because I conclude that, under New York law as interpreted by New York courts, the ratings may only be attributed to the Rating Agencies.

[108]    *See* MS_000014799 at -800 to -801; MS_000097388 at -392 to -394; MS_000646545 at -550 to -551.

[109]    Deposition of Charles C. Cox, plaintiffs' expert on class certification, at 42:15-18 ("Q. Okay. So it's pretty well understood in the market that a rating is a rating agency's opinion as to risk of default, right?  A. I think so.").

[110]    *See* Def. 56.1 ¶ 1.

[111]    6/3/06 E-mail from Rany Moubarak, employee in Morgan Stanley's Fixed Income Division, to Elena Miteva, Executive Director in Morgan Stanley's Fixed Income Division, MS_000418510 at -510.

insufficient as a matter of law to create a genuine issue of fact as to whether the ratings may be attributed to Morgan Stanley.  Although the NIR contained the ratings that Moody's assigned to Cheyne,[112] the statement does not imply that Morgan Stanley authored or assigned the *ratings* as opposed to the report.[113]  Thus, because the ratings cannot be attributed to Morgan Stanley, the fraud claim against Morgan Stanley is dismissed.

## 2.   Rating Agencies

Defendants argue that the credit ratings are opinions which cannot provide the basis of a fraud claim unless they are both disbelieved by the speaker when made *and* false or misleading.[114]  Defendants further argue that plaintiffs cannot prove either.[115]  This argument presents three separate questions: (1) whether credit ratings are opinions or statements of fact; (2) if the ratings are opinions, under what circumstances may they serve as the basis of a fraud claim;

---

[112]   *See* Def. 56.1 ¶ 53.

[113]   Moreover, the NIR itself gives no indication that Morgan Stanley was involved in its authorship.  *See* NIR at MS_000077900 to -911.

[114]   *See* Def. Mem. at 5-8. A statement that is either false or misleading may serve as the basis for a fraud claim under both New York and federal securities law.  *See High Tides, LLC v. DeMichele*, 931 N.Y.S.2d 377, 382 (2d Dep't 2011) (describing fraudulent reports as "false or misleading").

[115]   *See* Def. Mem. at 7-8.

and (3) whether there is a disputed issue of fact as to whether the ratings were false or misleading or disbelieved when made.

### a.   Whether Credit Ratings Are Opinions

Defendants offer testimony from plaintiffs and plaintiffs' expert indicating that plaintiffs understood that the ratings are subjective opinions of the Rating Agencies regarding the creditworthiness of the Cheyne notes.[116]  Plaintiffs dispute that they made any such admissions and offer contrary testimony.[117] However, as all of the cited cases addressing this issue were decided on motions to dismiss,[118] whether the credit ratings are opinions and under what circumstances they are actionable is a question of law, not of fact.

Recently, several New York courts have defined credit ratings not as opinions regarding future valuation but statements analyzing current worth.  In *M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, the Erie County Supreme Court discussed the actionability of credit ratings at length:

---

[116]     *See id*. at 6-7; Def. 56.1 ¶¶ 1, 2.

[117]     *See* Pl. Mem. at 4; Pl. 56.1 ¶¶ 1(a)-(c).

[118]     *See, e.g., In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011); *MBIA Ins. Corp v. Royal Bank of Canada*, No. 12238/09, 2010 WL 3294302 (Sup. Ct. Westchester Co. Aug. 19, 2010); *M&T Bank Corp. v. Gemstone CDO VII, Ltd.* (*M&T I*), No. 7064/08, 2009 WL 921381 (Sup. Ct. Erie Co. Apr. 7, 2009).

> DBSI argues that its alleged misrepresentations, including the credit ratings, the statements by Mr. Whelan and the representations as to HBK's skills, were all opinions and/or predictions and are therefore not actionable. The Court disagrees. The ratings by Moody's and S&P are facts constituting the actual evaluation by reputable independent entities concerning the creditworthiness of the Notes. Plaintiff alleges that these ratings were false because the Defendants provided false information to the ratings agencies. The ratings by Moody's and S&P are not just predictions of future valuation but a present analysis of current valuation. Such ratings have been highly regarded and eagerly sought for years. To characterize them merely as predictions or opinions would undercut the necessary reliability such ratings furnish in the world of credit.[119]

This decision was affirmed by the Appellate Division — although it did not discuss how credit ratings should be defined[120] — and its reasoning has been adopted by at least one other New York court.[121]

In contrast, federal courts have consistently described credit ratings as opinions. In *Fait v. Regions Financial Corp.*, the Second Circuit provided

---

[119]    2009 WL 921381, at *11.

[120]    *See M & T Bank Corp. v. Gemstone CDO VII, Ltd.* (*M&T II*), 891 N.Y.S.2d 578 (4th Dep't 2009).

[121]    *See MBIA*, 2010 WL 3294302, at *29 ("[T]he Court disagrees that the ratings were simply predictions and not actionable and agrees with Justice Curran's reasoning in *M & T Bank Corp.*, [] wherein he held that the alleged misrepresentations concerning credit ratings were not statements of predictions or opinions and instead were 'facts constituting the actual evaluation by reputable independent entities concerning the creditworthiness of the Notes.'") (quoting *M&T I*, 2009 WL 921381, at *11).

guidance for courts faced with the question of whether a representation is an

opinion or a fact:

> [P]laintiff's allegations regarding goodwill do not involve misstatements or omissions of material fact, but rather a misstatement regarding Regions' opinion. Estimates of goodwill depend on management's determination of the "fair value" of the assets acquired and liabilities assumed, which are not matters of objective fact. Plaintiff does not point to any objective standard such as market price that he claims Regions should have but failed to use in determining the value of AmSouth's assets.[122]

Because plaintiffs have not offered any objective standard by which credit ratings

can be evaluated, *Fait* implies that the ratings must be considered opinions. Other

federal courts that have considered the nature of credit ratings have come to the

same conclusion.[123]

---

[122]     *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (citations omitted). Although *Fait* addressed the actionability of statements under federal securities laws, "the elements of common-law fraud in New York are 'substantially identical to those governing [the federal securities laws, and therefore] the identical analysis applies.'" *In re Optimal U.S. Litigation*, 837 F. Supp. 2d 244, 252 (S.D.N.Y. 2011) (quoting *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448, 2005 WL 2385854, at *16 (S.D.N.Y. Sept. 26, 2005)).

[123]     *See, e.g., In re Lehman Bros.*, 650 F.3d at 183 (holding that because ratings issued by rating agencies "speak[] merely to the Agency's opinion of the creditworthiness of a particular security," ratings "should be evaluated under the 'expert' provision of § 11, not under the 'underwriter' provision"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 774-76 (1st Cir. 2011) ("The ratings are *opinions* purportedly expressing the agencies' professional judgment about the value and prospects of the certificates.") (emphasis in original); *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) ("A Moody's credit rating is a predictive opinion,

At first blush, the New York cases appear to be in tension with *Fait*. In reality, there is no conflict — the New York cases do not treat credit ratings as pure statements of either fact or opinion but rather as a hybrid of the two.  These opinions hold that ratings are actionable because they are understood to be statements of creditworthiness based on an analysis of underlying facts conducted by respected ratings organizations.[124]  *Fait* held that opinions may be actionable *if* they are disbelieved when made.[125]  While ratings are not objectively measurable statements of fact,[126] neither are they mere puffery[127] or unsupportable statements of belief akin to the opinion that one type of cuisine is preferable to another.[128]

---

dependent on a subjective and discretionary weighing of complex factors."); *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 Civ. 9888, 2011 WL 536437, at *12 (S.D.N.Y. Feb. 9, 2011) (holding that credit ratings are opinions).

[124]    *See M&T I*, 2009 WL 921381, at *11; *MBIA*, 2010 WL 3294302, at *29.  *Cf. Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011) (holding that certain types of opinion which are mere "puffery" are not actionable in fraud).

[125]    *See Fait*, 655 F.3d at 111-12.  *Accord Merrill Lynch*, 2011 WL 536437, at *12 ("There is an exception to the non-actionable opinion rule in cases where the opinion holder knew the opinion was false or did not hold the opinion expressed at the time it was expressed.").

[126]    *See id.* at 110.

[127]    *See Mandarin Trading*, 16 N.Y.3d at 179.

[128]    *See M&T I*, 2009 WL 921381, at *11.

Ratings should best be understood as *fact-based opinions*.[129]  When a rating agency issues a rating, it is not merely a statement of that agency's unsupported belief, but rather a statement that the rating agency has analyzed data, conducted an assessment, and reached a *fact-based* conclusion as to creditworthiness.  If a rating agency *knowingly* issues a rating that is either unsupported by reasoned analysis or without a factual foundation, it is stating a fact-based opinion that it does not believe to be true.

### b.    When Opinions Are Actionable

Plaintiffs argue that an opinion may be actionable in fraud if *either* the speaker genuinely disbelieves it *or* the opinion is without basis in fact.  In support of this, plaintiffs cite this Court's decision denying defendants' motion to dismiss plaintiffs' fraud claims, in which I said "'[a]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact.'"[130]  The word "or" was not, however, determinative in my prior opinion — plaintiffs had sufficiently pled both that the ratings were misleading *and* that "the Rating Agencies did not genuinely or reasonably believe that the ratings they

---

129    *Cf. Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12 Civ. 1579 (Docket No. 25), at 7 (S.D.N.Y. Aug. 15, 2012) (noting that ratings must be based on accurate facts).

130    *Abu Dhabi*, 651 F. Supp. 2d at 176 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998)).

assigned to the Rated Notes were accurate and had a basis in fact."[131]

Defendants concede that opinions may serve as the basis for a fraud claim,[132] yet argue that they may only do so when they are *both* disbelieved by the speaker *and* false.[133]  In *Fait*, the Second Circuit held that opinions "may be actionable if they misstate the opinions or belief held . . . *and* are false or misleading with respect to the underlying subject matter they address."[134]  In addition, the Second Circuit recently confirmed that the reasoning of *Fait* applies to both section 10(b) and section 11 claims,[135] and it is well-established that

---

[131]    *Id.*  Plaintiffs also cite *ADL, LLC v. Tirakian*, which stated that "even statements of opinion are actionable if they are made in bad faith or are not reasonably supported by the available evidence."  No. 06 Civ. 5076, 2010 WL 3925131, at *12 (E.D.N.Y. Aug. 26, 2010).  *ADL* is inapposite as it was discussing the actionability of opinions in the context of a *negligent misrepresentation* claim, not a fraud claim.

[132]    Defendants do briefly state that "[o]pinions generally cannot provide the basis for a claim of fraud," Def. Mem. at 6, and in support cite to *Mandarin Trading*, 16 N.Y.3d 173.  However, *Mandarin Trading* stands only for the proposition that certain types of opinion which amount to "puffery" are not actionable in fraud.  *Id.* at 179.  Defendants seem to concede this as in the next sentence of their Memorandum of Law, they acknowledge the circumstances in which the Second Circuit has held opinions to be actionable.  *See* Def. Mem. at 6.

[133]    Def. Mem. at 6-7.

[134]    *Fait*, 655 F.3d at 111 (emphasis added).

