UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ABU DHABI COMMERCIAL BANK, et al.,                   :
                                                     :
                                                     :
                                                     :
                                                     :
                 Plaintiffs,                         :
                                                     :   08 Civ. No 7508 (SAS)
                                                     :
              - against –                            :   **ECF Case**
                                                     :
MORGAN STANLEY & CO. INC., et al.,                   :
                                                     :
                                                     :
                 Defendants.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS MORGAN STANLEY & CO. INCORPORATED'S AND MORGAN
STANLEY & CO. INTERNATIONAL LIMITED'S MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 56(c)**

James P. Rouhandeh
Antonio J. Perez-Marques
Paul S. Mishkin
Jessica L. Freese
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000
*Counsel to Defendants Morgan Stanley &
Co. Incorporated and Morgan Stanley &
Co. International Limited*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................... 1

ARGUMENT ....................................................................................... 3

I.   There Was No Special, Fiduciary-Like Relationship Between Morgan Stanley and Any Plaintiff, and Thus No Resulting Duty.................................................... 3

   A.   Express Disclaimers Preclude the Duty Plaintiffs Must Establish ................. 4

   B.   Plaintiffs' Conceded Expertise and Sophistication Pursuant to Rule 144A Precludes Any Finding of a Duty.................................... 6

   C.   There Is No Evidence of Anything Other Than a Standard Arm's-Length Relationship Between Plaintiffs and Morgan Stanley .................................... 8

   D.   Credit Alliance Does Not Apply................................................. 11

II.   Under Anschutz, Morgan Stanley Owes No Duty to Plaintiffs with Which It Had No Contact in Connection with Their Purchase ........................................ 14

III.   Plaintiffs Have Not Identified Any Misrepresentation by Morgan Stanley ............. 16

CONCLUSION............................................................................... 18

# TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE</small>

50-01 Realty LLC v. Brooklyn Fed. Savings Bank,
  2012 WL 1130201 (N.Y. Sup. Ct. Mar. 28, 2012) ...................................................9

Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98 (2d Cir. 2012) ...........................................14

Credit Alliance Corp. v. Arthur Andersen & Co., 493 N.Y.S.2d 435 (1985) ..................11, 12, 13

Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775 (2d Cir. 2003)................................. passim

FHFA v. UBS Ams., 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ...........................................................4

Glanzer v. Shepard, 233 N.Y. 236 (1922) ...................................................................................12

Houbigant, Inc. v. Deloitte & Touche, LLP, 753 N.Y.S.2d 493 (1st Dep't 2003).........................8

HSH Nordbank AG v. UBS AG, 941 N.Y.S.2d 59 (1st Dep't 2012).............................................6

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8 (2d Cir. 2000) ..............................3, 17

In re JWP Sec. Litig., 928 F. Supp. 1239 (S.D.N.Y. 1996) ..........................................................13

Kimmell v. Schaefer, 652 N.Y.S.2d 715 (1996)................................................................... passim

King County, Washington v. IKB Deutsche Industriebank AG,
  863 F. Supp. 2d 288 (S.D.N.Y. 2012)............................................................................3, 4, 6

Mandarin Trading Ltd. v. Wildenstein, 919 N.Y.S.2d 465 (2011)...................................8, 16, 17

MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,
  928 N.Y.S.2d 229 (1st Dep't 2011) .......................................................................................4

In re Merrill Lynch Auction Rate Sec. Litig.,
  2012 WL 1994707 (S.D.N.Y. June 4, 2012) ........................................................................7

Murphy v. Kuhn, 660 N.Y.S.2d 371 (1997) ......................................................................... passim

Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson,
  541 N.Y.S.2d 335 (1989)........................................................................................................3

Parisi v. Metroflag Polo, LLC, 857 N.Y.S.2d 110 (1st Dep't 2008) ...............................................4

Parrott v. Coopers & Lybrand, L.L.P., 718 N.Y.S.2d 709 (2000) ................................ 4, 12, 13, 14

Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.,
    793 F. Supp. 2d 651 (S.D.N.Y. 2011) ........................................................................ 4

Ravenna v. Christie's Inc., 734 N.Y.S.2d 21 (1st Dep't 2001) ...................................... 8

Sabre Int'l Sec. Ltd. v. Vulcan Capital Mgmt, Inc.,
    944 N.Y.S.2d 36 (1st Dep't 2012) ......................................................................... 4, 14

Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,
    148 F. App'x 66 (2d Cir. 2005) ................................................................................. 5

Stewart v. Jackson & Nash, 976 F.2d 86 (2d Cir. 1992) ............................................... 3

Sykes v. RFD Third Avenue 1 Assocs.,
    884 N.Y.S.2d 745 (1st Dep't 2009), aff'd, 912 N.Y.S.2d 172 (2010) ..................... 13

Ultramares Corp. v. Touche, 255 N.Y. 170 (1931) ...................................................... 12

### STATUTES & REGULATIONS

Securities Act Release No. 6806, 53 Fed. Reg. 44,016
    (proposed Nov. 1, 1998) (to be codified at 17 C.F.R. pt. 230) ................................ 7

## PRELIMINARY STATEMENT

Plaintiffs' negligent misrepresentation claim is barred by the "economic loss" doctrine, which prohibits negligence claims for purely economic losses absent a fiduciary-like relationship of trust and confidence so "exceptional" and of "such a nature and caliber" as to impose a duty to speak with care. As a matter of law, there can be no such relationship or duty here for multiple, independent reasons.

