UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

ABU DHABI COMMERCIAL BANK, et al.,       :    Civil Action No. 1:08-cv-07508-SAS-DCF
Individually and On Behalf of All Others   :
Similarly Situated,                        :    CLASS ACTION
                                           :
                          Plaintiffs,      :    PLAINTIFFS' OPPOSITION TO
                                           :    DEFENDANTS MORGAN STANLEY &
                                           :    CO. INCORPORATED'S AND MORGAN
              vs.                          :    STANLEY & CO. INTERNATIONAL
                                           :    LIMITED'S MOTION FOR SUMMARY
MORGAN STANLEY & CO.                       :    JUDGMENT PURSUANT TO FEDERAL
INCORPORATED, et al.,                      :    RULE OF CIVIL PROCEDURE 56(c)
                                           :
                          Defendants.      :
                                           :
——————————————————— x

799476_1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT .....................................................................................................1

     A.     MS Owed a Duty to Provide Plaintiffs with Correct Information ...........................2

           1.     MS Possessed Unique and Special Expertise ..............................................2

           2.     A Special Relationship Existed Between MS and the Plaintiffs.................4

           3.     MS Knew the Plaintiffs Would Rely on the Information It Supplied in Deciding Whether to Purchase the Cheyne SIV Notes.........................16

     B.     MS Owed a Duty Not to Omit Facts When Communicating with the Plaintiffs............................................................................................17

     C.     MS's Summary Judgment Brief Is Based Largely on Legal Arguments that This Court Has Already Rejected ...........................................................19

           1.     MS's Disclaimers Are Irrelevant to Duty ................................................19

           2.     Plaintiffs' Level of Sophistication Is Irrelevant to Duty...........................22

           3.     Plaintiffs' and MS's Relationship Extended Beyond a Typical "Arm's Length" Business Transaction ......................................................23

     D.     MS Is Liable for Negligent Misrepresentation Regardless of Whether It Issued the False Credit Ratings...............................................................25

III.    CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*50-01 Realty LLC v. Brooklyn Fed. Sav. Bank*,
   951 N.Y.S.2d 85, 2012 WL 1130201 (N.Y. Sup. 2012).............................................2

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009).....................................................................20

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   No. 08 Civ. 7508(SAS), 2012 WL 3584278
   (S.D.N.Y. Aug. 17, 2012) .............................................................................3, 18, 20

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   No. 08 Civ. 7508(SAS), 2012 WL 4762039
   (S.D.N.Y. Oct. 5, 2012) .......................................................................5, 16, 18, 25

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
   404 F.3d 566 (2d Cir. 2005)....................................................................................5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................2

*Anschutz Corp. v. Merrill Lynch & Co.*,
   690 F.3d 98 (2d Cir. 2012)....................................................................................16

*Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*,
   432 F.3d 428 (2d Cir. 2005)....................................................................................1

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
   No. 652996/2011, 2012 WL 5187653
   (N.Y. Sup. Oct. 18, 2012) ...................................................................4, 19, 22, 23

*Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.*,
   No. 12 Civ. 3294(LLS), 2012 WL 5383572
   (S.D.N.Y. Nov. 5, 2012) ...................................................................................4, 23

*Century Pac., Inc. v. Hilton Hotels Corp.*,
   No. 03 Civ. 8358(SAS), 2004 WL 868211
   (S.D.N.Y. Apr. 21, 2004).................................................................................5, 16

*China Dev. Indus. Bank v. Morgan Stanley & Co. Inc.*,
   927 N.Y.S.2d 52 (1st Dep't 2011) ........................................................................22

799476_1

**Page**

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
   65 N.Y.2d 536 (1985) ...........................................................................4, 5, 7, 19

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
   352 F.3d 775 (2d Cir. 2003)...........................................................................21, 22

*Dorking Genetics v. United States*,
   76 F.3d 1261 (2d Cir. 1996)...................................................................................5

*E\*Trade Fin. Corp. v. Deutsche Bank AG*,
   No. 05 Civ. 0902, 2008 WL 2428225
   (S.D.N.Y. June 13, 2008) ................................................................................5, 23

*Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011)...................................................................18

*Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*,
   17 N.Y.3d 565 (2011)............................................................................................18

*HSH Nordbank AG v. UBS AG*,
   941 N.Y.S.2d 59 (1st Dep't 2012) ........................................................................22

*Kimmell v. Schaefer*,
   89 N.Y.2d 257 (1996) ...................................................................................passim

*King County v. IKB Deutsche Industriebank AG*,
   863 F. Supp. 2d 288 (S.D.N.Y. 2012) ...........................................................passim

*Kinsey v. Cendant Corp.*,
   576 F. Supp. 2d 553 (S.D.N.Y. 2008)....................................................................5

*Mandarin Trading Ltd. v. Wildenstein*,
   16 N.Y.3d 173 (2011)............................................................................................25

*McClellan v. Smith*,
   439 F.3d 137 (2d Cir. 2006)....................................................................................2

*Ossining Union Free Sch. Dist. v. Anderson*,
   73 N.Y.2d 417 (1989) ..............................................................................................5

*Salesian Soc'y, Inc. v. Nutmeg Partners Ltd.*,
   706 N.Y.S.2d 459 (2d Dep't 2000)..........................................................................2

- iii -

**Page**

*Smith v. Ameriquest Mortg. Co.*,
  876 N.Y.S.2d 447 (2d Dep't 2009) ........................................................................6

*Space Coast Credit Union v. Barclays Capital, Inc.*,
  No. 11 Civ. 2802(LLS), 2012 WL 946832
  (S.D.N.Y. Mar. 20, 2012) ....................................................................................23

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
  148 F. App'x 66 (2d Cir. 2005) ...........................................................................22

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) ...........................................................................19, 23

*Sykes v. RFD Third Ave. 1 Assocs., LLC*,
  15 N.Y.3d 370 (2010) ...........................................................................................5

*Vineyard Hills Developers, Inc. v. Dewett Eng'g, P.C.*,
  868 N.Y.S.2d 278 (2d Dep't 2008) ........................................................................5

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 56(a) ..............................................................................................................1
  Rule 56(c) ..............................................................................................18, 20, 21

## I.     INTRODUCTION

The evidence is clear that Morgan Stanley ("MS") owed a duty to plaintiffs, which it breached by providing plaintiffs with false and misleading information about the stability and quality of the notes issued by the Cheyne SIV.  There can be no legitimate dispute that MS: (1) had superior knowledge, not readily available to plaintiffs, about the Cheyne SIV notes, (2) had a relationship of trust and confidence with plaintiffs, whom MS aggressively solicited through multiple telephone calls, e-mails, and in-person meetings, and was a self-proclaimed "***trusted advisor***" to investors (Tab 1 at MS_000302406); and (3) was aware that plaintiffs would rely on the false ratings assigned to the Cheyne SIV notes, which MS provided to plaintiffs.  Nothing more is required for negligent misrepresentation.

Faced with this overwhelming evidence, MS spends the vast majority of its motion for summary judgment repeating legal arguments that the Court has already rejected.  Rather than even attempt to show the absence of a genuine issue of material fact, MS simply ignores the Court's prior rulings and seeks solely to re-litigate issues already decided.  At the end of the day, MS presents no meritorious basis for summary judgment; the negligent misrepresentation claim should be decided at trial by a jury.

