UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ──────────────────── x |  |  |
| ABU DHABI COMMERCIAL BANK, et al., Individually and On Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 1:08-cv-07508-SAS-DCF  CLASS ACTION |
| Plaintiffs, | : : : | PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF THEIR |
| vs. | : : | MOTIONS *IN LIMINE* |
| MORGAN STANLEY & CO. INCORPORATED, et al., | : : | **[REDACTED]** |
| Defendants. | : : : | |
| ──────────────────── x |  |  |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

    A.   Motion *in Limine* No. 1: Defendants Should Be Precluded from Arguing that Only the Knowledge of the Individuals Who Worked Directly on the Cheyne SIV Can Be Attributed to the Defendants ..................................................1

        1.   Evidence of Defendants' Pervasive Fraud in Rating and Structuring the Types of Structured Finance Securities that Underlie the Cheyne SIV Is Relevant to Defendants' State of Mind .........2

        2.   Evidence that the Same Morgan Stanley Employees Who Worked on the Cheyne SIV Knew Its Underlying Assets Were Filled with Toxic Subprime Loans Is Relevant to Morgan Stanley's Knowledge of the Underlying Fraud .........................................................7

        3.   Evidence of Defendants' Pervasive Fraud in Rating and Structuring the Types of Structured Finance Securities Contained in the Cheyne SIV Is "Inextricably Intertwined" with Evidence the Cheyne SIV Fraud..................................................................................9

        4.   Evidence of Defendants' Pervasive Fraud in Rating and Structuring the Types of Structured Finance Securities that Underlie the Cheyne SIV Is Relevant to the Falsity of the Cheyne SIV's Ratings ...........................................................................................10

    B.   Motion *in Limine* No. 10: Defendants Should Be Precluded from Arguing or Offering Evidence Regarding Plaintiffs' Investments Other than the Cheyne SIV ...............................................................................................11

    C.   Motion *in Limine* No. 14: Defendants Should Be Precluded from Introducing Evidence or Testimony from Experts Previously Identified by Plaintiffs Who Will Not Testify in This Action.....................................................13

    D.   Motion *in Limine* No. 17: Plaintiffs Should Be Permitted to Use at Trial Certain Documents Produced in the *King County* Action ......................................14

    E.   Motion *in Limine* No. 18: Plaintiffs Should Be Permitted to Call Raymond McDaniel and William Harrington at Trial ...........................................................16

        1.   McDaniel Possesses Unique, Highly Relevant Information.....................17

        2.   Harrington Possesses Unique, Highly Relevant Information ...................23

    F.   Motions *in Limine* Decided at the November 12, 2012 Hearing ..........................28

**Page**

II.    CONCLUSION.................................................................................................................29

804421_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   269 F.R.D. 252 (S.D.N.Y. 2010) ...........................................................11

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   No. 08 Civ. 7508(SAS), 2012 WL 3584278
   (S.D.N.Y. Aug. 17, 2012) .....................................................................20

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   860 F. Supp. 2d 251 (S.D.N.Y. 2012) ..................................................11

*Center v. Hampton Affiliates, Inc.*,
   66 N.Y.2d 782 (1985) .............................................................................6

*Cook v. Arrowsmith Shelburne, Inc.*,
   69 F.3d 1235 (2d Cir. 1995) .................................................................25

*Danna v. Malco Realty, Inc.*,
   857 N.Y.S.2d 688 (2008) ........................................................................6

*Defer LP v. Raymond James Fin., Inc.*,
   654 F. Supp. 2d 204 (S.D.N.Y. 2009) ....................................................6

*Flaherty v. Metromail Corp.*,
   293 F. Supp. 2d 355 (S.D.N.Y. 2003) ..................................................25

*Garrett v. Garden City Hotel, Inc.*,
   No. 05-CV-0962(JFB)(AKT), 2007 WL 1174891
   (E.D.N.Y. Apr. 19, 2007) .....................................................................25

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ....................................................6

*In re Homestore.com, Inc. Sec. Litig.*
   No. CV 01-11115 RSWL (CWx), 2011 WL 291176
   (C.D. Cal. Jan. 25, 2011) .....................................................................13

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................................................6

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................6, 7

804421_1

**Page**

*In re MBIA, Inc. Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010)...................................................................6

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  No. 1:00-1898, 2008 WL 1971538
  (S.D.N.Y. May 7, 2008)............................................................................14

*In re Metlife Demutualization Litig.*,
  262 F.R.D. 217 (E.D.N.Y. 2009)..............................................................6

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009).......................................................6

*In re WorldCom, Inc. Sec. Litig.*,
  352 F. Supp. 2d 472 (S.D.N.Y. 2005).......................................................5

*Kuo Feng Corp. v. Ma*,
  669 N.Y.S.2d 575 (1998)..........................................................................6

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007).....................................................................12

*Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012).......................................................5

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
  No. 10 Civ. 2835(NRB), 2011 WL 4357368
  (S.D.N.Y. Sept. 19, 2011).........................................................................6

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012).......................................................5

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
  203 F.R.D. 98 (S.D.N.Y. 2001)...............................................................23

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008).......................................................................6

*Treppel v. Biovail Corp.*,
  No. 03 Civ. 3002 PKL JCF, 2006 WL 468314
  (S.D.N.Y. Feb. 28, 2006).........................................................................23

*United States v. Bank of New England, N.A.*,
  821 F.2d 844 (1st Cir. 1987).......................................................................5

- iv -

Page

*United States v. Carboni,*
  204 F.3d 39 (2d Cir. 2000)..................................................................................9, 10

*United States v. Ferguson,*
  246 F.R.D. 107 (D. Conn. 2007)..........................................................................9, 10

*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007)................................................................................9, 10

*Valentini v. Citigroup, Inc.,*
  837 F. Supp. 2d 304 (S.D.N.Y. 2011)........................................................................5

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 26 ..............................................................................................................23
  Rule 26(a)(2)(C)(ii)..............................................................................................29
  Rule 26(b)(2)......................................................................................................22
  Rule 26(b)(4)(B) ...........................................................................................13, 14
  Rule 56(c)...........................................................................................................7

Federal Rules of Evidence
  Rule 401 ......................................................................................................11, 12
  Rule 402 ......................................................................................................11, 12
  Rule 403 ......................................................................................................11, 12
  Rule 404(b) .........................................................................................................9
  Rule 801(d)(2)(D)...............................................................................................25

**SECONDARY AUTHORITIES**

Restatement (Third) of Agency §5.03 (2006)................................................................5

## I.    INTRODUCTION

Plaintiffs respectfully submit this omnibus memorandum of law in support of their motions *in limine* pursuant to the Court's directive at the November 12, 2012 hearing.[1]   By this motion, plaintiffs seek orders (1) precluding defendants from arguing that only the knowledge of the individuals who worked directly on the Cheyne SIV can be attributed to defendants; (2) precluding defendants from arguing or offering evidence regarding plaintiffs' investments other than the Cheyne SIV; (3) precluding defendants from introducing evidence or testimony from experts previously identified by plaintiffs but who will not testify in this action; and (4) permitting plaintiffs to call Raymond McDaniel and William Harrington at trial.

### A.    Motion *in Limine* No. 1: Defendants Should Be Precluded from Arguing that Only the Knowledge of the Individuals Who Worked Directly on the Cheyne SIV Can Be Attributed to the Defendants

The Cheyne SIV was simply a repository for various classes of structured finance instruments.  The ratings on the Cheyne SIV's notes were derived from the ratings on its constituent assets.  Defendants' conduct in structuring and rating the types of structured finance instruments that were contained in and provided the collateral for the Cheyne SIV, including RMBS, CDOs, CMBS, and CLOs, and the knowledge of the individuals who worked on those types of securities, is directly relevant to the scienter and falsity elements of plaintiffs' claims.  Accordingly, defendants should be precluded from arguing that only the knowledge of individuals who worked directly on the Cheyne SIV can be attributed to defendants.

