UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABU DHABI COMMERCIAL BANK, et al. ,

Plaintiffs,

- against -

MORGAN STANLEY & CO. INC., et al.,

Defendants.

1:08-cv-07508 (SAS)

ECF CASE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' *DAUBERT*
MOTION TO EXCLUDE CERTAIN TESTIMONY BY PLAINTIFFS' EXPERTS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ..........................................................................................1

LEGAL STANDARD .........................................................................................................2

ARGUMENT ......................................................................................................................4

I.   DR. STIGLITZ'S OPINIONS SHOULD BE EXCLUDED IN THEIR ENTIRETY .............4

  A.  The Court Should Exclude Dr. Stiglitz's Opinion #2 Regarding Defendants'
      Purported Incentives ...............................................................................................5

  B.  The Court Correctly Determined that Dr. Stiglitz's Opinions #1 and #3 are
      Inadmissible ..........................................................................................................13

II.  DR. GOLDSTEIN'S LOSS CAUSATION OPINION SHOULD BE EXCLUDED IN ITS
     ENTIRETY ..............................................................................................................15

  A.  Dr. Goldstein's Analysis Relies on Assumed Market-Wide Fraud Wholly Separate
      from the Alleged Misrating of the Cheyne SIV ......................................................16

  B.  Dr. Goldstein Offers No Reliable Methodology for Attributing ABX Declines – and
      Thus Plaintiffs' Alleged Losses – to Defendants' Alleged Fraud..................................18

III. MR. REIFSNYDER'S OPINIONS SHOULD BE EXCLUDED TO THE EXTENT THEY
     DO NOT DIRECTLY RESPOND TO THE OPINION OFFERED BY PROF. JAMES ......26

CONCLUSION .................................................................................................................28

# **TABLE OF AUTHORITIES**

## CASES

PAGE

*405 Condo Associates LLC* v. *Greenwich Insurance Co.*,
No. 11 Civ. 9662, 2012 WL 6700225 (S.D.N.Y. Dec. 26, 2012)............................................2

*Am. Banana Co. v. J. Bonafede Co.*,
407 F. App'x 520 (2d Cir. 2010) ............................................................................10

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ...................................................................................2

*Bd. of Trs. of AFTRA Ret. Fund* v. *JP Morgan Chase Bank, N.A.*,
09 Civ. 0686, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ...........................3, 12

*Daubert* v. *Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .....................................................................................2, 3, 18

*Deutsch* v. *Novartis Pharmaceuticals Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011).....................................................................13

*E.E.O.C.* v. *Bloomberg L.P.*,
No. 07 Civ. 8383 (LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010)...............5

*Faulkner* v. *Nat'l Geographic Soc.*,
576 F. Supp. 2d 609 (S.D.N.Y. 2008) ...................................................................3

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................................................................13

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 04 Md. 1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom. Am. Banana
Co. v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010)...........................9-10, 13

*Highland Capital Mgmt., L.P.* v. *Schneider*,
551 F. Supp. 2d 173 (S.D.N.Y. 2008) ...................................................................12

*Hogan v. Novartis Pharmaceutical Corp.*,
No. 06 Civ. 0260, 2011 WL 1533467 (E.D.N.Y. Apr. 24, 2011)....................14-15

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001) ...................................................................................12

*Katyle v. Penn Nat. Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) *cert. denied*, 132 S. Ct. 115 (U.S. 2011) ................................20

*King County, Wash.* v. *IKB Deutsche Industriebank AG*,
   708 F. Supp. 2d 334 (S.D.N.Y. 2010) ...........................................................................21, 25

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
   No. 08 Civ. 8426, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) .......................................13

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...........................................................................................21

*Liberty Media Corp.* v. *Vivendi Universal, S.A.*,
   No. 03 Civ. 2175, 2012 WL 1097351 (S.D.N.Y. Apr. 2, 2012).........................................7

*LinkCo, Inc.* v. *Fujitsu Ltd.*,
   No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) .........................................11

*Lippe* v. *Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003).........................................................................................13

*In re Manulife Financial Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011) .......................................................................................21

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   643 F. Supp. 2d 482 (S.D.N.Y. 2009) ...........................................................................2, 4

*Nimely* v. *City of New York*,
   414 F.3d 381 (2d Cir. 2005) .......................................................................................2, 3, 9

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
   164 F.3d 736 (2d Cir. 1998) ...........................................................................................18

*In re Omnicom Grp., Inc., Sec. Litig.*,
   541 F.3d 501 (2d Cir. 2010) ...........................................................................................20

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...........................................................................................24

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ...........................................................................................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010) ...........................................................................11

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................................*passim*

*S.E.C. v. Badian*,
    822 F. Supp. 2d 352 (S.D.N.Y. 2011) .................................................................................9

*Sheehan* v. *Donlen Corp.*,
    173 F.3d 1039 (7th Cir. 1999) ..........................................................................................11

*Snyder* v. *Wells Fargo Bank, N.A.*,
    No. 11 Civ. 4496, 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) .....................................3, 5

*Solis* v. *Cindy's Total Care, Inc.*,
    No. 10 Civ. 7242, 2011 WL 5170009 (S.D.N.Y. Oct. 31, 2011) ..........................................3

*Solow v. Citigroup, Inc.*,
    No. 10 Civ. 2927 RWS, 2012 WL 1813277 (S.D.N.Y. May 18, 2012),
    *aff'd*, 12-2499-CV, 2013 WL 149902 (2d Cir. Jan. 15, 2013) ...........................................20

*South Cherry Street, LLC* v. *Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009) ...............................................................................................12

*United States* v. *Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ..............................................................................................4

*Weisgram* v. *Marley Co.*,
    528 U.S. 440 (2000) ............................................................................................................2

*Wills* v. *Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) ...............................................................................................11

### STATUTES & RULES

Fed. R. Evid. 401 ..........................................................................................................................3

Fed. R. Evid. 403 ..........................................................................................................................2

Fed. R. Evid. 702 ......................................................................................................................2, 3

Defendants – Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited ("Morgan Stanley"); Moody's Investors Services, Inc. and Moody's Investors Service Ltd. ("Moody's"); and The McGraw-Hill Companies, Inc. and Standard & Poor's Ratings Services ("S&P") – respectfully submit this memorandum of law in support of their *Daubert* motion to exclude certain testimony by plaintiffs' experts.

## PRELIMINARY STATEMENT

This motion is addressed to three of plaintiffs' expert witnesses:

*Joseph E. Stiglitz* – The Court already rejected two of the three "primary opinions" offered by Dr. Stiglitz, while expressing skepticism that the third would survive. Examination of Dr. Stiglitz's report confirms that it should be stricken in its entirety. Dr. Stiglitz offers only a factual narrative unsupported by any science, models, or methodology, and based solely on review and characterization of documents that the jury is capable of reviewing on its own.

*Michael A. Goldstein* – Dr. Goldstein concedes that plaintiffs' alleged losses were caused by a "market wide collapse," but opines that defendants caused the "market wide collapse" – not through alleged misrating of the Cheyne SIV, but through assumed misratings of all subprime securities. Dr. Goldstein's opinion rests on improper assumptions, is irrelevant to the fraud alleged, and is unsupported by any reliable methodology. It should therefore be excluded in full.

