**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ABU DHABI COMMERCIAL BANK, et al.,

                     Plaintiffs,

          - v. -

MORGAN STANLEY & CO. INCORPORATED, et al.,

                   Defendants.

Civil Action No. 1:08-cv-07508 (SAS)

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' OMNIBUS MOTIONS IN LIMINE

### ** REDACTED VERSION **

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

ARGUMENT ..................................................................................................... 1

A.  DEFENDANTS SHOULD NOT BE PRECLUDED FROM ARGUING
    THAT ONLY THE KNOWLEDGE OF THE INDIVIDUALS WHO
    WORKED ON THE CHEYNE SIV CAN BE ATTRIBUTED TO THE
    DEFENDANTS ......................................................................................... 1

    1.  Evidence Concerning Persons Who Were Not Responsible for Rating the
        Cheyne SIV Notes Should Be Excluded ..................................................... 3

    2.  Evidence Relating to Morgan Stanley Employees Who Were Not Involved In
        Structuring the Cheyne SIV or Communicating with Rating Agencies Should
        Be Excluded .......................................................................................... 10

        a)  Collective Knowledge Does Not Suffice to Prove
            Aiding and Abetting ........................................................................ 11

        b)  Plaintiffs' Effort to Admit Testimony and
            Documents from Shapiro, Telesca and Hubler Is
            Unsupported by the Record and Misstates the Facts .................... 11

    3.  Evidence of Defendants' Conduct in Rating and Structuring the Types of
        Securities Purchased by the Cheyne Asset Manager Is Not "Inextricably
        Intertwined" with Evidence of the Alleged Cheyne SIV Fraud ................ 14

    4.  The Knowledge of Individuals Who Did Not Work On the Cheyne SIV Is
        Not Relevant To Proof of Falsity ........................................................... 17

B.  DEFENDANTS SHOULD NOT BE PRECLUDED FROM
    INTRODUCING EVIDENCE OF PLAINTIFFS' INVESTMENTS IN
    OTHER STRUCTURED FINANCE INSTRUMENTS ................................ 19

C.  DEFENDANTS SHOULD BE PERMITTED TO INTRODUCE
    EVIDENCE AND TESTIMONY FROM PLAINTIFFS' PREVIOUSLY
    IDENTIFIED EXPERTS .......................................................................... 21

D.  THE COURT HAS ALREADY RULED THAT DOCUMENTS
    PRODUCED IN *KING COUNTY* AFTER THE CLOSE OF
    DISCOVERY ARE INADMISSIBLE ...................................................... 22

E.  PLAINTIFFS SHOULD NOT BE PERMITTED TO CALL RAYMOND
    MCDANIEL AND WILLIAM HARRINGTON AT TRIAL ........................ 23

    1.  This Court Should Adhere to Its Previous Rulings ................................. 24

i

2.   The Proffered Topics of Testimony of McDaniel and Harrington Are
Irrelevant and Inadmissible for Other Reasons.................................................26

    a)   Plaintiffs Have Offered No Basis for McDaniel's
Testimony .................................................................................26

    b)   Plaintiffs Equally Have Offered No Basis for
Harrington's Testimony .............................................................28

    c)   Testimony From McDaniel and Harrington Is
Otherwise Inadmissible.............................................................30

CONCLUSION...................................................................................................30

APPENDIX:  RESPONSE TO PLAINTIFFS' SECTION F PURPORTING TO
SUMMARIZE THE MOTIONS IN LIMINE DECIDED AT THE
NOVEMBER 12, 2012 HEARING ........................................................... A-1

# TABLE OF AUTHORITIES

**CASES** PAGE

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 2012 WL 3584278 (S.D.N.Y. Aug. 17, 2012) ................................................................ *passim*

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 269 F.R.D. 252 (S.D.N.Y. 2010) .................................................................................. 19n

*In re AES Corp. Sec. Litig.*, 849 F. Supp. 907 (S.D.N.Y. 1994) ........................................... 19-20

*Agron* v. *Trs. of Columbia Univ. in the City of N.Y.*, 176 F.R.D. 445 (S.D.N.Y. 1997) ............. 22

*Allison* v. *Round Table Inv. Mgmt. Co.*,  447 F. App'x 274 (2d Cir. 2012) ................................. 19

*In re Bank of America Corp. Sec. Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................ 4-5

*Billhofer* v. *Flamel Techs., S.A.*, 2012 WL 3079186 (S.D.N.Y. July 30, 2012)............................ 4

*Chemtex LLC* v. *St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536 (S.D.N.Y. 2007) ..................... 11

*In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010) ......................................... 6

*City of Monroe Emps. Ret. Sys.* v. *Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ............................................................................. 6

*City of Omaha, Nebraska Civilian Emps. Ret. Sys.* v. *CBS Corp.*, 679 F.3d 64 (2d Cir. 2012) ......................................................................................... 3n, 5

*Crigger* v. *Fahnestock and Co., Inc.*, 443 F.3d 230 (2d Cir. 2006) ........................................... 19

*Dalbec* v. *Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987).................................... 6n

*In re Deutsche Bank AG Sec. Litig.*, 2012 WL 3297730 (S.D.N.Y. Aug. 10, 2012)..................... 5

*DIMON Inc.* v. *Folium, Inc.*, 48 F. Supp. 2d 359 (S.D.N.Y. 1999) ......................................... 20n

*Fait* v. *Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) ........................................................ 3n

*Fed. Hous. Fin. Agency* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ....... 3n, 4n

*In re General Electric Co. Sec. Litig.*, 856 F. Supp. 2d 645 (S.D.N.Y. 2012) .............. 3n, 4, 4n, 5

*King County, Washington* v. *IKB Deutsche Industriebank AG*, 2013 WL 45878 (S.D.N.Y. Jan. 3, 2013)............................................................................ 2, 3n

*Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531 (2d Cir. 1997)....................... 20n

*Marcic* v. *Reinauer Transp. Cos.*, 397 F.3d 120 (2d Cir. 2005) .................................... 28

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................... 7n

*McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ................................... 27

*In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493 (S.D.N.Y. 2009) ..................................... 7n

*Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D 13 (S.D.N.Y. 2009) ........................................................................... 11

*New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964)................................................. 6n

*Plew* v. *Ltd. Brands, Inc.*, 2012 WL 379933 (S.D.N.Y. Feb. 6, 2012)..................................... 28n

*Rust Commc'ns Grp., Inc.* v. *70 State Street Travel Serv., Ltd.*, 122 A.D.2d 584 (4th Dep't 1986) ...................................................................... 6n

*Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) .................... 7

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008) .......................................................................... 5, 6

*United States* v. *Carboni*, 204 F.3d 39 (2d Cir. 2000)........................................... 15, 15n

*United States* v. *Dolney*, 2005 WL 2129169 (E.D.N.Y. Sept. 1, 2005), *aff'd sub. nom, United States* v. *Pirgousis*, 290 F. App'x 388 (2d Cir. 2008).................................. 15n

*United States* v. *Ferguson*, 246 F.R.D. 107 (D. Conn. 2007)................................. 15-16

*United States* v. *Hatfield*, 685 F. Supp. 2d 320 (E.D.N.Y. 2010)................................. 16

*United States* v. *Rea*, 958 F.2d 1206 (2d Cir. 1992) ......................................... 30

*In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................. 5n, 6-7

## RULES

Fed. R. Civ. P. 26 .............................................................................. 25

Fed. R. Civ. P. 26(c)........................................................................ 28n

Fed. R. Civ. P. 26(b)(4)(D) ............................................................... 22

Fed. R. Civ. P. 45(c)(3)(A)(iv) .......................................................... 28n

Fed. R. Evid. 403 ................................................................................... 21

Fed. R. Evid. 701 ................................................................................... 30

Fed. R. Evid. 801(d)(2)(D) ................................................................... 28

Defendants respectfully respond to Plaintiffs' Omnibus Motions in Limine ("Pl. MIL").[1]

## ARGUMENT

### A.   DEFENDANTS SHOULD NOT BE PRECLUDED FROM ARGUING THAT ONLY THE KNOWLEDGE OF THE INDIVIDUALS WHO WORKED ON THE CHEYNE SIV CAN BE ATTRIBUTED TO THE DEFENDANTS

Plaintiffs' motion seeking to preclude defendants from "arguing that only the knowledge of the individuals who worked directly on the Cheyne SIV can be attributed to the defendants" (Pl. MIL at 1-11) is factually and legally erroneous.

*Factually*, plaintiffs' argument fundamentally misunderstands how the Cheyne SIV was rated and what was rated. Plaintiffs state, without any evidence: the "Cheyne SIV was simply a repository for various classes of structured finance instruments" and that "[t]he ratings on the Cheyne SIV notes were derived from the ratings on its constituent assets." Pl. MIL at 1. These assertions are false.

