UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-------------------------------------------------------X

ABU DHABI COMMERCIAL BANK, et al.,

        Plaintiffs,

       - against -

MORGAN STANLEY & CO. INC., MORGAN
STANLEY & CO. INTERNATIONAL LTD,
MOODY'S INVESTORS SERVICE, INC.,
MOODY'S INVESTORS SERVICE LTD.,
STANDARD AND POOR'S RATINGS
SERVICES and THE McGRAW HILL
COMPANIES, INC.,

        Defendants.

-------------------------------------------------------X

          **OPINION AND ORDER**

          08 Civ. 7508 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

      Defendants Morgan Stanley & Co. Inc. and Morgan Stanley & Co.

International Ltd. (together "Morgan Stanley") move for summary judgment

pursuant to Federal Rule of Civil Procedure 56(c) on plaintiffs' negligent

misrepresentation claims.  Morgan Stanley argues that New York law prohibits

negligence claims for purely economic losses absent "a special relationship of trust

and confidence . . . creating a duty of care," and that plaintiffs cannot establish that

such a relationship existed.[1]  Plaintiffs oppose the motion.[2]

---

      [1]    *See* [Morgan Stanley's] Memorandum of Law in Support of Their
Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c)

## I.   BACKGROUND

### A.   Factual Background

Morgan Stanley's motion for summary judgment largely focuses on the nature of its relationship with plaintiffs.  The relevant background follows.[3] Plaintiffs are institutional investors who invested in the Cheyne structured investment vehicle ("SIV") and seek to recover losses stemming from the liquidation of notes issued by the SIV between October 2004 and October 2007.[4] The Cheyne SIV issued three categories of Rated Notes: Commercial Paper ("CP"), Medium Term Notes ("MTNs" and together with CP, "Senior Notes") and Mezzanine Capital Notes ("MCNs" and, together with the Senior Notes, the "Rated Notes"), each of which was rated by the Rating Agencies.[5]

---

at 1 ("Def. Mem.").

[2]    *See* Plaintiffs' Opposition to [Morgan Stanley's]Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) ("Pl. Opp.").

[3]    Only the facts directly relevant to the instant motion are discussed in this Opinion.  A detailed background of the case can be found in earlier decisions. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508, 2012 WL 3584278 (S.D.N.Y. Aug. 17, 2012) ("*Abu Dhabi* S.J. Op."); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) ("*Abu Dhabi* MTD Op.").

[4]    *See* Ninth Amended Complaint ("NAC") ¶¶ 2, 5.

[5]    *See id.* ¶ 2.  *See also* Cheyne Capital PLC Information Memoranda ("Information Memoranda"), Exs. 1-3 to Declaration of James P. Rouhandeh in Support of Morgan Stanley's Motion for Summary Judgment ("Rouhandeh

Morgan Stanley had dual roles in connection with the Cheyne SIV – it was "structurer and advisor to Cheyne with respect to the [Cheyne SIV] and [] lead placement agent for the instruments to be issued in connection with the [Cheyne SIV]."[6]  In its capacity as structurer of the Cheyne SIV, Morgan Stanley was responsible for "developing the appropriate structure and negotiating with [the Rating Agencies] that [Cheyne] and [Morgan Stanley] agree may rate certain of the instruments issued in the Transaction."[7]  A Morgan Stanley employee explained that "[g]enerally on these deals investors do request some ratings, so this is why you engage the rating agencies before you actually start the marketing process of these notes."[8]  Morgan Stanley was also "involved in the development of new

_____

Decl.").  Moody's Investors Service, Inc. and Moody's Investors Service Ltd., and Standard & Poor's Ratings Services and The McGraw Hill Companies, Inc. (collectively the "Rating Agencies") are also defendants in this suit.

[6]      12/8/03 Engagement Letter from Morgan Stanley to Cheyne Capital Management Limited ("Engagement Letter") at MS_000077748, Ex. 89 to Declaration of Daniel Drosman in Support of Opposition to Morgan Stanley's Motion for Summary Judgment ("Drosman Decl.").

[7]      *Id.*

[8]      11/6/09 Deposition of Rany Moubarak at 90:9-13, Ex. 11 to Drosman Decl.  *See also* 10/20/04 Email from Morgan Stanley to Cheyne Capital Management re: Cheyne Task List at MS_000590220, Ex. 10 to Drosman Decl. (stating that "both S&P and Moody's ratings are needed on the Senior Notes programmes").

structural features to be incorporated in the SIV" post-launch.[9]  Morgan Stanley received a ten million dollar structuring fee for these services in 2005, and twenty to twenty-five percent of the ongoing Senior Management Fee and a portion of the ongoing Performance Management Fee.[10]

In addition, as Arranger and Placement Agent for the Rated Notes Morgan Stanley was involved in the "extensive [and ongoing] marketing of the Notes to potential investors."[11]  In marketing the Cheyne SIV, Morgan Stanley's "goal [was] to identify the specific target universe of investors that will allow the [SIV] to achieve an attractive cost of funding on the Notes, while also meeting . . . other objectives."[12]  In furtherance of this goal, Morgan Stanley reached out to individual investors, including certain plaintiffs, to solicit investments, provided marketing materials and individualized memoranda answering plaintiffs' inquiries, and met with plaintiffs all over the world, held dinners and conducted phone calls.[13]  In communications with certain plaintiffs Morgan Stanley emphasized that

---

[9]     Engagement Letter at MS_000077748.

[10]    *See* 7/5/06 Interoffice Memorandum at MS_000452248, 452255, Ex. 95 to Drosman Decl.

[11]    Engagement Letter at MS_000077750.

[12]    *Id.*

[13]    *See* Pl. Opp. at 7-16 (discussing Morgan Stanley's communications with each plaintiff) (citing Exs. 8-88 to Drosman Decl.).

