UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ABU DHABI COMMERCIAL BANK, et al.,                                   :
                                                                     :
                                                                     :
                                                                     :
                         Plaintiffs,                                 :
                                                                     :    08 Civ. No 7508 (SAS)
                                                                     :
                     - against –                                     :    **ECF Case**
                                                                     :
MORGAN STANLEY & CO. INC., et al.,                                   :
                                                                     :
                                                                     :
                                                                     :
                         Defendants.                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
RENEWED MOTION FOR SUMMARY JUDGMENT PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 56(c)**

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ..................................................................................................3

I.      Plaintiffs Cannot Disaggregate Market-Driven Losses and Do Not Purport
        To Do So .............................................................................................3

        A.      Law of Disaggregation ...............................................................3

        B.      Dr. Goldstein Fails to Disaggregate Market Factors .....................7

        C.      Dr. Goldstein Fails to Analyze the Alleged Cheyne Ratings Defects ..........12

II.     Plaintiffs' New "Concealed Vulnerability" Theory is Legally Deficient...............14

        CONCLUSION.................................................................................17

## TABLE OF AUTHORITIES

<span style="text-align:center">C<small>ASES</small></span>

P<small>AGE</small>

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
  646 F. Supp. 2d 385 (S.D.N.Y. 2009) .......................................................................... 6, 7, 14

*Dura Pharmaceuticals, Inc. v. Broudo*
  544 U.S. 336 (2005) ................................................................................................. 3, 11, 12

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994) ................................................................................................. 3

*Gordon Partners v. Blumenthal*,
  02 CIV 7377 LAK, 2007 WL 1438753 (S.D.N.Y. May 16, 2007),
  *aff'd,* 293 F. App'x 815 (2d Cir. 2008). ............................................................................ 5

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) ............................................................................................ 4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ............................................................................................ 3, 10

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008),
  *aff'd* 597 F.3d 501 (2d Cir. 2009) .................................................................................. 4, 5

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) ................................................................................ 4

*In re Williams Sec. litigation-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009).......................................................................................... 5

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ......................................................................................... 5, 15

*Laub* v. *Faessel,*
  297 A.D.2d 28 (1st Dep't 2002) ......................................................................................... 6

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ...................................................................................... *passim*

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  03 CIV 2175 SAS, 2013 WL 541202 (S.D.N.Y. Feb. 12, 2013)........................................ 4

*Movitz v. First Nat. Bank of Chicago*,
    148 F.3d 760 (7th Cir. 1998) ............................................................................6

*Solow v. Citigroup, Inc.*,
    12-2499-CV, 2013 WL 149902 (2d Cir. Jan. 15, 2013)......................................................4

## PRELIMINARY STATEMENT

Plaintiffs invested in notes issued by the Cheyne SIV, and they allegedly suffered losses on those investments in the wake of an unprecedented, worldwide financial crisis. The only alleged fraud in this case is plaintiffs' allegation that the Cheyne SIV notes' rating opinions were false. It is therefore plaintiffs' burden to prove not just that they suffered losses, but that such losses were proximately and directly caused by the allegedly false Cheyne SIV note ratings. Under bedrock loss causation principles, plaintiffs cannot make this required causal showing without *disaggregating* the market-driven component of their losses from any losses allegedly caused by the ratings that they claim were false.

Now that plaintiffs have identified the theory their new causation expert (Dr. Goldstein) will rely upon at trial, it is clear they cannot meet this burden. Instead of even attempting to demonstrate any direct, proximate impact of the Cheyne SIV note ratings, Dr. Goldstein instead opines that plaintiffs' losses resulted from a "[m]arket wide collapse" of the trillion dollar "subprime RMBS" market, which defendants themselves purportedly caused. Thus, far from disaggregating the market-driven portion of plaintiffs' alleged losses and attributing them to the alleged fraud at issue, Dr. Goldstein instead identifies the market as the sole cause of plaintiffs' losses. Underscoring his failure to demonstrate that the alleged misrating of the Cheyne SIV notes caused any of plaintiffs' losses, Dr. Goldstein does not even analyze the causal impact, if any, of the alleged defects in the Cheyne SIV ratings identified by plaintiffs' ratings expert, Dr. Das.

What remains now is purely a legal question: can plaintiffs prove loss causation without disaggregating market impacts, and in the face of an affirmative opinion by their own expert attributing their losses to a "[m]arket wide collapse"? Plainly they cannot, for the following reasons:

*First*, an expert's failure to disaggregate market impacts is fatal to loss causation under Second Circuit case law.  This failure is exacerbated, not solved, by Dr. Goldstein's affirmative opinion attributing plaintiffs' losses to market impacts.  Dr. Goldstein's opinions stand as a concession that plaintiffs are unable to carry their burden of identifying losses that were directly and proximately caused by the alleged fraudulent rating of the Cheyne SIV, as opposed to market factors.  The notion that plaintiffs could recover from this concession by proving that defendants *caused* a market-wide collapse would effectively eliminate the loss causation requirement and is impermissible as a matter of law.

