UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
ABU DHABI COMMERCIAL BANK, et al.,　:　　Civil Action No. 1:08-cv-07508-SAS-DCF
Individually and On Behalf of All Others　:
Similarly Situated,　　　　　　　　　　　:　　CLASS ACTION
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Plaintiffs,　:　　PLAINTIFFS' OPPOSITION TO
　　　　　　　　　　　　　　　　　　　　:　　DEFENDANTS' RENEWED MOTION FOR
　　　vs.　　　　　　　　　　　　　　　:　　SUMMARY JUDGMENT
　　　　　　　　　　　　　　　　　　　　:
MORGAN STANLEY & CO.　　　　　　　　:
INCORPORATED, et al.,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　:
　　　　　　　　　　　　　　　　　　　　:
———————————————————————— x

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    LEGAL STANDARD.........................................................................................3

III.   ARGUMENT .....................................................................................................3

     A.    The Court Has Already Rejected Defendants' Loss Causation Arguments ............3

     B.    The Defendants Have Not Satisfied Their Burden of Demonstrating that a Jury Could Not Reasonably Infer Some Portion of Plaintiffs' Loss Was Concealed by Defendants' Fraud.............................................................................5

     C.    Plaintiffs' Evidence Provides the Jury with a Reasonable Basis for Ascribing Plaintiffs' Losses to Defendants' Fraud .................................................9

          1.    Information Misstated: The Fraudulent Ratings Concealed Material Risks.........................................................................................................9

          2.    Evidence of Plaintiffs' Investment Losses.................................................11

          3.    Evidence of the Relationship Between Defendants' Misstatements and Plaintiffs' Losses ...............................................................................12

               a.    Plaintiffs' Losses Were Within the "Zone of Risk".......................12

               b.    Dr. Goldstein Analyzed and Isolated Non-Fraud Factors.............14

               c.    Defendants' Admissions and Other Contemporaneous Evidence Raise a Triable Issue of Fact .........................................17

     D.    Dr. Goldstein's Opinions Tie Directly to Plaintiffs' Liability Evidence ..............19

# TABLE OF AUTHORITIES

Page

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    888 F. Supp. 2d 431, 2012 WL 3584278
    (S.D.N.Y. 2012) .................................................................................................... *passim*

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
    646 F. Supp. 2d 385 (S.D.N.Y. 2009),
    *aff'd*, 386 F. App'x 5 (2d Cir. 2010) ................................................................. 5, 6

*Basis Yield Alpha Fund (Master) ("BYAFM") v.*
    *Goldman Sachs Grp., Inc.*,
    37 Misc. 3d 1212-A (N.Y. Sup. Ct. 2012) ................................................. 7, 16, 20

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) .......................................................................... 13

*Chambers v. TRM Copy Ctrs. Corp.*,
    43 F.3d 29 (2d Cir. 1994) ................................................................................ 3

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................ 5

*In re Blech Sec. Litig.*,
    No. 94 Civ. 7696(RWS), 2003 WL 1610775
    (S.D.N.Y. Mar. 26, 2003) ............................................................................... 20

*In re Charles Schwab Corp. Sec. Litig.*,
    No. C 08-01510 WHA, 2010 WL 1463490
    (N.D. Cal. Apr. 8, 2010) ................................................................................... 8

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ........................................................................... 13

*In re Sadia*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ............................................................... 15, 16

*In re Tronox, Inc. Sec. Litig.*,
    No. 09 Civ. 6220(SAS), 2010 WL 2835545
    (S.D.N.Y. June 28, 2010) ................................................................................ 15

*King Cnty. v. IKB Deutsche Industriebank AG*
    708 F. Supp. 2d 334 (S.D.N.Y. 2010) .......................................................... 8, 13

- ii -

**Page**

*Lau v. Mezei,*
   No. 10 CV 4838 (KMW), 2012 WL 3553092
   (S.D.N.Y. Aug. 16, 2012) ...........................................................................16

*Laub v. Faessel,*
   745 N.Y.S.2d 534 (1st Dep't 2002) ...............................................................6

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005)................................................................ *passim*

*Liberty Media Corp., LMC v. Vivendi Universal, S.A.,*
   No. 03 Civ. 2175(SAS), 2013 U.S. Dist. LEXIS 19485
   (S.D.N.Y. Feb. 12, 2013) ...............................................................................5

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,*
   928 N.Y.S.2d 229 (1st Dep't 2011) ........................................................16, 20

*Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.,*
   801 F.2d 13 (2d Cir. 1986)...........................................................................13

*Movitz v. First Nat'l Bank,*
   148 F.3d 760 (7th Cir. Ill. 1998) ....................................................................6

*Schwarz v. ThinkStrategy Capital Mgmt. LLC,*
   No. 09 Civ. 9346(PAE), 2012 WL 2026365
   (S.D.N.Y. May 31, 2012) .............................................................................20

*SEC v. Razmilovic,*
   822 F. Supp. 2d 234 (E.D.N.Y. 2011) .............................................................8

*Siemens Westinghouse Power Corp. v. Dick Corp.,*
   219 F.R.D. 552 (S.D.N.Y. 2004) ....................................................................5

822373_1

# I.     INTRODUCTION

Far from meeting their burden of demonstrating "that a jury could not reasonably infer from the available evidence that *some* portion of plaintiffs' losses were caused by defendants' fraud," defendants' Renewed Motion for Summary Judgment rehashes the exact same arguments the Court already rejected. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 2012 WL 3584278, at *19 (S.D.N.Y. 2012) ("SJ Opinion") (emphasis in original).[1] Defendants' last ditch attempt to avoid trial for their fraud should be denied for several reasons.

Defendants' motion merely repeats arguments that the Court already considered and rejected. As plaintiffs already have established "[i]n great detail," there is evidence sufficient to show a direct relationship between plaintiffs' investment losses and defendants' misstatements. *Id.* at *19. Since that ruling, plaintiffs' theory has not changed.  Plaintiffs have consistently demonstrated that their losses were (1) caused by the materialization of the risks concealed by defendants' false ratings, and (2) within the "zone of risk."

Defendants' "disaggregation" arguments – already rejected by the Court (*id.*) – misconstrue the applicable law.  First, their price-disaggregation theory does not apply to this case, which is not a fraud-on-the-market action.  The Court held that plaintiffs' losses are measured by the amount of their investment less the amount that was returned to them when the Cheyne SIV collapsed and its assets were liquidated in a competitive auction. *Id.* at *22.  Because plaintiffs' losses are not based on market price, defendants' price-disaggregation arguments are inapplicable.

