UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

ABU DHABI COMMERCIAL BANK, et al.,

Plaintiffs,

- against -

MORGAN STANLEY & CO. INC., MORGAN
STANLEY & CO. INTERNATIONAL LTD,
MOODY'S INVESTORS SERVICE, INC.,
MOODY'S INVESTORS SERVICE LTD.,
STANDARD AND POOR'S RATINGS
SERVICES and THE McGRAW HILL
COMPANIES, INC.,

Defendants.

---------------------------------------------------------X

**OPINION AND ORDER**

08 Civ. 7508 (SAS)



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

This Opinion addresses cross-motions *in limine* by plaintiffs –

institutional investors who invested in the Cheyne structured investment vehicle

("SIV") – and defendants – Morgan Stanley & Co. Incorporated and Morgan

Stanley & Co. International Limited (collectively "Morgan Stanley"); Moody's

Investors Service, Inc. and Moody's Investors Service Ltd. (collectively

"Moody's"); and Standard & Poor's Ratings Services and The McGraw Hill

Companies, Inc. (collectively "S&P," and, together with Moody's, the "Rating

Agencies").[1]  In large part, the motions address whether and to what extent this trial will be limited to evidence regarding the ratings of the Cheyne SIV, as opposed to the underlying asset classes that composed the Cheyne portfolio.  In addition, the parties raise several other evidentiary issues for pre-trial resolution.

## I.    BACKGROUND

Plaintiffs seek to recover losses stemming from their investment in and the subsequent liquidation of the Cheyne SIV Notes issued between October 2004 and October 2007.[2]  Their claims are for common law fraud against the Rating Agencies, aiding and abetting fraud against Morgan Stanley, and negligent misrepresentation against Morgan Stanley.[3]  The alleged misstatements at issue are the credit ratings assigned by the Rating Agencies to the Cheyne SIV Notes.  Part of plaintiffs' theory of fraud is that the ratings masked "the actual risks associated

---

[1]    At a conference held on November, 12, 2012 I orally ruled on many of the parties' proposed motions *in limine*.  *See* 11/12/12 Hearing Tr.

[2]    *See* Ninth Amended Complaint ("NAC") ¶¶ 1, 15.  The Cheyne SIV issued three categories of rated notes: Commercial Paper, Medium Term Notes and Mezzanine Capital Notes (together the "Cheyne SIV Notes").

[3]    *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431 *on reconsideration in part*, 888 F. Supp. 2d 478 (S.D.N.Y. 2012) ("*Abu Dhabi* SJ Op.") (permitting fraud claims against Rating Agencies and aiding and abetting fraud claims against Morgan Stanley to proceed);  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508, 2013 WL 837536 (S.D.N.Y. Mar. 6, 2013) (permitting negligent misrepresentation claims of certain plaintiffs to proceed against Morgan Stanley).

with the securities included in the SIV's investment portfolio."[4]  Some relevant

background to the parties' motions *in limine* follows.[5]

    **A.**      **Rating Agency Practices for Rating the Cheyne SIV Notes**

        The Cheyne SIV issued short-term and medium-term debt in the form

of the Cheyne SIV Notes and used the proceeds to purchase longer term assets.

S&P and Moody's were retained to rate the structure of the Cheyne SIV, and each

Rating Agency issued ratings pursuant to its own published SIV rating criteria and

approach.  The ratings were determined by rating committees at each Rating

Agency specifically dedicated to the Cheyne SIV.

        The Rating Agencies issued ratings periodically throughout the life of

the Cheyne SIV, and even before its launch on August 3, 2005.  The pre-launch

"indicative" ratings were based on representations made by the SIV's manager,

Cheyne Capital Management ("Cheyne"), that the Cheyne SIV would have certain

structural features and portfolio concentration limits for each asset class that the

---

    [4]      NAC ¶ 83.

    [5]      Unless otherwise indicated, these facts are taken from the parties'
briefs and accompanying exhibits.  For a more detailed summary of the factual
background and allegations, *see Abu Dhabi* SJ Op., 888 F. Supp. 2d at 440-42; *Abu
Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 164-
69 (S.D.N.Y. 2009).

SIV was authorized to acquire.[6]  As stated in the materials issued to prospective investors, the ratings of the Cheyne SIV Notes were based on an analysis of "buckets" of assets that the SIV could acquire once it was launched – *e.g.*, up to X% "AAA"- rated Residential Mortgage Backed Securities ("RMBS"), up to Y% "AA"- rated Collateralized Debt Obligations ("CDOs"), up to Z% credit card assets.  With the exception of certain assets purchased prior to launch through a warehouse facility (as described *infra* Part I.B.), Cheyne would have sole discretion in acquiring the approved assets in accordance with the established portfolio limits.  The vast majority of approved underlying assets were rated by the Rating Agencies, by committees with expertise on those asset classes.

The Rating Agencies each issued an "initial" rating simultaneous with the launch of the Cheyne SIV.  Plaintiffs assert that these ratings considered the assets that Cheyne purchased through the warehouse facility, which were rolled over into the Cheyne SIV at launch.[7]  After the launch, Cheyne had sole authority

---

[6]    Plaintiffs assert that these ratings also considered the particular assets purchased through the warehouse facility prior to launch. *See* 3/15/13 Hearing Tr. at 9-10 ("THE COURT: [T]he indicative rating, that would have considered the assets that the warehouse was financing?  MR. BROOKS:  Our understanding is that it did, Judge.").

[7]    *See id.* at 10:11-14 ("THE COURT:  So you think the indicative ratings do consider the vast majority of the assets that were financed by the warehouse financing.  MR. BROOKS:  And the [initial] ratings, your Honor.").

to alter the composition of the Cheyne portfolio within the established limits.  The

Rating Agencies represented that they reviewed the Cheyne SIV's portfolio

composition every week and reaffirmed the ratings based on those reviews

throughout the relevant period.  They received weekly certificates from Bank of

New York Mellon stating that the SIV was in compliance with the structural

criteria on which the ratings were based.  The Cheyne SIV continued to issue notes

and purchase assets until August 2007.

### B.   Morgan Stanley's Role in the Cheyne SIV

Morgan Stanley was the Arranger/Structurer for the Cheyne SIV and

in that capacity negotiated with the rating committees on Cheyne Capital's behalf

to secure and maintain favorable ratings, including after the SIV's launch in

August 2005.  Although Morgan Stanley did not have authority over the

underlying assets in the Cheyne SIV post-launch, it issued a loan to Cheyne to

finance the purchase of assets before the launch of the SIV, which was secured by

those assets and repaid at the time of the launch.  This financing facility was called

the warehouse facility.[8]  Morgan Stanley had the authority to approve or veto the

---

[8]   A Morgan Stanley employee explained that "prior to closing the SIV did not have the proceeds from the issuance of notes to buy these assets so the only way for the SIV to buy assets is actually to borrow money from someone else." *See* Deposition of Rany Moubarak at 122-124, 128, Ex. 5(b) to Declaration of Mark A. Kirsch in Support of Defendants' Memorandum of Law in Support of Their Omnibus Motions *in Limine* ("Kirsch Decl.").

assets that Cheyne purchased *through the warehouse facility*.[9]

Morgan Stanley also sold the Cheyne SIV a portion of its underlying assets, including Home Equity Loans ("HELs"), some of which Morgan Stanley securitized itself based on due diligence it received on the underlying loans. Morgan Stanley also acted as a placement agent, responsible for marketing the Cheyne SIV Notes to potential investors both prior to and after the launch in 2005.

