UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ABU DHABI COMMERCIAL BANK, et al., Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br>  vs.<br><br>MORGAN STANLEY & CO. INCORPORATED, et al.,<br><br>       Defendants. | Civil Action No. 1:08-cv-07508-SAS-DCF<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS DEUTSCHE POSTBANK AG'S AND BANK SINOPAC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION OF THE COURT'S MARCH 6, 2013 ORDER ON MORGAN STANLEY'S MOTION FOR SUMMARY JUDGMENT |

823679_1

I.      INTRODUCTION

Plaintiffs Deutsche Postbank AG ("Postbank") and Bank SinoPac ("SinoPac") respectfully move pursuant to Southern District of New York Local Rule 6.3 ("Local Rule 6.3") for reconsideration of the Court's March 6, 2013 Opinion and Order dismissing Postbank's and SinoPac's negligent misrepresentation claims. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, No. 08 Civ. 7508 (SAS), 2013 WL 837536, at *6 (S.D.N.Y. Mar. 6, 2013).

Motions for reconsideration are governed by Local Rule 6.3 and are left to the sound discretion of the court. "A motion for reconsideration is appropriate where "'the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463(SAS), 2012 WL 1450420, at *1 (S.D.N.Y. Apr. 23, 2012). A motion for reconsideration may also be granted to ""'correct a clear error or prevent manifest injustice.'"" *Id.*

In the Order, the Court held that,

> Postbank . . . and . . . SinoPac . . . have not put forth evidence beyond generic communications regarding potential investment in the Cheyne SIV over a period of a couple of months. None of these communications suggest that Morgan Stanley was any more than a typical Placement Agent, an intermediary between Cheyne and the potential investors.

*Abu Dhabi*, 2013 WL 837536, at *6. Reconsideration should be granted because, in reaching this conclusion, the Court overlooked evidence submitted by Postbank and SinoPac and failed to ""'constru[e] all the evidence in the light most favorable to [SinoPac and Postbank] and draw[] all reasonable inferences in that party's favor.'"" *Id*. at *2.

First, although the Court held there were only "generic communications" between Morgan Stanley and Postbank and SinoPac that spanned "a period of a couple months" (*id.* at *6), the evidence submitted in plaintiffs' opposition brief establishes that there were more than 80 e-mails

- 1 -

823679_1

regarding the Cheyne SIV between Morgan Stanley and Postbank over a year-and-a-half period and 170 e-mails between Morgan Stanley and SinoPac regarding the Cheyne SIV over a two-year period. *See* Dkt. No. 530, Tab 8.[1] The evidence shows that Morgan Stanley persistently e-mailed, called, and met in-person with Postbank and SinoPac in order to tout the SIV's benefits, including Morgan Stanley's role in the deal, and procure Postbank's and SinoPac's investment. Morgan Stanley's aggressive solicitation resulted in multiple purchases of Mezzanine Capital Notes ("MCNs") – one by SinoPac and three separate purchases by Postbank. Dkt. Nos. 530, 532-533, Tabs 8 (Alvarado Decl., Ex. 1), 61-62, 81-84, 88, 96.

Second, the communications between Morgan Stanley and Postbank and SinoPac were far from generic. Rather, Morgan Stanley prepared and transmitted to Postbank and SinoPac individualized and targeted e-mails and memoranda concerning the Cheyne SIV. *Id.* In peddling Cheyne SIV notes to Postbank and SinoPac, Morgan Stanley touted its role as Arranger, emphasized the SIV's ratings and the purported high quality and structural innovations of the SIV, and highlighted the fact that Morgan Stanley's fees were payable from the profits of the Cheyne SIV in order to convey that Morgan Stanley had a vested interest in the SIV. *Id.* As a result, Morgan

---

[1] Due to page and exhibit limitations, plaintiffs submitted excerpted versions of many documents in their summary judgment opposition. For the Court's convenience, plaintiffs will submit full versions of the documents re-cited herein on an iBrief. Additionally, plaintiffs cited multiple communications between Morgan Stanley and the plaintiffs on Tab 8, attached to the Corrected Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to Defendants Morgan Stanley & Co. Incorporated's and Morgan Stanley & Co. International Limited's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) (Dkt. No. 530). For the Court's convenience, plaintiffs have segregated the communications between Morgan Stanley and Postbank and SinoPac that were originally cited on Tab 8 into a separate table. *See* Declaration of Darryl J. Alvarado in Support of Plaintiffs Deutsche Postbank AG'S and Bank SinoPac's Motion for Reconsideration of the Court's March 6, 2013 Order on Morgan Stanley's Motion for Summary Judgment ("Alvarado Decl."), Ex. 1. These documents will be hyperlinked on the iBrief.

