UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ABU DHABI COMMERCIAL BANK, et al.,

        Plaintiffs,

   - against –

MORGAN STANLEY & CO. INC., et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

08 Civ. No 7508 (SAS)

**ECF Case**

# DEFENDANTS MORGAN STANLEY & CO. INCORPORATED'S AND MORGAN STANLEY & CO. INTERNATIONAL LIMITED'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS DEUTSCHE POSTBANK AF'S AND BANK SINOPAC'S MOTION TO RECONSIDER SUMMARY JUDGMENT ORDER

James P. Rouhandeh
Antonio J. Perez-Marques
Paul S. Mishkin
Jessica L. Freese
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000
*Counsel to Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited*

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................1

I. Postbank's and SinoPac's Supposedly "Overlooked" Evidence Does Not Indicate a "Special Relationship" with Morgan Stanley ...................................................................1

    A. Postbank ...........................................................................................................................3

    B. SinoPac .............................................................................................................................6

II. The Disclaimers Here Independently Require Dismissal of Postbank's and SinoPac's Claims ..................................................................................................................8

CONCLUSION ...............................................................................................................................10

**PRELIMINARY STATEMENT**

The Court should deny the motion of plaintiffs Deutsche Postbank AG ("Postbank") and Bank SinoPac ("SinoPac") to reconsider the Court's March 6, 2013 decision dismissing their negligent misrepresentation claims. The Court correctly ruled that there is insufficient evidence for a jury to conclude that Postbank and SinoPac had anything other than an arm's-length, commercial relationship with Morgan Stanley falling far short of the "exceptional," fiduciary-like "special relationship" required for negligent misrepresentation. None of the supposedly "overlooked" evidence identified by Postbank or SinoPac is inconsistent with that determination.

Moreover, the disclaimers received by Postbank and SinoPac went far beyond the disclaimers of "representations" that the Court previously held to be insufficient to bar plaintiffs' negligent misrepresentation claims. Postbank and SinoPac also received disclaimers explaining that Morgan Stanley would not be "verif[ying]" the accuracy or completeness of any statements in the offering documents, "updating" the information contained therein, or "undertaking" to "advise any investor in the Capital Notes of any information coming to [its] attention." These disclaimers preclude the negligent misrepresentation claims of Postbank and SinoPac as a matter of law because they go to the heart of, and negate, the requisite duty – an obligation to impart correct and complete information.

**ARGUMENT**

I. **Postbank's and SinoPac's Supposedly "Overlooked" Evidence Does Not Indicate a "Special Relationship" with Morgan Stanley**

The Court dismissed the negligent misrepresentation claims of Postbank and SinoPac because their communications with Morgan Stanley indicated nothing more than arm's-length dealing with a typical placement agent, not the "exceptional" "special relationship" required for negligent misrepresentation. (Mar. 6, 2013 Opinion and Order, Dkt. No. 584 ("Opinion") at 27-

28.)  The Court expressly rejected as insufficient the evidence put forward by Postbank and SinoPac, including evidence regarding Morgan Stanley's fees and substantial expenditures of time and "relationship capital" in attempting to sell the Cheyne SIV notes; Morgan Stanley's arranging of investor meetings and calls, and its dissemination of information regarding the Cheyne SIV; and other evidence consistent with standard arm's-length dealing incapable of supporting the required special relationship.  (*Id.* at 27-28 & nn.76-77.)  Where, as here, there was no evidence that Morgan Stanley "acted as more than a mere agent of the Issuer and 'appeared to possess – and held [itself] out as possessing – special knowledge about the [SIV],'" there was no triable issue of fact and the negligent misrepresentation claims of Postbank and SinoPac were properly dismissed.  (*Id.* at 24.)