[135]    *See City of Omaha, Nebraska Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) ("Though *Fait* involved claims under Sections 11 and 12 of the Securities Act of 1933, [] the same reasoning applies under Sections 10(b) and 20(a) of the 1934 Act, as these claims all share a material

opinions interpreting federal securities laws are helpful to courts analyzing New York common law fraud claims.[136]  Moreover, a number of federal courts have held that opinions must be disbelieved when spoken to be actionable under common law fraud in New York.[137]  Thus, the Rating Agencies may only be liable for fraud if the ratings *both* misstated the opinions or beliefs held by the Rating Agencies *and* were false or misleading with respect to the underlying subject matter they address.

### c.   Whether Plaintiffs Have Proof that the Ratings Were Both Misleading and Disbelieved When Made

Defendants argue that "even if the truth or falsity of rating opinions could be evaluated objectively — which it cannot, as a matter of law — plaintiffs'

---

misstatement or omission element.").

[136]   *See, e.g., Marcus v. AT&T Corp.*, 138 F.3d 46, 57 n.2 (2d Cir. 1998) ("[A]ppellants also raise a claim of federal common law fraud, in addition to New York state common law fraud.  Because the standards for fraud are practically identical, we consider these claims together."); *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 10 Civ. 0124, 2012 WL 1994707, at *3 (S.D.N.Y. June 4, 2012) ("The parties agree that the elements of common law fraud essentially mirror those involved in the section 10(b) claims.  Thus, for the same reasons that Plaintiff's section 10(b) claims fail, this claim fails.") (citations omitted).

[137]   *See Arthur Props. S.A. v. ABA Gallery, Inc.*, No. 11 Civ. 4409, 2011 WL 5910192, at *2 n.17 (S.D.N.Y. Nov. 28, 2011) ("[A]n opinion is not actionable unless the person rendering it did not actually hold the stated opinion at the time the statement was made."); *SNCB Corporate Fin. Ltd. v. Schuster*, 877 F. Supp. 820, 826 (S.D.N.Y. 1994) ("[A] statement of opinion is not fraudulent under New York law unless it is not honestly held at the time it was made.").

claims fail because there is no evidence that the ratings of the Cheyne SIV notes were 'wrong' when issued."[138]  Defendants are correct that hindsight may not serve as the basis of a fraud claim and that plaintiffs must offer more than evidence of the SIV's subsequent performance to demonstrate that the ratings were false or misleading when issued.[139]  But plaintiffs have offered the following evidence, which is sufficient to create an issue of fact as to whether the ratings were misleading when issued:  (1) expert testimony that the ratings were not justified by the underlying facts when they were issued;[140] and (2) numerous statements from employees of the Rating Agencies describing how ratings should be calculated and the ways in which the Rating Agencies' practices fell short of that standard.[141]

Plaintiffs have also offered sufficient evidence from which a reasonable jury could infer that the Rating Agencies did not believe the ratings when they issued them.[142]  Plaintiffs have offered a statement from a Moody's

---

[138]    Def. Mem. at 8.

[139]    *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 247 (S.D.N.Y. 2010) ("subsequent writedowns" were insufficient support for plaintiffs' claim that statements of value were false when made).

[140]    *See* Declaration of Sanjiv Das ("Das Decl."), ¶ 6.

[141]    *See* Pl. 56.1 ¶ 1.

[142]    This inquiry is distinct from the scienter inquiry.  *See Fait*, 655 F.3d at 112 n.5 ("Contrary to plaintiff's concern, the standard applied here does not amount to a requirement of scienter. We do not view a requirement that a plaintiff

analyst explaining that a Triple-A rating describes assets that "should survive the equivalent of the US Great Depression, undoubtedly with downgrades but with no loss to Aaa holders."[143]   Nonetheless, in an e-mail, a lead analyst for Moody's observed that there was "no actual data backing the current model assumptions" on the Cheyne deal.[144]   The same analyst admitted that, although the Cheyne SIV contained a high percentage of RMBSs, he had little knowledge of the U.S. RMBS market when he rated Cheyne.[145]   Plaintiffs offer additional statements by Moody's employees — in e-mails, deposition testimony, and internal memoranda — indicating concern with the paucity of data and the adequacy of the models used to

---

plausibly allege that defendant misstated his truly held belief and an allegation that defendant did so with fraudulent intent as one and the same.").

[143]   "The Desired Meaning of Triple-A," Ex. 689 at MDYS ADCB 936594.

[144]   5/20/05 E-mail from David Rosa, Senior Analyst at Moody's, to numerous parties, Ex. 49 at MS_000695506.  The NIR indicates that David Rosa was the "Lead Analyst" behind Moody's ratings of the Cheyne SIV.  *See* NIR at MS_000077900.

[145]   *See* Deposition of David Rosa at 282:23-284:1 ("Q. And at the time you rated the Cheyne SIV you were familiar with the US RMBS market, weren't you, sir?" "A. Not in detail, no. . . .  Q.  Notwithstanding the fact that you understood the Cheyne SIV was going to hold 50 percent, up to 50 percent [Home Equity Loans], your testimony is that you were not familiar with the US RMBS market in detail. Is that right?" "A. That is the — yes, I was not familiar with it in detail, yes.").

40

rate Cheyne and SIVs in general.[146]  Similarly, plaintiffs offer a statement from

S&P's head quantitative analyst for structured finance explaining that the

methodology used to rate the Cheyne SIV was "totally inappropriate."[147]  Plaintiffs

also offer an Instant Message Dialog between two analysts, containing the

following conversation:

> **Shah, Rahul Dilip (Structured Finance — New York):** btw - that deal is ridiculous
> **Mooney, Shannon:** i know right . . . model def does not capture half of the rish
> **Mooney, Shannon:** risk
> **Shah, Rahul Dilip (Structured Finance — New York):** we should not be rating it
> **Mooney, Shannon:** we rate every deal
> **Mooney, Shannon:** it could be structured by cows and we would rate it
> **Shah, Rahul Dilip (Structured Finance — New York):** but there's a lot of risk associated with it — I personally don't feel comfy signing off as a committee member.[148]

---

[146]    *See* Pl. 56.1 ¶¶ 1(f), 1(g).  Because I find that the evidence pertaining to the rating of the Cheyne SIV is sufficient to sustain plaintiffs' fraud claims, I decline to make any ruling at this time regarding the admissibility of evidence pertaining to the rating of other SIVs.

[147]    Summary of Interviews with Kai Gilkes - Former S&P's Quantitative Analyst (Managing Director) in the London Office, Ex. A to Declaration of Jason Rowe in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at 3.

[148]    4/5/07 Instant Message Conversation between Rahul Dilip Shah and Shannon Mooney, PSI-SP-000015 (time-stamps removed and names bolded for clarity).  While the above conversation took place after the Cheyne SIV launched, it is unclear to which deal the analysts are referring. There is an issue of fact as to

And as with Moody's, plaintiffs offer additional e-mails, deposition testimony, and internal memoranda in which S&P employees indicate concern with the paucity of data and the adequacy of the models used to rate Cheyne and SIVs in general.[149]

In sum, plaintiffs have offered sufficient evidence from which a jury could infer that the ratings were both misleading and disbelieved by the Ratings Agencies when issued.[150] Plaintiffs have therefore raised a disputed issue of fact as

_____

whether it discusses Cheyne. Even if it refers to the rating of other SIVs, if such evidence is admissible, a jury could infer from it that S&P was in the practice of issuing ratings that it did not believe were accurate.

[149]     *See* Pl. 56.1 ¶ 1(j). In one striking example, upon receiving pressure from Morgan Stanley to grandfather existing deals, an S&P employee wrote to another S&P employee: "Lord help our fucking scam . . . this has to be the stupidest place I have worked at." *See* 11/23/05 E-mail from Elwyn Wong to Andrea Bryan, Ex. 561.

[150]     *Cf. In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 9, 2012) (dismissing securities fraud claims under sections 11, 12 and 15 based on *Fait* and *City of Omaha* because plaintiffs alleged only that defendants *should have known* that their valuation opinions were false and misleading, not that defendants engaged in "knowing misconduct" by making statements it did not believe were accurate); *Merrill Lynch*, 2011 WL 536437, at *12 ("'[T]here is no factual allegation that indicates the ratings . . . were incorrect at the time offered.' Instead, the complaint suggests that the ratings were improvident. It alleges that, as conditions deteriorated, the Rating Agencies did not properly downgrade ratings after they were issued or that the ratings should have been issued based on different criteria. This line of argument is simply a disagreement, informed by hindsight, with the opinions stated and is not enough to sustain this action.") (quoting *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653, 2010 WL 1473288, at *6 (S.D.N.Y. Mar. 29, 2010)) (additional citations omitted), *aff'd on other grounds*, *Anschutz Corp. v. Merrill Lynch & Co.*, No. 11 Civ. 1305, --- F.3d ---, 2012 WL 3518537, at *12 (2d Cir.

to whether the Rating Agencies made actionable misstatements.

## C.    Scienter

Defendants make the following arguments that summary judgment is appropriate due to lack of scienter: (1) plaintiffs have offered no evidence that any defendant disbelieved the SIV credit ratings; (2) defendants disclosed the risks of investing in Cheyne, thus negating any theory of scienter; (3) fraud cannot be proven in hindsight; and (4) there was no motive for defendants to commit fraud. Defendants' first argument misstates the test of scienter — plaintiffs need not demonstrate that the Rating Agencies disbelieved the ratings when they issued them; rather "[p]laintiffs may satisfy the scienter requirement by producing 'evidence of conscious misbehavior or recklessness.'"[151]

### 1.    Whether the Rating Agencies Had the Required Intent

Defendants argue that to demonstrate scienter, plaintiffs must provide direct evidence that individuals who worked on the Cheyne SIV transaction

---

Aug. 16, 2012) (holding that because plaintiffs did not allege any direct contact with the rating agencies, plaintiffs had failed to allege the existence of a privity-like special relationship — an essential element of a negligent misrepresentation claim under New York law).

[151]    *Gould*, 2012 WL 2924254, at *7 (quoting *ECA*, 553 F.3d at 198).

43

admitted that they believed the ratings were false.[152]  Defendants are incorrect.

*First*, plaintiffs may demonstrate scienter with evidence that the Rating Agencies

issued the ratings recklessly.[153]  *Second*, plaintiffs need only offer evidence from

which a jury could *infer* scienter[154] — indeed, it is the rare defendant who admits to

having had fraudulent intent.  Mindful of this, the Second Circuit has indicated that

courts should be "'lenient in allowing scienter issues to withstand summary

judgment based on fairly tenuous inferences,'" so as not to impermissibly take on

the role of the fact-finder.[155]

Defendants next argue that there is no evidence that those responsible

for issuing the ratings had the requisite state of mind.[156]  In support of this,

---

[152]    *See* Def. Mem. at 9 ("In the millions of pages of documents produced, plaintiffs cannot point to a single instance in which anyone who worked on the Cheyne SIV transaction suggested he or she believed that the SIV ratings were false.  Plaintiffs have simply come up empty.  Nor has any witness in this case — from defendants or plaintiffs or third parties — testified that anyone at the rating agencies expressed any such beliefs concerning the Cheyne SIV.").

[153]    *See Gould*, 2012 WL 2924254, at *7.

[154]    *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'") (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)).

[155]    *In re DDAVP*, 585 F.3d at 693 (quoting *Press*, 166 F.3d at 538).