*First*, under controlling Second Circuit case law, Morgan Stanley cannot be liable for negligent misrepresentation where, as here, it disclaimed the information contained in the offering materials (including the credit ratings), stating that those statements were not made or verified by Morgan Stanley, that the information was not "necessarily accurate [or] complete" and would not be updated. Morgan Stanley further disclaimed any fiduciary duty to investors. These types of disclaimers preclude plaintiffs' negligent misrepresentation claim under clear Second Circuit authority. If the rule were otherwise – *i.e.*, if a party were powerless to limit its exposure for allegedly inaccurate third-party statements – the economic loss doctrine would fail its core purpose of allowing commercial parties to control the duties they assume. Such a result would be unprecedented and flatly contrary to New York law.

*Second*, it would be a radical departure from existing law to find an "exceptional" relationship of trust and confidence in the context of a purely commercial transaction premised on the *absence* of any such relationship – *i.e.*, a Rule 144A transaction (or its equivalent for foreign investors) pursuant to which investors represent that they are sophisticated and possess the necessary expertise to make investment decisions independently, *without* any dependence on counterparties or need for any affirmative disclosures beyond those specifically solicited by the investors. Morgan Stanley is not aware of any case involving a 144A transaction in which a

court has found a special relationship of the "nature and caliber" required for a negligent misrepresentation claim.  Nor is there any precedent under New York law for the existence of a duty where a plaintiff had the requisite expertise to evaluate and make the investment, let alone where the plaintiff acknowledged that it possessed such expertise.

*Third*, even if the disclaimers and the expertise of the investors were not each independently dispositive – which they are – there is no evidence remotely allowing plaintiffs to demonstrate the requisite "exceptional" relationship.  Morgan Stanley's conduct with respect to plaintiffs is indistinguishable from that of any arm's-length placement agent, and the existence of a claim here would profoundly alter the commercial relationship between all placement agents and investors.  The Second Circuit and New York Court of Appeals have declined to apply a duty to speak with care across the board in the context of commercial relationships and, in fact, have done so only rarely when facts are present that create a special relationship that is the functional equivalent of a fiduciary relationship.  No such facts exist here.

*Fourth*, the Credit Alliance test is inapposite here because it focuses only on the narrow question of who enjoys the protections associated with a pre-established *professional* duty, not whether a duty exists in the first place.

*Fifth*, as to certain plaintiffs, Morgan Stanley had no contact with them whatsoever in connection with their purchase.  Under the Second Circuit's ruling in Anschutz, the absence of direct contact provides yet another reason why these particular plaintiffs cannot establish the special relationship needed for a negligent misrepresentation claim.

## ARGUMENT

**I.**     **There Was No Special, Fiduciary-Like Relationship Between Morgan Stanley and Any Plaintiff, and Thus No Resulting Duty**

As a general rule, the economic loss doctrine bars claims for purely economic losses resulting from alleged negligence in order to prevent "open-ended liability."  See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 16 (2d Cir. 2000).  As both the New York Court of Appeals and the Second Circuit have made clear, a limited exception to this rule may be available under New York law only where a special relationship of trust and confidence (tantamount to a fiduciary relationship) existed between the parties creating a duty of care.  See, e.g., Murphy v. Kuhn, 660 N.Y.S.2d 371, 373 (1997); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003).  Indeed, the Second Circuit has referred to the requisite relationship as indistinguishable from a fiduciary relationship.  See Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992).[1]

The circumstances giving rise to the required relationship are narrow, and plaintiffs face a "heavy burden" in establishing that they exist.  See Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 541 N.Y.S.2d 335, 339 (1989) ("We have defined this duty narrowly, more narrowly than other jurisdictions."); see also Murphy, 660 N.Y.S.2d at 373 (referring to requisite

---

[1] The Court has previously distinguished Stewart as being "part of a line of cases that address future-looking promises" and thus not applicable in light of the Court's finding that plaintiffs alleged a misstatement of present fact.  See King County, Washington v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288, 310 n.165 (S.D.N.Y. 2012) (Scheindlin, J.).  Morgan Stanley respectfully disagrees that Stewart can be distinguished on this basis.  Stewart addressed claims related to statements concerning future intent *and* statements of present fact, and its holding concerning the requisite relationship for a negligent misrepresentation claim applied generally to both types of alleged misstatements.  See Stewart, 976 F.2d at 89-90.  In any event, Morgan Stanley is not aware of any case that has identified and turned on a material difference between a fiduciary relationship and the "special" relationship required for negligent misrepresentation.

"exceptional" duty (quoting Kimmell v. Schaefer, 652 N.Y.S.2d 715, 719 (1996))); Order, Dkt.