## II.     ARGUMENT

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"  *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432

- 1 -

F.3d 428, 433 (2d Cir. 2005).[1]   To that end, "[i]t is a settled rule that 'credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006).  Thus, a court should consider granting summary judgment "with caution."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.     MS Owed a Duty to Provide Plaintiffs with Correct Information

Under New York law, the question of whether a defendant owes a plaintiff a duty sufficient to support a claim for negligent misrepresentation requires the fact-finder to consider:

> [1] whether the person making the representation held or appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).  Under *Kimmell*, "[t]o establish liability for negligent misrepresentation arising out of a commercial transaction, a party must demonstrate that the person making the misrepresentation possessed specialized or unique experience, or the persons involved are in a special relationship of confidence and trust such that reliance on the negligent misrepresentation is justified."  *Salesian Soc'y, Inc. v. Nutmeg Partners Ltd.*, 706 N.Y.S.2d 459, 461 (2d Dep't 2000) (citing *Kimmell*, 89 N.Y.2d at 263); *see also 50-01 Realty LLC v. Brooklyn Fed. Sav. Bank*, 951 N.Y.S.2d 85, 2012 WL 1130201, at *5 (N.Y. Sup. 2012) (same).

### 1.     MS Possessed Unique and Special Expertise

MS does not dispute that it possessed unique and special expertise.  Nor can it.  As the Court recognized in denying summary judgment on plaintiffs' aiding and abetting fraud claim against MS, "Morgan Stanley manipulated the Cheyne SIV modeling process to create the ratings it desired,"

---

[1]     Citations and footnotes are omitted and emphasis is added unless otherwise noted.

799476_1

"'develop[ed] a new model for the [Cheyne SIV] transaction' and 'adapt[ed] and creat[ed] a new form of SIV methodology that was presented to the rating agencies and the client for their approval.'" *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508(SAS), 2012 WL 3584278, at *23 (S.D.N.Y. Aug. 17, 2012). As the arranger of the Cheyne SIV, MS had access to immense non-public information and pressured the Rating Agencies into assigning ratings MS desired. *See id.* ("S&P acquiesced [to pressure from Morgan Stanley] and assigned the MCNs an 'A' rating."). Plaintiffs could not have known that the defendants used a flawed model and outdated and insufficient data to rate the Cheyne SIV or that MS pressured the Rating Agencies at every turn to issue inflated ratings. *Id.* at *11-*12.

Plaintiffs, who did not even know which assets the Cheyne SIV held, certainly had no way of knowing that MS routinely waived bad loans into securitizations and then sold bonds issued by those securitizations to the Cheyne SIV. *Id.* at *18; *see also* Tab 1A at MS_000115098 ("senior investors do not receive the portfolio breakdown and none of the investors receive the funding profile"); *see also* Tab 2 at 271:19-21, 295:21-24, 296:1-3 (noting that "the [CMA] analysts understood that the major rating agencies had access to CUSIP-level information, as part of their analysis and determination of the rating agencies' credit rating [on the Cheyne SIV]" but that "the buy side or investors did not necessarily have specific access to CUSIPs"); Tab 3 at 52:12-17 ("With the rating agency being the only person, as well as the investment manager, having access to the line by line CUSIP, we had to take [it for] face value within the investor report, being AAA – – AA to AAA rated 98 percent of the underlying collateral."); Tab 4 at 570:8-9 (noting that "we didn't have the detailed line-by-line explanations of" the SIV collateral).

As MS conceded in connection with arranging the Cheyne SIV, "disclosure [for SIVs] is significantly less than a typical CDO as many of the specific details are contained in the operating

manual," which was not available to plaintiffs.  Tab 5; *see also* Tab 6 at MDYS ADCB 776952-53 ("The operations manual is not a legal document and is ***not made public***.").  In response to an inquiry from Cheyne regarding whether revisions to key tests would be disclosed in the offering memorandum received by plaintiffs, MS directed that "the OM [offering memorandum] is aimed to ***remain vague*** on the subject, and will not reflect these changes."  Tab 7 at MS_000415894.

The evidence of MS's superior knowledge supports a finding of duty.  Under similar circumstances, Judge Stanton recently found that an investment bank that created and sold a CDO to investors owed those investors a duty because the bank "'had superior access to information and knowledge as to who had been responsible for selecting such collateral and the true quality and value of the collateral portfolio and knowledge as an expert concerning the actual risk of the assets in the portfolio.'"  *Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.*, No. 12 Civ. 3294(LLS), 2012 WL 5383572, at *4 (S.D.N.Y. Nov. 5, 2012); *see also Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, No. 652996/2011, 2012 WL 5187653, at *9 (N.Y. Sup. Oct. 18, 2012) (finding a duty where "the information that would have revealed that Goldman was making a misrepresentation was in Goldman's exclusive control, such as Goldman's internal marks and the details of the collateral").

### 2.    A Special Relationship Existed Between MS and the Plaintiffs

Under New York law, a special relationship giving rise to a duty to give correct information exists between plaintiff and defendant where (1) the defendant was aware that information given to plaintiff would be used for a particular purpose; (2) the defendant intended that known parties would rely upon the information given; and (3) conduct on the part of the defendant that evinces the defendant's understanding of that party or parties' reliance.  *See King County v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 307 (S.D.N.Y. 2012) (citing *Credit Alliance Corp. v. Arthur*

- 4 -

*Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)).[2]  Importantly, whether a "special relationship" giving

rise to a duty to give correct information exists is "highly fact-specific" (*Century Pac., Inc. v. Hilton*

*Hotels Corp.*, No. 03 Civ. 8358(SAS), 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004)

(Scheindlin, J.)), and is "inappropriate for resolution by summary judgment" (*Kinsey v. Cendant*

*Corp.*, 576 F. Supp. 2d 553, 559 (S.D.N.Y. 2008).  *See also E\*Trade Fin. Corp. v. Deutsche Bank*

*AG*, No. 05 Civ. 0902, 2008 WL 2428225, at *24 (S.D.N.Y. June 13, 2008) ("New York courts

generally leave the question of whether there exists a 'special relationship' sufficient to state a cause

of action for negligent misrepresentation to the finder of fact").

   This Court has already "conducted an extensive analysis of the relationship between Morgan

Stanley and plaintiffs and determined that plaintiffs had sufficiently alleged the existence of a

'special relationship' between the parties." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*

---

[2]  MS argues that the *Credit Alliance* test is inapplicable to this case because *Credit Alliance* involved accountants.  But as the Court recently recognized in applying the *Credit Alliance* test in a nearly identical case involving the Rhinebridge SIV, "[a]lthough *Credit Alliance* discussed accountants, the *Credit Alliance* test has been **applied broadly**."  *King County*, 863 F. Supp. 2d at 307.  It is thus unsurprising that MS fails to cite even a single case in which a court has limited the *Credit Alliance* test in the manner they suggest.  Indeed, New York courts, including the New York Court of Appeals and the Second Circuit, have consistently applied *Credit Alliance* to test whether a special relationship exists in the context of numerous occupations, including, for example, condominium engineers (*Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 373 (2010) ("We have made clear since *Credit Alliance* that these requirements do not apply to accountants only . . . .")); surety companies (*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 584 (2d Cir. 2005)); veterinarians (*Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996)); consultants (*Ossining Union Free Sch. Dist. v. Anderson*, 73 N.Y.2d 417 (1989)); and construction companies (*Vineyard Hills Developers, Inc. v. Dewett Eng'g, P.C.*, 868 N.Y.S.2d 278 (2d Dep't 2008)), among many others.  There is no reason why the *Credit Alliance* test should not apply here, where MS was an experienced investment bank that arranged the Cheyne SIV and acted as a placement agent for the SIV's notes.  MS's argument that *Credit Alliance* does not apply is also puzzling given that it has argued that *Credit Alliance* applies to this case in earlier attempts to dismiss plaintiffs' negligent misrepresentation claims.  *See, e.g.*, Memorandum of Law in Support of Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited's Motion for Reconsideration, dated May 22, 2012 (Dkt. No. 420), at 2 (arguing that "[w]hether a special relationship exists is **governed by a three factor test set forth in Credit Alliance**").