---

[1]    For ease of reference and where applicable, plaintiffs have utilized the same numbering as was used in plaintiffs' pre-motion letter concerning proposed motions *in limine*, dated October 23, 2012.  Plaintiffs have not included briefing herein regarding plaintiffs' Motion *in Limine* Nos. 11 (concerning the inadmissibility of plaintiffs' due diligence) and 13 (concerning preclusion of evidence on topics about which defendants refused to produce discovery), as both were the subject of separate letter briefs to the Court dated December 20, 2012 and November 29, 2012, respectively.

1.      **Evidence of Defendants' Pervasive Fraud in Rating and Structuring the Types of Structured Finance Securities that Underlie the Cheyne SIV Is Relevant to Defendants' State of Mind**

The false ratings were statements made by the rating agency defendants, not by specific employees or rating committees.  These statements carried the full weight and authority of the rating agencies.  Therefore, evidence that senior executives at the rating agencies knew that ratings on the structured finance asset classes contained in the Cheyne SIV were inaccurate, knew that those securities were poor quality, and knew that those falsely-rated, poor quality securities would be included in other securitizations further up the food chain that depend on underlying ratings, such as the Cheyne SIV, is directly relevant to the rating agencies' state of mind.  Thus, as the Court correctly noted at the November 12, 2012 conference, because the Cheyne SIV's ratings depended on the accuracy of the ratings assigned to the SIV's underlying assets, "it would be wrong" to limit the relevant inquiry to only evidence concerning the Cheyne SIV specifically.  11/12/2012 Hrg. Tr. at 69:2-8.  Instead, the conduct and knowledge of the individuals who worked on the types of structured finance products contained in the Cheyne SIV is unquestionably relevant.  *Id.* at 69:17 ("[I]t can't be limited to just [Cheyne SIV] rating committee members."); *id.* at 69:11 (the relevant inquiry is "limited to structured products").

As the Court has recognized, an SIV is by definition only as strong as the assets it holds. Indeed, the Cheyne SIV rating analysis was heavily dependent on the false ratings assigned to the SIV's underlying assets.  Defendants testified as much.  *See, e.g.*, Ex. 1 at 218:3-1███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████220:15-19 ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████Ex. 2 at 285:21-

- 2 -

287:8 

Because SIVs (like CDOs) ... Ex. 3 at S&P-ADCB 0315445; *see also id.* at S&P-ADCB 0315444 ...

Given that the accuracy of the Cheyne SIV's ratings depended on the accuracy of the ratings assigned to its underlying assets, the evidence of the rating agency employees' knowledge that (i) the assets contained in the Cheyne SIV were poor quality, (ii) the methodologies used to rate those underlying assets were flawed, (iii) the ratings on those underlying assets were inaccurate, and (iv) those poor quality assets and inaccurate ratings would drive the ratings on subsequent vehicles, such as the Cheyne SIV, is directly relevant to the rating agency defendants' state of mind.  For example, a June 2005 presentation circulated to S&P's global Structured Finance Leadership Team ("SFLT"), which consisted of the high-level executives in S&P's structured finance unit, indicated that "[c]ompetition among rating agencies has helped to drive down support levels in deals – this will create more ratings volatility."[3] *King County* Dkt. No. 329-2, Tab 52 at S&P-ADCB 2595538.  The same presentation warned:

---

[2]      All emphasis is added and citations are omitted throughout unless otherwise noted.

[3]      Executives on the SFLT included Executive Managing Director of Structured Finance, Joanne Rose, who was S&P's highest ranking structured finance executive, Chief Criteria Officer, Tom Gillis, European Head of Analytics, Kai Gilkes, and the managing directors of several units including CDOs, RMBS and CMBS.

804421_1

> Concerns that a "bubble" has developed . . . .  If this is the case and the "bubble"
> bursts then a large number of rating downgrades may occur.  This could lead to high
> negative rating volatility . . . .  This negative effect would trickle into CDOs as there
> are an increasing number of CDOs with RMBS and CMBS in them.

*Id.*  The fact that the senior-most S&P executives knew, as early as June 2005, that falsely-rated,

poor quality underlying assets would have a magnified negative effect on securities like the Cheyne

SIV (which contained CDOs, RMBS and CMBS) goes directly to the rating agency's scienter.

In addition, during the relevant period, senior management at both rating agencies directed

and coerced their employees continually to sacrifice analytical integrity in order to maintain market

share, with full knowledge that inflated ratings on RMBS, CMBS, CDOs and other structured

products would be used to rate other securities, like the Cheyne SIV, that contained those assets.  For

example, in August 2004, S&P's structured finance group arranged a meeting "to discuss adjusting

criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals."

Dkt. No. 433, Tab 50 at S&P-ADCB 0461730.  Similarly, in September 2004, an S&P analyst who

worked on the Cheyne deal asked "how far [correlation assumptions] would have to change for us to

be 'competitive'" with respect to CDO correlations.  Dkt. No. 433, Tab 51 at S&P-ADCB 0967342.

In March 2005, an S&P analyst lamented that a new, more accurate RMBS model "could've been

released months ago . . . if we didn't have to massage the sub-prime and Alt-A numbers to preserve

market share."  Dkt. No. 434, Tab 49 at PSI-SP-000226.  And in October 2007, Moody's CEO

commented on the "RATING EROSION BY PERSUASION" that had occurred at the agency

whereby Moody's "strong internal emphasis on market share & margin focus . . . does constitute a

'risk' to ratings."  Ex. 4 at CRDT_RTG_EXH_0000116.

This evidence, establishing that senior-level executives directed employees to apply

inaccurate methodologies and issue inflated ratings on the types of securities that would later be

included in and drive the rating of securities down the line, such as the Cheyne SIV, is highly

804421_1

relevant to the rating agencies' state of mind.  Indeed, if plaintiffs can prove that any executive from S&P or Moody's (1) knew that the rating agency had issued inflated ratings on the asset classes held by Cheyne and (2) that those ratings likely would be relied on to derive other structured finance ratings (like the ratings on Cheyne), scienter could be established through that executive, whether or not he or she worked directly on Cheyne.

Indeed, "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter.  ***Proof of a corporation's collective knowledge and intent is sufficient***."  *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005).  This is because "[o]rganizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information."  Restatement (Third) of Agency §5.03 illus. 8 (2006); *see also United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) (affirming "collective knowledge" jury instruction because "[t]he acts of a corporation are, after all, simply the acts of all of its employees operating within the scope of their employment" and "***[i]t is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation***").[4]  Accordingly, "courts in this District have recently emphasized that ***there is no***

---

[4]    *See also Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 316-17 (S.D.N.Y. 2011) ("The fact that, on multiple occasions, employees of both companies are alleged to have performed their professional duties in a consciously wrongful or reckless manner establishes a 'strong inference' of corporate scienter."); *Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341 (S.D.N.Y. 2012) (upholding fraud claim against corporation even though the allegations were not sufficient to allege scienter against the individual defendants that made the alleged false statements); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) (attributing

804421_1

***requirement 'that the same individual who made the alleged misstatement on behalf of a corporation personally possessed the required scienter.'"*** *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006). "Confining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement, as Defendants suggest, is unduly limiting." *Id.* As Judge Kaplan explained, this makes sense:

> There are good reasons for imputing the collective knowledge of employees or agents to their corporate principal. Doing so creates incentives for the entity to create and maintain effective internal communications and, more importantly, serves to protect third parties with which it does business.

*Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218-19 (S.D.N.Y. 2009).[5] Accordingly, proof that defendants' employees acted fraudulently in structuring and rating the types of structured

---

scienter of head of mortgage department to corporate defendant); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) ("the individual making an alleged misstatement and the one with scienter do not have to be one and the same"); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835(NRB), 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236-37 (S.D.N.Y. 2010); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010). *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008), does not change the analysis. *Dynex* stands merely for the legal principle that, "[w]hen the defendant is a company, scienter refers to the state of mind of one or more of the company's agents." *In re Metlife Demutualization Litig.*, 262 F.R.D. 217, 234 (E.D.N.Y. 2009).

[5]     New York courts are in accord: "While it is true that none of the appellants individually committed all of the acts constituting the fraud, this is not, as appellants contend, an exculpating circumstance. It is well established that liability for fraud may be premised on knowing participation in a scheme to defraud, even if that participation does not by itself suffice to constitute the fraud." *Kuo Feng Corp. v. Ma*, 669 N.Y.S.2d 575, 576 (1998); *see also Danna v. Malco Realty, Inc.*, 857 N.Y.S.2d 688 (2008); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985).

finance securities contained in the Cheyne SIV is highly relevant to the rating agencies' state of mind.[6]

**2.     Evidence that the Same Morgan Stanley Employees Who Worked on the Cheyne SIV Knew Its Underlying Assets Were Filled with Toxic Subprime Loans Is Relevant to Morgan Stanley's Knowledge of the Underlying Fraud**

The evidence also shows that Morgan Stanley personnel involved in the Cheyne SIV structuring and rating process knowingly included poor quality loans in subprime RMBS that it structured and later sold to the Cheyne SIV.  In 2005, Morgan Stanley's Steve Shapiro learned that an increasing number of the loans reviewed by Morgan Stanley for purchase "do not make sense" and that "[o]verall . . . the loans are riskier than [those] seen in the past."  Dkt. No. 437, Tab 136 at MS_RHI_001422949, MS_RHI_001422952.  Although Morgan Stanley observed an "unusually high amount of layered risk" and "*very flagrant*" appraisal inflation, it sought to "clear as many borderline loans" into its securitizations "as possible."  Dkt. No. 437, Tabs 137, 139.  By March 2006, Shapiro and Frank Telesca learned of "deteriorating appraisal quality" across "all of the sellers" from which Morgan Stanley purchased subprime loans.  Dkt. No. 437, Tab 139.  Despite knowledge of these poor quality loans, Morgan Stanley included bad loans into its securitizations on an astonishing scale, securitizing these knowingly poor quality loans and even overturning failing

---

[6]     As a result, defendants' argument that evidence of their fraud in connection with the types of assets underlying the Cheyne SIV is irrelevant because they are liable only if "the actual speaker [of the Cheyne SIV's false ratings] made the alleged misstatement with the requisite state of mind," clearly misses the mark.  Defendants' Joint Memorandum of Law in Support of Their Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) (Dkt. No. 458) at 10.  As explained above, Judge Kram rejected this identical argument in *Marsh & McLennan*, 501 F. Supp. 2d at 481.

- 7 -

grades on **64%** of the loans identified by its outside due diligence vendor as materially deficient. Dkt. No. 437, Tab 140 at CLAY-ABUDHABI-00014.



Ex. 5 at 114-15

*King County* Dkt. No. 323-7, Tab 399 at MS_001349255 (identifying Shapiro and Telesca as members of the ABS trading desk); Ex. 6 at 31:4-6

Further, the ABS traders responsible for approving all of the Cheyne SIV assets, including Shapiro and Telesca, reported to Howard Hubler, the notorious Morgan Stanley trader responsible for losing $9 billion through a botched subprime hedging strategy. *King County* Dkt. No. 323-7, Tab 399 at MS_001349255. Hubler, in turn, worked directly on the Cheyne SIV, expressing grave misgivings early on about the Cheyne SIV: "***The more I think about this trade the worse I feel about the risk/reward that it has***." Dkt. No. 433, Tab 115; *see also* Ex. 7 at MS_001297382 (demonstrating Hubler's involvement in the inception of the Cheyne SIV, including coming up with the idea to "put on a short position at tight spreads" on certain assets); Ex. 7 at MS_001439310



Ex. 7 at MS_000595653.

In sum, the evidence shows that the Morgan Stanley employees who worked on the ABS trading desk and were connected to the Cheyne SIV knew that its underlying assets were filled with toxic subprime loans.  This evidence goes directly to Morgan Stanley's knowledge of the underlying fraud – an element of plaintiffs' aiding and abetting claim.

> **3.** **Evidence of Defendants' Pervasive Fraud in Rating and Structuring the Types of Structured Finance Securities Contained in the Cheyne SIV Is "Inextricably Intertwined" with Evidence the Cheyne SIV Fraud**

Evidence of defendants' conduct in rating and structuring of the types of structured finance securities contained in the Cheyne SIV is admissible because it "'arose out of the same transaction or series of transactions as the charged offense, . . . is inextricably intertwined with the evidence regarding the [fraudulent ratings], [and is] necessary to complete the story of the crime on trial.'" *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000);[7] *see also United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007) (evidence that is "'inextricably intertwined with the evidence regarding the charged offense, or [that is] necessary to complete the story of the crime on trial'" is not prior bad acts evidence that must be analyzed under Rule 404(b)); *United States v. Ferguson*, 246 F.R.D. 107, 115 (D. Conn. 2007) ("'In particular, evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.'").

As described above, defendants' conduct in rating and structuring the types of securities underlying the Cheyne SIV impacted the ratings on the Cheyne SIV notes directly.  Thus, evidence

---

[7] The test for admissibility under the "inextricably intertwined" test articulated in *Carboni* is a disjunctive test.  *Id.*  Thus, evidence of other acts is admissible if one of the three tests is satisfied.  Here, the evidence of defendants' pervasive fraud satisfies all three prongs of the standard set forth in *Carboni*.

that defendants applied improper methodologies in rating and structuring the securities underlying the Cheyne SIV is "inextricably intertwined" with defendants' conduct in rating and structuring the Cheyne SIV. *See Carboni*, 204 F.3d at 44 (evidence of separate fraud "inextricably intertwined" with the charged fraud where "[t]he jury reasonably could have concluded that Carboni [committed separate fraudulent acts] as part of his continued effort to create an overly optimistic picture of Cableco's financial system and thus keep the money flowing from Fleet to the troubled company"); *see also Ferguson*, 246 F.R.D. at 115 (evidence of prior financial fraud as inextricably linked to the fraud charged). So, too, is evidence showing that the rating agencies succumbed to undue pressure from investment banks inextricably intertwined with evidence showing that the rating agencies succumbed to that same pressure from Morgan Stanley in rating the Cheyne SIV. Similarly, evidence that defendants rated and structured poor quality securities and then turned around and sold those securitizations or permitted them to be sold to the Cheyne SIV arises out of the "'same transaction or series of transactions'" relating to defendants' fraud. *Rigas*, 490 F.3d at 238. The evidence of defendants' pervasive fraud is also necessary to provide a complete explanation of the defendants' conduct concerning the Cheyne SIV.

> **4.      Evidence of Defendants' Pervasive Fraud in Rating and Structuring the Types of Structured Finance Securities that Underlie the Cheyne SIV Is Relevant to the Falsity of the Cheyne SIV's Ratings**

Even putting aside the issue of defendants' knowledge, evidence that the Cheyne SIV's underlying assets were falsely rated and of poor quality is directly relevant to the falsity of the Cheyne SIV's ratings – an additional, independent element of plaintiffs' claims. Kai Gilkes, S&P's most senior quantitative analyst in Europe when the Cheyne SIV was launched, testified that the ratings assigned to SIVs containing subprime RMBS – such as the Cheyne SIV – were inaccurate because the ratings on the underlying assets were inaccurate:

- 10 -

> So it is a factual statement that the ratings of those [structured investment] vehicles were inappropriate because the ratings of the underlying assets were not appropriate. So it leads to the conclusion that they should not have been rated, but that is not necessarily my – is not necessarily my belief. It is just a factual statement.