*Jeremy E. Reifsnyder* – Plaintiffs designated Mr. Reifsnyder as a rebuttal witness to defendants' expert Prof. Chris James. As the Court has already found, Mr. Reifsnyder is limited to critiquing the specific loan performance comparison performed by Prof. James. His other opinions and analyses are outside the scope of proper rebuttal.[1]

---

[1] Defendants also reserve the right to object at trial to categorically impermissible testimony by any expert witness, including improper factual narratives and testimony as to state of mind, legal

## LEGAL STANDARD

"The proponent of expert evidence bears the initial burden of establishing admissibility by a 'preponderance of proof.'" *405 Condo Associates LLC* v. *Greenwich Insurance Co.*, 11 Civ. 9662, 2012 WL 6700225, at *3 (S.D.N.Y. Dec. 26, 2012) (citation omitted). In order to be admissible, expert testimony must be: (1) reliable, (2) relevant, and (3) within the proper scope of expert testimony. *See Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Nimely* v. *City of New York*, 414 F.3d 381, 397 (2d Cir. 2005); *see also* Fed. R. Evid. 702. Further, expert testimony is subject to Rule 403 and the Supreme Court and the Second Circuit have "noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397 (citations omitted).[2]

In assessing reliability, the district judge must determine whether expert "testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002). Under Federal Rule of Evidence 702, an expert witness may only testify if, *inter alia,* his or her testimony "is the product of reliable principles and methods" and if "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Expert testimony must meet "exacting standards of reliability," *Weisgram* v. *Marley Co.*, 528 U.S. 440, 455 (2000), and this determination is based on multiple factors, including "[w]hether the expert has adequately accounted for obvious

conclusions, and final inferences for the jury. (Defs.' Pre-Motion Daubert Letter, Dec. 20, 2012 at 1-4; Hr'g Tr. Dec. 27, 2012.)

[2] Experts also may not "simply transmit . . . hearsay to the jury . . . without applying any expertise whatsoever." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, at 494 (S.D.N.Y. 2009) (Scheindlin, J.) (citation omitted).

alternative explanations."  Fed. R. Evid. 702 advisory committee's note (2000); *see also*

*Faulkner* v. *Nat'l Geographic Soc.*, 576 F. Supp. 2d 609, 619 (S.D.N.Y. 2008).

The relevance prong requires the court to determine whether the expert's opinions "fit"

the case at hand and thereby "assist the trier of fact to understand or determine a fact in issue."

*Daubert*, 509 U.S. at 591-92; *see also* Fed. R. Evid. 401 (relevant evidence must have a

"tendency to make a fact more or less probable than it would be without the evidence" and the

fact must be "of consequence in determining the action."); *Solis* v. *Cindy's Total Care, Inc.*, 10

Civ. 7242, 2011 WL 5170009, at *1 (S.D.N.Y. Oct. 31, 2011) ("Whether a disputed fact is 'of

consequence' is [] framed by the elements of, and cognizable defenses to, the underlying cause

of action.").

The third inquiry focuses on whether the expert's testimony will actually "assist the trier

of fact," and the Second Circuit has "consistently held, in that respect, that expert testimony that

usurps either the role of the trial judge in instructing the jury as to the applicable law or the role

of the jury in applying that law to the facts before it by definition does not aid the jury in making

a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to

substitute the expert's judgment for the jury's."  *Nimely*, 414 F.3d at 397 (citations and quotation

marks omitted); *see also Snyder* v. *Wells Fargo Bank, N.A.*, 11 Civ. 4496, 2012 WL 4876938, at

*2 (S.D.N.Y. Oct. 15, 2012).  It is well settled that "opinions concerning state of mind,"

"rehash[ing] a factual narrative [to] present counsels' theory of the case," and testimony as to

legal conclusions and ultimate issues are categorically excludable as inappropriate subjects of

expert testimony.  *See Bd. of Trs. of AFTRA Ret. Fund* v. *JP Morgan Chase Bank, N.A.*, 09 Civ.

0686, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) (Scheindlin, J.) (state of mind); *In re*

*Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 548, 551 (S.D.N.Y. 2004) (Kaplan, J.) (state of

mind and factual narrative); *United States* v. *Bilzerian,* 926 F.2d 1285, 1295 (2d Cir. 1991) (legal conclusions/ultimate issues); *In re MTBE*, 643 F. Supp. 2d at 505 (same).

## ARGUMENT

## I.   DR. STIGLITZ'S OPINIONS SHOULD BE EXCLUDED IN THEIR ENTIRETY

As set forth in Dr. Stiglitz's "Summary of Opinions," he purports to offer "three primary opinions in this case" (Stiglitz Report (Ex. 1[3]) at ¶ 17):  (1) that defendants "had superior information to the plaintiff investors" (*id.* at ¶ 18); (2) that "defendants had incentives to inflate the credit ratings . . . and their actions are consistent with these incentives" (*id.* at ¶ 19); and (3) that "plaintiffs reasonably relied on the defendants' credit ratings [because] they were not and could not have been aware of the defendants' failure to adequately control their conflicts of interest" (*id.* at ¶¶ 18-20).  This Court has already determined that opinions #1 and #3 do not meet the standards for admissibility of expert testimony.  (*E.g.*, Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 27:12-13 ("That's the only one, is the middle one [*i.e.* conclusion #2], that may be permissible.").)[4]  Dr. Stiglitz's second conclusion is likewise inadmissible because it is not based on any expert methodology, is unhelpful to the jury, and constitutes impermissible testimony regarding defendants' purported state of mind.

Dr. Stiglitz's testimony, once stripped of the inadmissible opinions, has little or no substance at all.  As such, the danger of misleading or usurping the role of the jury far outweighs the minimal probative value of what remains of his testimony.  This danger is heightened here by

---

[3] Parenthetical Exhibit numbers refer to the exhibits of the Declaration of James P. Rouhandeh submitted herewith.

[4] *See also* Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 27:13-14 ("That plaintiffs reasonably relied is not [an opinion] that is permissible."); *id.* at 27:16-19 (opinion regarding "superior information" "doesn't help the trier of fact," "is something that a lay juror can figure out," and is "just self-evident").

Dr. Stiglitz's lofty credentials, which only increase the risk that the jury will be inclined to defer to his generalized "expertise," even though not applied here in any discernible way.  (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 13:14-16 ("There is almost a feeling of an effort to choose an expert who has a well-known name but I can't figure out what his expertise is with relationship to this case.").)[5]  Defendants therefore request that the Court exclude Dr. Stiglitz's opinions in their entirety.  *See, e.g., E.E.O.C.* v. *Bloomberg L.P.*, 07 Civ. 8383, 2010 WL 3466370, *18 (S.D.N.Y. Aug. 31, 2010); *see also Snyder*, 2012 WL 4876938, at *5 (striking entirety of expert report "ridden with improper statements and opinions," declining to "identify the limited portions that might qualify as expert testimony").

### A.    The Court Should Exclude Dr. Stiglitz's Opinion #2 Regarding Defendants' Purported Incentives

#### i.    Dr. Stiglitz's Opinion is Unsupported by any Expert Methodology

The Court's significant skepticism expressed at the pre-motion conference regarding the supposed "methodology" underlying Dr. Stiglitz's conclusions was well-founded.  After noting that the subject matter Dr. Stigltiz purports to address in his report "is not a traditional subject of expert testimony," the Court repeatedly questioned whether Dr. Stiglitz had applied any "models," "science," or "real methodology" with "any validity," as opposed to simply "study[ing] the case file here and say[ing] here is what the jury should do."  (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 13:10-16, 22:12-14, 27:20-24, 28:1-3, 35:3-9.)  The answer to these questions is a resounding "no":  none of Dr. Stiglitz's opinions, including as to defendants' alleged incentives, is based on any expert methodology whatsoever.  Dr. Stiglitz has indeed, as the Court expressed it, simply "stud[ied] the case file" and now purports to say "here is what the jury

---

[5] It is perhaps notable in this regard that Dr. Stiglitz's six-page rebuttal report uses the term "Nobel" no fewer than sixteen times.  (Stiglitz Rebuttal (Ex. 2) at ¶¶ 5-7, n.14.)

should do," based on his alleged review of selective portions of the record, but without any scientific analysis.  His report is a classic example of pure "storytelling," used to bolster a narrative that counsel will ask the jury to accept and unsupported by any expert analysis or reliable methodology.  (*Id.* at 12:14-17 ("Defendants are also correct on the factual narrative criticism . . . I said the expert can't become the mouthpiece for the attorney.").)