First, the SIV was not a "repository" of pre-selected assets. At the time the ratings were issued in August 2005, there were no assets in the Cheyne SIV. The ratings were based on the structure and operating guidelines of the SIV. Thereafter, unlike many other types of structured securities which have a particular portfolio of assets that remains "static" over the course of the securitization, the Cheyne SIV was an actively managed vehicle with assets that were bought and sold by the asset manager in its discretion subject to disclosed investment policies and guidelines. The assets selected by the manager were not known in advance or approved by the Rating

---

[1] Lettering of sections herein corresponds to sections of Pl. MIL; Defendants' Memorandum of Law in Support of Defendants' Omnibus Motion in Limine is referred to as "Def. MIL." Although not requested by the Court, Plaintiffs' MIL included a purported description of rulings in limine that the Court made at the November 12, 2012 hearing. We do not respond herein to plaintiffs' characterization of the record, but, because their purported description of the Court's rulings is substantially inaccurate, we have included a brief appendix with record citations to set forth clearly what the record reflects as to the Court's rulings to date.

Agencies.  Nor did the Rating Agencies know when such assets might later be sold or replaced by other assets.

Second, the Rating Agencies issued their rating opinions on the notes issued by the SIV as an entity, and those ratings did not depend upon any particular asset or portfolio of assets; rather, they were based upon the disclosed structural elements of the SIV as well as the operational requirements and protections imposed on the asset manager.  Def. MIL at 4-6, 9.

Third, at each Rating Agency, specially constituted rating committees issued the rating opinions for the Cheyne SIV.  At the time they issued their ratings, the committees did not rate (or "re-rate") the assets to be purchased by the Cheyne SIV.  Def. MIL at 5-6, 9.  Plaintiffs offer no evidence that any Rating Agency employee other than a member of the respective Rating Agency's Cheyne rating committees had any input whatsoever in the rating of the Cheyne SIV.

*Legally*, plaintiffs' argument ignores the legal standard already announced by this Court: the Cheyne SIV ratings, the only alleged misstatements, are opinions that are actionable only if the speaker issued a rating that it *knew* was "either unsupported by reasoned analysis or without a factual foundation" <u>and</u> if the Rating Agency "d[id] not believe [the rating] to be true."  *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 2012 WL 3584278, at *10 (S.D.N.Y. Aug. 17, 2012) ("*ADCB*"); *see also King County, Washington* v. *IKB Deutsche Industriebank AG*, 2013 WL 45878, at *4 (S.D.N.Y. Jan. 3, 2013) ("*King County*").

Because the only people who could and did issue the ratings were the members of each Rating Agency's Cheyne SIV rating committee, it is what *they knew and believed* that is responsive to the relevant inquiry.  Plaintiffs' efforts to broaden the trial to include allegations concerning assets that the committee members did not rate, or conversations or information they were unaware of, would, if permitted, enormously and wastefully expand the scope and duration of the

trial.   Such information is irrelevant to the question that survived summary judgment: whether the Rating Agencies, through their authorized agents, issued false rating opinions on the Cheyne SIV with actual, subjective knowledge of falsity.   Plaintiffs do not want to answer that question and do not want defendants to "argue" that point, but that is the fundamental issue in the case. All unrelated evidence should be excluded.

### 1.   Evidence Concerning Persons Who Were Not Responsible for Rating the Cheyne SIV Notes Should Be Excluded

The Court has held that the Cheyne SIV credit ratings at issue in this case are fact-based opinions.   *See ADCB*, 2012 WL 3584278, at *10.   As such, they are not actionable unless plaintiffs can prove that the opinion was both objectively and subjectively false at the time it was made; plaintiffs must prove that the speaker did not believe the opinion when it was issued.[2]

To establish falsity for liability with respect to an opinion, plaintiffs must put forth clear and convincing evidence that at the time the *speaker or maker* issued his opinion, he did not genuinely or honestly believe it.[3]   In other words, plaintiffs must demonstrate that the speakers or "originators" of the opinions—here, each Rating Agency's Cheyne SIV rating committee[4]— issued the ratings with *actual knowledge* of their falsity, *i.e.,* that they disbelieved their ratings

---

[2] *See City of Omaha, Nebraska Civilian Emps. Ret. Sys.* v. *CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012); *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011); *King County*, 2013 WL

[3] *Fait*, 655 F.3d at 11; *Fed. Hous. Fin. Agency* v. *UBS Americas, Inc.* ("*FHFA*"), 858 F. Supp. 2d 306, 326-27 (S.D.N.Y. 2012); *In re General Electric Co. Sec. Litig.*, 856 F. Supp. 2d 645, 656 (S.D.N.Y. 2012) ("*In re GE*").

[4] There is no mystery about the identity of the "speaker" with respect to the Cheyne SIV ratings. Each Rating Agency identified *by name* members of its Cheyne rating committee in published reports setting out its respective ratings.   *See, e.g.*, Ex. 1 (S&P Pre-Sale Report); Ex. 2 (S&P New Issue Report); Ex. 3 (Moody's New Issue Report).   Citations to "Ex. _" refer to the exhibits to the Declaration of Dean Ringel, filed contemporaneously herewith.

opinions at the time they were made.[5]

Even though the identity of the "speakers" is clear and this Court has held that rating opinions require proof of *subjective* falsity to be actionable, plaintiffs repeatedly attempt to insert irrelevant and prejudicial evidence relating to individuals who were not involved with the Cheyne SIV – and, by the current motion – attempt to preclude defendants from pointing out the irrelevance of such evidence through reference to an inapplicable (and misstated) concept of "scienter" separate from subjective falsity. Pl. MIL at 2-7. This effort is misplaced for two distinct reasons. First, where a statement of opinion is involved, actual knowledge of falsity is required to establish the existence of any misrepresentation; if that element is not proven, the requisite state of mind has not been established. Second, scienter must be proven as to the specific corporate employee(s) responsible for the opinion; it cannot be created from the knowledge of an assemblage of employees unconnected to the opinion. We address each of these reasons below.

In a case premised on an allegedly false opinion, the requisite state of mind is subjective knowledge of falsity. *See In re Bank of America Corp. Sec. Litig.*, 757 F. Supp. 2d 260, 311 (S.D.N.Y. 2010) (explaining that an opinion "cannot be false at all unless the speaker is knowingly misstating his truly held opinion" (internal quotation marks omitted)); *In re GE*, 856 F. Supp. 2d at 657 (holding that if the speaker "had disbelieved this statement of opinion at the time he made it—in other words, if he had lied—then he would have engaged in a form of knowing misconduct"). Courts have made clear that "recklessness will not suffice." *Billhofer* v. *Flamel Techs., S.A.*, 2012 WL 3079186, at *10 (S.D.N.Y. July 30, 2012); *see also In re Bank of Ameri-*

---

[5] *ADCB*, 2012 WL 3584278, at *10-11; *FHFA*, 858 F. Supp. 2d at 325-27 (holding that *Fait* "impos[es] upon the plaintiff the duty to plead that *the person who formed the opinion* did not believe the opinion when she expressed it" (emphasis added)); *see also In re GE*, 856 F. Supp. 2d at 656 ("Pursuant to *Fait*, a statement of opinion is not actionable unless the speaker disbelieved it at the time he expressed it." (citation omitted)).

*ca*, 757 F. Supp. 2d at 310-11 & n.12 (collecting cases).  Nor of course will it suffice to prove that "[d]efendants *should have known* that their [opinions] were false or misleading."  *In re Deutsche Bank AG Sec. Litig.*, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012); *see also City of Omaha*, 679 F.3d at 68.  Rather, plaintiffs must show that each rating committee "engaged in a form of *knowing* misconduct."  *In re GE*, 856 F. Supp. 2d at 657 (emphasis added); *see also In re Deutsche Bank*, 2012 WL 3297730, at *2 (holding that after *Fait*, where the challenged statements are opinions, they are not actionable unless "based on *knowing* misconduct by the Defendants" (emphasis added)); *ADCB*, 2012 WL 3584278, at *10-11.  Accordingly, plaintiffs cannot use cover of a different and lesser "scienter" standard to circumvent their burden of proving that the rating committees (the "speakers") knowingly issued false ratings on the Cheyne SIV.

Plaintiffs cannot, as they contend, simply aggregate the knowledge of any Rating Agency employees in any department at any time to establish the requisite state of mind.  Rather, plaintiffs must prove that those individuals at each Rating Agency who had actual responsibility for rating the Cheyne SIV acted with the requisite state of mind.  *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).[6]  In *Dynex*, the Court of Appeals explained that "[t]o *prove* liability against a corporation, of course, a plaintiff must prove that *an agent* of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."  *Id.* at 195 (emphasis added).  After *Dynex*, no court in this circuit has accepted the viability of collective scienter at the *proof* stage—not in an ordinary fact case and certainly not in an opinion case.  The cases plaintiffs cite in their motion are not to the contrary.  *See* Pl. MIL at 5-6 & n.4.

---

[6] *See also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) (explaining that the relevant state of mind is that of "the employees or agents who made the statement(s)").