4

the deal "offer[ed] different rated tranches (A or BBB or unrated) with attractive returns" and a "[high quality] underlying portfolio"[14] and offered the opportunity to discuss the deal further with its structuring team.[15]   In its capacity as a Placement Agent, Morgan Stanley distributed Information Memoranda and other selling documents containing key terms with respect to the Rated Notes.[16]

### B.   Procedural History

The procedural history relevant to plaintiffs' negligent misrepresentation claim follows.  Plaintiffs initiated this action on August 25, 2008 alleging common law fraud and tort claims against, *inter alia*, Morgan Stanley.  In a September 2, 2009 Opinion and Order I dismissed all common law tort claims against Morgan Stanley in accordance with then-settled Second Circuit law that New York's Martin Act preempted common law tort claims.[17]  Following the December 20, 2011 decision of the New York Court of Appeals that the Martin

---

[14]     4/13/05 Email from Morgan Stanley to Abu Dhabi Commercial Bank ("ADCB") re: New Deal *** SIV Cheyne Managed Investment at MS_000221694, Ex. 9 to Drosman Decl.

[15]     *See id.*

[16]     *See* NAC ¶ 3.  *See also* Information Memoranda.

[17]     *See Abu Dhabi* MTD Op., 651 F. Supp. 2d at 181.

Act does not preempt these claims,[18] plaintiffs filed a Ninth Amended Complaint renewing their common law tort claims against, *inter alia*, Morgan Stanley.  On May 4, 2012, I dismissed all common law tort claims against Morgan Stanley except for negligent misrepresentation.[19]

   In an August 17, 2012 Opinion and Order, I granted summary judgment for Morgan Stanley on plaintiffs' fraud claims because plaintiffs had not identified any actionable misstatement attributable to Morgan Stanley.[20]  Although Morgan Stanley had not yet moved for summary judgment on plaintiffs' negligent misrepresentation claims, I ordered plaintiffs to show cause as to why their negligent misrepresentation claims against Morgan Stanley should not be dismissed in light of my finding that Morgan Stanley made no actionable misstatement to plaintiffs.[21]  On October 5, 2012, I held that under New York law,

---

[18] *See Assured Guaranty (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 939 N.Y.S.2d 274 (2011) ("[W]e conclude that plaintiff's breach of fiduciary duty and gross negligence claims are not barred by the Martin Act.").

[19] *See* 5/4/12 Order (Dkt. No. 404).  Finding that "[i]n all ways that are relevant to defendants' motions, the facts here are similar to the facts in *King County, Washington v. IKB Deutsche Industriebank AG*," my decision on the common tort law claims in *Abu Dhabi* rested on the grounds set forth in the *King County* decision. *Id.* (discussing *King County, Washington v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288 (S.D.N.Y. May 4, 2012)).

[20] *See Abu Dhabi* S.J. Op., 2012 WL 3584278, at *7-9.

[21] *See id.* at *23.

a plaintiff may maintain a negligent misrepresentation claim against a defendant to whom no actionable misstatement can be attributed and declined to dismiss plaintiffs' negligent misrepresentation claim against Morgan Stanley.[22]

On January 3, 2013, following the Second Circuit's decision in *Anschutz Corp. v. Merrill Lynch & Co.*, I granted Morgan Stanley's motion for summary judgment on the negligent misrepresentation claims in *King County*, because plaintiffs "concede[d] that they had no direct contact with Morgan Stanley."[23]  Morgan Stanley now moves for summary judgment on the *Abu Dhabi* plaintiffs' negligent misrepresentation claims.

## II.   LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict."[24]  Thus, summary judgment is appropriate "only where, construing all the evidence in the light most

---

[22]     *See Abu Dhabi* Order to Show Cause Op., No. 08 Civ. 7508, 2012 WL 4762039, at *1 (S.D.N.Y. Oct. 5, 2012).

[23]     *King County, Washington v. IKB Deutsche Industriebank AG*, No. 09 Civ. 8387, 2013 WL 45878, at *7 (S.D.N.Y. Jan. 3, 2013) ("*King County* S.J. Op.") (citing *Anschutz*, 690 F.3d at 115 ("Here, there are no allegations of any direct contact between Anschutz and the Rating Agencies. We therefore conclude that Anschutz has failed to state a claim for negligent misrepresentation under New York law.")).  I rejected plaintiffs' argument that *Anschutz* was not controlling. *See id.*

[24]     *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

7

favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[25]  "A fact is material if it might affect  the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[26]

"[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[27]  "When the burden of proof at trial would fall on the non-moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[28]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[29]  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material

---

[25]     *Rivera v. Rochester Genesee Regional Transp. Authority*, 702 F.3d 685, 692 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)) (other quotations omitted).

[26]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012) (internal quotations and alterations omitted).

[27]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citation omitted).

[28]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[29]     *Id.*

facts,'"[30] and cannot "rely on conclusory allegations or unsubstantiated speculation."[31]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[32] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[33]

## IV.    APPLICABLE LAW ON NEGLIGENT MISREPRESENTATION

Under New York law "'[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'"[34] The question at issue here – "[w]hether the nature and caliber of

---

[30]    *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[31]    *Id.*

[32]    *Cuff ex rel. B.C. v. Valley Cent. School Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[33]    *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[34]    *Mandarin Trading Ltd. v. Wildenstein*, 919 N.Y.S.2d 465, 470 (2011) (quoting *J.A.O. Acquisition Corp. v. Stavitsky*, 831 N.Y.S.2d 364, 366 (2007)).

the relationship between the parties is such that the injured party's reliance on a

negligent misrepresentation is justified [ – ] generally raises an issue of fact."[35]

       In evaluating whether the requisite duty of care existed the fact-finder

must consider: "[1] whether the person making the representation held or appeared

to hold unique or special expertise; [2] whether a special relationship of trust or

confidence existed between the parties; and [3] whether the speaker was aware of

the use to which the information would be put and supplied it for that purpose."[36]

---

*Accord Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003)
("[T]he elements of negligent misrepresentation are: (1) carelessness in imparting
words; (2) upon which others were expected to rely; (3) and upon which they did
act or failed to act; (4) to their damage. Most relevant, the action requires that (5)
the declarant must express the words directly, with knowledge or notice that they
will be acted upon, to one to whom the declarant is bound by some relation or duty
of care.") (citation omitted).