*Second*, plaintiffs cannot survive summary judgment by abandoning Dr. Goldstein's theory and attempting yet another theory based on the supposed concealment of Cheyne's "vulnerability" to market declines, as they have attempted to do in recent submissions. Regardless of the risk that plaintiffs claim was concealed, they must separate losses attributable to Cheyne's *disclosed* risks – including its disclosed exposure to assets that were susceptible to market changes, and disclosures showing precisely how much asset value decline the SIV could withstand – from losses attributable to the risks that were allegedly concealed.  Plaintiffs' failure to do so is fatal to loss causation.

Plaintiffs' approach would convert their fraud claim into a form of "investor insurance" against market downturns, precisely the result that the proximate causation element and its disaggregation requirement are intended to avoid.  The Court should reject this approach and grant summary judgment to defendants.

<u>**ARGUMENT**</u>

I.   <u>**Plaintiffs Cannot Disaggregate Market-Driven Losses and Do Not Purport To Do So**</u>

A.   **Law of Disaggregation**

Disaggregation is a fundamental principle of loss causation law.  It is premised on the concept explained by the U.S. Supreme Court in *Dura Pharmaceuticals* that investment losses can arise from a "tangle of factors," including "changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events," all of which, "taken separately or together," may explain some or all of an investment's loss of value.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  Because a defendant may be held liable only for those investment losses proximately and directly caused by the alleged fraud, as distinguished from market forces or other facts, "*Dura* requires plaintiffs to *disaggregate* those losses caused by 'changed economic circumstances'" or any of the other "tangle" of non-fraud factors that may explain some or all of the alleged losses.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (emphasis added) (citing *Dura*, 544 U.S. at 342-43).

The need for disaggregation is particularly acute in the presence of broad market phenomena potentially impacting the value of the relevant investment.  As the Second Circuit has explained for purposes of considering loss causation at the pleading stage:

> "[W]hen the plaintiff's loss coincides with a *marketwide phenomenon causing comparable losses to other investors*, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (emphasis added) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).  Indeed, a "market" is the quintessential "tangle of factors" because it is an amalgam of the actions and perceptions of potentially vast numbers of individual participants, all reacting to events of every

conceivable type, including changes in macroeconomic variables and other developments.[1]  Loss causation inquiries do not undertake the hopeless task of teasing out individual causal contributors to broad market changes, but rather set aside losses that are "market-driven" to focus on whether any causal connection is evident once market-related losses are stripped away. *See Solow v. Citigroup, Inc.*, 12-2499-CV, 2013 WL 149902, at \*2 (2d Cir. Jan. 15, 2013) (dismissing claims that "fail[ed] to distinguish the effects of the fraud alleged from those caused by the adverse market conditions existing at the time"); *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599-600 (S.D.N.Y. 2010) (plaintiffs must exclude "intervening events of the housing market crisis and actions by third  parties," which they failed to do because "[p]laintiffs' allegations themselves incorporate intervening events and actors, and . . . wide event windows that welcome into their narrative noise and information from other events").[2]

Disaggregation of market-driven and other non-fraud causes is an *affirmative* obligation on the part of plaintiffs, not something to be disproved by defendants.  *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 03 CIV. 2175 SAS, 2013 WL 541202, at \*3 & n.29 (S.D.N.Y. Feb. 12, 2013) ("[Plaintiff] bore the burden of  disaggregating the effects of such 'materialization' events . . . from the effects of other, non-fraud-related 'confounding' events.").  Plaintiffs only get to trial if they come forward with a viable and reliable method of disaggregation, so as to provide the jury with some basis for assigning a portion of the losses to the alleged fraud.  *See, e.g., In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*

---

[1] *E.g.* Goldstein Dep. (Ex. 5) at 236:10-19 ("conceivably all news is relevant to market participants").  Parenthetical Exhibit numbers refer to the exhibits of the Declaration of James P. Rouhandeh submitted herewith.

[2] *See also Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729 (11th Cir. 2012) (testimony that failed "to account for the effects of the collapse of the Florida real estate market" was insufficient as a matter of law to establish loss causation).

597 F.3d 501 (2d Cir. 2009); *Gordon Partners v. Blumenthal*, 02 CIV 7377 LAK, 2007 WL

1438753 (S.D.N.Y. May 16, 2007), *aff'd*, 293 F. App'x 815 (2d Cir. 2008).