Second, defendants have no legal basis for their claim that plaintiffs must disaggregate losses Cheyne incurred on its underlying subprime HELs from losses suffered by other subprime HELs in

---

[1]     All citations are omitted and emphasis is added unless otherwise noted.

the market that were constructed the same way, contained the same bad mortgages, and had the same credit problems.  In the Second Circuit, "loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).  Defendants ignore this standard.  Dr. Goldstein's analysis and plaintiffs' other evidence show that the relationship is more than sufficient to establish loss causation.

Dr. Goldstein's analysis ruled out the possibility that plaintiffs' losses were caused by a simple market decline or any other non-fraud factors.  Goldstein Report (Dkt. No. 587-1), ¶¶87-94; Goldstein Rebuttal (Dkt. No. 587-2), ¶¶9-13.  Dr. Goldstein established that Cheyne's collapse was caused by the emergence of concealed credit problems.  He also showed that true "AAA" securities, and even far "weaker" BB rated corporate bonds, saw no price declines throughout the "worldwide" crisis on which defendants seek to lay blame.  Goldstein Rebuttal, ¶¶11-12.  The stock market hit its all time high more than a month after Cheyne entered enforcement and just days before it was declared insolvent.  *Id.*, ¶¶13, 93.  In short, the "market" did not cause Cheyne to collapse.

To the contrary, plaintiffs' losses were caused by the fact that the Cheyne SIV's false ratings concealed the true credit risks associated with the SIV's notes, including – among other problems – the poor quality of subprime HELs in the Cheyne SIV portfolio.  The evidence demonstrates that the Cheyne SIV's HELs were choked with toxic mortgages that began to suffer high rates of serious delinquencies almost as soon as housing prices flattened.  Goldstein Report, ¶¶36, 40.  Dr. Goldstein's analysis demonstrates a direct link between defendants' fraud and plaintiffs' losses, and a reasonable jury could conclude that after the risks concealed by Cheyne's false ratings materialized, the SIV collapsed and caused plaintiffs harm.  The evidence is more than sufficient to

- 2 -

raise a question of fact as to whether plaintiffs' losses were caused by defendants' fraud. Defendants' motion should be denied again.

## II.   LEGAL STANDARD

At summary judgment, "'[t]he burden of demonstrating that no material fact exists lies with the moving party.'" *Abu Dhabi*, 2012 WL 3584278, at *3. To prevail on the issue of loss causation at summary judgment, "defendants must demonstrate that a jury could not reasonably infer from the available evidence that ***some*** portion of plaintiffs' losses were caused by defendants' fraud." *Id*. at *19 (emphasis in original). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## III.   ARGUMENT

### A.   The Court Has Already Rejected Defendants' Loss Causation Arguments

Defendants' "renewed" motion simply repeats the legal arguments the Court has already heard and rejected. Although defendants assert a "critical change in plaintiffs' loss causation theory," plaintiffs' theory has not changed. During the first round of summary judgment, plaintiffs presented evidence that their losses were (1) caused by the materialization of the risks concealed by the false ratings on the Cheyne SIV, namely, the poor quality of the Cheyne SIV's subprime assets and the Cheyne SIV's insufficient structural protections; and (2) within the "zone of risk" concealed by the false ratings. *See generally* MSJ Opp. (Dkt. No. 430), §II.E.1. ("Plaintiffs' Losses Were Caused by the Materialization of the Risks Concealed by Defendants' Fraud"); *id*., §II.E.2. ("Plaintiffs' Losses Were Within the 'Zone of Risk'"). This position has not changed. *See, e.g.*, Goldstein Report, ¶¶10, 60.

- 3 -

Defendants first argue that plaintiffs fail to disaggregate their losses from the general market decline.  *See* Renewed MSJ (Dkt. No. 586), §I.A.-B.  This is the exact same argument defendants advanced in their first summary judgment motion, where they argued that plaintiffs failed to "disentangle" and "separate losses caused by the alleged fraud from losses caused by the undisputed market decline."  MSJ Reply (Dkt. No. 460) at 18-19.  In rejecting this identical argument, the Court held that "'[p]laintiffs need not demonstrate that defendants' misstatements or omissions caused ***all*** of plaintiffs' losses.'  Summary judgment is inappropriate so long as plaintiffs provide evidence 'that would allow a factfinder to ascribe some ***rough*** proportion of the whole loss to [the defendant's alleged] misstatements.'"  *Abu Dhabi*, 2012 WL 3584278, at *19 (emphasis in original).  Despite defendants' mischaracterization of Dr. Goldstein's opinions, the evidence remains the same.

Defendants next complain about plaintiffs' "new 'concealed vulnerability' theory."  Renewed MSJ at 14.  But plaintiffs have always alleged that their losses were caused by the materialization of the concealed risks of "the poor quality of the Cheyne SIV's toxic assets, the risks posed by the Cheyne SIV's woefully insufficient structural protections, and a deeply flawed ratings process" and that such losses were "precisely within the 'zone of risk'" concealed by the false ratings.  MSJ Opp. at 33.  The Court held that "a disputed issue of fact remains as to whether the ratings concealed a risk which caused some portion of the plaintiffs' losses."  *Abu Dhabi*, 2012 WL 3584278, at *20.

Finally, defendants assert that the SIV's risks were fully disclosed.  Renewed MSJ at 15-16.  Once again, defendants advanced this identical argument in their first summary judgment brief.  *See* MSJ (Dkt. No. 458), §IV.C.  The Court rejected that argument, finding that "[w]hile plaintiffs may have understood that there were certain risks inherent in the structure of SIVs, plaintiffs may ***not*** have understood that ratings reported by NRSROs such as Moody's and S&P might lack factual support or fail to accurately report the risky nature of this investment."  *Abu Dhabi*, 2012 WL

- 4 -

3584278, at *20 (emphasis in original).  Again, none of this has changed.[2]

**B.    The Defendants Have Not Satisfied Their Burden of Demonstrating that a Jury Could Not Reasonably Infer Some Portion of Plaintiffs' Loss Was Concealed by Defendants' Fraud**

Defendants' claim that plaintiffs must disaggregate the decline in value of the Cheyne SIV's HELs from the decline in value of other, similar subprime RMBS assets is meritless.  Renewed MSJ at 9.  First, defendants' theory fails because their price disaggregation analysis does not apply to this case.  In the SJ Opinion, and again at the February 14, 2013 hearing, the Court recognized that there are fundamental differences between this case and standard securities stock-drop cases that impact the loss causation analysis, including the application of any "disaggregation" requirement.  2/14/13 Hrg. Tr. 47:19-48:2; *Abu Dhabi*, 2012 WL 3584278, at *20-*22.