## II.   LEGAL STANDARD

The purpose of a motion *in limine* is to "enabl[e] the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."[10] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[11]  A court will exclude evidence on a motion *in limine* only if the evidence is "clearly inadmissible on all potential

---

[9]      *See id.* at 116.

[10]     *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  *Accord Luce v. United States*, 469 U.S. 38, 40 n.2 (1984) (the purpose of motions *in limine* are to allow a court to rule on the admissibility of potential evidence in advance of trial).

[11]     Fed. R. Evid. 401.

grounds."[12]   A court "considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context"[13] and any ruling is subject to change as the case unfolds, in the court's discretion.[14]

## III.   EVIDENCE NOT DIRECTLY RELATED TO THE CHEYNE SIV RATINGS

Throughout these proceedings I have declined to make this trial a full investigation into the Rating Agencies' "method and practice of rating everything," and have sought to limit plaintiffs' prosecution to particular transactions – specifically the ratings of the Cheyne SIV.[15]  In furtherance of this limitation, defendants submit that the Court should exclude documents and testimony concerning: (1) the rating processes for structured finance products other than the Cheyne SIV Notes; (2) persons who were not responsible for rating the Cheyne SIV Notes; (3) Morgan Stanley's loan diligence and securitization practices unrelated to the Cheyne SIV, and its involvement in the warehouse facility; (4)

---

[12]     *United States v. Ozsusamlar*, 428 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

[13]     *In re Methyl Tertiary Butyl Ether("MTBE") Prods. Liab. Lit.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009) (citation and quotation marks omitted).

[14]     *See Palmieri*, 88 F. 3d at 139.

[15]     1/26/11 Hearing Tr. at 21, 69.  *Accord* 11/2/10 Hearing Tr. at 27 (declining to transform the case into an "indictment of the last five years of our country's financial system").

defendants' revenues unrelated to the Cheyne SIV; (5) after-the-fact-testimony on the financial crisis; and (6) treatment of HELs as liquidity eligible assets ("LEAs").[16]

Plaintiffs argue that defendants' "conduct in structuring and rating the types of structured finance instruments that were contained in and provided the collateral for the Cheyne SIV . . . and the knowledge of the individuals who worked on those types of securities is directly relevant to the scienter and falsity elements of plaintiffs claims."[17]  However, plaintiffs move to exclude evidence of their investments in securities other than the Cheyne SIV Notes.[18]

## A.    Evidence Regarding the Rating Processes of Structured Finance Products Other than the Cheyne SIV Notes

Defendants argue that "[t]he rating of securities *other than* the Cheyne Notes, whether or not the Cheyne SIV subsequently invested in such securities, says nothing about the Cheyne rating opinions issued by each Rating Agency's Cheyne SIV rating committee" and, moreover, such evidence would "hopelessly

---

[16]    *See* Defendants' Memorandum of Law in Support of Their Omnibus Motions *in Limine* ("Def. Mem.").

[17]    Plaintiffs' Omnibus Memorandum of Law in Support of Their Motions *in Limine* ("Pl. Mem.") at 1.  Specifically, plaintiffs seek to call Raymond McDaniel, Moody's CEO, and William Harrington, a senior analyst at Moody's from 1999-2010.  *See id.* at 16.

[18]    *See id.* at 16.

complicate the trial[,] and waste the Court's time and judicial resources."[19]

Evidence of the Rating Agencies' ratings processes for classes of structured finance products that the Cheyne SIV was not authorized to acquire is irrelevant and prejudicial insofar as it would be introduced for the purpose of implicating defendants in the financial crisis more generally.  However, as I previously recognized, "the SIV is composed of certain assets" and "to rate it, you are also aware of the components of the SIV."[20]  Even if the precise assets were undetermined at the time the initial ratings were issued, the Rating Agencies' valuation of the assets that Cheyne was authorized to purchase is relevant to determining their beliefs regarding the creditworthiness of the Cheyne SIV Notes.

The lead S&P analyst on the Cheyne SIV testified that in assessing the creditworthiness of the CDOs in the Cheyne SIV, "the [underlying] assets are rated by a committee [at] S&P, so I would rely on people in S&P."[21]  The lead Moody's

---

[19]     Def. Mem. at 8, 10.

[20]     11/12/12 Hearing Tr. at 59, 69.

[21]     1/13/11 Deposition of Lapo Guadagnuolo at 220-221, Ex. 1 to Declaration of Darryl J. Alvarado in Support of Plaintiffs' Omnibus Memorandum of Law in Support of Their Motions *in Limine* ("Alvarado Decl.").  *See also id.* at 218 ("Our analysis would have looked at the creditworthiness of the securities that are backed by those type of assets, and those securities would have been rated by our colleagues in the RMBS group.  So I would have looked at the creditworthiness of those assets as expressed by the rating given by colleagues.").

9

analyst testified that "monitoring of ratings . . . gives us comfort at the structure side that our ratings are appropriate, because the other folk at the underlying level are doing the detailed analysis."[22]  The testimony given by the Rating Agencies belies their argument that because the Cheyne SIV Notes were rated before underlying assets were actually purchased, knowledge of the creditworthiness of these types of assets is irrelevant.[23]  Moreover, if, in fact, the Rating Agencies disregarded or avoided available information about the quality of the underlying assets in issuing or monitoring the ratings of the Cheyne SIV Notes, that too is relevant to establishing scienter.[24]

---

[22]    4/6/11 Deposition of David Rosa at 286, Ex. 2 to Alvarado Decl.  *See also id.* ("if the analysts of these underlying securities . . . decide that the risk factors in their analysis should be changed . . . they will reflect their new views in the underlying ratings of these securities, and that would also be picked up in our weekly monitoring process").

[23]    *See, e.g.*, Moody's Report on Non-Moody's Rated Collateral in SIVs, Ex. 4 to Declaration of Darryl J. Alvarado in Support of Plaintiffs' Opposition to Defendants' Motions in Limine ("Alvarado Opp. Decl.") (stating that "Moody's rates the vast majority of the securities available in the market segments in which [SIVs] invest" and discussing Moody's approach to assessing the quality of non-Moody's rated assets).

[24]    *See Abu Dhabi* SJ Op., 888 F. Supp. 2d at 455 ("If a rating agency knowingly issues a rating that is either unsupported by reasoned analysis or without a factual foundation, it is stating a fact-based opinion that it does not believe to be true.").  *See also infra* Part III.B. (discussing the policy behind imputing broad collective knowledge of employees to the corporate principal – to prevent corporations from limiting their liability by intentionally limiting the transmission of information).