Stanley "'appeared to possess – and held [itself] out as possessing – special knowledge about the SIV, . . . knew that [Postbank and SinoPac] sought information about [the ratings] to aid their investment decision and [ ] supplied it for that purpose.'" *Abu Dhabi*, 2013 WL 837536, at *6.

This evidence creates a triable issue of fact as to the existence of a special relationship between Postbank and SinoPac and Morgan Stanley. Accordingly, Postbank's and SinoPac's motion for reconsideration should be granted and their negligent misrepresentation claims reinstated.

## II.     MORGAN STANLEY OWED POSTBANK A DUTY

The Court's holding that "[t]he only evidence plaintiffs put forth regarding the relationship between Morgan Stanley and Postbank are *internal* Morgan Stanley emails discussing a meeting as part of a roadshow," overlooked key evidence. *Abu Dhabi*, 2013 WL 837536, at *6 n.76. In fact, ***Postbank and Morgan Stanley exchanged over 80 e-mails***, spoke on conference calls, and met in-person on multiple occasions over the course of more than a year concerning the Cheyne SIV. *See* Dkt. Nos. 530, 532, Tabs 8 (Alvarado Decl., Ex. 1), 63-64. Morgan Stanley's targeting efforts paid off: Postbank purchased Cheyne SIV notes on three separate occasions totaling $57.5 million.

In October 2005, Morgan Stanley sent Postbank Cheyne SIV marketing materials, including "updated IRR [Internal Rates of Return] figures, portfolio composition and capital structure added in the appendix," emphasizing the purported high-quality nature of the SIV and its structural protections. Dkt. No. 532, Tab 63. Morgan Stanley added a customized appendix to the marketing material sent to Postbank – Appendix F – wherein Morgan Stanley conveyed to Postbank that it could structure the Cheyne SIV notes to the needs of Postbank. *Id*. at MS_001518257 ("Cheyne Finance offers a customized maturity of Capital Notes."). Indeed, Morgan Stanley ultimately customized Postbank's Cheyne SIV note investments. Specifically, Morgan Stanley structured an option for Postbank whereby Postbank's Cheyne SIV note would pay "7yr spread throughout, and

- 3 -

[Postbank] would have a one-off put after 4yrs." Alvarado Decl., Ex. 1, Doc. No. 387 at MS_001520848. Without such customization, Postbank would not have been able to purchase the notes. In the same e-mail exchange regarding the Cheyne note customization, Morgan Stanley allayed Postbank's concern about the possible termination of Cheyne SIV's administrator, QSR, assuring Postbank that "there is a number of alternative service providers with whom Cheyne has an existing relationship and therefore we are confident that we can readily transfer the settlements function" and stating "[Morgan Stanley] can currently perform the risk management function in house." Id. "[A]n issue of fact exists where Morgan Stanley acted as more than a mere agent of the Issuer and 'appeared to possess – and held [itself] out as possessing – special knowledge about the [SIV], . . . knew that plaintiffs sought information about [the ratings] to aid their investment decision and [ ] supplied it for that purpose.'" *Abu Dhabi*, 2013 WL 837536, at *6.

In the marketing materials Morgan Stanley sent to Postbank, Morgan Stanley assured Postbank that the Cheyne SIV's mark-to-market risk was mitigated because "[c]apital levels are sized to cover expected market value losses arising from [g]eneral market spread widening, [a]sset downgrade driven spread widening, [l]iquidation losses resulting from forced sales, [and] [d]efaults." Dkt. No. 532, Tab 63 at MS_001518029. The materials also emphasized the benefit of "daily compliance with detailed rating agency requirements" and "daily reporting and asset mark to markets, reported weekly to rating agencies and reviewed monthly by external auditors." *Id.* at MS_001518028. Two weeks later, Morgan Stanley sent Postbank an individualized spreadsheet entitled "Cheyne Finance Portfolio – as of 30 Sep 2005 – sent to Postbank.xls," describing the SIV's asset holdings. *See* Alvarado Decl., Ex. 1, Doc. No. 357.

Morgan Stanley also explained that Morgan Stanley's fees would derive, in part, from the SIV's profits, stating that "[t]he Senior Management Fee . . . will be paid to a receivables trust, to be

applied . . . to Morgan Stanley" and that "[a]lthough Morgan Stanley will receive a proportion of the Senior Management Fees, these fees are for ongoing and deferred structuring and placement services . . . ." Dkt. No. 532, Tab 63 at MS_001518227.  Where, as here, "there is evidence that in soliciting [Postbank's] investments Morgan Stanley emphasized its dual role as structurer and Placement Agent, including that it received structuring and placement fees from the Issuer that came from the profits of the SIV," a special relationship exists.  *Abu Dhabi*, 2013 WL 837536, at \*6.