      Plaintiffs' primary argument for reconsideration is that they had *more* communications with Morgan Stanley, and over a longer time period, than referenced in the Court's decision.  (Pls.' Mem. at 1-3, 5-6, 8-9.)  The premise of this argument is that volume and repetition can substitute for the required nature and quality of evidence required to establish a "special relationship."  That is not the law, and the Court said nothing of the kind in its decision.  Long-term negotiations involving repeated communications are hallmarks of arm's-length dealing between sophisticated parties, not an indicator of anything "exceptional."  Indeed, the New York Court of Appeals has refused to find a "special relationship" between parties that communicated repeatedly over the course of decades.  *Murphy v. Kuhn*, 660 N.Y.S.2d 371, 374 (1997).  Accordingly, evidence that Postbank exchanged "more than 80 e-mails" with Morgan Stanley "over a year-and-a-half period," or that SinoPac and Morgan Stanley exchanged "170 e-mails" "over a two-year period" (Pls.' Mem. at 1-2) is meaningless unless the *substance* of those communications is "exceptional" and provides a "high level" of evidence distinguishing the

interactions from standard arm's-length dealing.  *Murphy*, 660 N.Y.S.2d at 374.[1]

As discussed below, the required substance is utterly lacking for Postbank and SinoPac. The Court already rejected as insufficient the evidence these plaintiffs identified in opposition to defendants' summary judgment motion, which the Court expressly invited plaintiffs to supplement, both before and during oral argument on the motion.  (*See* Ex. 1,[2] Email from E. Barron to Counsel dated Feb. 25, 2013; Ex. 2, Hr'g Tr. Feb. 26, 2013 at 12:6-11.)  Postbank and SinoPac now urge the Court to reach a different result based on:  (i) the same documents they previously cited and which the Court rejected as insufficient; and (ii) a handful of additional, materially indistinguishable documents that they did not deem worthy of mention in their opposition brief or in response to the Court's invitation to identify additional evidence.  After multiple opportunities, Postbank and SinoPac are still unable to identify evidence supporting their negligent misrepresentation claims, and the Court should reject them once again.

A. **Postbank**

Most of the Postbank documents summarized in plaintiffs' brief are precisely the type of generic communications the Court already found do *not* indicate a "special relationship." Plaintiffs describe, for example:

- Postbank's receipt of the Capital Notes Marketing Book (Dkt. No. 532, Tab 63). (Pls.' Mem. at 3, 4, 5.)  This was a standard document made available to all potential

---

[1] Plaintiffs disregard this basic rule when they seek, once again, to oppose summary judgment based on "an exhaustive list of communications" with Morgan Stanley reflected in a lengthy chart lacking any substantive descriptions of the communications or any basis for concluding that they indicate an "exceptional," fiduciary-like "special relationship" with Morgan Stanley. (Dkt. No. 532, Tab 8; Ex. 2 at 12:12-21; Alvarado Decl. Exh. 1; Pls.' Mem. at 2 n.1, 3-6, 9.) Plaintiffs must specifically direct the Court to evidence in support of their claims, not dump a large discovery record on the Court and ask the Court to search for support that they do not identify themselves.  Plaintiffs have repeatedly failed to satisfy that burden.

[2] "Ex." refers to exhibits to the Declaration of James P. Rouhandeh submitted herewith.

capital note investors. In sharing it with Postbank, Morgan Stanley was simply "passing along generic information from Cheyne and the Rating Agencies," which the Court held does not create a "special relationship." (Opinion at 28 n.77.)[3]

- Postbank's receipt of generic Cheyne portfolio and investor reports, indicating on their face that they came from Cheyne and were simply forwarded by Morgan Stanley (Dkt. No. 532, Tab 64; Ex. 7, Alvarado Decl. Exh. 1 at Doc. No. 357). (Pls.' Mem. at 3, 4.) The Court held that Morgan Stanley's acting as an information conduit for Cheyne does not create a "special relationship." (Opinion at 28, n.77.)[4]

- A request by Postbank for a call with Cheyne and a member of the Morgan Stanley structuring team (Ex. 8, Alvarado Exh. 1, Doc. No. 436). (Pls.' Mem. at 5.) The Court held that Morgan Stanley's arranging of this type of information call does not create a "special relationship." (Opinion at 27 n.76.)