[156]    *See* Def. Mem. at 11.

defendants offer testimony from members of the ratings committee that the ratings reflected their honestly-held beliefs.[157]  In deciding a motion for summary judgment, however, I cannot assess the credibility of witnesses, nor weigh competing evidence.[158]  Plaintiffs have offered extensive evidence from which a jury could infer that the ratings were either disbelieved when made or issued in a manner that was "highly unreasonable and which represent[ed] an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[159]  For example, in an internal e-mail before the SIV was launched, S&P's lead analyst stated "I had difficulties explaining 'HOW' we got to those numbers since there is no science behind it."[160]  Similarly, in an e-mail, a lead analyst for Moody's observed that there was "no actual data backing the current model assumptions" on the Cheyne deal.[161]  Plaintiffs also present expert testimony

---

[157]    *See* Def. 56.1 ¶¶ 35, 54.

[158]    *See McClellan*, 439 F.3d at 144.

[159]    *Chill*, 101 F.3d at 269 (quoting *Rolf*,  570 F.2d at 47).

[160]    9/6/04 E-mail from Lapo Guadagnuolo to Stephen McCabe, Ex. 148.

[161]    5/20/05 E-mail from David Rosa to numerous parties, Ex. 49 at MS_000695506.

supporting an inference that the ratings were highly unreasonable when made,[162] as well as additional documents and testimony which support not only an inference that the ratings were issued recklessly, but also an inference that those on the ratings committee did not believe the ratings to be accurate.[163]

The parties dispute whether plaintiffs must demonstrate that specific individuals within the Rating Agencies — such as executives or those who worked on the rating committees — had the requisite state of mind.  "To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."[164] Defendants argue that plaintiffs must produce evidence that the "actual speakers" — those on the rating committee — made the alleged misstatement with the requisite state of mind.[165]  Plaintiffs argue that "there is no requirement 'that the same individual who made the alleged misstatement on

---

[162]    *See* Das Decl.

[163]    *See* Pl. 56.1 ¶ 3.

[164]    *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[165]    Def. Mem. at 10.

46

behalf of a corporation personally possessed the required scienter.'"[166]  I have already determined that plaintiffs have proffered sufficient evidence from which a jury could infer that *those on the rating committees* issued the ratings recklessly or without believing the ratings to be accurate.  Thus, there is no need to resolve this dispute at this time.

### 2.   Disclosure of the Risks

Defendants argue that general disclaimers in the offering documents disclosed the risk of loss, and that "'[t]he mere fact of that disclosure undermines any credible theory of scienter,'"[167] because disclosures of potential risks are "inconsistent with a state of mind going toward 'deliberate illegal behavior.'"[168] *First*, the disclaimers in the IMs are attributable to Morgan Stanley, not the Rating Agencies.  *Second*, plaintiffs do not assert that the Rating Agencies hid the *possibility* that the Cheyne SIV could collapse and go into enforcement mode; rather, plaintiffs' claim is that the ratings were false or misleading because they:

---

[166]   Pl. Mem. at 18 (quoting *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006)).

[167]   Def. Mem. at 13 (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 356 (S.D.N.Y. 2011)).

[168]   *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *20 (S.D.N.Y. Sept. 28, 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

(1) misstated the *likelihood* that Cheyne would collapse;[169] and (2) implied that the Rating Agencies had conducted a detailed and fact-based analysis when they had not done so.  The crux of plaintiffs' complaint is that by issuing the top ratings, the Rating Agencies indicated to them that notes issued by Cheyne would have an extremely low probability of default — and that the Rating Agencies did this either recklessly or with the knowledge that the notes would have a much higher risk of default.

### 3.  Hindsight

Defendants assert that plaintiffs' case proceeds from the premise that, because the SIV ultimately collapsed, the ratings must have been false when issued.[170]  It is axiomatic that fraud may not be proven by hindsight and that plaintiffs must provide evidence that the ratings were either highly unreasonable or disbelieved by the Rating Agencies *at the time they were issued*.[171]  However, as

---

[169]   *See N.J. Carpenters*, 2010 WL 1473288, at *6 (holding that "cautionary language" in offering documents would not shield defendants from liability because the "disclosures fail[ed] to make clear the magnitude of the risk").

[170]   *See* Def. Mem. at 13.

[171]   *See Shields*, 25 F.3d at 1129 ("We have rejected the legitimacy of 'alleging fraud by hindsight.'") (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 474-75 (S.D.N.Y. 2010) (granting summary judgment due to a lack of evidence that defendants "connected the dots that plaintiffs now connect" in hindsight).

48

discussed above, plaintiffs have not relied solely on hindsight but rather provided

sufficient evidence that the ratings were actionable misstatements when made.[172]

### 4.    Motive

While a plaintiff need not show a motive to establish scienter,

evidence of a motive to commit fraud can support an inference of fraudulent

intent.[173]  Thus, even were defendants correct that "[t]here is no evidence that

defendants had any motive to commit fraud,"[174] lack of motive would not be fatal

to plaintiffs' fraud claim.  That said, plaintiffs have presented evidence that the

Rating Agencies had incentives to issue top ratings, regardless of whether those

ratings were supportable.[175]  If a given Rating Agency did not issue the top ratings

that Morgan Stanley desired, Morgan Stanley could have taken its business

elsewhere.[176]  An analyst at Moody's acknowledged that ratings on structured

---

[172]     *See supra* Part V.B.2.c.

[173]     *See Tellabs*, 551 U.S. at 325 ("While it is true that motive can be a
relevant consideration, and personal financial gain may weigh heavily in favor of a
scienter inference, we agree with the Seventh Circuit that the absence of a motive
allegation is not fatal.").

[174]     Def. Mem. at 14.

[175]     *See* Pl. 56.1 ¶¶ 8, 9.

[176]     *See* 7/12/04 Letter from Brian M. Clarkson, Executive Vice President
of Moody's, to Jonathan G. Katz, Secretary of the Securities and Exchange
Commission, Ex. 588 at MDYS ADCB 1261874 ("[T]he issuer could take its
business elsewhere *unless* the rating agency provides a higher rating.") (emphasis

financial products such as CDOs and SIVs were "cash cows."[177]  Further, not only

is there evidence that the Rating Agencies' fees would have been significantly

diminished had the Cheyne SIV not closed,[178] but there is also evidence that the

Rating Agencies compromised the quality of their ratings in pursuit of profits.[179]

_____

in original).

[177]    6/8/04 E-mail from Khalid Howladar, analyst in Moody's Structured Finance Group, to others at Moody's, Ex. 676 at MDYS ADCB 998832 ("CDO is the cash cow for the rest of structured."). *Accord* 4/23/10 Memorandum from Senators Carl Levin and Tom Coburn to Members of the Permanent Subcommittee on Investigations, CRDT_RTG_EXH_0000015 at -19 ("From 2004 to 2007, Moody's and S&P produced a record number of ratings and a record amount of revenues, primarily because of RMBS and CDO ratings. . . .  Revenues increased dramatically over time as well. Moody's gross revenues from RMBS and CDOs increased from just over $61 million in 2002 to over $208 million in 2006.  S&P's net annual revenues from ratings nearly doubled from $517 million in 2002, to $1.16 billion in 2007.  During that same period, the structured finance group's revenues tripled from $184 million in 2002, to $561 million in 2007. . . .  Top [Rating Agency] executives were also compensated handsomely.").

[178]    *See* Pl. 56.1 ¶¶ 8(f), 9(h).

[179]    *See* Deposition of Frank L. Raiter, former Managing Director and Head of RMBS Ratings at S&P, at 270:5-11, 271:14-272:7 ("A.  It was a house of cards because they had violated the diversification premise that the CDO concept was based on. . . .  Q. . . .  you responded, well, I just think it's a further indictment that there was a big breakdown between the people that were trying to maximize profits and the people that were trying to maximize the credit ratings methodology and activities. And that the people with the profit motive won. . . . [W]as that testimony accurate?  A.  Yes.").  When Richard Gugliada, S&P's former Global Practice Leader for CDOs, was asked, "[i]f you didn't have the data, and you're a data-based credit rating agency, why not walk away" from rating the deals, he responded: "The revenue potential was too large."  *See* Transcript of *NOW on PBS: Credit and Credibility* (PBS television broadcast, week of 12/26/08), Ex. 96 at 5, *available at* http://www.pbs.org/now/shows/446/transcript.html.

50

Defendants vigorously dispute that they had any motive to commit fraud,[180] just as they vigorously dispute whether there is any evidence that those responsible for the ratings disbelieved the ratings when they issued them.[181]  Yet, with respect to scienter, plaintiffs need only provide evidence from which a jury could reasonably infer that the ratings were made recklessly.  The evidence plaintiffs have provided — coupled with the suggestion that courts should refrain from deciding issues of intent on summary judgment — is enough to create a disputed issue of fact as to scienter.

### D.    Reliance

To survive summary judgment, each plaintiff must provide evidence from which a reasonable jury could infer that the ratings were a substantial factor

---

[180]    *See* Def. Mem. at 14-15.

[181]    *See id.* at 11 ("Plaintiffs now point to inflammatory language plucked out of context from disparate emails, irrelevant testimony on matters and ratings not at issue in this case, and hindsight re-evaluations aimed at improving future processes.").  Indeed, the Rating Agency defendants each submitted separate briefs solely to argue that they lacked the requisite state of mind.  *See* Reply Memorandum of the McGraw Hill Companies, Inc. in Further Support of Its Motion for Summary Judgment; Reply Memorandum of Law of Moody's Investors Service, Inc. and Moody's Investors Service Ltd. in Further Support of Their Motion for Summary Judgment, at 2-3 (referring to plaintiffs' evidence as "out-of-context scraps" and "a driblet of water-cooler gossip").

51

in its decision to invest in Cheyne.[182]  "[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court,"[183]  Generally, "[t]he reliance element does not require complex legal analysis and may be satisfied simply by plaintiff's testimony."[184]

Plaintiffs argue that because some of the key information pertaining to the Cheyne SIV was available to the Rating Agencies but not to investors,[185]

_____

[182]   *See Curiale v. Peat, Marwick, Mitchell & Co.*, 630 N.Y.S.2d 996, 1002 (1st Dep't 1995) ("The representations need not have been the exclusive cause of plaintiff's action in entering the agreement; it is sufficient that they were a substantial factor in inducing the plaintiff to act the way it did.").

[183]   *STMicroelectronics*, 648 F.3d at 81.

[184]   *Gabriel Capital L.P. v. NatWest Fin., Inc.*, 177 F. Supp. 2d 169, 174-75 (S.D.N.Y. 2001).

[185]   *See* 1/6/05 E-mail from Ronan Mellon, employee in Morgan Stanley's Fixed Income Division, to Cheyne and others at Morgan Stanley, Ex. 71 at MS_00656659 ("[D]isclosure is significantly less [in an SIV such as Cheyne] than [in] a typical CDO as many of the specific details are contained in the operating manual which is not made public and can be amended in consultation with the rating agencies."); Review of Structured Investment Vehicles and Introduction to Moody's New Quantitative Model, Ex. 316 at MDYS ADCB 776952 ("Each SIV has a detailed Operations Manual, which provides the genetic blueprint for the SIV.  The operations manual is not a legal document and is not made public. However, compliance with the manual is a necessary, though not sufficient, condition for the maintenance of the ratings."); 6/22/05 E-mail from Peter Fagan, employee in Morgan Stanley's Fixed Income Division, to Erin Morahan, Vice President in Morgan Stanley's Global Capital Markets Division, Ex. 628 at MS_000240237 (in response to a request to send certain information to potential investors in Cheyne: "[n]o, we cannot send the warehouse report to CP investors. It is my understanding that Cheyne [does] not want to show this level of breakdown (i.e. asset by asset) to the CP investors.").

plaintiffs had no choice but to rely on the ratings and thus reliance may be

presumed.[186]  Plaintiffs also argue that reliance may be demonstrated by Moody's

and S&P statements indicating their understanding that investors rely on their

ratings.[187]  While these facts may indicate a *likelihood* that Cheyne's investors

relied on the ratings — particularly because plaintiffs lacked access to information

---

[186]    *See* Pl. Mem. at 27-28.