No. 404 (May 4, 2012) (incorporating reasoning in King County, 863 F. Supp. 2d 288).  New

York courts have found the requisite relationship to exist between professionals and their clients

for claims akin to malpractice (e.g., alleged violations of professional duties by accountants,

architects, engineers, etc.), see, e.g., Parrott v. Coopers & Lybrand, L.L.P., 718 N.Y.S.2d 709,

711 (2000), but not in ordinary commercial contexts, including those involving sales between

arm's-length counterparties, see, e.g., Sabre Int'l Sec. Ltd. v. Vulcan Capital Mgmt, Inc., 944

N.Y.S.2d 36, 42 (1st Dep't 2012) ("To the extent plaintiff alleges negligent misrepresentation,

defendants may not be held liable because they are not professionals, and had a commercial – not

a special – relationship with plaintiff.").[2]  As the Second Circuit has explained, in New York "the

law of negligent misrepresentation requires a closer degree of trust between the parties than that

of the ordinary buyer and seller in order to find reliance on such statements justified."  Dallas

Aerospace, 352 F.3d at 788.

## A.    Express Disclaimers Preclude the Duty Plaintiffs Must Establish

As the Second Circuit has made clear, the requisite relationship cannot be established in

the commercial context where, as here, the defendant disclaimed any representations.  See, e.g.,

Dallas Aerospace, 352 F.3d at 789.  The written offering materials provided to plaintiffs included

express disclaimers stating, among other things, that Morgan Stanley was not the maker of the

---

[2] See also FHFA v. UBS Ams., 858 F. Supp. 2d 306, 334-35 (S.D.N.Y. 2012); Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc., 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011) (finding no duty where plaintiff was "simply one more customer that relied on the [alleged] misrepresentations"); MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 928 N.Y.S.2d 229, 235 (1st Dep't 2011); Parisi v. Metroflag Polo, LLC, 857 N.Y.S.2d 110, 110 (1st Dep't 2008) (granting summary judgment because defendants were "non-professionals who negotiated an arm's length commercial contract with plaintiffs and had no special relationship with them").

statements in the offering documents, had not "verif[ied]" their contents, "expressly [did] *not* undertake" to provide any updates to the information contained therein or advise investors "of any information coming to [its] attention," and was not acting as the investors' "fiduciary or financial or investment advisor." <u>See, e.g.</u>, Ex. 1[3] at 2-3, 133; Ex. 2 at 4, 58; Ex. 3 at 3-4, 113 (emphasis added); <u>see also</u> Order, Dkt. No. 474, at 30 (Aug. 17, 2012) (finding that "the IMs indicate that Morgan Stanley is not responsible for and has not verified the information contained in the ratings") (citing Ex. 1 at 2-3; Ex. 2 at 3-4; Ex. 3 at 4-5).[4]

The Second Circuit and other courts have repeatedly held that disclaimers of precisely this sort defeat any claim of negligent misrepresentation. For example, in <u>Dallas Aerospace</u>, the Second Circuit held that the defendant could not be liable in negligence for an alleged misstatement regarding the "airworthiness" of an airplane engine it sold, because the defendant had expressly stated that it was making no representations regarding that topic. <u>See</u> 352 F.3d at 789 (distinguishing <u>Kimmell</u> on the grounds that the defendant disclaimed the representations); <u>see also</u> <u>Steed Fin. LDC v. Nomura Sec. Int'l, Inc.</u>, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming dismissal because there was no evidence of a special relationship between the parties, where the defendant had disclaimed any warranties in the private placement memorandum);

---

[3] "Ex." refers to exhibits to the Declaration of James P. Rouhandeh submitted herewith.

[4] Plaintiffs do not dispute that they received and understood these disclaimers. <u>See</u> **ADCB**, Ex. 4 at 89:22-23, 210:3-17; Ex. 5 at 352:3-8; **Butterfield**, Ex. 6 at 413:17-415:13, 419:8-15, 422:24-426:11; **Commerzbank**, Ex. 7 at 151:20-158:5; **FSBA**, Ex. 8 at 221:18-21; Ex. 9 at 28:5-18; **GIB**, Ex. 10 at 238:2-241:24; **GIS**, Ex. 11 at 109:8-14; **Hapoalim**, Ex. 12 at 68:24-25, 105:14-108:25; **King County**, Ex. 13 at 165:7-169:16; **NACF**, Ex. 14 at 275:25-276:7, 284:20-24; **PSERS**, Ex. 15 at 70:11-24, 74:15-19, 76:4-12; Ex. 16 at 4, **Postbank**, Ex. 17 at 166:9-167:4, 169:14-171:20; **SEI**, Ex. 18 at 181:21-182:11, 184:13-185:12; Ex. 19 at 192:5-19; **SEI Strat**, Ex. 20 at 183:20-184:9, 187:20-190:2; **SFT**, Ex. 21 at 180:17-24, 190:14-191:11; **Sinopac**, Ex. 22 at 254:8-255:10.