*Inc.*, No. 08 Civ. 7508(SAS), 2012 WL 4762039, at *2 (S.D.N.Y. Oct. 5, 2012).  As demonstrated below, the evidence supports those allegations.  For example, the New York Court of Appeals in *Kimmell* found that a "special relationship" existed under circumstances similar to the record evidence in this case.  89 N.Y.2d at 265.  There, the defendant solicited the plaintiffs' investment, met with certain plaintiffs, supplied plaintiffs with information generated for the express purpose of educating plaintiffs and investors generally, urged plaintiffs to review and rely on the information, and received financial compensation for his efforts on behalf of the investment project.  *Id.*; *see also Smith v. Ameriquest Mortg. Co.*, 876 N.Y.S.2d 447, 448-49 (2d Dep't 2009) (finding that genuine issue of fact existed as to whether defendant owed a duty to the plaintiff where defendant had personally solicited the plaintiff and personally visited plaintiff to provide her with information about the transaction and to convince her the transaction was worthwhile).

As discussed below, the evidence shows that MS affirmatively encouraged plaintiffs to review and rely on the ratings it provided.  As in *Kimmell*, MS reached out to plaintiffs to solicit their investments, provided individualized memoranda answering plaintiffs' investment inquiries, conducted telephone calls, held client dinners, and crisscrossed the globe to meet with and sell Cheyne SIV notes to the plaintiffs.  All told, there were ***more than 1,000*** communications between MS and plaintiffs concerning the Cheyne SIV.  Tab 8.  MS emphasized to investors the high ratings on the SIV's notes and its underlying assets as a key advantage compared to other investments.  *See, e.g.*, Tab 9 at MS_000221705 (describing in its presentation to potential investors that the Cheyne SIV's assets "will be highly rated and short term" and that the SIV will have "access to a wider range of highly rated investments" and "enhance[d] value creation potential").  The ratings assigned to the Cheyne SIV were provided to the plaintiffs by MS for the express purpose of encouraging plaintiffs to purchase Cheyne SIV notes.  *See, e.g.*, Tab 10 at MS_000590220 (stating that "both

S&P and Moody's ratings are needed on the Senior Notes programmes"); Tab 11 at 90:9-13 ("Generally on these deals investors do request some ratings, so this is why you engage the rating agencies before you actually start the marketing process of these notes."); *see also infra*, §II.A.3.

Under *Kimmell* and *Credit Alliance*, the evidence demonstrates a special relationship between MS and each of the 15 plaintiffs:

**Abu Dhabi Commercial Bank** ("ADCB") was approached by MS regarding the Cheyne SIV on April 13, 2005, when an MS representative e-mailed ADCB to convince ADCB to purchase the SIV. Tab 9 at MS_000221694-95. In summarizing the Cheyne SIV, MS emphasized to ADCB that the SIV's "underlying portfolio is a high quality one" and that it was comprised of a "portfolio of highly rated structured finance assets." *Id.* Unsolicited, MS also provided ADCB with an MS-prepared presentation for potential investors regarding the Cheyne SIV. Tellingly, the first two bullet points in the presentation asserted that the SIV Mezzanine Capital Notes ("MCNs") would be rated A/A3, and that the SIV had "been designed to invest in highly rated term assets." *Id.* at MS_000221704.

From the time that MS approached ADCB until ADCB purchased its MCNs in July 2005, MS and ADCB stayed in frequent contact via e-mail, instant messenger, conference calls, and in-person discussions. Tab 12. MS even traveled to the Middle East to promote the Cheyne SIV and meet personally with ADCB's representative. Tab 13 at MS_000222151.

The evidence shows that MS intended ADCB to rely on the ratings it provided. In late June 2005, just prior to ADCB's purchase, an MS sales representative contacted ADCB, asking, "how's the proposal coming along[?]" Tab 14. ADCB responded that it would need to know "how much of the portfolio is rated AAA and how much is rated A & above . . . ASAP [as] it would need to be included in preparing the [investment] proposal." *Id.* In response, MS sent ADCB a document

- 7 -

illustrating the breakdown of the SIV's underlying portfolio by rating.  Tab 15.  In addition, MS sent ADCB a memorandum describing rating agency methodology "that may be useful in analyzing the deal" which stressed that "SIVs are subject to constant ongoing monitoring of compliance with detailed rating agency requirements, effectively reaffirming their ratings on a daily basis."  Tab 16 at MS_000222133, MS_000222136.  Even after ADCB made its initial purchase, MS attempted to persuade ADCB to increase its investment in the Cheyne SIV.  Tab 17.

*The Bank of N.T. Butterfield & Son Limited* ("Butterfield") also communicated with MS in the months leading up to its investment in Cheyne SIV Medium Term Notes ("MTNs") and Commercial Paper ("CP").  An e-mail chain among the MS marketing team identified Butterfield as a potential purchaser of the Cheyne SIV, and noted that Butterfield had "interest[] [in the Cheyne SIV] but need[s] to find a way to get approved internally," evidencing MS's prior discussions with Butterfield concerning the Cheyne SIV.  Tab 18 at MS_000235609.  In addition, Butterfield reviewed the ratings that MS generated with the Rating Agencies and made publicly available.  *See* Tab 98 at 246:18-247:4 ("Q: Are you aware of any evidence that [the individual who decided to purchase Cheyne for Butterfield] considered the rating at the time the money market fund first invested in the Cheyne SIV in 2005?  A: He had to have.  We are bound by the AAA rating statistics that S&P puts in front of us. . . .  So yes, he considered the rating.  I can guarantee you that.").

*Commerzbank AG* ("Commerzbank") was solicited by MS in November 2004 to invest in the Cheyne SIV.  When MS contacted Commerzbank, it emphasized that the SIV's underlying portfolio would be highly-rated "AAA and AA ABS."  Tab 19 at CBe00414179-80.  MS also prepared individualized memoranda for Commerzbank that answered questions regarding both SIVs in general and the Cheyne SIV in particular.  One such memorandum concerning the Cheyne SIV highlighted that "[a] high credit quality, lower risk portfolio, combined with careful sizing of MTM

- 8 -

risk . . . results in an expected 'A' rating on the Mezzanine Capital Notes. . . .  Given th[e] combination of a high quality credit portfolio, an expected [A] S&P rating, and the depth of the mezzanine tranche, these notes are expected to price at attractive levels."  Tab 20 at MS_000601016. Additional marketing materials sent by MS to Commerzbank in an effort to convince Commerzbank to purchase Cheyne SIV MCNs similarly emphasized the significance of the ratings assigned to the notes and the underlying assets, including investor presentations, the Cheyne SIV termsheet, an "Introduction to SIVs" memorandum, and the Cheyne Warehouse Portfolio breakdown.  Tab 21 at CBe00855190, CBe00855322.