Dkt. No. 436-6, Tab 124 at 106:2-7. Because the accuracy of the Cheyne SIV's ratings were dependent on the accuracy of the ratings on its underlying assets, evidence concerning the improper methodologies and assumptions used to rate those assets is admissible to prove the falsity element of plaintiffs' fraud and negligent misrepresentation claims. *See* 1/12/2012 Hrg. Tr. at 69:2-8 (because the Cheyne SIV's ratings depended on the accuracy of the ratings assigned to the SIV's underlying assets, "it would be wrong" to limit the relevant evidence to only that which related directly to the Cheyne SIV).

    **B.**    <u>**Motion** *in Limine* **No. 10**</u>**: Defendants Should Be Precluded from Arguing or Offering Evidence Regarding Plaintiffs' Investments Other than the Cheyne SIV**

Defendants should be precluded from arguing or offering evidence about plaintiffs' investments in securities other than the Cheyne SIV notes. Plaintiffs' other investments are irrelevant to their Cheyne SIV purchases. As the Court held in denying class certification, "reliance requires hearing from each investor as to what it did, what it relied on when deciding to invest ***in the Cheyne SIV***, and whether it relied substantially on the credit ratings, minimally on the ratings, or did not rely on them at all." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 263 (S.D.N.Y. 2010). Whether plaintiffs invested in other securities, (i) which had different risk profiles and offered different returns, (ii) on different occasions, (iii) for other reasons, is irrelevant to their purchase of the Cheyne SIV notes at issue in this case. As such, evidence or argument concerning plaintiffs' unrelated investments would be prejudicial, waste time and confuse the jury. Fed. R. Evid. 401, 402, 403; *see also Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 258 (S.D.N.Y. 2012) (Scheindlin, J.) (excluding evidence of investments

- 11 -

other than those at issue in plaintiffs' case, holding that "[t]he confusion and wasted time resulting from requiring a mini-trial on the prudence of every non-party investor in Sigma would substantially outweigh any probative value this evidence has").  Because plaintiffs' decisions to purchase Cheyne SIV notes were not based on and had absolutely no connection to purchases of other, unrelated securities, evidence and argument regarding those other purchases should be excluded.

At the November 12, 2012 hearing, the Court questioned whether evidence of plaintiffs' purchases of the types of securities that were contained in the Cheyne SIV might bear on the reasonableness of plaintiffs' reliance on the Cheyne SIV ratings or to plaintiffs' sophistication.  It does not.  Indeed, any due diligence or investigation concerning structured finance securities in general, and even any due diligence relating to the Cheyne SIV in particular, is wholly irrelevant to reasonable reliance absent a showing that plaintiffs could have discovered the fraud by exercise of reasonable diligence.  *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181-82 (2d Cir. 2007) (if "the misrepresentations relate to matters peculiarly within the other party's knowledge . . . ***the wronged party may rely on them without further investigation***"); *see generally* Letter dated 12/20/2012 from Luke Brooks to Judge Scheindlin Regarding Plaintiffs' Motion *in Limine* No. 11. Plaintiffs' separate purchases of other securities is particularly irrelevant for the plaintiffs who purchased Cheyne SIV senior notes, as they did not even have access to the assets contained in the Cheyne SIV.  Further, evidence of other purchases is not necessary to establish plaintiffs' status as sophisticated Qualified Institutional Buyers – such status is a ***stipulated fact***.  Accordingly, evidence of any of plaintiffs' other investments should be excluded because it is irrelevant, prejudicial, and would waste time and lead to confusion.  Fed. R. Evid. 401, 402, 403.

- 12 -

C.     **Motion *in Limine* No. 14: Defendants Should Be Precluded from Introducing Evidence or Testimony from Experts Previously Identified by Plaintiffs Who Will Not Testify in This Action**

In connection with plaintiffs' motion for class certification, plaintiffs retained experts Christopher Cox and David Mordecai in 2009 and 2010 to opine on investors' reliance on ratings and to opine that had the Cheyne SIV's ratings been lower, the SIV would not have been economically viable. Both Cox and Mordecai submitted declarations in support of plaintiffs' motion for class certification and Cox was deposed. Because plaintiffs will not call either Cox or Mordecai to testify in this action, defendants should be precluded from introducing any evidence relating to those experts, including deposition testimony, declarations, reports, exhibits or analyses. In light of the fact that defendants did not list any of Cox's or Mordecai's expert materials on their exhibit or witness lists, and in an effort to avoid burdening the Court with unnecessary briefing, plaintiffs asked defendants whether they consented to the limitations in plaintiffs' proposed Motion *in Limine* No. 14 regarding exclusion of evidence from prior expert witnesses who will not testify in this action. Defendants never responded to plaintiffs' inquiry.

Defendants cannot demonstrate the requisite "exceptional circumstances" to justify the introduction of evidence from plaintiffs' earlier expert witnesses who will not testify at trial. In *In re Homestore.com, Inc. Sec. Litig.*, the court granted plaintiffs' motion *in limine* to exclude evidence from an expert witness earlier retained by plaintiffs but who plaintiffs did not plan to call at trial, holding that defendants "ha[d] not demonstrated that 'exceptional circumstances' exist[ed]" to enable defendants to use such evidence because defendants "could have designated other experts to testify on this matter." No. CV 01-11115 RSWL (CWx), 2011 WL 291176, at *2-*3 (C.D. Cal. Jan. 25, 2011) (citing Fed. R. Civ. P. 26(b)(4)(B)). Thus, absent such "exceptional circumstances,"

- 13 -

Fed. R. Civ. P. 26(b)(4)(B) precludes defendants' use of deposition testimony by a previously designated expert where plaintiff no longer intends to call that expert at trial. *Id.*

Here, defendants could have designated one or more experts to opine on reliance and the economic viability of the Cheyne SIV vis-à-vis its ratings. In fact, defendants ***did*** designate at least two experts to opine on reliance – Frank Fabozzi and Brian Cartwright. So, too, did plaintiffs' expert, Joseph Stiglitz, opine on the role of ratings in investors' investment decisions. It is thus unsurprising that defendants do not list Cox's or Mordecai's declarations on their trial exhibit list or designate any of Cox's deposition testimony. Permitting defendants to introduce evidence from Cox and Mordecai would also be cumulative, as the topics on which they testified overlap completely with the opinions of Fabozzi, Cartwright, and Stiglitz. As the Court recognized, cumulative expert testimony is a waste of time and will not aid the jury. 11/12/2012 Hrg. Tr. at 6:7-15; *see In re Methyl Tertiary Butyl Ether* ("*MTBE*") *Prods. Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538, at *3, *13 (S.D.N.Y. May 7, 2008) (Scheindlin, J.) ("I have instructed the parties in these cases that, due to the large number of expert witnesses, it is important that each expert address a distinct issue and cumulative expert testimony will not be allowed."). Accordingly, defendants should not be permitted to introduce evidence from Cox or Mordecai, including their deposition testimony, declarations, reports, exhibits or analyses.