A telling indicator of this true nature of Dr. Stiglitz's report is his appendices C-E, which collectively contain over 40 pages of pure document characterization and argument, much of which is lifted verbatim or near-verbatim from the Rule 56.1 statement authored by plaintiffs' counsel in connection with summary judgment.  (Stiglitz Report, Appendices C-E; Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 21:20-23 (concession by plaintiffs' counsel that "if [Dr. Stiglitz] felt that the 56.1 adequately described [a document] . . . [h]e didn't then go and try to redescribe it, he would take the language from the 56.1.").)[6]  Dr. Stiglitz's appendices contain page after page of argumentative point headings – accusing defendants of wide-ranging misconduct and repeating every major theme of plaintiffs' case – all "supported" exclusively by selected quotations from and/or purported descriptions of various emails and other documents.  (*Id.*)  These appendices are nothing more than counsel advocacy, and yet, Dr. Stiglitz cites them no fewer than 35 times

---

[6] *Compare, e.g.*, Stiglitz Report Appendix C ¶ 3(e) *with* Plaintiffs' 56.1 Statement ¶ 1(f); *compare* Stiglitz Report Appendix C ¶ 6(j) *with* Plaintiffs' 56.1 Statement ¶ 1(j); *compare* Stiglitz Report Appendix C ¶ 7(b) *with* Plaintiffs' 56.1 Statement ¶ 1(j); *compare* Stiglitz Report Appendix C ¶ 7(c) *with* Plaintiffs' 56.1 Statement ¶ 1(f); *compare* Stiglitz Report Appendix C ¶ 7(n) *with* Plaintiffs' 56.1 Statement ¶ 1(f); *compare* Stiglitz Report Appendix C ¶ 7(w) *with* Plaintiffs' 56.1 Statement ¶ 1(f); *compare* Stiglitz Report Appendix C ¶ 7(dd) *with* Plaintiffs' 56.1 Statement ¶ 3(aaa); *compare* Stiglitz Report Appendix C ¶ 7(yy) *with* Plaintiffs' 56.1 Statement ¶ 1(f); *compare* Stiglitz Report Appendix D ¶ 2(e) *with* Plaintiffs' 56.1 Statement ¶ 2(f); *compare* Stiglitz Report Appendix D ¶ 2(f) *with* Plaintiffs' 56.1 Statement ¶ 2(f); *compare* Stiglitz Report Appendix D ¶ 2(f) *with* Plaintiffs' 56.1 Statement ¶ 2(f).

in his report, often as the primary or only support for the opinions he purports to render.[7]  And

when he is not citing specifically to one of his appendices, he is "opining" in precisely the same

way – *i.e.*, providing sweepingly broad opinions unsupported by any science, models, or

methodology, and based solely on review and characterization of documents that the jury is

capable of assessing on its own.  (*E.g.* Stiglitz Report (Ex. 1) at ¶¶ 34-35; Stiglitz Rebuttal (Ex.

2) at ¶¶ 15-16.)[8]  This is plainly improper.  *See In re Rezulin*, 309 F. Supp. 2d, at 551 (experts

may not "invade the province of the jury by presenting a narrative that advocates plaintiffs'

version of the facts"); *Liberty Media Corp.* v. *Vivendi Universal, S.A.*, 03 Civ. 2175 (SAS), 2012

WL 1097351, at *5 (S.D.N.Y. Apr. 2, 2012).[9]

---

[7] *E.g.*, Stiglitz Report (Ex. 1) at ¶ 54 n.42 (citing Appendices C-E as only support for statement that "defendants had access to crucial information not available to investors, and it was neither feasible nor economical for investors to obtain that information"); *id.* at ¶ 63 n.61 (citing Appendix C as only support for statement that rating flaws "went beyond simple human error, an innocent mistake; given their incentives, it was to be expected that S&P and Moody's inflated their ratings in order to gain or maintain market share, and there is evidence consistent with that"); *id.* at ¶ 65 n.68 (citing Appendix C as only support for statement that Cheyne ratings "were compromised by conflicts of interest and competitive pressure"); *id.* at ¶ 70 n.89 (citing Appendix D as only support for statement that "[n]ot surprisingly, given its role, Morgan Stanley also had access to superior information not available to investors about the risks associated with the Cheyne SIV and its underlying assets"); *id.* ¶ 72 n.95 (citing Appendix D as only support for statement that "Morgan Stanley had strong incentives to ensure that the Cheyne SIV was successfully launched arising from the very large fees it would receive").

[8] At the pre-motion conference, plaintiffs' counsel sought to minimize the importance of Dr. Stiglitz's appendices by stating that they are separate from his report and are not "something that he plans to go through during his testimony."  (Hr'g Tr. Dec. 27, 2012 at 21:12-15, 23-25.)  It makes no difference where the appendices are located or whether Dr. Stiglitz intends to read from them at trial.  Because Dr. Stiglitz has no "methodology" other than citing his appendices or engaging in other selective document review, his opinions are unreliable, unhelpful, and inadmissible.

[9] As the Court stated at the pre-motion conference, "Defendants are also correct on the factual narrative criticism and I did say that in Liberty media, flat out," and thus if Stiglitz "spent 40 pages summarizing the 56.1 he wasted some typing time and some paper . . . it is not going to be testified to from the stand and if the report or parts of it came into evidence, that part would not be there."  (Hr'g Tr. Dec. 27, 2012 at 12:14-22.)

Dr. Stiglitz lacks any expert methodology for *any* of the opinions expressed in his report, including his conclusion that "defendants had incentives to inflate the credit ratings" and that "their actions are consistent with these incentives." (Stiglitz Report (Ex. 1) at ¶ 19; *see also id.* at ¶¶ 63, 72, 74.) Taking the latter piece first, Dr. Stiglitz plainly has no basis to opine regarding whether defendants' "actions" were consistent with an alleged incentive to inflate credit ratings. The report does not explain what methodology was employed to reach that conclusion, nor how *any* methodology could determine whether a party "succumbed" to pressure to "inflate" ratings, as Dr. Stiglitz asserts. (*See* Stiglitz Report ¶ 74.)[10] Such opinions are particularly deficient in light of Dr. Stiglitz's apparent failure to review the rating agencies' SIV methodologies, their committee memoranda, or any other portions of the voluminous SIV rating record apart from the very same pieces of "evidence" that plaintiffs cited in their summary judgment papers. Nor does Dr. Stiglitz purport to be an expert in ratings methodology, and he has offered no analysis whatsoever regarding the appropriateness or accuracy of the ratings here. As to Morgan Stanley, the extent of Dr. Stiglitz's "analysis" is to parrot plaintiffs' allegations, including that Morgan Stanley "pressured" the rating agencies, "sold . . . poor quality assets into the Cheyne SIV," "was aware that the models, data and assumptions used for the Cheyne SIV were seriously flawed," and "was aware of the poor quality of the subprime loans held by Cheyne." (Stiglitz Report (Ex. 1) at ¶¶ 67-74).[11] Dr. Stiglitz offers no reliable methodological basis for asserting anything about

---

[10] At most, an expert could opine on what he or she perceived as certain alleged flaws in the rating agencies' SIV models or methodologies. Plaintiffs have a different expert, Dr. Sanjiv Das, to testify on that precise topic.

[11] These too are verbatim, or near-verbatim, quotes from plaintiffs' briefing. (*See* Pls.' Opp. Mem. Law Summ. J., Dkt. No. 430, at 14-15.)

these topics, let alone repeatedly opining that defendants "inflated" the ratings or otherwise acted consistently with their alleged motivation to do so.