The impropriety of collective scienter at the proof stage is especially obvious in an opin-

ion case. *Fait* and its progeny are clear that in a fraud case premised on a misstatement of opin-

ion, the court's analysis rests on the knowledge of the speaker. Plaintiffs do not point to any

opinion case where proof of the knowledge of someone other than the speaker has satisfied

*Fait*'s burden of proof. Even plaintiffs' own post-*Dynex* cases (Pl. MIL n.4) are clear that the

requisite state of mind must exist within a specific individual at the corporation with responsibil-

ity for the statement at issue, as opposed to the corporation's collective knowledge. *See, e.g.,*

*City of Monroe Emps. Ret. Sys.* v. *Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *13

(S.D.N.Y. Sept. 19, 2011) ("As for the corporate entity, . . . courts look to whether the pleaded

facts 'create a strong inference that *someone* whose intent could be imputed to the corporation

acted with the requisite scienter.'" (quoting *Dynex*, 531 F.3d at 195) (emphasis added)); *In re*

*Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236-37 (S.D.N.Y. 2010) (plaintiffs adequately

pleaded scienter because "[t]heir allegations support a strong inference that *someone* whose in-

tent is attributable to Citigroup" acted with the requisite state of mind (emphasis added)).[7]

And the courts are clear that the "someone" has to be someone fairly characterized as the

author or speaker of the statement. *See, e.g., In re Vivendi*, 765 F. Supp. 2d at 543-44. In *Viven-*

*di*, the court set aside a jury verdict of liability against a corporate defendant as to a statement

---

[7] The requirement that the knowledge of falsity of opinion reside in the individual speaker has some parallels in the application of the subjective "actual malice" requirement in libel. *See New York Times Co.* v. *Sullivan*, 376 U.S. 254, 287 (1964) ("[T]he state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement."); *Dalbec* v. *Gentleman's Companion, Inc.*, 828 F.2d 921, 925-26 (2d Cir. 1987) ("To establish liability, it is not enough to show that one or more employees, having no contact with the individuals responsible for a libelous statement, suspected or knew of the falsity of the statement. Rather, it must be shown that the employees responsible for the statement knew of or suspected its falsity." (citation omitted)); *Rust Commc'ns Grp., Inc.* v. *70 State Street Travel Serv., Ltd.*, 122 A.D.2d 584, 585 (4th Dep't 1986).

made by an identified corporate employee because "plaintiffs did not introduce any evidence whatsoever regarding [the employee]'s knowledge or state of mind." *Id.* The court noted that "the required state of mind must actually exist in the individual making (or being a cause in the making of) the representation. . . ." *Id.* (quoting *Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*, 365 F.3d 366 (5th Cir. 2004)). The court noted that even in the absence of the specific identification of the authors or speaker in the document, only the knowledge of a person "who played a meaningful role in drafting or reviewing" the statement could satisfy the requisite mental state. *Id.* at 545. It is precisely those limitations that plaintiffs seek to circumvent here.[8]

Plaintiffs' argument is based on the premise that senior executives at both Rating Agencies "directed employees to apply inaccurate methodologies" and that such alleged evidence can be used to attempt to prove the requisite state of mind. Pl. MIL at 4. This argument is wrong.

Plaintiffs' apparent contention that they can prove that a corporation "disbelieved" Cheyne's ratings through individuals who had *no idea* about Cheyne or its ratings is both nonsensical and contrary to law. The law makes clear that in a fraud case the speaker (not anyone else) must possess the requisite state of mind—here, disbelief. Plaintiffs' "evidence" regarding the alleged knowledge of employees who were not part of the Cheyne SIV rating committees is irrelevant in the absence of proof that the employees or executives in question even knew of the *existence* of the Cheyne SIV, let alone disbelieved its ratings.

Moreover, plaintiffs' argument is premised on the baseless assertion that executives with

---

[8] In *In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493 (S.D.N.Y. 2009) (Pl. MIL at n.4), Judge Kram stated that "the individual making an alleged misstatement and the one with scienter do not have to be one and the same." *Id.* at 516 (relying in part on her earlier decision *In re Marsh & McLennan*, 501 F. Supp. 2d 452, 481-83 (S.D.N.Y. 2006)). Neither decision dealt with opinions and both came at the pleading stage. The court did not discuss or cite to the *Dynex* opinion in its *In re Moody's* discussion of scienter although the decision came after *Dynex*. These decisions provide no guidance as to what needs to be proven at a trial in an opinion case.

authority over SIV rating committees exerted pressure on the members of the SIV committees. Most of the individuals on plaintiffs' witness list, however, had no authority over SIVs. With respect to the current and former S&P employees, for example, plaintiffs have not—and cannot—proffer any evidence that Terry Osterweil, Frank Raiter, Frank Parisi or Gale Scott either served on the Cheyne SIV rating committee or had line authority over SIV ratings (or any member of the rating committee). Rather, these individuals worked in wholly separate divisions of S&P and had no involvement with or authority over SIV ratings. The same is true with respect to plaintiffs' list of current and former Moody's employees, as only two of them – David Rosa and Henry Tabe – had any role whatsoever in rating Cheyne or had any personal knowledge about whether the Cheyne rating committee believed its ratings. *See* Def. MIL, App'x at 15. The rest of the Moody's individuals—Brian Clarkson, Jerome Fons, Mark Froeba, Noel Kirnon, Ilya Eric Kolchinsky, Warren Kornfield, Richard Michalek, Jonathan Polansky, and David Teicher—had nothing to do with rating the Cheyne SIV.[9]

Further, with respect to those individuals who did have any measure of direct or indirect line authority over the Cheyne rating committee members, plaintiffs have failed to put forth any evidence showing that these individuals had any control over the rating process or that they exerted any pressure on the Cheyne SIV rating committees. Plaintiffs have not identified a single piece of evidence that even suggests that any executive pressured rating committee members to issue a Cheyne rating that he or she did not believe to be true. Absent such evidence, the knowledge and testimony of such employees is irrelevant to whether the "originators" of the Cheyne SIV ratings genuinely believed the ratings at the time they were issued.

---

[9] Likewise, Raymond McDaniel and William Harrington did not play any role in rating the Cheyne SIV; nor do they have personal knowledge about whether the Cheyne rating committee believed its ratings. *See infra* Section E.

8

For example, plaintiffs' "evidence" with respect to Moody's is a post-credit crisis review that plaintiffs knowingly misattributed to Moody's CEO, which in fact was written by an individual who had no role in rating whatsoever.  Pl. MIL at 4; *see also infra* p. 26.  With respect to S&P, plaintiffs contend that a June 2005 presentation circulated to S&P's Global Structured Finance Leadership Team ("SFLT") is somehow "directly relevant to the rating agency defendants' state of mind."  *See* Pl. MIL at 3-4 (citing *King County* Dkt. No. 329-2, Tab 52 at S&P-ADCB 2595538).  However, the presentation is nothing more than a forward-looking strategic plan for the entire S&P Global Structured Finance Ratings department that analyzes both positive and negative "economic or market trends" in various markets across the globe and identifies potential future priorities and strategies.  The document makes no mention whatsoever of the Cheyne SIV and no one on the SFLT served on the Cheyne SIV rating committee.  While plaintiffs pluck out of context two of the hundreds of trends identified in this 92-page document as supposed evidence that the "senior-most S&P executives" knew that "falsely-rated, poor quality underlying assets would have a magnified negative effect on securities like the Cheyne SIV," (Pl. MIL at 4), even a cursory look at the document shows that plaintiffs have given these words a gloss they simply cannot bear.[9]  These two excerpts are merely two possible trends among scores of others identified that could have some kind of undetermined effect on unidentified transactions at an unknown point in time.  Nowhere do the statements even hint that anyone at S&P thought that

---

[9] The excerpts cited by plaintiffs state: (i) "Competition among rating agencies has helped to drive down support levels in deals- this will create more ratings volatility and put more pressure on surveillance resource needs."; and (ii) "Concerns that a "bubble" has developed in both residential and commercial real estate sectors.  If this is the case and the 'bubble' bursts then a large number of rating downgrades may occur.  This could lead to high negative rating volatility and potential skepticism of the rating.  In addition, surveillance resource needs would be needed to manage the scenario.  This negative effect would trickle into CDOs as there are an increasing number of CDOs with RMBS and CMBS in them."  *King County,* Dkt. No. 329-2, Tab 52 at S&P-ADCB 2595538 (cited in Pl. MIL at 3-4).

any ratings were false, let alone suggest that any SIV rating was inaccurate.  With no mention of Cheyne or even SIVs generally and no connection to the Cheyne SIV rating committee, plaintiffs' unwarranted suggestion that these excerpts demonstrate knowledge by S&P in June 2005 of a supposed "magnified negative effect" on the Cheyne SIV should not be permitted.[10]

Moreover, placing such "evidence" before the jury would bring with it a host of new and complex collateral issues that could serve only to detract from the central focus of this case—i.e., the knowledge of each Cheyne SIV rating committee at the time the ratings were issued.  Because the documents cited by plaintiffs involve dozens of individuals with no relation to the rating of the Cheyne SIV and introduce new and complex issues from all corners of the ratings industry, if such evidence were included in this trial, it would create a series of lengthy sideshows on collateral issues having no bearing on the knowledge of the Cheyne SIV rating committees at the time the ratings were issued.  Evidence of what a non-committee member, unaware of the Cheyne rating facts, thought in a different context about an unrelated security during a different time period is not probative of the central issue in this case—the rating of the Cheyne SIV.[11]

2.   **Evidence Relating to Morgan Stanley Employees Who Were Not Involved In Structuring the Cheyne SIV or Communicating with Rating Agencies Should Be Excluded**

To prove aiding and abetting, plaintiffs must establish that the Morgan Stanley employees involved in structuring the Cheyne SIV and communicating with the Rating Agencies had actual, not constructive, knowledge that the Rating Agencies were committing fraud.  Plaintiffs

---

[10] *See also* Dkt. No. 434, Tab 49 at PSI-SP-000226 (email from Frank Parisi—an RMBS analyst who had no involvement whatsoever with SIVs, or the Cheyne SIV in particular—to other individuals similarly not on the Cheyne SIV rating committee discussing the LEVELS model for rating RMBS, *not* SIVs).