[35]   *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996). However, the New
York Court of Appeals explained that "the *nature* of the duty which may give rise
to liability for negligent misrepresentation" – *i.e.* the duty to speak with care – is an
issue of law for the courts. *Id.* at 263 (citing *Eiseman v. State of New York*, 70
N.Y.2d 175, 187 (1987)). The question whether the nature of the relationship
makes plaintiffs' reliance justified is distinct from the third factor – whether
reliance was in fact reasonable.

[36]   *Id.* at 264. In "recognizing liability [for negligent misrepresentation]
of professionals to third parties," the New York Court of Appeals set forth three
requirements for establishing the necessary special relationship: "(1) the defendant
had awareness that its work was to be used for a particular purpose; (2) there was
reliance by a third party known to the defendant in furtherance of that purpose; and
(3) there existed some conduct by the defendant linking it to that known third party
evincing the defendant's understanding of the third party's reliance."
*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692

10

The Second Circuit recently clarified that "New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity."[37]  In addition there must be "direct contact" between the parties.[38]  In the "absence of obligations arising from the speaker's professional status,"  liability for negligent misrepresentation requires "some identifiable source of a special duty of care . . . giv[ing] rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech."[39]  Whether such a "special relationship" exists in the commercial context is "highly fact specific" and is not generally amenable to summary disposition.[40]

---

F.3d 42, 60 (2d Cir. 2012) (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)).

[37]     *Anschutz*, 690 F.3d at 114 (addressing negligent misrepresentation claims against rating agencies) (internal quotations omitted).

[38]     *Id.* at 115.  *Accord Dallas Aerospace*, 352 F.3d at 788 (An action for negligent misrepresentation "requires that the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care.") (citation omitted).

[39]     *Kimmell*, 89 N.Y.2d at 264.  The duty to speak with care may arise by virtue of one's professional status where the "training and expertise, may [give rise to] special relationships of confidence and trust with [] clients . . . ."  *Id.*  The court in *Kimmell* cited lawyers, engineers and accountants as the types of professionals that might be subject to the duty to speak with care.  *See id.*

[40]     *Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8358, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004).  *Accord Murphy v. Kuhn*, 660 N.Y.S.2d

## IV.   DISCUSSION[41]

Morgan Stanley does not, for the purposes of the instant motion, dispute that it possessed expertise and had access to information that was not available to plaintiffs in deciding whether to invest in the Cheyne SIV.[42]  Nor does

266, 270-71 (1997) (holding that "in the absence of obligations arising from the speaker's professional status . . . to be sure, [] whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact") (internal quotations and alterations omitted).

[41]   Plaintiffs note that the Court "already 'conducted an extensive analysis of the relationship between Morgan Stanley and plaintiffs and determined that plaintiffs had sufficiently *alleged* the existence of a 'special relationship' between the parties.'"  Pl. Opp. at 5 (quoting *Abu Dhabi* Order to Show Cause Op., 2012 WL 4762039, at *2 (emphasis added).  This conclusion was based on accepting plaintiffs' allegations as true and does not govern the Court's conclusions on summary judgment, particularly since the "special relationship of trust or confidence" element may be "sparsely pled" at the motion to dismiss stage where "the complaint emphatically alleges [specialized knowledge and awareness of the intended purpose of the information conveyed]."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004).  *Accord King County*, 863 F. Supp. 2d at 306.

[42]   There is, at minimum, a triable issue of fact as to whether and to what degree Morgan Stanley possessed "superior knowledge" and "special expertise."  *See, e.g.*, Pl. Opp. at 2-3 ("As the arranger of the Cheyne SIV, [Morgan Stanley] had access to immense non-public information and pressured Rating Agencies into assigning ratings [Morgan Stanley] desired.");  9/9/11 30(b)(6) Deposition of SFT Collective Fund at 52:12-17, Ex. 3 to Drosman Decl. ("With the rating agency being the only person, as well as the investment manager, having access to the line by line CUSIP, we had to take [it for] face value within the investor report");  1/6/05 Internal Morgan Stanley Email at MS_000634695, Ex. 5 to Drosman Decl. (stating that "disclosure [for SIVs] is significantly less than a typical CDO as many of the specific details are contained in the operating manual, which was not

Morgan Stanley dispute that it understood the use to which the ratings information

would be put and supplied it for that purpose.[43]  However, neither expertise, nor

knowledge that plaintiffs would rely gives rise to the requisite duty of care if there

is no special relationship.[44]  This is particularly so where the claim rests on Morgan

---

available to plaintiffs.").  *See also, e.g.*, *Bayerische*, 2012 WL 5383572, at *4 (finding a duty where bank "had superior access to information and knowledge as to . . . the true quality and value of the collateral portfolio and knowledge as an expert concerning the actual risk of the assets in the portfolio").

[43]     There is also ample factual support for the proposition that Morgan Stanley knew plaintiffs would rely on the ratings and supplied them for that purpose.  *See, e.g.*, 10/20/04 Email from Rany Moubarak, Morgan Stanley employee, re: Cheyne Task List at MS_000590220, , Ex. 10 to Drosman Decl. (stating that "both S&P and Moody's ratings are needed on the Senior Note programmes"); 11/6/09 Deposition of Rany Moubarak at 88:10-12, Ex. 11 to Drosman Decl. (stating that "because most of the investors asked for our ratings on these notes, that's why you have to work with the rating agencies to actually try to get these ratings").