      Plaintiffs must provide the jury with some specific basis for assigning an ascertainable

portion of the loss to the alleged fraud, as distinct from the portion arising from market-driven or

other non-fraud-related causes, without leaving the jury simply to speculate regarding how to

perform the required disaggregation. *Lentell*, 396 F.3d at 175 (plaintiffs must show that they

"would have been spared all or an ascertainable portion of [the] loss absent the fraud"); *Lattanzio

v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (factfinder must be able to "ascribe

some rough proportion of the whole loss" to the alleged fraud).  Courts will scrutinize the

testimony of a plaintiff's loss causation expert to determine whether it in fact provides such a

basis, and if not, grant summary judgment for defendants.  *See, e.g., In re Omnicom*, 541 F.

Supp. 2d at 554 (holding that "the law requires the disaggregation of confounding factors," and

awarding summary judgment to defendants where plaintiffs' expert "disaggregated only *some*"

but not all non-fraud factors).[3]

      Contrary to the position plaintiffs have taken in recent submissions, the obligation to

disaggregate is not confined to the stock-drop context or other cases related to an efficient

market.  Disaggregation is a fundamental loss causation requirement regardless of the factual

context, and indeed, the Court has already recognized that plaintiffs face a disaggregation

obligation here. *E.g.*, 2/14/13 Hr'g Tr. (Ex. 8) at 47:14-17 (COURT: "If there are market forces

that are apart from this misrepresentation and the concealed risk and then the disclosure, then it

does have to be disaggregated."); *see also AIG Global Sec. Lending Corp. v. Banc of Am. Sec.*,

---

[3] *See also In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1139-41 (10th Cir. 2009)
(after "close inspection" of plaintiffs' evidence, summary judgment was proper where plaintiffs
failed to control for other causes of their loss, including "the bankruptcies of [defendant's]
competitors, [and] a decline in the telecommunications industry as a whole").

*LLC*, 646 F. Supp. 2d 385, 403-04 (S.D.N.Y. 2009) (citing and applying *Lentell* disaggregation test in securitization case), *aff'd sub nom. AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 386 F. App'x 5 (2d Cir. 2010); *Laub* v. *Faessel*, 297 A.D.2d 28, 32 (1st Dep't 2002) (dismissing fraud claim against investment advisor where plaintiff "failed to allege or provide any evidence that [defendant's] asserted misrepresentations – rather than market forces – caused plaintiff's alleged losses"); *Movitz v. First Nat. Bank of Chicago*, 148 F.3d 760, 762-64 (7th Cir. 1998) (finding no loss causation where plaintiff failed to separate losses due to alleged breach of duty from losses attributable to real estate market collapse).

Nor is there any basis for the contention that the disaggregation burden is in any way reduced in a non-stock-drop case. *AIG Global*, relied upon heavily by plaintiffs as supposedly diminishing the disaggregation burden in the securitization context, is illustrative. That case involved a securitization backed by home furnishing installment loans. *AIG Global*, 646 F. Supp. 2d at 389. Plaintiff investors sued for alleged misstatements and omissions relating to the credit quality of the underlying loans. They alleged, for example, that the loss and delinquency statistics contained in the offering materials were false and misleading, because the statistics were based on an allegedly inappropriate and non-standard accounting methodology that tended to understate true default rates. *Id.* at 391-92. Plaintiffs' loss causation expert built a computer model "to compare the amount of cash that the Trust should have collected if the Trust's default rates were actually as they had been reported to the amount of cash that was actually collected by the Trust." *Id.* at 395. According to this model, if the allegedly "correct" accounting methodology had been used, and if the default rates had been accurate under that alternative method, the trust would have received sufficient or nearly sufficient cash to compensate investors in full. *Id.* at 396. The court held that this was a permissible methodology for

6

demonstrating loss causation, because it complied with the Second Circuit's requirement articulated in *Lentell* that plaintiffs must show that they "would have been spared all or an ascertainable portion of [the] loss absent the fraud." *Id.* at 403-04 (quoting *Lentell*, 396 F.3d at 175).