Disaggregation is a concept used in fraud-on-the-market cases, where in order to prove loss causation plaintiffs are required to separate the impact of fraud-related "materialization events" from "non-fraud-related 'confounding' events."  *Liberty Media Corp., LMC v. Vivendi Universal, S.A.*, No. 03 Civ. 2175(SAS), 2013 U.S. Dist. LEXIS 19485, at *3 (S.D.N.Y. Feb. 12, 2013).  It is an inherently stock price-based analysis, applied only where plaintiffs seek "damages for declines in [defendant's] ***stock price***" caused by materializations of previously concealed risks.  *Id.*; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  But in this case, as in *AIG*, plaintiffs invested in the Cheyne notes "'with the expectation that they would receive a stream of interest payments for the life of the securitization and, at the end of the securitization, the return of their principal.'"  *Abu*

---

[2]    Defendants' attempt to advance a new theory, contending that there can be no loss causation because other securities suffered credit problems violates the well-established rule that parties must "'present their strongest case for summary judgment when the matter is first raised.'"  *Siemens Westinghouse Power Corp. v. Dick Corp.*, 219 F.R.D. 552, 554 (S.D.N.Y. 2004).  Permitting defendants to change theories, after plaintiffs retained Dr. Goldstein, who relied on the Court's prior opinion, would unduly prejudice plaintiffs.  Defendants' belated theory must await trial.

*Dhabi*, 2012 WL 3584278, at *22 (quoting *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403-04 (S.D.N.Y. 2009), *aff'd*, 386 F. App'x 5 (2d Cir. 2010)).   Thus, "plaintiff[s] may demonstrate loss causation by showing a causal link between the fraud and a 'decrease in the amount of money returned to [plaintiffs] over the course of the securitization.'" *Id.* at *20.   Because "the plaintiffs' loss was not a decrease in ***market price***," defendants' price-disaggregation arguments are not applicable. *AIG*, 646 F. Supp. 2d at 403.   In fact, the court in *AIG* expressly rejected the argument that defendants advance here because it "confuses loss causation with apportionment." *Id.* at 402.[3]

Second, the fact that other subprime RMBS securities – backed by exactly the same types of risky mortgages and suffering similar high rates of delinquencies – also suffered price declines at the same time as Cheyne's HELs does not defeat causation.   As the Court recognized during the February 14, 2013 hearing, plaintiffs are not required to prove that Cheyne's subprime assets performed differently than other subprime securities in the market. 2/14/13 Hrg. Tr. at 33:15-24 ("It's not the market. It's that portion of the market that was suffering in the exact same way as the investors in the Cheyne SIV, namely, the RMBS securitization market. . . .   The subprime securitization market, RMBS securitization market, is more than Cheyne but it's not the entire

---

[3]     The cases defendants cite do not hold differently.   Renewed MSJ at 5-6.   For example, although defendants assert that *AIG* "appl[ied] [that] *Lentell* disaggregation test in [a] securitization case" (*id.* at 6), *AIG* does not apply the concept of disaggregation, or even contain the word.   Like *AIG*, defendants' other cases stand for the simple proposition that to prove loss causation, plaintiffs must establish a connection between the fraud and finding plaintiffs' losses. *Laub v. Faessel*, 745 N.Y.S.2d 534, 537 (1st Dep't 2002) (loss causation was not established in open market case because plaintiff failed to allege that defendants made "any misrepresentations about" any specific company or stock); *id.* at 535-37; *Movitz v. First Nat'l Bank*, 148 F.3d 760, 761 (7th Cir. Ill. 1998) (finding no loss causation in case decided under Illinois state law where misrepresentation concerned net income and structural soundness of physical building that had no connection to losses, which were due to market collapse). Defendants' conflation of this standard with their heightened "disaggregation" requirement is an error that permeates their brief.

market."); *id.* at 34:6-9.[4]  The Court summed it up: "To use the word 'market' loosely is causing a problem."  2/14/13 Hrg. Tr. at 34:11.

Rather, plaintiffs' losses were caused by the fact that the Cheyne SIV's false ratings concealed the true credit risks associated with the SIV's notes.  MSJ Opp. at 41; *Abu Dhabi*, 2012 WL 3584278, at *19.  Those concealed credit risks included, among other problems, the poor quality of subprime HELs in the Cheyne SIV portfolio.  MSJ Opp. at 41; *In Limine* Opp. (Dkt. No. 568) at 19-20.  The evidence shows that the Cheyne SIV's HELs were stuffed to the gills with toxic mortgages that began to suffer high rates of serious delinquencies almost as soon as housing prices flattened – a foreseeable event.  *Compare* Goldstein Report, ¶40, Fig. 4 (illustrating delinquencies) *with id.*, ¶36, Fig. 2 (showing flat-to-mild housing price declines).

The fact that ***other*** subprime RMBS referenced by ABX indices with similar characteristics and suffering from the ***same*** delinquency problems as those in the Cheyne portfolio also lost value does nothing to demonstrate that the Cheyne SIV's ratings were not false, or break the chain of causality.  *Id.*, ¶71, Fig. 11 (demonstrating a nearly exact (0.98) correlation between 90+ day delinquencies in Cheyne HELs and those referenced by the ABX).  Prices on both sets of these poor performing assets declined ***due to credit problems***, when the market began to understand that the assigned ratings were no longer an appropriate gauge of risk.  Goldstein Report, ¶¶83-86; Ex. 1 (Timeline of Cheyne SIV's Collapse).[5]  Dr. Goldstein's analyses therefore show a direct link

---

[4]    *Accord Basis Yield Alpha Fund (Master) ("BYAFM") v. Goldman Sachs Grp., Inc.*, 37 Misc. 3d 1212-A, 20 (N.Y. Sup. Ct. 2012) ("While it is obviously true that the collapse of the housing market led to BYAFM incurring a loss on the securities, causation has been established because, but for Goldman's representations, BYAFM alleges it would never have purchased the securities and suffered a loss that was foreseeably related to Goldman's representations.").