In sum, plaintiffs will not be permitted to undertake a sweeping inquiry into the alleged "pervasive fraud in rating structured finance securities,"[25] or the particular practices for rating structured finance securities other than the Cheyne SIV.  However, evidence of the Rating Agencies' knowledge of the creditworthiness of the asset classes that Cheyne was *authorized* to purchase, insofar as it is probative of their knowledge of the creditworthiness of the Cheyne SIV is relevant and admissible.[26]

### B.   Evidence Regarding Individuals Who Were Not Directly Responsible for Rating the Cheyne SIV

Defendants argue that "[e]vidence concerning persons who were not responsible for rating the Cheyne SIV Notes" is irrelevant and should be excluded.[27]  To establish falsity with respect to the fact-based opinions at issue –

---

[25]     Plaintiffs' Opposition to Defendants' Motions *in Limine* ("Pl. Opp.") at 3.

[26]     In addition, evidence regarding the quality of the underlying assets may be relevant to establishing loss causation.  *See King County v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 340 (S.D.N.Y. 2010) (holding that "the risk that caused plaintiffs' losses – that [Cheyne] consisted of toxic assets that would become worthless – was precisely within the zone of risk concealed by the Top Ratings.").  *See also Louros v. Kreicas*, 367 F. Supp. 2d 572, 579 (S.D.N.Y. 2005) (loss foreseeable where broker represented that investments were "conservative" and "safe" when, in fact, the investments were highly risky securities).

[27]     Def. Mem. at 11.  By contrast, plaintiffs request an order "precluding defendants from arguing that only the knowledge of the individuals who worked

11

the ratings –  plaintiffs must prove both that the statements "misstate the opinions or belief held . . . *and* are false or misleading with respect to the underlying subject matter they address."[28]  The subjective element requires that "the originator of the opinion" disbelieved the opinion expressed at the time it was made.[29]

Defendants are corporations and the ratings were disseminated by and on behalf of S&P and Moody's as corporate entities, not merely by the individuals on the Cheyne SIV ratings committees.[30]  The Second Circuit has held that "[t]o

---

directly on the Cheyne SIV can be attributed to defendants."  Pl. Mem. at 1.

[28]  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011).

[29]  *Federal Housing Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 325-27 (S.D.N.Y. 2012).  It does not suffice to prove that "defendants *should have known* that their [opinions] were false or misleading."  *In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012).  *Accord City of Omaha, Nebraska Civilian Emps. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (holding that pleading that "defendants were aware of facts that *should* have" notified them of the falsity of their statements was insufficient to state a claim for fraud absent "allegations that defendants did not believe in their statements of opinion . . . at the time they made them"); *Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *10 (S.D.N.Y. July 30, 2012) ("recklessness will not suffice" to establish falsity with respect to opinions).

[30]  *See, e.g.*, S&P New Issue Report, Ex. 2 to Declaration of Dean Ringel in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Omnibus Motions *in Limine* ("Ringel Opp. Decl."); Moody's New Issue Report, Ex. 3 to Ringel Opp. Decl.  The fact that the analysts on the rating committees are identified does not negate the fact that these reports were issued on behalf of the corporations.

prove liability against a corporation . . . a plaintiff must prove that an agent of the corporation committed a culpable act *with* the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."[31]  However, where the alleged misleading statements are attributable to the corporation, the relevant knowledge is not limited to that of the individuals who directly authored the statements, but may be possessed by any employee to whom issuance of the statements by the Rating Agencies are attributable – this includes higher-ups who were not directly responsible for authoring the ratings but had authority over the issuance of ratings generally.[32]

> This does not mean that evidence of every Moody's or S&P employee who ever doubted the creditworthiness of the assets they were rating is relevant. Although there is some disagreement over whether collective knowledge may

---

[31]     *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (citing *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 853 (2d Cir. 1981); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)) (emphasis added).

[32]     *See id.* at 196 (confirming that "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant" where, for example "a[] [fraudulent] announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false") (quotations and citations omitted).  *Accord In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236-37 (S.D.N.Y. 2010) (plaintiffs must show that "someone whose intent is attributable to Citigroup" acted with the requisite state of mind).

13

suffice to prove the state of mind of a corporate defendant at the proof stage,[33] the law requires that the opinions misstate the belief as to creditworthiness *of the Cheyne SIV*. Thus, one who had no knowledge of *or* authority over the Cheyne SIV ratings cannot have had the requisite state of mind.[34]  However, testimony that the ratings of the underlying asset classes or SIVs generally misrepresented creditworthiness may establish that such knowledge was widespread during the

---

[33]     *Compare Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012), *reconsideration denied* (Aug. 28, 2012) ("courts in this jurisdiction consistently interpret *Dynex*" to hold that "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement") (citing cases); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) ("the individual making the alleged misstatement and the one with scienter do not have to be one and the same"); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218-19 (S.D.N.Y. 2009) ("imputing the collective knowledge of employees . . . to their corporate principal . . . creates incentives for the entity to create and maintain effective internal communications" and . . . protect[s] third parties with which it does business") *with In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) (holding that only the knowledge of a person "who played a meaningful role in drafting or reviewing" the statement is relevant) (citing *Dynex*, 531 F.3d at 195).

[34]     Plaintiffs argue that *Dynex*'s requirement is satisfied because "multiple rating agency executives 'committed [] culpable act[s] with the requisite scienter' by systematically misrating structured finance securities with the knowledge that those inflated ratings would be used to derive false ratings on other structures and securities like the Cheyne SIV."  Pl. Opp. at 9 n.9 (quoting *Dynex*, 531 F.3d at 195).  This contorts the Second Circuit's holding.  It is not enough that an agent commit *any* culpable act.  The culpable act must be the alleged fraud at issue in the case – false ratings of the Cheyne SIV.

14

relevant time period.[35]  Such testimony, even from individuals not associated with the Cheyne SIV, would provide circumstantial evidence of the actual knowledge of the individuals responsible for the Cheyne SIV, and is therefore relevant and admissible.[36]

### 1.    Plaintiffs' Request to Call Raymond McDaniel

Raymond McDaniel was the Chief Executive Officer of Moody's during the relevant time period, and remains its CEO.  In adopting the Special Master's recommendation denying plaintiffs' request to depose McDaniel "at th[at] time," I granted permission to renew the request "after they have taken the

---

[35]    Jerome Fons, who defendants assert had no involvement in SIVs and no involvement in RMBS ratings after 1996 is excluded.  *See* Def. Mem. at 13. Although Frank Raiter left S&P in April 2005 before the Cheyne SIV launch and simultaneous issuance of the ratings, his testimony about the models used to rate RMBS around the time that the Cheyne SIV ratings were being prepared is relevant.  *See* Appendix A to Alvarado Opp. Decl. at 10.  However, Raiter's hindsight testimony is inadmissible to prove fraud.  *See* Def. Mem. at 13.