Moreover, Morgan Stanley participated in several conference calls and meetings with Postbank.  *See, e.g.*, Dkt. No. 532, Tabs 61-62.  In December 2005, for example, Morgan Stanley's lead Cheyne SIV structurer, Gregg Drennan, participated in a conference call with Postbank in order to explain the SIV's "compliance tests and capital adequacy" requirements.  Alvarado Decl., Ex. 1, Doc. No. 436 at MS_001520898.  Postbank testified that it "had various discussions, especially early on with Morgan Stanley, among others, with Ms. Diana Feizer . . . , Loren Gerald, **Gregg Drennan**, Eric Ha."  *See* Dkt. No. 525, Ex. 17 at 173:4-7.  Morgan Stanley also provided Postbank with non-public pricing information and updated Postbank on its Cheyne SIV investments: "Morgan Stanley delivered us prices for the evaluation of the capital notes, and the amount of that price, of course, represents an assessment on the quality of the SIV and our specific note."  *Id.* at 170:18-22. Postbank testified:

> This was a commitment that was made by Morgan Stanley, this evaluation of positions . . . the price of which you cannot just learn from . . . a service like Bloomberg, for example.  But that was very important to us, to learn also the prices of those.  And Morgan Stanley had made that commitment, and they did indeed give us this information on a regular basis during the term of the investment.

*Id.* at 172:5-14.  In addition, Postbank continued to "receive[] new information memoranda on a regular basis" from Morgan Stanley.  *Id.* at 167:20-24.

Subsequent to Postbank's 2005 and 2006 Cheyne SIV investments, in January 2007, Morgan Stanley met with Postbank at an investment conference in Las Vegas in an effort to procure further investment. *See* Alvarado Decl., Ex. 1 at Doc. No. 741; *see also id.* at Doc. No. 747. Morgan Stanley's efforts paid off – Postbank made a third investment in Cheyne SIV notes four weeks later. *See* Dkt. No. 525, Ex. 23, ¶23. The evidence of "additional overtures after [Postbank] initially invested, touting the success of the SIV to encourage further investment," establishes a special relationship between Morgan Stanley and Postbank. *Abu Dhabi*, 2013 WL 837536, at *6. As such, the Court should reconsider its Order dismissing Postbank's negligent misrepresentation claims against Morgan Stanley.

### III. MORGAN STANLEY OWED SINOPAC A DUTY

Prior to SinoPac's October 2005 purchase of Cheyne SIV notes, Morgan Stanley and SinoPac exchanged **nearly 100 e-mails** concerning the Cheyne SIV. Through those communications, Morgan Stanley touted the Cheyne SIV's portfolio as "compris[ed] . . . of highly rated structured finance assets" and Cheyne Capital Management as having "over 60 years of combined experience." Dkt. No. 533, Tab 79 at MS_001508298. In a special write-up prepared specifically for SinoPac, Morgan Stanley emphasized the Cheyne SIV's purported high quality, stating that "[o]ver 80% of the portfolio [would] be invested in ABS rated AA or higher" and that such securities have "superior rating stability" and "lower expected default rates and higher expected recovery rates" vis-à-vis corporate credits. *Id.*, Tab 85 at MS_001508424. The memorandum also touted the Cheyne SIV's simulation model, which, of course, was built by Morgan Stanley, stating that it would "be run weekly . . . to monitor [the] stability of Mezzanine Capital Note Ratings." *Id.*

Morgan Stanley sent SinoPac multiple individualized memoranda in an effort to procure SinoPac's investment. For example, in a memorandum from Morgan Stanley to SinoPac entitled

"Cheyne Finance Combo Capital Note," Morgan Stanley responded to SinoPac's inquiries regarding the mark-to-market risk faced by the Cheyne SIV and advised that SinoPac could invest in derivative instruments to hedge against such mark-to-market risks. *Id.*, Tab 82 at MS_001508449. Morgan Stanley, however, assured SinoPac that there was "no reason to" purchase such a hedge given the ability to raise excess capital. *Id.* With the presence of excess capital, Morgan Stanley assured, "the market value risk really becomes more of a theoretical than a real risk." *Id.*