- Morgan Stanley's arranging of a meeting between Postbank and Cheyne (Ex. 9, Alvarado Exh. 1, Doc. No. 741). (Pls.' Mem. at 6.) The Court held that Morgan Stanley's arranging of this type of meeting does not create a "special relationship." (Opinion at 27 n.26.)[5]

- Morgan Stanley's plan to meet with Postbank as part of a roadshow and arranging a call between Postbank and Cheyne. (Dkt. No. 532, Tabs 61 and 62.) The Court expressly considered these very same documents in its decision and found that "[i]nternal Morgan Stanley emails discussing a meeting as part of a roadshow" and a "call it arranged between Postbank and Cheyne" were insufficient to support a finding of a "special relationship." (Opinion at 27 n.76 (citing Dkt. No. 532, Tabs 61 and 62).)

---

[3] Plaintiffs mischaracterize Appendix F to the Marketing Book as a "customized appendix" provided specially for Postbank. (Pls.' Mem. at 3.) To the contrary, an identical appendix was included in the generic Marketing Book available to all potential capital note investors. *See, e.g.*, Ex. 3, at -7031, -7099 (instructing that Marketing Book including Appendix F could be forwarded to investors generally); Ex. 4, at -5340, -5517 (sent by blast email to more than 100 recipients); Ex. 5 at -2264, -2507 (sent to Brittania); Ex. 6, at -2019, -2262 (sent to Nationwide).

[4] Plaintiffs mischaracterize the Cheyne portfolio report included with Doc. No. 357 as an "individualized spreadsheet." (Pls.' Mem. at 4.) As reflected on the face of the spreadsheet, the information it contained was prepared by Cheyne and simply passed along by Morgan Stanley. The only "individualized" characteristic of the spreadsheet identified by plaintiffs is that the electronic file was renamed to include the suffix "sent to Postbank." (*Id.*)

[5] Plaintiffs characterize this document as referring to a meeting with Morgan Stanley (Pls.' Mem. at 6), when in fact the email refers to Morgan Stanley setting up a meeting with Cheyne Capital. *See also* Ex. 10, Alvarado Exh. 1, Doc. No. 747).

Postbank's efforts to identify different evidence not already rejected by the Court are unavailing. Postbank argues that Morgan Stanley "customized Postbank's Cheyne SIV note investments" by altering the investment to meet Postbank's specifications. (Pls.' Mem. at 3.) To the extent this has any relevance whatsoever, it contradicts Postbank's argument: an investor's ability to demand and obtain terms different than those originally offered shows the investor's sophistication and self-reliance, not a fiduciary-like relationship of trust and confidence. Postbank also argues that Morgan Stanley "emphasized its dual role as structurer and Placement Agent" as part of its solicitation of Postbank (Pls.' Mem. at 5), but attempts to support that assertion solely by citing a fee disclosure contained in the generic Marketing Book, which stated that Morgan Stanley would receive a portion of the senior management fees (*id.* at 4-5). Standard disclosure language provided to all investors does not indicate that Morgan Stanley touted or "emphasized" its dual role in its interactions with Postbank.[6]

The remainder of Postbank's arguments rest on mischaracterizations of the Court's decision and misstatements of applicable law. Postbank argues, for example, that standard placement agent activities such as answering investor questions, providing price information,[7] or "touting the success of the SIV to encourage further investment" are indicative of the required "exceptional," fiduciary-like relationship. (Pls.' Mem. at 4, 5, 6.) If that were the law, "any

---

[6] Morgan Stanley respectfully disagrees with the Court's ruling that emphasis of Morgan Stanley's dual role could, in any event, support the existence of a "special relationship." (Opinion at 24-25.) Morgan Stanley preserves all objections to the claims at issue here.