[187]    *See* 9/30/09 Testimony of Raymond W. McDaniel, Chairman and
CEO of Moody's, before the U.S. House of Representatives Subcommittee on
Capital Markets, Insurance and Government-Sponsored Enterprises, Ex. 688 at 7
("Unlike in the corporate market, where investors and other market participants can
reasonably develop their own informed opinions based on publicly available
information, in the structured finance market, there is insufficient public
information to do so.  Disclosure requirements for publicly offered securities do
not require the public dissemination of sufficient information about the structure or
underlying assets of a securitization to make reliable analysis possible.  Indeed,
under this limited information disclosure model, [Rating Agencies]  must ask for
additional information to analyze and rate securities.  In the absence of sufficient
data, investors are unable to conduct their own analysis and develop their own
independent views about potential or existing investments.  Furthermore, [Rating
Agencies] are practically unable to offer unsolicited ratings and research, which
has the effect of restricting information available to investors and increasing the
potential for rating shopping by issuers."); S&P's CDO Strategic Plan Draft, Ex.
347 at S&P-ADCB 0945549 ("Fundamentally, [investors in CDOs] rel[y] on S&P
for review of the transaction, and for S&P to identify the credit risk (ratings)
associated with the tranches they intend to purchase. They also rely on S&P to
ensure that the ratings assigned remain consistent with the credit quality of the
underlying portfolio and the credit enhancement afforded by the CDO structure
throughout the lifetime of the rated debt.").

available to the Rating Agencies[188] — this is still insufficient to prove substantial reliance.  In denying plaintiffs' motion for class certification, I held that:

> [T]he question of reliance requires hearing from each investor as to what it did, what it relied on when deciding to invest in the Cheyne SIV, and whether it relied substantially on the credit ratings, minimally on the ratings or did not rely on them at all.[189]

Accordingly, I will evaluate plaintiffs' evidence as to whether each plaintiff relied on the ratings in making its investment decision, taking into consideration that each plaintiff lacked access to all the information available to the Rating Agencies.

### 1.   GIB

Defendants argue that GIB could not have relied on the ratings because it decided to invest in Cheyne before the ratings were issued.[190]  S&P issued a "Presale Report" containing its preliminary ratings on May 16, 2005 and rating letters setting forth final ratings on August 3, 2005.[191]  Moody's announced preliminary ratings for the Cheyne SIV on July 29, 2005, and published final

---

[188]   *See Crigger*, 443 F.3d at 234 ("[W]hen matters are held to be peculiarly within defendant's knowledge [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth.") (citations omitted).

[189]   *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 263 (S.D.N.Y. 2010).

[190]   *See* Def. Mem. at 19.

[191]   *See* Def. 56.1 ¶ 38.

ratings in an NIR on August 2, 2005.[192]  Although defendants assert that GIB's

"investment securities approval form" demonstrates that GIB decided to invest in

Cheyne in May 2005,[193] the approval form is unclear as to the precise date on

which GIB made its final determination.[194]  Not only does the form list a number of

dates ranging from May 2005 to October 2005, but the form explicitly mentions

ratings from both Moody's and S&P,[195] indicating that the ratings played a role in

GIB's decision to invest in Cheyne.  Thus, there is a disputed issue of fact as to

whether GIB made a final and binding decision to invest in Cheyne before the

ratings were issued.[196]

      Defendants also argue that because Yaser Humaidan — GIB's Rule

30(b)(6) designee — did not speak to five of the six individuals who approved

GIB's investment and could not recall anything from his conversation with the

---

[192]    *See id.* ¶ 53.

[193]    *See id.* ¶ 59.

[194]    *See* GIB Credit Approval Routing Slip, Ex. 456 at GIB0000029 to - 30.

[195]    *See id.*

[196]    Even if GIB made an initial decision to invest in Cheyne before the final ratings were issued, defendants provide no evidence that GIB made a binding commitment such that, had Cheyne received lower ratings than expected, GIB could not back out.  *Cf. Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) (holding that "a securities transaction occurs when the parties incur irrevocable liability").

sixth, there is no evidence of what GIB considered in making its investment decision.[197]  This ignores Humaidan's testimony that he prepared the internal investment proposal recommending that GIB invest in Cheyne, and that in doing so, he relied on the ratings.[198]  Because a reasonable jury could infer that those who approved GIB's investment decision did so on the basis of an internal investment proposal, Humaidan's testimony is sufficient to create an issue of fact as to whether GIB relied on the ratings.

### 2.    NACF

As with GIB, defendants argue that NACF's decision to invest in Cheyne was made before the ratings were issued.  Byung-Gyu Pahk — NACF's Rule 30(b)(6) designee — testified that NACF approved its decision to invest in Cheyne on June 8, 2005.[199]  There is no evidence as to whether NACF took additional steps between June 8 and the August 3, 2005 launch date of Cheyne to confirm that the information on which it based its investment decision remained accurate.[200]  While Pahk testified at length as to the importance of the ratings in the

---

[197]    *See* Def. Mem. at 19-20; Def. 56.1 ¶ 60.

[198]    *See* Deposition of Yaser Humaidan at 21:10-22:1 ("We relied on the rating of [the Cheyne SIV].").

[199]    *See* Deposition of Byung-Gyu Pahk ("Pahk Dep.") at 386:18-387:3.

[200]    *See id.* at 387:10-14.

decision to invest in Cheyne,[201] NACF's internal "investment evaluation document" does not refer to any rating from Moody's.[202]  Because Pahk testified that he had no knowledge of anyone at NACF viewing or considering a Moody's rating prior to investing in Cheyne[203] — and because NACF has provided no evidence that it was aware of or considered Moody's ratings in making its decision to invest[204] — NACF's claims against Moody's are dismissed.

Although NACF's internal "investment evaluation document" does mention S&P, it refers only to an "expected" rating from S&P.[205]  As described by S&P, provisional ratings are issued "pending receipt of final documentation and legal opinions."[206]  Further, S&P cautions that "[a]ssignment of a final rating is conditional on the receipt and approval by Standard & Poor's of appropriate documentation.  Changes in the information provided to Standard & Poor's could

---

[201]    *See id.* at 13:16-22, 32:9-20, 126:23-129:11.

[202]    *See* DX 520-Pahk at 1; DX 522-Pahk at 1.

[203]    *See* Pahk Dep. at 360:10-362:5 ("Q. . . .  Did NACF receive any reports specifically about Cheyne written by Moody's prior to its investment in Cheyne?  A. I haven't heard that NACF received any document from Moody's prior to investment.").

[204]    *See* Pl. 56.1 ¶ 14.

[205]    *See* Pahk Dep. at 380:22-381:2, 414:20-415:15; DX 520-Pahk at 1; DX 522-Pahk at 1.

[206]    S&P's Rating Definitions, at MDYS ADCB 790158.

57

result in the assignment of a different rating."[207]  Still, NACF's decision to invest

in Cheyne was not irrevocable until August 3, the date on which the SIV launched

and S&P issued its final ratings.[208]  A reasonable jury could infer that NACF relied

on the preliminary rating in making its initial decision to invest, and that had

Cheyne launched with an unexpectedly lower final rating, NACF would not have

consummated its purchase of Cheyne notes.  Thus, a disputed issue of fact remains

as to whether NACF relied on S&P's ratings.

### 3.    SinoPac

SinoPac invested in Cheyne CCNs, which were assigned a Baa2 rating

---

[207]    *Id.*

[208]    *See* Reliance Decl. ¶ 6 ("When ADCB, GIB, GIS, and NACF considered the MCNs, they understood that the final ratings would be the same as the preliminary/provisional A/A3 ratings and that preliminary/provisional ratings are virtually identical to final ratings.  Their investments were not actually consummated until the final ratings were issued on August 3, 2005 — the settlement date of their MCN purchases. Had the final ratings been different, ADCB, GIB, GIS, and NACF would have canceled their trades.").  Declarations are properly considered as evidence on a motion for summary judgment when they set forth specific facts based on a party's personal knowledge.  *See* Fed. R. Civ. P. 56(c)(1) and (4).  *Accord Goolsby v. Carrasco*, No. 09 Civ. 1650, 2011 WL 386986, at *4 (S.D.N.Y. Feb. 3, 2011) ("'Only in certain instances — such as when a declaration states only conclusions and not such facts as would be admissible in evidence — can a court disregard a self serving declaration for purposes of summary judgment.'  This is not the case [where a plaintiff's] declaration sets forth specific facts based upon his personal knowledge. Such information is properly before the Court on a motion for summary judgment.") (quoting *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)).

by Moody's, but which were not rated by S&P.[209]  While SinoPac concedes that

the CCNs were not rated by S&P, it provides evidence that the CCNs were

comprised primarily of rated Cheyne MCNs (along with a small portion of unrated

junior notes) and that SinoPac relied on S&P's high rating of the MCNs when it

decided to purchase CCNs.[210]  This is sufficient to create a genuine issue of fact as

to whether SinoPac relied on ratings issued by both Moody's and S&P.  However,

S&P cannot be liable for SinoPac's losses stemming from the performance of the

CCNs — a product which S&P did not rate.  Instead, SinoPac may only recover

from S&P to the extent it can demonstrate measurable losses stemming from the

performance of the S&P-rated MCNs.[211]

### 4.   Hapoalim

Hapoalim offers the following evidence demonstrating that it relied on

---

[209]    *See* Def. Mem. at 20; Def. 56.1 ¶ 66.

[210]    *See* Deposition of James Chen, SinoPac's 30(b)(6) designee, at 386:16-388:21; Ex. 527 at 1-15 (internal investment approval memorandum and analysis report prepared before SinoPac's investment explicitly states that it relied on the A/A3 credit ratings on the MCNs and the high ratings on the Cheyne SIV's underlying assets).

[211]    This is not to suggest that under all circumstances, a party that purchases a complex asset-backed security may pursue a claim based on fraudulent misrepresentations concerning the assets comprising the security.  I hold only that when an SIV issues both rated notes and unrated combination notes comprised primarily of the rated notes, a purchaser of the combined notes may pursue a fraud claim if the ratings of the underlying notes were fraudulent.

the ratings: (1) testimony that it considered the ratings, and that the ratings served as the basis for the decision to invest in Cheyne;[212] (2) internal guidelines stating that it could rely on AA-AAA ratings which are updated at least once a year;[213] and (3) the investment application prepared before Hapoalim's investment, which explicitly relies on both the A/A3 ratings on the MCNs and the high ratings of Cheyne's underlying assets.[214]  This is sufficient to create an issue of fact as to whether Hapoalim relied on ratings issued by both Moody's and S&P in making the decision that Venus would invest in Cheyne.