HSH Nordbank AG v. UBS AG, 941 N.Y.S.2d 59, 76 (1st Dep't 2012) (dismissing claim for lack of a special relationship where parties "agreed that they were dealing with each other at arm's length, [and] that [defendant] was not acting as [plaintiff's] financial or investment advisor").

Unsurprisingly, there is no precedent in the negligent misrepresentation context for imposing on a defendant a duty to do precisely that which it said it would not do – *i.e.*, speak with care on a topic as to which it disclaimed any representations – and certainly not where the only alleged affirmative misstatement is attributable to a third party. There is no basis for creating a new rule here that would deprive parties of the well-established ability to limit the scope of negligent misrepresentation liability through disclaimers. Such a rule would fly in the face of the economic loss doctrine, which, as the Court has held, "protect[s] defendants from disproportionate, and potentially limitless liability," restricts plaintiffs to the "benefits of their bargains," and imposes on defendants only those "obligations bargained for and subsumed within the transaction." See King County, 863 F. Supp. 2d at 302-03.

**B.   Plaintiffs' Conceded Expertise and Sophistication Pursuant to Rule 144A Precludes Any Finding of a Duty**

Plaintiffs' level of expertise and sophistication negates the existence of any duty and independently requires dismissal of plaintiffs' negligent misrepresentation claim. Plaintiffs' expertise is established by their own representations that they were qualified to invest in the Cheyne SIV, which was limited to "qualified purchasers" ("QPs") and "qualified institutional buyers" ("QIBs").[5] Plaintiffs' conceded expertise precludes any finding of a duty. See, e.g.,

---

[5] See Ex. 2 at 1, 58; Ex. 3 at 1, 113 (investors represented that they are QPs and QIBs by requesting and receiving the Information Memorandum); Ex. 1 at 17-18, 104-12 (analogous representations for foreign investors); see also Ex. 1 at 2, Ex. 2 at 4, Ex. 3 at 3 (purchase was

Dallas Aerospace, 352 F.3d at 789 (plaintiff "cannot claim it relied on [defendant's] special expertise because it is clear that [plaintiff] itself had the relevant expertise at issue").

More generally, it would be contrary to the fundamental characteristics of the relationship between a sophisticated investor and a placement agent in a Rule 144A or similar foreign private offering to find that a duty of care was owed to the investor. The whole point of a Rule 144A transaction is that it is limited to sophisticated investors who represent that they have the requisite expertise and are fully capable of making investment decisions on their own without the full panoply of disclosures otherwise required by the securities laws. See Securities Act Release No. 6806, 42 SEC Docket 76, 53 Fed. Reg. 44016 (Nov. 1, 1998) (Rule 144A seeks to identify investors who "can be conclusively assumed to be sophisticated," have "extensive experience," and are "fully able to fend for themselves"); In re Merrill Lynch Auction Rate Sec. Litig., 2012 WL 1994707, at *5 (S.D.N.Y. June 4, 2012) ("QIB's are presumed to be sophisticated investors capable of fending for themselves in the marketplace." (internal quotations omitted)). It would be a dramatic departure indeed from existing law if a Rule 144A transaction – which epitomizes self-reliance and arm's-length dealing – could somehow form the basis of an "exceptional" relationship premised on an unusually high degree of dependence on one's counterparty. Simply

_____

acknowledgment that investors had made "such investigation and evaluation of the creditworthiness of the Issuer as it deems appropriate"); Ex. 1 at 18, Ex. 2 at 20, Ex. 3 at 23-24 (Information Memorandum stated expressly that investors should possess sufficient "expertise" and "knowledge and experience" to analyze and assess the investment, "have access to, and knowledge of, appropriate analytical tools to evaluate" the investment, and "understand thoroughly the terms of the Notes.") Beyond plaintiffs' representations and acknowledgments in the context of this transaction, their basic profiles further confirm their sophistication. See generally Ex. 23, Expert Report of Brian G. Cartwright (identifying and relying upon evidence of plaintiffs' sophistication). Notably, several plaintiffs supplemented their own expertise with the services of highly experienced outside advisors retained to assist with the investment. These advisors were: Credit Suisse (PSERS), Ex. 15 at 27:3-14; 70:4-15; CMA (SEI), Ex. 18 at 48:22 – 49:17; NZ Funds (GIS), Ex. 11 at 62:10-63:4; and Victory Capital Management (FSBA), Ex. 8 at 115:20-116:10; 134:13-17.

stated, Rule 144A transactions are the antithesis of a "special relationship" transaction, and Morgan Stanley is not aware of any case where the two have been found to coexist.[6]

### C.    There Is No Evidence of Anything Other Than a Standard Arm's-Length Relationship Between Plaintiffs and Morgan Stanley

Morgan Stanley's disclaimers, the expertise of the plaintiffs, and the Rule 144A context are each independently sufficient to defeat plaintiffs' negligent misrepresentation claim, and *a fortiori* fatal to plaintiffs' claim when considered together.  But even if that were not the case, plaintiffs cannot begin to identify evidence establishing the requisite "exceptional" duty.