*State Board of Administration of Florida* ("FSBA") was approached by MS about the Cheyne SIV in July 2005, when MS sent FSBA an e-mail announcing the deal and attaching a preliminary offering document.  Tab 22 at FSBAe00116611, FSBAe00116692.  The document included an entire section on the ratings of the SIV's notes and its underlying assets, noting that the SIV would only "acquire Investments which have a Deemed Rating of at least A- by S&P and at least A3 by Moody's."  *Id.* at FSBAe00116692.  FSBA also received an invitation to listen to a conference call presentation concerning the Cheyne SIV and to review the Cheyne SIV Bloomberg road show presentation to learn more about the deal.  Tab 23 at FSBAe00116350; Tab 24.  In addition to offering and marketing documents, MS provided FSBA with S&P's Presale Report on the Cheyne SIV, which stated that preliminary top ratings had been assigned to the SIV and that "Cheyne Finance [would] purchase assets with an average rating higher than its SIV peers."  Tab 25 at MS_001530198.  MS also sent FSBA the rating breakdown of the SIV's underlying assets, which noted that 70.5% of the assets were rated AAA.  *Id.* at MS_001530198, MS_001530204.

*Gulf International Bank B.S.C.* ("GIB") was targeted by MS as a potential Cheyne SIV investor in October 2004, while MS was planning its roadshow trip to the Middle East.  *See* Tab 26

- 9 -

at MS_000565972 (identifying "Gulf International Bank" as a "target account[]" in Bahrain).  MS marketed the Cheyne SIV heavily to GIB following the Middle East Roadshow.  *See* Tab 27 at 90:2-5 ("[MS] was the one that tapped on GIB's door.  It's been marketing Cheyne [to] us ***for over two years*** before we invested in it.").  MS urged GIB to purchase MCNs, explaining that they were "[r]ated by BOTH Moody's (A3) and S&P (A)."  Tab 99 at GIB0000226.  In addition to Cheyne SIV marketing material, MS sent GIB personalized memoranda concerning the Cheyne SIV.  In response to a GIB question, one memo noted that "[a]ssets rated below single A-/A3 cannot be purchased into the portfolio."  Tab 28 at MS_000223120.  In another e-mail to GIB, MS wrote encouragingly, "I hope you find this investment attractive and rewarding in such a tight credit market."  Tab 29 at MS_000256209, MS_000256211.

**Bank Hapoalim B.M.** ("Hapoalim") was first solicited to invest in the Cheyne SIV by an MS sales representative in June 2006.  Tab 30.  Over the next several months, Hapoalim communicated frequently with MS by telephone, e-mail, and in-person meetings in connection with its decision to invest in Cheyne SIV MCNs.  Tab 31 at 37:3-40:18.  During this process, MS sent Hapoalim both general marketing materials containing the false ratings, such as the Cheyne SIV Information Memorandum, the presentation it prepared for potential MCN investors, and Cheyne SIV investor reports (Tabs 32, 33), as well as personalized e-mails and memoranda addressing specific questions from Hapoalim concerning the Cheyne SIV.  Tabs 34, 35; *see also* Tab 36.

Moreover, MS's New York and London offices specifically advised Hapoalim's representative, Fred Becker, in preparation for his proposal of the investment to Hapoalim's Israeli Head Office (Tab 37), and, unsolicited, sent Mr. Becker information about the Cheyne SIV as "ammunition for the Israel team as they're looking at the Cheyne investment."  Tab 38.  In 2006, MS touted in an internal document its sales achievements for the discovery of "the structured finance

- 10 -

group at Hapoalim, who was previously uncovered at MS," noting that "*[w]e built a relationship there* and got him involved in transactions such as the Cheyne SIV."  Tab 39 at MS_001571258.

*King County, Washington* ("King County") similarly based its decision to buy Cheyne SIV CP in large part on the ratings, which MS and the Rating Agencies generated.  MS communicated the false ratings assigned to the Cheyne SIV CP purchased by King County by affirmatively contacting Bloomberg and uploading the ratings onto the Bloomberg Professional service, an electronic trading platform from which King County purchased its Cheyne CP, with the intent and expectation that investors would review and rely on those ratings.  *See* Tabs 40, 41, 42, 43 (the Cheyne SIV's ratings "will . . . be put on [Bloomberg] once we forward the [offering memorandum] to BBerg"); *see also* Tab 44 at 12:18-24 ("[King County] look[ed] at the description page on the Bloomberg chart to – the Bloomberg system to see that – the most critical item we look at is the ratings by, in this case Moody's and Standard & Poor's, was the most important thing that we relied on in placing the trade.").

*National Agricultural Cooperative Federation* ("NACF") was solicited by MS in October 2004, when it received an e-mail from an MS representative announcing that MS had a new "high grade" SIV investment opportunity in a structure that would have "very high quality underlying assets."  Tab 45 at MS_000214845-46.  Over the next year, MS aggressively marketed the Cheyne SIV to NACF.  MS traveled to Asia for a roadshow presentation and an individual meeting with NACF, sent NACF the official marketing book, investor summaries, the presentation to potential capital note investors (emphasizing the SIV's high ratings), and prepared and transmitted at least five individualized memoranda addressing NACF's questions and concerns about the Cheyne SIV.  Tab 45 at MS_000214845; Tabs 46, 47, 48, 49, 50.  In an internal e-mail, MS acknowledged the importance of ratings to NACF: "Can we confirm that Cheyne will not be buying assets rated below

- 11 -

'A' for the life of the deal? . . . The NACF guys need to have I guess, more explicit language which states this." Tab 51 at NACFe00000923.

**Global Investment Services Limited** ("NZ Funds") was first solicited by MS to invest in the Cheyne SIV in November 2004, when MS e-mailed NZ Funds to describe "a new high grade US ABS CDO deal" it would be bringing to market and provided NZ Funds with a Cheyne SIV marketing presentation. Tab 52 at NZFe0253586. This presentation emphasized that the Cheyne SIV's underlying assets would be focused in "high grade" securities and touted that "[h]ighly rated ABS assets have displayed superior rating stability." *Id*. at NZFe0253595. After this initial pitch, MS remained in frequent communication with NZ Funds concerning the Cheyne SIV, sending e-mails, conducting telephone conference calls, and distributing additional marketing materials containing the ratings. *See, e.g.*, Tabs 53, 54, 55. MS also emphasized to NZ Funds that the "Mezzanine Capital Notes are now dual rated by BOTH Moody's and S&P > 'A3/A.'" Tab 56 at NZFe0254285; *see also* Tabs 57, 97. In addition, MS prepared multiple individualized memoranda for NZ Funds addressing specific questions about the Cheyne SIV. *See, e.g.*, Tab 58 at NZFe0254538; Tabs 54, 59. After NZ Funds' initial purchase, MS tried to persuade NZ Funds to increase its Cheyne SIV holdings, reassuring NZ Funds that the "SIV A/A3 ratings are stabilized by specific maintenance of capital buffer on a weekly basis" and that SIVs are less risky because they "are subject to constant ongoing monitoring of compliance with detailed rating agency requirements, effectively reaffirming their ratings on a daily basis." Tab 60 at MS_001559516.