    **D.**    <u>**Motion *in Limine* No. 17**</u>**: Plaintiffs Should Be Permitted to Use at Trial Certain Documents Produced in the *King County* Action**

At an April 19, 2011 conference, the Court stated that plaintiffs could use documents produced in the *King County* case in this case if they were produced before applicable discovery cutoffs in this case. *See* 4/19/2011 Hrg. Tr. at 68. The Court stated at that conference that documents produced in the *King County* case after the discovery cutoff in this case should not be admissible in this case because to allow otherwise would be an end-run around the discovery cutoff

date.  Plaintiffs have included on their trial exhibit list 97 documents that were produced by Morgan Stanley in the *King County* action.  Because those documents were not produced until after the discovery cutoff in this case, defendants have taken the position that they are inadmissible here.  Morgan Stanley's objections should be overruled because (1) most of those documents are now public records available to any litigant, including the plaintiffs, for any purpose; and (2) all of the documents are responsive to document requests propounded on Morgan Stanley in this case and should have been produced in this case.[8]

First, following summary judgment in the *King County* action, 49 of the 97 contested documents listed on plaintiffs' trial exhibit list that were produced in the *King County* action are public documents.  While defendants may have other objections to the admissibility of these publicly available documents, the production date of those documents is irrelevant.  Indeed, the Court's restriction on the use of documents from the *King County* action arose out of plaintiffs' request to modify the protective order in that case to remove restrictions which do not apply to documents that are in the public record.

Second, the remaining 48 contested *King County* documents are responsive to document requests propounded by plaintiffs in this case.  The fact that these documents were not available to plaintiffs until after the discovery cutoff is due to gamesmanship by Morgan Stanley.  Plaintiffs clearly requested these documents in this case and Morgan Stanley failed to produce them.  The contested documents consist of due diligence spreadsheets reflecting the results of due diligence conducted on loans being purchased and securitized by Morgan Stanley, agreements between

---

[8]     It is beyond dispute that all evidence produced in *King County* (regardless of the date of production) is admissible for impeachment in this case.  *See* 4/19/2011 Hrg. Tr. at 71.

Morgan Stanley and loan originators and RMBS sponsors relating to the SIV's underlying assets, and internal presentations regarding Morgan Stanley's RMBS business.  All of these documents are responsive to document requests propounded on Morgan Stanley **in this case** concerning the SIV's underlying assets, particularly RMBS.[9]  The fact that defendants inexplicably failed to produce these highly relevant and responsive documents should not insulate them from admission here.

        **E.**        **Motion _in Limine_ No. 18: Plaintiffs Should Be Permitted to Call Raymond McDaniel and William Harrington at Trial**

Plaintiffs should be permitted to call at trial Raymond McDaniel, Moody's CEO, and William Harrington, a senior analyst who worked in structured finance at Moody's from 1999 until his resignation in 2010.  Both possess relevant, non-cumulative knowledge concerning plaintiffs' claims.

---

[9]      *See, e.g.*, Ex. 8 (Second Request for Production to Morgan Stanley) at 9 (RPD No. 4) ("All documents reflecting any data, assumptions and/or models used by any entity, including Morgan Stanley, to evaluate the Rated Notes and/or any assets supporting the Rated Notes."); Ex. 8 (Fifth Request for Production to Morgan Stanley) at 12 (RPD No. 8) ("All documents containing opinions, evaluations or analyses of any asset class contained in the Cheyne SIV, including but not limited to . . . residential mortgage backed securities (RMBS) [and] home equity loans (HEL) . . . ."), at 12 (RPD No. 10) ("All documents concerning any due diligence, investigation, evaluation, opinion or analysis of any asset contained in the Cheyne SIV."), at 13 (RPD No. 15) ("All documents concerning any due diligence, investigation, evaluation, opinion or analysis of nonprime mortgages, including but not limited to Alt-A mortgages and subprime mortgages."), at 13 (RPD No. 16) ("All documents concerning any due diligence, investigation, evaluation, opinion or analysis of mortgages originated or serviced by Argent Mortgage Company, LLC, American Home Mortgage Corp., New Century Mortgage Corporation, First Franklin, Fremont Investment & Loan, Countrywide Mortgage and IndyMac Bank."), at 13 (RPD No. 17) ("All documents concerning information provided by Clayton Holdings, Inc. relating to any asset, pool of assets or class of assets held by the Cheyne SIV, including, without limitation, due diligence investigations and statistical information or analyses."); *see also* Ex. 9 (requesting, *inter alia*, all due diligence information, collateral tapes, agreements between Morgan Stanley and loan originators and RMBS sponsors, and presentations concerning RMBS).

- 16 -

McDaniel was at the center of the subprime crisis and the massive downgrades of structured finance products during 2007, including the Cheyne SIV. McDaniel is also on record as admitting that Moody's succumbed to pressure from investment banks and that investors in structured finance instruments – like the Cheyne SIV investors – are required to rely on credit ratings due to lack of sufficient information. McDaniel has also stated that the collapse of structured finance products was caused in part by the market's realization of the poor quality of those assets. Plaintiffs should be permitted to examine at trial Moody's most senior executive on topics that support plaintiffs' claims.

Harrington provided a Comment to the Securities and Exchange Commission ("SEC") in August 2010 that sharply criticized Moody's and highlighted several relevant issues concerning practices at Moody's during the relevant period, including troubling practices in Moody's SIV ratings business. Accordingly, plaintiffs should be permitted to call both witnesses at trial.

### 1.   McDaniel Possesses Unique, Highly Relevant Information

During discovery, plaintiffs noticed the deposition of Raymond McDaniel. Moody's objected on the grounds that McDaniel was Moody's CEO and sought protection under the "apex" deposition exception. In March 2011, plaintiffs filed a submission with the Court-appointed Special Master seeking permission to depose Raymond McDaniel, Moody's CEO. The Special Master denied plaintiffs' request. On April 22, 2011, plaintiffs filed an objection with the Court to the Special Master's Report & Recommendation. *See* Dkt. No. 233. In affirming the Special Master's findings, the Court noted that plaintiffs were only "precluded from taking [McDaniel's] deposition *at this time*." Dkt. No. 249 at 3 (emphasis in original). The Court found that plaintiffs should first complete the depositions of other, lower-level Moody's employees but made clear that "after completion of those depositions, plaintiffs could again request the deposition of the CEO if they are able to show that he has 'unique' information that is relevant and not redundant of information

- 17 -

already obtained." *Id.* at 4.  The Court repeated this reasoning at the May 16, 2011 hearing, warning Moody's: "[Y]ou're at risk.  Seems to me if they can prove up that they still need McDaniel, because you didn't give them what they need with [Brian] Clarkson," plaintiffs will renew their request for McDaniel's deposition.  5/16/2011 Hrg. Tr. at 39:13-15.

McDaniel unquestionably possesses unique information relevant to plaintiffs' claims.  No other Moody's deponent was an adequate substitute for McDaniel's testimony about the relevant observations he personally made.  Moreover, the rationale for holding plaintiffs' deposition in abeyance – McDaniel's classification as an "apex" deponent because of his position as CEO – does not apply to trial testimony.  Plaintiffs are entitled to call McDaniel – Moody's highest executive – to testify about his statements concerning plaintiffs' reliance on ratings, Moody's shortcomings in its structured finance ratings, and the causes of plaintiffs' losses.  Plaintiffs are entitled to present this compelling evidence to the jury.  As the Court has recognized, this is an important case.  Mr. McDaniel should not be permitted to wield his position as a high-ranking executive to avoid examination on his statements and actions.

Testimony from McDaniel is highly relevant to show that investors in structured finance instruments like the Cheyne SIV relied on the assigned credit ratings, in part, due to the complicated and opaque nature of the SIV and the lack of information about its structure and underlying assets. McDaniel admitted in a statement to the SEC that investors in structured finance securities like the Cheyne SIV must rely on credit ratings due to their lack of access to sufficient information to analyze such securities:

> Unlike in the corporate market, where investors and other market participants can reasonably develop their own informed opinions based on publicly available information, *in the structured finance market, there is insufficient public information to do so*. . . .

> *In the absence of sufficient data, investors are unable to conduct their own*
> *analysis and develop their own independent views about potential or existing*
> *investments*.