Dr. Stiglitz is equally prohibited from opining as to defendants' alleged incentives to inflate credit ratings. The sum total of Dr. Stiglitz's "analysis" of this question is his repeated assertion that defendants stood to make money from false ratings, supported by citations to documents purportedly indicating such a profit motive. (*E.g.*, Stiglitz Report (Ex. 1) at ¶¶ 61, 63, 72, 74.) His conclusion is not supported by any "science" or "model" or application of any "methods" to any "data." Dr. Stiglitz does not, for example, perform any quantitative analysis of defendants' alleged incentives, including any analysis – much less measurement – of the effect of countervailing incentives to *not* engage in the alleged conduct.[12] Instead, he simply draws the common-sense inference that a party may be incentivized to act in ways that may increase its profits, while urging the jury to find that such incentives applied here and that defendants allegedly "succumbed" to them. (Stiglitz Report (Ex. 1) at ¶ 74.) Where, as here, an expert opinion is unsupported by rigorous analysis – let alone *any* analysis – it must be excluded. *See, e.g.*, *Nimely*, 414 F.3d at 396 (requiring "sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions"); *S.E.C. v. Badian*, 822 F. Supp. 2d 352, 357-60 (S.D.N.Y. 2011) (precluding expert testimony on defendant's "incentives" and "optimal trading strategy" because it gave either "cursory attention," or none at all, to counter-incentives); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 04 Md. 1628 (RMB) (MHD), 2009 WL

---

[12] Despite acknowledging, as he must, that defendants had a contrary reputational incentive not to engage in the alleged conduct, Dr. Stiglitz dismisses this matter in a single passing reference in his report, supplying no analysis whatsoever. (Stiglitz Report (Ex. 1) at ¶ 74 ("[Morgan Stanley] succumbed to these incentives, even though there was some reputational risk.").) The statement by plaintiffs' counsel that Dr. Stiglitz "did an analysis" to "compare and weigh the various incentives that existed" (Hr'g Tr. Dec. 27, 2012 at 16:3-19) is baseless.

3241401, at *16 (S.D.N.Y. Sept. 30, 2009) *aff'd sub nom.*, *Am. Banana Co., Inc. v. J. Bonafede Co., Inc.*, 407 F. App'x 520 (2d Cir. 2010) (rejecting expert testimony that "'[did] not demonstrate any particular scientific expertise that [could] be assessed for reliability'") (citation omitted).

Dr. Stiglitz's invocations of "information economics" and references to his Nobel prize do not salvage his testimony, but rather are simply an effort to cloak his opinions with the suggestion of "science" or expert methodology where in fact none has been applied.  As conceded by plaintiffs' counsel, "information economics" is at most a "theoretical overlay," or some other form of "broad theory."  (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 22:12-25.)  At least as applied here, it does not involve any models or methodology, and certainly it supplies no reliable basis for resolving contested issues of fact in this case, such as whether defendants "succumbed" to particular incentives (Stiglitz Report (Ex. 1) at ¶ 74) or whether any other of Dr. Stiglitz's purported opinions are correct.

Nor is there any merit to the suggestion of plaintiffs' counsel that Dr. Stiglitz has somehow applied information economics to "data" in reaching his opinions.  (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 16:7-16, 21:18-20, 30:24-31:7.)[13]  The only "data" examined by Dr. Stiglitz are the same emails and other documents relied on by plaintiffs' counsel in opposing summary judgment, and his only "analysis" of that "data" is reading and characterizing the documents – or, as plaintiffs' counsel conceded, simply copying counsel's characterization of the documents from plaintiffs' Rule 56.1 statement.  (*Id.* at 21:20-23.)  This approach – the only discernible

---

[13] Plaintiffs' counsel stated, for example, that the "methodology [Dr. Stiglitz] applied is he took the concepts and discipline of information economics and looked at the **data** that exists, he looked at the publicly available **data** and the case file **data** and he made observations based on that **data** which is done all the time in case studies published in peer-reviewed journals."  (Hr'g Tr. Dec. 27, 2012 at 30:24-31:4 (emphasis added).)

"methodology" employed by Dr. Stiglitz – is impermissible because it converts the expert into a mouthpiece for counsel and, instead of assisting the jury, fundamentally usurps the jurors' role by reading and interpreting documents for them. *LinkCo, Inc.* v. *Fujitsu Ltd.*, 00 Civ. 7242 (SAS), 2002 WL 1585551, *2 (S.D.N.Y. Jul. 16, 2002) (excluding expert testimony that "'[did] no more than counsel for [plaintiff would] do in argument, i.e. propound a particular interpretation of [defendant]'s conduct'" (citation omitted)).

### ii. Dr. Stiglitz's Opinion is Unhelpful to the Jury

Dr. Stiglitz's opinion regarding defendants' alleged incentives should also be excluded because it relates to a common-sense matter, well within the jury's understanding, rendering expert testimony on this subject unhelpful and superfluous. The Court recognized this point expressly during the pre-motion conference, noting that a party's alleged incentives are not a "subject of expert testimony," but rather an issue to be argued to the jury based on the factual record, as to which Dr. Stiglitz "isn't adding anything." (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 15:18-16:2.) This view is in accord with well-established case law prohibiting expert witnesses from "describ[ing] 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *See In re Rezulin*, 309 F. Supp. 2d at 546 (citation omitted); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 457-58 (S.D.N.Y. 2010) (Scheindlin, J.) ("expert witnesses are generally not permitted to address issues of fact that a jury is capable of understanding without the aid of expert testimony."); *Wills* v. *Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (citation omitted); *Sheehan* v. *Donlen Corp.*, 173 F.3d 1039, 1046 (7th Cir. 1999) ("'The jurors, and they alone, are to judge the facts, and weigh the evidence. . . . [T]hey are better calculated to judge of motives, weigh probabilities, and take what may be called a 'common-sense view' of a set of circumstances, involving both

11

act and intent, than any single man, however pure, wise, and eminent he may be.'" (citation

omitted)).  Whether and to what extent a party was "incentivized" to act in a particular manner

based on potential profit is a lay inference that the jury can draw on its own.[14]

### iii.  Dr. Stiglitz's Opinion Constitutes Impermissible State-of-Mind Testimony

Dr. Stiglitz's opinion regarding alleged incentives should be excluded for the additional

reason that it constitutes impermissible testimony regarding defendants' alleged state of mind.

Courts have consistently held that it is for the jury, and not expert witnesses, to draw conclusions

regarding states of mind (including motive and intent).  *See, e.g., Bd. of Trs. of AFTRA Ret.*

*Fund*, 2011 WL 6288415, *8 (precluding expert from making statements speculating about the

state of mind and motivations of defendant and individual witnesses); *Highland Capital Mgmt.,*

*L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008); *In re Rezulin*, 309 F. Supp. 2d at

548.  The importance of excluding such testimony is even higher where, as here, state of mind is

an element of plaintiffs' claim that plaintiffs must prove by clear and convincing evidence.

Expert "opinions" about a defendant's alleged motivations and alleged failure to control

improper incentives are routinely excluded.  In *Rezulin*, for example, the court evaluated expert

testimony that "Warner-Lambert was motivated by profit" and concluded that such testimony

was inadmissible, stressing that "[i]nferences about the intent or motives of parties or others lie

outside the bounds of expert testimony."  *In re Rezulin*, 309 F. Supp. 2d at 546 n.38, 547

---

[14] The Second Circuit has in any event made clear that fraudulent intent cannot be inferred from such generalized motives as "the desire for the corporation to appear profitable."  *See, e.g.*, *South Cherry Street, LLC* v. *Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (holding plaintiff's allegations insufficient to plead scienter under the PSLRA and stating that "in attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability . . . ." (citation omitted)); *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

("'[T]he question of intent is a classic jury question and not one for the experts.'" (citation omitted)). The *Rezulin* court declined to allow plaintiffs' experts to "improperly . . . assume the role of advocates for the plaintiffs' case by arguing as to the intent or motives underlying the conduct of Warner-Lambert or others." *Id.* at 546; *see also Deutsch* v. *Novartis Pharmaceuticals Corp.*, 768 F. Supp. 2d 420, 467 (E.D.N.Y. 2011) ("opinions [such as "[w]hile Novartis delays, it profits from Zometa's continuing sales"] which implicitly opine on bad faith, intent, motive, or state of mind are inadmissible"); *In re Fresh Del Monte Pineapples*, 2009 WL 3241401, at *16 (precluding testimony of proposed expert and rejecting plaintiffs' argument "that 'economists routinely evaluate evidence with regard to business incentives and economic decisionmaking'"); *Lippe* v. *Bairnco Corp.*, 288 B.R. 678, 687-88 (S.D.N.Y. 2003) (precluding expert from testifying regarding the "'business purpose' of the transactions in question"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (precluding state of mind testimony); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 08 Civ. 8426, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) (collecting cases).