[11] *See* Def. MIL at 1-16 for a more extensive discussion as to why such documents are irrelevant and prejudicial and should be excluded from this case.

cannot make the necessary showing with evidence from personnel who were not involved in structuring the Cheyne SIV or communicating with Rating Agencies, nor with evidence about other securitizations. Plaintiffs' argument lacks legal justification and distorts the record, and admission of this irrelevant evidence would only confuse and mislead.

> **a)   Collective Knowledge Does Not Suffice to Prove Aiding and Abetting**

As discussed above, plaintiffs' collective scienter argument has been rejected by the Second Circuit. Moreover, plaintiffs do not cite a single case holding that a theory of collective corporate knowledge can satisfy the heightened "actual knowledge" standard for aiding and abetting claims. In fact, because collective knowledge is a form of constructive, rather than actual, knowledge, collective knowledge cannot suffice for aiding and abetting liability. *See Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 24 n.11 (S.D.N.Y. 2009) (holding that "collective knowledge of the JPMorgan 'family'" could not support an aiding and abetting claim where plaintiff was "unable to allege that any specific employee(s) had the requisite knowledge" of the alleged fraud); *Chemtex LLC* v. *St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007). Accordingly, plaintiffs must show that specific employees who worked on the structuring of the SIV (*i.e.*, those who allegedly substantially assisted the Rating Agencies), knew that the Rating Agencies were engaged in fraud.

> **b)   Plaintiffs' Effort to Admit Testimony and Documents from Shapiro, Telesca and Hubler Is Unsupported by the Record and Misstates the Facts**

Perhaps recognizing that collective knowledge cannot suffice, plaintiffs retreat in Section I.A.2 of their motion – the only section addressed specifically to Morgan Stanley – to the argument that "evidence that the *same* Morgan Stanley employees who worked on the Cheyne SIV knew its underlying assets were filled with toxic subprime loans" is relevant. *See* Pl. MIL at 7 (emphasis added). Yet, plaintiffs advance this argument to obtain evidence from one current and

two former Morgan Stanley employees (Frank Telesca, Steven Shapiro, and Howard Hubler) who were <u>not</u>, as plaintiffs suggest, "involved in the Cheyne SIV structuring and rating process." *Id.* In fact, Shapiro and Telesca had no involvement in the Cheyne SIV, and Hubler's limited involvement in the warehouse financing is insufficient to admit his testimony. Plaintiffs' argument to the contrary relies on rank mischaracterizations of the record, and only underscores the risk of juror confusion that would arise from permitting this irrelevant evidence.

**Shapiro and Telesca Are Not Relevant.** Shapiro and Telesca had no role in the Cheyne SIV, but rather were members of Morgan Stanley's Securitized Product Group, who in that regard oversaw the RMBS securitization process. After years of extraordinarily broad discovery, there is no evidence that either one of them had any involvement whatsoever in the Cheyne SIV. *See* Def. MIL at 18. They do not appear on any working group list for the Cheyne SIV (*see* Ex. 4; Ex. 5), on a single email concerning the structuring of the Cheyne SIV, on any communication with the Rating Agencies concerning the Cheyne SIV or on any communication with plaintiffs. Not one of the more than 60 witnesses who have testified in this case has testified that Shapiro or Telesca had any involvement in the SIV.

Moreover, contrary to plaintiffs' assertions, Shapiro and Telesca were *not* even members of the ABS trading desk, which desk plaintiffs suggest had a role in selling assets to the SIV. The organizational chart cited by plaintiffs in fact proves the opposite: it shows that Shapiro and Telesca were on the HEL ABS Finance team, <u>not</u> the HEL ABS Secondary Trading desk. *King County* Dkt. No. 323-7, Tab 399 at MS001349255. Likewise, plaintiffs cite Rany Moubarak's deposition testimony that ███████████████████████████████████████ ██████████████████████ Ex. 6 at 113:22-114:18. But Moubarak never mentioned Shapiro or Telesca, ████████████████████████████████████████████████████████

████████████████████████████████.  *See* Ex. 4.  Finally, plaintiffs cite Anton Peterson's testimony that ████████████████████████████████████████████ ████████████████████ (Pl. MIL at 8 & Ex. 6 (emphasis added)) – but this only confirms that Shapiro and Telesca were involved in purchasing and securitizing *loans*, not purchasing or trading *RMBS assets*.  Peterson himself was not involved in the Cheyne SIV, and was not asked once about Cheyne or credit ratings in his deposition.[12]

Even if Shapiro and Telesca had been involved in the Cheyne SIV (and they were not), their documents and testimony would be irrelevant because they are unrelated to the Cheyne SIV ratings.  Out of the millions of pages of documents produced in this case, plaintiffs cannot cite to even one that shows that Shapiro and Telesca knew the assets that the SIV purchased at launch contained "poor quality loans."  *See* Pl. MIL at 7.  The three documents they cite make no reference to the Cheyne SIV, post-date its structuring and launch, and one is an email that was neither sent to nor received by Shapiro or Telesca.  *See id.* (citing Dkt. No. 437, Tabs 136, 137, 139).

**Hubler Is Not Relevant.**  Plaintiffs' claim that Hubler—a former Morgan Stanley employee who has not been deposed—"worked directly on the Cheyne SIV" (Pl. MIL at 8) is equally unavailing.  Hubler was involved only with the warehouse, which was effectively a loan by Morgan Stanley to finance the purchase of assets before the SIV's launch.  *See* Def. MIL at 20.  Hubler had no role in the structuring of the Cheyne SIV and plaintiffs' effort to obtain his testimony relies on a mischaracterization of the warehouse financing.

The documents cited by plaintiffs do not show otherwise: they relate solely to financing considerations with respect to the warehouse and do not suggest that Hubler had any role in the rating of the Cheyne SIV.  Indeed, there is no evidence that Hubler was included on a single

---

[12] Peterson, though not a subject of Pl. MIL, is similarly irrelevant.  *See* Def. MIL at 17.

communication with the Rating Agencies concerning the Cheyne SIV.  Hubler's work on the warehouse is therefore entirely irrelevant to whether Morgan Stanley had actual knowledge of or substantially assisted in the Rating Agencies' alleged fraud.  His insertion into the case would be confusing to the jury, requiring additional witnesses and evidence solely to demonstrate the irrelevance of the warehouse to the issues in this case.

Most glaring is plaintiffs' bald assertion—without any citation to the record—that Morgan Stanley ABS traders reporting to Hubler (which, as explained above, did not include Shapiro and Telesca) were "responsible for approving all of the Cheyne SIV assets." Pl. MIL at 8.  That proposition has been roundly rejected by every witness in this case, including by Cheyne Capital (which had exclusive asset selection responsibility) and even by plaintiffs themselves.  *See, e.g.*, Ex. 7 at 75:10-76:17, 190:3-19, 342:20-343:11; Ex. 8 at 107:6-109:16, 112:17-113:18; Ex. 9 at 228:12-229:3.  Morgan Stanley did not and could not select any assets that would ultimately become part of the Cheyne SIV.  Moreover, plaintiffs' continued insistence on mischaracterizing the record in this manner only underscores why evidence concerning the ABS trading desk and warehouse must be excluded:  it is being proffered on the basis—and to persuade the jury—of a blatant falsehood.

3.   **Evidence of Defendants' Conduct in Rating and Structuring the Types of Securities Purchased by the Cheyne Asset Manager Is Not "Inextricably Intertwined" with Evidence of the Alleged Cheyne SIV Fraud**

The rating of the Cheyne SIV is not "inextricably intertwined" with the separate rating opinions issued on the "types of structured finance securities contained in the Cheyne SIV." Pl. MIL at 9-10.  The rating and structuring of the various different structured finance securities held at one time or another by the Cheyne SIV reflected unique and distinct processes involving different individuals, criteria, methodology, and timing and were wholly separate from the rating of the Cheyne SIV.  Review of the cases plaintiffs rely upon reflects how far afield they are driven

14

to find a basis to introduce evidence unrelated to the rating of the Cheyne SIV.

Every case cited by plaintiffs, and virtually every Second Circuit case in which this doctrine is invoked, is a criminal case, not a civil case.[13] Even in that context, the doctrine focuses on similar acts *by the same individual*. In plaintiffs' lead case, *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000), the defendant had himself engaged in other acts of deception with respect to other inventory fraud that paralleled and aided the inventory fraud of which he was accused; this was held sufficient to admit the evidence of the other acts. Here, "evidence" that *other* employees at the Rating Agencies in *other* non-Cheyne circumstances allegedly "succumbed to undue pressure from investment banks" (Pl. MIL at 10) is not linked, let alone "inextricably linked," to whether the individuals on the Cheyne committees subjectively disbelieved the Cheyne SIV ratings.[14] Plaintiffs' argument to the contrary only underscores their illegitimate desire to put defendants' organizations as a whole on trial.