[44]     *See Mandarin Trading*, 919 N.Y.S.2d at 471 (dismissing negligent misrepresentation claims despite defendants' expertise where "there are no allegations here that Wildenstein ever met with Mandarin, was retained by Mandarin for an appraisal, or knew that the appraisal would be used by Mandarin for the purpose of purchasing the painting"); *Kimmell*, 89 N.Y.2d at 264 (holding that in "the absence of obligations arising from the speaker's professional status . . . there must be . . . a special relationship giv[ing] rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech"); *Ravenna v. Christie's Inc.*, 734 N.Y.S.2d 21 (1st Dep't 2001) (holding that notwithstanding special expertise and knowledge that plaintiff would rely on defendant's advice, a "one-time meeting, which did not even create a business relationship, cannot be said to have created a relationship of trust and confidence").  *Accord King County*, 863 F. Supp. 2d at 306 ("[T]here can be no negligent misrepresentation without some form of 'special relationship' between the parties.").

Stanley's dissemination of the allegedly false statements of the Rating Agencies, rather than its own statements.[45]

Morgan Stanley argues that there can be no special relationship with plaintiffs with whom it had no direct contact.[46]  Morgan Stanley further contends that its relationship with the plaintiffs to whom it spoke directly was nothing more than that found in any arms-length transaction and, moreover, that express disclaimers and plaintiffs' expertise and sophistication preclude a finding of a duty of care.[47]

### A.   The Requisite Special Relationship Cannot Exist Absent Direct Contact with Morgan Stanley

The Second Circuit recently held that a claim for negligent misrepresentation under New York law cannot lie absent allegations of direct contact between the plaintiff and maker of the misrepresentation.[48]  I rejected the

---

[45]      *See Abu Dhabi* Order to Show Cause Op., 2012 WL 4762039, at *3 ("The existence of the special relationship without which a negligent misrepresentation claim cannot proceed creates a duty to impart correct – and complete – information.").

[46]      *See* Def. Mem. at 14-16.

[47]      *See id.* at 5-8.

[48]      *See  Anschutz*, 690 F.3d at 115 ("Here, there are no allegations of any direct contact between Anschutz and the Rating Agencies. We therefore conclude that Anschutz has failed to state a claim for negligent misrepresentation under New York law.").

*King County* plaintiffs' efforts to distinguish *Anschutz* and dismissed negligent misrepresentation claims premised on the fact that Morgan Stanley "was responsible for communicating the misleading ratings to investors through the Bloomberg Professional service, an electronic platform from which both plaintiffs purchased their Rhinebridge CP."[49]  The negligent misrepresentation claims of King County, Washington and SEI Investment Strategies, LLC in the instant case must be dismissed for the same reason.[50]

Bank of N.T. Butterfield & Son Limited ("Butterfield") purchased Cheyne SIV MTNs and CP through Barclays and Merrill Lynch, not Morgan Stanley.[51]  Butterfield's only evidence of any direct contact with Morgan Stanley is an internal Morgan Stanley email stating that Butterfield "is interested but need[s] to find a way to get approved internally to have a legal final."[52]  The Butterfield

---

[49]    *King County* S.J. Op., 2013 WL 45878, at *7 (citing *King County* Plaintiffs' Opposition to Summary Judgment at 33-34, No. 09 Civ. 8387 (Dkt. No. 303)).

[50]    *See* Pl. Opp. at 11, 14 (alleging only that the ratings were communicated by Morgan Stanley through Bloomberg Professional service).

[51]    *See* Butterfield Transaction Receipt from Barclays at BTRFLD0000021, Ex. 24 to Rouhandeh Decl.; Butterfield Transaction Receipt from Merrill Lynch at BTRFLD0000022, Ex. 25 to Rouhandeh Decl.

[52]    6/9/05 Internal Morgan Stanley Email at MS_000235609, Ex. 18 to Drosman Decl.

employee who made the decision to invest in the Cheyne SIV had no recollection of any conversation with Morgan Stanley let alone any direct communication from Morgan Stanley that was relied upon in deciding whether to invest.[53]  Absent testimony from Butterfield that there was direct contact, much less contact sufficient to establish a "privity-like" relationship, indirect evidence of a single communication is simply too thin a reed on which to find a triable issue of fact as to whether Butterfield had the requisite special relationship with Morgan Stanley.[54]  Thus, Butterfield's negligent misrepresentation claim is also dismissed.

### B.  The Effect of Disclaimers on Plaintiffs' Negligent Misrepresentation Claim

#### 1.  Disclaimers of Representations Do Not Foreclose a Claim for Negligent Misrepresentation Where the Relevant Facts Were Within Defendant's Peculiar Knowledge

Morgan Stanley argues that notwithstanding any personalized

---

[53]   *See* 9/14/11 Butterfield 30(b)(6) Deposition ("Butterfield Dep.") at 64-69, Ex. 6 to Rouhandeh Decl.  Plaintiffs cite deposition testimony that the individual who decided to purchase Cheyne for Butterfield "had to have [considered the ratings because] [w]e are bound by the AAA rating statistics that S&P puts in front of us."  Pl. Opp. at 8 (quoting Butterfield Dep. at 246:18-247:4). However, there is no evidence that Morgan Stanley was responsible for providing Butterfield with those ratings and it is well established that Morgan Stanley was not the maker of the statements.

[54]   *See Ravenna*, 734 N.Y.S.2d at 21 (allegations of a "one-time meeting, which did not even create a business relationship, cannot be said to have created a relationship of trust and confidence").

16

marketing efforts it made toward plaintiffs, "the requisite relationship cannot be established in the commercial context where, as here, the defendant disclaimed any representations."[55]  The Information Memoranda for each category of Rated Note state that

> Morgan Stanley (as a Placement Agent or in any other capacity) . . . [has not] independently verified the information contained herein . . . [and accordingly makes]  no representation, warranty or undertaking, express or implied . . . as to the accuracy or completeness at any time of the information contained or incorporation in this Memorandum and expressly do[es] not undertake . . . to advise any investor in the Capital Notes of any information coming to [its] attention . . . .[56]

Although the Second Circuit has, on several occasions, dismissed negligent misrepresentation claims on the basis of substantially similar disclaimers, it has also recognized that such disclaimers may not negate a "special duty of care .