 *AIG Global* is significant for two reasons.  First, the *AIG Global* court applied *Lentell*'s disaggregation rule, thereby agreeing that disaggregation is required in the securitization context. Second, it highlights precisely what plaintiffs have failed to do here:  they have not even attempted to demonstrate that they "would have been spared all or an ascertainable portion of [the] loss absent the fraud."  As explained below, plaintiffs attribute their alleged losses to the collapse of the entire subprime RMBS market, a massive event that would have occurred regardless of the ratings on their specific investments.  And plaintiffs do not contend that they "would have been spared" any losses absent the alleged defects in the ratings identified by their ratings expert. (*See infra* pp. 12-14.)  Thus, far from supporting plaintiffs' position, *AIG Global* only reinforces their failure to comply with the Second Circuit's rule of disaggregation.[4]

### B. Dr. Goldstein Fails to Disaggregate Market Factors

 The report of Dr. Goldstein, the expert witness proffered by plaintiffs to prove loss causation, refutes rather than establishes their ability to do so.  The starting point of Dr. Goldstein's opinion is straightforward and not disputed:  Cheyne entered Enforcement because

---

[4] Contrary to plaintiffs' repeated suggestion, the *AIG Global* court did not reduce the loss causation burden on plaintiffs when it described their loss as involving a "decrease in the amount of money returned to them over the course of the securitization," as opposed to a sudden "decrease in market price."  *AIG Global*, 646 F. Supp. 2d at 403.  The concept of disaggregation is not concerned with how – or over what period of time – the loss is experienced, but rather the extent to which it was caused by the alleged fraud as opposed to other factors.  As the *AIG Global* court held, the loss causation testimony in that case was adequate because the expert demonstrated, using a computer model, the amount of the loss that plaintiffs "would have been spared" absent the fraud, thereby specifically isolating the impact of just the fraud alleged.  *Id.* at 403-04.  Plaintiffs here fail to do so.

of a drop in the market value of its assets, and specifically market price declines in subprime

RMBS and CDO holdings.  (*E.g.*, Goldstein Report (Ex. 1) at ¶17(b) ("The Cheyne SIV entered

'Enforcement' as a direct consequence of the marked fall in value of its Home Equity Loan

Residential Mortgage Backed Securities ('HEL RMBS') and Structured Finance Collateralized

Debt Obligations ('SF CDOs') (collectively the 'subprime assets')." ); *id.* at ¶17(c) (referring to

"[t]he price declines on subprime assets that drove the Cheyne SIV into Enforcement").)

     Dr. Goldstein then seeks to explain *why* Cheyne's assets declined in value and to attribute

those declines to certain credit ratings downgrades on July 10, 2007, which he assumes to be a

"revelation" of the relevant fraud.  (*Id.* at ¶¶74-78; Goldstein Rebuttal (Ex. 2) at ¶ 46.)  Dr.

Goldstein is incorrect, because these downgrade announcements are entirely disconnected from

the alleged fraud in this case.[5]  In any event, the ability of his analysis to demonstrate proximate

causation of any kind depends entirely on whether it *disaggregates* any fraud-related declines in

asset values from the host of conceded market forces that would have impacted those asset

values.  Some of those market forces as admitted by Dr. Goldstein would include, for example,

the housing market slowdown, including increasingly negative housing projections; market

reactions to the deteriorating financial health and failures of major financial institutions; and

various other macroeconomic indicators, such as interest rates, GDP, and unemployment.

(Goldstein Dep. (Ex. 5) at 106:3-13, 112:23-114:19, 118:15-20, 236:10-19; Goldstein Report

(Ex. 1) at ¶¶ 37-39.)  Plaintiffs are required to disaggregate these and other factors likely to have

---

[5] On July 10, 2007, the rating agencies announced downgrade and "credit watch" actions addressed to assets *never held* in the Cheyne SIV and *rated significantly lower* than the assets the Cheyne SIV did hold.  Thus, whatever causal impact Dr. Goldstein believes he can attribute to the July 2007 downgrades, it is not the causal impact of the alleged fraud actually at issue in this case.  Moreover, the notion that ratings downgrades could constitute a "revelation" of a fraud is incorrect as a matter of law.  *See Lentell*, 396 F.3d at 175 n.4 (downgrade of equity analyst's rating from "buy" to "neutral" is not "corrective" because it does not "reveal to the market the falsity of the prior recommendations").

impacted subprime asset prices, so that a jury could assign an ascertainable portion of the losses to the alleged fraud, while excluding the portion attributable to non-fraud factors. *See, e.g.*, *Lentell*, 396 F.3d at 175.