[5]    All exhibit ("Ex.") references are to the Declaration of Luke O. Brooks in Support of Plaintiffs' Opposition to Defendants' Renewed Motion for Summary Judgment.

between defendants' fraud and plaintiffs' losses, and a jury could reasonably conclude that after the risks concealed by Cheyne's false ratings materialized, the SIV collapsed and plaintiffs lost much (Senior Noteholders) or all (Capital Noteholders) of their money.

*Lentell* does not compel a different conclusion. In *Lentell,* the plaintiffs claimed that the defendants issued false and misleading reports recommending that investors purchase shares of public companies. 396 F.3d at 174. The Second Circuit held that there was no connection between the fraud and plaintiffs' losses, which were caused by an ***unrelated*** market-wide event. *Id.* at 175-76. However, "the Second Circuit expressly distinguished [*Lentell*] from cases, such as this one, in which some or all of the risk materialized was clearly concealed by defendant's misstatement or omission." *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 263-64 (E.D.N.Y. 2011) (citing *Lentell*, 396 F.3d at 164, 175). As this Court recognized in *King County*, "*Lentell* does not say that the existence of a market-wide phenomenon necessarily ***eliminates*** a plausible causal connection between plaintiffs' losses and defendants' alleged fraud." *King Cnty.*, 708 F. Supp. 2d at 343 (emphasis in original). The illustration the Court used in *King County* is applicable:

> "[I]f a mutual fund holds itself out as investing no more than 25 percent in a single industry but then, as actually planned, invests fifty percent in a single industry, there is no escape by blaming the industry [upon its decline] rather than the promoter. The materialization of the concealed risk causes the loss."

*Id.* & n.63 (quoting *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2010 WL 1463490, at *6 (N.D. Cal. Apr. 8, 2010)).

Here, the false ratings concealed the risk that caused plaintiffs' losses, and "'there is no escape by blaming'" the market. *Id.* A jury could reasonably find that defendants' false ratings are sufficiently connected to plaintiffs' losses because they concealed a risk that materialized (*Lentell*, 396 F.3d. at 173), not because they "caused" that risk to materialize – a false standard that defendants advance. *Id.* ("[I]t cannot ordinarily be said that a drop in the value of a security is

- 8 -

'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated.").  Defendants cannot meet their burden; summary judgment should still be denied.

### C.   Plaintiffs' Evidence Provides the Jury with a Reasonable Basis for Ascribing Plaintiffs' Losses to Defendants' Fraud

Loss causation analysis is "fact-based," *Lentell*, 396 F.3d at 174, not, as defendants contend, "purely a legal question."   Renewed MSJ   at 1.   *Lentell* calls for a three-step analysis: (1) determining the information misstated; (2) determining plaintiffs' investment losses; and (3) adducing facts to show a relationship between the misstatements and losses.   In this case, plaintiffs have adduced sufficient "evidence 'that would allow a factfinder to ascribe some ***rough*** proportion of the whole loss to [the defendant's alleged] misstatements.'"   *Abu Dhabi*, 2012 WL 3584278, at *19 (emphasis in original).   In fact, there is evidence sufficient to show a direct relationship between all of plaintiffs' losses and defendants' misstatements, and defendants have come forward with no contrary evidence.   Defendants' call for disaggregation is, under these circumstances, baseless.

### 1.   Information Misstated: The Fraudulent Ratings Concealed Material Risks

The "information misstated" in this case consists of credit ratings.   *Lentell*, 396 F.3d at 174. Defendants stated that Cheyne's credit ratings were A-1+/P-1, AAA/Aaa, and A/A3, ranging from Senior to Mezzanine Rated Notes.   These statements are terms of art – they mean "that the rating agency has analyzed data, conducted an assessment, and reached a ***fact-based*** conclusion as to creditworthiness."   *Abu Dhabi*, 2012 WL 3584278, at *10 (emphasis in original).   As the Court held, "according to Moody's, an Aaa rating describes assets that 'should survive the equivalent of the U.S. Great Depression, undoubtedly with downgrades but with no loss to Aaa holders.'"   *Id*. at *19.

- 9 -

S&P's AAA rating means the same thing: "An issuer or obligation rated 'AAA' should be able to withstand an extreme level of stress and still meet its financial obligations.  An historical example of such a scenario is the Great Depression in the U.S."[6]  Ex. 2, S&P-ADCB 3109213, at 27.  But there was no Great Depression in 2007, when the Cheyne SIV collapsed and went into enforcement, locking the Senior Noteholders into "*a CP roach motel*," as Morgan Stanley described Cheyne's Senior Notes.[7]  Dkt. No. 448-26, Tab 366 ("*we check in but can't check out*").

A Single-A rated asset also "should be able to withstand a substantial level of stress and still meet its financial obligations."  Ex. 2, S&P-ADCB 3109213, at 15.  "In such a [Single-A] scenario, GDP could decline by as much as 6%, and unemployment could reach up to 15%.  The Stock market could drop up to 60%," and the asset should still perform.  *Id*.  The A ratings on Cheyne's MCNs therefore described Cheyne's ability to make the ultimate payment of principal and interest due to the MCN plaintiffs in times of very serious financial stress, far greater than any that occurred prior to Cheyne's October 17, 2007 receivership when the MCN's value stood at *zero*.  Goldstein Report ¶32.  At that time, the stock market was at its peak (Goldstein Report, ¶93); and bonds that were not

---

[6]    According to S&P's "Selected Recessions And Financial Crises And Standard & Poor's View Of Corresponding Stress Levels" dating back to the "Panic of 1797," only three events in world history resulted in a stress level greater than AAA: the Spanish Civil War – in **Spain**, and WWII – in **France** and **Germany**.  Ex. 2, S&P-ADCB 3109213, at 28-30.

[7]    As S&P admitted, "'[o]nce a SIV enters into enforcement mode, it has reached the point of no return.'"  Goldstein Report, ¶55 (quoting S&P's Structured Investment Criteria publication).  By that point, all plaintiffs were "locked into Cheyne SIV for the duration of the liquidation process."  *Id*.  The MCN holders were completely wiped out shortly thereafter and on October 17, 2007, at the latest.  The Senior Note ratings "are premised on expected repayment during the enforcement period" and therefore indicated an ability "to protect noteholders against market risk during wind-down" at a AAA level.  *Id*.  Accordingly, from an economic perspective, "establishing that Defendants' alleged misrepresentations were the proximate cause of Cheyne SIV entering Enforcement and Receivership is sufficient" to establish that the misrepresentations proximately caused "the losses Plaintiffs suffered at liquidation."  *Id*.