[36]    *See Slayton v. American Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) ("circumstantial evidence of . . . actual knowledge" may establish scienter); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11 Civ. 3658, 2012 WL 5512176 , at *9 (S.D.N.Y. Nov. 14, 2012) ("failing to detect a fraud of large magnitude provides some circumstantial evidence of scienter, just as failing to detect a large boulder in front of your face qualifies as circumstantial evidence of blindness"); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("[t]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter") (citation omitted).

appropriate depositions of other Moody's representatives."[37]  Plaintiffs did not renew their request to depose McDaniel.

Plaintiffs argue that McDaniel "was at the center of . . . massive downgrades of structured finance products during 2007" and  possesses unique information that was not obtained from any other Moody's deponent about "plaintiffs' reliance on ratings, Moody's shortcomings in its structured finance ratings, and the causes of plaintiffs' losses."[38]  In a statement to the Securities and Exchange Commission ("SEC"), McDaniel explained that "in the structured finance market, there is insufficient public information" for investors to "reasonably develop their own informed opinions."[39]  He further acknowledged that "the lack of current information regarding structured finance products and the underlying pools of assets can hinder the efforts of secondary market purchasers to make informed investment decisions."[40]  In addition, in August of 2007, McDaniel

---

[37]     Dkt. No. 249 at 3.  *Accord* 5/16/11 Hearing Tr. at 39.  The original denial of plaintiffs' request was based in large part on his status as an "apex" witness as well as heightened good cause requirements for deposing witnesses who exceed the allotted number of depositions.

[38]     Pl. Mem. at 17-18.

[39]     4/15/09 Statement of Raymond W. McDaniel CEO and President, Moody's Investor Service Before the SEC at 2, Ex. 10 to Alvarado Decl.

[40]     *Id.* at n.16.

opined about the accuracy of Moody's ratings, and the role of the rating agencies in the "recent downgrades of some [RMBS] and CDOs."[41]  Although McDaniel offers no testimony directly about the Cheyne SIV or SIVs in general, his statements regarding reliance and loss causation are directly relevant to plaintiffs' case and to rebutting certain defenses that defendants have raised.  Defendants argue that this knowledge is not unique but have not pointed to another witness who has made similar admissions.

If defendants are willing to stipulate that the Moody's CEO made these statements, I will admit the statements at trial but will not require McDaniel to appear in light of plaintiffs' failure to renew their request to depose him, his "apex" witness status, and the absence of any evidence of direct knowledge regarding the falsity statements at issue in this case.[42]  However, if defendants are not willing to stipulate, plaintiffs will be permitted to conduct a limited examination of McDaniel at trial.

---

[41]     8/31/07 Draft Q&A with Ray McDaniel (based on institutional investor teleconference on 8/22/07), Ex. 12 to Alvarado Decl.

[42]     Plaintiffs do not point to any statements McDaniel made that would be probative of the questions of knowledge or falsity, as opposed to reliance or loss causation.  For example, the testimony plaintiffs seek regarding a document addressing "Credit Policy Issues at Moody's," which defendants state was drafted by Moody's Chief Credit Officer, not McDaniel, contains highly generalized statements about market dynamics and market pressures not relevant to proving falsity or scienter.

### 2.      Plaintiffs' Request to Call William Harrington

From 1999-2010, William Harrington was an analyst in Moody's

Derivatives Group where he analyzed, amongst other things, CDOs. There is no

evidence that he had any connection with the Cheyne SIV.  Plaintiffs seek

Harrington's testimony about a statement he made to the SEC in August 2010 in

which he relayed a conversation with another Moody's employee who stated that

"nothing about SIVs added up.  In rating SIVs analysts ran the SIV tool and

presented the output to Henry Tabe, their manager.  Mr. Tabe then disregarded the

output and made up haircuts that were palatable to SIV issuers."[43]

I previously held that Harrington's proposed testimony was likely

double hearsay, but stated that he could be deposed if he appeared on the final trial

witness list.[44]  Plaintiffs argue that the statement is admissible under Federal Rule

of Evidence 801(d)(2)(D) as the statement of a party opponent because it was made

by a Moody's employee within the scope of employment.[45]  Plaintiffs will be

permitted to depose Harrington and, if his testimony reveals that the statement is

---

[43]     Pl. Mem. at 24 (quoting Dkt. No. 437-22, Tab 152 at 56).  This
testimony is clearly relevant as it concerns Moody's practices with respect to rating
SIVs such as Cheyne.

[44]     *See* Pl. Mem. at 24.

[45]     *See id.*

admissible (as a hearsay exception) he will be permitted to testify regarding the statement at trial.[46]

### C.   Evidence Concerning Morgan Stanley Unrelated to the Structuring of the Cheyne SIV

In order to prove their aiding and abetting fraud claim against Morgan Stanley, plaintiffs must prove that Morgan Stanley had "actual knowledge" that the ratings misrepresented the creditworthiness of the Cheyne SIV.[47]  In addition plaintiffs must show that Morgan Stanley"substantially assisted" the Rating Agencies in making these misrepresentations.[48]

#### 1.   Evidence Regarding Morgan Stanley's Warehouse Work

Defendants argue that "because [employees who worked on the warehouse facility] were not involved in the ratings process, their work . . . is

---

[46]   *See Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 128-29 (2d Cir. 2005) ("In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a sufficient foundation by establishing (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency") (internation quotation omitted).

[47]   *Abu Dhabi* SJ Op., 888 F. Supp. 2d at 445.  *Accord Chemtex LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007) (aiding and abetting liability requires actual knowledge of the primary wrong).  The applicable law set forth in Part IV.B. regarding corporate knowledge applies equally to the aiding and abetting claim against Morgan Stanley.

[48]   *Abu Dhabi* SJ Op., 888 F. Supp. 2d at 445.

entirely irrelevant to whether Morgan Stanley had actual knowledge of or substantially assisted in the Rating Agencies' alleged fraud."[49]  However, the inquiry into Morgan Stanley's state of mind for the purposes of aiding and abetting liability is not limited to the individuals on the structuring team.  The evidence makes clear that the structurers, the sales team, and the individuals in the warehouse were in communication and shared responsibility and credit for the successful launch of the Cheyne SIV.[50]  Evidence of what the warehouse team knew and was doing is within the scope of the issues raised at this trial and is therefore admissible.