Moreover, in another memorandum entitled "Memo to Bank Sinopac," Morgan Stanley again reassured SinoPac that mark-to-market risk was remote, stating: "In order to try to ensure that Cheyne Finance will hold an appropriate level of capital to guard against MTM [mark-to-market] movements, Cheyne Finance has seven different capital matrices for different ABS classes, including a CDO capital matrix which has been sized with specific reference to market price analysis across the CDO market." *Id.*, Tab 96 at MS_000015180. Morgan Stanley emphasized that such capital matrices were "a feature atypical to more traditional SIV vehicles where one capital matrix . . . based on corporate data . . . is utilized to determine capital allocation for all assets in the SIV portfolio." *Id.* At the same time Morgan Stanley touted the Cheyne SIV's unique capital matrices, or haircuts, in an effort to convince SinoPac to purchase Cheyne notes, it knew that those matrices were based on insufficient data. *See* Dkt. No. 529 at 2-3. The insufficiency of these matrices ultimately failed to guard against the mark-to-market risk specifically flagged by SinoPac. *Id.*

The individualized memoranda Morgan Stanley prepared for and sent to SinoPac were far from generic. Rather, they were tailored to assuage SinoPac's specific concerns about the risk of the Cheyne SIV in a (successful) effort to procure SinoPac's investment. Notably, the customized and targeted nature of Morgan Stanley's representations to SinoPac are indistinguishable from those the Court found probative in finding an issue of fact as to Morgan Stanley's special relationship with

plaintiffs ADCB, Commerzbank, GIB, NACF, NZ Funds, and Bank Hapoalim. *See Abu Dhabi*, 2013 WL 837536, at *6 n.70-75.[2]

In finding that Morgan Stanley's and SinoPac's interaction was generic and only spanned the course of a few months, the Court overlooked evidence establishing that, as early as January 2005 – 10 months before SinoPac ultimately purchased Cheyne notes – Morgan Stanley began soliciting SinoPac's investment. *See* Dkt. No. 533, Tab 84. In an August 2005 e-mail, a Morgan Stanley sales representative responsible for covering SinoPac urged the Morgan Stanley employees who structured the Cheyne SIV, including Gregg Drennan and Rany Moubarak: "we have been working SO hard to get things done on this deal and get a client who gave us an ioi [indication of interest] on the single a's in ***jan of this year***. . . . ***We've spent so much time and relationship capital*** and the client has finally said okay to looking at bbb's." *Id.* Morgan Stanley's nearly 10 months of "time and relationship capital" spent convincing SinoPac to invest in the Cheyne SIV resulted in SinoPac's $4.29 million investment.[3]

Additionally, in finding that SinoPac had not proffered evidence that Morgan Stanley made "any particular representation about its own role in the SIV" (*Abu Dhabi*, 2013 WL 837536, at *6 n.77), the Court overlooked cited evidence demonstrating that in July 2005 and again in October

---

[2] For example, Morgan Stanley sent SinoPac a memorandum concerning the benefits that an investment in the Cheyne SIV had over other, similar investments, entitled "SIV vs. CDO." *See* Dkt. No. 533, Tab 79. This is the same memorandum the Court found probative in finding a special relationship between Morgan Stanley and NACF. *See Abu Dhabi*, 2013 WL 837536, at *6 n.73 (citing Tab 46).

[3] The Court found similar evidence of internal Morgan Stanley discussions concerning Morgan Stanley's relationship with Bank Hapoalim created an issue of fact as to the existence of a special relationship. *See Abu Dhabi*, 2013 WL 837536, at *6 n.75 ("Morgan Stanley stated that it 'built a relationship [at Hapoalim] and got him involved in transactions such as the Cheyne SIV.'").

- 8 -

823679_1

2005, Morgan Stanley sent SinoPac a presentation explaining that the SIV's profits "will be paid to a receivables trust and a portion of such fees will be paid by the Receivables Trustee to Morgan Stanley . . . in respect of ongoing and deferred structuring and placement services." Dkt. No. 533, Tab 88 at MS_001557369; *see also id.*, Tab 79 at MS_001508394. Here, as with Postbank, "there is evidence that in soliciting [SinoPac's] investments Morgan Stanley emphasized its dual role as structurer and Placement Agent, including that it received structuring and placement fees from the Issuer that came from the profits of the SIV." *Abu Dhabi*, 2013 WL 837536, at *6. Such evidence establishes a disputed fact as to the existence of a special relationship between Morgan Stanley and SinoPac.