[7] Plaintiffs mischaracterize Postbank's testimony as supposedly stating that Morgan Stanley provided Postbank with "non-public" pricing information. (Pls.' Mem. at 5.) To the contrary, Postbank testified regarding its receipt of *public* information from Morgan Stanley. (Dkt. No. 525, Exh. 17 at 171:17-20 ("We believed that [Morgan Stanley] [was] supposed to give us information that was *publicly available* and specifically information on the prices of our note.") (emphasis added).)

Placement Agent would be liable and the word 'exceptional' in *Kimmell* would be rendered meaningless." (Opinion at 28.)

### B. SinoPac

SinoPac also now seeks to rely on the same types of documents previously rejected by the Court. It discusses, for example:

- SinoPac's receipt of a generic marketing summary email and other deal summary information (Dkt. No. 533, Tabs 79, 85). (Pls.' Mem. at 6.) It was precisely this type of "passing along [of] generic information from Cheyne and the Rating Agencies" that the Court already deemed insufficient to create a "special relationship." (Opinion at 28 n.77.)[8] Indeed, the Court specifically referenced Tab 79 in rejecting SinoPac's claim. (*Id.*)

- SinoPac's receipt of the Capital Notes Marketing Book (Dkt. No. 533, Tab 88). (Pls.' Mem. at 9.) As the Court found, dissemination of standard marketing materials does not begin to suggest the required "special relationship." (Opinion at 28 n.77.)

- Morgan Stanley's internal email referencing "time and relationship capital" spent securing SinoPac's investment (Dkt. No. 533, Tab 84). The Court already expressly considered and rejected the argument that this document is suggestive of a "special relationship." (Opinion at 28 n.77 (citing Dkt. No. 533, Tab 84).)[9]

SinoPac also claims that it received "multiple individualized memoranda" from Morgan Stanley (Pls.' Mem. at 6), but the evidence it cites does not support that claim, nor does it suggest an "exceptional" relationship. The supposedly "individualized" "Memo to Bank SinoPac" (*id.* at 7) conveyed information obtained from Cheyne and was identical to memos

---

[8] Plaintiffs refer to Tab 85 as a "special write-up prepared specifically for SinoPac" (Pls.' Mem. at 6), but there is no evidence to support that assertion. The document simply reflects that Morgan Stanley provided SinoPac with a memo entitled "cheyne(2)," which contains a general transaction summary and other generic transaction information.

[9] SinoPac's argument that Morgan Stanley's efforts continued over a longer time period than reflected in the Court's decision (Pls.' Mem. at 8) is simply a rehash of the flawed argument discussed above that the existence of a "special relationship" turns on the duration and frequency of the parties' dealings. To the contrary, as explained, it is the quality and nature of the parties' interactions, not their quantity, that determines whether the required "exceptional" relationship arises. SinoPac, like Postbank, lacks evidence that such a relationship arose here.

provided to other plaintiffs, except that it contained SinoPac's name in the title.[10]  The supposedly "individualized" memo entitled "SIV vs. CDO" (Pls.' Mem. at 7-8 & n.2) was part of the generic Cheyne SIV marketing package and was provided to various other investors in exactly the same form.[11]  The memo entitled "Cheyne Finance Combo Capital Note" (Pls.' Mem. at 6-7), was an informal, one-page "Q&A" relaying brief answers by email to certain questions posed by SinoPac. (Dkt. No. 533, Tab 82.) Contrary to SinoPac's claim, that email did not purport to advise about a hedging strategy that *SinoPac* could pursue (Pls.' Mem. at 7), but rather explained a theoretical hedging option open to the *Cheyne SIV*, in response to a specific question SinoPac had posed.[12]  While these communications certainly conveyed information to SinoPac, they do not suggest that SinoPac should rely on Morgan Stanley or that SinoPac should refrain from conducting its own diligence, and SinoPac does not allege otherwise.  There is thus no basis to conclude from these communications that Morgan Stanley was "act[ing] as more than a mere agent of the Issuer and 'appeared to possess – and held [itself] out as possessing – special knowledge about the [SIV].'" (Opinion at 24.)[13]