### 5.    Postbank

Postbank offers the following evidence that it relied on the ratings in making its decision to invest in Cheyne: (1) testimony from its 30(b)(6) designee

---

[212]    *See* Becker Dep. at 51:16-22, 195:13-196:13 ("Q. Other than the pitch book and the IM, what other documents did Hapoalim consider in deciding whether to invest in the Cheyne SIV?  A. The ratings reports.  Q. Which ratings reports?  A. The new issue reports issued by S&P and Moody's." "Q. Why Cheyne as opposed to some other SIV?  A.  Because the ratings were single A, which was not always the case on other mezzanine notes.").

[213]    *See* Bank Hapoalim International Credit Review Unit (ICRU) Procedures, BHAe0053543 at -550.

[214]    *See* Bank Hapoalim B.M. U.S. Credit Application, BHAe0052548 at -551 to -556 (enabling Venus to invest in "A/A3 rated 10-year mezzanine capital notes issued by [Cheyne]," and requiring that any potential investment of Cheyne "[have] either a deemed rating of at least A by S&P and A3 by Moody's or, in the case of an investment which has an original term to maturity of 90 days or less, A-1 by S&P and P-1 by Moody's").

that it was "particularly interested in the ratings by S&P and Moody," and that "[i]n evaluating the risk, we relied on the A3 and A rating of S&P";[215] (2) the investment approval memorandum prepared in connection with Postbank's purchase, which explicitly relied on and highlighted the A/A3 ratings as "pros" in support of the purchase;[216] and (3) Postbank's own guidelines allowed it to invest only in assets with high ratings.[217]  Defendants counter with evidence that Postbank conducted its own extensive analysis of the transaction, and argue that the ratings could not have been a substantial factor in Postbank's decision to invest given the many other factors it considered.[218]  However, investors did not have access to enough information to conduct a fully informed analysis of Cheyne,[219] and Postbank has offered sufficient evidence to create an issue of fact as to whether it relied on the ratings.

### 6.    Commerzbank

With regard to the MCNs Commerzbank purchased on its own

---

[215]    Deposition of Christian Herter ("Herter Dep.") at 25:23-24, 67:8-11.

[216]    *See* Ex. 433 at PSTBNK0000087.

[217]    *See* Herter Dep. at 147:21-24, ("I can tell you that according to our own guidelines, which are also set forth in handbooks, we are only allowed to invest in investment grade assets.").

[218]    *See* Def. 56.1 ¶¶ 76-78; Def. Mem. at 25.

[219]    *See supra* Part V.D.

behalf,[220] Commerzbank has provided evidence that it relied on ratings from both Moody's and S&P in making its decision to invest in Cheyne.[221]  Thus, there is a disputed issue of fact as to whether Commerzbank relied on the ratings.

### 7.    PSERS

PSERS invested through its advisor, Credit Suisse Asset Management ("CSAM") on whose judgment it relied.[222]  PSERS offered evidence that it had guidelines requiring CSAM to rely on ratings when making investment decisions on PSERS' behalf,[223] and that while only Baa3/BBB ratings were required, "[t]he

---

[220]    Commerzbank's claims based on the MCNs purchased by DAF have been dismissed.  *See supra* Part V.A.3.

[221]    *See* Deposition of Sascha Klaus, Commerzbank's 30(b)(6) designee, at 360:17-362:22, 363:17-365:2 ("Q. Did Ms. Medora identify any specific communications on rating that she considered in choosing to propose this investment?  A. Yeah. The rating . . . . [t]he communication on the rating of the capital notes . . . .  Q. Which rating agency report did [] Ms. Medora tell you that she reviewed in choosing to propose this investment?  [] A. I can only tell you the brand, if you ask which, which documents.  If I recollect from, from my conversation and from — from the file review, was the — the two major — 'major' I should not say.  I have seen Moody's and — Moody's and S&P reports, if I recall correctly.").

[222]    *See* Def. 56.1 ¶ 84; Pl. Mem. at 25.

[223]    *See* Deposition of James Grossman, PSERS' 30(b)(6) designee, at 30:16-18 ("The guidelines were provided as a framework under which [CSAM] was to operate."); Deposition of Christopher Burton, CSAM's 30(b)(6) designee ("Burton Dep."), at 101:15-17 ("As a portfolio manager, we would need to see some sort of rating to make sure we were compliant with guidelines.").

overall weighted-average rating of the portfolio must be A2/A or better."[224]  CSAM

provided conflicting testimony regarding the role that the ratings played in its

analysis.  While CSAM suggested that the ratings *might* have been given some

weight in its own credit analysis,[225] it also testified that the Cheyne credit file

contained ratings from both S&P and Moody's, and that PSERS' guidelines

required that ratings be a relevant factor in CSAM's analysis.[226]  This is sufficient

evidence from which a reasonable jury could infer that CSAM — and by

---

[224]     *See* PSERS Investment Objectives and Guidelines, Ex. 4 (Grossman)
at PSERSe0049960.

[225]     *See* Burton Dep. at 99:14-101:20 ("There was a memo which was
previously described and there was a list of various characteristics of the security.
The rating was one of those characteristics but I'm not aware of how much of a
weight would've been placed on that versus any other characteristic listed on — or
any weight, if at all, was on that characteristic versus other characteristics in that
memo.").

[226]     *See id.* at 95:3-25, 98:3-13 ("Q. What, if anything, did CSAM do
when it selected the Cheyne medium-term notes on behalf of PSERS to fulfill its
duty as a fiduciary with respect to PSERS? What information did — did CSAM
look at to make sure they're fulfilling that duty? [] A. . . . [S]ome of the
information that was — that was used to purchase it is contained in that credit file.
Q. And one of the items that you saw earlier in the credit file were the ratings on
the [Cheyne] medium-term notes, correct?  A. Correct.  Q. And those were rated
AAA by both — by Moody's, correct?  A. Correct.  Q. And rated AAA by
Standard & Poor's, correct?  A. Correct." "Q.   [W]hy should an analyst be aware
of what the ratings are before putting an investment on the approved list?  A. . . .
I'd say it's an important item to — to understand — I guess it's an item that's very
relevant to the investments for a variety of reasons, including sometimes
guidelines, limit, a particular type of — a particular rating.").

extension, PSERS — relied on the ratings.[227]

### 8.     SFT

SFT has provided testimony that "in order to even look at [an investment], it had to be AAA rated," and that SFT "look[ed] at the rating agencies for their AAA rating at first and then look[ed] at the underlying assets that would fall into that category."[228]  Further, SFT provided testimony that "the AAA rating was . . . the gateway or the threshold to meet before you could actually look at the underlying [assets]," and that SFT's Chief Investment Officer mandated that SFT could only purchase AAA-rated securities.[229]  This testimony is sufficient to create an issue of fact as to whether SFT relied on the ratings.[230]

### 9.     FSBA

---

[227]     *See Jay Dees Inc. v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954, 2008 WL 4501652, at *5 (S.D.N.Y. Sept. 30, 2008) ("Reliance need not result from direct communication from defendant to plaintiff. There is no reason why a misrepresentation to the plaintiff's agent does not suffice.").

[228]     Deposition of Phillip N. Picariello, SFT's 30(b)(6) designee, at 181:17-18, 254:24-255:3.

[229]     *See id.* at 255:6-8; 256:5-6.

[230]     Picariello clarified that when he used the phrase "AAA rating," he was referring to ratings issued by both Moody's and S&P.  *See id.* at 185:2-7 ("Highest credit quality means the top rating, and according to S&P and Moody's, that is AAA rated.  So, the AAA rating acts as the gateway to look at the assets within a sector, and then from there the due diligence is done within the different selected assets.").

FSBA invested through an investment advisor, Victory Capital Management ("Victory"), which had "full discretion" to make investment decisions on FSBA's behalf consistent with FSBA's guidelines.[231]   Defendants argue that because Victory's own internal credit rating process gave the ratings no weight, neither it nor FSBA could have relied on the ratings.[232]   However, FSBA's investment advisor testified that ratings were a "significant factor" and the "initial door-opener" before Victory could even consider the MTNs for inclusion in FSBA's portfolio.[233]   As a whole, the evidence supports an inference that Victory *first* relied on the ratings to create a list of investments it could consider, and *then* conducted its own analysis (which did not consider the ratings)  to decide which of those investments to pursue.[234]   Thus, because the evidence supports an inference

---

[231]     *See* Def. 56.1 ¶ 91.

[232]     *See id.* ¶ 92; Def. Mem. at 24.

[233]     Deposition of Dennis Walsh, FSBA's 30(b)(6) designee, at 23:21-25, 79:5-22, 83:21-25, 84:2-11 ("And she would have, you know, read the Moody's and S&P reports to make sure they have the, you know, kind of initial door-opener, that it's A1, P1 to get — to begin her analysis." "Q. [I]s it fair to say that the credit rating agency was a significant factor in the determination whether to pursue any analysis? [] A. Significant is hard to define. If it doesn't have a specific rating, we're not going to go any farther.").

[234]     *See* Deposition of William R. Allen, Victory's 30(b)(6) designee, at 47:5-48:3 ("A. . . . [T]he Cheyne rating was AAA rated, so it fit within those guidelines.  Q. Which guidelines specifically are you referring to?  A. All right. Let's take it word for word.  'At the time of purchase, all investments must carry a program or instrument rating of . . . either Aa3 or higher by Moody's, AA- or

65

that Victory would not have invested in Cheyne if not for the ratings, it is sufficient to create an issue of fact as to whether the ratings were a substantial factor in Victory's selection of the Cheyne SIV as an investment.[235]

### 10.   SEI

SEI is suing on investments made by an investment advisor, Columbia Management Advisors ("CMA").[236]  Defendants provide evidence that CMA expressly disagreed with the ratings,[237] and argue that CMA therefore could not have relied on the ratings in  deciding to invest in Cheyne on behalf of the SEI

---

higher by S&P, or AA- or higher by Fitch.' So I believe it satisfied all three of those. Correct. Okay.  Q. Is it your testimony, Mr. Allen, that the Cheyne medium-term notes that were purchased in connection with the FSBA securities lending arrangement, fell within policy because they were rated . . . AA- or higher by S&P?  A. Yes.  Q. And also, Aa3 or higher by Moody's; is that right?  A. That is correct.").

[235]    Defendants argue that the "substantial factor" test of reliance is essentially a "but for" causation test, Def. Mem. at 16, and indeed, there is some support for this.  *See McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222-23 (2d Cir. 2008) (discussing the question of reliance as a test of "but for" causation). Even applying defendants' suggested standard, the evidence supports an inference that the ratings were a "but for" cause of Victory's decision to invest in Cheyne (*i.e.* but for the ratings, it would *not* have invested in Cheyne).

[236]    *See* Def. 56.1 ¶ 94; Reliance Decl. ¶ 10.

[237]    *See* Deposition of Paul T. Quistberg, CMA's 30(b)(6) designee ("Quistberg Dep."), at 37:14-43:16 ("Q. . . . is it your understanding that the analyst who prepared this cash investments analyst report disagreed with the Moody's opinion? [] A. Yes. In the context of having a different opinion from Moody's.  Q. And did the analyst disagree with the S&P opinion? [] A. Yes."); CMA0000735 at -735.