As held by the New York Court of Appeals, a plaintiff attempting to establish negligent misrepresentation must demonstrate based on a "high level" of evidence that there is something sufficiently *different* about the parties' relationship, as compared to a typical commercial transaction, such that the defendant can be said to have assumed a fiduciary-like role.  If not, the claim fails.  See Murphy, 660 N.Y.S.2d at 374 (1997) (dismissing claim at summary judgment where the record presented "only the standard consumer-agent insurance placement relationship, albeit over an extended period of time," and thus did not satisfy the "high level required to recognize the special relationship threshold that might superimpose on defendants the initiatory advisement duty, beyond the ordinary placement of requested insurance responsibilities"); see also Houbigant, Inc. v. Deloitte & Touche LLP, 753 N.Y.S.2d 493, 495 (1st Dep't 2003) (no

---

[6] To the extent plaintiffs allege that their own self-proclaimed expertise was insufficient in light of alleged "special expertise" of Morgan Stanley, such a showing would be insufficient as a matter of law.  See Mandarin Trading Ltd. v. Wildenstein, 919 N.Y.S.2d 465, 471 (2011) (defendant's "expertise alone cannot create a special relationship where otherwise the relationship between the parties is too attenuated"); Ravenna v. Christie's Inc., 734 N.Y.S.2d 21 (1st Dep't 2001) (dismissing negligent misrepresentation claim because the parties did not have a special relationship of trust and confidence, despite allegations that seller had superior expertise concerning the painting at issue and conveyed its information directly to plaintiff).

liability where the representation was made "in the context of any audit" rather than "undertaken pursuant to any duty owed toward [plaintiff]"); 50-01 Realty LLC v. Brooklyn Fed. Savings Bank, 2012 WL 1130201, at *5 (N.Y. Sup. Ct. Mar. 28, 2012) (lack of "longstanding relationship of trust and confidence with [defendant] *prior to* the transaction at issue" belies existence of special relationship (emphasis added)).

Here, there is no evidence of any relationship between Morgan Stanley and any plaintiff that was different from a standard arm's-length relationship.[7]  Indeed, the only evidence is to the contrary.  Plaintiffs' negligent misrepresentation claim is based on Morgan Stanley's alleged dissemination of information as one of the placement agents for the Cheyne SIV, specifically, its passing along of allegedly false statements of the credit rating agencies in relation to the sale of the Cheyne notes.  (See NAC ¶¶ 187, 226.)  If providing information memoranda or other materials relating to a sale of securities were sufficient to raise a triable question on plaintiffs' claim, then every placement agent would owe fiduciary-like duties to every prospective investor with which it deals, as would any other seller of a product that provides information to prospective purchasers.  That is, of course, not the law.  See, e.g., Murphy, 660 N.Y.S.2d at 373-74.  Plaintiffs must, but cannot, identify evidence *distinguishing* Morgan Stanley's relationship with *each of them* from that of a typical commercial, seller/purchaser, placement agent relationship such that there is evidence of "some identifiable source of a special duty of care" based on the "nature and caliber" of each individual plaintiff's alleged relationship with Morgan Stanley which could be found to give rise to an "exceptional duty" of care.  See id.  No such evidence exists.

---

[7] In fact, as to some plaintiffs, there is no evidence of *any* communication whatsoever, which alone precludes the finding of a duty.  See infra II.

Furthermore, notably absent from the facts here is anything resembling the type of affirmative conduct by a defendant that has been found on rare occasions to constitute exceptional circumstances sufficient to convert an otherwise arm's-length commercial relationship into the type of relationship necessary to confer a duty of care.  For example, in Kimmell v. Schaefer – which has been subsequently limited to its facts by the New York Court of Appeals, Murphy, 660 N.Y.S.2d at 373-74, and the Second Circuit, Dallas Aerospace, 352 F.3d at 788-89 – the court considered the defendant's solicitation of a prospective investor for a business venture and held that a "special relationship" existed under the unique circumstances of that case only because the defendant actively "*urged plaintiffs to review and rely*" on his recommendation to invest, "*personally represented*" that the project would generate income, and personally assured plaintiff that he would "*provide hot comfort*" should the plaintiff have any reservations about investing.  Kimmell, 652 N.Y.S.2d at 719-20 (emphasis added).

All this stands in sharp contrast to the facts here.  There is no evidence that Morgan Stanley affirmatively encouraged plaintiffs to rely even on the ratings, much less on its own statements, in deciding whether to invest in the Cheyne SIV.  Morgan Stanley did not give plaintiffs cold comfort, let alone "hot comfort."  Nor did Morgan Stanley personally "guarantee" the investment – to the contrary, the offering documents contained disclaimers which expressly cautioned plaintiffs *against* relying on any statements included therein, including specific warnings about any reliance on the credit ratings, and explicitly stated that Morgan Stanley was not "guarantee[ing]" the "success" of the Cheyne SIV or the accuracy of the information that it passed to plaintiffs in its role as placement agent.  See, e.g., Ex. 1 at 18, Ex. 2 at 58, Ex. 3 at 113; see also Ex. 1 at 87, Ex. 2 at 39, Ex. 3 at 15 ("Ratings are not a recommendation to buy or sell or hold a security.  An explanation of the significance of such credit ratings may be obtained from

10

the Rating Agencies furnishing the same.  These ratings are subject to revision or withdrawal at any time, and there is no assurance that they will remain unchanged.").