**Deutsche Postbank AG** ("Postbank") was solicited by MS in September 2005. Subsequently, the parties communicated often via multiple telephone calls, e-mails, and personal visits to Postbank's offices in Germany in order to market the Cheyne SIV and again later to convince Postbank to increase its investment. *See* Tabs 61, 62. Postbank relied on several

- 12 -

marketing documents sent by MS, including the Cheyne SIV investor memorandum, a memorandum entitled "Intro to SIVs," the Cheyne SIV marketing book, and investor reports. Tab 63. These materials emphasized the stability and high quality of the Cheyne SIV's ratings, noting that "daily compliance with detailed rating agency requirements, effectively reaffirm[s] their AAA/Aaa and A-1+/-P-1 ratings daily" (*id*. at MS_001518028) and that "[t]he higher proportion of AAA rated assets in the portfolio reflects the defensive nature of [Cheyne's] investment strategy." Tab 64 at MS_001520772. Securing Postbank's investment was particularly important for MS, as it needed to sell "22m of single As in the next 2-3 weeks [preceding Postbank's purchase] to get [its] fees" from Cheyne. Tab 65.

*Commonwealth of Pennsylvania Public School Employees' Retirement System* ("PSERS")'s financial representative, Credit Suisse Asset Management ("CSAM"), was targeted by MS as a potential investor in the Cheyne SIV in October 2005, when a member of the MS sales team requested that CSAM consider the Cheyne SIV for its clients and provided a brief description of the SIV highlighting the CP's A-1+/P-1 ratings. Tab 66. In the same communication, MS directed CSAM to let it know "what we can do to help you with the approval process." *Id.* CSAM thereafter bought Cheyne SIV CP for PSERS's account. Tab 67 at 61:21-22.

*SEI Investments Company* ("SEI") was solicited by MS as an investor in the Cheyne SIV following a dinner between one of MS's top salespeople, Trisha Ostergaard, and SEI's financial representatives. Tab 68; Tab 69 at MS_000473261 (describing Ms. Ostergaard as "the most experienced Investor Marketer in the business"). Throughout months of marketing the Cheyne SIV to SEI, MS repeatedly e-mailed SEI's financial representatives and sent SEI's financial team the Cheyne SIV preliminary information memorandum, the MS-prepared Cheyne SIV marketing presentation, both the S&P and Moody's rating letters, and investor reports. Tab 70 at

- 13 -

MS_001523660, MS_001523668; Tabs 71, 72, 73.  All of these documents touted the Cheyne SIV's

top ratings.  In addition, MS arranged a conference call between itself, SEI's investment agents, and

Cheyne Capital and an in-person meeting between SEI's financial representative and Cheyne

Capital.  Tab 74.  MS also invited SEI's financial representatives to listen in on a conference call

road show presentation concerning the Cheyne SIV.  *Id*.  MS even solicited the opinions of SEI's

financial representative on the Cheyne SIV pool report to give feedback to Cheyne Capital on its

marketing strategy.  Tab 75.

     ***SEI Investment Strategies, LLC*** ("SEI Strategies") was prompted to invest in the Cheyne

SIV based largely on the ratings.  MS communicated the false ratings assigned to the Cheyne SIV

CP purchased by SEI Strategies by affirmatively contacting Bloomberg and uploading the ratings

onto the Bloomberg Professional service, an electronic trading platform from which SEI Strategies

purchased its Cheyne CP, with the intent and expectation that investors would review and rely on

those ratings.  *See* Tabs 40, 41, 42, 43 (the Cheyne SIV's ratings "will . . . be put on [Bloomberg]

once we forward the [offering memorandum] to BBerg"); *see also* Tab 76 at 23:17-23 ("To the

extent that I wanted to make sure that it was a prudent investment before, certainly before trading,

being that we utilized Bloomberg, there is a great deal of information that you can check and you

headline before you make that decision, which is something that I did do."); Tab 77 at 197:24-198:1

("[T]ypically ratings are available on Bloomberg.  Daisy's looking at them when she's purchasing

these things.").

     ***SFT Collective Investment Fund*** ("SFTCIF") was solicited by MS for many of its "more

difficult to move names," including the Cheyne SIV.  Tab 78 at MS_000741366.  MS bragged

internally about its ongoing relationship with SFTCIF, noting that MS was SFTCIF's "biggest

supplier" of commercial paper, and that it would "continue with [its] efforts and focus . . . to stay one

step ahead of our competition" in marketing to SFTCIF.  *Id*. at MS_000741367.  As part of its

marketing efforts, MS traveled to SFTCIF's offices in Boston for in-person meetings and caused the

SIV ratings to be published on Bloomberg, where they were available for SFTCIF analysts to view.

*See id*.; Tab 3 at 16:12-13.

    ***Bank SinoPac*** ("SinoPac") was approached by MS in July 2005, when MS sent SinoPac a

Cheyne SIV deal summary and marketing material.  Tabs 79, 80.  Thereafter, MS made repeated

sales calls to SinoPac concerning the Cheyne SIV, sending memoranda and additional marketing

material, responding to SinoPac's concerns with personalized memoranda, and meeting face-to-face

with SinoPac in an effort to sell the Cheyne SIV.  *See, e.g.*, Tabs 81, 82, 83, 96.  In connection with

its marketing to SinoPac, MS highlighted the Cheyne SIV's ratings and represented that the ratings

were indicative of the SIV's quality and stability.   For example, in one memorandum, MS

emphasized that the Cheyne SIV's portfolio "comprises . . . 90% AAA, 5% AA and 5% A rated

CDO investments. . . .  [I]n the current spread environment there is a strong preference towards

focusing on high quality CDO investments" and that Cheyne Capital's strategy focused on the more

liquid and stable portion of the CDO market for the SIV's underlying portfolio.  Tab 84 at

MS_001509462.  Another communication from MS to SinoPac emphasized that "[a]ll the collaterals

[sic] has to be rated at least A at the time of purchase."  Tab 85 at MS_001508422.  In another e-

mail, an MS representative encouraged SinoPac to review and rely on the SIV's ratings, stating, "let

me know if I still need to call tony on the rating . . . ***since he will have the rating letter . . . the letter***

***is stronger than anything***."  Tab 86.  Soon after, MS sent SinoPac the Moody's rating letter.  Tab

83.

    By virtue of its close relationship with SinoPac, MS knew that ratings were an important

factor for SinoPac.  *See, e.g.*, Tab 87 ("The client is also asking if we don't do A rated tranche but

- 15 -

doing one big capital note instead . . . what rating will this new note get?"); Tab 85 (SinoPac inquired whether "the Combo [note was] officially rated by rating agencies (public rating?)"); Tab 88 at MS_001557359 (e-mail from SinoPac to MS asking for deal terms, and checking that the "rating is A, right?").  MS pushed hard to complete the SinoPac sale, as evidenced by an August 2005 internal e-mail between members of MS's sales team stressing that they "ha[d] been working **SO hard** to get things done on this deal and get a client who gave us an ioi on the single a's in jan of this year . . . .  We've spent *so much time and relationship capital* . . . we really don't want to miss this opportunity after having spent so much time on it."  Tab 84 at MS_001509459.