Ex. 10 at 2.  McDaniel stated further:

> [S]tructured finance products can be much more complex than general corporate debt
> securities, which tend to have standardized terms and often are issued by entities for
> which potential investors have independent access to a substantial amount of
> information.  Due to these factors, the quality and clarity of disclosure for privately
> offered structured finance products [like the Cheyne SIV] often lags behind the
> quality and clarity of disclosure for privately offered corporate debt securities.
> Furthermore, as demonstrated by recent events, the lack of current information
> regarding structured finance products and the underlying pools of assets can hinder
> the efforts of secondary market purchasers to make informed investment decisions.

*See id*. at n.16.  Similarly, in his testimony before the Financial Crisis Inquiry Commission,

McDaniel testified that "[i]f I wanted to rate a structured security [as an investor] I don't think there

is enough information in the public domain to do so."[10]  McDaniel went on to state that "in the

corporate market I think there is information more broadly available to the investing public than in

the securitization market" and that investors "must find [ratings] useful because they seek ratings."

These statements bear directly on the issue of reliance – an element of fraud and negligent

misrepresentation and a focus of defendants' defense.[11]  Plaintiffs are entitled to examine McDaniel

about these critical and highly relevant statements.

Moreover, in a confidential  presentation to Moody's Board of Directors, McDaniel noted

that ratings accuracy was at risk and acknowledged that "'Moody's Mortgage Model (M3)'" – the

model used to rate RMBS – "'needs investment.'"  Ninth Amended Complaint for Common Law

---

[10]     Mr. McDaniel's interview is available in audio format at www.fcic.gov.  The quoted portions
herein are based on plaintiffs' counsel's transcription of the audio interview.

[11]     As the Court is aware, defendants have argued in connection with other motions *in limine*
that the jury must determine that the fraud was peculiarly within the defendants' knowledge.
McDaniel's testimony also bears directly on this issue.

Fraud, Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, and Aiding and Abetting (Dkt. No. 354), ¶117.   McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  *Id.*  McDaniel admitted to the Moody's Board: "'The real problem is not that the market . . .  underweights [sic] ratings quality but rather that, in some sectors, it actually penalizes quality . . . .  It turns out that ratings quality has surprisingly few friends . . . .'"  *Id.*, ¶145.  McDaniel recognized the pressure exerted on analysts to come up with high ratings, explaining: "'*[a]nalysts and MDs [managing directors] are continually "pitched" by bankers, issuers, investors' and sometimes 'we "drink the kool-aid*.'"'"  *Id.*

Additionally, McDaniel drafted a document entitled, "Credit Policy issues at Moody's suggested by the subprime/liquidity crisis" in which he discussed the conflicts of interest under which Moody's and the other rating agencies operated for years, saying "Moody's *for years* has struggled with this dilemma.  *On the one had, we need to win the business and maintain market share, or we cease to be relevant.  On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes)*."  Ex. 4 at CRDT_RTG_EXH_0000115.  He continued: "As head of corporate ratings, I offered my managers precious few suggestions on how to address this very tough problem, just assumed that they would strike an appropriate balance.  I set both market share and rating quality objectives for my MDs, while reminding them to square the circle within the bounds of the code of conduct."  *Id.* at CRDT_RTG_EXH_0000115-16.  McDaniel admitted that although "[m]ethodologies & criteria are published and thus put boundaries on rating committee discretion . . . *there is usually plenty of latitude within those boundaries to register market influence*."  *Id.* at CRDT_RTG_EXH_000016.  This is the same market influence that plaintiffs allege Morgan Stanley exerted over Moody's and S&P in obtaining the false ratings, which the Court found persuasive in denying defendants' motions for summary judgment.  *See Abu*

*Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508(SAS), 2012 WL 3584278, at *23 (S.D.N.Y. Aug. 17, 2012) ("Perhaps most relevant is evidence provided by plaintiffs indicating that Morgan Stanley pressured the Rating Agencies to issue ratings it did not believe were accurate.").

McDaniel's testimony is also relevant to rebut defendants' contention that it was liquidity problems rather than credit problems that drove Cheyne into enforcement.  In an August 2007 e-mail, written as the Cheyne SIV began to unravel, McDaniel stated:



Ex. 11 at MDYS ADCB 093057.  Further, in an August 31, 2007 Question & Answer session, McDaniel admitted that ███████████████████ ████████████████████████████████████████ Ex. 12 at MDYS ADCB 1269503.  In the same session, McDaniel admitted that ████████████████ ████████████████████████████████████████ *Id.* at MDYS ADCB 1269506 (explaining that despite high ratings, ████████████████████████████████  These statements demonstrate that plaintiffs' losses were caused by the false ratings on Cheyne's subprime assets and the market's realization of that fact and rebut defendants' argument that the Cheyne SIV imploded because of an unexplainable market collapse.

As noted above, the Court at the May 16, 2011 conference stated that plaintiffs could call McDaniel if they did not get "what they need with [Brian] Clarkson."  5/16/2011 Hrg. Tr. at 39. Unsurprisingly, the deposition of Brian Clarkson was not an adequate substitute for McDaniel's

testimony.  During his deposition, Clarkson testified consistently that he had no understanding of the assertions in documents authored by McDaniel. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ Ex. 13 at 281:24; *see also id.* at 282:17-19 ████████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* at 283:22 ██████████

████████████████████████████████ *id.* at 284:13-14 ████████████████

██████████████████████████████ *id.* at 285:8 (same); *id.* at 317:20-21 ███████

██████████████████████████████ *id.*  at 319:2 █████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████ *Id.* at 499:20-22, 501:9-10. ███████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████ *Id.* at 509:17-19, 510:21-22.

Defendants will likely argue, as they did in opposing McDaniel's discovery deposition, that McDaniel should not be compelled to testify because, as the CEO of Moody's, he constitutes an "apex" witness.  But the apex witness doctrine applies to the ***discovery*** stage.  Plaintiffs' counsel is unaware of any recent authority in the Second Circuit shielding a witness with relevant information from testifying at ***trial*** under the "apex witness" doctrine.  Indeed, the underlying authority providing the rationale for the doctrine is Rule 26(b)(2), which limits discovery requests to those which are not

- 22 -

unreasonably cumulative or burdensome.  *See, e.g.*, *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001) ("Even where, as in this case, a high-ranking corporate officer denies personal knowledge of the issues at hand, this 'claim . . . is subject to testing by the examining party.'  Nevertheless, ***discovery*** is not boundless, and a court may place limits on discovery demands that are 'unreasonably cumulative or duplicative' . . . ."); *see also Treppel v. Biovail Corp.*, No. 03 Civ. 3002 PKL JCF, 2006 WL 468314, at *1-*2 (S.D.N.Y. Feb. 28, 2006) (citing Fed. R. Civ. P. 26 and noting that "permitting unlimited access to corporate executives [at the discovery stage] could . . . create a tool for harassment").  Here, where McDaniel possesses highly relevant, non-duplicative information, his testimony is clearly not sought for harassment purposes – the only danger against which the "apex witness" doctrine is meant to guard.

The testimony of other Moody's employees is not a reasonable substitute for McDaniel's testimony about the highly relevant statements and observations he personally made.  Further, the fact that McDaniel is Moody's CEO does not immunize him from testifying.  Accordingly, plaintiffs should be permitted to call him at trial.