**B.    The Court Correctly Determined that Dr. Stiglitz's Opinions #1 and #3 are Inadmissible**

With respect to Dr. Stiglitz's first opinion that defendants "had superior information to plaintiffs" (Stiglitz Report (Ex. 1) at ¶ 18), the Court did not deem this a matter requiring expert guidance, noting that "this notion that investors generally have less information than sellers is common sense and we have been trying cases for . . . a hundred years or so, without some expert saying that the seller or the structure or the issuer obviously knows more, at least initially, than the buyer and the market." (Hr'g. Tr. Dec. 27, 2012 at 14:2-7.) The Court likewise rejected Dr. Stiglitz's third opinion that plaintiffs "reasonably relied" on the ratings. (*Id.* at 12:10-13 ("It is

not for [Stiglitz] to reach the ultimate issue of whether plaintiffs reasonably relied on the ratings or other statements, those are issues for the jury ultimately and he can't give a conclusion."); *id.* at 27:13-14 ("That plaintiffs reasonably relied is not [an opinion] that is permissible.").)[15]  These opinions are excludable for a host of reasons, including that they usurp the role of the jury, purport to address an ultimate legal question (reasonable reliance), and constitute the same type of pure "storytelling" evident throughout Dr. Stiglitz's report, divorced from any application of any science, models, or methodology.[16]

*       *       *

Dr. Stiglitz's professional accolades do not automatically imbue his report with the requisite reliability.  Plaintiffs may not "elevate and advocate the value of individual evidence by having it recounted by an expert."  *Hogan v. Novartis Pharmaceutical Corp.*, 06 Civ. 0260, 2011 WL 1533467, at *8 (E.D.N.Y. Apr. 24, 2011).  Dr. Stiglitz's proffered testimony should be excluded due to its failure to meet the standard for reliability under *Daubert*, its impermissible

---

[15] Part of Stiglitz's conclusion that Plaintiffs "reasonably relied" on the credit ratings, incorporates another inappropriate legal conclusion – that plaintiffs *actually* relied on the credit ratings.  (*E.g.*, Stiglitz Report (Ex. 1) at ¶ 75 ("*I find the plaintiffs' reliance on these ratings to be reasonable and, indeed inevitable*, given the information asymmetries and the role that the ratings play within the regulatory structure.") (emphasis added).)  Actual reliance is a separate element of plaintiffs' fraud claim that plaintiffs must prove.  (Dkt. No. 474 at 4, 14.)  The Court has made clear that, *even assuming* some information asymmetry, "the question of reliance requires hearing from each investor as to what it did, what it relied on when deciding to invest in the Cheyne SIV, and whether it relied substantially on the credit ratings, minimally on the ratings, or did not rely on them at all."  (*Id.* at 14.)  Plaintiffs should not be permitted to use Dr. Stiglitz's testimony as a vehicle to evade their burden to prove, by clear and convincing evidence, as to *each* plaintiff that the Cheyne SIV ratings were a substantial factor in that plaintiff's decision to invest in the Cheyne SIV.

[16] For example, despite opining that it was "impractical" and "economically infeasible" for plaintiffs to conduct independent credit analysis (Stiglitz Report (Ex. 1) at ¶¶ 76-77), Dr. Stiglitz does not support this view with any economic analysis, such as any calculation of the estimated cost of independent investigation, or any justification for his implied claim that such costs were prohibitive despite plaintiffs' multibillion dollar investment portfolios.

opinions regarding state of mind and ultimate conclusions, and its overall attempt to usurp the jury's role of reviewing and interpreting the evidence for itself.

## II.   DR. GOLDSTEIN'S LOSS CAUSATION OPINION SHOULD BE EXCLUDED IN ITS ENTIRETY

Dr. Goldstein's loss causation opinion is deeply flawed and should be excluded under *Daubert*. Notably, his theory is not in fact a loss causation opinion at all, because – if accepted – it would affirmatively establish the *absence* of loss causation. Far from *disaggregating* market-wide declines from any purported impact of the alleged fraud, as he must, Dr. Goldstein affirmatively attributes all of plaintiffs' alleged losses to a "*market wide* collapse in value of subprime RMBS assets," not to anything specific to the allegedly false ratings of the Cheyne SIV. Indeed, Dr. Goldstein has not even analyzed whether plaintiffs' losses would have been any different if the rating and structure of the Cheyne SIV had been "corrected" as plaintiffs' rating procedure expert (Dr. Sanjiv Das) suggests. Dr. Goldstein's response to this criticism – that he establishes loss causation because *defendants caused the market-wide collapse* – is impermissible. As the Court has repeatedly made clear, plaintiffs cannot use this case to adjudicate the causes of the U.S. financial crisis.[17] And in any event, Dr. Goldstein does not attribute the market-wide decline to alleged misrating of the Cheyne SIV (the only misstatement alleged here), but rather to assumed misratings of subprime securities generally.

Dr. Goldstein's "analysis" purporting to blame defendants for a market-wide decline that caused the Cheyne SIV to enter Enforcement is also unreliable. Dr. Goldstein claims to demonstrate that defendants' assumed misratings of *all* subprime RMBS assets caused the

---

[17] Defendants explain this fundamental deficiency in more detail in their letter to the Court, submitted concurrently with this *Daubert* motion, seeking leave to file a renewed summary judgment on the issue of loss causation, in light of Dr. Goldstein's concession (and affirmative opinion) that plaintiffs' alleged losses are attributable to a "market wide collapse."

market-wide collapse, and thus ultimately triggered the key events leading to plaintiffs' alleged losses – *i.e.*, the Cheyne SIV's entry into Enforcement, its declaration of insolvency, and ultimate liquidation of its assets at a loss for investors. But Dr. Goldstein's sole basis for claiming there was a link between credit ratings and the decline in the Cheyne SIV's portfolio is a deeply-flawed event study that does not address the SIV ratings at all and *ends* six weeks before the SIV entered Enforcement, meaning that it does not even consider (much less explain) price declines during the relevant period. Indeed, the byzantine analysis by which Dr. Goldstein purports to hold defendants responsible for a "market wide collapse" represents precisely the type of opinion that *Daubert* was designed to keep from a jury: it is couched in technical terms, adorned with charts and graphs, and cloaked in jargon tending to deter close scrutiny, but upon examination, provides no reliable basis for the sweeping conclusions Dr. Goldstein seeks to derive from it. To fulfill its gatekeeping function under *Daubert*, the Court should examine each component of Dr. Goldstein's opinion as set forth below and exclude his opinions in their entirety.

### A.   Dr. Goldstein's Analysis Relies on Assumed Market-Wide Fraud Wholly Separate from the Alleged Misrating of the Cheyne SIV

As an initial matter, Dr. Goldstein's testimony should be precluded because it rests on the fundamentally flawed premise that defendants engaged in fraudulent conduct that is not alleged in the complaint. Specifically, Dr. Goldstein's conclusions depend on the sweeping assumption that defendants engaged in an unalleged market-wide fraud involving inflation not only of the Cheyne SIV notes rating, but also of the ratings of *all* subprime RMBS assets and *all* structured finance CDO ratings. (Goldstein Dep. (Ex. 9) at 54:1-12 (assumptions included falsity of "the general industry subsector ratings"); Goldstein Rebuttal (Ex. 4) at ¶ 14 (assuming

"misrepresentations across the Cheyne SIV's notes *and across subprime RMBS ratings*

(Cheyne's assets included)" (emphasis added); *id.* at Figure 4 (depicting "Chain of causality"

with reference to assumed  "misratings on *subprime assets* and on the Cheyne SIV notes")

(emphasis added).)

Dr. Goldstein has thus assumed a vast range of misconduct, wholly separate from the

alleged false Cheyne SIV ratings, and Dr. Goldstein purports to attribute losses to that assumed

market-wide fraud, not the alleged fraud actually at issue.  Indeed, the disconnect between Dr.