Plaintiffs' reliance on *United States* v. *Ferguson* (Pl. MIL at 10) is wholly unavailing; the court held that evidence of deals underlying the transactions at issue were not admissible because they were "separate, discrete incidents of alleged fraud or deceit" and were not inexorably

---

[13] Counsel located 87 cases in the Second Circuit analyzing the "inextricably intertwined" doctrine. Of those 87, 81 arise in the criminal context; the remaining 6 are equally inapposite (4 involving habeas claims, and 2 involving Section 1983 excessive-force claims).

[14] The difference in timing between the rating of the Cheyne SIV and the rating of the many of the assets later purchased by it also distinguishes this case from *Carboni* where the court relied on the fact that the actions at issue occurred at about the same time as the charged conduct. *See Carboni*, 204 F.3d at 44; *United States* v. *Dolney*, 2005 WL 2129169, at *2 (E.D.N.Y. Sept. 1, 2005), *aff'd sub. nom, United States* v. *Pirgousis*, 290 F. App'x 388 (2d Cir. 2008). Here, there were no securities in the Cheyne SIV at the time the notes were rated and many of those that were eventually included were not structured until months or even years after the SIV was rated. The acts reflecting pressure to which other non-SIV committee members allegedly succumbed with respect to assets that are never alleged to have been held by the Cheyne SIV also occurred years *after* the rating of the SIV. *See* Def. MIL at 5-6.

linked to defendants' alleged fraud. 246 F.R.D. 107, 115-16 (D. Conn. 2007). The court also emphasized that the marginal probative value of evidence of the underlying deals was substantially outweighed by the danger of unfair prejudice and risk of creating a trial within a trial by diverting the jury's attention to the collateral question of whether the underlying deals themselves were fraudulent. *Id.*; *see also United States* v. *Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) (holding that defendants' alleged misrepresentations to stock exchange were not admissible in securities fraud prosecution and explaining: "[I]n a trial that will already likely last for 15-20 weeks and include tens of thousands of pages of witness testimony and exhibits, the NASDAQ evidence stands a good chance of confusing the jury as to the actual crimes charged, which a curative instruction may not alleviate" and "conducting a 'mini-trial' as to whether the Defendants lied to the NASDAQ will necessarily result in 'undue delay' while adducing no evidence concerning whether the Defendants committed the charged crimes.").

As in *Ferguson*, any issues plaintiffs have with defendants' conduct in rating or structuring any of the assets or asset types purchased by the Cheyne SIV would present "separate, discrete incidents of alleged fraud" that are not inexorably intertwined with the defendants' conduct in rating the Cheyne SIV. Each type of security—whether SIV, CDO, RMBS, CMBS, etc.—was governed by a distinct set of criteria and methodologies and was rated by individuals specifically trained in that particular kind of transaction. The assets in the SIV were not rated or "re-rated" by members of the Rating Agencies' Cheyne rating committees. Def. MIL at 4-6. Moreover, Cheyne Capital—not the Rating Agencies or Morgan Stanley—had sole authority for selecting the assets held by the Cheyne SIV, and such selection was made without deference to any Rating

Agency's rating of the particular assets.[15]  Plaintiffs' argument does not even focus on the 680 assets that were actually held at some point by the Cheyne SIV, but seeks rather to admit at trial comments about *other* assets never held by the SIV but which fell into classes that the SIV was authorized to acquire.  All such evidence should be excluded.

### 4.   The Knowledge of Individuals Who Did Not Work On the Cheyne SIV Is Not Relevant To Proof of Falsity

In a last ditch effort to open the door to proof unrelated to the Cheyne SIV, plaintiffs contend briefly that evidence as to other assets bears on the alleged falsity of the Cheyne SIV ratings.  Pl. MIL at 10.  This argument too lacks merit.

To the extent plaintiffs suggest that the knowledge of falsity inquiry does not itself turn on the knowledge of Cheyne SIV rating committees, plaintiffs are mistaken for the reasons discussed above.  *See supra* pp. 3-10.  Moreover, to the extent plaintiffs argue that because the ratings of the assets owned by the Cheyne SIV were false, the Cheyne SIV's ratings also must be false, that argument is incorrect as a factual matter.  *See supra* pp. 1-2.

Plaintiffs have not provided evidence that the Cheyne SIV failed because the ratings of assets it held were "false."  Plaintiffs have offered the expert opinion of Professor Sanjiv Das as to alleged flaws in the rating of the Cheyne SIV.  He has opined that the Cheyne rating process failed to provide adequate buffers and did not apply adequate stresses, but he has not opined as to any alleged flaws in the ratings of its assets.  And plaintiffs have not even suggested that any asset held by the Cheyne SIV had been downgraded or failed to make timely payments prior to the

---

[15] As Cheyne executive Adrian Mallinson testified: ███████████████████████
██████████████████████████████████████████████████████████   Ex. 8
at 148:23-149:2.

August 2007 rating actions as to the SIV itself. [16]

\*      \*      \*

This is not the typical fraud case premised on an objective misstatement of fact. Rather, this case involves an allegedly false opinion. Because opinions represent the beliefs of the speaker, the only way they are actionable is if the speaker engaged in knowing misconduct by uttering an opinion that he or she did not genuinely believe at the time it was issued. Because years of extensive discovery have failed to yield any evidence demonstrating that the rating committees subjectively disbelieved their Cheyne SIV ratings, plaintiffs now grasp at whatever inflammatory and prejudicial evidence they can find despite the fact that such evidence has no connection to the Cheyne SIV or those responsible for its rating. By ignoring this Court's previous ruling that the Cheyne SIV ratings are opinions and the unique requirements such a case presents, and by cobbling together evidence reflecting bits of knowledge of dozens of employees on the models, methodology, and criteria used to rate hundreds of different transactions, plaintiffs now seek to transform this from a case about the Cheyne SIV to an indictment of the entire ratings system, an outcome which this Court has explicitly rejected. To permit plaintiffs to use such "evidence" would only serve to waste the Court's and jury's time on dozens of mini-trials on collateral issues that ultimately have no bearing on the core issue in this case—what the originators of the Cheyne SIV rating opinions believed when issuing their ratings.

---

[16] The hindsight statement of Kai Gilkes, a former S&P quantitative analyst uninvolved in the rating of the Cheyne SIV, to the effect that SIVs would have been rated differently, or not at all, had the Rating Agencies known the magnitude of the crisis that would ultimately ensue (Pl. MIL at 10-11) is not to the contrary.

**B.   DEFENDANTS SHOULD NOT BE PRECLUDED FROM INTRODUCING EVIDENCE OF PLAINTIFFS' INVESTMENTS IN OTHER STRUCTURED FINANCE INSTRUMENTS**

Plaintiffs must prove "reasonable reliance."  *See Crigger* v. *Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *ADCB*, 2012 WL 3584278, at *4.  As this Court has recognized, "[a]n evaluation of the reasonable-reliance element [should involve] many factors to consider and balance, no single one of which is dispositive."  *Id.* (quotation marks omitted).  Plaintiffs' sophistication is one such factor and is relevant to the reasonableness of plaintiffs' alleged reliance.  *See Crigger*, 443 F.3d at 235 ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as . . . the sophistication of the parties") (internal citation and quotation marks omitted); *see also Allison* v. *Round Table Inv. Mgmt. Co.*, 447 F. App'x 274, 276 (2d Cir. 2012).  Plaintiffs' sophistication is also relevant to plaintiffs' alleged actual knowledge, defendants' "defense of non-reliance," *In re AES Corp. Sec. Litig.*, 849 F. Supp. 907, 910 (S.D.N.Y. 1994),[17] and to rebut plaintiffs' loss causation theory.

Plaintiffs' experience investing in structured finance products is relevant to demonstrating their sophistication and thus to the reasonableness of their alleged reliance.  *See Crigger*, 443 F.3d at 236 (evidence that "[e]ach of the plaintiffs had substantial and varied experience with millions in investments" relevant to jury's consideration of whether plaintiffs' pre-investment investigation was "commensurate with their level of sophistication"); *In re AES Corp.*, 849 F. Supp. at 910 ("the discovery of prior investments is reasonably calculated to lead to evidence

---

[17] The Court has recognized the significance of plaintiffs' sophistication to the reliance inquiry and to defendants' defense of non-reliance in this case.  *See Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 269 F.R.D. 252, 265 (S.D.N.Y. 2010) (ruling that plaintiffs' evidence "on the question of whether investors generally rely on credit ratings . . . does nothing to refute the fact that in this case some sophisticated investors chose not to rely—or relied only minimally—on the credit ratings prior to investing in the Rated Notes").

concerning plaintiffs' sophistication"). The Court recognized this at a recent hearing. *See* Nov. 12, 2012 Tr. 72:8-15 (plaintiffs' investments in structured finance products may go to show "the reasonableness of their reliance on these ratings, given that they have sophistication, they bought others, they bought other structured products, they invested in other SIVs with XYZ ratings").