---

[55]     Def. Mem. at 4.  In denying Morgan Stanley's motion to dismiss plaintiffs' negligent misrepresentation claims in *King County*, I stated that "defendant's awareness of or intention to induce plaintiff's reliance may be relevant to the 'special relationship' analysis" but "sophistication of plaintiffs, the existence of disclaimers, and a defendant's possession of unique or special expertise are *generally* only relevant to whether or not a plaintiff reasonably relied," which is a separate element of negligent misrepresentation.  863 F. Supp. 2d at 312 (emphasis added).

[56]     U.S. Capital Note Information Memorandum ("CN IM") at MS_000014800-01, Ex. 1 to Rouhandeh Decl.; U.S. Commercial Paper Program ("CP IM") at MS_000097393 Information Memorandum, Ex. 2 to Rouhandeh Decl.; U.S. Medium Term Note Program Information Memorandum ("MTN IM") at MS_000646550, Ex. 3 to Rouhandeh Decl..

. . giv[ing] rise to an exceptional duty regarding commercial speech and justifiable

reliance on such speech"[57] where the subject of the alleged misrepresentation –

here the actual credit-worthiness of the Rated Notes – is peculiarly within a

defendant's knowledge.[58]  Because plaintiffs here have raised a question of fact as

to whether the misrepresentations were peculiarly within Morgan Stanley's

knowledge, these disclaimers do not, as a matter of law, foreclose a negligent

misrepresentation claim.

## 2. Disclaimers of a Special Relationship Foreclose a Claim for Negligent Misrepresentation

In addition to the above disclaimers of representations, the CP and

MTN Information Memoranda provide that

> [because] the Issuer relies on the Section 3(c)(7) Exclusion [which limits beneficial ownership of Notes to QPs and QIBs in accordance with the requirements of Rule 144A] each purchaser or other transferee of Notes will be deemed [agreed that] none of the Issuer, the Placement Agents, . . . the Manager or any of their

---

[57]    *Kimmell*, 89 N.Y.2d at 264.

[58]    *See Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 Fed. App'x 679, 682-83 (2d Cir. Apr. 19, 2012) (rejecting the argument that disclaimers "requir[ing] Landesbank to represent that it was a 'sophisticated investor' and had sufficient access to financial and other information to make an informed investment decision" did not undermine justifiable reliance because plaintiffs failed to plausibly allege that the allegedly misrepresented facts were peculiarly within defendants' knowledge); *Dallas Aerospace*, 352 F.3d at 789 ("[Plaintiff] cannot claim it relied on [defendant's] special expertise because it is clear that [plaintiff] itself had the relevant expertise at issue.").

respective affiliates *is acting as a fiduciary or financial or investment adviser for the purchaser; (ii) the purchaser is not relying (for purposes of making any investment decision []or otherwise) upon any advice, counsel, or representations* (whether written or oral) . . . other than those (if any) set forth in a current offering circular for such Notes and any representations expressly set forth in a written agreement . . . .[59]

Plaintiffs State Board of Administration of Florida ("FSBA"), SEI Investments Company ("SEI"), SFT Collective Investment Fund ("SFT"), and Commerzbank AG ("Commerzbank") all purchased Commercial Paper or Medium Term Notes.[60]

The Second Circuit recently held that identical disclaimers of a relationship between a Placement Agent and an investor negated any "special relationship" for the purposes of establishing a claim for negligent misrepresentation.[61]  Plaintiffs point to no evidence of communications between

----

[59]    CP IM at MS_000097446-7; MTN IM at MS_000646657-9 (emphases added).  The Information Memoranda specify that "[r]eferences . . . to the 'relevant Placement Agent' shall, . . . be to all Placement Agents agreeing to offer and sell such Notes."  MTN IM at MS_000646546.   The fact that Morgan Stanley was also an Arranger does not negate the applicability of this disclaimer because its relationship with plaintiffs was undertaken in its capacity as a Placement Agent.  Even if it touted its role as Arranger to market the SIV, any duties arising out of that status would be owed solely to Cheyne.

[60]    *See* NAC ¶¶ 17, 18.  King County, SEI Investment Strategies, LLC and Butterfield also invested in CP or MTN, however, I have already concluded that they cannot state a negligent misrepresentation claim because they lacked any direct contact with Morgan Stanley.  *See supra* Part IV.A.

[61]    *See Landesbank*, 478 Fed. App'x at 682 (affirming dismissal of a claim for negligent misrepresentation where "[t]he Offering Circular by which the

Morgan Stanley and any plaintiff, either prior or subsequent to receipt of the

Information Memoranda, in which Morgan Stanley represented itself as an adviser

or otherwise in a special relationship of trust with plaintiffs sufficient to overcome

the disclaimer of such a relationship in the Information Memoranda.[62]

---

[] notes were marketed disclaimed both the existence of a special relationship of trust or confidence between the defendants and [plaintiff] and any particular expertise on the part of the defendants with respect to the credit quality of the [] notes"). *Accord HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 76 (1st Dept. 2012) (finding that the special relationship was foreclosed as a matter of law where the "parties expressly agreed that they were dealing with each other at arm's length, that UBS was not acting as HSH's financial or investment advisor," and that HSH was 'not relying (for purposes of making any investment decisions or otherwise) upon any advice, counsel or representations . . . of [UBS]'"). The Offering Circular in *Landesbank* stated that "neither Goldman nor TCW was 'acting as a fiduciary or financial or investment advisor for [Landesbank] ... [and Landesbank was] not relying ... upon any advice, counsel or representations ... of [Defendants] other than in the Circular.'" *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 619 (S.D.N.Y. 2011).