Plaintiffs cannot overcome this basic hurdle because Dr. Goldstein has not attempted any disaggregation at all. Quite the contrary, he affirmatively opines that the value declines of Cheyne's subprime assets are explained by a market-wide event. For example, Figure 4 of his rebuttal report, which depicts the "[c]hain of causality" that he purports to have "established" and "quantified," shows a "Market wide collapse in value of subprime RMBS assets" (step #3) as the precipitating factor for "Value of Cheyne SIV's HEL RMBS and SF CDOs collapse" (step #4). (Goldstein Rebuttal (Ex. 2) at ¶17, Figure 4.) Dr. Goldstein is clear that the event to which he attributes the declines in value of Cheyne's subprime assets is the collapse of *all* subprime assets market-wide – *i.e.*, an overall collapse in a more than trillion dollar, complex market impacted by a host of factors and the decisions of vast numbers of market participants. (*E.g.*, Goldstein Report (Ex. 1) at ¶¶17(c), 37-39; Goldstein Rebuttal (Ex. 2) at ¶16 (referring to "a problem across the *entire* subprime RMBS market") (emphasis in original).) Broad market movements such as these are precisely what Dr. Goldstein should be *disaggregating* from his causal analysis. Instead, he affirmatively attributes plaintiffs' losses to this broad market movement.

Dr. Goldstein expresses the same fatally flawed opinion in other ways throughout his report, often with reference to the ABX market index – a "highly liquid" and "representative" "benchmark for the performance of subprime RMBS" and a "gauge [of] market sentiment around the asset-class." (Goldstein Report (Ex. 1) at ¶¶44, 74; Goldstein Rebuttal (Ex. 2) at ¶ 36; Goldstein Dep. (Ex. 5) at 106:3-13 (ABX index is representative of the subprime market

generally "in the same sense that S&P 500 . . . is generally treated as representative of the overall U.S. stock market . . . ".)  Dr. Goldstein opines that the movement of this market index explains the entirety of the price decreases in the Cheyne SIV subprime assets that caused plaintiffs' losses:

- "Drops in the ABX Explain the Drops in Cheyne's HEL RMBS Portfolio" (Goldstein Rebuttal (Ex. 2) at 20, section heading IV.A.2);

- "[T]he overall decline in Cheyne SIV's subprime assets is best explained by the general decline in the ABX" (*id.* at ¶44);

- "[T]he ABX is an important factor driving the performance of Cheyne SIV's subprime assets – in fact, ***it is the only statistically significant factor in the relevant period***" (*id.* at ¶51(emphasis added)).

The "general decline in the ABX" that Dr. Goldstein opines "best explain[s] plaintiffs' alleged losses" is a broad market event that cannot be attributed to the Cheyne SIV ratings.  Dr. Goldstein admits that the ABX market index moves in response to various macroeconomic factors, including "housing prices," "interest rates," "expectations [for] GDP growth," and "unemployment."  (Goldstein Dep. (Ex. 5) at 106:3-13, 112:23-114:19.)  Thus, just like his opinion that plaintiffs' alleged losses resulted from a "[m]arket wide collapse in value of subprime RMBS assets," Dr. Goldstein's opinion that the alleged losses are explained by ABX declines is a concession that plaintiffs were harmed by economic forces unrelated to the alleged fraudulent ratings, none of which he has attempted to disaggregate.[6]

---

[6] Indeed, by conceding that the ABX index is a "benchmark" and a "proxy" for subprime RMBS market "sentiment" and "perception" (Goldstein Report (Ex. 1) at ¶¶ 72, 74, 84), Dr. Goldstein is equating the ABX with the same "tangle of factors" – including "changed investor expectations" – that the U.S. Supreme Court and the Second Circuit have said must be disaggregated from alleged losses.  *See In re Flag*, 574 F.3d at 36 (citing *Dura*, 544 U.S. at 342-43).  But instead of disaggregating the impact of ABX changes on Cheyne's asset values, Dr. Goldstein opines that movements in Cheyne's asset values are entirely "explained by" the ABX.  In other words, he is affirmatively attributing Cheyne's asset value declines – and therefore plaintiffs' losses – to the "tangle of factors" that he is instead required to strip away.

Notwithstanding his failure to disaggregate, Dr. Goldstein claims he can still establish loss causation based on the remarkable opinion that defendants caused the market-wide collapse itself, through the assumed misrating of *all* subprime securities.[7]  As depicted in his "[c]hain of causality," Dr. Goldstein opines that the "[m]arket wide collapse" responsible for plaintiffs' alleged losses (step #3) was caused when the "[m]arket los[t] faith in credit ratings" (step #2), which purportedly occurred when there was a "[r]evelation of the misrepresented credit quality" of subprime assets generally (step #1).  (Goldstein Rebuttal (Ex. 2) at ¶17, Figure 4.)  In other words, plaintiffs are arguing that defendants engaged in a market-wide ratings fraud over the course of years, which, when revealed, single-handedly caused the collapse of the more than trillion dollar subprime RMBS market (which moves in responses to innumerable factors other than credit ratings), and thus that plaintiffs in this case can recover 100% of their investment losses by attributing them to the market collapse.[8]

This theory is as legally wrong as it is factually baseless.  The notion that defendants could be held responsible for losses *admittedly* caused by a "market wide collapse" because defendants supposedly caused the collapse (through an assumed, but unalleged, market-wide fraud) is without legal precedent and incorrect as a matter of law.  Losses caused by the market

---

[7] *E.g.*, Goldstein Rebuttal (Ex. 2) at ¶16 ("[I]nflated subprime ratings caused a problem across the *entire* subprime RMBS market" (emphasis in original)); *see also id.* at ¶15 (criticizing defendants' expert as "rel[ying] on the false argument that by simply attributing the 'cause' of 'collapse to a 'market-wide event,' it automatically disqualifies the possibility that Defendants' actions could have been causal").