- 10 -

exposed to subprime mortgages were trading high.  Goldstein Rebuttal, ¶¶11-14.  Unemployment never reached 15%, even years later at the height of the recession.

Defendants knew the SIV was susceptible to more credit risk, market risk and liquidity risk than they represented to investors when it was launched.  But, they falsely assured plaintiffs that those risks had been properly accounted for in the rating, and, in combination with all other risks, had a minimal chance of materializing.  Dkt. Nos. 432-24, 432-25, 448-27, at 698.  With actual knowledge of those risks, defendants set about to model "subordination" – to build a large enough cushion of unrated notes beneath the investment grade notes in this case – that could absorb losses triggered by such events.  After running their purportedly fact-based models and independent processes to build that subordination, defendants stated that the credit strength of Cheyne's structure and bonds was sufficient to endure any of those events up to and including "A" and "AAA" levels. *Abu Dhabi*, 2012 WL 3584278, at *20.[8]  These are the "misstatements" that *Lentell* requires defendants to face if they are going to challenge loss causation.  *Lentell*, 396 F.3d at 174. Defendants' motion practically ignores them.

### 2.    Evidence of Plaintiffs' Investment Losses

Plaintiffs' investment losses are severe.  Excluding statutory damages and interest, plaintiffs have lost over $428 million.  Goldstein Rebuttal, Table 5.  Investors in Cheyne's "A" bonds suffered

---

[8]    Having decided to state the credit quality of Cheyne's bonds in such terms in no way suggests, however, that defendants lacked other vocabulary to make different statements. "Obligations rated Ba," for example, "are judged to have speculative elements and are subject to substantial credit risk," according to Moody's.  Ex. 3, MDYS ADCB 1334279, at 290.  S&P had a similar vocabulary at its disposal.  It assigned its "BB" ratings to bonds that were "[l]ess vulnerable" in the near-term but "face[d] major ongoing uncertainties or exposure to adverse business, financial or economic conditions."  Dkt. No. 563, Ex. 15, at 77.

a complete wipeout.  *Id*.  Investors in Cheyne's "AAA" bonds lost a substantial portion of their investments.  *Id*.

The mechanics of plaintiffs' realized losses are straightforward.  Using plaintiffs' money, Cheyne purchased assets at or near 100% of par value.  After Cheyne collapsed, it sold large swaths of those assets at 43% of par value in a competitive auction process that involved 11 bidders.  Goldstein Report, ¶90.  The "subordination" that defendants built in the Cheyne SIV using models to absorb losses upon the occurrence of what they called credit, market and liquidity events was insufficient, and Cheyne's structure too weak, to protect investors' AAA and A bonds.  Of course, the evidence shows that defendants had "'no actual data backing the current model assumptions'" that they used to make their AAA and A statements, and that the process defendants followed to make those statements was "'totally inappropriate.'"  *Abu Dhabi*, 2012 WL 3584278, at *11.

### 3.    Evidence of the Relationship Between Defendants' Misstatements and Plaintiffs' Losses

#### a.    Plaintiffs' Losses Were Within the "Zone of Risk"

That the SIV would collapse was entirely foreseeable.  Defendants' misstatements represented that plaintiffs were unlikely to lose any money – and if they did, it would be next to nothing – ***even if*** the very events that defendants claim caused plaintiffs' losses actually materialized.  Dkt. No. 432, Tab 24; Dkt. No. 434, Tab 79.  But defendants fraudulently overstated the credit quality of Cheyne's AAA and A bonds, and the Cheyne SIV was driven into receivership when investors began to realize that the ratings on the subprime assets held by Cheyne did not represent the actual risk inherent in those securities.  Goldstein Rebuttal, ¶55; Ex. 1 (Timeline of Cheyne SIV's Collapse).

> [T]he risk that caused plaintiffs' losses – that [Cheyne] consisted of toxic assets that would become worthless – was precisely within the zone of risk concealed by the Top Ratings.  That plaintiffs would suffer losses when these toxic assets collapsed

- 12 -

and [Cheyne] entered receivership was reasonably foreseeable.  Therefore, . . . the materialization of the risk concealed by the Top Ratings caused plaintiffs' losses.

*King Cnty.*, 708 F. Supp. 2d at 340.

Plaintiffs have adduced "numerous statements from employees of the Rating Agencies describing how ratings should be calculated and the ways in which the Rating Agencies' fell short of that standard."  *Abu Dhabi*, 2012 WL 3584278, at *11 (citing evidence).  The false ratings did not physically push Cheyne into "receivership as a bankrupt entity" (*id*. at *1), but they did mask that **likelihood**, making it appear "remote or highly unlikely."  *Lentell*, 396 F.3d at 173-74 (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188 (2d Cir. 2001)); *Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 16-17 (2d Cir. 1986) (loss causation established where fraudulent "solvency" opinion concealed the **likelihood** of bankruptcy of entity that later collapsed).[9]

The evidence shows Cheyne's bankruptcy was not nearly as remote or highly unlikely as its AAA and A ratings indicated; it was supposed to withstand the equivalent of a "U.S. Great Depression" but collapsed when housing prices declined by a meager 3%, and when the marks on its assets reflected the actual toxic credit quality of those assets, as opposed to the rosy characteristics defendants assumed, falsely, with "'no . . . data'" when rating the SIV notes.  *Abu Dhabi*, 2012 WL 3584278, at *11 (citing evidence); Goldstein Report, §V.

Defendants seek to blame the "market" for their own misconduct.  The centerpiece of defendants' theory supposes that because the market prices of Cheyne's assets at liquidation were lower (43% par) than the market prices of those assets at the time of purchase (100% par), the "market" is the **cause** of plaintiffs' losses.  Not so.  Market prices, filtered through Cheyne's

---

[9]      The Second Circuit recently cited *Manufacturers Hanover* as an example of a case in which "the plaintiffs demonstrated a specific **causal connection** between the loss and the alleged fraud."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 n.5 (2d Cir. 2010) (citing *Mfrs. Hanover*, 801 F.2d at 16-17, 19, 21-22).

- 13 -

inadequate structure, simply measure plaintiffs' financial losses.  The "market" did not convert Cheyne from a safe, secure investment into a bankrupt junk bond.  Cheyne was always junk – defendants just claimed it was AAA.  The "market" did not "cause" Cheyne to do anything, it rationally responded to the revelation of defendants' fraud.  It was fraudulent to state, as defendants did, that Cheyne's risk of default was practically non-existent; the evidence shows plaintiffs' losses are squarely "'within that zone'" of risk, and loss causation requires nothing more than that relationship.  *Lentell*, 396 F.3d at 173-74.