### 2.    Evidence Regarding Morgan Stanley's Securitization Business

Plaintiffs argue that "evidence demonstrating that the same Morgan Stanley employees who worked on the Cheyne SIV knew its underlying assets,

---

[49]    Def. Mem. at 20.  Plaintiffs list three witnesses whose role in the Cheyne SIV related to the warehouse facility: Howard Hubler, Brett Kalesky, and Erik Siegel.  *See id.*

[50]    *See, e.g.*, 4/19/05 Internal Morgan Stanley Email at MS_001423106, Ex. 4 to Alvarado Opp. Decl. (email between warehouse people and cc'ing analysts working directly on the Cheyne SIV discussing approving exceptions for warehouse assets to let Cheyne "know that we [Morgan Stanley] love them"); 8/5/05 Internal Morgan Stanley Email from Greg Drennan (analyst on the Cheyne SIV), Ex. 4 to Alvarado Opp. Decl. (thanking warehouse people for their "help in getting this Cheyne deal over the line"); *see id.* (listing "everybody that has contributed to [the Cheyne transaction]" including Hubler, Kalesky and Siegel).

particularly its risky HELs, were filled with toxic subprime loans is relevant to Morgan Stanley's knowledge of the underlying fraud."[51]  Specifically, plaintiffs contend that Morgan Stanley employees Steven Shapiro and Frank Telesca had knowledge of the quality of HELs – Cheyne SIV's largest and riskiest asset class – and worked on the Morgan Stanley desk that was "responsible for approving the assets to be purchased into the Cheyne SIV warehouse," which was headed by Howard Hubler.[52]

   While the knowledge of the individuals at Morgan Stanley *who worked on the Cheyne SIV* about the quality of the underlying assets is relevant to their knowledge of the primary violation,[53] plaintiffs have offered no evidence that Shapiro or Telesca ever worked on the Cheyne SIV or communicated their knowledge to individuals who did, including Hubler.  Absent evidence that these individuals communicated their knowledge to those involved with the Cheyne SIV, their testimony would at most provide circumstantial evidence that the individuals who were *in a position* to "substantially assist" the Rating Agencies' alleged fraud

---

[51]  Pl. Opp. at 16-17.

[52]  *Id.*

[53]  *See supra* Part III.A.  Even if particular assets were not in the Cheyne SIV at the time of the launch, or even ever, they are relevant to Morgan Stanley's knowledge about the *classes* of assets that the Cheyne SIV would contain, and, whether the ratings of the Cheyne SIV accurately reflected creditworthiness.

had knowledge that assets in the Cheyne portfolio were high-risk.

Such testimony is too attenuated from the key issue – whether individuals who were involved with or ultimately responsible for Morgan Stanley's work on the Cheyne SIV had actual knowledge that the ratings were false.  The potential for complicating and prolonging this already complex trial outweighs the potential value of this testimony.[54]

### 3.    Evidence of Morgan Stanley's Loan Level Due Diligence

Defendants argue that evidence of Morgan Stanley's loan-level due diligence is irrelevant because it "was not conducted in connection with the Cheyne SIV transaction (much less the Cheyne SIV ratings at issue in this case)" and "was not conducted by or communicated to the Morgan Stanley Cheyne SIV structuring team."[55]  Plaintiffs do not dispute that Anton Peterson, a Florida-based Morgan Stanley employee who oversaw loan-level due diligence had no connection with the Cheyne SIV, nor have they produced evidence that he

---

[54]    If plaintiffs can establish, through their examination of Hubler or otherwise, that Shapiro and Telesca were directly or indirectly involved with the Cheyne SIV during the relevant time period, *or* if Hubler or the individuals at Morgan Stanley who *did* work on the Cheyne SIV disclaim knowledge regarding the quality of the underlying assets, I may revisit my ruling excluding Shapiro and Telesca.

[55]    Def. Mem. at 16.

communicated with Morgan Stanley personnel involved in the Cheyne SIV.[56]

While Morgan Stanley's work securitizing the types of assets that ultimately made

up the Cheyne portfolio is potentially probative of its knowledge of the fraud, an

independent inquiry into the complex nature of the due diligence underlying the

purchase of loans that were eventually securitized is too attenuated from the ratings

of the Cheyne SIV Notes.[57]

### D.    Evidence of Defendants' Revenue Unrelated to the Cheyne SIV

Defendants seek to exclude "evidence regarding defendants' general

corporate wealth or revenue earned unrelated to rating the Cheyne SIV" and argue

that "the desire to maximize revenue from a product . . . is irrelevant to

demonstrating each rating committee's state of mind."[58]  Plaintiffs respond that

"evidence demonstrating defendants' structured finance revenue during the

relevant time period" is relevant to proving "that defendants had [a] motive to issue

---

[56]    In their explanation of the relevance of Anton Peterson's testimony,
plaintiffs explain that Peterson "testified regarding the due diligence process for
subprime loans Morgan Stanley purchased and later securitized into HELs."
Appendix A to Alvarado Opp. Decl. at 9.  Peterson testified that once the due
diligence process was completed, "the traders (Steven Shapiro or Frank Telesca)
would ultimately make the purchase decision for Morgan Stanley."  *Id.*

[57]    For the same reason, I will not permit plaintiffs to call Vicki Beal, an
employee of Clayton Holdings, Morgan Stanley's outside due diligence provider.
*See* Appendix A to Alvarado Opp. Decl. at 1.

[58]    Def. Mem. at 22.

poor quality securities with inflated ratings."[59]

In addressing the issue of defendants' revenue in a conference, I stated that I was disinclined to allow generalized evidence of defendants' profits, but that I would permit evidence of the Cheyne SIV fee structure in comparison to other fee structures.[60]  Evidence of how the fees and incentives for the Cheyne SIV differed from fees for ratings of other structures is relevant because one of plaintiffs' arguments is that the fee structure was a motivating factor in the alleged fraud.[61]  Evidence that the Rating Agencies experienced pressure during the relevant time period to issue favorable ratings on the Cheyne SIV is also relevant.  However, generalized evidence of the volume of ratings and record revenues, and evidence of Rating Agency executives' compensation generally as opposed to with respect to the Cheyne SIV threatens to make this a trial of the Rating Agencies structured finance practices in general and as they related to the financial meltdown.  The

---

[59]    Pl. Opp. at 22.

[60]    *See* 11/12/12 Hearing Tr. at 55-58.  I agreed that the evidence should be in terms of percentages rather than as a quantum of income.  *See id.*

[61]    Defendants argue that plaintiffs should be precluded from arguing to the jury that S&P received three times its normal corporate rating fees for rating the Cheyne SIV because the only evidence of this is double hearsay.  *See* Def. Mem. at 22 n.11.  Of course, if the evidence is inadmissible hearsay, plaintiffs will not be permitted to introduce it.  However, to the extent that the evidence is admissible, it will not be precluded on grounds of relevance or prejudice.

probative value of such evidence to the question of motive is outweighed by the potential for prejudice and will not be admitted.

### E. After-the-Fact Testimony, Reports and Other Lawsuits Against Defendants Not Relating to Cheyne Activities

As I have already held, after-the-fact testimony stating what defendants knew and did during the relevant time period is admissible.[62]  In contrast, evidence of what defendants realized in hindsight is not relevant to proving fraud.[63]

### 1. After-the-Fact Testimony Regarding Rating Agencies, Including Government Reports and Lawsuits

The cut-off date for establishing fraud on the part of the Rating Agencies is not the date of the launch of the Cheyne SIV in 2005 but rather the

---

[62]    *See* 11/12/12 Hearing Tr. at 43:2-13 ("If some person testified in 2012 about events in 2007 or '08, that's okay"); *see also REMD Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2002 WL 31780188, at *2 (S.D.N.Y. Dec. 11, 2002) ("simply stating that . . . scienter [is] determined based on the facts at the time of the alleged misstatement does not mean that later occurring evidence is irrelevant").