Finally, subsequent to Sinopac's investment, Morgan Stanley continued to make overtures to SinoPac in October 2005 and again in January 2006 in an effort to secure additional Cheyne SIV investments. *See, e.g.*, Dkt. No. 533, Tab 88; *see also* Dkt. No. 530, Tab 8 (Alvarado Decl., Ex. 1) at Doc. No. 465. Where, as here, SinoPac has "proffered evidence that Morgan Stanley affirmatively solicited their investment, made numerous in-person, email and telephone communications over significant periods of time, provided individualized memoranda and, in some cases made additional overtures after plaintiffs initially invested, touting the success of the SIV to encourage further investment," an issue of fact exists as to whether a special relationship existed between Morgan Stanley and SinoPac. *Abu Dhabi*, 2013 WL 837536, at *6.

## IV.  CONCLUSION

For the foregoing reasons, the Court should grant Postbank's and SinoPac's motion for reconsideration and reinstate Postbank's and SinoPac's negligent misrepresentation claims.

- 9 -

823679_1

| | |
|---|---|
| DATED:  March 20, 2013 | Respectfully submitted, |

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL J. DOWD
DANIEL S. DROSMAN
DARRYL J. ALVARADO
ANGEL P. LAU
HILLARY B. STAKEM


              s/ DARRYL J. ALVARADO
              DARRYL J. ALVARADO

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
miked@rgrdlaw.com
dand@rgrdlaw.com
dalvarado@rgrdlaw.com
alau@rgrdlaw.com
hstakem@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
JASON C. DAVIS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
lukeb@rgrdlaw.com
jdavis@rgrdlaw.com

Attorneys for Plaintiffs

- 10 -

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
MARC I. GROSS
TAMAR A. WEINRIB
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
taweinrib@pomlaw.com

Additional Attorneys for Plaintiff State Board of Administration of Florida

CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 20, 2013.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
&  DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dalvarado@rgrdlaw.com

823679_1

**Mailing Information for a Case 1:08-cv-07508-SAS-DCF**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Mario Aieta**
  maieta@ssbb.com,managingclerk@ssbb.com,marioaieta@gmail.com,dgerard@ssbb.com

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **X Jay Alvarez**
  jaya@rgrdlaw.com

- **Greg Donald Andres**
  greg.andres@davispolk.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com

- **Gina Marie Castellano**
  gina.castellano@davispolk.com

- **Dai Wai Chin Feman**
  dchinfeman@ssbb.com

- **Joel M. Cohen**
  jcohen@gibsondunn.com,aarias@gibsondunn.com,mkdunning@gibsondunn.com,snurhussein@gibsondunn.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,jillk@rgrdlaw.com,E_File_SD@rgrdlaw.com,nlindell@rgrdlaw.com,tholindrake@rgrdlaw.com,kcook@rgrdlaw.com

- **Mary K Dunning**
  mkdunning@gibsondunn.com,dwolber@gibsondunn.com,mkatz@gibsondunn.com,aarias@gibsondunn.com,arublin@gibsondunn.com,pwade@gibsondunn.com,cdieng

- **Jessica Lynn Freese**
  jessica.freese@davispolk.com

- **Charles Alan Gilman**
  cgilman@cahill.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Goutam Umesh Jois**
  gjois@gibsondunn.com

- **Christopher Michael Joralemon**
  cjoralemon@gibsondunn.com,aarias@gibsondunn.com

- **Mark Adam Kirsch**
  mkirsch@gibsondunn.com,aarias@gibsondunn.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Jeffrey B. Korn**
  jkorn@willkie.com,maosdny@willkie.com

- **Angel P. Lau**
  alau@rgrdlaw.com

- **William Ross Miller , Jr**
  william.miller@dpw.com,ecf.ct.papers@dpw.com

- **Paul Steel Mishkin**
  paul.mishkin@dpw.com

- **Tariq Mundiya**
  maosdny@willkie.com,jsim@willkie.com,tmundiya@willkie.com

- **Lucas F. Olts**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David Owen**
  dowen@cahill.com

- **Antonio Jorge Perez-Marques**
  antonio.perez@dpw.com,ecf.ct.papers@dpw.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Christopher Joseph Roche**
  croche@kaplanrice.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Tammy Lynn Roy**
  troy@cahill.com,ndelutri@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com,jdoty@ssbb.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew Dickens Schlichter**
  andrew.schlichter@dpw.com

- **Jessica T. Shinnefield**
  jshinnefield@rgrdlaw.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com

- **Tamar Aliza Weinrib**
  taweinrib@pomlaw.com

- **Robert Frank Wise , Jr**
  rwise@dpw.com,ecf.ct.papers@dpw.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

- **Lawrence Jay Zweifach**
  lzweifach@gibsondunn.com,aarias@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David C. Walton
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101
```