---

[10] *Compare* Dkt. No. 533, Tab 96 (Memo to Bank SinoPac: Cheyne Finance: CDO Bucket) *with, e.g.*, Ex. 11 (Memo to BNP Paribas: Cheyne Finance: CDO Bucket), Ex. 12 (Memo to Commerzbank: Cheyne Finance: CDO Bucket).  The document also expressly warned that it "d[id] not provide individually tailored investment advice." (Dkt. No. 533, Tab 96 at -179.)

[11] *See* Ex. 13 (attaching "SIV vs. CDO" memorandum as part of Cheyne Finance Marketing Package); *compare* Dkt. No. 533, Tab 79 *with, e.g.*, Ex. 14 at -2737 (sent to Allstate); Ex. 15 at -1484 (sent to Dynamic Credit); Ex. 16 at -9758 (sent to Elliot Management); Ex. 17 at -9431 (sent to Evergreen Investments); Ex. 18 at -8133 (sent to Princeton Advisory); Ex. 19 at -1155 (sent to RBC Capital Markets); Ex. 20 at -0794 (sent to Zais Group).

[12] SinoPac appears to read out of context the word "you" in the email's response to Question (d). (Dkt. No. 533, Tab 82.) The question asked about options open to the *Cheyne SIV*, and the answer plainly addressed that question, not a suggested hedging strategy for SinoPac. (*Id.*)

[13] SinoPac also asserts that Morgan Stanley "emphasized its dual role as structurer and Placement Agent," but like Postbank, premises that assertion on nothing more than a disclosure

## II.     The Disclaimers Here Independently Require Dismissal of Postbank's and SinoPac's Claims

Regardless of the interactions that Postbank and SinoPac had with Morgan Stanley, the disclaimers they received negate, as a matter of law, the duty required for a negligent misrepresentation claim.  As the Court explained, negligent misrepresentation is based on a "duty to impart correct – and complete – information." (Opinion at 14 n.45; *see also id.* at 9.) Because the only alleged misstatements here are the allegedly false credit ratings – which are statements of the rating agencies, not Morgan Stanley – the question is whether Morgan Stanley assumed a duty to Postbank and SinoPac to investigate those third-party statements and ensure their accuracy and completeness.  If not, there can be no claim for negligent misrepresentation.

There was no such duty here because the offering documents expressly and repeatedly informed Postbank and SinoPac that Morgan Stanley was *not* assuming a duty to impart correct and complete third-party information.  Beyond the "disclaimers of representations" considered by the Court in its decision (Opinion at 16-18), the offering documents received by Postbank and SinoPac also contained explicit disclaimers of the relevant duty, warning, for example, that:

- Morgan Stanley accepted ***no "responsibility***, express or implied, ***for updating this Information Memorandum*** and therefore it ***should not be assumed*** that the information contained herein is necessarily ***accurate, complete or up-to-date*** at any given time."

- Morgan Stanley ***has not "independently verified*** the information contained herein."

- Morgan Stanley ***did not "undertake to*** . . . ***advise*** any investor in the Capital Notes ***of any information coming to [its] attention***."[14]

The language of these disclaimers makes clear that, in conveying third-party information,

---

contained in the generic Capital Notes Marketing Book.  (Pls.' Mem. at 9; Dkt. No. 533, Tab 79 at MS_001508394, Tab 88 at MS_001557369.)

[14] Ex. 21 at 1-3; Ex. 22 at 1-3.