Funds.[238]  Plaintiffs counter with testimony from CMA that securities would not likely be considered for investment unless they had "Tier 1" ratings.[239]  Plaintiffs also provide evidence that CMA was not authorized to purchase unrated notes.[240]  The evidence does not, however, support an inference that CMA relied on the high ratings issued by Moody's and S&P in making the decision to invest in Cheyne on behalf of SEI.  For one thing, SEI's 30(b)(6) designee testified only that "a rating" — and not necessarily high ratings, or the ratings actually issued by the Rating Agencies — was required before CMA could purchase a note.[241]  For another, CMA testified that: (1) its own analysts did an extensive analysis which did not

---

[238]   *See* Def. Mem. at 24.

[239]   Quistberg Dep. at 256:13-19 ("[I]f a deal . . . were to come to market and not have a Tier 1 rating from Moody's, S&P or an expectation that it couldn't get a rating like that, then it wouldn't be looked at. As a preliminary screen.  Not the only factor, but a substantial factor, in my opinion. It's a preliminary review.").

[240]   *See* Deposition of James F. Smigiel, SEI's 30(b)(6) designee, at 32:25-33:2, 84:25-85:5, 386:21-387:3 ("They could not purchase this note in our funds unless it had a rating attached to it." "[The analysts at CMA are] required to rely on the rating agencies via Rule 2a-7, and in [a] typical scenario there is no access to the underlying collateral so there is very little else they can do." "We need to rely on the ratings to do that since we don't have a look through to the underlying [collateral], so the assumption made there is that a AAA rated subprime securitization is actually, the AAA rating is actually comparable to the U.S. Treasury and has the same potential default as the U.S. Treasury.").

[241]   *See id.* at 32:25-33:2.

67

rely on and was independent of the ratings;[242] and (2) it *could* consider notes which lacked a "Tier 1" rating.[243]  In sum, SEI has provided no evidence that the actual ratings issued by Moody's and S&P were a substantial factor in CMA's decision to invest.  Accordingly, SEI's claims are dismissed.

### 11.  ADCB

Vikas Vijayan — ADCB's 30(b)(6) designee — testified that ADCB's investment committee fully approved the decision to invest in Cheyne on July 18, 2005.[244]  While S&P had issued a preliminary rating by then, Moody's had not.[245]  Still, ADCB has produced the following evidence which supports a reasonable

---

[242]    *See* Quistberg Dep. at 38:1-44:14 ("Q. Do you have an understanding of what the analyst does? [] A. He or she conducts their own independent analysis of credit factors that they deem important to determine the CI4 rating." "Q. And do you consider that ability to reach opinions different from that of the rating agencies to be one of CMA's strengths?  [] A. I view research as a strength, not necessarily forming a different opinion, in and of itself.  Q. But the independence, do you think that's a strength?  [] A. Yes.").

[243]    *See id.* at 253:19-254:10 ("Q. Let's start with the first factor that you mentioned. You said '[the ratings are] an important first screen.' What does that mean?  A. Typical first screen for new issues . . . was to look at — for 2a-7 funds it had to have Tier 1 holdings, the type of issue, issuer coming to market, the size of the issue coming to market, and the ratings.  And usually, the major rating agencies provided an initial indication of what the rating could be.  So if it wasn't deemed to be Tier 1, it likely wouldn't have been looked at. Could have, but unlikely to be looked at. If something came in, for example, at Ba1, BB+, Moody's S&P junk ratings, usually a 2a-7 analyst wouldn't look at that.").

[244]    *See* Deposition of Vikas Vijayan ("Vijayan Dep."), at 146:9-148:9.

[245]    *See* Def. 56.1 ¶¶ 38, 53.

inference that ADCB relied on ratings from both Rating Agencies in deciding to invest in Cheyne: (1) an April 13, 2005 e-mail from Morgan Stanley to ADCB that lists expected ratings from both Rating Agencies;[246] (2) testimony that ADCB relied on the ratings in making its decision to invest;[247] (3) an internal memorandum proposing that ADCB invest in Cheyne and specifically listing the ratings as a criteria;[248] and (4) a declaration stating that although ADCB understood that the ratings on which it based its decision to invest were preliminary, ADCB would not have consummated its investment had Cheyne launched with different ratings on August 3, 2005.[249]   Thus, there is a disputed issue of fact as to whether ADCB relied on ratings issued by both Moody's and S&P.

### 12.   GIS

Defendants argue that there is no genuine issue of fact as to whether GIS relied on the ratings because: (1) GIS decided to invest before the ratings were

---

[246]      *See* 4/13/05 E-mail from Vikrant Bhansali, Executive Director in Morgan Stanley's Fixed Income Division, to Jim Coleman and Vikas Vijayan, employees at ADCB, at MS_000221694 to -696.

[247]      *See* Vijayan Dep. at 25:25-26:3 ("The decision to invest in the Cheyne SIV was actually made based on the ratings of the SIV."), 36:4-6; Deposition of Olivia Birchall, an additional 30(b)(6) designee for ADCB, at 56:15-19, 89:15-23, 115:7-18, 219:2-7, 293:24-294:12.

[248]      *See* ADCB Memorandum re: "Investment Proposal" from Neil Sharp, Head of Investments, Ex. 5 at ADCB00000922 to -927.

[249]      *See* Reliance Decl. ¶ 6.

issued; (2) GIS conducted its own analysis on which it relied; and (3) GIS purchased CCNs, which it knew were not rated by S&P.[250]  As discussed above, none of these facts are fatal to GIS's ability to demonstrate reliance.[251]  In November 2004, Morgan Stanley informed GIS that it was bringing a new SIV to market which was expected to have high ratings from both Moody's and S&P.[252] David Wilson — GIS's 30(b)(6) designee — testified that the initial decision to invest in Cheyne was made in June, 2005.[253]  GIS further asserts that it made its decision based on the preliminary/provisional ratings that it expected the MCNs to have, that its decision was not final until the SIV launched on August 3, 2005, and that it would have backed out had the MCNs not received the expected ratings.[254]

To demonstrate that it relied on the ratings despite conducting its own analysis and even though the CCNs were not rated by S&P, GIS offers testimony that: (1) it purchased MCNs in addition to CCNs; (2) the ratings of the MCNs that

---

[250]    *See* Def. Mem. at 25; Def. 56.1 ¶ 100.

[251]    *See supra* Parts V.D.2, V.D.3, V.D.9.

[252]    *See* 11/1/04 E-mail from Linda Meade, Vice President in Morgan Stanley's Fixed Income Division, to GIS, Ex. 514.

[253]    *See* Deposition of David Wilson ("Wilson Dep."), at 12:9-10 ("I think that was made in around June 2005 and I think the deal settled in around about August 2005.").

[254]    *See* Reliance Decl. ¶ 6

70

the CCN contained were "very important" to its decision to purchase CCNs; and (3) the CCNs contained an MCN to junior notes ratio of 6.5 to 1.[255]  Moreover, as discussed above, investors did not have sufficient information to conduct a full analysis of Cheyne.[256]  Thus, whether GIS relied on ratings issued by both rating agencies is a disputed issue of fact.  However, as with SinoPac, GIS may only recover from S&P on its purchase of CCNs to the extent it can demonstrate measurable losses stemming from the performance of the S&P-rated MCNs contained within the CCNs.[257]

### 13.    SEI Strategies

SEI Strategies has provided testimony that "[t]he rating reports from the credit rating agencies [were] always at the forefront" of its investment decision and that "the ratings opened the door for [SEI Strategies] to . . . even be able to consider this SIV for investment.  [SEI Strategies] would not have looked at it had it not carried those ratings."[258]  SEI Strategies further proffers testimony that it

---

[255]    *See* Wilson Dep. at 9:2-10:8, 12:22-14:18 ("[I]n buying the product, we were very aware of the rating. We were, as I said, we made the decision essentially to buy the equity and also to buy the mezzanine capital notes, so to ensure that we had a sufficient rating for that portfolio.").

[256]    *See supra* Part V.D.

[257]    *See supra* Part V.D.3.

[258]    Deposition of Daisy Lac, SEI Strategies' 30(b)(6) designee, at 120:2-4, 172:6-12.

reviewed the ratings contained in the IMs prior to investing in Cheyne.[259]  This testimony satisfies plaintiff's burden regarding reliance at the summary judgment phase.

### 14.    King County

King County, too, provides testimony that it relied on the ratings in making its investment decision.[260]  Further, King County provides evidence that its investment policies and Washington state law governing its investments required it to rely on the ratings.[261]  Defendants argue that this evidence is insufficient to create an issue of fact regarding King County's reliance in light of:  (1) testimony that King County did no due diligence and spent no time or effort considering its

---

[259]    *See id.* at 435:21-436:11 ("Q. And did you read this portion of the Information Memorandum prior to making your investment in the Cheyne SIV in March of 2007? [] A. Yes.  Q. And you understand that 'this portion' refers to the paragraph that begins, 'The program has been rated AAA by Moody's [and] . . . S&P.' Did you read that sentence when you reviewed the Information Memorandum?  A. Yes.").

[260]    *See* Deposition of Kenneth M. Guy, King County's 30(b)(6) designee, at 72:24-25 ("[T]he communication we relied on was the credit rating, the short-term credit rating and long-term credit rating."); Deposition of Mike Smith, a King County employee involved in the purchase of notes issued by Cheyne, at 12:20-24 ("[T]he most critical item we look at is the ratings by, in this case Moody's and Standard & Poor's, was the most important thing that we relied on in placing the trade.").

[261]    *See id.* at 207:21-209:24.

decision to invest in Cheyne;[262] and (2) evidence that "[a]n expert panel appointed by King County itself found the county's investment process so deficient that it recommended 'emergency' legislative action to strip the county personnel of investment duties without delay, privately describing those investment practices as 'atrocious.'"[263]  While a jury may find such evidence persuasive if it is admissible and presented by defendants at trial, I cannot give it more weight than the testimony offered by King County.[264]  Thus, a genuine issue of fact remains as to whether King County relied on the ratings.

### E.    Loss Causation

Defendants argue that summary judgment is appropriate because "plaintiffs have no evidence, let alone clear and convincing evidence, that 'out of the myriad of factors' that impacted plaintiffs' investments, 'it was the alleged

---

[262]    *See* Def. 56.1 ¶¶ 103, 105.

[263]    Def. Mem. at 26 (citing Def. 56.1 ¶ 100).

[264]    Further, defendants' assertion that King County should have conducted a diligent investigation rather than rely on the ratings is undercut by plaintiffs' declaration that "[r]eliance on ratings was particularly critical and necessary due to the Cheyne SIV's complexity and the limited information available to plaintiffs."  Reliance Decl. ¶ 5. *Accord supra* Part V.D.  As I noted in *King County II*, it is highly relevant to plaintiffs' claims that the Rating Agencies had access to information about the SIV's assets that investors did not.  *See* 2012 WL 1592193, at *10 n.142.

misrepresentations . . . that caused any loss.'"[265]  In support of this assertion,
defendants make four arguments: (1) plaintiffs' losses were caused by an
unprecedented market disruption; (2) at the time of the rating downgrades,
plaintiffs had suffered no loss at all; (3) the risks that materialized and caused
plaintiffs' losses were disclosed; and (4) some of the senior noteholder plaintiffs
have no evidence of damages.

### 1.    The Cause of Plaintiffs' Losses

Defendants assert that plaintiffs' losses were caused by the
unprecedented and market-wide liquidity crisis that began in 2007.[266]  Defendants
buttress this assertion with testimony from plaintiffs describing the liquidity crisis
as a "black swan event," a "100-year flood," and "the largest financial crisis since
the Great Depression."[267]  *First*, as discussed above, according to Moody's, an Aaa
rating describes assets that "should survive the equivalent of the US Great
Depression, undoubtedly with downgrades but with no loss to Aaa holders."[268]

---

[265]    *See* Def. Mem. at 26 (quoting *JSMS Rural LP v. GMG Capital Partners III, LP*, No. 04 Civ. 8591, 2006 WL 2239681, at *3 (S.D.N.Y. Aug. 4, 2006)).

[266]    *See id.* at 28.

[267]    *See* Def. 56.1 ¶ 110.

[268]    "The Desired Meaning of Triple-A," Ex. 689 at MDYS ADCB 936594.

*Second*, "[p]laintiffs need not demonstrate that defendants' misstatements or omissions caused *all* of plaintiffs' losses."[269]  Summary judgment is inappropriate so long as plaintiffs provide evidence "that would allow a factfinder to ascribe some *rough* proportion of the whole loss to [the defendant's alleged] misstatements."[270]

Defendants argue extensively that given the structure of the Cheyne SIV and the nature of commercial paper, the notion that plaintiffs' losses were caused by anything other than the liquidity crisis is "at odds with the evidence, logic and the law."[271]  These arguments are almost identical to those made by defendants in *King County I* in their motion to dismiss.[272]  I considered those arguments at great length and held that:

> To hold that plaintiffs failed to plead loss causation solely because the credit crisis occurred contemporaneously with [the collapse of the SIV at issue in *King County*] would place too much weight on one single factor and would permit S&P and Moody's to blame the asset-backed securities industry when their alleged conduct plausibly caused at least some proportion of plaintiffs' losses.[273]

---

[269]   *King County v. IKB Deutsche Industriebank AG* (*King County I*), 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010) (emphasis in original).

[270]   *Id.* (emphasis in original).

[271]   Def. Mem. at 28-30.

[272]   *See King County I*, 708 F. Supp. 2d at 340-42.

[273]   *Id*. at 343.

Thus, I have already determined that plaintiffs' position on loss causation is both logical and legally viable.

In *King County I*, I allowed that "S&P and Moody's argument may yet prevail at a later stage in this case," and that "[i]f defendants ultimately prove that plaintiffs' losses were, in fact, caused entirely by an intervening event, then defendants will prevail either at summary judgment or at trial."[274]  To prevail on summary judgment, though, it is insufficient for defendants to offer evidence that plaintiffs' losses were caused by the liquidity crisis; rather, defendants must demonstrate that a jury could not reasonably infer from the available evidence that *some* portion of plaintiffs' losses were caused by defendants' fraud.  This is not the case here.  In great detail, plaintiffs proffered factual evidence from which a jury could infer that their losses were a direct and foreseeable result of defendants' false or misleading ratings.[275]  Plaintiffs have also submitted an expert declaration demonstrating that some of their losses are attributable to defendants' conduct.[276]

---

[274]  *Id*. at 345-46.

[275]  *See* Pl. Mem. at 34-37; Pl. 56.1 ¶¶ 29, 39.

[276]  *See* Declaration of Bjorn I. Steinholt, CFA, in Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Steinholt Decl.").  Defendants assert that Steinholt's report "lacks any scientific methodology, [and] should be ascribed no weight." Def. Reply Mem. at 19 n.35.  However, I cannot reach such a conclusion at this point in the litigation.  Defendants also requested "permission to brief the

Defendants counter with admissions from plaintiffs that the Cheyne SIV's losses were market-driven.[277]  However, those "admissions" may have been based on information provided by defendants and Cheyne, all of whom had incentives to blame the market for Cheyne's losses.  Finally, I cannot assess the credibility of witnesses or weigh the evidence on a motion for summary judgment.

### 2.    Whether Plaintiffs Suffered Losses When the Ratings Were Downgraded

Defendants argue that:

> Plaintiffs did not suffer any losses when the Cheyne SIV entered enforcement and its notes were downgraded.  Had the SIV sold its assets at the market prices then, the senior noteholders would have recovered in full, and the capital noteholders would have recovered all or nearly all of their investments as well.[278]

This argument is legally irrelevant and defies common sense.  Rated notes do not trade in an efficient market like shares of publicly-traded stock.[279]  The lack of an

---

issue of whether plaintiffs' two expert reports satisfy Fed. R. Evid. 702 if the Court is inclined to rely on them in deciding this motion."  *Id*.  Because this summary judgment motion comes before the close of expert discovery, neither expert reports nor rebuttal reports have been made available to the Court.  As such, briefing on the admissibility of expert testimony is inappropriate at this time.

[277]    *See* Def. 56.1 ¶¶ 114-125.

[278]    Def. Mem. at 30.

[279]    *See AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) ("[P]roving loss causation in connection with the sale of privately-offered, asset-backed securities such as [the Rated Notes] is a different undertaking from proving loss causation in a typical stock drop case.").

efficient market means that a credit downgrade may not lead to an immediate and measurable drop in the price of the assets.[280]  Rather, a plaintiff may demonstrate loss causation by showing a causal link between the fraud and a "decrease in the amount of money returned to [plaintiffs] over the course of the securitization."[281] Defendants' argument also makes the bizarre assumption that all of the Cheyne SIV's assets could have been liquidated without any liquidation discount.  Unloading the SIV's assets on the market in an unplanned, disorderly sale would have likely resulted in even more losses than plaintiffs actually suffered.[282]

### 3.    Disclosure of the Risks

Defendants argue that summary judgment is appropriate because plaintiffs provided no evidence that the ratings concealed a risk which caused plaintiffs' losses.[283]  The IMs and the marketing books contained the following

---

[280]    It is undisputed that asset-backed securities do not trade in an efficient market and that their present value is therefore difficult to ascertain.  Defendants acknowledge this in making their argument pertaining to the Gryphon notes.  *See infra* Part V.E.4., Def. Reply Mem. at 20 n.37 ("The Gryphon notes do not trade in an efficient market and their potential, future sale prices cannot serve as proxies for value.").

[281]    *AIG Global*, 646 F. Supp. 2d at 403.

[282]    *See* Pl. 56.1 ¶ 35(e); Steinholt Decl. ¶¶ 33-34.

[283]    *See* Def. Mem. at 31.

disclaimers: (1) that the SIV was required to mark its assets to market frequently and thus faced "market risk, which could lead to realized losses if it becomes a forced seller of assets in a declining market environment";[284] and (2) that the SIV could "be forced to sell its assets at below market value in a fire sale, resulting in losses to investors."[285]   For a disclaimer to be sufficient, "'[t]he cautionary words must be specific, prominent, and must directly address the risk that plaintiffs' claim was not disclosed.'"[286]   The issue, then, is whether these disclosures are insufficient because they do not disclose the possibility that the ratings assigned to Cheyne: (1) were unsupported by facts or reasoned analysis; and (2) misstated the likelihood of collapse.   While plaintiffs may have understood that there were certain risks inherent in the structure of SIVs, plaintiffs may *not* have understood that ratings reported by NRSROs such as Moody's and S&P might lack factual support or fail to accurately report the risky nature of this investment.   Thus, a disputed issue of fact remains as to whether the ratings concealed a risk which caused some portion of the plaintiffs' losses.

---

[284]   IM, MS_000014799 at -816.

[285]   Cheyne Capital Management Limited's Presentation to Prospective Capital Note Investors, MS_000221699 at -744.

[286]   *N.J. Carpenters*, 2010 WL 1473288, at *6 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009)).

### 4.  The Senior Noteholders' Evidence of Damages

While defendants do not dispute that the MCN-holding plaintiffs[287] lost one hundred percent of their principal investments,[288] defendants argue that some of the senior noteholder plaintiffs have no evidence of damages.  In support of this, defendants provide evidence that, other than King County and PSERS, all of the senior noteholder plaintiffs exchanged their Cheyne SIV notes for unrated Gryphon notes which are backed by the same collateral that backed the Cheyne SIV.[289]  Defendants argue that because these plaintiffs "continue to hold and receive payments on those notes and will do so for the next 10-30 years," the extent of their losses is speculative and unknowable.[290]  This is a deeply flawed argument.

Plaintiffs provide the following background regarding the Gryphon Notes:

> 2.  On July 17, 2008, all of Cheyne Finance's assets were

---

[287]   The MCN-holding plaintiffs were ADCB, Hapoalim, SinoPac, Postbank, NACF, GIB and GIS.  Commerzbank purchased both MCNs and senior notes.  *See* Declaration of Plaintiffs Regarding Damages in Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Damages Decl."), ¶ 1 n.1.

[288]   *See* Pl. 56.1 ¶¶ 39(a), 39(d), 39(f).

[289]   *See* Def. 56.1 ¶ 137.

[290]   *See* Def. Mem. at 32; Def. 56.1 ¶¶ 138-139.

sold. A vertical slice of Cheyne's portfolio was sold through a competitive auction process that involved 11 bidders. The winning bid came in at 43.9% of notional value. The remaining assets were then sold to Goldman Sachs International ("GSI") at the same price as in the auction. The assets purchased by GSI were then sold to a new entity, Gryphon Funding Limited ("Gryphon"). The Senior Noteholders chose whether to receive cash (from the sale of a vertical slice) or new long-term Gryphon notes (cash flow from the remaining Cheyne assets in Gryphon).

3. King County and PSERS chose the cash option described in ¶ 2, above. Accounting for the cash payment at liquidation and other principal payments, King County and PSERS incurred losses in excess of 30% on their investment in the Cheyne SIV. Following the Cheyne SIV's insolvency, SEI, SEI Strategies, SFTCIF, FSBA, Commerzbank and Butterfield elected to take the Gryphon option.[291]

Defendants' argument that these plaintiffs' damages are unknowable rests on two assumptions: (1) that the Gryphon notes represent a continuation of plaintiffs' investment in Cheyne; and (2) that damages can only be calculated when plaintiffs have liquidated any vestiges of their investment in Cheyne. Neither assumption is correct.

The Gryphon notes' offering memorandum states:

The Gryphon Offers are not part of the Receivership or the Receivership Process. None of SIV Portfolio plc (in receivership), Cheyne Finance LLC or the Receivers [] have any role whatsoever in, and are not in any way affiliated with or

---

[291]    Damages Decl. ¶¶ 2, 3.

responsible for, the Issuer or the Gryphon Offers.[292]

Thus, plaintiffs' possession of the Gryphon notes is not a continuation of their investment in Cheyne, but a new investment concerning a completely different note.  If King County and PSERS invested the cash they received from the sale of the vertical slice in a new investment, the subsequent success or failure of that investment would have no bearing on the measure of the damages they suffered due to Cheyne's collapse.[293]  Likewise, the performance of the Gryphon notes after plaintiffs acquired them is irrelevant to the measure of damages.[294]

---

[292]   Offering Memorandum of Gryphon Funding Limited, at CMA0000995.

[293]   *See Acticon AG v. China North East Petroleum Holdings Ltd.*, --- F.3d ---, 2012 WL 3104589, at *6 (2d Cir. Aug. 1, 2012) ("If we credit an unrelated gain against the plaintiff's recovery for the inflated purchase price, he has not been brought to the same position as a plaintiff who was not defrauded because he does not have the opportunity to profit (or suffer losses) from 'a second investment decision unrelated to his initial decision to purchase the stock.'") (quoting *Harris v. American Inv. Co.*, 523 F.2d 220, 228 (8th Cir. 1975)).  *Accord Harris*, 523 F.2d at 228 ("[W]hat happens after this second decision has no bearing whatsoever on the measure of plaintiff's damages.").

[294]   *See In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003) ("The damages of a purchaser were always understood to be the difference between the purchase price and the true value of the shares (adjusted for any negative causation) as disclosed after the revelation of the fraud to the public, followed by a reasonable period (usually no longer than a week or ten days) during which the market took cognizance of the fraud and the publicly traded price was presumed, under the 'efficient market' hypothesis endorsed by the Supreme Court in *Basic*, to reflect an adjustment for the fraud.  If the plaintiff or absent class member retained the security after the period of time within which the efficient

Defendants also argue that the economic loss of the Gryphon note-holding plaintiffs is not ascertainable because these plaintiffs have yet to sell their notes.  This is not so.  In *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, the Second Circuit held that while "in securities cases there is a presumption that shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold,"[295] such a presumption does not apply to common law fraud claims arising from the sale of a business as opposed to publicly-traded securities.  In *AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*, the court cited to and extended the holding of *Allegheny Energy*, ruling that the presumption is similarly inapplicable to fraud claims arising out of the sale of mortgage-backed securities.  In discussing the adequacy of plaintiffs' loss causation proof on a motion for a new trial under Rule 59, the court reasoned:

> [The] presumption does not apply here, where the plaintiffs do not allege that they suffered losses from selling the Certificates at some reduced price after the fraud was uncovered.  Rather, the plaintiffs allege that they suffered losses when, after the securitization went into early amortization, there was not enough money in the Trust to pay them back.  The plaintiffs purchased the Trust Certificates with the expectation that they would receive a

---

market adjusted for the revelation of the fraud, he or she made a new investment decision, and could not collect damages for any further drop in the market price.").

[295]     500 F.3d at 183.

> stream of interest payments for the life of the securitization and,
> at the end of the securitization, the return of their principal.
> Therefore, the plaintiffs' loss was not a decrease in market price,
> but a decrease in the amount of money returned to them over the
> course of the securitization.[296]

The *AIG Global* court thus held that plaintiffs could recover for an approximation of their losses even though they still held Trust Certificates.[297]

Applying the reasoning of these cases, the damages of the senior noteholders holding Gryphon notes should be reduced by an approximation of the value of the Gryphon notes as of the day plaintiffs acquired them in return for the remainder of their interest in Cheyne. Plaintiffs have provided evidence that the return on the Gryphon notes will not match the expected revenue stream of the senior notes, and that the reduced bid prices for the notes reflect this decreased value.[298] Further, plaintiffs' expert has suggested a method of valuation for the Gryphon notes.[299] I do not now suggest a particular method for calculating the losses of the Gryphon note-holding plaintiffs — it would be inappropriate to make such a determination before the close of expert discovery and full briefing as to the proper method for measuring damages. That said, plaintiffs have provided

---

[296]    *AIG Global*, 646 F. Supp. 2d at 403.

[297]    *See id.*

[298]    *See* Pl. 56.1 ¶ 39(a).

[299]    *See* Steinholt Decl. ¶¶ 35-36.

sufficient evidence to raise a disputed issue of fact as to whether the Gryphon note-holding senior noteholders have suffered measurable economic losses.

### F.   Aiding and Abetting

#### 1.   The Rating Agencies

Because plaintiffs' fraud claims against Morgan Stanley are dismissed, plaintiffs' claims against the Rating Agencies for aiding and abetting Morgan Stanley's fraud must also be dismissed.[300]  To establish that the Rating Agencies aided and abetted each others' fraud, plaintiffs must offer evidence giving rise to a reasonable inference that each Rating Agency had actual knowledge of fraud by the other.[301]  Plaintiffs have provided no evidence that either Moody's or S&P knew what was going on at the other Rating Agency, nor have plaintiffs provided evidence that either Rating Agency provided substantial assistance to the other — and indeed, it would be odd for them to substantially assist each other given that they are competitors.  Accordingly, plaintiffs' claims against the Rating Agencies for aiding and abetting fraud is dismissed.

#### 2.   Morgan Stanley

To avoid summary judgment on the aiding and abetting claims,

---

[300]   *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006).

[301]   *See Winnick*, 406 F. Supp. 2d at 254.

plaintiffs must provide evidence that Morgan Stanley had actual knowledge of the Rating Agencies' fraud.[302]  Where the defendant had no independent duty to plaintiffs, even "ignorance of 'red flags' or obvious warning signs of fraudulent activity cannot establish a [defendant]'s actual knowledge sufficient to support a claim of aiding and abetting fraud."[303]  Despite this high bar, plaintiffs have offered sufficient evidence from which a jury could infer that Morgan Stanley: (1) had actual knowledge of the Rating Agencies' fraud; and (2) provided substantial assistance to the Rating Agencies in perpetrating the fraud.

Plaintiffs have offered evidence suggesting that despite misgivings, Morgan Stanley manipulated the Cheyne SIV modeling process to create the ratings it desired.  Gregg Drennan, Morgan Stanley's lead structurer, wrote that Morgan Stanley had "develop[ed] a new model for the [Cheyne SIV] transaction" and "adapt[ed] and creat[ed] a new form of SIV methodology that was presented to the rating agencies and the client for their approval."[304]  Drennan also described

---

[302]    *See Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007) ("New York law requires that the alleged aider and abettor have 'actual,' as opposed to merely constructive, knowledge of the primary wrong.").

[303]    *Rosner v. Bank of China*, No. 06 Civ. 13562, 2008 WL 5416380, at *8-10 (S.D.N.Y. Dec. 18, 2008).

[304]    Ex. 279 at MS 000558825.

Morgan Stanley as "pushing the envelope" on SIVs.[305]  Morgan Stanley pushed

forward with Cheyne despite misgivings.[306]

Perhaps most relevant is evidence provided by plaintiffs indicating

that Morgan Stanley pressured the Rating Agencies to issue ratings it did not

believe were accurate.  In an e-mail to Drennan, Lapo Guadagnuolo — an S&P

analyst involved in rating the Cheyne SIV — informed Morgan Stanley that S&P

was only willing to assign a BBB rating to the MCNs.[307]  The next day, Drennan

replied to both Guadagnuolo and Perry Inglis — Guadagnuolo's boss — indicating

Morgan Stanley's view that "the position the committee is taking is very

---

[305]     Deposition of Gregg Drennan at 474:4-22.

[306]     *See* 10/19/04 E-mail from Howard Hubler, a former Morgan Stanley mortgage bond trader, to Robert Rooney, employee at Morgan Stanley, at MS_001439223 ("The more I think about [the Cheyne deal] the worse I feel about the risk/ reward that it has.").  Hubler has been widely blamed for a nine billion dollar trading loss at Morgan Stanley — more than has ever been lost by a single trader — stemming from his bets on RMBSs.  *See* Max Abelson, *Howie Hubler of New Jersey:  the Return of a Subprime Villain*, New York Observer, Mar. 24, 2010, http://observer.com/2010/03/howie-hubler-of-new-jersey-the-return-of-a-subprime-villain/.

[307]     *See* 7/22/04 E-mail from Lapo Guadagnuolo to Gregg Drennan, Ex. 72 at S&P-ADCB 0072366.

inappropriate."[308]  S&P acquiesced and assigned the MCNs an "A" rating.[309]

Drennan boasted that Morgan Stanley's efforts "did get us the rating we wanted in

the end."[310]  From this exchange — in combination with the additional evidence

presented by plaintiffs — a jury could reasonably infer that: (1) the Rating

Agencies assigned the MCNs ratings that they did not believe were accurate: (2)

Morgan Stanley had actual knowledge that the Rating Agencies were assigning

ratings they did not believe in; and (3) Morgan Stanley not only substantially

assisted the Rating Agencies in perpetrating a fraud, but actively encouraged them

to do so.  Accordingly, summary judgment on plaintiffs' aiding and abetting fraud

claim against Morgan Stanley is denied.

## VI.   ADDENDUM

Plaintiffs are hereby ordered to show cause, by August 31, 2012, as to

why their negligent misrepresentation claims against the Rating Agencies should

not be dismissed based on the Second Circuit's recent holding in *Anschutz Corp. v.*

*Merrill Lynch & Co.*  Plaintiffs are also ordered to show cause as to why their

---

[308]    *See* 7/23/04 E-mail from Gregg Drennan to Lapo Guadagnuolo and
Perry Inglis, Ex. 72 at S&P-ADCB 0072365.

[309]    *See* 8/3/05 Letter from Perry Inglis to Cheyne Finance PLC, Ex. 284.

[310]    1/20/06 E-mail from Gregg Drennan to Pinar Onur, Morgan Stanley
employee in Fixed Income Research, at MS_001277854 to -855.

negligent misrepresentation claims against Morgan Stanley should not be dismissed in light of my holding that there is no evidence of an actionable misrepresentation that may be attributed to it.[311]

## VII. CONCLUSION

For the reasons set forth above, plaintiffs' claims for fraud against Morgan Stanley and aiding and abetting fraud against the Rating Agencies are dismissed. Further: (1) NACF's claims against Moody's for fraud and Morgan Stanley for aiding and abetting Moody's fraud are dismissed; (2) SEI's and Butterfield's claims are dismissed; and (3) Commerzbank's claims based on DAF's purchase of notes are dismissed. The Clerk of the Court is directed to close this motion (Docket No. 358). A conference is scheduled for September 19, 2012 at 3:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          August 17, 2012

---

[311]    *See supra* Part V.B.1.b.

89

**- Appearances -**

**For Plaintiffs:**

Patrick J. Coughlin, Esq.
Daniel S. Drosman, Esq.
Jessica T. Shinnefield, Esq.
Jarrett S. Charo, Esq.
Darryl J. Alvarado, Esq.
X. Jay Alvarez, Esq.
David C. Walton, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
(619) 231-1058

Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Luke O. Brooks, Esq.
Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
(415) 288-4545

**Additional Attorneys for Plaintiff State Board of Administration of Florida:**

Marc I. Gross, Esq.
Pomertantz Haudek Grossman & Gross LLP
100 Park Avenue
New York, NY 10017
(212) 661-1100

**For Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited:**

James P. Rouhandeh, Esq.
Antonio J. Perez-Marques, Esq.
William R. Miller, Jr., Esq.
Jessica L. Freese, Esq.
Christopher J. Roche, Esq.
Andrew D. Schlichter, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**For Defendants Moody's Investors Service, Incorporated and Moody's Investors Service Limited:**

Joshua M. Rubins, Esq.
James J. Coster, Esq.
Mario Aieta, Esq.
Dai Wai Chin Feman, Esq.
Justin E. Klein, Esq.
Aaron M. Zeisler, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY 10169
(212) 818-9200

91

**For Defendants Standard & Poor's Rating Services and The McGraw-Hill Companies, Incorporated:**

Floyd Abrams, Esq.
Dean I. Ringel, Esq.
Tammy L. Roy, Esq.
Andrea R. Butler, Esq.
David Owen, Esq.
Adam N. Zurofsky, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
(212) 701-3000