In fact, this case falls squarely within the four corners of the Second Circuit's decision in Dallas Aerospace.  As in Dallas Aerospace, there are no allegations or evidence here that Morgan Stanley itself made a statement it expected plaintiffs to rely on, let alone one that Morgan Stanley "represented" as "reasonable," or that Morgan Stanley provided "hot comfort." These are the very factors present in Kimmell (where a duty was found), that the Second Circuit noted were not before it in Dallas Aerospace (where no duty was found to exist).  352 F.3d at 789.  As the Second Circuit further explained in Dallas Aerospace, where, as here, the defendant disclaimed the representation at issue, there can be no special relationship and the exception permitted in Kimmell is inapplicable.  Id. at 788-89.  Kimmell thus has no application to the facts here, which far more closely resemble those of cases that have distinguished Kimmell and restricted its holding to its unique circumstances.  See, e.g., Dallas, 352 F.3d at 788-89; Murphy, 660 N.Y.S.2d at 373-74.

### D.    Credit Alliance Does Not Apply

Plaintiffs also cannot rely on the test set forth in Credit Alliance Corp. v. Arthur Andersen & Co., to establish the required "exceptional" relationship and resulting duty.  493 N.Y.S.2d 435 (1985).  Credit Alliance deals with a narrow question not applicable here: whether, and to what extent, a *professional's* duty to its direct client *extends* to other parties not in privity with the professional.  The starting point for the Credit Alliance test is a professional relationship that inherently carries a duty of care.  Where, as here, the only relationship at issue is an ordinary commercial sale transaction presumed *not* to carry any duty, the Credit Alliance test has no application.

The narrow focus of Credit Alliance is evident from the origins of the test, the way it is used and cited by courts, and the nature of the test's inquiry.  Credit Alliance itself addressed whether an accountant's professional duty owed to its client extended to third parties who received a copy of the accountant's report and relied on it to their detriment.  493 N.Y.S.2d 435 (1985).  The New York Court of Appeals surveyed past case law and formulated a three-part test for determining whether parties not in privity with the accountant could nevertheless sue for breaches of the accountant's duty of care to a party in privity, focusing on the accountant's knowledge and intent regarding who would receive its report and for what purpose, and whether there was conduct "linking" the accountant to the third parties.  Id. at 439-43.[8]  Subsequent cases have expanded Credit Alliance to other professions, but have retained its focus on professional duties and how far those duties extend, as opposed to the question here, whether any duty exists in the first place.  See, e.g., Parrott, 718 N.Y.S.2d at 711 ("Although this rule first developed in the context of accountant liability, it has applied equally in cases involving other professions."); Sykes v. RFD Third Avenue 1 Assocs., 884 N.Y.S.2d 745, 748 (1st Dep't 2009) (same), aff'd, 912 N.Y.S.2d 172 (2010).

---

[8] The doctrine established by Credit Alliance was derived from the seminal cases of Ultramares Corp. v. Touche, 255 N.Y. 170 (1931), and Glanzer v. Shepard, 233 N.Y. 236 (1922).  Those cases concerned whether a defendant could be liable to third parties for negligent preparation of information in the course of performing professional services to its client.  See Ultramares, 255 N.Y. 170 (public accountant balance sheet certification); Glanzer, 233 N.Y. 236 (public weigher certification).  The three-part test adopted by Credit Alliance asks whether the professional was "(1) aware that [its professional work product was] to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) [whether] there [was] some conduct on the part of the [defendant] linking [it] to that party or parties, which evinces the [defendant's] understanding of that party or parties' reliance."  Credit Alliance, 493 N.Y.S.2d at 443.

Application of <u>Credit Alliance</u> outside this narrow context would not only be contrary to its well-understood purpose, but would also conflict with New York's no-duty rule for arm's-length commercial transactions.  By focusing on the defendant's knowledge and intent regarding the scope and purpose of information dissemination, as well as conduct merely "linking" the defendant to the plaintiff, the <u>Credit Alliance</u> test never asks the key question posed by the Court of Appeals in <u>Murphy</u> and <u>Kimmell</u>:  Is there something fundamentally different about the relationship at issue from that of a standard arm's-length commercial transaction?  Arm's-length commercial counterparties routinely share information for specifically known and intended purposes, and are "linked" to one another by any interactions necessary to their commercial dealings.  The <u>Credit Alliance</u> test is thus not capable of distinguishing a standard arm's-length relationship from a "special" relationship, which only underscores that it was never intended for that purpose.  Tellingly, <u>Murphy</u> and <u>Kimmell</u> do not cite <u>Credit Alliance</u> in analyzing whether a duty arises in the context of a commercial transaction.

Reliance on <u>Credit Alliance</u> here would be further anomalous because the test is universally characterized as analyzing whether a "near privity" or "privity-like" relationship exists, such that the traditional requirement of actual privity is dispensed with.  <u>See, e.g.</u>, <u>In re JWP Sec. Litig.</u>, 928 F. Supp. 1239, 1253 (S.D.N.Y. 1996); <u>Parrott</u>, 718 N.Y.S.2d at 711-12.  It would only make sense to inquire whether a relationship is "privity-like" if the existence of actual privity would establish a duty, as in the case of a professional who owes a duty of care to his or her client.  In a buyer/seller or other commercial context, however, the existence of privity does not establish any duty, and thus the inquiry is misplaced.  Indeed, if privity were sufficient to create a duty, then a duty would arise in every commercial transaction, which is plainly not the law.  <u>Sabre</u>, 944 N.Y.S.2d at 42.

13

**II.**     **Under Anschutz, Morgan Stanley Owes No Duty to Plaintiffs with Which It Had No Contact in Connection with Their Purchase**

The Second Circuit recently considered the issue of whether a special relationship existed between two parties that did not have direct contact in connection with the alleged misrepresentation.  See Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98 (2d Cir. 2012).  The Second Circuit explained that, without direct contact between defendant and plaintiff, the test for the required relationship underlying a negligent misrepresentation claim would not be "remotely" satisfied.  Id. at 114-15.  Accordingly, negligent misrepresentation claims by plaintiffs who had no contact with Morgan Stanley in connection with their purchases of the Cheyne SIV securities fail as a matter of law.

There is no evidence that Morgan Stanley had any direct contact with the following plaintiffs in the context of their purchases, and there is affirmative evidence, including admissions from the plaintiffs themselves, indicating that there was no such contact:

- ***Butterfield***:  Butterfield Money Market Fund ("BMMF") purchased its Commercial Paper through Merrill Lynch and Barclay's, not Morgan Stanley.  See Ex. 24; Ex. 25; Ex. 6 at 547:2-8; 550:13-15).  Butterfield conceded that it knows of no conversations with Morgan Stanley concerning the Cheyne SIV (Ex. 6 at 64:7-10; 66:24-67:6; 67:7-14) and could point to no communication from Morgan Stanley upon which Butterfield Asset Management allegedly relied in making its investment decision (Ex. 6 at 65:20-25).  When asked whether Morgan Stanley had *anything* to do with its decision to invest in the Cheyne SIV, Butterfield simply responded:  "*I don't know*."  (Ex. 6 at 67:15-21.)

- ***King County***:  King County purchased its Commercial Paper through Lehman Brothers, not Morgan Stanley.  (Ex. 13 at 29:4-6.).  King County conceded that it had no communications with Morgan Stanley before investing in the Cheyne SIV (Ex. 26 at 71:17-73:3; Ex. 13 at 30:8-17), that Morgan Stanley had *nothing* to do with its decision to invest in the Cheyne SIV (Ex. 13 at 32:5-11), and that it was not even aware of Morgan Stanley's general involvement with the Cheyne SIV (Ex. 13 at 29:7-30:7).  Moreover, Morgan Stanley was not on King County's approved dealer list at the time of its Cheyne SIV investment.  (Ex. 13 at 30:24-31:3.)

14

- **FSBA**:  FSBA, through its investment advisor Victory Capital Management, purchased its Cheyne MTN through Merrill Lynch, not Morgan Stanley.  (Ex. 9 at 48:24-49:4.)  FSBA could not identify any communication that it had with Morgan Stanley in connection with the Cheyne SIV (Ex. 8 at 225:22-226:6), nor could its investment advisor Victory identify any communications concerning FSBA's investment in the Cheyne SIV MTNs (Ex. 9 at 21:16-22:25).

- **PSERS**:  PSERS, through its investment advisor Credit Suisse Asset Management ("CSAM"), purchased its Cheyne MTNs from Barclays, not Morgan Stanley. (Ex. 27 at -304.)  PSERS admitted that it was not aware of any communication with Morgan Stanley about the Cheyne SIV.  (Ex. 15 at 67:7-11.)  PSERS also acknowledged that it was not aware of any communication that its investment advisor CSAM had in connection with its purchase of the Cheyne CP (Ex. 15 at 158:22-161:21), and CSAM testified that it could not identify any statement by Morgan Stanley upon which it relied in making its investment decision for the PSERS investment (Ex. 28 at 76:2-16.)  Indeed, PSERS acknowledged that prior to the commencement of this litigation, it did not have any understanding as to Morgan Stanley's role in connection with the Cheyne SIV.  (Ex. 15 at 160:19-24.)

- **SEI Strategies**:  SEI Strategies purchased its Cheyne notes through Barclays, not Morgan Stanley.  (Ex. 18 at 79:3-79:8.)  SEI Strategies has conceded that the individuals who made its investment decision had no communications with Morgan Stanley regarding the investment.  (Ex. 18 at 104:12-15; Ex. 20 at 8:14-9:11.)  Indeed, SEI Strategies admits that Morgan Stanley had nothing to do with its decision to invest in the Cheyne SIV.  (Ex. 20 at 9:12-9:17; Ex. 29 at 492:21-493:10.)  More specifically, SEI Strategies concedes that it understood that Morgan Stanley had not verified the information in the Cheyne Information Memoranda ("IM") (Ex. 20 at 186:13-187:5), was not making any representation as to the IM's accuracy or completeness and did not accept any liability for information contained in the IM (Ex. 20 at 187:20-188:4) or any responsibility for updating that information during the life of the SIV (Ex. 20 at 188:16-190:2), and did not undertake any responsibility to review the SIV during its lifetime or provide information to investors that came to its attention (Ex. 20 at 190:15-191:2).  SEI Strategies further conceded that it understood that neither Morgan Stanley nor the other placement agents were recommending that SEI Strategies purchase the Cheyne SIV notes.  (Ex. 20 at 183:12-184:9.)

- **SEI**:  SEI is suing based on notes purchased through Barclay's, Merrill Lynch, and Lehman Brothers, not Morgan Stanley.  (Ex. 18 at 79:9-13.)  SEI admits that it is not aware of any communications that its investment advisor, Columbia Management Advisors ("CMA") had with Morgan Stanley in connection with its Cheyne SIV investment.  (Ex. 18 at 104:16-105:12.)  Nor could CMA itself identify any communication that it had with Morgan Stanley in connection with SEI's investment in the Cheyne SIV notes.  (Ex. 19 at 82:24-83:14.)

- ***SFT***: SFT is suing based on Cheyne MTNs purchased by its investment advisor ESEC Lending through Barclay's, not Morgan Stanley. (See Ex. 30.) SFT could not identify any statement by Morgan Stanley on which it allegedly relied in deciding to invest in the Cheyne SIV. (Ex. 21 at 65:23-67:21.) SFT further admitted that the IM disclosed that Morgan Stanley was not recommending the investment and that Morgan Staley had not verified the information contained in the IM or reviewed the SIV's financial condition. (Ex. 21 at 186:23-194:15.)

## III.   Plaintiffs Have Not Identified Any Misrepresentation by Morgan Stanley

Even if plaintiffs could establish the "exceptional" duty required for negligent misrepresentation, which they cannot, plaintiffs' negligent misrepresentation claim fails because they do not identify – let alone establish – any misrepresentation by Morgan Stanley. The Court has already determined that the only alleged misstatements at issue, the credit ratings, are not attributable to Morgan Stanley, Order, Dkt. No. 474, at 31 (August 17, 2012) ("[T]he ratings cannot be attributed to Morgan Stanley . . . ."), and this finding alone precludes plaintiffs' negligent misrepresentation claim.

Although the Court previously addressed the misstatement requirement for negligent misrepresentation, Morgan Stanley respectfully submits that the Court's prior ruling should not now control on summary judgment in the presence of a factual record. The duty to "impart correct information," see Mandarin Trading, 919 N.Y.S.2d at 470 (relied on by the Court here in its October 5, 2012 Order, Dkt. No. 501, at 4-5), is premised on the making of some representation by the party against whom the claim is brought and not an affirmative duty to comment on the correctness of representations made by others, such as the ratings agencies here. Such a duty would be inconsistent with controlling Second Circuit and New York Court of Appeals case law, which uniformly describes negligent misrepresentation as premised on an affirmative statement, frequently framing the claim as one that prohibits  "carelessness in imparting words" or requires one to "speak with care."  See, e.g., Dallas Aerospace, 352 F.3d at

788; Murphy, 660 N.Y.S.2d at 373; see also Mandarin Trading, 919 N.Y.S.2d at 470.  Consistent with these articulations, Morgan Stanley is not aware of any Second Circuit or New York Court of Appeals case that has found a viable negligent misrepresentation claim in the absence of an alleged misrepresentation by the defendant itself, and there is no basis for adopting this type of novel theory here.

Because plaintiffs have not identified any alleged misrepresentation by Morgan Stanley, they necessarily cannot establish reliance and loss causation, which are additional basic elements of their negligent misrepresentation claim.  See Hydro Investors, 227 F.3d at 20.  Without identifying the misrepresentation at issue in the context of *this* claim, plaintiffs cannot rely on the Court's prior findings regarding reliance and loss causation in other contexts.

## CONCLUSION

For the foregoing reasons, Morgan Stanley's motion for summary judgment should be granted.

Dated:   November 30, 2012
         New York, New York

DAVIS POLK & WARDWELL LLP

By:   /s/ James P. Rouhandeh
      James P. Rouhandeh
      james.rouhandeh@davispolk.com
      Antonio J. Perez-Marques
      antonio.perez@davispolk.com
      Paul S. Mishkin
      paul.mishkin@davispolk.com
      Jessica L. Freese
      jessica.freese@davispolk.com

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

*Counsel to Defendants Morgan Stanley &
Co. Incorporated and Morgan Stanley &
Co. International Limited*