In sum, the evidence establishes conclusively "a special relationship and duty" here, "where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information." *Abu Dhabi*, 2012 WL 4762039, at *2 (citing *Century Pac.*, 2004 WL 868211, at *8).[3]

### 3.      MS Knew the Plaintiffs Would Rely on the Information It Supplied in Deciding Whether to Purchase the Cheyne SIV Notes

Finally, MS knew that plaintiffs would rely on the ratings assigned to the Cheyne SIV notes and on other statements concerning the purported high quality of the SIV investment in deciding whether to the purchase those notes.  *See supra*, §II.A.2.  Indeed, MS actively encouraged plaintiffs to purchase.  *Id*.  As the Court already held, MS "knew the credit ratings would be used by investors to decide whether or not to purchase" the Cheyne SIV notes.  *King County*, 863 F. Supp. 2d at 310. The Court also held that MS knew plaintiffs would use the ratings where, as here, MS specified in the engagement letter with Cheyne Capital that the desired ratings were a "condition[] precedent" to

---

[3]      In light of the extensive contact between MS and the plaintiffs, MS's reliance on *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98 (2d Cir. 2012), misses the mark.

marketing the Cheyne SIV to investors (Tab 89 at MS_000077751), meaning that if the desired ratings were not obtained from the Rating Agencies, MS would walk away from the deal. *King County*, 863 F. Supp. 2d at 310 ("MS and IKB made Top Ratings a condition precedent to issuance of the Senior Notes because they knew that QIBs such as the plaintiffs – legally, the only potential purchasers of the Senior Notes – require Top Ratings."). Indeed, before MS succeeded in pressuring S&P to inflate its MCN rating, MS stated that it would "need to hold off on the marketing" until an "A" rating could be achieved. Tab 90 at MS_000571736. Moreover, MS recognized that "both S&P and Moody's ratings are needed on the Senior Notes programmes" in order to sell those notes to investors. Tab 91 at Z0408458; *see also* Tab 92 (stating that SIVs required AAA ratings in order to launch); *see also* Tab 93 at 431:4-7 (testifying that "the Aaa ratings assigned to SIVs [enabled] them to sell their securities to the market"); Tab 10 at MS_000590220 (stating that "both S&P and Moody's ratings are needed on the Senior Notes programmes"); Tab 11 at 88:10-12, 93:11-13 (noting that "all investors you talked to" required ratings).

### B. MS Owed a Duty Not to Omit Facts When Communicating with the Plaintiffs

MS also owed plaintiffs a duty to refrain from omitting facts necessary to determine that the Cheyne SIV ratings were false and misleading when communicating with plaintiffs. As the Court recently held:

> "Under New York law, a duty to disclose material facts arises in one of three ways: (1) where the parties stand in a confidential fiduciary relationship, (2) *where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge*, or (3) where a party to a business transaction has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth. [A] *breach of a duty to disclose can constitute an element of various torts such as . . . negligent misrepresentation based on omission*, or breach of fiduciary duty . . . ."

*Abu Dhabi*, 2012 WL 4762039, at \*2-\*3 (emphasis in original) (quoting *Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011)); *see also Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 578 (2011) (holding that a duty to provide correct information is "'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party'").

As described above, MS possessed superior knowledge of the facts and circumstances surrounding the false ratings assigned to the Cheyne SIV notes and the overall poor quality of the Cheyne SIV investment. *See supra*, §II.A.1. Furthermore, MS knew that plaintiffs, by purchasing Cheyne SIV notes in reliance on the assigned false ratings and other misrepresentations concerning the quality of the Cheyne SIV, were acting on the basis of mistaken knowledge. *See supra*, §II.A.3. MS breached its duty to disclose by withholding from plaintiffs the fact that, *inter alia*, the Cheyne SIV was rated with flawed methodologies, inaccurate models, data, and assumptions, and was far riskier than the ratings represented. *See Abu Dhabi*, 2012 WL 3584278, at \*13; *see also* Plaintiffs' Memorandum of Law in Support of Their Opposition to Defendants' Joint Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c), dated February 29, 2012 (Dkt. No. 430). Accordingly, MS is liable to plaintiffs for negligent misrepresentation.[4]

---

[4]      Thus, the economic loss doctrine does not bar negligent misrepresentation claims here, where MS owed plaintiffs a duty of care based on affirmative misstatements and omissions. *See King County*, 863 F. Supp. 2d at 304 ("Where, as here, the parties are not in contractual privity, the duty analysis at the heart of the economic loss doctrine is subsumed by the determination of whether the parties had a relationship that barred the defendant from making any negligent misrepresentations to the plaintiff.").

**C.     MS's Summary Judgment Brief Is Based Largely on Legal
        Arguments that This Court Has Already Rejected**

      **1.     MS's Disclaimers Are Irrelevant to Duty**

Faced with an extensive factual record evidencing its duty owed to plaintiffs, MS devotes the

vast majority of its brief to repeating legal arguments that the Court has already considered and

rejected.  For example, MS argues that certain boilerplate disclaimers contained in the Cheyne SIV

information memorandum negate any duty owed by MS.  But the Court has already rejected this

***exact same*** argument in *King County*.  There, in response to defendants' argument that "there can be

no special relationship between plaintiffs and IKB due to . . . the PPM's disclaimers that plaintiffs

should conduct their own investment analysis and that IKB only accepted responsibility for" certain

statements in the information memorandum, the Court held that "***the existence of disclaimers . . .***

***[is] generally only relevant to whether or not a plaintiff reasonably relied on statements by the***

***defendant***.  Justifiable reliance has little to do with the *Credit Alliance* test" governing a special

relationship.  *King County*, 863 F. Supp. 2d at 312.

Further, the evidence shows that MS made multiple negligent misrepresentations to plaintiffs

in various forms, including e-mails, individualized memoranda, phone calls, and in-person meetings.

*See supra*, §II.A.2.  Thus, even if the disclaimers contained in the information memorandum could

negate MS's duty for statements contained in the information memorandum (and they cannot), such

disclaimers would not shield MS's myriad other misrepresentations.  *See Suez Equity Investors, L.P.*

*v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) (finding a special relationship even

where there were disclaimers akin to those relied upon here by MS, holding that "at best, [the

disclaimer] conflicts with defendants' alleged oral statements in the January 2, 1997 conference call.

The disclaimer would not cover the subsequent telephone conversation . . . .");  *Basis*, 2012 WL

5187653, at *7 ("However, the instant case does not merely involve false representations in offering

materials.  Rather, Goldman allegedly made numerous and repeated representations to BYAFM in emails and during conference calls that specifically addressed the concerns at issue in this case.").

Defendants' reliance on authority concerning contractual disclaimers is unpersuasive. Defendants long ago prevailed on their argument that there were no contracts between MS and plaintiffs.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 183-84 (S.D.N.Y. 2009).  Moreover, even if there were contractual disclaimers of duty, such disclaimers are enforceable only when explicit.  "Here, the 'disclaimers' on which . . . MS rel[ies] are not sufficiently explicit, as they make no reference to a fiduciary duty" or a duty in negligence.  *King County*, 863 F. Supp. 2d at 313.  Rather, the disclaimers are the kind of general, boilerplate disclaimers the Court already rejected in *King County*.  *Compare id.* at 313 & n.193 (rejecting disclaimers that "'"Morgan Stanley . . . expressly do[es] not undertake . . . to advise any investor in the [Senior] Notes of any information coming to [its] attention"'"), *with* Defendants Morgan Stanley & Co. Incorporated's and Morgan Stanley & Co. International Limited's Memorandum of Law in Support of Their Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) (Dkt. No. 524) at 4-5 (relying on similar disclaimers that MS "was not the maker of the statements in the offering documents, had not 'verif[ied]' their contents, [and] 'expressly [did] not undertake' to provide any updates to the information contained therein or advise investors 'of any information coming to [its] attention'"); *see also Abu Dhabi*, 2012 WL 3584278, at *20 (holding that defendants' disclosures failed to "'"directly address the risk that plaintiffs' claim was not disclosed"'").  Indeed, nowhere in any of the purported disclaimer documents cited by MS is "duty" or "relationship" even mentioned, much less disclaimed.  *See generally* Declaration of James P. Rouhandeh in Support of Morgan Stanley & Co. Incorporated's and Morgan Stanley & Co. International Limited's Motion for

Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) (Dkt. No. 525), Exs. 1-3 (Dkt. Nos. 525-1–525-5).

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003), a case heavily relied upon by MS, is not to the contrary. In that case, the plaintiff and the defendant had entered into a contract whereby the plaintiff expressly disclaimed reliance on any statements made by the defendant. *Id.* at 785. Accordingly, the court held that the contract "preclude[d] [plaintiff] from claiming reliance on any asserted misrepresentation because a party cannot justifiably rely on a representation that has been disclaimed by agreement." *Id.*[5] Moreover, in affirming dismissal of plaintiff's negligent misrepresentation claim, the *Dallas* court distinguished the facts alleged in *Dallas* from the facts of *Kimmell*, where, as MS did here, the defendant communicated with plaintiffs, urged plaintiffs to invest in defendant's project, expected plaintiffs to rely on the alleged misstatements, and made money as a result of plaintiffs' investments. *Dallas*, 352 F.3d at 789. Thus, the *Dallas* court declined to impose a duty because there was no evidence of any relationship between plaintiff and defendant. Although the *Dallas* court repeated again in *dicta* in the negligent misrepresentation section of the opinion that defendant "disclaimed any representations," it did not hold that a duty in negligence was or even could be disclaimed. *Id.* Instead, it appears that the *Dallas* court's reference to disclaimers in the negligent misrepresentation section is referring back to its earlier holding that there can be no justifiable reliance where plaintiff agreed not to rely on the

---

[5]   In so holding, the *Dallas* court made clear that while "it is well established that a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud," the contract at issue there "specifically disclaimed . . . any representations about the airworthiness of the engine" – the very representations alleged to have been fraudulent. 352 F.3d at 785. In contrast, and as explained above, there are no contractual disclaimers here and the disclaimers upon which MS relies, contained in the non-contractual information memorandum, do not mention duty or relationship whatsoever and therefore fail for lack of explicitness.

very statements alleged to have been false, as reliance is also an element of negligent misrepresentation. *Id.*[6]

## 2. Plaintiffs' Level of Sophistication Is Irrelevant to Duty

The Court has also already rejected MS's regurgitated argument that it owed no duty to plaintiffs because plaintiffs were qualified institutional buyers ("QIBs") and "sophisticated" at the time they purchased Cheyne SIV notes. For example, in *King County*, defendants argued, as they do again here, "that there can be no special relationship between plaintiffs and IKB due to . . . plaintiffs' sophistication as QIBs." 863 F. Supp. 2d at 312. The Court expressly rejected that argument, holding that "the sophistication of plaintiffs . . . [is] generally only relevant to whether or not a plaintiff ***reasonably relied*** on statements made by the defendant. Justifiable reliance . . . is a separate element of a negligent misrepresentation claim." *Id.* It is therefore unsurprising that MS fails to cite even a single case holding that a sophisticated investor, as a matter of law, can never be owed a duty. To the contrary, sophisticated investors are treated as any other plaintiff for purposes of negligent

---

[6]     The other cases cited by MS concerning disclaimers similarly miss the mark. In *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66 (2d Cir. 2005), a summary order of no precedential effect (*see King County*, 863 F. Supp. 2d at 323), the court held that in that case, unlike this one, there was an "absence of any evidence of a 'special relationship' between" plaintiff and defendant. *Id.* at 69. In addition to the lack of evidence of the requisite special relationship, the court also noted defendant's disclaimer of ***warranties*** but did not hold that such disclaimers defeat ***duty***. *Id.* Moreover, *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 76 (1st Dep't 2012), is equally inapposite. There, the court affirmed dismissal of a negligent misrepresentation claim where, unlike here, there was no evidence of a "special relationship" and where plaintiffs agreed by contract that they were dealing with defendants in an arm's length transaction, had equal access to information, and were not relying on any of defendants' statements. *Id.* No such contracts are present here. Even if there were, such disclaimers would still be ineffective because MS had "peculiar knowledge of the . . . fraud" (*see supra*, §II.A.1.), which negates any contractual disclaimers. *China Dev. Indus. Bank v. Morgan Stanley & Co. Inc.*, 927 N.Y.S.2d 52, 53 (1st Dep't 2011); *see also HSH Nordbank*, 941 N.Y.S.2d at 75 n.15 (distinguishing *China Development* on the ground that the defendants in *HSH* did not have peculiar knowledge of the relevant facts); *Basis*, 2012 WL 5187653, at *7 ("Goldman cannot rely on disclaimers in the offering documents to avoid liability for misrepresenting facts in Goldman's exclusive control, such as Goldman's internal marks.").

misrepresentation; so long as the requisite relationship exists, negligent misrepresentation can lie. Indeed, one need not search far to find countless cases involving sophisticated investors alleging cognizable negligent misrepresentation claims.  *See, e.g.*, *Bayerische Landesbank*, 2012 WL 5383572, at *4 (duty owed to multi-billion dollar German bank); *Space Coast Credit Union v. Barclays Capital, Inc.*, No. 11 Civ. 2802(LLS), 2012 WL 946832 (S.D.N.Y. Mar. 20, 2012) (duty owed to multi-billion dollar domestic credit union); *see also Basis*, 2012 WL 5187653, at *7, *9 (duty owed to multi-billion dollar investment fund despite objection to plaintiff's sophistication); *E*Trade*, 2008 WL 2428225, at *24 (duty owed to multi-billion dollar brokerage firm).

### 3. Plaintiffs' and MS's Relationship Extended Beyond a Typical "Arm's Length" Business Transaction

As the Second Circuit held in *Suez Equity*, a commercial relationship extends "beyond the typical arm's length business transaction" where defendants had personal contact with plaintiffs and vouched for the veracity of the allegedly false information.  250 F.3d at 103; *see also Kimmell*, 89 N.Y.2d at 265 (relationship is more than arm's length business transaction where the defendant solicited the plaintiffs' investment, met with certain plaintiffs, supplied plaintiffs with information generated for the express purpose of educating plaintiffs and investors generally, urged plaintiffs to review and rely on the information, and received financial compensation for his efforts on behalf of the investment project).  As discussed above, the evidence shows that MS affirmatively encouraged plaintiffs to review and rely on the ratings it provided, communicated with plaintiffs to solicit their investments, provided individualized memoranda answering plaintiffs' investment inquiries, conducted telephone calls, held client dinners, crisscrossed the globe to meet with and sell Cheyne SIV notes to the plaintiffs, and received compensation for their sales to plaintiffs.  *See supra*, §II.A.

MS's attempt to paint its role as simply one among many uninvolved placement agents grossly mischaracterizes the facts.  In truth, MS was also responsible for arranging and structuring

- 23 -

the Cheyne SIV, providing the warehouse for the SIV's underlying portfolio, approving all assets that went into the asset portfolio, and negotiating with the Rating Agencies to obtain the high, albeit false, credit ratings.  *See, e.g.*, Tab 94 at MS_000301634 (emphasizing, as part of its "extensive knowledge of the SIV sector," that "Morgan Stanley was responsible for structuring, marketing and placing the capital notes" for the Cheyne SIV).  In addition, MS was the lead placement agent for the CP and MTNs and the exclusive placement agent for MCNs.  Tab 89 at MS_000077750.  MS was also deeply entrenched with the Cheyne SIV, as it received, in addition to its $10 million structuring fee, 20%-25% of the ongoing Senior Management Fee and a portion of the ongoing Performance Management Fee.  Tab 95 at MS_000452248.  Finally, MS was "involved in the development of new structural features to be incorporated in the SIV" post-launch.  *Id.* at MS_000452255.

In fact, MS itself described its relationship with investors as something more than a typical business relationship.  For example, MS emphasized that it "takes pride in giving the most accurate and helpful market intelligence and trading advice to each of our issuing clients."  Tab 69 at MS_000473256; *see also* Tab 1 at MS_000302406 (trumpeting its "unique" strength and the depth of its relationships with investors and its role as "***trusted advisor***" to investors); Tab 69 at MS_000473256 (highlighting MS's "extensive ***education*** and marketing" to investors); Tab 94 at MS_000201634 (MS "recognize[s] the importance of investor marketing and education.  This has allowed us to build strong relationships with investors built on ***respect and trust*** that have, in turn, helped us to bring issuing clients the broadest distribution and best funding levels possible."); Tab 69 at MS_000473256 (emphasizing that MS traders "have ***deeper investor relationships*** which enhance our overall distribution capabilities"); Tab 1 at MS_000302406 (emphasizing MS has "***unique relationships with money market investors*** bringing them value added trade ideas and often becoming their ***trusted advisor***").

### D.   MS Is Liable for Negligent Misrepresentation Regardless of Whether It Issued the False Credit Ratings

In yet another attempt to re-litigate legal issues upon which this Court has already ruled, MS again argues that it cannot be liable for negligent misrepresentation because it did not "make" the false credit ratings.  But, as the Court held the last time MS made this argument, the elements of negligent misrepresentation under New York law do "not include any requirement of an affirmative misrepresentation by a defendant." *Abu Dhabi*, 2012 WL 4762039, at *2 (citing *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (the New York Court of Appeals' most recent recitation of the elements of negligent misrepresentation)).  Instead, "the question is not whether an affirmative misrepresentation can be attributed to a defendant, but whether a defendant breached a duty to provide a plaintiff with accurate information." *Id.*  Here, where the evidence clearly creates a dispute of fact as to MS's duty to plaintiffs and breach of that duty by its provision of the false credit ratings to the plaintiffs, nothing more is required.  *Id.* ("a defendant whose duty consisted of an obligation to provide accurate information to a plaintiff may be liable for negligently providing inaccurate information ***even if that information originated from third parties***") (emphasis in original).

Additionally, "because a negligent misrepresentation claim may be based on the breach of a duty to provide accurate information, it may be premised on an ***omission***." *Id.* (emphasis in original).  Where, as here, MS "possesse[d] superior knowledge, not readily available to [plaintiffs], and kn[ew] that [plaintiffs were] acting on the basis of mistaken knowledge" about the safety and stability of the Cheyne SIV notes, MS is liable in negligent misrepresentation for omitting facts necessary to make its provision of information not misleading.  *Id.* (original emphasis omitted).

## III.   CONCLUSION

For the foregoing reasons, MS's motion for summary judgment should be denied.

- 25 -

DATED:  December 21, 2012   Respectfully submitted,

          ROBBINS GELLER RUDMAN
            & DOWD LLP
          MICHAEL J. DOWD
          DANIEL S. DROSMAN
          DARRYL J. ALVARADO


             s/ DANIEL S. DROSMAN
            DANIEL S. DROSMAN

          655 West Broadway, Suite 1900
          San Diego, CA  92101-3301
          Telephone:  619/231-1058
          619/231-7423 (fax)
          miked@rgrdlaw.com
          dand@rgrdlaw.com
          dalvarado@rgrdlaw.com

          ROBBINS GELLER RUDMAN
            & DOWD LLP
          SAMUEL H. RUDMAN
          58 South Service Road, Suite 200
          Melville, NY  11747
          Telephone:  631/367-7100
          631/367-1173 (fax)
          srudman@rgrdlaw.com

          ROBBINS GELLER RUDMAN
            & DOWD LLP
          LUKE O. BROOKS
          JASON C. DAVIS
          Post Montgomery Center
          One Montgomery Street, Suite 1800
          San Francisco, CA  94104
          Telephone:  415/288-4545
          415/288-4534 (fax)
          lukeb@rgrdlaw.com
          jdavis@rgrdlaw.com

          Attorneys for Plaintiffs

799476_1

POMERANTZ GROSSMAN HUFFORD
 DAHLSTROM & GROSS LLP
MARC I. GROSS
TAMAR A. WEINRIB
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
taweinrib@pomlaw.com

Additional Attorneys for Plaintiff State Board of
Administration of Florida

- 27 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 28, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 28, 2012.

s/ DANIEL S. DROSMAN
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  ddrosman@rgrdlaw.com

## Mailing Information for a Case 1:08-cv-07508-SAS-DCF

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Mario Aieta**
  maieta@ssbb.com,managingclerk@ssbb.com,marioaieta@gmail.com,dgerard@ssbb.com

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **X Jay Alvarez**
  jaya@rgrdlaw.com

- **Greg Donald Andres**
  greg.andres@davispolk.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com

- **Dai Wai Chin Feman**
  dchinfeman@ssbb.com

- **Joel M. Cohen**
  jcohen@gibsondunn.com,aarias@gibsondunn.com,mkdunning@gibsondunn.com,snurhussein@gibsondunn.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,jillk@rgrdlaw.com,E_File_SD@rgrdlaw.com,nlindell@rgrdlaw.com,tholindrake@rgrdlaw.com,jcharo@rgrdlaw.com

- **Mary K Dunning**
  mkdunning@gibsondunn.com,dwolber@gibsondunn.com,mkatz@gibsondunn.com,aarias@gibsondunn.com,arublin@gibsondunn.com,pwade@gibsondunn.com,cdieng

- **Jessica Lynn Freese**
  jessica.freese@davispolk.com

- **Charles Alan Gilman**
  cgilman@cahill.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Christopher Michael Joralemon**
  cjoralemon@gibsondunn.com,aarias@gibsondunn.com

- **Mark Adam Kirsch**
  mkirsch@gibsondunn.com,aarias@gibsondunn.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Jeffrey B. Korn**
  jkorn@willkie.com,maosdny@willkie.com

- **William Ross Miller , Jr**
  william.miller@dpw.com,ecf.ct.papers@dpw.com

- **Paul Steel Mishkin**
  paul.mishkin@dpw.com

- **Tariq Mundiya**
  maosdny@willkie.com,jsim@willkie.com,tmundiya@willkie.com

- **David Owen**
  dowen@cahill.com

- **Antonio Jorge Perez-Marques**
  antonio.perez@dpw.com,ecf.ct.papers@dpw.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Christopher Joseph Roche**
  croche@kaplanrice.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Tammy Lynn Roy**
  troy@cahill.com,ndelutri@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com,jdoty@ssbb.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew Dickens Schlichter**
  andrew.schlichter@dpw.com

- **Jessica T. Shinnefield**
  jshinnefield@rgrdlaw.com

- **Robert Frank Wise , Jr**
  rwise@dpw.com,ecf.ct.papers@dpw.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

- **Lawrence Jay Zweifach**
  lzweifach@gibsondunn.com,aarias@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David C. Walton
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301
```