### 2.    Harrington Possesses Unique, Highly Relevant Information

In September 2011, plaintiffs filed a submission with the Special Master seeking permission to exceed their deposition limit to depose William Harrington, which was denied.  On October 14, 2011, plaintiffs filed an objection with the Court to the Special Master's finding.  *See* Dkt. No. 327.  Thereafter, the Court directed plaintiffs to attempt to reach out to Harrington to see if he would speak voluntarily with plaintiffs.  *See* 10/21/2011 Hrg. Tr. at 5-6.  Plaintiffs sent Harrington a letter requesting to speak with him but never received a response.  Ex. 14.  On October 27, 2011, the Court

- 23 -

endorsed R&R No. 20, denying plaintiffs' request to depose Harrington **without prejudice** and holding that if Harrington appears on the finalized trial witness list, he should be deposed.[12]

Plaintiffs should be permitted to call Harrington at trial to examine him about the comment he provided to the SEC in response to the SEC's proposed rating agency reform measures (the "Comment"), which sharply criticized Moody's SIV ratings process and highlighted the way in which Henry Tabe, the Managing Director overseeing the Cheyne SIV rating process, succumbed to pressure from issuers like Morgan Stanley. Harrington has firsthand knowledge of the false ratings Moody's assigned to structured investment vehicles such as the Cheyne SIV. Under the heading "***Making It All Up: Moody's Methodology for Structured Investment Vehicles ('SIVS')***," Harrington described a meeting concerning Moody's SIV methodology that he attended in 2005 designed to calculate SIV haircuts (discounts applied to assets contained in an SIV for purposes of rating an SIV) for a range of assets contained in SIVs. Dkt. No. 437-22, Tab 152 at 56. Harrington related the conversation that he had with another Moody's employee after the training, stating:

> The training session left the contributor confused. The SIV methodology remained inaccessible despite the explanations and the hands-on training. As the contributor was not as quantitatively gifted as his PhD colleagues, he assumed that he had missed something. After the session, the contributor asked if a colleague shared the impression that something wasn't adding up. The colleague replied that ***nothing about SIVs added up***. In rating SIVs, analysts ran the SIV tool and presented the output to Henry Tabe, their manager. ***Mr. Tabe then disregarded the output and made up haircuts that were palatable to SIV issuers***.

---

[12] The Special Master's recommendation and the Court's Order were both governed by the heightened good cause requirement applied to requests to exceed the deposition limit.

*Id.*[13]  Harrington's observation that Moody's Henry Tabe would simply make up haircut inputs that were more palatable to the investment banks is corroborated by a statement by Gregg Drennan, the lead Morgan Stanley structurer for the Cheyne SIV, that "***Moody's will fix the inputs to get the outputs they want***!"  Dkt. No. 433, Tab 68 at Z0404422.  Due to Mr. Tabe's black-box SIV methodology and his conscious decision to disregard ratings outputs in favor of pleasing SIV issuers, such as Morgan Stanley and Cheyne, Mr. Harrington "added SIVs to the growing list of asset classes to be ***avoided at all costs***."  Dkt. No. 437-22, Tab 152 at 56.[14]

---

[13]     At the October 21, 2011 hearing, the Court suggested that the comment from Harrington's colleague that "nothing about SIVs added up" constitutes hearsay.  *See* 10/21/2011 Hrg. Tr. at 11.  Although an out-of-court statement, it is non-hearsay as an admission by a party opponent under Fed. R. Evid. 801(d)(2)(D), which provides that a statement offered against an opposing party is not hearsay where it was made by the party's agent or employee on a matter within the scope of that relationship while the relationship existed.  *Id.*  Here, both Harrington and his colleague were employed by Moody's, a defendant to this action, at the time their conversation took place in 2005.  Moreover, the topic of conversation – Moody's method of rating SIVs – was within the scope of their employment.  Indeed, the statement was made at a Moody's training session.  Courts in the Second Circuit have found out-of-court conversations to be party admissions, and thus not hearsay, under identical circumstances.  *See, e.g., Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962(JFB)(AKT), 2007 WL 1174891, at *15 n.12 (E.D.N.Y. Apr. 19, 2007) ("[T]he alleged double-hearsay remark by Samman . . . [is] still admissible as [an] admission[] of defendant GCH, pursuant to Fed. R. Evid. 801(d)(2)(D).  At the time they allegedly made the comments, both Marcinow and Samman were employees of GCH.  Moreover, the alleged comment by Samman concerned matters within the scope of his employment because it related to a personnel decision."); *Flaherty v. Metromail Corp.*, 293 F. Supp. 2d 355, 360 n.4 (S.D.N.Y. 2003) (admitting testimony by plaintiff's colleague concerning a conversation in which her supervisor had instructed her to fire plaintiff due to plaintiff's age); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (finding that plaintiff's account of double-hearsay statements made by plaintiff's supervisors were admissible as admissions of party's agents).  If the Court is concerned that Harrington did not identify his colleague, plaintiffs should be permitted to depose Harrington to lay a proper foundation for this conversation so that this incredibly damaging admission regarding Moody's practices and scienter may be received in evidence.

[14]     In denying plaintiffs' request to depose Harrington, the Special Master hypothesized that because Mr. Harrington stated he was "confused" after the meeting, his deposition would not be useful.  *See* Report and Recommendation No. 20 at 3, 7 (Dkt. No. 324).  What Harrington actually said, however, was that he was "confused" because, despite attending the meeting, the "SIV

- 25 -

Harrington also provided insight into Moody's knowledge of the falsity of its RMBS ratings and, in the process, undercut one of Moody's primary defenses:

> Moody's argues that RMBS committees could not have factored the collapse of real estate prices into their opinions, given that the scale of the collapse was both unprecedented and unforeseeable. This rationale is as unconvincing as it is disingenuous, for it pretends that Moody's and other financial players were not *designing and operating the conveyances that carried real estate prices to unsustainable levels in the first place*.

*Id.* at 5. Harrington provided similar insight into Moody's knowledge of the falsity of its CDO ratings, particularly CDOs containing RMBS assets. *Id.* at 20 ("Committees comprised of experienced CDO analysts who were aware that the quality of RMBS opinions had for some time prior to 2006 been hollowed-out through management fiat, could have begun suggesting adjustments to compensate for the suspect RMBS opinions on an initially ad-hoc basis.").

Furthermore, Harrington explained that structured finance investors rely on credit ratings in making purchase decisions, a fact that defendants contest. Indeed, Harrington explained that without credit ratings, structured finance instruments would not exist. *Id.* at 7 ("*The senior-most tranche of a CDO could not be sold with an opinion of anything but Aaa*. . . . If the senior-most tranche of a CDO could not be sold, *neither could any other tranches* of the CDO.").

Harrington detailed his personal knowledge of several other important facts. For example, Mr. Harrington highlighted the "race . . . to the bottom" in terms of ratings standards in which the three major rating agencies – Moody's, S&P, and Fitch – were engaged since at least 2004, before the Cheyne SIV's launch. *Id.* at 5-6. Harrington also described the conflicts of interest that infected

---

methodology remained inaccessible" and because "nothing about SIVs added up." Dkt. No. 437-22, Tab 152 at 56. In any event, the various possible interpretations for the words used by Harrington in his Comment underscore precisely why plaintiffs should be permitted to examine him.

Moody's ratings process and "***permeate[d] all levels of employment***" at Moody's.  *Id.* at 10. Harrington explained that these conflicts incentivized everyone to give investment banks, like Morgan Stanley, the ratings they wanted, not the ratings that were most accurate, in order to maintain market share.  *Id.* at 11-13.

Under the heading "***Court the Bankers.  Embrace the Bankers.  Love the Bankers.  Never, Ever, Harm a Banker***," Harrington explained that Brian Clarkson, the President of Moody's during the relevant time period, was particularly hard on any Moody's analyst who resisted capitulating to bankers and simply assigning the ratings desired by the investment banks, stating that "Mr. Clarkson was yet one more obstacle among the very many whom [sic] around whom analysts must duck and weave on a daily basis simply to do their jobs correctly." *Id.* at 55-56.  For that reason, Harrington stated he "intended from the outset to frustrate Clarkson and other senior managers in their quest for a watered-down methodology that would appease bankers." *Id.* at 58.

Additionally, the Comment described the Compliance Department at Moody's, which was responsible for changes to methodologies and had the ability to contest ratings outcomes after ratings committees reached those outcomes, as "a virtual Potemkin village for regulators to admire" and stated that the Compliance Department "actively harasses analysts viewed as 'troublesome.'" *Id.* at 9.  Harrington personally witnessed "harassment meted out by the Compliance Department while employed at Moody's as well as ongoing harassment that has stopped only recently."  *Id.* Harrington explained that Moody's ratings methodologies, which Moody's touts as being publicly available, "ordain[] neither the recommended opinion presented by the lead analyst, nor the individual opinion of any committee member, nor the resulting Moody's opinion" and states that he "participated in numerous committees where management maneuvered for a ***prescribed result*** through intimidation of other voting members." *Id.* at 10-14.

In sum, it is clear that McDaniel and Harrington possess information that is directly relevant to plaintiffs' claims.  Testimony from other Moody's employees about McDaniel's and Harrington's statements, particularly where those employees will disclaim any understanding of those statements, is not a reasonable substitute.  Therefore, plaintiffs should be permitted to call McDaniel and Harrington at trial.

### F.     Motions *in Limine* Decided at the November 12, 2012 Hearing

At the November 12, 2012 pre-motion *in limine* hearing, the Court ruled on a number of plaintiffs' motions.  Those rulings are summarized below:

Motion *in Limine* No. 2: The Court ruled that plaintiffs are permitted to examine witnesses identified with defendants by leading questions.  *See* 11/12/2012 Hrg. Tr. at 15-16.

Motion *in Limine* No. 3: The Court ruled that defendants are precluded from (i) introducing live testimony from persons unavailable to plaintiffs, and (ii) introducing deposition testimony of persons under their control.  *See id.* at 16-19.

Motion *in Limine* No. 4: The Court ruled that defendants are compelled to bring current employees to testify live at trial.  *See id.* at 20.

Motion *in Limine* No. 5: The Court ruled that percipient witnesses will be excluded from the courtroom until after they have testified, and that the Court will instruct that witnesses who have not yet testified should not be aware of the testimony given by other witnesses.  *See id.* at 25-27.

Motion *in Limine* No. 6: The Court ruled that counsel will be prohibited from communicating with sworn-in adverse witnesses, and from communicating with non-adverse and expert witnesses once cross-examination begins.  *See id.* at 28-32.

- 28 -

Motion *in Limine* No. 7: The Court ruled that defendants are precluded from presenting argument or evidence regarding or referencing the Gryphon notes, except for their value on the day they were issued. *See id.* at 32-34.

Motion *in Limine* No. 8: The Court ruled that defendants must make a full disclosure concerning the facts and opinions to which Katrien van Acoleyen intended to testify under Fed. R. Civ. P. 26(a)(2)(C)(ii), and that plaintiffs would have the right to depose Ms. van Acoleyen should defendants choose to call her to testify. *See id.* at 34-39.

Motion *in Limine* No. 9: The Court ruled that defendants are precluded from arguing or presenting evidence that their ratings are opinions protected by the First Amendment. *See id.* at 39.

Motion *in Limine* No. 12: The Court ruled that defendants are precluded from introducing evidence of subsequent remedial measures taken by certain plaintiffs as a result of losses sustained on Cheyne, other SIVs or other investments following the subprime crisis. *See id.* at 43.

Motion *in Limine* No. 15: The Court ruled that defendants are precluded from presenting evidence or argument of defendants' or their employees' good character and honesty, including evidence of charitable contributions, public service or other good works. *See id.* at 53.

Motion *in Limine* No. 16: The Court ruled that defendants are precluded from presenting evidence of or referring to the fact that any claim, theory of liability or allegation was dismissed or withdrawn. *See id.* at 54.

## II.   CONCLUSION

For the foregoing reasons, plaintiffs' motions *in limine* seeking orders (1) precluding defendants from arguing that only the knowledge of the individuals who worked directly on the Cheyne SIV can be attributed to defendants; (2) precluding defendants from arguing or offering evidence regarding plaintiffs' investments other than the Cheyne SIV; (3) precluding defendants

- 29 -

from introducing evidence or testimony from experts previously identified by plaintiffs but who will

not testify in this action; and (4) permitting plaintiffs to call Raymond McDaniel and William

Harrington at trial, should be granted.

DATED:  January 14, 2013                  Respectfully submitted,

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          MICHAEL J. DOWD
                                          DANIEL S. DROSMAN
                                          DARRYL J. ALVARADO
                                          ANGEL P. LAU
                                          HILLARY B. STAKEM


                                               s/ DARRYL J. ALVARADO
                                          ────────────────────────────
                                             DARRYL J. ALVARADO

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101-3301
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          miked@rgrdlaw.com
                                          dand@rgrdlaw.com
                                          dalvarado@rgrdlaw.com
                                          alau@rgrdlaw.com
                                          hstakem@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com

804421_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
JASON C. DAVIS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
lukeb@rgrdlaw.com
jdavis@rgrdlaw.com

Attorneys for Plaintiffs

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
MARC I. GROSS
TAMAR A. WEINRIB
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
taweinrib@pomlaw.com

Additional Attorneys for Plaintiff State Board of
Administration of Florida

- 31 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 14, 2013.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dalvarado@rgrdlaw.com

## Mailing Information for a Case 1:08-cv-07508-SAS-DCF

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Mario Aieta**
  maieta@ssbb.com,managingclerk@ssbb.com,marioaieta@gmail.com,dgerard@ssbb.com

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **X Jay Alvarez**
  jaya@rgrdlaw.com

- **Greg Donald Andres**
  greg.andres@davispolk.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com

- **Dai Wai Chin Feman**
  dchinfeman@ssbb.com

- **Joel M. Cohen**
  jcohen@gibsondunn.com,aarias@gibsondunn.com,mkdunning@gibsondunn.com,snurhussein@gibsondunn.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,jillk@rgrdlaw.com,E_File_SD@rgrdlaw.com,nlindell@rgrdlaw.com,tholindrake@rgrdlaw.com,jcharo@rgrdlaw.com

- **Mary K Dunning**
  mkdunning@gibsondunn.com,dwolber@gibsondunn.com,mkatz@gibsondunn.com,aarias@gibsondunn.com,arublin@gibsondunn.com,pwade@gibsondunn.com,cdieng

- **Jessica Lynn Freese**
  jessica.freese@davispolk.com

- **Charles Alan Gilman**
  cgilman@cahill.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Goutam Umesh Jois**
  gjois@gibsondunn.com

- **Christopher Michael Joralemon**
  cjoralemon@gibsondunn.com,aarias@gibsondunn.com

- **Mark Adam Kirsch**
  mkirsch@gibsondunn.com,aarias@gibsondunn.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Jeffrey B. Korn**
  jkorn@willkie.com,maosdny@willkie.com

- **William Ross Miller , Jr**
  william.miller@dpw.com,ecf.ct.papers@dpw.com

- **Paul Steel Mishkin**
  paul.mishkin@dpw.com

- **Tariq Mundiya**
  maosdny@willkie.com,jsim@willkie.com,tmundiya@willkie.com

- **David Owen**
  dowen@cahill.com

- **Antonio Jorge Perez-Marques**
  antonio.perez@dpw.com,ecf.ct.papers@dpw.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Christopher Joseph Roche**
  croche@kaplanrice.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Tammy Lynn Roy**
  troy@cahill.com,ndelutri@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com,jdoty@ssbb.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew Dickens Schlichter**
  andrew.schlichter@dpw.com

- **Jessica T. Shinnefield**
  jshinnefield@rgrdlaw.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com

- **Robert Frank Wise , Jr**
  rwise@dpw.com,ecf.ct.papers@dpw.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

- **Lawrence Jay Zweifach**
  lzweifach@gibsondunn.com,aarias@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Angel P. Lau
Robbins Geller Rudman & Dowd LLP
655 West Broadway Suite 1900
San Diego, CA 92101

David C. Walton
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301
```