Goldstein's assumptions and this case is two-fold:  Dr. Goldstein focuses on ratings of *RMBS*

*and CDO securities* (rather than the ratings of the Cheyne SIV notes), and on *all* such RMBS and

CDO ratings market-wide.  The unstated premise of Dr. Goldstein's assumptions is that plaintiffs

could somehow use their Cheyne SIV investments to recover based on market-wide declines that

are purported to have resulted from the misrating of assets never owned by the Cheyne SIV,

never alleged or proven to have been knowingly false when made, and as to which these

plaintiffs have no standing to sue.

Dr. Goldstein's assumptions render his opinion wholly irrelevant, unreliable and

improper.  As the Court has previously held, the only alleged misstatements at issue are the

allegedly false ratings of the *Cheyne SIV notes*.  (*See e.g.*, Dkt. No. 474 at 22-23 (Cheyne SIV

ratings are "the only alleged misstatements" in this case).)[18]  The Court has also made clear that

plaintiffs cannot "[t]urn this case into an indictment of the last five years of our country's

---

[18] Plaintiffs and their ratings experts have also admitted as much.  *See, e.g.*, Mem. Supp. Pls.'
Mot. for Class Cert., dated Dec. 22, 2009, at *14 ("The misrepresentations at issue are the false
credit ratings that defendants assigned to the [Cheyne SIV] Rated Notes and the Cheyne SIV,
which they disseminated to plaintiffs."); Ninth Amended Complaint at ¶ 241 ("The Rating
Agencies assigned materially false and misleading credit ratings to the Cheyne SIV and the
Rated Notes"); *see also* Das Report (Ex. 6) at ¶ 8 ("Plaintiffs allege that the Rating Agencies
assigned inappropriately high credit ratings to the Rated Notes issued by the Cheyne SIV.").

financial system" (Hr'g Tr. Nov. 2, 2010 (Ex. 11) at 27:13-15); that "[t]his is a case about

Cheyne," not a "broad investigation" of defendants' conduct (Hr'g Tr. Jan. 26, 2011 (Ex. 12) at

21:15-22); and that any loss causation opinion "has to be tied in the plaintiff's expert case to the

alleged fraud with respect to Cheyne" (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 40:12-14); *see also*

*Lentell*, 396 F.3d at 173 (alleged losses must have been "directly caused" by the alleged

misrepresentation).  Whatever causal impact Dr. Goldstein thinks he can attribute to assumed

market-wide misratings, it has no bearing on whether the alleged misrepresentation here caused

plaintiffs' losses and therefore fails the *Daubert* requirement that an expert opinion must "fit" the

case at hand.  *See Daubert*, 509 U.S. at 591-92; *Nora Beverages, Inc. v. Perrier Group of Am.,*

*Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (expert opinions premised on assumed conduct not at

issue in the case properly excluded as "irrelevant to the issues in [the] lawsuit").

### B.    Dr. Goldstein Offers No Reliable Methodology for Attributing ABX Declines – and Thus Plaintiffs' Alleged Losses – to Defendants' Alleged Fraud

Dr. Goldstein's attempt to connect defendants' alleged fraud to plaintiffs' alleged losses

consists of two analyses:  his **first regression**, which he characterizes as an event study,

purporting to show that inflated credit ratings (on securities other than Cheyne) caused decreases

in the "ABX" market index, a "high[ly] liquid" "benchmark" for the subprime market as a

whole; and his **second regression**, purporting to show that drops in Cheyne's asset prices are

"explained by" drops in the ABX market index.[19]  Putting these two regressions together, Dr.

Goldstein concludes that (1) the subprime market as a whole, as reflected by the ABX index,

---

[19] We use the terminology of "first regression" and "second regression" here for consistency with
Dr. Goldstein's reports, the report of defendants' expert Dr. Grenadier, and the depositions of
both, each of which used these terms as used herein to refer to the two pieces of Dr. Goldstein's
analysis.  (*E.g.*, Grenadier Report (Ex. 7) at ¶ 31, n.74; Goldstein Rebuttal (Ex. 4) at ¶¶ 18, 21-
22, 37-38; Goldstein Dep. at 59:21-60:11, 140:16-140:24; Grenadier Dep. (Ex. 10) at 203:15-
205:9.)

declined because of inflated credit ratings on securities other than Cheyne (event study); (2) the Cheyne SIV's subprime assets declined along with the market, as reflected by the ABX (second regression); and thus (3) the Cheyne SIV's subprime assets declined in value because of inflated ratings on other subprime assets, putting the vehicle into Enforcement and ultimately causing plaintiffs' losses.  (Goldstein Report (Ex. 3) at ¶¶ 16-22.)  Critically, it is only his first regression that purports to draw any link to any credit ratings (but not those of the Cheyne SIV); the second regression shows (and purports to show) only that the Cheyne SIV declined in value along with the market as a whole, as reflected by the ABX.  The fatal flaws in Dr. Goldstein's first regression therefore break any purported connection between any ratings and plaintiffs' losses, and render his entire loss causation theory unsupported and inadmissible.

Dr. Goldstein's first regression attempts to link credit ratings to ABX index declines by focusing on the effect on the ABX of certain ratings downgrades and CreditWatch actions announced on July 10, 2007, relating to RMBS securities primarily rated below single-A, none of which were held by the Cheyne SIV.  (Goldstein Report (Ex. 3) at ¶¶ 70-78, 85-86, 89; Grenadier Report (Ex. 7) at ¶¶ 28, 39; Goldstein Rebuttal (Ex. 4) at ¶¶ 18-20.)  Dr. Goldstein interprets these downgrades as a "revelation" of a multi-year, market-wide ratings fraud supposedly perpetrated by defendants, and opines that this "revelation" of a fraud (albeit not the fraud alleged in this case) caused the ABX declines that led to plaintiffs' alleged losses.  (Goldstein Rebuttal (Ex. 4) at Figure 4.)

As shown below, Dr. Goldstein's first regression is fatally flawed because it ignores the allegedly false ratings actually at issue (the ratings of the Cheyne SIV); ignores the relevant time period; and does not even purport to address the causes of ABX declines to which he ultimately attributes plaintiffs' losses.

19

### i.    Dr. Goldstein's Event Study is Focused on an Irrelevant Event

Dr. Goldstein's event study (his first regression) is fundamentally flawed because the event it purports to study – the July 10, 2007 ratings downgrades – did not concern the Cheyne SIV.  Neither the Cheyne SIV nor any other SIV was downgraded on July 10, 2007.  (Goldstein Report (Ex. 3) at ¶¶ 45-48, 70-78, 85-86, 89; Grenadier Report (Ex. 7) at ¶¶ 28, 39; Goldstein Rebuttal (Ex. 4) at ¶¶ 18-20; Goldstein Dep. (Ex. 9) at 226:7-17.)  Nor even were any of the securities held by the Cheyne SIV downgraded.  (*Id.*)  Instead, on that day, Moody's downgraded, and S&P placed on "Credit Watch Negative," certain subprime RMBS securities primarily rated single-A and below, not a single one of which was held by the Cheyne SIV.  (*Id.*)  Thus, even if the downgrades could somehow be construed as revelations of fraudulent ratings, they would reveal only the falsity of ratings of assets unrelated to the Cheyne SIV, and there is no basis for construing them as a "revelation" of any alleged misconduct actually at issue in this case.  Any causal significance Dr. Goldstein purports to attribute to the downgrades is therefore irrelevant.  *See, e.g., In re Omnicom Grp., Inc., Sec. Litig.,* 541 F.3d 501, 512-13 (2d Cir. 2010) (an event study that "merely links the decline in the value . . . to various events" is irrelevant to prove loss causation);  *Solow v. Citigroup, Inc.,* 10 Civ. 2927 (RWS), 2012 WL 1813277, at *6- *10 (S.D.N.Y. May 18, 2012) *aff'd,* 12-2499-CV, 2013 WL 149902 (2d Cir. Jan. 15, 2013) (plaintiffs fail to plead loss causation by attributing declines to events unrelated to the fraud);  *Katyle v. Penn Nat. Gaming, Inc.,* 637 F.3d 462, 471-78 (4th Cir. 2011) *cert. denied*, 132 S. Ct. 115 (U.S. 2011) (same); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392-94 (9th Cir. 2010) (no triable loss causation issue where supposed disclosure was unrelated to alleged fraud).[20]

---

[20] Moreover, the mere fact that the rating agencies downgraded certain securities on July 10, 2007 is insufficient as a matter of law to demonstrate causation.  *See Lentell v. Merrill Lynch &*

### ii. Dr. Goldstein Has Not Analyzed, and Thus Cannot Reliably Explain, the Declines in the ABX after July 10, 2007 that He Claims Explain the Cheyne SIV's Performance

In addition to studying an irrelevant event, Dr. Goldstein's event study cannot possibly explain the movements in the ABX through mid-2008 that he claims put the SIV in Enforcement and caused plaintiffs' losses:  his event study *stops* on July 10, 2007 and includes no data after that point.  (Goldstein Dep. (Ex. 9) at 196:25-200:21 (conceding that his event study "did not look at [ABX] returns after July 10, 2007" and did not "assess the impact of news released on any date after July 10, 2007").)  For weeks afterwards, through late August, the SIV continued in normal operations, meeting all its required tests.  But Dr. Goldstein's analysis ignores that period and all later periods, when the SIV actually entered into Enforcement, was declared insolvent, and had its assets liquidated.[21]  This fundamental limitation of Dr. Goldstein's event study is illustrated by the following annotated version of Figure 10 from Dr. Goldstein's report:

---

*Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (downgrade of equity analyst's rating from "buy" to "neutral" is not "corrective" because it does not "reveal to the market the falsity of the prior recommendations"); *see also In re Manulife Financial Corp. Securities Litigation*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("Manulife's downgrade by Fitch Ratings does not qualify as such a corrective disclosure because the Amended Complaint does not allege that any new material information was revealed by the downgrade.").

[21] The Court has previously recognized that with respect to another measure of market performance, Treasury Bills, the "precipitous decline occurred in August 2007," *King County, Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 345 (S.D.N.Y. 2010), a period after Dr. Goldstein's analysis ends.



**Goldstein Figure 10 (Annotated)**
\* Dr. Goldstein's only quantitative analysis of this later, relevant period is his second regression, which compares valuations of the Cheyne SIV's subprime assets to the ABX index, and shows only that the performance of the SIV's assets is "explained by" the movement of the ABX. (*E.g.*, Goldstein Rebuttal (Ex. 4) at ¶ 44.) He offers no analysis at all of what was causing movement in the value of the ABX (and, with it, of the Cheyne SIV portfolio).

   Remarkably, as shown above and as admitted by Dr. Goldstein in his deposition, Dr. Goldstein's event study ends more than six weeks before the Cheyne SIV entered Enforcement, excludes the period during which the ABX declined most significantly, and does not even cover, much less explain: the dates on which the Cheyne SIV **(1)** entered Enforcement (Aug. 28, 2007); **(2)** was downgraded (Aug. 28, Sept. 5, Sept. 7, Oct. 4, Oct. 19, and Oct. 23, 2007); **(3)** was declared insolvent (Oct. 17, 2007), **(4)** auctioned its assets (Jul. 17, 2008), or **(5)** completed its restructuring based on the bids received at auction (Jul. 23, 2008).  (Goldstein Report (Ex. 3) at

¶¶ 31-33, *id.* at App'x MG-4; Grenadier Report (Ex. 7) at ¶ 24.)  Dr. Goldstein freely concedes that he has conducted no quantitative analysis of the reasons for the ABX declines on any dates after July 10, 2007, and can offer no explanation for changes on such dates, other than that – for reasons he has not analyzed – perceptions of default risk appear to have changed.[22]  Having failed to even identify what caused the ABX index to decline on the relevant dates, Dr. Goldstein cannot possibly attribute those declines to defendants or to any risk allegedly concealed by the Cheyne SIV ratings.

Because his analysis ignores the time period after July 10, 2007, Dr. Goldstein *a fortiori* fails to control for or exclude non-fraud-related causes of the declines in the ABX or Cheyne SIV portfolio during the relevant period.[23]  Dr. Goldstein admits – as he must – that the ABX is impacted by "a variety of economic information" and that any number of non-fraud-related factors could move the ABX, including "housing prices," "interest rates," "expectations [for] GDP growth," and "unemployment."  (Goldstein Dep. (Ex. 9) at 112:23-114:19.)  Indeed, as Dr. Goldstein admits, "conceivably all news is relevant to market participants" (Goldstein Dep. (Ex. 9) at 236:10-236:19), and "[o]nly the market participants setting the prices would know" why the ABX went up or down on a given date (Goldstein Dep. (Ex. 9) at 247:13-248:15).  Yet Dr. Goldstein has made no effort to identify or exclude the impact of such macroeconomic

---

[22] When asked about changes in the ABX index on the dates that the Cheyne SIV entered enforcement and became insolvent, Dr. Goldstein opined that the movements were caused by changed perceptions of subprime asset credit quality, but he repeatedly disclaimed any ability to explain what was supposedly causing those changed perceptions, noting that "only the market participants setting the prices would know that."  (Goldstein Dep. (Ex. 9)at 218:13-226:5, 247:13-248:15, 249:11-253:17.)

[23] We put aside, for purposes of this argument, that the movement of the ABX is itself a non-fraud-related cause, and that thus Dr. Goldstein's opinion that the ABX is "the only statistically significant" driver of the performance of the Cheyne SIV's subprime assets affirmatively attributes the entirety of plaintiffs' losses to a non-fraud-related cause.

23

developments or other non-fraud-related factors (*e.g.*, the August 9, 2007 announcement by BNP

Paribas that it had frozen redemptions for three major investment funds, or the collapse of Bear

Stearns).  (Grenadier Report (Ex. 7) at ¶¶ 46, 84, Ex. 5.)  For this reason too, Dr. Goldstein fails

to link the declines in the ABX to the alleged fraud, or to any risks allegedly concealed by the

Cheyne SIV ratings.  *See, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir.

2010) (excluding expert causation analysis where plaintiffs' expert merely "link[ed] the decline

in the value of [the company's] stock to various events" rather than "draw[ing] the requisite

causal connection" between the specific fraud alleged and plaintiffs' losses).

      Dr. Goldstein has failed even to account for non-fraud-related news on the one date he

did study, July 10, 2007.  On that date, before any ratings downgrades were announced, Home

Depot issued a profit warning citing weakness in the housing market.[24]  (As Dr. Goldstein notes,

"Home Depo[t] primarily provides things to contractors and rebuilders."  (Goldstein Dep. (Ex. 9)

at 239:3-4.).)  Credit spreads widened immediately.[25]  Dr. Goldstein admits that he did not

analyze whether or to what extent that announcement moved the markets (though he did "seem

to recall looking at stories about it") (*Id.* at 240:7-242:12), and that he did not know one way or

the other whether most of the movement in the ABX that he purports to attribute to ratings

downgrades in fact occurred in response to the Home Depot profit warning, before the

---

[24] Natalie Harrison & Richard Barley Reuters, *Crossover Sell-Off Deepens As Subprime Fears Rise*, Reuters, July 10, 2007; Angel Jennings, *Citing Weak Housing Market, Home Depot And Sears Lower Estimates*, N.Y. Times, July 11, 2007; Chris Palmeri, *The Housing Woes Spread*, Bloomberg Businessweek, July 10, 2007, http://www.businessweek.com/stories/2007-07-10/the-housing-woes-spread.

[25] Natalie Harrison & Richard Barley Reuters, *crossover sell-off deepens as subprime fears rise*, Reuters, July 10, 2007 ("Credit spreads initially widened on Tuesday after Home Depot Inc., the largest home improvement chain in the United States, issued a profit warning citing weakness in the housing market.").

downgrades were even announced (*Id.* at 242:13-243:19).  Dr. Goldstein also admits that he did

no analysis to differentiate the impact (if any) of Moody's downgrades on July 10, 2007 versus

the impact (if any) of S&P CreditWatch actions on the same date.  (*Id.* at 245:5-8).

### iii.  Dr. Goldstein Focuses on the Relationship *Among* Tranches of the ABX, Instead of Purporting to Explain What Was Driving the Decline of All of Them

Finally, even if it were somehow permissible and relevant for Dr. Goldstein to attempt to

attribute ABX declines to the July 10, 2007 downgrades without looking past that date or

controlling for any other causal factors, he has not even accomplished that much.  Dr.

Goldstein's event study simply compares (1) the returns on the AA tranche of the ABX:HE

index to (2) the returns on the AAA and A tranches of that same index, purporting to show that

the relationship among the three tranches was aberrational on the specific day of the

announcements.  (Goldstein Report (Ex. 3) at ¶¶ 76-77; Goldstein Rebuttal (Ex. 4) at ¶¶ 18-20,

39-40.)  In other words, Dr. Goldstein's focus is purely on how the individual ABX tranches

related to *one another*, and whether any change in that internal relationship is apparent on July

10, 2007.  Whether or how this internal relationship could explain anything about what was

causing the overall decline in *all* of the ABX tranches – the conceded driver of plaintiffs' alleged

losses – is left unexplained.

*     *     *

Ultimately, Dr. Goldstein's failure and inability to reliably identify the causes of ABX

declines is unsurprising.  As the Court has previously recognized, no single factor is

appropriately blamed for the financial crisis.  *King County, Wash*. v. *IKB Deutsche Industriebank*

*AG*, 708 F. Supp. 2d 334, 346 (S.D.N.Y. 2010) (Scheindlin, J.) ("Blame for the financial crisis

can be, and has been, spread globally – from the financial sector's increasingly complex financial

25

products, to mortgage originators, to the government's loosened regulatory practices and its failure to respond to the collapse and substantial weakening of multiple financial powerhouses."). Dr. Goldstein has not undertaken, and would not be expected to succeed at, any effort to analyze these and myriad other relevant factors and quantify their relative contributions to the financial crisis.

In sum, having conceded that the financial crisis itself caused all of plaintiffs' alleged losses, Dr. Goldstein is left with no legal or methodologically sound basis for attributing any portion of those losses to defendants. His opinion must therefore be excluded.

## III.   MR. REIFSNYDER'S OPINIONS SHOULD BE EXCLUDED TO THE EXTENT THEY DO NOT DIRECTLY RESPOND TO THE OPINION OFFERED BY PROF. JAMES

Plaintiffs designated Mr. Reifsnyder as a rebuttal expert to Morgan Stanley's expert, Prof. Chris James. However, substantial portions of Mr. Reifsnyder's report are beyond the scope of permissible rebuttal and must therefore be excluded. Consistent with the Court's ruling at the *Daubert* pre-motion conference, which adopted defendants' position on this matter, all portions of Mr. Reifsnyder's opinion not directly addressed to the particular loan comparison analysis performed by Prof. James must be excluded.

As discussed in detail at the conference, Prof. James analyzed a narrow question in response to an argument repeatedly advanced by plaintiffs. Plaintiffs have contended that Morgan Stanley supposedly "*overturned*" mortgage loan due diligence findings by a due diligence vendor (Clayton), and as a result "*waived* bad loans into its [RMBS] securitizations." (Pls.' Opp. Mem. Law Summ. J., Dkt. No. 430 at 15 (emphasis added).)[26] Prof. James responded

---

[26] Plaintiffs have repeated this argument within the last month in their Jan. 14, 2013 Motion in Limine memorandum. (See Pls.' Mem. Supp. Mot. in Limine, Dkt. No. 541 at 7-8 ("Morgan

to this argument by focusing exclusively on these allegedly "waived" (or "Adjusted") loans and demonstrating that these loans performed no worse (indeed, slightly better) than loans for which Clayton's findings were not, as plaintiffs allege, "overturned."  (James Report (Ex. 8) at ¶ 27.) Mr. Reifsnyder devotes a portion of his report to contesting the reliability of Prof. James's conclusion as to allegedly "waived" loans.  (Reifsnyder Report (Ex. 5) at ¶¶ 9, 38-70.)  But as Mr. Reifsnyder expressly states in describing his assignment, his scope of work has two parts: first, "review and comment on the Expert Report of Dr. Christopher M. James," but then also a second component, involving analysis of other issues.  (*Id.* at ¶ 6.)  Indeed, the majority of Mr. Reifsnyder's report is not a response to the specific loan performance analysis put forward by Prof. James, but rather purported testimony on other topics, including the performance and alleged characteristics of loans that did not conform 100% to originator guidelines, and the performance of certain loans for which Morgan Stanley received "Broker Price Opinions," regardless of whether any of these loans were "waived" or "overturned" by Morgan Stanley. (Reifsnyder Report (Ex. 5) at ¶¶ 10-13, 45-46, 62-83, Appendix B.)

As the Court ruled at the pre-motion conference, all such opinions unconnected to the performance of allegedly "waived" or "overturned" loans are impermissible and should be excluded.  (Hr'g Tr. Dec. 27, 2012 (Ex. 13) at 44:3-5 ("[Mr. Reifsnyder's opinion] should be limited to rebutting what James did.  If he is going off and talking about loans that James didn't touch on, then that's something he can't do."); *id.* at 51:13-20 ("Your expert is coming in trying to rebut an opinion that James didn't give. . . . [I]t is not proper rebuttal to say that an expert

---

Stanley included bad loans into its securitizations on an astonishing scale, securitizing these knowingly poor quality loans and even overturning failing grades on 64% of the loans identified by its outside due diligence vendor as materially deficient" (emphasis added).)

didn't [analyze a separate question] and now I'm going to do it.  That's not rebuttal.  If you want to call an expert to do that, you should have.").)[27]

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' *Daubert* motion to exclude certain testimony by plaintiffs' experts should be granted.

---

[27] Mr. Reifsnyder's non-rebuttal opinions are excludable for other reasons as well, including that they are irrelevant to plaintiffs' allegations, are unsupported by any reliable methodology, and rely on the purported expertise of undisclosed individuals, not Mr. Reifsnyder.  (Defs.' Pre-Motion Daubert Letter, Dec. 20, 2012 at 10-11.)

Dated: New York, New York
February 8, 2013

DAVIS POLK & WARDWELL LLP

By:   /s/ James P. Rouhandeh
James P. Rouhandeh
james.rouhandeh@davispolk.com
Antonio J. Perez-Marques
antonio.perez@davispolk.com
Paul S. Mishkin
paul.mishkin@davispolk.com

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Counsel for Defendants Morgan Stanley & Co.
Inc. and Morgan Stanley & Co. Int'l Ltd.*

CAHILL GORDON & REINDEL LLP

By:   /s/ Dean Ringel
Floyd Abrams
fabrams@cahill.com
Charles A. Gilman
cgilman@cahill.com
Dean Ringel
dringel@cahill.com
Tammy L. Roy
troy@cahill.com
Jason M. Hall
jhall@cahill.com

80 Pine Street
New York, New York 10005
(212) 701-3000

*Counsel for Defendants Standard & Poor's
Ratings Services and The McGraw-Hill
Companies, Inc.*

29

SATTERLEE STEPHENS BURKE &
BURKE LLP


By:    /s/ Joshua M. Rubins
      Joshua M. Rubins
      jrubins@ssbb.com
      James J. Coster
      jcoster@ssbb.com
      Mario Aieta
      maieta@ssbb.com
      James I. Doty
      jdoty@ssbb.com

230 Park Avenue
11th Floor
New York, New York 10169
(212) 818-9200

*Counsel for Defendants Moody's Investors
Service, Inc. and Moody's Investors Service Ltd.*


GIBSON, DUNN & CRUTCHER LLP


By:    /s/ Mark Kirsch
      Mark A. Kirsch
      mkirsch@gibsondunn.com
      Joel M. Cohen
      jcohen@gibsondunn.com
      Lawrence J. Zweifach
      lzweifach@gibsondunn.com
      Christopher M. Joralemon
      cjoralemon@gibsondunn.com
      Mary Kay Dunning
      mkdunning@gibsondunn.com

200 Park Avenue,
New York, NY 10166-0193
(212) 351-2607

*Counsel for Defendants Moody's Investors
Service, Inc. and Moody's Investors Service Ltd.*