Among other things, evidence that plaintiffs invested in other structured finance products (and in particular other SIVs, RMBS, and CDOs) will show plaintiffs' understanding of these types of investments and the risks associated with those investments.[18] To the extent plaintiffs invested in the same classes of assets held by the Cheyne SIV, plaintiffs were able to investigate those asset classes directly. *See, e.g.*, Ex. 10 at ESECe0135136 █████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████

Plaintiffs' other investments are also directly relevant to their allegation of actual reliance. Evidence concerning plaintiffs' other investments shows, among other things, that many plaintiffs <u>did</u> invest extensively in lower-rated and unrated structured finance securities (*see, e.g.*, Ex. 7 at 351:23-352:14; Ex. 11 at 96:3-12), undercutting the contention that plaintiffs would not

---

[18] Plaintiffs are incorrect that there must be a "showing that plaintiffs could have discovered the [alleged] fraud" before evidence of sophistication can be introduced. Pl. MIL at 12. Evidence of plaintiffs' other structured finance investments requires no foundation to be relevant. Even if, as plaintiffs contend, evidence as to plaintiffs' lack of due diligence required prior disproof of peculiar knowledge, evidence of plaintiffs' other investments, which would go to that threshold question of peculiar knowledge, requires no foundation. *DIMON Inc.* v. *Folium, Inc.*, 48 F. Supp. 2d 359, 369 n.55 (S.D.N.Y. 1999) ("In general, the more sophisticated the buyer, the less accessible must be the information to be considered within the seller's peculiar knowledge."). And, even if defendants had peculiar knowledge, plaintiffs' sophistication is relevant to whether plaintiffs took sufficient steps to protect themselves. *See Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531, 1542-43 (2d Cir. 1997) (finding reliance "unreasonable as a matter of law" where plaintiff failed to insist on examining relevant documents).

have invested without the particular ratings assigned or could not assess credit risk without ratings. Plaintiffs' other investments are additionally relevant to loss causation because the same "market wide collapse" that caused plaintiffs' alleged losses on the Cheyne SIV, (*see* Ex. 12 at 10), caused the distress of, and losses to plaintiffs on, a host of other unrelated securities. Ex. 11 at 15:6-18, 181:8-184:8. The extent of plaintiffs' losses on other investments (many times in excess of their Cheyne SIV investments) confirms that any losses here were caused by the same market-wide collapse that caused losses across plaintiffs' portfolios, and not anything specific to the Cheyne SIV or its ratings.

Finally, plaintiffs' Rule 403 argument is without merit because it is not defendants' intention to engage in any detailed inquiry into plaintiffs' state of mind with respect to particular non-Cheyne investments or extensive analysis of individual transactions. Instead, defendants intend to demonstrate plaintiffs' general sophistication and knowledge of structured finance investments generally and of SIV characteristics. Such evidence is probative of core elements of plaintiffs' claims: actual reliance, reasonable reliance, and loss causation. The matter is one for trial supervision, not pretrial conclusion.

## C.   DEFENDANTS SHOULD BE PERMITTED TO INTRODUCE EVIDENCE AND TESTIMONY FROM PLAINTIFFS' PREVIOUSLY IDENTIFIED EXPERTS

In their motion in limine no. 14, plaintiffs seek to preclude "evidence or testimony" from Christopher Cox or David Mordecai, two of plaintiffs' previously identified experts who they did not designate to testify at trial. Plaintiffs' motion does not seek to bar evidence regarding their prior expert on causation, Bjorn Steinholt. Defendants do not object to plaintiffs' motion provided that a similar ruling extends to any experts identified by defendants but not presented at trial and that evidence from plaintiffs' former experts is available, if necessary, on rebuttal. *See Agron* v. *Trs. of Columbia Univ. in the City of N.Y.*, 176 F.R.D. 445, 449 (S.D.N.Y. 1997) (hold-

ing that Rule 26(b)(4)(D) "governs limitations on discovery. . . .[and] does not address itself to the admissibility at trial of the testimony of such an expert which is elicited by the opponent").

## D.    THE COURT HAS ALREADY RULED THAT DOCUMENTS PRODUCED IN *KING COUNTY* AFTER THE CLOSE OF DISCOVERY ARE INADMISSIBLE

The Court has already ruled that the documents produced in the *King County* litigation after the discovery cutoff in this case are inadmissible.  Apr. 19, 2011 Hr'g Tr.at 67:12-25 ("[Y]ou can't just import the King County discovery into a case where discovery has been closed by framing a question differently, maybe better from your perspective, and getting even more and more and more.  It can't be done."); *id.* at 68:9-12.  Plaintiffs cannot avoid the Court's ruling by noting that they themselves have filed a number of these documents publicly.  Plaintiffs should not be permitted to make an end-run around the Court's ruling by attaching documents to their own opposition to summary judgment, moving to compel the publication of the documents they cited, and then arguing that the public availability of those documents renders them admissible.[19]

Further, plaintiffs' claim that the remaining documents would have been responsive to document requests issued in this case is incorrect and contrary to plaintiffs' prior admissions to the Court.  The documents that plaintiffs seek leave to admit at trial were produced in *King County* in response to plaintiffs' request for Morgan Stanley documents that had been produced to the Massachusetts Attorney General.  *See* Order, *King County*, Dkt. No. 193 (S.D.N.Y. Sept. 21, 2011).  Plaintiffs themselves have previously acknowledged to the Court that they never requested those documents in this case.  *See* Aug. 10, 2011 Hr'g Tr. 5:18-20 (Mr. Drosman: "[T]he document requests for the Massachusetts Attorney General, that is an issue relating to *King County* not *Abu Dhabi*."); 21:13-15 (The Court: "How come you didn't seek the Massa-

---

[19] Even if the Court grants plaintiffs' motion despite its prior ruling, defendants object to the admissibility of *King County* documents on other grounds, including relevance and prejudice.

chusetts Attorney General material when you were still timely in the *Abu Dhabi* discovery.");
22:2-3.[20]  Plaintiffs' allegation that Morgan Stanley engaged in "gamesmanship" in its document
productions (*see* Pl. MIL at 15), is belied by their previous concessions that they sought these
documents in *King County,* and not in this case.[21]

### E.   PLAINTIFFS SHOULD NOT BE PERMITTED TO CALL RAYMOND MCDANIEL AND WILLIAM HARRINGTON AT TRIAL

In their motion in limine no. 18, plaintiffs seek this Court's permission to call Raymond
McDaniel and William Harrington as trial witnesses.  McDaniel was (and remains) Moody's
CEO.  From 1999 to 2010, Harrington worked in New York as an analyst in Moody's Deriva-
tives Group, where he analyzed Structured Finance Operating Companies ("SFOCs"), Derivative
Product Companies ("DPCs"), and, to a far lesser extent, CDOs—not SIVs.  There is no evi-
dence that either had even heard of the Cheyne SIV until years after it was rated.

Plaintiffs' request to call McDaniel and Harrington to the stand should be denied.  In fact,
this Court has already rejected plaintiffs' arguments, including the evidence they now cite, when
it previously rejected their attempts to depose these witnesses, and plaintiffs have offered no
good reason for this Court to depart from its prior rulings.  It is therefore unsurprising, then, that

---

[20] Plaintiffs seek admission of 97 documents produced by Morgan Stanley in the *King County*
action.  94 of those documents were produced by Morgan Stanley as part of the Massachusetts
Attorney General production.  The remaining three documents concern diligence on loan pools
subsequently purchased by Morgan Stanley and securitized into MSAC 2005-WMC6.  One of
those three documents was produced to plaintiffs in this case, and the other two were produced in
response to a request in *King County*—made after the discovery cutoff in this case—that Morgan
Stanley produce diligence documents associated with the MSAC 2005-WMC6 securitization.

[21] Plaintiffs also contend that "[i]t is beyond dispute that all evidence produced in *King County*
(regardless of the date of production) is admissible for impeachment in this case."  Pl. MIL at 15
n.8.  However, the Court has already ruled that a document from the *King County* litigation will
be allowed for impeachment purposes only if it "is flat out impeaching of something you've al-
ready been told or something somebody said under oath."  Apr. 19, 2011 Hr'g Tr. 67:16-18.

the Court has preliminarily ruled against calling McDaniel at trial. *See* Nov. 12, 2012 Hr'g Tr. 22:10-13 ("I doubt I will be allowing him [to testify]."). Moreover, plaintiffs have presumably mustered the best evidence they could to support their renewed request yet every piece of evidence is not only irrelevant but also inadmissible for other reasons.

### 1.   This Court Should Adhere to Its Previous Rulings

This is not the first time that plaintiffs have sought testimony from both McDaniel and Harrington. In 2011, plaintiffs separately sought to depose both, based on the same evidentiary excerpts that plaintiffs cite in their current brief. Defendants opposed plaintiffs' efforts.

With respect to McDaniel, the Special Master concluded that "[t]here does not appear to be a credible argument that Mr. McDaniel was directly involved with the rating of the Cheyne SIV or has unique personal knowledge regarding the Cheyne SIV." Corrected R&R No. 5, Dkt. No. 230 ("R&R No. 5"), at 9. The Special Master further recognized that Moody's had offered other witnesses "who have been deposed or are available for deposition" who could "address the issues with at least as much knowledge as Mr. McDaniel and provide identical testimony on behalf of Moody's." *Id.* at 10. The Special Master's ruling permitted plaintiffs to renew their request if further discovery revealed McDaniel's "unique knowledge" relevant to the case. *See* R&R No. 5, ¶ 27; *see also* Discovery Order, Dkt. No. 249, at 3–4. Plaintiffs never did.

The Special Master similarly concluded that there was no evidence that Harrington possessed unique knowledge. R&R No. 20, Dkt. No. 324 ("R&R No. 20"). Noting that plaintiffs' request was primarily based on an unsolicited 2011 comment to the SEC ("SEC Comment"), the Special Master noted that "the SEC Comment[] does not support plaintiffs' contention that Mr. Harrington has 'unique knowledge' that is 'highly relevant to the Plaintiffs' case.'" *Id.* at 7.

Plaintiffs filed objections to the Special Master's reports and recommendations regarding both men, which this Court overruled. Discovery Orders, Dkt. Nos. 249, 339. In so doing, this

Court rejected plaintiffs' arguments that their evidentiary excerpts showed McDaniel's and Harrington's "unique knowledge" about issues specific to this trial—one about the rating of the Cheyne SIV, and not about Moody's rating processes generally.

Notwithstanding the Court's clear rejection of their purported bases for seeking testimony from McDaniel and Harrington, plaintiffs now return to this Court with the *same* legal arguments, and the *same* supporting "evidence." In fact, plaintiffs' objections to the Special Master mirror almost exactly the arguments of their current motion. *Compare* Pl. Objs. to R&R No. 5, at 11–17, *and* Pl. Objs. to R&R No. 20, at 4–7; *with* Pl. MIL at 18–27. Plaintiffs' "motion in limine" essentially is a belated, unauthorized motion for reconsideration of this Court's previous rulings. Apparently, plaintiffs believe that this Court sustained the Special Master's ruling precluding *deposition* testimony from these witnesses only to authorize *trial* testimony from these same witnesses for the reasons the Court already rejected. Contrary to plaintiffs' suggestion, discovery gives a party more latitude than trial, not *vice versa*. *See* Fed. R. Civ. P. 26.

Nothing has changed since the Court first resolved this dispute. Indeed, plaintiffs' only new argument as to why McDaniel has "unique" information rests on the deposition testimony of Brian Clarkson. *See* Pl. MIL at 21–22. This argument lacks merit: whether Clarkson knew what McDaniel meant by a particular generalized statement unrelated to the Cheyne SIV is immaterial to the pertinent question of whether McDaniel has "unique" information about the Cheyne SIV. On *that* point, plaintiffs make no demonstration whatsoever.[22] And as to Harrington, plaintiffs offer no new argument whatsoever as to why his testimony is either relevant or noncumulative.

---

[22] Moreover, any argument based on Clarkson's testimony is waived due to plaintiffs' failure to renew their deposition request as to McDaniel. *See* Nov. 12, 2012 Hr'g Tr. 22. If plaintiffs believed that discovery revealed that McDaniel possessed unique and relevant knowledge, the time to make that argument was before the close of discovery, not the eve of trial.

For these reasons, and those stated below, this Court should adhere to its prior rulings.

### 2. The Proffered Topics of Testimony of McDaniel and Harrington Are Irrelevant and Inadmissible for Other Reasons

Plaintiffs' effort to secure the trial testimony of these two witnesses is part and parcel of their impermissible attempt to broaden the scope of this case from what it is properly about—the Cheyne SIV—to the structured finance rating system more generally. *See generally* Def. MIL at 8-16. Moreover, even if the Court were to expand the case beyond the Cheyne SIV—which defendants respectfully submit would be clear error—the proposed testimony of McDaniel and Harrington is *still* irrelevant and inadmissible, as explained below.

#### a) Plaintiffs Have Offered No Basis for McDaniel's Testimony

In seeking testimony from McDaniel, plaintiffs rely heavily on what they claim are two documents he allegedly drafted. *See* Pl. MIL at 19–20. But these two documents are in fact a single document—the "Credit Policy issues" document—and it was drafted by Moody's Chief Credit Officer, *not* McDaniel. The Financial Crisis Inquiry Commission has reconfirmed this point. *See* Final FCIC Report at 209-11, *available at* http://fcic.law.stanford.edu/report. Although plaintiffs have twice been advised of the truth regarding the document's authorship,[23] they have chosen to repeat their misrepresentation throughout this litigation. In any event, the "Credit Policy issues" document has no bearing on plaintiffs' fraud claims. Contrary to plaintiffs' intimations, (*see* Pl. MIL at 19–20), that document, describing purported general market dynamics, does not suggest that *any* Moody's analysts—let alone the Cheyne SIV analysts—issued ratings they did not believe. In fact, the document discusses steps that Moody's had undertaken to ensure that market-share pressure would not affect the integrity of their ratings. *See* Pl. MIL, Ex. 4

---

[23] *See* Response to Pls.' Objs. to R&R No. 5, Dkt. No. 243, Ex. B, at 2-3 & n.3.

(CRDT_RTG_EXH_0000114 at 17).

Equally meritless is plaintiffs' contention that McDaniel's testimony would establish that plaintiffs relied on Moody's ratings of the Cheyne SIV Notes. *See* Pl. MIL at 18–19, 26. McDaniel's statements regarding the amount of information available to the public about the structured finance market has nothing to do with whether these plaintiffs actually and reasonably relied on the Cheyne SIV ratings in making their investment decisions. *Cf. McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) ("[R]eliance on [a] misrepresentation, cannot be the subject of general proof. Individualized proof is needed. . . .").[24]

Furthermore, plaintiffs have not established that McDaniel has any relevant information—much less *unique* information—about why plaintiffs suffered losses. Plaintiffs cite only general observations about potential credit problems in the subprime-mortgage sector. *See* Pl. MIL at 21. None of these observations concern whether the allegedly false Cheyne ratings caused the Cheyne SIV to be downgraded or generally caused plaintiffs' losses. Moreover, even if generalized observations about other structured finance products could be relevant to establishing proximate causation in this case, the particular statements on which plaintiffs rely are irrelevant. For example, the fact that plaintiffs rely in part on a *question* by McDaniel as to generalized credit problems speaks loudly to plaintiffs' failure to muster such evidence. *Id.* ("[D]oes it look like the liquidity stresses are likely to be compounded by real credit failures in, for example, some parts of the A and above RMBS market?"). This question, like all of the "credit problem" evidence plaintiffs rely on, has no bearing on the key issue: did the alleged fraudulent Cheyne

---

[24] The question of any particular investor's alleged reliance on a SIV rating requires a highly specific factual inquiry tailored to each investor. *See ADCB*, 2012 WL 3584278, at *14. Plaintiffs cite only general, speculative observations about the opacity of structured finance products that have no bearing on that limited inquiry. *See* Pl. MIL at 18–19.

SIV ratings *proximately cause* plaintiffs' losses? *See id.* at 19.

In sum, plaintiffs' insistence that McDaniel's testimony is not sought for harassment purposes (Pl. MIL at 23) is disingenuous.[25]  Plaintiffs' request appears to be motivated by a desire for publicity, as opposed to a genuine need for testimony.  Their motion should be denied.

### b) Plaintiffs Equally Have Offered No Basis for Harrington's Testimony

To justify calling Harrington to the stand, plaintiffs rely most heavily—as they did previously—on a brief anecdote in the SEC Comment regarding an alleged "SIV training session." According to Harrington, an unnamed and otherwise unidentified "colleague" allegedly made a comment to him after the session that SIV haircuts were simply "made up" by Henry Tabe.  *See* Pl. MIL at 24–25.  This Court previously stated that this anecdote was "[d]ouble hearsay.  I am perfectly aware of that."  Oct. 21, 2011 Hr'g Tr. 11:14.  Notwithstanding the Court's clear directive that the matter was not "to be briefed," (*id.* at 13:6-9), plaintiffs argue that the anecdote qualifies as an admission by a party-opponent under Rule 801(d)(2)(D), *see* Pl. MIL at 25 n.13. Among other things, however, a party-opponent admission must "relate[] to a matter within the scope of the agency," *Marcic* v. *Reinauer Transp. Cos.*, 397 F.3d 120, 128-29 (2d Cir. 2005), and plaintiffs have provided no evidence that forming an opinion on SIV methodology was within the scope of the unnamed colleague's employment.  *Cf. id.* (affirming exclusion of statement from employee where there was no evidence the statement related to employee's job responsibil-

---

[25] Plaintiffs' contention that the "apex witness" doctrine applies only in discovery, *see* Pl. MIL at 22–23, is incorrect: Witnesses are no less deserving of protection from undue burden and harassment at trial than they are during discovery.  *See* Fed. R. Civ. P. 45(c)(3)(A)(iv); *see also id.*, advisory committee notes (explaining that new Rule 45(c)(3) "tracks the provisions of Rule 26(c)").  "Where a plaintiff fails to make any demonstration that the executive possesses some unique knowledge of the issues in the case, it may be appropriate to preclude a redundant examination of a highly-placed executive [at trial]."  *Plew* v. *Ltd. Brands, Inc.*, 2012 WL 379933, at *3 (S.D.N.Y. Feb. 6, 2012) (internal citation, quotation marks, and alterations omitted).

28

ities). If anything, the fact that the colleague was at a training session for employees who, like Harrington, had no experience with SIVs suggests strongly that the unidentified colleague had no involvement with rating SIVs. If the search for the unnamed colleague's identity was an insufficient basis for exploratory discovery, it certainly fails to provide grounds for trial testimony.

No other statement in Harrington's SEC comment is probative of subjective falsity, contrary to plaintiffs' assertion otherwise. *See* Pl. MIL at 24–27. Indeed, none of the statements in the SEC Comment are relevant for the same reasons why McDaniel's statements are irrelevant: Although Harrington opined about market pressures and conflicts of interest at Moody's, none of his comments were directed to the *Cheyne SIV*. Additionally, even if this Court were to expand this case beyond the Cheyne SIV, Harrington's testimony should be excluded: His comments suggest that whether specific analysts issued ratings they did not believe is a highly *individualized* inquiry. In fact, the SEC Comment implies that, even though Harrington believed himself to be subject to alleged market share pressures, he never issued ratings he did not believe. *See* Dkt. No. 437–22, Tab 152 (stating that he "intended from the outset to frustrate Clarkson and other senior managers in their quest for a watered-down methodology that would appease bankers.").

Lastly, plaintiffs fail to lay a proper foundation for Harrington's lay opinions. Indeed, plaintiffs rely solely on his SEC Comment, in which he provides a series of sweeping, general assertions about rating practices at Moody's that are entirely unconnected to the Cheyne SIV. Because Harrington's experience is in SFOCs and DPCs, and *not* SIVs,[26] "the proffered opinion

---

[26] *See* Pls.' Objs. to R&R No. 20, Dkt. No. 327, Ex. 3, at 3, 76–77. Harrington's only experience tangentially related to SIVs is his experience as "lead analyst for approximately 50 CDOs." *Id.* at 3. CDOs, however, comprised only 10 percent of the Cheyne SIV's assets. Even though the ratings of those assets are irrelevant as a matter of law, (*see* Def. MIL at 8–11), there is no allegation that Harrington rated any CDO that Cheyne acquired. Nor is there any allegation that Harrington communicated with any member of Moody's Cheyne SIV rating committee.

obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on [Harrington's] perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." *United States* v. *Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992). Unlike the SEC, this Court is constrained by Rule 701's requirements as to lay opinion testimony; Harrington's speculative, unsupported opinions do not pass evidentiary muster.

### c)   Testimony From McDaniel and Harrington Is Otherwise Inadmissible

Even if this Court were to determine that McDaniel or Harrington possessed relevant knowledge, they nonetheless should be excluded for two independent reasons.

*First*, plaintiffs fail to offer any evidence that McDaniel or Harrington have "unique" knowledge[27] that renders their testimony noncumulative of other witnesses who have such similar knowledge and who *can* testify about Moody's ratings processes and other policies. Plaintiffs should not be permitted to offer what would be cumulative testimony in light of this Court's intention to scrutinize draft witness lists for "redundancy." Discovery Order, Dkt. No. 249, at 3.

*Second*, even if these witnesses' testimony could be deemed of minimal probative value, that testimony is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, and undue delay. Allowing this testimony would broaden this case from one about Cheyne to the structured finance rating system more generally, which would hopelessly complicate the trial and confuse the jury. *See generally* Def. MIL at 10–11, 15–16.

## CONCLUSION

For the foregoing reasons, plaintiffs' motions in limine should be denied.

---

[27] *See* R&R No. 5, at 8–9; R&R No. 20, at 7.

Dated:       February 11, 2012
             New York, New York

                                    Respectfully submitted,

                                    CAHILL GORDON & REINDEL LLP


                                    /s/ Dean Ringel
                                    Floyd Abrams
                                    Dean Ringel
                                    Charles A. Gilman
                                    Tammy L. Roy
                                    Jason M. Hall

                                    80 Pine Street
                                    New York, NY 10005
                                    Telephone: 212/701-3000
                                    212/269-5420 (fax)
                                    fabrams@cahill.com
                                    dringel@cahill.com
                                    cgilman@cahill.com
                                    troy@cahill.com
                                    jhall@cahill.com

                                    *Attorneys for Defendants Standard & Poor's Rat-
                                    ings Services and The McGraw-Hill Companies, Inc.*

DAVIS POLK & WARDWELL LLP


/s/ James P. Rouhandeh
James P. Rouhandeh
Antonio J. Perez-Marques
Richard A. Cooper
Gina Castellano

450 Lexington Avenue
New York, NY 10017
Telephone: 212/450-4000
212/701-5800 (fax)
james.rouhandeh@davispolk.com
antonio.perez@davispolk.com
richard.cooper@davispolk.com
gina.castellano@davispolk.com

*Attorneys for Defendants Morgan Stanley & Co.
Incorporated and Morgan Stanley & Co.
International Limited*

SATTERLEE STEPHENS BURKE &
BURKE LLP


/s/ James J. Coster
James J. Coster
Joshua M. Rubins
James Doty

230 Park Avenue, 11th Floor
New York, NY 10169
Telephone: 212/818-9200
212/818-9606 (fax)
jcoster@ssbb.com
jrubins@ssbb.com
jdoty@ssbb.com

*Attorneys for Defendants Moody's Investors Service,
Inc. and Moody's Investors Service, Ltd.*

GIBSON, DUNN & CRUTCHER LLP


/s/ Mark A. Kirsch
Mark A. Kirsch
Joel M. Cohen
Lawrence Jay Zweifach
Christopher M. Joralemon
Mary Kay Dunning

200 Park Avenue,
48th Floor
New York, NY 10166
Telephone: 212/351-4000
212/351-4035 (fax)
mkirsch@gibsondunn.com
jcohen@gibsondunn.com
lzweifach@gibsondunn.com
cjoralemon@gibsondunn.com
mkdunning@gibsondunn.com

*Attorneys for Defendants Moody's Investors Service,
Inc. and Moody's Investors Service, Ltd.*

**APPENDIX:  RESPONSE TO PLAINTIFFS' SECTION F PURPORTING
TO SUMMARIZE THE MOTIONS IN LIMINE DECIDED AT THE
NOVEMBER 12, 2012 HEARING**

Plaintiffs purport to "summarize[]" the rulings of the Court on several motions in limine discussed at the November 12, 2012, hearing.  Pl. MIL at 28.  But plaintiffs' "summary" mischaracterizes those rulings, and also fails to mention this Court's several favorable rulings on defendants' motions in limine.

*First*, plaintiffs omit that the Court *granted*:  (1) defendants' motion in limine no. 2 to exclude evidence of after-the-fact revisions to ratings methodologies and processes or, as the Court put it, to preclude both sides from introducing "subsequent remedial measures," *see* Nov. 12, 2012 Hr'g Tr. 39–40, 55; (2) defendants' motion in limine no. 5(a) to exclude expert and opinion testimony not timely disclosed, *see id.* at 60–63; and (3) defendants' motion in limine no. 5(b) to exclude testimony of lay witnesses who lack personal knowledge, *see id.* at 63–64.

*Second*, plaintiffs misstate several of the Court's rulings:[28]

Plaintiffs' Motion No. 3: Although defendants agree that neither party may introduce deposition testimony of persons under their control, plaintiffs omit the fact that the Court suggested that former employees are not persons under defendants' control. *See id.* at 19.[29]

Plaintiffs' Motion No. 4: According to plaintiffs, the Court ruled that defendants must bring current employees to testify live at trial.  But the Court also agreed with defendants that it may ultimately exclude certain current employees, including McDaniel and Parisi, on relevance grounds after the briefing on the motion in limine as to scope of the trial. *See id.* at 20–26.

---

[28] Defendants do not contest plaintiffs' summary of the rulings on plaintiffs' motions in limine nos. 7, 8, and 9, but respectfully renew their objections to the Court's rulings as to nos. 7 and 9.

[29] The Court also ruled that when plaintiffs call a witness who is identified with a defendant, defendants' cross-examination is not limited to the scope of direct examination. *See id.* at 17–18.

A-1

Plaintiffs' Motion No. 5: The Court only *partially* granted plaintiffs' request for a sequestration order, ruling that fact witnesses—but *not* corporate representatives or expert witnesses—would be excluded from the courtroom before giving testimony. *Id.* at 26–27.

Plaintiffs' Motion No. 6: The Court's ruling on this motion—that adverse witnesses may not have contact with counsel at all, either during the hostile direct or during "friendly" cross—is not as final as plaintiffs suggest, and defendants intend to send a letter on this topic in short order. *See id.* at 32.

Plaintiffs' Motion No. 15: The Court ruled that *neither* party could proffer evidence that they "do good works," but the Court ruled that defendants could "of course . . . proffer a good faith, honest belief in the ratings." *Id.* at 53.

Additionally, plaintiffs suggest, wrongly, that the Court's rulings with respect to four of their motions in limine—numbers 2, 12, 15, and 16—unilaterally favor them. The Court actually ruled that each ruling applied bilaterally to *both* parties. *See id.* at 15–16, 43, 53–55.[30]

---

[30] Defendants also explicitly note that the Court's ruling with respect to plaintiffs' motion in limine no. 5 "works for both sides." *Id.* at 27.