[62]     *Cf. Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) (declining to dismiss a claim for negligent misrepresentation where a disclaimer of representations "would not cover the subsequent telephone conversation [making representations]"); *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, No. 652996/2011, 2012 WL 5187653, at *7 (Sup. Ct., N.Y. Co., Oct. 18, 2012) ("Goldman allegedly made numerous and repeated representations to BYAFM in emails and during conference calls that specifically addressed the concerns at issue in this case."). Plaintiffs argue that "[Morgan Stanley] itself described its relationship with investors as something more than a typical business relationship [by] emphasiz[ing] that it 'takes pride in giving the most accurate and helpful market intelligence and trading advice to each of our issuing clients.'" Pl. Opp. at 24 (quoting Morgan Stanley Marketing Materials at MS_ 000473256, Ex. 69 to Drosman Decl.). However, this statement was made with respect to issuing clients such as Cheyne, not investors, and was not made to any plaintiff in this case. Plaintiffs cite other marketing documents in

20

The fact that plaintiffs were not in a contractual relationship with Morgan Stanley strengthens the argument that such disclaimers, to which plaintiffs are deemed to have agreed by their purchase of the Rated Notes, foreclose the *more elusive privity-like* relationship.[63]   Moreover, that these disclaimers of a fiduciary or advisory relationship are expressly premised on the fact that these transactions were, by law, reserved for sophisticated investors strengthens their enforceability. While a plaintiff's sophistication neither automatically forecloses a duty of care, nor necessarily undermines reasonable reliance, in the absence of contractual privity much of the "special relationship" inquiry as set forth in *Kimmell* and

which Morgan Stanley emphasized that it has "recognized the importance of investor marketing and education," which has "allowed us to build strong relationships with investors built on respect and trust," Fortis Summary at MS_000201634, and that it "build[s] unique relationships with money market investors . . . and often becom[es] their trusted advisor in money markets," Morgan Stanley ABCP Marketing Materials at MS_000302406, Ex. 1 to Drosman Decl.  I need not consider whether these statements would have been sufficient to override the disclaimers of relationship had they been made directly to plaintiffs in conjunction with the sale of the Cheyne SIV because plaintiffs offer no evidence that such statements were made to them.

[63]   *See Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 541 N.Y.S.2d 335, 339 (1989) (holding that, absent privity, New York defines the duty of care giving rise to claims for negligent misrepresentation "more narrowly than other jurisdictions").  *Accord King County*, 863 F. Supp. 2d at 307 ("In the absence of actual contractual privity, plaintiffs alleging a special relationship sufficient to give rise to a duty face a 'heavy burden.'").  *Cf.* Pl. Opp. at 20 ("[d]efendants' reliance on authority concerning *contractual* disclaimers is unpersuasive [because] [d]efendants long ago prevailed on their argument that there were no contracts between MS and plaintiffs") (emphasis added).

*Credit Alliance* is about the parties' understanding of the nature of their relationship.  It is therefore relevant that plaintiffs were sophisticated investors who represented that they understood the nature of the transaction including that their relationship with Morgan Stanley was not one of trust entailing an "exceptional" duty to speak with care.

Where there is no special relationship, plaintiffs cannot establish the existence of a duty to impart correct information and their claim necessarily fails.[64] Thus, the negligent misrepresentation claims of FSBA, SEI and SFT are dismissed and Commerzbank's negligent misrepresentation claims based on its purchase of CP or MTNs are also dismissed.

### C.  Whether Morgan Stanley's Communications With Capital Note Plaintiffs Create a Disputed Issue of Fact as to the Existence of a Special Relationship

Unlike the MTN and CP Information Memoranda, the Capital Note Information Memorandum contained no explicit disclaimer of a fiduciary or advisory relationship on the part of Placement Agents.  I have already concluded

---

[64]     *See Mandarin Trading*, 919 N.Y.S.2d at 470 ("the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff" is an element of negligent misrepresentation). Although *Kimmell* suggests that expertise alone could suffice to establish the requisite special relationship, this case involves Morgan Stanley's dissemination of allegedly false statements by the Rating Agencies.  Morgan Stanley's expertise is insufficient, absent a special relationship of trust, to create the requisite duty.

that the disclaimers of representations regarding the accuracy of the ratings do not

necessarily foreclose the existence of a special relationship resulting in a duty of

care and justifiable reliance.[65]   However, Morgan Stanley argues that, disclaimers

aside, its interaction with plaintiffs was typical of an arms-length transaction.[66]

Plaintiffs, by contrast, argue that their relationship with Morgan Stanley was akin

to the relationship in *Kimmell*, where the New York Court of Appeals held plaintiff

had established the requisite duty of care in a commercial context.[67]

---

[65]     *See supra* Part IV.B.1.

[66]     *See* Def. Mem. at 9.

[67]     *Kimmell* involved claims by investors in a project developed by a
corporation of which Kimmell was chief financial officer and chairman of the
board, in part because "the company believed that his reputation would enhance its
credibility with potential investors."  89 N.Y.S.2d at 260. In this capacity, Kimmell
sought investors for the project.  *See id.* at 261. The court found that a duty of care
existed where Kimmell contacted plaintiffs, generated and distributed projections
for the purpose of providing plaintiffs with information about potential returns on
the project, met with each plaintiff, urged plaintiffs to rely on the projections,
offered "hot comfort" should plaintiff entertain any reservations about investing,
provided updated projections with the expectation that they would be routed to
plaintiffs, and received a commission.  *Id.* at 265.  *See also Suez*, 250 F.3d at 103
(plaintiff adequately alleged a special relationship where "defendants initiated
contact with plaintiffs, induced them to forebear from performing their own due
diligence, and repeatedly vouched for the veracity of the allegedly deceptive
information"); *Smith v. Ameriquest Mortg. Co.*, 876 N.Y.S.2d 447, 450 (2d Dep't
2009) (finding a triable issue of fact as to whether the requisite special relationship
existed where defendant "personally solicited the plaintiff to refinance her
mortgage with [his company], and came to her home twice to provide her with
information about the transaction in an effort to convince her that the transaction
was in her best interests").

It is not easy to draw the line between the typical relationship of a Placement Agent and a sophisticated investor, and one which goes beyond an arms length transaction giving rise to a duty of care regarding commercial speech. However, I find that an issue of fact exists where Morgan Stanley acted as more than a mere agent of the Issuer and "appeared to possess – and held [itself] out as possessing – special knowledge about the [SIV] , . . . knew that plaintiffs sought information about [the ratings] to aid their investment decision and [] supplied it for that purpose."[68] Certain plaintiffs have proffered evidence that Morgan Stanley affirmatively solicited their investment, made numerous in-person, email and telephone communications over significant periods of time, provided individualized memoranda and, in some cases made additional overtures after plaintiffs initially invested, touting the success of the SIV to encourage further investment. Significantly, there is evidence that in soliciting these investments Morgan Stanley emphasized its dual role as structurer and Placement Agent,

---

[68]     *Suez*, 250 F.3d at 104.  In *Suez*, the Second Circuit upheld negligent misrepresentation claims against a bank retained to market a corporation's securities where the bank approached plaintiffs and, in order to solicit their investments, provided them with a report by an independent investigator regarding the corporation, which was modified to exclude certain relevant information, and discouraged them from conducting their own diligence. *See id.*  Although plaintiffs do not allege that Morgan Stanley discouraged them from conducting their own diligence, they allege that they could not have discovered the information which was the subject of the alleged misrepresentation.

24

including that it received structuring and placement fees from the Issuer that came

from the profits of the SIV.[69]  Thus, in light of my conclusion that there is a

question of fact whether Morgan Stanley had specialized expertise, and peculiar

knowledge regarding the ratings which may overcome the disclaimers, and

understood the purpose for which the ratings were supplied, Morgan Stanley's

motion to dismiss the negligent misrepresentation claims is denied as to the

following plaintiffs: ACDB,[70]  Commerzbank,[71] Gulf International Bank, BSC

---

[69]    *See* 4/28/05 Email from Morgan Stanley to NACF at NACFe00001234, Ex. 47 to Drosman Decl. (explaining that "MS is participating in the profit because that is how we are getting paid our structuring and placement fees").

[70]    Morgan Stanley contacted ADCB regarding the Cheyne SIV and encouraged it to invest, touting the portfolio as a "high quality one" comprised of "highly rated structured finance assets" with a "very reputed manager."  4/13/05 Email from Morgan Stanley to Abu Dhabi re: Cheyne SIV at MS_000221694., Ex. 9 to Drosman Decl.  Morgan Stanley emphasized that the SIV was "designed to invest in highly rated term assets."  *Id.* at MS_000221704.  Morgan Stanley stressed that the ratings were constantly monitored.  *See* 6/28/05 Email from Morgan Stanley to ADCB at MS_000222133, - 136.  In addition, Morgan Stanley continued to meet with Abu Dhabi analysts after they invested in July 2005, and encouraged them to increase their investment.  *See* 5/26/06 Internal Morgan Stanley Email re: ADCB at MS_000163004, Ex. 12 to Drosman Decl. (discussing dinner with ADCB); 4/13/07 Email from Morgan Stanley to ADCB re: Cheyne SIV Roadshow, Ex. 17 to Drosman Decl. (discussing 2007 meeting in United Arab Emirates with Abu Dhabi).

[71]    Morgan Stanley contacted Commerzbank in November 2004 and affirmatively encouraged its investment in the Cheyne SIV. *See* 11/22/04 Email from Morgan Stanley to Commerzbank, Ex. 19 to Drosman Decl.  Morgan Stanley provided individualized memoranda addressing SIVs, and the Cheyne SIV in

("GIB"),[72] National Agricultural Cooperative Federal ("NACF"),[73] Global

Investment Services Limited ("NZ Funds"),[74] and Bank Hapoalim B.M.

---

particular, which highlighted the "high quality credit portfolio" and careful design of "rating agency methodologies." Memo to Commerzbank re: SIVs at MS_000601014, Ex. 20 to Drosman Decl.

[72]        A GIB representative testified that Morgan Stanley "tapped on GIB's door [and] market[ed] Cheyne . . . for over two years before [GIB] invested in it." 30(b)(6) Deposition of GIB at 90:2-5, Ex. 27 to Drosman Decl.  Morgan Stanley urged GIB to purchase the Cheyne SIV and sent individualized memoranda including statements that Cheyne's model will be "approved by and calibrated to the models used by the Rating Agencies" and that "Morgan Stanley is currently finalizing the last structural points with the rating agencies" but that "all the analysis required by the rating agencies has already been undertaken" and Morgan Stanley has received written confirmation of the expected ratings.  *See* 4/28/05 Email from Morgan Stanley to GIB attaching Individualized Memoranda Addressing Questions from a Conference Call, Ex. 28 to Drosman Decl.

[73]        Morgan Stanley contacted NACF to market the Cheyne SIV and provided substantial individualized attention– specifically five individualized memoranda addressing NACF's questions, including concerns about ratings, and in-person meetings.  *See* 10/14/04 Email from Morgan Stanley to, *inter alia*, NACF, Ex. 45 to Drosman Decl. (noting that the SIV contained "very high quality underlying assets," that rating agencies review the portfolio every week and that "SIVs must adhere to stricter rating agency . . . standards compared to typical CDO structures"); 5/5/05 Memorandum to NACF re: Follow Up Questions, Ex. 48 to Drosman Decl.  *See also* Exs. 46, 47 to Drosman Decl. (emails answering NACF questions); 4/12/06 Internal Morgan Stanley Email re: meeting with NACF in Asia.

[74]        NZ Funds was solicited to invest in Cheyne in November 2004.  *See* 11/1/04 Email from Morgan Stanley to NZ Funds, Ex. 52 to Drosman Decl. NZ Funds received numerous follow ups from Morgan Stanley, including individualized memoranda.  *See, e.g.*, 6/9/05 Email from Morgan Stanley to NZ Funds, Ex. 54 to Drosman Decl. (attaching individualized memorandum); 12/11/06 Email from Morgan Stanley to NZ Funds (attaching updated presentation on mezzanine capital notes and individualized memorandum).  In addition, after NZ

("Hapoalim").[75]

However, Deutsche Postbank AG ("Postbank")[76] and Bank SinoPac

---

Funds' first purchase, Morgan Stanley continued to communicate with NZ Funds regarding the investment. *See* 1/14/07 Email from Morgan Stanley to NZ Funds, Ex. 60 to Drosman Decl. ("The SIV structure permits investments in a higher quality portfolio than a HG ABS CDO" and SIVs can "take advantage of changing market conditions without compromising rated tranches").

[75]    Morgan Stanley stated that it "built a relationship [at Hapoalim] and got him involved in transactions such as the Cheyne SIV."  11/27/06 Internal Morgan Stanley Email at MS_001571258, Ex. 39 to Drosman Decl.  *See also* 6/7/06 Internal Morgan Stanley Email, Ex. 30 to Drosman Decl. (discussing making inroads with Hapoalim's structured finance group, including with respect to Cheyne SIV).  In addition, Morgan Stanley touted its own "commitment to the vehicle" as a recipient of fees for its "ongoing placement and structuring role" in addition to being one of three Senior Notes dealers. 7/25/06 Email from Morgan Stanley to Hapoalim re: Cheyne Question, Ex. 34 to Drosman Decl. (attaching Individualized Memorandum discussing, amongst other things, Morgan Stanley's role as Structurer and Placement Agent, as a "key ingredient" in delivering "attractive returns to investors").  Finally Morgan Stanley forwarded to Hapoalim an evaluation by its "structurers" of the various notes offered and was "pushing for the combo note" in part on the ground that it was "publicly rated Baa2 by Moodys".  7/20/06 Email from Morgan Stanley to Hapoalim, Ex. 38 to Drosman Decl.

[76]    The only evidence plaintiffs put forth regarding the relationship between Morgan Stanley and Postbank are internal Morgan Stanley emails discussing a meeting as part of a roadshow, Ex. 61 to Drosman Decl., and a call that it arranged between Postbank and Cheyne where Postbank obtained information, Ex. 62 to Drosman Decl.  The fact that Morgan Stanley needed Postbank's investment in order to get its fees, *see* Ex. 64 to Drosman Decl., does not aid Postbank's case that it had a special relationship of trust with Morgan Stanley.

("SinoPac")[77] have not put forth evidence beyond generic communications regarding potential investment in the Cheyne SIV over a period of a couple months.  None of these communications suggest that Morgan Stanley was any more than a typical Placement Agent, an intermediary between Cheyne and the potential investors.  If these communications could give rise to a claim for negligent misrepresentation then any Placement Agent would be liable and the word "exceptional" in *Kimmell* would be rendered meaningless.

## V.    CONCLUSION

For the foregoing reasons, Morgan Stanley's motion for summary judgment on plaintiffs' negligent misrepresentation claim is granted as to Butterfield, King County, SEI Investments Company, SEI Investment Strategies, LLC, SFT Collective Investment Fund, FSBA, Postbank and Sinopac.  The motion

---

[77]    Morgan Stanley contacted Sinopac in July 2005 regarding the Cheyne SIV and sent marketing material.  *See* Exs. 79, 80 to Drosman Decl.  Although Morgan Stanley admitted to having "spent so much time and relationship capital" securing Sinopac's investment, *see* 8/11/05 Internal Morgan Stanley Email at MS_001509459-60, Ex. 84 to Drosman Decl. (reminding that it "took lots of effort to get them interested again"), the entire relationship appears to have been over the course of several months and Morgan Stanley appears to be acting exclusively as an intermediary, passing along generic information from Cheyne and the Rating Agencies, rather than making any particular representations about its own role in the SIV.  *See, e.g.*, Ex. 84 (stating concern that Sinopac will have a bad impression of Cheyne because of its failure to answer simple questions); Ex. 86 (stating that the letter from a the rating agency is "stronger than anything"); Ex. 83 (sending a rating letter from Moody's to Sinopac).

is denied as to ADCB, Commerzbank, GIB, Hapoalim, NACF, NZ Funds.

As a procedural matter, because the remaining plaintiffs' negligent misrepresentation claims will depend both on whether or not the actual credit-worthiness of the Rated Notes is deemed within the peculiar knowledge of Morgan Stanley,[78] and on individualized proof regarding the requisite special relationship giving rise to a duty of care, the remaining plaintiffs' negligent misrepresentation case will be reserved for Phase II of the trial, in accordance with my February 25, 2013 Order bifurcating the trial (Dkt. No. 572). The Clerk of the Court is directed to close this motion (Dkt. No. 522). A status conference in this case is currently scheduled for March 15, 2013 at 10:00 a.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 5, 2013

---

[78]      *See supra* Part IV.B.1.

**- Appearances -**

**For Plaintiffs:**

Patrick J. Coughlin, Esq.
Daniel S. Drosman, Esq.
Jessica T. Shinnefield, Esq.
Jarrett S. Charo, Esq.
Darryl J. Alvarado, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
(619) 231-1058

Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Luke O. Brooks, Esq.
Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
(415) 288-4545

**Additional Attorneys for Plaintiff State Board of Administration of Florida:**

Marc I. Gross, Esq.
Tamar A. Weinrib, Esq.
Pomerantz Haudek Grossman & Gross LLP
100 Park Avenue
New York, NY 10017
(212) 661-1100

**For Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited:**

James P. Rouhandeh, Esq.
Antonio J. Perez-Marques, Esq.
William R. Miller, Jr., Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**For Defendants Moody's Investors Service, Incorporated and Moody's Investors Service Limited:**

Joshua M. Rubins, Esq.
James J. Coster, Esq.
Mario Aieta, Esq.
James I. Doty, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY 10169
(212) 818-9200

Mark A. Kirsch, Esq.
Christopher M. Joralemon, Esq.
Joel M. Cohen, Esq.
Lawrence J. Zweifach, Esq.
Mary K. Dunning, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 48th Floor
New York, NY 10166
(212) 351-5391

**For Defendants Standard & Poor's Rating Services and The McGraw-Hill Companies, Incorporated:**

Floyd Abrams, Esq.
Dean I. Ringel, Esq.

31

Charles A. Gilman, Esq.
Tammy L. Roy, Esq.
Jason M. Hall, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
(212) 701-3000