[8] Consistent with this sweeping and unprecedented theory, plaintiffs have recently claimed that defendants are responsible for the collapse of Bear Stearns, and that Dr. Goldstein was therefore justified in not disaggregating the impact of that event as part of his loss causation analysis.  (Pls' Daubert Opp. (Dkt. # 577) at 26 (characterizing the collapse of Bear Stearns as a "symptom" and "consequence" of "underlying problems in the subprime RMBS sector after the rating agencies' announcements," the occurrence of which "did not break the link of loss causation from the fraudulent ratings").)  That plaintiffs would resort to such a theory only underscores their inability to identify any proximate link between the alleged fraud and their alleged losses.

are the antithesis of fraud-related damages, and thus, loss causation experts must *control for* market-wide events.  (*See supra* pp. 3-7.)  Dr. Goldstein's attempt to blame defendants for the collapse of the entire subprime RMBS market flies in the face of *Dura Pharmaceuticals* and Second Circuit loss causation law, which are premised on the notion that the "tangle of factors" contributing to market movements must be stripped away, so as to reveal only that portion of plaintiffs' alleged losses specifically and proximately caused by the alleged fraud, and to avoid converting defendants into guarantors against market losses.  *See, e.g.*, *Dura*, 544 U.S. at 345 (securities actions not intended to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.")  Dr. Goldstein has made no attempt to separate market factors, and plaintiffs therefore cannot establish loss causation.[9]

## C.    Dr. Goldstein Fails to Analyze the Alleged Cheyne Ratings Defects

In a related failure to offer any permissible loss causation opinion, Dr. Goldstein fails to analyze the causal impact, if any, of the alleged defects identified by plaintiffs' ratings expert, Dr. Das.  Plaintiffs retained Dr. Das as a "quantitative modeling expert" to identify the components of the Cheyne SIV ratings that they claimed were not "justified and appropriate."

---

[9] Plaintiffs have recently suggested that they could survive summary judgment as to loss causation even without Dr. Goldstein, because they have proffered emails and other documentary evidence purportedly showing a causal link between the alleged fraud and their alleged losses. (2/12/13 Letter from L. Brooks to J. Scheindlin at 4.)  This suggestion is baseless.  Plaintiffs have already conceded, and the Court has recognized, that plaintiffs need expert testimony to establish loss causation.  (2/8/12 Hr'g Tr. (Ex. 7) at 19:2-20:02 (COURT:  "That is the only way . . . that you intended to address loss causation was through your expert?" / PLAINTIFFS' COUNSEL:  "For loss causation, yes." / COURT:  "Then that one expert can put in a declaration.  *Obviously, you have to*." (emphasis added)).)  In any event, plaintiffs do not explain how their non-expert loss causation evidence could somehow meet their disaggregation burden – specifically, how it could conceivably provide the jury with a methodology for ascribing an ascertainable portion of the losses to the alleged fraud, rather than to market-based and other non-fraud-related factors.

(Dkt. # 378 at 11 (citing Dkt. # 380 at ¶¶ 5-6); *see also* Pls.' Draft JPTO (Ex. 9) at 8 (describing Dr. Das's testimony as addressing "the deficiencies in the models, data, assumptions and parameters used by the defendants to rate the Cheyne SIV's notes").)  Dr. Das has submitted a report analyzing whether the ratings were correct, and how – in his view – correct ratings should have been assigned.  He addresses, for example:

- the appropriate degree of "stress testing" of "ratings transitions" and "spread transitions" (Das Report (Ex. 3) at ¶¶35-44);

- the use of a "t-copula" as opposed to "Gaussian copula" model (*id.* at ¶¶45-47);

- the extent to which "liquidity risk" in stressed markets was accounted for (*id.* at¶¶ 50-55);

- the propriety of the reduction of the "Junior Capital Leverage test" from 1.0% to 0.75% (*id.* at ¶55);

- the extent to which the possibility of liquidation discounts was accounted for (*id.* at ¶¶56-60);

- estimation of asset-specific "haircuts" (*id.* at ¶¶61-66); and

- stress testing and estimation of the SIV's "capital requirements" (*id.* at ¶¶67-72).

Dr. Das purports to have analyzed these and other factors and to have concluded that, in his judgment, these issues should have been addressed before the Cheyne notes could have properly received the ratings that they did.  (*Id.* at ¶11.)

Yet, Dr. Das never opines that plaintiffs would have been spared any of their losses if each of these various factors had been addressed as he now (with hindsight) opines would have been "correct."  Nor does Dr. Goldstein, as plaintiffs' loss causation expert, analyze the supposed errors identified by Dr. Das and opine that "correcting" them would have avoided any portion of plaintiffs' alleged losses.  (Goldstein Dep. (Ex. 5) at 86:13-17 (Q. "And have you analyzed in your report how correcting the supposed errors identified by Dr. Das would have affected plaintiffs' losses?" A: "No.").)  Plaintiffs' failure to proffer any expert testimony to show that

they "would have been spared all or an ascertainable portion of [their] loss absent the fraud" is fatal to their claims. *Lentell*, 396 F.3d at 175; *AIG Global*, 646 F. Supp. at 403-04. *Defendants'* loss causation expert, by contrast, did analyze the allegedly concealed methodological defects and demonstrated that they would *not* have avoided plaintiffs' losses. (Grenadier Report (Ex. 4) at ¶¶55-63.) None of plaintiffs' experts have attempted to counter this analysis. For this reason as well, Dr. Goldstein neither attributes any portion of plaintiffs' alleged losses to the allegedly fraudulent ratings nor disaggregates losses caused by non-fraud-related factors.

## II.   Plaintiffs' New "Concealed Vulnerability" Theory is Legally Deficient

Plaintiffs have recently introduced yet another theory of loss causation, under which (as in Dr. Goldstein's construct), their alleged losses were caused by a market-wide event – specifically, a "slowdown in housing." (2/12/13 Letter from L. Brooks to Judge Scheindlin (Ex. 10) at 10 ("[T]he *slowdown in housing* was ultimately what caused plaintiffs' losses (through various channels)." (emphasis added)).) But instead of attempting to defend Dr. Goldstein's indefensible conclusion that the defendants caused the market-wide event, plaintiffs advance another argument: regardless of what caused the event, the Cheyne SIV ratings allegedly concealed Cheyne's vulnerability to the occurrence of the event. (*E.g., id.* at 8 ("[T]he false ratings masked the vulnerability of Cheyne's subprime assets to housing declines . . . ."); *id.* at 9 ("[T]he fraudulent ratings indeed concealed the high vulnerability of Cheyne's subprime assets to even small shifts in the housing market . . . ."); *id.* at 10 ("[T]he fraudulent ratings by defendants concealed the vulnerability of Cheyne's Notes to the slowdown in housing.").) [10] The

---

[10] At the February 14 conference, plaintiffs refused to rule out the possibility that they are actually alleging that defendants caused the slowdown in housing. (2/14/13 Hr'g Tr. (Ex. 8) at 36:5-15 (COURT: "[A]re you saying the false ratings caused the collapse of the housing market? . . . Are you saying that? / PLAINTIFFS' COUNSEL: "I don't want to answer yes or no, because I know they are going to throw it in some letter later and misconstrue it.").) As the

premise of this new theory is that loss causation can be inferred from the fact that the value of Cheyne's subprime assets declined sufficiently to send Cheyne into Enforcement, because Cheyne's ratings were supposedly a guarantee that such declines would not occur.  As plaintiffs explain it, the mere fact that this value decline in Cheyne's subprime assets occurred is "*by itself enough* to establish loss causation under the relevant standard," because this occurrence was purportedly "within the 'zone of risk'" concealed by the Cheyne ratings.  (Pls' Daubert Opp. (Dkt. #577 at 16-17 (emphasis added).)[11]

As with their principal theory, this new approach would effectively eliminate the loss causation requirement and make defendants the guarantors of plaintiffs' investments in the Cheyne notes.  Here again, plaintiffs fail to perform the disaggregation necessary under Second Circuit law.  They simply assert that 100% of their losses resulted from an allegedly concealed risk that Cheyne could lose value due to market changes.  But what about the impact of Cheyne's *disclosed* risk of loss from market changes?  It is undisputed that Cheyne's leverage and asset allocation – including its exposure to subprime RMBS assets – were communicated to

---

Court recognized, any such theory would not be sustainable.  (*Id.* at 47:2-3 (COURT: "I think the ratings didn't cause the housing market crisis.").)

[11] Plaintiffs' "zone of risk" definition under their new theory is barred by the Second Circuit's decision in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007).  *Lattanzio* teaches that the "zone of risk" cannot be defined so broadly as to effectively remove the loss causation element from plaintiffs' claim.  *See id.* at 157 ("[I]f *Lentell*'s 'zone of risk' could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement.").  But that is precisely the consequence of plaintiffs' new theory.  If plaintiffs were permitted to define the "zone of risk" allegedly concealed by the defendant so broadly as to include the risk that Cheyne investors could lose money in the event of a market downturn (a risk that was obviously not capable of being concealed), then *any* losses, even those fully caused by a market downturn, could be deemed to have resulted from a "materialization" of the defined risk. That approach would, directly contrary to Second Circuit law, not only render loss causation self-proving without any need to disaggregate, but also would subsume the loss causation element in the misstatement element.

investors, and the fact that these asset types could lose value in the event of a housing slowdown or other market downturn was certainly not concealed (or capable of being concealed).  Investors also knew, based on Cheyne's disclosed leverage and asset allocation, exactly how much asset value decline could occur before they would experience losses, and what would happen to Cheyne based on the value of its assets at any given time, including the precise point at which it would enter Enforcement.  (Grenadier Dep. (Ex. 6) at 55:21-58:7; Das Dep. (Ex. 11) at 223:20-224:16.)  To whatever extent plaintiffs claim that Cheyne faced *undisclosed* risk of market exposure, they must provide the jury with some methodology for disaggregating the impact of *disclosed* market exposure from allegedly undisclosed or concealed risks.  They have utterly failed to do so.

Plaintiffs' ratings expert, Dr. Das, has identified alleged defects in the ratings; yet neither he nor any other of plaintiffs' experts has attempted to quantify the causal impact of such alleged defects on plaintiffs' losses.  Nor have plaintiffs contested defendants' showing that correcting these alleged defects would have made no difference, given the extent of the market-wide downturn.  (*See supra* pp. 12-14.)  This showing is telling because, if plaintiffs' losses are not explained by any allegedly concealed defect in the SIV's ratings, then those losses must be explained by other, non-fraud factors.  But plaintiffs have not disentangled those other factors, leaving the jury with no basis for assigning any ascertainable portion of the alleged losses to the allegedly fraudulent ratings.  This failure violates Second Circuit law and requires summary judgment for defendants as to loss causation.

**CONCLUSION**

For the foregoing reasons, defendants' renewed motion for summary judgment should be

granted.

Dated: New York, New York
       March 6, 2013

DAVIS POLK & WARDWELL LLP

By:    /s/ James P. Rouhandeh
       James P. Rouhandeh
       james.rouhandeh@davispolk.com
       Antonio J. Perez-Marques
       antonio.perez@davispolk.com
       Paul S. Mishkin
       paul.mishkin@davispolk.com

       450 Lexington Avenue
       New York, New York 10017
       (212) 450-4000

       *Counsel for Defendants Morgan Stanley & Co.*
       *Inc. and Morgan Stanley & Co. Int'l Ltd.*

CAHILL GORDON & REINDEL LLP

By:    /s/ Dean Ringel
       Floyd Abrams
       fabrams@cahill.com
       Charles A. Gilman
       cgilman@cahill.com
       Dean Ringel
       dringel@cahill.com
       Tammy L. Roy
       troy@cahill.com
       Jason M. Hall
       jhall@cahill.com

       80 Pine Street
       New York, New York 10005
       (212) 701-3000

       *Counsel for Defendants Standard & Poor's*
       *Ratings Services and The McGraw-Hill*

*Companies, Inc.*

SATTERLEE STEPHENS BURKE &
BURKE LLP


By:    /s/ Joshua M. Rubins
      Joshua M. Rubins
      jrubins@ssbb.com
      James J. Coster
      jcoster@ssbb.com
      Mario Aieta
      maieta@ssbb.com
      James I. Doty
      jdoty@ssbb.com

230 Park Avenue
11th Floor
New York, New York 10169
(212) 818-9200

*Counsel for Defendants Moody's Investors
Service, Inc. and Moody's Investors Service Ltd.*


GIBSON, DUNN & CRUTCHER LLP


By:    /s/ Mark Kirsch
      Mark A. Kirsch
      mkirsch@gibsondunn.com
      Joel M. Cohen
      jcohen@gibsondunn.com
      Lawrence J. Zweifach
      lzweifach@gibsondunn.com
      Christopher M. Joralemon
      cjoralemon@gibsondunn.com
      Mary Kay Dunning
      mkdunning@gibsondunn.com

200 Park Avenue,
New York, NY 10166-0193
(212) 351-2607

*Counsel for Defendants Moody's Investors
Service, Inc. and Moody's Investors Service Ltd.*