### b. Dr. Goldstein Analyzed and Isolated Non-Fraud Factors

Defendants concealed the SIV's weak structure and toxic underlying assets that suffered from severe credit problems.  Dr. Goldstein therefore analyzed the impact of those credit problems on those securities' values and ultimately the return on plaintiffs' Cheyne SIV notes.  Goldstein Report, §V.

Dr. Goldstein first disaggregated the SIV's subprime HEL and CDO assets from the SIV's other assets, and found that the subprime assets caused Cheyne's collapse.  Goldstein Report, ¶¶53-54.  He then isolated the reason the Cheyne SIV's subprime assets suffered price declines, and found that the declines "were caused by a realization that credit quality was materially lower than had been represented and a materialization of the credit risks that had been concealed."  *Id*., ¶¶17(c), 63-95; Goldstein Rebuttal, ¶¶22, 30, 54.  Dr. Goldstein did this by showing that Cheyne's precipitous HEL price decline corresponded to ABX HEL indices referencing the same asset class (HELs) and ratings A, AA, AAA.  Goldstein Report, ¶¶78-86.  Dr. Goldstein does not opine that the declines in the ABX caused the declines in Cheyne's HEL RMBS.  Nor does he opine that Cheyne's HELs' price declines were caused by some unrelated market-wide collapse.  Instead, because Cheyne's HELs were illiquid, Dr. Goldstein used the ABX index as a proxy for Cheyne's HELs.

- 14 -

The ABX is an index of credit default swaps that are priced based on credit risk but not other factors that impact HEL prices.  Goldstein Report, ¶91.  Dr. Goldstein thus used the ABX to isolate credit risk – the primary risk defendants' fraud concealed – from other non-fraud-related factors that might have impacted the marks on Cheyne's underlying HELs.   For example, Dr. Goldstein disaggregated potential liquidity problems from plaintiffs' losses, concluding that Cheyne's collapse was caused by an adjustment of the prices on Cheyne's assets from their inflated prices to their "true" prices, and thereby excluding the possibility of liquidity shock.  *Id.*, ¶¶87-95.

Dr. Goldstein also specifically "controlled for" the possibility that a general market-wide "financial crisis" caused plaintiffs' losses by including several "stock and bond indexes" in his analysis.  Goldstein Report, ¶¶87-94; Goldstein Rebuttal, ¶¶9-13; *see In re Sadia*, 269 F.R.D. 298, 317 (S.D.N.Y. 2010) (holding expert appropriately "controlled for" possibility that financial crisis constituted independent intervening event by "including domestic and foreign stock and bond indexes as variables in his event study").  Dr. Goldstein's analyses show that true "AAA" securities weathered defendants' "worldwide" crisis just fine.  U.S. Treasury Bonds were fine.  Goldstein Rebuttal, ¶11.  A massive segment of the mortgage market, Freddie and Fannie RMBS bonds were, again, just fine.  *Id.*, ¶12.  Even far "weaker" investments – BBB, BB corporate bonds – were, yet again, just fine.  *Id.*, ¶13.  Stocks were just fine, too – "the Dow Jones Industrial Average hit its all-time high on October 9, 2007," more than a month after Cheyne entered enforcement and just days before it was declared insolvent.  Goldstein Report, ¶93.

Dr. Goldstein's analyses aligns perfectly with the Court's previous observation in *Tronox* that "[w]hile this crisis [was] severe, most companies did not suffer losses comparable to those experienced by [Cheyne].  They did not, by and large, lose essentially one hundred percent of their market value or fall into bankruptcy."  *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220(SAS), 2010

WL 2835545, at *13 (S.D.N.Y. June 28, 2010). Because Dr. Goldstein eliminated the possibility that plaintiffs' losses were caused by an unrelated market-wide collapse, the Court should reject defendants' "'don't blame me, blame the financial crisis'" defense. *See Sadia*, 269 F.R.D. at 317.

Far from an unrelated intervening event, moreover, a simultaneous decline in the value of subprime RMBS similar to those held in the Cheyne SIV is logical, considering (as detailed in plaintiffs' submissions) the pervasive abandonment of underwriting standards across the subprime market and the rating agencies' pervasive use of antiquated and flawed analyses to rate subprime bonds.[10] Dkt. No. 430 at 3-20; *In Limine* Opp. at 1-26. These facts show that the same credit risks that affected Cheyne pervaded the entire RMBS sector – the securities were backed by bad mortgages, and the securitizations provided insufficient support to justify the ratings. This does not mean that plaintiffs have to prove market-wide fraud in order to establish loss causation; however, it does put to rest the notion that the decline in ABX indices constitutes an unrelated, intervening event. *See, e.g.*, *BYAFM*, 37 Misc. 3d 1212-A.[11]

---

[10]     *See, e.g.*, Dkt. No. 437-6, Tab 136 at MS_RHI_001422949, at 52 (documenting widespread waiver of bad loans by numerous investment banks with subprime securities); Dkt. No. 437-9, Tab 139 (in 2005, Morgan Stanley saw "deteriorating appraisal quality" across "all of the [subprime loan] sellers"); *see also* www.fcic.gov, FCIC Report at 167 (finding that 28% of the nearly 1 million loans Clayton reviewed for investment banks from January 2006 through June 2007 did not meet underwriting guidelines, but the banks "waived in" 39% of those mortgages into RMBS anyway); Case No. 09-CV-8387, Dkt. No. 329-2, Tab 52, Ex. 501 at S&P-ADCB 2595538 ("Competition among rating agencies has helped to drive down support levels in deals – this will create more ratings volatility."); Dkt. No. 436-11, Tab 129 at PSI-SP-000091; Dkt. No. 433-19, Tab 49 at PSI-SP-000226 (in 2004, S&P intentionally withheld its new RMBS ratings model to preserve market share, resulting in understated RMBS risk); Dkt. No. 437-19, Tab 149 at 80:24-83:4 (same); Dkt. No. 437-1, Tab 131 at MDYS ADCB 305352-53 (2006 report to top Moody's executives); *see also* Dkt. No. 446-1, Tab 296, Senate Report at 245-46 (finding that Moody's and S&P knew their ratings of RMBS and CDOs were inaccurate resulting in widespread "inflated" ratings).

[11]     *See also Lau v. Mezei*, No. 10 CV 4838 (KMW), 2012 WL 3553092, at *8 (S.D.N.Y. Aug. 16, 2012) (rejecting argument at summary judgment that "financial crisis" caused the loss where plaintiff was "misinformed as to the degree of risk in the investment" and the sufficiency of the collateral protecting the investment); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928

c.   **Defendants' Admissions and Other Contemporaneous Evidence Raise a Triable Issue of Fact**

Defendants' own statements give rise to a triable issue of fact on loss causation, independent from Dr. Goldstein's opinions.  By early 2007, the defendants recognized that the risk concealed by their false ratings on the Cheyne SIV was threatening to emerge.  S&P experienced "serious pressure to respond to the burgeoning poor performance of sub-prime deals" and admitted internally that subprime RMBS ratings were "not going to hold through 2007."  Dkt. Nos. 447-1 – 447-3, Tabs 297-299.  On March 16, 2007, Moody's began to monitor Cheyne and three other SIVs "closely," "given their exposures to US subprime."  Dkt. Nos. 447-4, 447-5, 447-7, 444-16, Tabs 300, 301, 303, 274.  Although delinquencies were rising in Cheyne's subprime assets, their prices (marks) generally remained stable (high) as the market maintained faith in the rating agencies' A, AA, and AAA ratings indicating that those tranches would be spared any losses.  Goldstein Report, ¶¶36-50.

On July 10, 2007, Moody's and S&P downgraded, and put on watch for a possible downgrade, hundreds of subprime assets.  *Id*., ¶¶45-48.  S&P also announced that it was changing its RMBS methodology.  *Id.*  As detailed in Exhibit 1, the Timeline of Cheyne SIV's Collapse, the downgrades had a direct adverse impact on Cheyne, and defendants recognized as much.  In fact, "subordinated tranches for 37 deals owned by the Cheyne SIV" – 25% of the SIV's HELs – were "downgraded or put on negative watch."  Goldstein Report, ¶60.  The same day as the mass downgrades, a Morgan Stanley SIV analyst concluded internally that the Cheyne deal was "***worse than I thought it was***," that the price of MCNs should be discounted by 10%-15%, and that "the deal ***could unravel***."  Dkt. Nos. 434-30, 435-1, Tabs 100-101.  Ten days later, Morgan Stanley concluded

---

N.Y.S.2d 229, 235 (1st Dep't 2011) ("These allegations are sufficient to show loss causation since it was foreseeable that MBIA would suffer losses as a result of relying on Countrywide's alleged misrepresentations about the mortgage loans.").

that, if proper market prices were used, the "HEQs" – home equity securities – would "trigger outright" the Major Capital Loss Test, sending Cheyne into enforcement.  Dkt. No. 447-14, Tab 310; *see also* Dkt. No. 431, ¶2(f).  Yet, Morgan Stanley kept "try[ing] to push SIVs through the franchise," seeking to maximize profits even though its "senior MDs [were] saying SIVs are going to blow up."  Dkt. No. 447-16, Tab 312.

Despite defendants' effort to prop Cheyne up, the SIV entered enforcement on August 28, 2007, and receivership on October 17, 2007.  Goldstein Report, ¶¶31-32.  Contrary to defendants' after-the-fact attempt to blame Cheyne's collapse on an unrelated "market-wide collapse," defendants admitted the "*[m]arket ha[d] singled out Cheyne as [the] most likely SIV to come down given its portfolio [of] HELs and CDOs*."  Dkt. No. 447-30, Tab 326; Dkt. No. 444-16, Tab 274.[12]

Defendants also conceded that the reason Cheyne failed was because the market no longer believed the ratings assigned to its underlying subprime assets – the precise conclusion that Dr. Goldstein reached through statistical analysis.  Goldstein Report, §V.  For example, Moody's Managing Director of SIVs conceded, "I don't think we can escape from the fact that the undoing of SIVs . . . is *primarily explained* by the *overly aggressive ratings* of underlying assets, from the market's perspective."  Dkt. No. 433-1, Tab 31.  Similarly S&P admitted that their mass subprime "[d]owngrades have shaken faith in S&P ratings."  Dkt. No. 432-22, Tab 22.  Moody's CEO Raymond McDaniel concurred: "[*A*] *key reason* for the *disconnection* between ratings and market value is that many of *our RMBS/CDO ratings are not currently viewed as credible or stable*.  As a

---

[12]      *See also* Dkt. No. 433-4, Tab 34 ("This is the first 'traditional' SIV (*i.e.* a SIV which is not a SIV lite) that we place on review.  However, *unlike most* – but not all [of] – the other traditional SIVs, *Cheyne has a large exposure to US RMBS (63%)*."); *id.* ("we should make it clear that Cheyne is *unique* in this sector for example, significant exposure to subprime"); Dkt. No. 448-18, Tab 358 ("We are about to downgrade two SIVs (Axon and Cheyne). . . .  Axon, Cheyne and Rhinebridge (that we downgraded last Thursday) are *the only SIVs* with large exposure to RMBS or ABS CDOs.").

result, a primary reason that ratings are currently a poor proxy for market values is that *the market thinks the ratings are wrong*."[13]  Such strong evidence certainly would allow a jury to reasonably conclude that defendants' fraudulent ratings proximately caused plaintiffs' losses.

### D.   Dr. Goldstein's Opinions Tie Directly to Plaintiffs' Liability Evidence

Dr. Goldstein's opinions are tied directly to Dr. Das's opinions, which are just one piece of plaintiffs' evidence establishing fraud.  Dr. Goldstein's opinions tie to plaintiffs' other fraud evidence, too.  Dr. Das found that Cheyne was not appropriately structured and quantified the shortcoming in several different ways.  *See, e.g.*, Das Report, Dkt. No. 587-3, ¶¶11, 73.  Dr. Das also explained repeatedly that if the ratings on Cheyne's underlying assets were incorrect or inflated, it would have a magnifying effect on the problems he identified, making the Cheyne SIV structure even weaker.  *Id.*, ¶¶18, 39, 42, 45, 57, 58, 61, 64, 65, 72.  As S&P's Kai Gilkes admitted, "any inaccuracy in the assumptions of the underlying assets would result in a significantly greater degree proportionately of volatility in the ratings of the SIVs . . . that included those assets." *Id.*, ¶67.  As a result, "it is a factual statement that the rating of those vehicles were inappropriate because the ratings of the underlying assets were not appropriate." *Id.*  Dr. Goldstein's opinion is that defendants' fraud caused plaintiffs' losses when the concealed risks – Cheyne's inadequate structure and toxic assets – materialized.  Goldstein Report ¶¶16-17.  His opinion connects directly with Dr. Das's opinions.  That he assumed falsity rather than duplicating Dr. Das's analysis himself is

---

[13]       Dkt. No. 447-36, Tab 332; Dkt. No. 447-37, Tab 333 ("the fact that the portfolio assets [were] still highly rated" when Cheyne failed simply "highlight[s] the dis-connect between our ratings and what the market [was] telling us about the quality of the assets"); Dkt. No. 431, ¶30(e); Ex. 4 at MDYS ADCB 995665 ("The secondary bond market remains frozen for many asset classes, particularly RMBS and CDOs, with investors distrusting ratings due to rapid transitions and anticipated future downgrades, and huge bid/ask spreads."); *id.* at 675 ("Much of the recent price declines clearly reflects changes in fundamental credit risk."); Dkt. No. 432-18, Tab 18; Dkt. No. 447-44, Tab 339 (Senior employees emphasized that "non-prime RMBS exposures" explained Cheyne's collapse.).

perfectly appropriate. *See, e.g.*, *In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2003 WL 1610775, at *25 (S.D.N.Y. Mar. 26, 2003).

Dr. Das also concluded that had the structure been rated properly, it would not have been economically feasible and, therefore, never would have existed. Das Report, ¶¶11, 73. Loss causation is established where, as here, it is foreseeable that investment in the Cheyne SIV would lead to losses. *MBIA*, 928 N.Y.S.2d at 235; *BYAFM*, 37 Misc. 3d 1212-A; *Schwarz v. ThinkStrategy Capital Mgmt. LLC*, No. 09 Civ. 9346(PAE), 2012 WL 2026365, at *18 (S.D.N.Y. May 31, 2012) (loss causation established in bench trial because, if the defendant "told plaintiffs the truth about ThinkStrategy's sparse diligence, ***plaintiffs never would have invested***, thus avoiding the grievous losses the TS Fund suffered").

Finally, Dr. Das's opinions do not constitute the only evidence of defendants' false ratings, and they do not capture the entire fraud. As the Court held, plaintiffs have adduced "extensive" additional evidence of defendants' fraud. *Abu Dhabi*, 2012 WL 3584278, at *11. Similarly, plaintiffs have adduced extensive evidence of loss causation in addition to Dr. Goldstein's opinions. Whether all of plaintiffs' evidence taken together establishes fraud, and whether that evidence proves that defendants' fraud caused plaintiffs' losses, are clearly fact-bound questions for the jury. Defendants have no basis for summary judgment.

DATED:  March 13, 2013                    Respectfully submitted,

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          LUKE O. BROOKS
                                          JASON C. DAVIS


                                                  s/ LUKE O. BROOKS
                                          _____
                                                LUKE O. BROOKS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
lukeb@rgrdlaw.com
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
MICHAEL J. DOWD
DANIEL S. DROSMAN
DARRYL J. ALVARADO
ANGEL P. LAU
HILLARY B. STAKEM
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
miked@rgrdlaw.com
dand@rgrdlaw.com
dalvarado@rgrdlaw.com
alau@rgrdlaw.com
hstakem@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Attorneys for Plaintiffs

822373_1

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
MARC I. GROSS
TAMAR A. WEINRIB
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
taweinrib@pomlaw.com

Additional Attorneys for Plaintiff State Board of
Administration of Florida

- 22 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 13, 2013.

s/ LUKE O. BROOKS
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:  lukeb@rgrdlaw.com

## Mailing Information for a Case 1:08-cv-07508-SAS-DCF

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Mario Aieta**
  maieta@ssbb.com,managingclerk@ssbb.com,marioaieta@gmail.com,dgerard@ssbb.com

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **X Jay Alvarez**
  jaya@rgrdlaw.com

- **Greg Donald Andres**
  greg.andres@davispolk.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com

- **Gina Marie Castellano**
  gina.castellano@davispolk.com

- **Dai Wai Chin Feman**
  dchinfeman@ssbb.com

- **Joel M. Cohen**
  jcohen@gibsondunn.com,aarias@gibsondunn.com,mkdunning@gibsondunn.com,snurhussein@gibsondunn.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,jillk@rgrdlaw.com,E_File_SD@rgrdlaw.com,nlindell@rgrdlaw.com,tholindrake@rgrdlaw.com,kcook@rgrdlaw.com

- **Mary K Dunning**
  mkdunning@gibsondunn.com,dwolber@gibsondunn.com,mkatz@gibsondunn.com,aarias@gibsondunn.com,arublin@gibsondunn.com,pwade@gibsondunn.com,cdieng

- **Jessica Lynn Freese**
  jessica.freese@davispolk.com

- **Charles Alan Gilman**
  cgilman@cahill.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Goutam Umesh Jois**
  gjois@gibsondunn.com

- **Christopher Michael Joralemon**
  cjoralemon@gibsondunn.com,aarias@gibsondunn.com

- **Mark Adam Kirsch**
  mkirsch@gibsondunn.com,aarias@gibsondunn.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Jeffrey B. Korn**
  jkorn@willkie.com,maosdny@willkie.com

- **Angel P. Lau**
  alau@rgrdlaw.com

- **William Ross Miller , Jr**
  william.miller@dpw.com,ecf.ct.papers@dpw.com

- **Paul Steel Mishkin**
  paul.mishkin@dpw.com

- **Tariq Mundiya**
  maosdny@willkie.com,jsim@willkie.com,tmundiya@willkie.com

- **David Owen**
  dowen@cahill.com

- **Antonio Jorge Perez-Marques**
  antonio.perez@dpw.com,ecf.ct.papers@dpw.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Christopher Joseph Roche**
  croche@kaplanrice.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Tammy Lynn Roy**
  troy@cahill.com,ndelutri@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com,jdoty@ssbb.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew Dickens Schlichter**
  andrew.schlichter@dpw.com

- **Jessica T. Shinnefield**
  jshinnefield@rgrdlaw.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com

- **Tamar Aliza Weinrib**
  taweinrib@pomlaw.com

- **Robert Frank Wise , Jr**
  rwise@dpw.com,ecf.ct.papers@dpw.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

- **Lawrence Jay Zweifach**
  lzweifach@gibsondunn.com,aarias@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David C. Walton
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101
```