[63]    *See Abu Dhabi* SJ Op., 888 F. Supp. 2d at 460 ("It is axiomatic that fraud may not be proven by hindsight and that plaintiffs must provide evidence that the ratings were either highly unreasonable or disbelieved by the Rating Agencies at the time they were issued [or reaffirmed].") (citing *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("We have rejected the legitimacy of 'alleging fraud by hindsight.'"); *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 474–75 (S.D.N.Y. 2010) (granting summary judgment due to a lack of evidence that defendants "connected the dots that plaintiffs now connect" in hindsight).

25

time period during which the Rating Agencies maintained responsibility for reviewing and updating the ratings, and during which plaintiffs purchased the Cheyne Notes, allegedly in reliance on those ratings. The Rating Agencies maintained their ratings until the Cheyne SIV collapsed, and represented to investors that they monitored those ratings on a weekly basis. Evidence of what the Rating Agencies knew throughout this period is relevant, and the fact that testimony is given after-the-fact is not preclusive.

Defendants seek to exclude "evidence of government reports and investigation, and their underlying testimony, exploring the causes of the unprecedented financial crisis" on the grounds that they are irrelevant, inadmissible hearsay, and more prejudicial than probative.[64] The Senate Report in question was "'the product of a two-year bipartisan investigation by the U.S. Senate Permanent Subcommittee on Investigations into the origins of the 2008 financial crisis.'"[65]

Plaintiffs argue that the evidence is not inadmissible hearsay,[66] but they fail to refute defendants' arguments that the Report, as a whole, is irrelevant and, to the extent that it has any relevance to the alleged fraud at issue here, more

---

[64]    Def. Mem. at 23.

[65]    Pl. Opp. at 25 (quoting Senate Report at 1).

[66]    *See id.*

prejudicial than probative.  Particularly in light of my unwillingness to let this trial

become an inquiry into the role of the Rating Agencies in the financial crisis,

reports undertaking that very inquiry, with the benefit of hindsight not legally

available to the jury in making its findings, are irrelevant and would prejudice the

jury.[67]  However, the testimony of parties in this case before government agencies

discussing relevant events during the relevant time period and memorialized in the

reports may be admissible and I will evaluate the admissibility of specific

statements as the need arises.[68]  References to other lawsuits including their factual

allegations and evidence are also inadmissible.[69]

---

[67]   *See, e.g.*, *City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981) (report was properly excluded under Fed. R. Evid. 403 because the "likelihood that it would confuse the jury and protract the proceedings outweighed its probative value"); *In re September 11 Litig.*, 621 F. Supp. 2d 131, 157-58 (S.D.N.Y. 2009) (holding that, notwithstanding its potential relevance and admissibility as non-hearsay "[t]he 9/11 Report, in contrast to its specific findings . . . poses considerable dangers of confusion, prejudice, and undue delay").

[68]   *See In re September 11 Litig.*, 621 F. Supp. 2d at 157-58 ("Although specific statements may be relevant, useful, and admissible, admitting longer sections of the report would cause the trial to digress into innumerable arguments relating to myriad issues, causing undue prejudice, extensive delay, and confusion. Fed.R.Evid. 403.").

[69]   See *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("courts are reluctant to cloud the issues in the case at trial by admitting evidence relating to previous litigation involving one or both of the same parties") (internal citation omitted); *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 330 (S.D.N.Y. 2009) ("any probative value of references to [other litigations] is substantially outweighed by the risk of unfair prejudice, confusion of the issues,

### 2.  Evidence Concerning Morgan Stanley Post-Dating the Structuring of the SIV

As with the Rating Agencies, the relevant time period for proving aiding and abetting fraud against Morgan Stanley is the period during which Morgan Stanley could have substantially assisted the Rating Agencies in issuing false ratings of the Cheyne SIV.  Morgan Stanley's role as structurer did not end with the launch of the Cheyne SIV, and it had continuing dialogue with the Rating Agencies and Cheyne throughout the life of the SIV.  Therefore, evidence of what Morgan Stanley knew regarding the accuracy of the ratings post-launch, and its role in the alleged continued falsification of the ratings is relevant to the aiding and abetting claims against it.  In addition, Morgan Stanley marketed the Cheyne SIV Notes to investors, including plaintiffs, well after the launch in 2005.  Evidence of what it represented to plaintiffs about the ratings at this time, in light of what it knew about the Cheyne SIV, is also relevant to the remaining negligent misrepresentation claims.[70]

### F.  Evidence Relating to Treatment of HELs as LEAs

---

misleading the jury, and waste of time under FRE 403").

[70]   For example the testimony of Ralph Al Raheb, a member of Morgan Stanley's sales force who marketed the Cheyne SIV to Abu Dhabi Commercial Bank is highly relevant to the negligent misrepresentation claim and reliance, and may be introduced in Phase II.  *See* Appendix A to Alvarado Opp. Decl. at 1.

28

Defendants seek to preclude "evidence concerning the classification of HELs as LEAs" on the ground that "such classification had no effect whatsoever on the outcome of the Cheyne SIV or on plaintiffs' losses."[71]  Although plaintiffs do not cite any evidence in their motions *in limine* to support their allegation that "[a]fter successfully persuading the rating agencies to allow the Cheyne SIV to even purchase HELs in the first place . . . Morgan Stanley pressured the rating agencies to allow the Cheyne SIV to treat HELs as LEAs for important liquidity tests,"[72] such evidence, if it exists, would be relevant to proving aiding and abetting against Morgan Stanley.[73]  To the extent that plaintiffs contend that this misclassification caused their losses, if they have evidence that this is the case they will be able to introduce it and defendants will be permitted to submit evidence to the contrary.

### G.    Evidence of Plaintiffs' Investments in Other Structured Finance Instruments

Defendants argue that "plaintiffs' sophistication is [a] factor [in proving reasonable and actual reliance]" and evidence of their "experience

---

[71]    Def. Mem. at 26.

[72]    Pl. Opp. at 29.

[73]    Of course, if plaintiffs have no evidence to support this then they will not be able to raise it and defendants' concerns will be unfounded.

investing in structured finance products is relevant to demonstrating their

sophistication."[74]  For example, defendants cite evidence that one plaintiff invested

with thirty-three of the thirty-six HEL issuers included in the Cheyne SIV and

claimed "deep expertise in the sectors where Cheyne has both the greatest volume

and the greatest volatilities."[75]

In Phase I of the trial, plaintiffs will have the opportunity to prove that

the subject of the alleged misrepresentations, which plaintiffs insist are inextricably

related to the underlying assets in the Cheyne SIV,[76] were within the peculiar

knowledge of defendants, and defendants will be entitled to submit evidence to the

contrary.[77]  To the extent that plaintiffs argue that the quality of the underlying

assets of the Cheyne SIV is one of the things that made the ratings false (in

addition to insufficient structural protections and factors specific to the Cheyne

SIV), plaintiffs' knowledge of the quality of the underlying assets at the time they

---

[74]     Def. Opp. at 19 (citing, *inter alia*, *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider . . . the sophistication of the parties")).

[75]     11/5/07 Memorandum from Ty Danco of Securities Finance Trust Co. ("SFT") re: Cheyne Manager Position, Ex. 10 to Ringel Opp. Decl. (arguing that SFT should "be able to compete for a liquidation type manager position").

[76]     *See* Pl. Mem. at 1-10.

[77]     *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508, 2013 WL 664176 (S.D.N.Y. Feb. 25, 2013) (order bifurcating trial).

invested is relevant to defeating plaintiffs' proof of peculiar knowledge.[78]  In

addition, if plaintiffs are unsuccessful in establishing peculiar knowledge, they will

have to prove that they performed adequate due diligence to render their reliance

on the ratings reasonable.  Plaintiffs' experience with investments in the

underlying asset classes that made up the Cheyne SIV may be relevant to whether

plaintiffs' diligence was "commensurate with their level of sophistication"[79] and

may be admitted for that purpose if the need arises.

      However, evidence that plaintiffs invested in lower-rated and unrated

structured finance securities *generally* is not probative of whether they actually

relied on the ratings in investing in the *Cheyne SIV*.  Plaintiffs may have had

different criteria for other investments.  Nor will I admit evidence regarding

plaintiffs' other investments to rebut loss causation.  Although defendants will be

entitled to submit evidence that a market-wide collapse caused plaintiffs' losses, an

inquiry into plaintiffs' other investments is a more prejudicial than probative

method of refuting loss causation.

## IV.  OTHER EVIDENTIARY ISSUES

---

[78]  *See DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 369 n.55
(S.D.N.Y. 1999) ("In general, the more sophisticated the buyer, the less accessible
must be the information.").

[79]  *Crigger*, 443 F.3d at 236.

31

A.     **Testimony of Plaintiffs' Witnesses on Subjects About Which Their 30(b)(6) Designees Disclaimed Knowledge**

Defendants argue that plaintiffs should be precluded from calling witnesses to testify as to key subjects about which their Rule 30(b)(6) corporate representatives disclaimed knowledge, thereby frustrating defendants' attempt to get discovery regarding the basis for plaintiffs' investment decisions.[80]  Defendants rely on *Reilly v. Natwest Markets Group Inc.*, in which the Second Circuit affirmed a district court's preclusion of fact witnesses on the ground that "when a party fails to comply with Rule 30(b)(6), Rule 37 allows courts to impose various sanctions, including the preclusion of evidence."[81]  The readily distinguishable facts of that case and others in which courts have found such sanctions appropriate confirm that such sanctions are not warranted here.[82]

_____

[80]     *See* Def. Mem. at 27-28.  Specifically, defendants seek to preclude Ty Danco (SFT), Marianne Medora (Commerzbank), Ted Liao (Sinopac),and Massood Zafar (GIB).  *See id.* at 29.

[81]     181 F.3d 253, 269 (2d Cir. 1999).

[82]     *See, e.g.*, *Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007) (sanctions warranted where Rule 30(b)(6) witness's performance amounted to a non-appearance); *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 07 Civ. 930, 2009 WL 3270794, at *3 (S.D.N.Y. Oct. 13, 2009) (sanctions warranted where 30(b)(6) witnesses neither had personal knowledge of matters noticed nor took any steps to inform themselves with corporate knowledge).  *See also Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 40 (S.D.N.Y. 2009) (denying request for sanctions where "there [was] no suggestion that [plaintiff's] counsel ever attempted in good faith to seek

Defendants have not established that plaintiffs' Rule 30(b)(6) witnesses failed to adequately prepare,[83] that plaintiffs failed to make available individuals with relevant knowledge, or that defendants would be prejudiced by the designation of additional witnesses.[84]  To the contrary, plaintiffs' 30(b)(6) witnesses possessed knowledge of the relevant information and either prepared by speaking with the very additional witnesses designated to testify or were prevented from doing so.[85]  Defendants may depose any new witness before trial if they so

---

additional Rule 30(b)(6) testimony").

[83]    *See EEOC v. American Intern. Group., Inc.*, No. 93 Civ. 6390, 1994 WL 376052, at *3 (S.D.N.Y. July 18, 1994) (finding that corporate designees were not egregiously deficient where each exhibited specific knowledge of key issues identified by the notice, despite lacking knowledge on certain topics); *see also Crawford*, 261 F.R.D. at 40 (same).

[84]    *See Reilly*, 181 F.3d at 269 ("In assessing the propriety of a district court's preclusion of witness testimony, we consider the following factors: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance").

[85]    SFT's designee, Joseph Picariello testified comprehensively and "consistently identified Ty Danco – whose name appears no fewer than 80 times in Mr. Picariello's deposition – as a witness with knowledge of SFT[]'s policies, practices and reasons for purchasing Cheyne note."  Pl. Opp. at 28.  GIB's designee, Yaser Humaidan, selected the Cheyne SIV Notes and prepared the investment analysis proposal.  *See id.* He provided multiple examples of the information relied upon in the bank's decision to invest in the Cheyne SIV.  *See id.* (citing Humaidan Deposition at 21:10-22:2, Ex. 13 to Alvarado Opp. Decl. ("Like I said, we – we relied on the pitch book. We relied on the investor summary.").

33

choose to avoid any prejudice.

### B.   Evidence and Testimony from Previously Identified Experts Who Have Not Been Designated to Testify at Trial

Plaintiffs move to preclude defendants from introducing evidence or testimony from plaintiffs' experts who were retained in connection with plaintiffs' motion for class certification to opine on the issue of reliance.[86]  Neither party will be permitted to present evidence or testimony from opponents' experts who opponents have not designated to testify at trial except, if necessary, on rebuttal.[87]

---

Commerzbank's 30(b)(6) designee, Sascha Klaus spoke with employees directly involved in the Cheyne SIV investment, including Marianne Medora, who was the primary decision-maker in connection with Commerzbank's purchase of Cheyne SIV Notes, and provided examples of the information that the investment committee had relied upon in approving the Cheyne SIV investment.  *See id.* (citing Klaus Deposition  at 71:17-23; 324:24-325:2; 329:5-9; 357:24-358:8, Ex. 12 to Alvarado Opp. Decl.).  Although SinoPac's designee, James Chen, was not personally involved in SinoPac's decision to invest in the Cheyne SIV, he sought help in preparing for his deposition from Ted Liao, who was in charge of approving the investment, but who was no longer employed at Sinopac and refused to participate.  *See id.* (citing Chen Deposition at 9:3-8; 10:7-16; 11:10-24, Ex. 13 to Alvarado Opp. Decl.).  Ted Liao has now agreed to testify on behalf of plaintiffs. *See id.*

[86]   Specifically plaintiffs seek to preclude "any evidence relating to [David Mordecai and Christopher Cox], including deposition testimony, declarations, reports, exhibits or analyses."  Pl. Mem. at 13.

[87]   Defendants agree to this limitation.  *See* Def. Opp. at 21.  The parties need not show exceptional circumstances in order to admit testimony, on rebuttal, of experts previously designated.  *See Agron v. Trustees of Columbia Univ. in City of New York*, 176 F.R.D. 445, 449 (S.D.N.Y. 1997) (discussing Rule 26(b)(4)(B)).  Rather, this evidence is governed by the Federal Rules of Evidence and will be

### C.    Admissibility of Documents Produced in the *King County* Action

I have stated that all documents produced in the *King County* action prior to the discovery cut-off date in this case could be used at trial, but that documents produced after the cut-off would be inadmissible for purposes other than impeachment.[88]  Plaintiffs now seek to introduce ninety-seven documents produced in *King County* after the discovery cut-off in this case on the ground that most of the documents are now public records and all of the documents are responsive to document requests in this case and should have been produced.[89]  I decline to revisit my prior ruling regarding documents produced after the discovery cut-off date.[90]  However, if plaintiffs can establish that documents produced in *King County* after the discovery cut-off in this case were directly responsive to

---

admitted only if relevant and non-cumulative.  *See id.* The "if necessary" qualification cannot be determined at this time.  I will revisit this motion if and when the need arises.

[88]    *See* 4/19/11 Hearing Tr. at 67-68 (stating that such documents will be allowed only if they are "impeaching of something you've already been told or something somebody said under oath").

[89]    *See* Pl. Mem. at 15.

[90]    The documents that are public records solely because they were produced in connection with plaintiffs' summary judgment motion in *King County* are not admissible on that basis.  The justification for my original limitation was that plaintiffs should not be able to make an end-run around the discovery cut-off in this case.

document requests in this case *and* are relevant, those documents will be admitted.[91]

## V.    CONCLUSION

In light of the foregoing, my rulings on the motions *in limine* are as follows: (1) the Rating Agencies' valuation of the assets that Cheyne was authorized to purchase is relevant to determining their beliefs regarding the creditworthiness of the Cheyne SIV Notes; (2) the relevant knowledge is not limited to that of the individuals who directly authored the Cheyne SIV ratings, but may be possessed by any employee to whom issuance of the statements by the Rating Agencies are attributable, and testimony of individuals at the Rating Agencies who were not associated with the Cheyne SIV may provide circumstantial evidence of the actual knowledge of individuals responsible for the Cheyne SIV ratings; (3) plaintiffs' requests to call Raymond McDaniel is denied subject to defendants' willingness to stipulate as to certain statements; (4) plaintiffs' may depose William Harrington to determine whether the subject of his proposed testimony is admissible; (5) evidence of Morgan Stanley's loan diligence

---

[91]    Plaintiffs should invoke this sparingly.  As I explained in an April 19, 2011 hearing, plaintiffs "can't just import the King County discovery into a case where discovery has been closed by framing a question differently, maybe better . . . and getting even more."  4/19/11 Hearing Tr. at 68.  At the same time, defendants should not benefit from their failure to produce relevant documents that were within the scope of plaintiffs' document requests.

and securitization practices is irrelevant unless it can be linked to individuals
involved in the structuring of the Cheyne SIV, but evidence regarding Morgan
Stanley's warehouse financing is relevant; (5) generalized evidence of defendants'
ratings profits is inadmissible, but evidence comparing the Cheyne SIV fees with
other fee structures is relevant; (6) after-the-fact testimony regarding what
defendants knew during the relevant time period is admissible, including testimony
given in government reports, but the reports will not be admitted as a whole, nor
will evidence of other lawsuits; (7) evidence that Morgan Stanley pressured the
Rating Agencies to treat HELs as LEAs is relevant; (8) evidence of plaintiffs'
investments in the types of securities that composed the Cheyne SIV may be
relevant to the issues of peculiar knowledge and reliance; (9) no sanctions
preventing plaintiffs from offering witness testimony beyond that given by
30(b)(6) witnesses are warranted; (10) neither party will be permitted to present
evidence or testimony from opponents' experts who are not designated to testify at
trial except, if necessary, on rebuttal; (11) documents produced in *King County*
after the discovery cut-off are inadmissible for purposes other than impeachment
unless plaintiffs can establish that they were directly responsive to document
requests in this case and are otherwise admissible.

   In accordance with these rulings, plaintiffs will be permitted to call

Ralph Al Raheb, Brian Clarkson, Ty Danco, Kai Gilkes, Howard Hubler, Brett Kalesky, Navindu Katugampola, Noel Kirnon, Ted Liao, Marianne Medora, Erik Siegel, and Massood Zafar.  William Harrington will be permitted to testify subject to the determination that his testimony is not hearsay.  Plaintiffs will not be permitted to call Vicki Beal, Jerome Fons, Raymond McDaniel (subject to stipulation), Anton Peterson, Steven Shapiro, or Frank Telesca.  Jason Rowe will be permitted to testify only to rebut statements made by Kai Gilkes.  While I will not preclude Mark Froeba, Thomas Gillis, Richard Gugliada, Eric Kolchinsky, Warren Kornfeld, Richard Michalek, Terry Osterweil, Frank Parisi, Jonathan Polansky, Frank Raiter, David Teicher, and Elwyn Wong based on the subject matter of their testimony, I will not have twelve witnesses testify cumulatively about grandfathering, market pressures or any other topic.[92]  I assume that based on this Opinion plaintiffs will be able to eliminate a number of these witnesses.  If not, I will hear argument again directed to this group of witnesses.  The Clerk is directed to close these motions (Dkt. Nos. 540, 546).

---

[92]    These witnesses potentially fall within my ruling that testimony of individuals at the Rating Agencies who were not associated with the Cheyne SIV may provide circumstantial evidence of the actual knowledge of individuals responsible for the Cheyne SIV ratings *if* that knowledge relates to the relevant time period.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
            March 20, 2013

**- Appearances -**

**For Plaintiffs:**

Patrick J. Coughlin, Esq.
Daniel S. Drosman, Esq.
Jessica T. Shinnefield, Esq.
Jarrett S. Charo, Esq.
Darryl J. Alvarado, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
(619) 231-1058

Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Luke O. Brooks, Esq.
Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
(415) 288-4545

**Additional Attorneys for Plaintiff State Board of Administration of Florida:**

Marc I. Gross, Esq.
Tamar A. Weinrib, Esq.
Pomertantz Haudek Grossman & Gross LLP
100 Park Avenue
New York, NY 10017
(212) 661-1100

**For Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co.**

**International Limited:**

James P. Rouhandeh, Esq.
Antonio J. Perez-Marques, Esq.
William R. Miller, Jr., Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**For Defendants Moody's Investors Service, Incorporated and Moody's Investors Service Limited:**

Joshua M. Rubins, Esq.
James J. Coster, Esq.
Mario Aieta, Esq.
James I. Doty, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY 10169
(212) 818-9200

Mark A. Kirsch, Esq.
Christopher M. Joralemon, Esq.
Joel M. Cohen, Esq.
Lawrence J. Zweifach, Esq.
Mary K. Dunning, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 48th Floor
New York, NY 10166
(212) 351-5391

**For Defendants Standard & Poor's Rating Services and The McGraw-Hill Companies, Incorporated:**

Floyd Abrams, Esq.
Dean I. Ringel, Esq.
Charles A. Gilman, Esq.

Tammy L. Roy, Esq.
Jason M. Hall, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
(212) 701-3000