8

Morgan Stanley was not (on behalf of investors or anyone else) undertaking any obligation to verify the correctness or completeness of that information as of the date it was provided, or to update it later in light of any new information obtained by Morgan Stanley. Indeed, in describing what Morgan Stanley would *not* be doing, the disclaimers track the formulation found in negligent misrepresentation case law, which turns on a duty to impart correct and complete information. The claim that Morgan Stanley assumed the precise duty that it expressly disclaimed is "predestined to result in a directed verdict" for defendants and therefore not sustainable on summary judgment. (Opinion at 7.)

This conclusion is not inconsistent with the Court's ruling regarding "disclaimers of representations" (Opinion at 16-18), because the disclaimers cited above were explicit disclaimers of the relevant *duty*, not a mere statement that Morgan Stanley made no representations in connection with the Cheyne SIV.[15] Postbank and SinoPac were explicitly informed that Morgan Stanley would not be investigating or ensuring the correctness and completeness of the third-party credit ratings. Nothing in the Court's decision indicates that a party undertakes such a duty when it disseminates third-party information, or that explicit disclaimers are insufficient to avoid that duty. To the contrary, the Court repeatedly noted the unique nature of the duty at issue here given that it relates to the alleged inaccuracy of third-party information. (*Id.* at 13-14, 22 n.64.)

The "peculiar knowledge" cases cited by the Court are not to the contrary. (*Id.* at 18

---

[15] A portion of the disclaimer language quoted by the Court also goes beyond a mere disclaimer of representations (Opinion at 17 (quoting disclaimer that Morgan Stanley undertook no obligation to ensure the "accuracy or completeness" of information contained in the Information Memorandum)), but the Court explicitly confined its analysis of this disclaimer solely to whether disclaiming a *representation* negates the requisite duty. (*Id.* at 16-18.)

9

nn.57-58.)  Morgan Stanley is aware of no cases where alleged "peculiar knowledge" was found relevant to the existence of a supposed duty to disseminate accurate and complete third-party information, let alone where alleged "peculiar knowledge" was found to defeat explicit disclaimers that no such duty was undertaken.  *Kimmell* did not involve any disclaimers at all, and as the Court found, *Kimmell* does not support the notion that a duty arises in this case based on alleged specialized knowledge or expertise alone, particularly because the claims here rest on dissemination of allegedly false third-party information.  (*Id.* at 13-14, 22 n.64.)  *Landesbank*, which found disclaimers sufficient to defeat a negligent misrepresentation claim, did not involve explicit disclaimers of an alleged duty to ensure the accuracy of third-party information.  And although *Landesbank* referred to the absence of plausibly alleged "peculiar knowledge," it did so in the context of considering reasonable reliance and not whether a duty existed.  *Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, 478 Fed. App'x 679, 682-83 (2d Cir. Apr. 19, 2012).[16]  Similarly in *Dallas Aerospace*, the Second Circuit dismissed a negligent misrepresentation claim based on disclaimers similar to those here, noting the absence of alleged "special expertise" only insofar as it related to the plaintiff's allegation that it had "relied on" such expertise, not with respect to the threshold duty question.  *Dallas Aerospace, Inc. v. CIS Air Corporation*, 352 F.3d 775, 789 (2d Cir. 2003).

## CONCLUSION

For the foregoing reasons, the motion for reconsideration filed by Postbank and SinoPac should be denied.

---

[16] As the Court has explained, "reasonable reliance" is a separate element of negligent misrepresentation, distinct from the threshold question of whether the "nature of the duty" is such that the defendant is obligated to "speak with care" (Opinion at 10 n.35).

Dated: March 28, 2013
New York, New York

DAVIS POLK & WARDWELL LLP

By:  /s/ James P. Rouhandeh
James P. Rouhandeh
james.rouhandeh@davispolk.com
Antonio J. Perez-Marques
antonio.perez@davispolk.com
Paul S. Mishkin
paul.mishkin@davispolk.com
Jessica L. Freese
jessica.freese@davispolk.com

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

*Counsel to Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited*